UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS,<br><br>     Plaintiff,<br><br> v.<br><br>UNITED STATES OF AMERICA; ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>     Defendant,<br><br> and<br><br>SENATOR WENDY DAVIS, REPRESENTATIVE MARC VEASEY, JOHN JENKINS, VICKI BARGAS, and ROMEO MUÑEZ,<br><br>     Defendant-Intervenors,<br><br> and<br><br>GREG GONZALEZ, LISA AGUILAR, DANIEL LUCIO, VICTOR GARZA, BLANCA GARCIA, JOSEPHINE MARTINEZ, KATRINA TORRES and NINA JO BAKER,<br><br>     Proposed Defendant-Intervenors. | Civil Action No. 1:11-cv-01303 (RMC-TBG-BAH) |

## PROPOSED INTERVENORS' MEMORANDUM
## IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   PROPOSED INTERVENORS .......................................................................... 1

III.  FACTS .............................................................................................................. 4

      A.    Between 2000 and 2010, Texas's Hispanic and African-American Populations Grew Significantly ........................................................ 4

      B.    Texas's Congressional Plan Weakens Minority Voting Strength Statewide .......................................................................................... 4

      C.    The Congressional Redistricting Plan Causes Retrogression in Specific Regions and Directly Affects The Proposed Intervenors .................. 7

IV.  ARGUMENT .................................................................................................... 9

      A.    Intervention as of Right Should Be Granted .................................... 9

            1.    Proposed Intervenors' Motion Is Timely ............................ 10

            2.    Proposed Intervenors Have a Direct Interest in this Case .... 11

            3.    The Disposition of this Case Will Likely Impair Proposed Intervenors' Interests ........................................................ 14

            4.    Proposed Intervenors' Interests Cannot Be Adequately Represented by Existing Parties ......................................... 14

      B.    In the Alternative, Proposed Intervenors Should Be Granted Permissive Intervention .................................................................. 16

V.    CONCLUSION ................................................................................................ 17

70916-0009/LEGAL21435020.2

## I.      INTRODUCTION

Proposed Intervenors are Hispanic and African-American voters who have a direct interest in challenging Texas's purposefully discriminatory redistricting plan and preventing the retrogression of minority voting strength.  They seek intervention because preclearance of the congressional redistricting plan at issue in this action will impair their ability to effectively participate in the electoral process and the existing parties cannot adequately represent their interests.  Alternatively, Proposed Intervenors seek permissive intervention under Fed. R. Civ. P. 24(b) because their defenses share with the main action common questions of law and fact.  Proposed Intervenors submit this motion before Defendant has responded to Plaintiff's Complaint, and intervention will not disrupt the Court's schedule or any existing deadlines.  Proposed Intervenors respectfully request that the Court grant their motion for intervention as of right, or, in the alternative, for permissive intervention.

## II.      PROPOSED INTERVENORS

Greg Gonzales is a Hispanic voter living in San Antonio, Texas.  He currently resides in Congressional District 20 and would continue to live in Congressional District 20 under the proposed congressional redistricting plan, Plan C185 ("Congressional Redistricting Plan").  Mr. Gonzalez requests intervention in order to oppose preclearance of the Congressional Redistricting Plan.  In particular, Mr. Gonzalez seeks to protect his voting rights and those of other minority voters in Congressional District 20 who would suffer retrogression of their voting strength under the Congressional Redistricting Plan.

Lisa Aguilar is a Hispanic voter living in Clint, Texas.  She currently resides in Congressional District 23 and would continue to live in Congressional District 23 under the Congressional Redistricting Plan.  Ms. Aguilar requests intervention in order to oppose preclearance of the Congressional Redistricting Plan.  In particular, Ms. Aguilar seeks to protect her voting rights and those of other minority voters in Congressional District 23 who

70916-0009/LEGAL21435020.2

would suffer retrogression of their voting strength under the Congressional Redistricting Plan.

Daniel Lucio is a Hispanic voter living in Corpus Christi, Texas. He currently resides in Congressional District 27 and would live in Congressional District 27 under the Congressional Redistricting Plan. Mr. Lucio requests intervention in order to protect his voting rights and oppose preclearance of the Congressional Redistricting Plan. In particular, Mr. Lucio intends to show that if precleared, the Congressional Redistricting Plan would dilute the effective voting strength of Hispanic voters currently living in Congressional District 27.

Victor Garza is a Hispanic voter living in San Benito, Texas. He currently resides in Congressional District 27 and would live in Congressional District 34 under the Congressional Redistricting Plan. Mr. Garza requests intervention in order to protect his voting rights and oppose preclearance of the Congressional Redistricting Plan. In particular, Mr. Garza intends to show that if precleared, the Congressional Redistricting Plan would dilute the effective voting strength of Hispanic voters currently living in Congressional District 27.

Blanca Garcia is a Hispanic voter living in Austin, Texas. She currently resides in Congressional District 25 and would live in Congressional District 21 under the Congressional Redistricting Plan. Ms. Garcia requests intervention in order to protect her voting rights and oppose preclearance of the Congressional Redistricting Plan. In particular, Ms. Garcia intends to show that if precleared, the Congressional Redistricting Plan would dilute the effective voting strength of Hispanic voters currently living in Congressional District 25.

Josephine Martinez is a Hispanic voter living in Fort Worth, Texas. She currently resides in Congressional District 12 and would live in Congressional District 26 under the

Congressional Redistricting Plan.  Ms. Martinez requests intervention in order to protect her voting rights and oppose preclearance of the Congressional Redistricting Plan.  In particular, Ms. Martinez seeks to show that the Congressional Redistricting Plan is the product of a discriminatory purpose and has a retrogressive effect because it fails to create a new minority opportunity district in the Dallas-Fort Worth area.

Nina Jo Baker is an African-American voter living in Fort Worth, Texas.  She currently resides in Congressional District 12 and would live in Congressional District 26 under the Congressional Redistricting Plan.  Ms. Baker requests intervention in order to protect her voting rights and oppose preclearance of the Congressional Redistricting Plan.  In particular, Ms. Baker seeks to show that the Congressional Redistricting Plan is the product of a discriminatory purpose and has a retrogressive effect because it fails to create a new minority opportunity district in the Dallas-Fort Worth area.

Katrina Torres is a Hispanic voter living in Irving, Texas.  She currently resides in Congressional District 32 and would live in Congressional District 6 under the Congressional Redistricting Plan.  Ms. Torres requests intervention in order to protect her voting rights and oppose preclearance of the Congressional Redistricting Plan.  In particular, Ms. Torres seeks to show that the Congressional Redistricting Plan is the product of a discriminatory purpose and has a retrogressive effect because it decreases the Hispanic voting age population in Congressional District 32 and fails to create a new minority opportunity district in the Dallas-Fort Worth area.

### III.   FACTS

**A.   Between 2000 and 2010, Texas's Hispanic and African-American Populations Grew Significantly**

In 2000, the Hispanic and Latino ("Hispanic") voting age population in Texas totaled 4,282,901, or 28.6% of the state's total voting age population.[1]  By 2010, this population had grown to 6,143,144—an increase of almost 2 million people—or 33.6% of the total voting age population.  The growth in the Hispanic voting age population accounted for 56% of the total voting age population growth in Texas since 2000.  The African-American voting age population, meanwhile, grew from 1,657,756 in 2000 to 2,128,048 in 2010, accounting for 11.6% of the total voting age population and 14.2% of the growth in the voting age population in the last decade.  Together, the Hispanic and African-American voting age populations now make up 45.2% of the total voting age population in Texas.

Meanwhile, the white, non-Hispanic ("Anglo") voting age population in Texas grew by only 679,076 between 2000 and 2010.  Because of their lower growth rate, Anglos actually decreased as a percentage of the total voting age population, from 57% to 50.4%.

If not for the growth in Texas's Hispanic and African-American populations, Texas would have received at most one additional congressional district after the 2010 Census, but as a direct result of the growth in these populations, Texas instead received four additional congressional districts, increasing from 32 to 36 the number of Texas's seats in the United States House of Representatives.

**B.   Texas's Congressional Plan Weakens Minority Voting Strength Statewide**

On May 31, 2011, the 82nd Texas Legislature convened a special legislative session, during which it enacted a new congressional map.  Minority communities and elected representatives proposed plans that would have provided Texas's growing Hispanic and

---

[1] All figures cited in this Motion and Memorandum can be found at Texas Redistricting, http://www.tlc.state.tx.us/redist/redist.htm (last visited July 28, 2011) or Texas State Data Center, http://txsdc.utsa.edu/txdata/2010/redistrict/ (last visited July 28, 2011).

African-American communities additional opportunities to influence the election of their congressional representatives.  These communities and representatives, however, were largely excluded from the process of redrawing congressional districts, and their proposed plans were rejected.  On June 29, 2011, the special session ended with the Legislature having adopted a new district map for Texas's Congressional delegation.

Texas has a history of racial bloc voting, and the Anglo majority has historically been able to prevent minorities from electing their preferred candidates.  In 2011, Anglos comprised a bare majority of Texas's voting age population and still controlled the Texas legislature and the redistricting process.  Rather than provide the growing Hispanic and African-American populations with the ability to elect candidates of their choice, Texas lawmakers approved the Congressional Redistricting Plan, which reduces Hispanic and African-American voting strength.

The Congressional Redistricting Plan was drawn for the purpose of, and will have the effect of, reducing the voting strength of racial minorities in Texas.  Several aspects of the plan evidence this unlawful purpose and effect.

First, even though Texas's additional congressional seats are almost entirely attributable to growth in its Hispanic and African-American populations, the Congressional Redistricting Plan is designed to ensure that three of the four new seats would be dominated by Anglos.  Texas's Hispanic voting age population grew by 1,860,243 people since 2000, more than enough to create four new congressional districts in which Hispanics comprise at least 60% of the voting age population—a majority likely large enough to consistently elect a preferred candidate.  The Congressional Redistricting Plan, however, would add no such district and only one district where Hispanics comprise a bare majority of the voting age population.  By contrast, the Anglo voting age population grew by only 679,076, yet the

70916-0009/LEGAL21435020.2

Congressional Redistricting Plan would create three additional Anglo-dominated congressional districts.

Second, the Congressional Redistricting Plan not only would guarantee that Anglos would control Texas's new congressional seats, it actually would *reduce* the influence of minority voters statewide.  The plan would decrease the percentage of districts with at least 60% Hispanic voting age population.  Under the benchmark plan,[2] 7 of 32 congressional districts, or 21.9%, have Hispanic voting age populations over 60%.  Texas's new Congressional Redistricting Plan would have 36 congressional districts, but still only 7, or 19.4%, would have Hispanic voting age populations over 60%.

The Congressional Redistricting Plan also would cause retrogression by packing majority-minority districts.  Under the Congressional Redistricting Plan, 4 congressional districts would have combined Hispanic and African-American voting age populations of over 80%, far more than is needed to elect a minority-preferred candidate.  Under the benchmark plan, the Hispanic and African-American voting age population makes up more than 80% of the total voting age population in only 3 districts.  By contrast, not a single congressional district under either plan has a voting age population that is 80% Anglo.  This is not an innocent or accidental result; it is an intentional effort to reduce the number of districts where Hispanic and African-American voters can influence elections.

The Congressional Redistricting Plan further dilutes the voting strength of Hispanics by disproportionately placing them in Anglo-dominated districts.  Under the Congressional Redistricting Plan, 56% of the Hispanic voting age population would live in majority-Anglo districts where Hispanics likely could not elect their preferred candidates.  By vivid contrast,

---

[2] Under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, a redistricting plan cannot be precleared if it causes "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Abrams v. Johnson*, 521 U.S. 74, 95 (1997) (internal quotation marks omitted).  To determine whether the Congressional Redistricting Plan is retrogressive, the Court must compare it to a "benchmark plan." *See id*. at  96.  Here, Proposed Intervenors use the existing congressional districts as the benchmark plan.

83% of voting age Anglos live in majority-Anglo districts and do not suffer from this vote dilution.

The discriminatory purpose and retrogressive effect of the Congressional Redistricting Plan are further evident in its treatment of districts where Hispanics and African-Americans together would be a majority of the voting age population.  Hispanics and African-Americans together comprise over 60% of the voting age population in 10 of 32 congressional districts, or 31.3%, of the benchmark plan.  Under the Congressional Redistricting Plan, Hispanics and African-Americans together would comprise over 60% of the voting age population in only 11 of 36 districts, or 30.6%.  The percentage of minority-dominated districts, therefore, would decrease under the Congressional Redistricting Plan, even though the combined Hispanic and African-American voting age population has grown to 45.2% of the total voting age population.

C.   **The Congressional Redistricting Plan Causes Retrogression in Specific Regions and Directly Affects The Proposed Intervenors**

The Congressional Redistricting Plan's discriminatory purpose and retrogressive effect are particularly acute in certain areas and districts.  For example, under the benchmark plan, Congressional District 20 serves much of San Antonio and is a majority-Hispanic district capable of electing the Hispanic majority's preferred candidates.  The Congressional Redistricting Plan would decrease this district's minority voting age population and threaten the Hispanic majority's ability to elect candidates of its choice.  Proposed Intervenor Gonzalez resides in this district and seeks intervention to challenge this retrogressive proposal.

Congressional District 23 serves El Paso and southwest Texas.  Hispanics comprise more than 60% of the district's voting age population, and the district is effectively a Hispanic opportunity district.  The Congressional Redistricting Plan, however, would redraw the district boundaries to include precincts with high Hispanic populations but low Hispanic

-7-

voter turnout.  It would also cherry-pick precincts with high Anglo population and particularly high voter turnout to turn this Hispanic opportunity district into an Anglo-dominated district come election day.  Proposed Intervenor Aguilar resides in Congressional District 23 and seeks intervention to challenge this retrogressive proposal.

Running along the Gulf Coast in southeast Texas is Congressional District 27.  The Congressional Redistricting Plan proposes to divide the current Congressional District 27 into a new Congressional District 34, located in the southern portion of the current Congressional District 27, and a new Congressional District 27, which would stretch up the Gulf Coast and further inland.  Under the benchmark plan, Congressional District 27 is a Hispanic opportunity district, with Hispanics accounting for 69.2% of the voting age population.  Not only would the Congressional Redistricting Plan alter Congressional District 27 to become an Anglo-dominated district, but it would do so in part by packing minority voters into Congressional District 34, in which Hispanics would account for 79% of the voting age population.  Proposed Intervenors Lucio and Garza reside in Congressional District 27 and seek intervention to challenge this retrogressive proposal.

Congressional District 25 is currently an effective cross-over and coalition district in which the voting age population is divided between Anglos (54.9%) and Hispanic and African-American voters (41.5%) and the minority community has been able to elect its preferred candidates.  The Congressional Redistricting Plan would destroy the coalition in Congressional District 25 and divide its minority communities among surrounding districts, where their voices will be drowned out by Anglo majorities.  Under the Congressional Redistricting Plan, for example, Proposed Intervenor Garcia would switch from Congressional District 25 to Congressional District 21, where 68.3% of the voting age population is Anglo and minority voters will not be able to influence elections.  Proposed Intervenor Garcia seeks intervention to challenge this retrogressive proposal.

70916-0009/LEGAL21435020.2

The Congressional Redistricting Plan would also intentionally avoid creating minority opportunity districts in areas with increased, concentrated Hispanic and African-American populations.  The Dallas-Fort Worth area, for example, has seen tremendous growth in minority populations but, under the Congressional Redistricting Plan, would be home to only one district in which minorities can elect their preferred candidate.  Congressional District 32, in particular, is an Anglo-dominated district but has a quickly growing Hispanic population.  Under the Congressional Redistricting Plan, Hispanics would be moved from Congressional District 32 to other districts to ensure that it remains an Anglo-dominated district.  Proposed Intervenors Martinez, Torres, and Baker seek intervention to show that the failure of the Congressional Redistricting Plan to create additional minority opportunity districts in the Dallas-Fort Worth area demonstrates the discriminatory purpose and retrogressive effect of the Congressional Redistricting Plan.

## IV.   ARGUMENT

### A.   Intervention as of Right Should Be Granted

A party has a right to intervene in an action when, on timely motion, it

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).  The United States Court of Appeals for the D.C. Circuit has interpreted this rule to allow a moving party to intervene as of right when it shows that (1) its motion is timely, (2) it has an interest in the subject of the action, (3) the disposition of the action will impair or impede its ability to protect that interest, and (4) its interest is not adequately represented by existing parties.  *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003).  The Supreme Court has affirmed intervention by voters seeking to protect their rights in Section 5 preclearance cases like this one.  *See Georgia v. Ashcroft*,

539 U.S. 461, 477 (2003).  This Court has already allowed intervention in this case, *see* Order Granting Motion to Intervene, Case No. 11-1303 (August 16, 2011), Dkt. # 11, and regularly allows intervention in similar cases, *see, e.g.*, *Shelby County, Alabama v. Holder*, No. 1:10-cv-00651 (D.D.C., Order Granting Intervention August 25, 2010); *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 33 (D.D.C. 2002) *vacated on other grounds*, 539 U.S. 461 (2003); *North Carolina State Bd. of Elections v. United States*, 208 F. Supp. 2d 14, 17 (D.D.C. 2002) (voter allowed to intervene in Section 5 preclearance case).  *See also Castro County, Tex. v. Crespin*, 101 F.3d 121, 122 (D.C. Cir. 1996) (approving request by intervenor in Section 5 case to reopen case for calculation of attorneys' fees).

## 1.    Proposed Intervenors' Motion Is Timely

"Timeliness is to be judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001).  Here, Plaintiff filed its Complaint on July 19, 2011, and the three-judge panel was designated on July 27, 2011.  Proposed Intervenors file this motion on August 17, 2011—less than one month after the case began and less than three-weeks after the three-judge panel was designated.  Because Proposed Intervenors file this motion for the reasons contemplated by Rule 24, namely to protect their interests, and because very little time has elapsed since the filing of this case, this Motion is timely.  *See, e.g.*, *Karsner v. Lothian*, 532 F.3d 876, 886 (D.C. Cir. 2008) (motion to intervene filed one month after commencement of case is timely); *Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*, 260 F.R.D. 1, 4 (D.D.C. 2009) (memorandum opinion) (motion to intervene filed fifteen months after commencement of litigation is timely); *Me-Wuk Indian Cmty. of the Wilton Rancheria v. Kempthorne*, 246 F.R.D. 315, 319 (D.D.C. 2007) (memorandum

opinion) (motion to intervene filed less than three months after commencement of litigation is timely).

**2.      Proposed Intervenors Have a Direct Interest in this Case**

The "interest" requirement is satisfied if intervention is "compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967).  Parties seeking to protect themselves against racial discrimination alleged in a case have a direct interest that permits intervention.  *See, e.g.*, *Cook v. Boorstin*, 763 F.2d 1462, 1466-68 (D.C. Cir. 1985) (allowing thirty-one employees to intervene in a Title VII racial and sexual discrimination case).  The Congressional Redistricting Plan is the product of a discriminatory purpose and has retrogressive effects.  Proposed Intervenors are Texas voters and members of groups who would be harmed by this plan and historically have been disenfranchised.  They have an interest in protecting their voting rights and in ensuring that the Congressional Redistricting Plan does not weaken their ability to meaningfully participate in the electoral process.

This case will determine whether the Congressional Redistricting Plan satisfies the standard for preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Section 5 requires this Court to deny preclearance unless Texas shows that its Congressional Redistricting Plan "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." *Id.* § 1973c(a).  Any voting change, such as redistricting, "that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of" Section 5.  *Id.* § 1973c(b).

Proposed Intervenors have a direct and substantial interest in showing that the Congressional Redistricting Plan cannot meet the Section 5 standard.  As explained above, the Congressional Redistricting Plan would dilute the voting strength of Hispanic and

-11-

African-American voters statewide by packing them into as few districts as possible, deliberately drawing Texas's additional congressional seats to be controlled by Anglo majorities even though Texas obtained those seats because of minority population growth, and reducing minority voters' influence in districts where they are currently able to elect candidates of their choice.  Proposed Intervenors, as Hispanic and African-American voters in Texas harmed by these changes, have a direct interest in preventing them.

Proposed Intervenors also have an interest in challenging the retrogressive aspects of the Congressional Redistricting Plan on a local level.  For example, Proposed Intervenor Greg Gonzalez, a Hispanic voter in Congressional District 20, requests intervention to prevent the removal of Hispanic voters from his district, which is currently a Hispanic opportunity district but which would see minority voting strength significantly weakened under the Congressional Redistricting Plan.  Similarly, Lisa Aguilar, a Hispanic voter in Congressional District 23, has an interest in preventing the redrawing of her district to include precincts with historically low Hispanic voter turnout, effectively preventing her majority-minority district from being a minority opportunity district.  Blanca Garcia, a Hispanic voter in Congressional District 25, currently has the opportunity to elect her candidate of choice because she lives in a cross-over district where the Anglo and minority populations together vote for minority-preferred candidates.  Under the Congressional Redistricting Plan, however, she will be placed in an Anglo-dominated district where her vote and those of other minority voters will be effectively nullified by the votes of the overwhelming Anglo majority.  Like these voters, the other Proposed Intervenors have a direct interest in preventing the statewide and local retrogressive effects of the Congressional Redistricting Plan.

Proposed Intervenors have a further interest in preventing preclearance of the Congressional Redistricting Plan based on its discriminatory purpose in violation of Section

5 of the Voting Rights Act.  The Congressional Redistricting Plan would pack minority voters into over-crowded minority opportunity districts and would crack districts that were minority opportunity districts under the benchmark plan.  Anglo-dominated districts, meanwhile, are only bolstered under the Congressional Redistricting Plan.  Moreover, many districts in the new plan violate traditional districting principles and are drawn with unusual shapes to manufacture Anglo-dominated districts and dilute minority voting strength.  The Texas lawmakers responsible for the plan were presented with alternative plans and could have chosen one that would not be retrogressive and would create more minority opportunity districts.  They rejected this option and instead chose a plan that would dilute the growing minority population's voting strength.  Proposed Intervenors should be allowed to challenge the Congressional Redistricting Plan as the result of its discriminatory and unlawful purpose.

In short, like minority voters in previous Section 5 cases, Proposed Intervenors have a direct and immediate interest in this case.  *See, e.g.*, *Georgia v. Ashcroft*, 539 U.S.at 477 (affirming intervention in Section 5 case and District Court's finding that "analysis of the . . . Senate redistricting pla[n] identifies interests that are not adequately represented by the existing parties"); *City of Lockhart v. United States*, 460 U.S. 125, 129 (recognizing intervenor in Section 5 case); *Nw. Austin Mun. Ut. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221, 230 (D.D.C. 2008) (recognizing intervenors in Section 5 case), *rev'd and remanded on other grounds sub/nom. Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504 (U.S. 2009); *South Carolina v. United States*, 589 F. Supp. 757, 758 (D.D.C. 1984) (recognizing intervenor in Section 5 case); *City of Port Arthur, Tex. v. United States*, 517 F. Supp. 987, 991 n.2 (D.D.C. 1981) (recognizing intervenors in Section 5 case).[3]

---

[3] When ruling on a motion to intervene, courts in this circuit have combined their analysis of whether a party has standing with their analysis of whether a party meets Rule 24's interest requirement.  *See, e.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d at 731-32 (D.C. Cir. 2003) ("a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution"); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074-76 (D.C. Cir. 1998).  "To establish standing under Article III, a prospective intervenor—like any party—must show: (1) injury-in-fact, (2) causation, and (3) redressability."  *Fund for Animals*, 322 F.3d at 732-

3.      **The Disposition of this Case Will Likely Impair Proposed Intervenors' Interests**

When deciding whether disposition of a case will impair a proposed intervenor's interests, courts look to the "practical consequences" of denying intervention.  *See Fund for Animals*, 322 F.3d at 735; *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 13 (D.D.C. 2010); *Akiachak Native Cmty. v. Dep't of the Interior*, 584 F. Supp. 2d 1, 6-7 (D.D.C. 2008). Denying this motion would prevent Proposed Intervenors from formally challenging the Congressional Redistricting Plan under Section 5's retrogression and discriminatory purpose standards.  It would also deny them an opportunity to defend their voting rights when Texas has the burden of proving that its redistricting plan has no discriminatory purpose or retrogressive effect.  Although Proposed Intervenors may have the opportunity to bring different challenges—such as a claim under the United States Constitution or Section 2 of the Voting Rights Act—those claims are subject to different substantive standards and burdens of proof.  That is no substitute.  *See, e.g.*, *Fund for Animals*, 322 F.3d at 735 (holding that the ability to file a different suit does not affect whether denial of a motion to intervene will impair movant's interests); *Natural Res. Def. Council v. Castle*, 561 F.2d 904, 909 (D.C. Cir. 1977).

4.      **Proposed Intervenors' Interests Cannot Be Adequately Represented by Existing Parties**

The burden to show that existing parties cannot adequately represent Proposed Intervenors' interests is "not onerous."  *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986).  Proposed Intervenors need only show that representation of their interests "'may be' inadequate, not that representation will in fact be inadequate."  *Id.*; *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *accord Castle*, 561

---

33.  As this Motion and Memorandum make clear, Proposed Intervenors will suffer an injury-in-fact if their voting rights are impaired; Plaintiff has caused this injury by approving and seeking preclearance of the Congressional Redistricting Plan; and the Court can redress this injury by denying preclearance of the Congressional Redistricting Plan.

F.2d at 911.  Even "a partial congruence of interests" is insufficient to "guarantee the adequacy of representation."  *Fund for Animals*, 322 F.3d at 737.

Courts regularly find that government agencies cannot, under Rule 24, adequately represent the interests of potential intervenors.  *See, e.g.*, *id.*; *Dimond*, 792 F.2d at 192.  In *Trbovich*, for example, the Supreme Court held that because the Labor Secretary had various duties, only one of which was representing the interests of a union member in a suit, the union member could better represent his own interests and was permitted to intervene.  404 U.S. at 538-39.  In the voting rights context, intervenors have successfully represented their own interests after the Government stopped representing them, and these cases provide historical evidence that the Attorney General's office may not adequately represent Proposed Intervenors' interests.  *See, e.g.*, *City of Lockhart v. United States*, 460 U.S. at 130 (1983) (intervenor continued to challenge covered jurisdiction under Section 5 after government ended its challenge); *Blanding v. Du Bose*, 454 U.S. 393, 394 (1982) (citizen group successfully pursued appeal of Section 5 decision).

Here, the Attorney General cannot represent Proposed Intervenors' interests as they can, and the Attorney General, therefore, cannot adequately represent them.  The Attorney General's office, as a government agency, has many obligations to many different interests, and its goals are set and resources distributed according to shifting priorities.  The interests the Attorney General represents may overlap to some extent with some of Proposed Intervenors' interests, but only Proposed Intervenors can represent solely their interests and represent them completely.   Proposed Intervenors also have an interest in and can provide valuable information regarding the local impact of redistricting that the Attorney General cannot approximate, as the Attorney General's office must respond to voting rights issues nationwide.  The Proposed Intervenors, therefore, likely have more motivation, incentive, and ability than the Attorney General to represent their interests, and they have no guarantee

-15-

that the Attorney General's office will represent their interests in the way Proposed Intervenors wish or for as long as they need.  The Attorney General's representation of Proposed Intervenors' specific interests "may be" inadequate, and therefore, Proposed Intervenors have a right to intervene.

Proposed Defendant-Intervenors Wendy Davis, Marc Veasey, John Jenkins, Vicki Bargas, and Romeo Munoz ("Davis Intervenors") have also moved to intervene, but because their motion is pending, they are not parties to this action and cannot represent Proposed Intervenors' interests.  Moreover, even if the Davis Intervenors' motion were granted, they still would be unable to adequately represent Proposed Intervenors' interests.  Proposed Intervenors have interests in challenging federal congressional districts throughout the state and have identified specific congressional districts whose boundaries and composition they wish to challenge.  By contrast, the only specific jurisdiction challenged by the Davis Intervenors is State Senate District 10.  Thus, the interests of the Davis Intervenors and Proposed Intervenors significantly differ.  Moreover, there is no evidence or reason to think that the Davis Intervenors have any concern for or incentive to protect Proposed Intervenors' interests.   No parties or potential parties to the action, therefore, can adequately represent Proposed Intervenors' interests.

**B.      In the Alternative, Proposed Intervenors Should Be Granted Permissive Intervention**

Rule 24(b) allows permissive intervention when, upon a timely motion, a party shows it has "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).  Courts adopt a "flexible reading" of Rule 24(b), *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998), and consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Huron Envtl. Activist League v. EPA*, 917 F. Supp. 34, 43 (D.D.C. 1996).

Proposed Intervenors submit this motion less than one month after Plaintiff filed the Complaint, and, as explained above, the motion is timely.  Proposed Intervenors present a defense to Plaintiff's claim for preclearance, contending that Plaintiff's Congressional Redistricting Plan is retrogressive and the product of a discriminatory purpose and therefore violates Section 5 of the Voting Rights Act.  The questions of law and fact central to this defense are similar and in many cases identical to the issues of law and fact raised in the main action.  Proposed Intervenors' participation in the case, moreover, will not unduly delay or prejudice the adjudication of the case or the rights of the parties.  To the contrary, Proposed Intervenors will abide by all deadlines and will not delay the resolution of this matter while at the same time contributing additional facts and information and providing unique insights into the effects of the Congressional Redistricting Plan.

In sum, permissive intervention should be granted to allow Proposed Intervenors to defend their voting rights and to show that the Congressional Redistricting Plan fails Section 5's preclearance standard.

## V.    CONCLUSION

If precleared, the Congressional Redistricting Plan would dilute minority voting strength in Texas and, for the next decade, prevent many minority voters from "elect[ing] their preferred candidates of choice."  42 U.S.C. § 1973c(b).  Proposed Intervenors should have the opportunity to defend their voting rights in this case and respectfully request that the Court grant their Motion to Intervene.

DATED this 17th day of August, 2011

70916-0009/LEGAL21435020.2

Respectfully submitted,


By: s/ Marc Erik Elias
     Marc Erik Elias, Bar No. 442007
     John M. Devaney, Bar No. 375465
     Kevin J. Hamilton, Pro Hac Vice Pending,
      WSBA No. 15648
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654-6211
Email: MElias@perkinscoie.com
Email: KHamilton@perkinscoie.com


By: s/ Max Renea Hicks
     Max Renea Hicks, Pro Hac Vice Pending,
     Texas Bar No. 9580400
**LAW OFFICES OF MAX RENEA HICKS**
101 West 6th Street, Suite 504,
Austin, Texas, 78701
Telephone: (512) 480-8231
Facsimile: (512) 480-9105
Email: rhicks@renea-hicks.com

Attorneys for Proposed Defendant-Intervenors

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2011, I electronically filed the foregoing with the Clerk of the United States District Court for the District of Columbia by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Respectfully submitted,

**PERKINS COIE** LLP

By:  s/ John M. Devaney
    John M. Devaney, Bar No. 375465
    JDevaney@perkinscoie.com
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654-6211

70916-0009/LEGAL21435020.2