# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | Case No. 11-01303 RMC-TBG-BAH |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| and ERIC H. HOLDER, JR. in his | § | |
| official capacity as Attorney General | § | |
| of the United States, | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF STATE OF TEXAS' MOTION FOR SUMMARY JUDGMENT [ORAL ARGUMENT REQUESTED]

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff State of Texas respectfully moves this Court for entry of an Order granting summary judgment to Plaintiff and declaring (1) that the State's redistricting plans for the U.S. Congress, Texas House of Representatives, Texas Senate, and Texas State Board of Education neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority and otherwise fully comply with Section 5 of the Voting Rights Act; and (2) that the State's redistricting plans for the U.S. Congress, Texas House of Representatives, Texas Senate, and Texas State Board of Education may be implemented without delay.

Pursuant to Local Civil Rule 7, Plaintiff is filing a Statement of Material Facts, a Memorandum of Points and Authorities, Exhibits, and a Proposed Order in support of this Motion.  Plaintiff also respectfully requests oral argument on this motion.

Plaintiff respectfully prays that this Court enter an Order granting Plaintiff's Motion for Summary Judgment.

Dated: September 14, 2011        Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID MORALES
Deputy First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation

DAVID C. MATTAX
Director of Defense Litigation

*/s/ David J. Schenck*
DAVID J. SCHENCK
Deputy Attorney General for Legal Counsel

J. REED CLAY, JR.
Special Assistant and Senior Counsel to the Attorney General

BRUCE D. COHEN
Special Assistant to the Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.] (512) 936-0596
[Fax] (512) 474-2697
*david.schenck@oag.state.tx.us*

COUNSEL FOR PLAINTIFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | Case No. 11-01303 RMC-TBG-BAH |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| and ERIC H. HOLDER, JR. in his | § | |
| official capacity as Attorney General | § | |
| of the United States, | § | |
| | § | |
| *Defendants*. | § | |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The State of Texas is a covered jurisdiction subject to the preclearance requirements of Section 5 of the Voting Rights Act of 1965, as amended and codified at 42 U.S.C. § 1973c.[1] The Voting Rights Act (VRA) requires Texas, prior to implementing changes to its voting practices and procedures, to obtain a declaratory judgment from the United States District Court for the District of Columbia (unless the United States Attorney General preclears the change) that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or because of membership in a language minority group. 42 U.S.C. § 1973c(a). That requirement is further defined in subsection (b), which states:

---

1. Local Rule 7(h) requires the State of Texas to include with its motion for summary judgment "a statement of material facts as to which the moving party contends there is no genuine issue." The Court has ordered the State to file its motion prior to the Defendants' deadline for filing their answer. Nevertheless, because the facts contained herein are taken almost exclusively from (1) documents produced by the Texas Legislative Council using national census and American Community Survey data, (2) federal and state statutes, and (3) federal cases, the State contends that there should be no genuine dispute over these facts.

> Any . . . practice[] or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens . . . to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of subsection (a) of this section.

43 U.S.C. § 1973c(b).

The Supreme Court has "consistently understood [Sections 2 and 5 of the VRA] to combat different evils and, accordingly, to impose very different duties upon the States." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 477 (1997) (*Bossier Parish I*). Section 5 retrogression analysis "requires a comparison of a jurisdiction's new voting plan with its existing plan," which is the "benchmark" plan. *Id.* at 478 (citing *Holder v. Hall*, 512 U.S. 874, 883 (1994) (plurality opinion)); *see also Beer v. United States*, 425 U.S. 130, 141 (1976).

The 2010 census indicated that the Texas population has increased by 4,293,741 million people, to 25,145,561. http://factfinder2.census.gov. Following the census, Texas was required to redraw four districting maps: United States Congress, Texas House of Representatives, Texas Senate, and the Texas State Board of Education. The 82d Texas Legislature reapportioned the districts in each map, and on July 19, 2011, the State filed this suit seeking a declaratory judgment that the four plans (1) neither had the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority, and (2) thus may be implemented immediately in preparation for the 2012 primary and general elections. Complaint, Demand for Judgment (Doc. 1). Also on July 19, the State filed informal preclearance submissions with the

Department of Justice. Complaint, Attachment 1 (Doc. 1).

The Legislature's changes to the four districting plans, as relevant to the opportunities that minority voters have to elect their candidates of choice, are as follows:

## 1. United States Congress

Following each decennial census, every State with more than one congressional district must enact a new congressional districting plan to satisfy the one person - one vote requirement. *Reynolds v. Sims*, 377 U.S. 533, 566 (1964). Texas's benchmark congressional plan contains 32 districts. Due to the increase in Texas's population, Texas is entitled to elect 36 members to the United States House of Representatives beginning in 2012. The 2011 apportionment was also necessary to reflect this increase.

*a. Benchmark Congress Plan (Plan C100)*

In 2001, the Legislature convened but failed to enact any redistricting plans to account for the population growth and shifts reflected in the 2000 census. Texas was, at that time, entitled to 2 new congressional districts (32 districts total), so federal litigation was initiated to draw new congressional lines. A three-judge federal district court drew a plan in 2001, *Balderas v. Texas*, No. 6:01-CV-158, 2001 WL 35673968 (E.D. Tex. Nov. 14, 2001), *aff'd*, 536 U.S. 919 (2002), but in 2003 the Legislature decided to take up redistricting again and enacted a congressional districting plan. That plan was precleared by the Department of Justice but challenged under Section 2 of the VRA. A three-judge federal district court upheld the plan, *Session v. Perry*, 298 F. Supp. 2d 451 (E.D. Tex.), *vacated sub nom. Henderson v. Perry*, 543 U.S. 941 (2004), but the United States Supreme Court determined

that CD 23 violated Section 2 and directed the district court to draw a remedial plan, *LULAC v. Perry*, 548 U.S. 399 (2006).

On remand, the district court recognized that its "task [was] narrow: we must do no more than necessary to correct the flaws the Supreme Court found in [the 2003 legislative plan]." *LULAC v. Perry*, 457 F. Supp. 2d 716, 716–18 (E.D. Tex. 2006) (per curiam). When it redrew part of the map on remand, the district court explained that its "remedial plan contains six Latino opportunity districts" in south and west Texas, and that the Supreme Court had recognized that a seventh reasonably compact Hispanic opportunity district could not be drawn. *Id*. at 720. This court-drawn remedial plan was used in the last three election cycles, and it served as the benchmark plan for the 82d Legislature.

The benchmark congressional plan contains 7 Hispanic opportunity districts: the 6 in south and west Texas, and CD29 in the Houston area. Each district has an Hispanic Citizen Voting Age Population (HCVAP)[2] greater than 50%. Exhibit 2 (demonstrating HCVAPs ranging from 56% to 74.5%). Each district also has an Hispanic Voting Age Population (HVAP) greater than 60%. Exhibit 1 (demonstrating HVAPs ranging from 62.8% to 79.1%).

---

2. The Fifth Circuit has unequivocally held that HCVAP is the population base that should be considered to determine whether a minority group satisfies the first *Gingles* requirement in a vote-dilution claim. *See Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997) ("We hold that courts evaluating vote dilution claims under section 2 of the Voting Rights Act must consider the citizen voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district."); *see also Session v. Perry*, 298 F. Supp. 2d 451, 494 n.133 (E.D. Tex. 2004) ("This circuit, along with every other circuit to consider the question, has concluded that the relevant voting population for Hispanics is citizen voting age population."), *rev'd on other grounds*, *LULAC v. Perry*, 548 U.S. 399, 429 (2006) (commenting in dicta that using HCVAP to determine Hispanic electoral opportunity "fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates"). For information about how the State of Texas calculates HCVAP, please see the Texas Legislative Council's website: http://www.tlc.state.tx.us/redist/pdf/CitizenshipAddendum.pdf.

4

All 7 districts have Spanish Surname Voter Registration (SSVR)[3] above 50%.  Exhibit 3

(demonstrating SSVRs ranging from 52.6% to 71.2%).

In the most recent elections (November 2010), these 7 districts elected 5 Democrats

and 2 Republicans to Congress.  http://www.sos.state.tx.us/election/historical/index.shtml.

The benchmark plan also contains 1 district in which the Black Voting Age Population

(BVAP) is greater than 40% and 2 additional districts in which the BVAP is greater than

30%.  Exhibit 1 (demonstrating BVAPs ranging from 36.3% to 42.5%).

b. *The 2011 Plan (Plan C185)*

The Legislature failed to enact a new congressional map during its regular session, but

after the Legislature convened a special session, it passed Plan C185 (and new congressional

districts were enacted into law) on June 24, 2011.  Act of June 24, 2011, 82d Leg., 1st C.S.,

Tex. S.B. 4.  Plan C185 contains 8 Hispanic opportunity districts in which the HCVAP is

greater than 50%.  Exhibit 5 (demonstrating HCVAPs ranging from 51.9% to 72.7%).  Like

---

3.  According to the Texas Legislative Council:

> Spanish surname voter registration, also reported in the secretary of state's
> Statewide Voter Database, is generated using a comparison to the 2000
> Census Bureau List of Spanish Surnames.  While most sources agree that
> the match between people who have Spanish surnames and those who
> consider themselves Hispanic is relatively good in Texas (the Census
> Bureau estimates a 90 percent correlation for the state), the reported
> number of registered voters with Spanish surnames is not a precise measure
> of Hispanic voter registration. Some people who consider themselves
> Hispanic do not have surnames that are included in the Spanish surname
> file and will be missed by the Spanish surname matching technique. Others,
> who have surnames that are included in the Spanish surname file but do not
> consider themselves Hispanic, will be incorrectly counted as Hispanic
> registered voters.

http://www.tlc.state.tx.us/redist/pdf/Data_2011_Redistricting.pdf.

the benchmark plan, Plan C185 has 7 districts with HVAP over 60%. Exhibit 4 (demonstrating HVAPs ranging from 63.8% to 79%). And Plan C185 retains 7 districts with SSVR greater than 50%. Exhibit 6 (demonstrating SSVRs ranging from 53% to 71.9%).

Plan C185 contains 2 districts in which BVAP is greater than 40%, and one additional district in which the BVAP is greater than 30%. Exhibit 4 (demonstrating BVAPs ranging from 37.6% to 46.5 %).

**2. Texas House of Representatives**

The Texas House of Representatives is comprised of 150 members elected in single-member districts. TEX. CONST. art. III, §§ 2, 26.

*a. Benchmark House Plan (Plan H100)*

In 2001, the Texas Legislature failed to pass a districting plan reapportioning the Texas House of Representatives' legislative districts during its regular session. *Balderas*, 2001 WL 35673968 (E.D. Tex. 2001), *aff'd,* 536 U.S. 919 (2002). The Legislative Redistricting Board convened as required by law, TEX. CONST. art. 3, § 28, and it adopted a Texas House plan, *Balderas*, 2001 WL 35673968 (E.D. Tex. 2001) (Plan 1289H). The plan was submitted to the Department of Justice for preclearance, and DOJ objected to three Texas House districts. *Id.* A three-judge court modified the plan to address DOJ's concerns, *id.*, and that court-drawn map—used in the ensuing five election cycles—served as the Legislature's benchmark plan in 2011.

The Texas House of Representatives benchmark plan contains 30 Hispanic opportunity districts. Each of those districts has an HCVAP greater than 50%. Exhibit 8

(demonstrating HCVAPs ranging from 54.6% to 93.6%). The plan also contains 30 districts with an HVAP greater than 60%. Exhibit 7 (demonstrating HVAPs ranging from 61.6% to 95.2%). Twenty-nine districts in the benchmark plan contain a SSVR of 50% or greater. Exhibit 9 (demonstrating SSVR ranging from 50.8% to 90.9%).

The benchmark plan contains 11 African-American opportunity districts. Each of those districts has a BVAP greater than 40%. Exhibit 7 (demonstrating BVAPs ranging from 40.3% to 63.9%).

*b. The 2011 Plan (Plan H283)*

Following the 2010 census, the Texas Legislature was required to redraw the legislative districts in order to comply with the Texas Constitution's apportionment provisions. TEX. CONST. art. III §§ 26, 28. The Legislature enacted Plan H283 on May 23, 2011. Act of May 23, 2011, 82d Leg., R.S., Tex. H.B. 150. Due to divergent population growth in the various regions of the State during the last decade, the benchmark plan currently has an overall population deviation of 109.44%. Exhibit 7. Under the new Texas House plan, the overall population deviation was reduced to 9.92%. Exhibit 10.

Like the benchmark plan, Plan H283 contains 30 Hispanic opportunity districts with an HCVAP greater than 50%. Exhibit 11 (demonstrating HCVAPs ranging from 51.4% to 91.1%). Plan H283 also contains 30 districts with an HVAP greater than 60%. Exhibit 10 (demonstrating HVAPs ranging from 62.6% to 95.1%). Additionally, H283 increases (from 29 to 30) the number of districts with SSVR of 50 % or greater. Exhibit 12 (demonstrating SSVRs ranging from 50.0% to 91.8%).

7

Plan H283 increases the number of African-American opportunity districts from 11 to 12. Each of those districts has a BVAP greater than 40%. Exhibit 10 (demonstrating BVAPs ranging from 40.8% to 57.4%).

### 3. Texas Senate

The Texas Senate is comprised of 31 members elected in single-member districts. TEX. CONST. art. III, §§ 2, 25.

*a. Benchmark Senate Plan (Plan S100)*

In 2001, the Texas Legislature failed to pass a districting plan during its regular session. The Legislative Redistricting Board was thus required to convene, TEX. CONST. art. III, § 28, and it adopted a Texas Senate districting map, Letter to The Honorable Geoffrey Connor, Texas Secretary of State, Oct. 15, 2001, available at www.tlc.state.tx.us/redist/pdf/DOJ_October15.pdf. The plan was submitted to the Department of Justice for preclearance, DOJ precleared the plan without objection, and that plan—used by the State in the ensuing five election cycles—served as the Legislature's benchmark plan in 2011.

The benchmark plan for the Texas Senate contains 7 Hispanic opportunity districts. Each of those districts has an HCVAP greater than 50%. Exhibit 14 (demonstrating HCVAPs ranging from 57.9% to 79.8%). These districts also have an HVAP greater than 60%. Exhibit 13 (demonstrating HVAPs ranging from 65.6% to 86.2%). In addition, the Senate benchmark plan has 7 districts with SSVR of 50% or greater. Exhibit 15 (demonstrating SSVRs ranging from 54.2% to 78.4%).

The benchmark plan contains 2 African-American opportunity districts. Each of those districts has a BVAP that exceeds 40%. Exhibit 13 (demonstrating BVAPs of 41.1% and 43.2%).

b. *The 2011 Plan (Plan S148)*

Following the 2010 census, the Texas Legislature was required to redraw the districting plan in order to comply with the Texas Constitution. TEX. CONST. art. III, § 28. The Legislature enacted the new Senate plan, Plan S148, on May 23, 2011. Act of May 23, 2011, 82d Leg., R.S., Tex. S.B. 31. Due to divergent population growth in the various regions of the State during the last decade, the benchmark plan currently has an overall population deviation of 46.11%. Exhibit 13. Under S148, the overall population deviation is reduced to 8.04%. Exhibit 16.

Like the benchmark plan, Plan S148 contains 7 Hispanic opportunity districts. Each of those districts retains an HCVAP greater than 50%, Exhibit 17 (demonstrating HCVAPs ranging from 53% to 79.8%), and an HVAP greater than 60%, Exhibit 16 (demonstrating HVAPs ranging from 63% to 86.2%). In addition, like the Senate benchmark plan, Plan S148 has 7 districts with SSVR over 50%. Exhibit 18 (ranging from 50.2% to 78.4%).

Like the benchmark plan, Plan S148 contains 2 African-American opportunity districts that have a BVAP greater than 40%. Exhibit 16 (demonstrating BVAPs of 40.9% and 44.3%).

**4. Texas State Board of Education**

The Texas State Board of Education is comprised of 15 members elected in single-member districts.  TEX. EDUC. CODE § 7.101.

*a. Benchmark Board of Education Plan (Plan E100)*

In 2001, a three-judge district court in the Northern District of Texas adopted a districting plan for the State Board of Education.  *Miller v. Cuellar*, No. 3:01-CV-1072-G (N.D. Tex. 2001).  Because it was a court-drawn map, it did not need to be precleared, *see Lopez v. Montgomery County*, 519 U.S. 9 (1996), and the State used the plan in the ensuing five election cycles.  The court-drawn map served as the Legislature's benchmark in 2011.

The benchmark plan contains 3 Hispanic opportunity districts.  Each of these districts has an HCVAP greater than 50%.  Exhibit 20 (demonstrating HCVAPs ranging from 62.1% to 66.5%).  Each district also has an HVAP greater than 60%.  Exhibit 19 (demonstrating HVAPs ranging from 68.2% to 73.6%).  Each of the 3 Hispanic opportunity districts in the State Board of Education benchmark plan also have SSVR over 50%. Exhibit 21 (ranging from 58.6% to 63.5%).

The benchmark plan contains 2 districts in which African-American communities have historically been able to elect their candidate of choice.  Each of those districts has a BVAP greater than 30%.  Exhibit 19 (demonstrating BVAPs of 32.1% and 33.9%).

*b. The 2011 Plan (Plan E120)*

Following the 2010 census, the Texas Legislature was required to redraw the State Board of Education districts.  TEX. EDUC. CODE § 7.104.  The Legislature enacted Plan E120

10

on May 18, 2011.  Act of May 6, 2011, 82d Leg., R.S., H.B. 600.  Due to divergent population growth in the various regions of the State during the last decade, the benchmark plan currently has an overall population deviation of 29.53%.  Exhibit 19.  The new State Board of Education plan reduces the overall population deviation to 5.85%.  Exhibit 22.

Like the benchmark plan, Plan E120 contains 3 Hispanic opportunity districts.  Each of those districts retains an HCVAP greater than 50%, Exhibit 23 (demonstrating HCVAPs ranging from 60.9% to 67.4%%), and an HVAP greater than 60%, Exhibit 22 (demonstrating HVAPs ranging from 68.5% to 74.5%).  In addition, like the benchmark plan, each of Plan E120's three Hispanic opportunity districts have SSVR over 50%.  Exhibit 24 (ranging from 59.3% to 64.5%).

Like the benchmark plan, Plan E120 contains 2 African-American districts in which the BVAP is greater than 30%.  Exhibit 22 (demonstrating BVAPs of 31.3% and 33.7%).

Dated: September 14, 2011                    Respectfully submitted,

                                         GREG ABBOTT
                                         Attorney General of Texas

                                         DANIEL T. HODGE
                                         First Assistant Attorney General

                                         DAVID MORALES
                                         Deputy First Assistant Attorney General

                                         BILL COBB
                                         Deputy Attorney General for Civil Litigation

                                         DAVID C. MATTAX
                                         Director of Defense Litigation

                                         */s/ David J. Schenck*
                                         DAVID J. SCHENCK
                                         Deputy Attorney General for Legal Counsel

                                         J. REED CLAY, JR.
                                         Special Assistant and Senior Counsel to the
                                         Attorney General

                                         BRUCE D. COHEN
                                         Special Assistant to the Attorney General

                                         OFFICE OF THE ATTORNEY GENERAL
                                         P.O. Box 12548 (MC 059)
                                         Austin, Texas 78711-2548
                                         [Tel.] (512) 936-0596
                                         [Fax] (512) 474-2697
                                         *david.schenck@oag.state.tx.us*

                                         COUNSEL FOR PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | Case No. 11-01303 RMC-TBG-BAH |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| and ERIC H. HOLDER, JR. in his | § | |
| official capacity as Attorney General | § | |
| of the United States, | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID MORALES
Deputy First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation

DAVID C. MATTAX
Director of Defense Litigation

DAVID J. SCHENCK
Deputy Attorney General for
  Legal Counsel

J. REED CLAY, JR.
Special Assistant and Senior Counsel
  to the Attorney General

BRUCE D. COHEN
Special Assistant to the Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.] (512) 936-0596
[Fax] (512) 474-2697
*david.schenck@oag.state.tx.us*

COUNSEL FOR PLAINTIFF

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

I.    THE STATE'S DISTRICTING PLANS HAVE NO RETROGRESSIVE EFFECT
    BECAUSE THEY EITHER MAINTAIN OR INCREASE THE OPPORTUNITIES OF
    MINORITIES TO ELECT THEIR CANDIDATES OF CHOICE. . . . . . . . . . . . . . . . . . .  3

    A.    Section 5's "Effect" Prong Was Enacted to Prevent Voting Changes
        That Cause Retrogression. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.    Texas's Districting Plans Are Not Retrogressive. . . . . . . . . . . . . . . . . . . .  6

        1. United States Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        2. Texas House of Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        3. Texas Senate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        4. Texas State Board of Education . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

II.    THE PLANS DO NOT HAVE ANY DISCRIMINATORY PURPOSE. . . . . . . . . . . . .  16

    A.    Under the 2006 Amendments to Section 5 of the VRA, "Purpose"
        Refers Only to Intentional Discrimination That Itself Violates the
        Fourteenth or Fifteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

    B.    The Court Should Construe and Apply Section 5's Purpose Prong
        Narrowly to Avoid Constitutional Infirmities. . . . . . . . . . . . . . . . . . . . .  21

C.    The Plans Do Not Have the Purpose of Denying or Abridging the Right to Vote on Account of Race, Color, or Language Minority Because They Were Not Motivated by Any Discriminatory Purpose. . . . . . . . . . 24

1.    United States Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.    Texas House of Representatives . . . . . . . . . . . . . . . . . . . . . . . . . 27

3.    Texas Senate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.    Texas State Board of Education . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# INDEX OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) . . . . . . . . . . . . . . . . . . 1, 2

*Bartlett v. Strickland*, 129 S.Ct. 1231, 1253–54 (2009) . . . . . . . . . . . . . . . . . . . . . . . . 6

*Beer v. United States*, 425 U.S. 130, 141 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 20

*Bush v. Vera*, 517 U.S. 952, 983 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Chapman v. Meier*, 420 U.S. 1, 27 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*City of Lockhart v. United States*, 460 U.S. 125, 134 n.10 (1983) . . . . . . . . . . . . . . . . . 5

*City of Mobile v. Bolden,* 446 U.S. 55 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

*City of Pleasant Grove v. United States*, 479 U.S. 462, 469 (1987) . . . . . . . . . . . . . . . . 2

*Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) . . . . . . . . . . . . . . . 1, 2

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568, 575 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Elkins v. United States*, 364 U.S. 206, 218 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) . . . . . . . . . . . 2

*Georgia v. Ashcroft*, 539 U.S. 461, 479 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 23

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (per curiam) . 2

*Lopez v. Monterey County*, 525 U.S. 266, 282 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*LULAC v. Perry*, 548 U.S. 399 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) . . . . . . . . . . . . . . . . . . . . 3

*Miller v. Johnson*, 515 U.S. 900, 926 (1995) . . . . . . . . . . . . . . . . . . . 3, 5, 19, 20, 22-24

*Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2513 (2009) . . . . . . . . 22

*Patterson v. New York,* 432 U.S. 197, 211 n.13 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) . . . . . . . . . . . . . . . . . . 19

*Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 477 (1997) . . . . . . . . . . . . . 4, 17, 20, 22

*Reynolds v. Sims,* 377 U.S. 533, 566 (1964) . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 30, 32

*Riley v. Kennedy*, 553 U.S. 406, 421 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Rogers v. Lodge*, 458 U.S. 613, 617 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Shaw v. Hunt*, 517 U.S. 899, 913 n.6 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Shaw v. Reno*, 509 U.S. 630, 646 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Georgia*, 546 U.S. 151, 158 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Louisiana,* 363 U.S. 1, 16 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Raines*, 362 U.S. 17, 26 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Smith*, 267 F.3d 1154, 1161 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . 3

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
   429 U.S. 252, 264-65 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Washington v. Davis,* 426 U.S. 229 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iv

## FEDERAL STATUTES

U.S. CONST. amend IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

U.S. CONST. amend XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

528 U.S. 320, 335 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

536 U.S. 919 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

42 U.S.C. § 1973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 1973b(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 1973c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. § 1973c(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

42 U.S.C. § 1973c(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13, 15, 16

42 U.S.C. § 1973c(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 1973(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

43 U.S.C. § 1973c(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1973c(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## FEDERAL RULES

FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FED. R. CIV. P. 56(a)-(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATE STATUTES

TEX. CONST. art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 28, 30

TEX. EDUC. CODE § 7.104(a)-(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a)-(c). The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if, under the substantive law applicable to the case, it is capable of affecting the outcome of the litigation. *Id.* A dispute is "genuine" for summary-judgment purposes if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) (citing *Anderson*, 477 U.S. at 248).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden is met, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by [the record evidence] designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations

marks omitted). The non-moving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Doe*, 706 F. Supp. 2d at 5; *see also Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) (a plaintiff must have more than "a scintilla of evidence to support [its] claims"). Stated differently, the non-moving party must point to evidence that would permit a reasonable jury to find in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (per curiam).

Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. That said, factual assertions in the moving party's evidence may be accepted as true unless the opposing party submits its own evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

## ARGUMENT

To satisfy Section 5 of the Voting Rights Act and obtain preclearance of Texas's four districting plans, the State bears the burden of demonstrating by a preponderance of the evidence that the new plans "neither ha[ve] the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or membership in a language minority group. 42 U.S.C. §§ 1973c(a), 1973b(f)(2); *see City of Pleasant Grove v. United States*, 479 U.S. 462, 469 (1987). "A preponderance standard . . . requires merely that the

fact-finder believe that the existence of a fact is more probable than the non-existence of that fact." *United States v. Smith*, 267 F.3d 1154, 1161 (D.C. Cir. 2001).  In other words, "'[t]he burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [the trier of fact] may find in favor of the party who has the burden to persuade the [court] of the fact's existence.'" *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)).

In Part I, the State will show that its four new districting plans do not have a retrogressive effect.  *See Miller v. Johnson*, 515 U.S. 900, 926 (1995).  And in Part II, the State will show that the four plans were not enacted with any discriminatory purpose.

I.    **THE STATE'S DISTRICTING PLANS HAVE NO RETROGRESSIVE EFFECT BECAUSE THEY EITHER MAINTAIN OR INCREASE THE OPPORTUNITIES OF MINORITIES TO ELECT THEIR CANDIDATES OF CHOICE.**

A.    **Section 5's "Effect" Prong Was Enacted to Prevent Voting Changes That Cause Retrogression.**

Section 5's "effect" inquiry has always focused on whether the change is retrogressive: The limited goal of Section 5 is "'to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" *Miller*, 515 U.S. at 926 (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976)). And in *Reno v. Bossier Parish School Board* (*Bossier Parish II*), the Supreme Court noted that "preclearance under § 5 affirms nothing but the

absence of backsliding."   528 U.S. 320, 335 (2000).   While the 2006 VRA amendments regarding discriminatory purpose may have broadened the scope of the Section 5 inquiry somewhat, *see infra* Part II, the "effect" prong remains a retrogression inquiry, *see Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478 (1997) (*Bossier Parish I*) ("[W]e have adhered to the view that the only effect that violates § 5 is a retrogressive one.").

Thus, Section 5 bars the State from implementing changes "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer*, 425 U.S. at 141.   Retrogression is a relative standard that measures a protected minority group's new voting strength compared to its ability prior to the change. A Section 5 retrogression inquiry "requires a comparison of a jurisdiction's new voting plan with its existing plan," called the "benchmark" plan.   *Bossier Parish I*, 520 U.S. at 478 (citing *Holder v. Hall*, 512 U.S. 874, 883 (1994) (plurality opinion)); *see also Beer*, 425 U.S. at 141. The appropriate benchmark plan is the "most recent [plan] that was both precleared and in force or effect."   *Riley v. Kennedy*, 553 U.S. 406, 421 (2008).

In conducting the retrogression inquiry for changes to districting plans, "the inquiry must encompass the entire statewide plan as a whole."   *Georgia v. Ashcroft*, 539 U.S. 461, 479 (2003).   As Congress noted during the course of the 1975 VRA amendments, the inquiry is "whether the ability of minority groups to participate in the political process and to elect their choices to office is augmented, diminished, or not affected by the change affecting voting."   H.R. Rep. No. 94-196 at 60, *quoted in Beer*, 425 U.S. at 141.   And because Section 5 was enacted to preclude "diminishing" the voting rights of minority groups, 42 U.S.C.

4

§ 1973(c), plans that maintain the status quo are entitled to preclearance.  *City of Lockhart v. United States*, 460 U.S. 125, 134 n.10 (1983) (A plan that preserves "current minority voting strength" is entitled to preclearance.); *see also Bush v. Vera*, 517 U.S. 952, 983 (1996) (plurality opinion) ("Nonretrogression . . . merely mandates that the minority's *opportunity* to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions.").  Plans that increase minority voting strength are called "ameliorative" plans, and they, too, are entitled to preclearance.  *See Miller*, 515 U.S. at 923 (citing *Beer*, 425 U.S. at 141).

To determine whether a district is one in which a minority group has the ability to elect its candidate of choice—*i.e.*, whether the district is a protected, opportunity district—courts must look to the racial make-up of the population in the district.  Since "effective exercise of the electoral franchise," *Beer*, 425 U.S. at 141, has been construed to mean the ability to determine the outcome of elections, the minority group must account for a sufficient amount of the district's population to exert that control.  At one time, the Supreme Court held that coalitional districts (in which a minority group was not a majority of the population, but could still influence elections) could suffice to maintain minority voting strength in a new plan.  *Ashcroft*, 539 U.S. at 481.  But the VRA was amended in 2006 in response to *Ashcroft*, and now, as a result, the VRA requires districts in which the minority group can actually control the elections.  Majority-minority districts are best-suited to accomplish this task.

When reviewing African-American opportunity districts, Black Voting Age Population (BVAP) is the preferred metric. *E.g. Bartlett v. Strickland*, 129 S.Ct. 1231, 1253–54 (2009). For Hispanic districts, Hispanic Citizen Voting Age Population (HCVAP) is a better metric—"it fits the language of [the VRA] because only eligible voters affect a group's opportunity to elect candidates." *LULAC v. Perry*, 548 U.S. 399, 429 (2006). Relying on a citizen voting-age population metric for Hispanics accounts for the significant segment of the Hispanic community that lacks U.S. citizenship and is therefore ineligible to vote. Indeed, relying on 50% HVAP as the standard would not consistently enable Hispanic voters to elect their candidates of choice. *Id.* Although the 2010 census does not include citizenship information, the U.S. Census Bureau has released a tabulation of CVAP data based on the 2 0 0 5 – 2 0 0 9   5 - y e a r   A m e r i c a n   C o m m u n i t y   S u r v e y . http://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html.

### B.    Texas's Districting Plans Are Not Retrogressive.

#### 1.  United States Congress

The benchmark congressional plan has 7 Hispanic opportunity districts: CD15, CD16, CD20, CD23, CD27, CD28, CD29. Each of those districts contains an HCVAP greater than 50%. Exhibit 2; *see also LULAC*, 548 U.S. at 429 (noting that "the parties agree that the relevant numbers must include citizenship"). Six of the 7 districts in the benchmark plan are located in south and west Texas, while the remaining Hispanic opportunity district, CD29, is in the Houston area. *See generally* Plan C100 map. The Census Bureau's 2010 population data show that all 6 of the south and west Texas districts were overpopulated. Exhibit 1

(showing that districts 15, 16, 20, 23, 27, and 28 were all over the ideal population of 698,488). The Legislature was thus required to remove large numbers of people from these districts without reducing the ability of the minority voters who remained to elect their candidates of choice. It is also critical to note that these 6 Hispanic opportunity districts were overpopulated by a total of about 500,000 people. Exhibit 1 (The total population in the 6 south and west Texas districts was 4,697,651; 6 ideally populated districts would contain 4,190,928 people). Because approximately 500,000 is significantly less than the required population for an ideally populated district, it would not have been possible to combine the districts' excess population to create a new district. Put another way, the Legislature could not draw 7 districts in the new plan using only the population contained in the 6 south and west Texas districts on the benchmark plan.

A comparison of the 7 Hispanic opportunity districts in Plan C100 with the corresponding districts in Plan C185 demonstrates that there has been no retrogression. First, CD29 experienced a slight increase in HCVAP, from 56% to 56.3%. *Compare* Exhibit 2 *with* Exhibit 5. Next, 5 of the 6 south and west Texas districts retained the same congressional district designation, and each retained an HCVAP similar to that in the benchmark plan, as this chart shows:

|            | CD15  | CD16  | CD20  | CD23  | CD28  |
|------------|-------|-------|-------|-------|-------|
| Plan C100  | 71.9% | 74.5% | 63.8% | 58.4% | 68.3% |
| Plan C185  | 71%   | 72.7% | 62.9% | 58.5% | 65.9% |

*Compare* Exhibit 2 *with* Exhibit 5.

The remaining Hispanic district in the benchmark plan, CD27, was overpopulated by more than 40,000 people. Exhibit 1 (indicating that 741,993 people lived in CD27; the ideal district population is 698,488). Given the geography of the district (Mexico is on its southern border, and the Gulf of Mexico is on its eastern border), the Legislature had limited options when it altered CD27's lines and removed its excess population. Nueces County, in the northern part of the district, was moved into a district to the north, where the Legislature was able to keep the county contained in a single district. That district was designated CD27, and the southern portion of benchmark CD27 was re-designated CD34. As a result, much of the area and population from benchmark CD27 is now in CD34, which has been maintained as an Hispanic opportunity district, with HCVAP greater than 50%:

|  | CD27 | CD34 |
|---|---|---|
| **Plan C100** | 63.8% | -- |
| **Plan C185** | -- | 71.7% |

*Compare* Exhibit 2 *with* Exhibit 5.

Plan C185 also contains a new district, CD35, with an HCVAP greater than 50%. Exhibit 5 (showing that CD35 has an HCVAP of 51.9%). This district provides an eighth congressional district in which Hispanics will have an opportunity to elect candidates of their choice under Plan C185.

Moreover, Plan C185 retains HVAPs in the opportunity districts that are similar to those present in Plan C100, as these two charts show:

8

|          | CD15  | CD16  | CD20 | CD23  | CD28  | CD29  |
|----------|-------|-------|------|-------|-------|-------|
| PlanC100 | 78.7% | 79.1% | 68%  | 62.8% | 75.7% | 72.3% |
| PlanC185 | 77.2% | 77.6% | 66%  | 63.8% | 73.6% | 71.7% |

*Compare* Exhibit 1 *with* Exhibit 4.

|            | CD27  | CD34 |
|------------|-------|------|
| Plan C100  | 69.2% | --   |
| Plan C185  | --    | 79%  |

*Compare* Exhibit 1 *with* Exhibit 4.

And finally, Plan C185 retains similar SSVR numbers:

|          | CD15  | CD16  | CD20  | CD23  | CD28  | CD29  |
|----------|-------|-------|-------|-------|-------|-------|
| PlanC100 | 71.2% | 68.1% | 59.2% | 52.6% | 66%   | 52.6% |
| PlanC185 | 66.8% | 66.2% | 56.6% | 54.8% | 64.1% | 53%   |

*Compare* Exhibit 3 *with* Exhibit 6.

|            | CD27  | CD34  |
|------------|-------|-------|
| Plan C100  | 61.1% | --    |
| Plan C185  | --    | 71.9% |

*Compare* Exhibit 3 *with* Exhibit 6.

Just as Plan C185 does not retrogress with respect to Hispanic voters, it does not retrogress with respect to African-American voters. Plan C185 increases, from 1 to 2, the number of districts in which BVAP is greater than 40%. And both Plan C100 and Plan C185 have 3 districts in which BVAP is greater than 30%. Thus, there is no retrogression with respect to African-Americans in the new plan:

9

|             | CD9   | CD18  | CD30  |
|-------------|-------|-------|-------|
| **Plan C100** | 36.3% | 37.9% | 42.5% |
| **Plan C185** | 37.6% | 40.5% | 46.5% |

*Compare* Exhibit 1 *with* Exhibit 6.

In sum, new districting plans that maintain the same opportunities for a minority group to elect its candidates of choice as it had in the benchmark plan are entitled to preclearance. And on this basis alone, the State is entitled to a declaration that Plan C185 does not have the effect of "diminishing the ability of any citizens . . . to elect their preferred candidates of choice." 42 U.S.C. § 1973(c)(b). The increase from 7 to 8 districts in which HCVAP is greater than 50%, and the addition of 1 district in which BVAP is greater than 40%, indicate that this is an ameliorative plan that does more than just maintain the status quo. It should be precleared on that basis also.

## 2. Texas House of Representatives

The new Texas House of Representatives plan contains 30 Hispanic opportunity districts with an HCVAP greater than 50%. Exhibit 11 (The districts are: H31, H34, H35, H36, H37, H38, H39, H40, H41, H42, H43, H74, H75, H76, H77, H78, H79, H80, H104, H116, H117, H118, H119, H123, H124, H125, H140, H143, H145, H148). This is the same number of Hispanic opportunity districts that the benchmark plan contained. Exhibit 8. Indeed, with only one exception, the 50% or greater HCVAP districts have the same district numbers in both plans; in the benchmark plan, Plan H100, H33 meets the 50% HCVAP threshold, and in Plan H283, H148 hits that threshold. *Compare* Exhibit 8 *with* Exhibit 11.

By maintaining the same number of Hispanic opportunity districts, the Legislature ensured

that Plan H283 is not retrogressive:

|  | Plan H100 | Plan H283 |
|---|---|---|
| H31 | 93.6% | 88.9% |
| H33 | 60.4% | -- |
| H34 | 58.2% | 64.6% |
| H35 | 54.6% | 52.5% |
| H36 | 83.8% | 88.7% |
| H37 | 85.4% | 82.3% |
| H38 | 79% | 80.6% |
| H39 | 79.1% | 82.4% |
| H40 | 90.2% | 89% |
| H41 | 77.5% | 72.1% |
| H42 | 90.1% | 91.1% |
| H43 | 71.7% | 71.7% |
| H74 | 59.7% | 69.4% |
| H75 | 83.1% | 89% |
| H76 | 89.4% | 83.5% |
| H77 | 78.6% | 73.4% |
| H78 | 56.2% | 55.2% |
| H79 | 70% | 76.7% |
| H80 | 67.2% | 79.7% |
| H104 | 60.8% | 51.7% |
| H116 | 61.6% | 57.1% |
| H117 | 58.8% | 63.8% |

| | | |
|---|---|---|
| **H118** | 61.9% | 64.7% |
| **H119** | 65% | 58.3% |
| **H123** | 67.3% | 62.3% |
| **H124** | 64.2% | 62.4% |
| **H125** | 60.5% | 64.3% |
| **H140** | 66.1% | 58.5% |
| **H143** | 64.7% | 57% |
| **H145** | 68.9% | 56.2% |
| **H148** | -- | 51.4% |

*Compare* Exhibit 8 *with* Exhibit 11.

In both plans, 28 of the 30 districts with an HCVAP greater than 50% also have an HVAP greater than 60%. Exhibit 7 (all but H35 and H117 in Plan H100); Exhibit 10 (all but H35 and H116 in Plan H283). And in both plans, there are 2 districts—H90 and H103—that have an HVAP of greater than 60% that do not have an HCVAP of at least 50%. Exhibit 7 (Plan H100); Exhibit 10 (H283). Finally, Plan H283 increases by 1 district (from 29 to 30) the number of districts with SSVR greater than 50%. Exhibit 12.

Plan H283 is also not retrogressive with respect to African-Americans. The plan produces one new African-American opportunity district, and it retains the 11 opportunity districts from the benchmark plan. There are now 12 districts in which BVAP is greater than 40%:

|          | Plan H100 | Plan H283 |
|----------|-----------|-----------|
| **H22**  | 52.1%     | 47.3%     |
| **H27**  | --        | 42.9%     |
| **H95**  | 45.6%     | 45.1%     |
| **H100** | 40.3%     | 40.8%     |
| **H109** | 63.9%     | 57.4%     |
| **H110** | 42.2%     | 42.5%     |
| **H111** | 49.1%     | 50.4%     |
| **H131** | 47.7%     | 42.4%     |
| **H139** | 47.2%     | 42.1%     |
| **H141** | 42.8%     | 50%       |
| **H142** | 42.7%     | 44.8%     |
| **H146** | 47.1      | 43.7%     |

*Compare* Exhibit 7 *with* Exhibit 10.

Thus, at a minimum, Plan H283 maintains minority voting opportunities.  Hispanics retain the opportunities that they had to elect their candidates of choice under the benchmark plan.  And African-Americans have gained an opportunity, making Plan H283 an ameliorative plan in this respect.  For these reasons, the State is entitled to a declaration that Plan H283 does not have the effect of "diminishing the ability of any citizens . . . to elect their preferred candidates of choice."  42 U.S.C. § 1973c(b).

### 3.  Texas Senate

The Texas Senate plan retains the 7 Hispanic opportunity districts (S6, S19, S20, S21, S26, S27, and S29) and the 2 African-American opportunity districts (S13 and S23) from the

benchmark plan.  A comparison of the districts in the two plans demonstrates that there has been no retrogression.

Both plans have 7 districts in which the HCVAP is greater than 50%:

|  | S6 | S19 | S20 | S21 | S26 | S27 | S29 |
|---|---|---|---|---|---|---|---|
| **Plan S100** | 57.9% | 60.8% | 67.8% | 61% | 62.6% | 79.8% | 74% |
| **Plan S148** | 53% | 59.1% | 68.2% | 59.8% | 60.9% | 79.8% | 74.5% |

*Compare* Exhibit 14 *with* Exhibit 17.

And the HVAP in these 7 districts remains above 60% in Plan S148:

|  | S6 | S19 | S20 | S21 | S26 | S27 | S29 |
|---|---|---|---|---|---|---|---|
| **Plan S100** | 73.7% | 65.6% | 73.4% | 67.3% | 65.9% | 86.2% | 79% |
| **Plan S148** | 70% | 63% | 73.8% | 67.9% | 64.8% | 86.2% | 79.6% |

*Compare* Exhibit 13 *with* Exhibit 16.

Likewise, Plan S148 retains 2 districts in which African-Americans have the opportunity to elect their candidates of choice.  The BVAP in these districts are both above 40%, as in the benchmark plan:

|  | S13 | S23 |
|---|---|---|
| **Plan S100** | 43.2% | 41.1% |
| **Plan S148** | 44.3% | 40.9% |

*Compare* Exhibit 13 *with* Exhibit 16.

Plan S148 thus maintains the opportunities that both Hispanics and African-Americans had to elect their respective candidates of choice under the benchmark plan.  The State is therefore entitled to a declaration that Plan S148 does not have the effect of "diminishing the ability of any citizens . . . to elect their preferred candidates of choice."  42 U.S.C. § 1973c(b).

### 4.  Texas State Board of Education

The Texas Board of Education plan is not retrogressive because it retains the 3 Hispanic opportunity districts and the 2 districts in which African-Americans make up greater than 30% of the population.  The 3 Hispanic opportunity districts in Plan E120 each have HCVAP greater than 50%, just as before:

|        | E1    | E2    | E3    |
|--------|-------|-------|-------|
| **E100** | 66.5% | 62.1% | 63.3% |
| **E120** | 67.4% | 60.9% | 64.5% |

*Compare* Exhibit 20 *with* Exhibit 23.

And the 3 districts retain an HVAP greater than 60%:

|        | E1    | E2    | E3    |
|--------|-------|-------|-------|
| **E100** | 73.6% | 69.4% | 68.2% |
| **E120** | 74.5% | 68.8% | 68.5% |

*Compare* Exhibit 19 *with* Exhibit 22.

Plan E120 also maintains African-American voting strength by retaining the 2 districts with BVAP greater than 30%:

15

|        | E4    | E13   |
|--------|-------|-------|
| **E100** | 33.9% | 32.1% |
| **E120** | 33.7% | 31.3% |

*Compare* Exhibit 19 *with* Exhibit 22.

Plan E120 thus maintains the opportunities that both Hispanics and African-Americans had to elect candidates of choice under the benchmark plan. The State is therefore entitled to a declaration that Plan E120 does not have the effect of "diminishing the ability of any citizens . . . to elect their preferred candidates of choice." 42 U.S.C. § 1973c(b).

## II.     THE PLANS DO NOT HAVE ANY DISCRIMINATORY PURPOSE.

Texas is also entitled, as a matter of law, to declaratory judgments that the plans do not have the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group because they were not motivated by any discriminatory purpose.

### A.     Under the 2006 Amendments to Section 5 of the VRA, "Purpose" Refers Only to Intentional Discrimination That Itself Violates the Fourteenth or Fifteenth Amendment.

In addition to showing the absence of a retrogressive effect, Section 5 of the VRA also requires that the State demonstrate that the plans do not have "the purpose . . . of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title." 42 U.S.C. § 1973c(a); *see Bossier Parish I*, 520 U.S. at 478. Section 1973b(f)(2) extends the VRA's protections to "member[s] of a language minority group." 42 U.S.C. § 1973b(f)(2).

16

Prior to the 2006 amendments to the VRA, the Supreme Court had interpreted this purpose prong of Section 5 to require covered jurisdictions to prove only that a change in voting practices did not have a *retrogressive* purpose. *Bossier Parish II*, 528 U.S. at 328-41. As a result, a change with a discriminatory but nonretrogressive purpose did not foreclose preclearance. *Id.* at 340-41.

Congress abrogated this holding in 2006 by adding subsection (c) to Section 5. 42 U.S.C. § 1973c(c); S. REP. NO. 109-295, at 14, 15 (2006). That subsection now defines "purpose" in Section 5 to include "any discriminatory purpose." 42 U.S.C. § 1973c(c).

In this context, "any discriminatory purpose" refers *only* to intentional discrimination that itself violates the Fourteenth or Fifteenth Amendment. The purported mischief that this new language sought to cure was the prospect that the Department of Justice or this Court might be required to preclear redistricting plans "'that have an unconstitutional, racially discriminatory purpose as long as the purpose is simply to perpetuate unconstitutional conditions and not to actually make them worse,'" in which case the federal government would be "giving its seal of approval to practices that violate the Constitution." S. REP. NO. 109-295, at 14 (2006) (quoting Pamela S. Karlan, Responses to Written Questions from Sen. Kennedy (submitted for May 16, 2006 hearing)). To avoid that outcome, Congress redefined "purpose" to include "any discriminatory purpose," 42 U.S.C. § 1973c(c), reasoning that this phrase "is the language that the Supreme Court uses in defining unconstitutional behavior under the Fourteenth and Fifteenth Amendments," S. REP. NO. 109-295, at 15 (citing *City of Mobile v. Bolden*, 446 U.S. 55 (1980); *Washington v. Davis*, 426 U.S. 229 (1976)).

17

Consequently, "'the amendment of section 5 to overturn the Supreme Court's interpretation in *Bossier II . . . only* forbids states from making changes that would themselves violate the Fourteenth and Fifteenth Amendments.'" *Id.* (quoting Testimony of Pamela S. Karlan, The Continuing Need for Section 5 Pre-Clearance, Hrg.  Before the Senate Judiciary Committee (May 16, 2006)).

Under revised Section 5, then, a covered jurisdiction need only establish that it did not enact a voting change because of purposeful, invidious intent to discriminate against persons because of their race, ethnicity, national origin, or membership in a language minority group. *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) ("[I]n order for the Equal Protection Clause to be violated, the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose."); *Bolden*, 446 U.S. at 65 (plurality op.) (noting that the Fifteenth Amendment "prohibits only purposefully discriminatory denial or abridgement by government of the freedom to vote 'on account of race, color, or previous condition of servitude'" (quoting U.S. CONST. amend. XV, § 1)).[4]   In this regard, "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation,

---

4.   *See also* H.R. REP. 109-478, at 42 (2006) (observing that, "[t]hrough the 'purpose' requirement [in Section 5], Congress sought to prevent covered jurisdictions from enacting and enforcing voting changes made with a clear racial animus"); S. REP. 109-295, at 17 (2006) ("The Constitution and the courts already define racial discrimination and it is that constitutional definition which we incorporate" into Section 5.).

some internal quotation marks, and footnote omitted).

Because Section 5's purpose prong bars preclearance only when a covered jurisdiction engages in unconstitutional discrimination actually motivated by racial or ethnic animus, there remain broad categories of complaints that may arise in voting-rights litigation, but that do not present any obstacle to preclearance. Among the allegations that do *not* defeat preclearance are:

- The voting-procedure change has a disparate *impact* on members of a particular racial, ethnic, or language minority. *Bolden*, 446 U.S. at 70 (plurality op.) ("[W]here the character of the law is readily explainable on grounds apart from race, . . . disproportionate impact alone cannot be decisive, and courts must look to other evidence to support a finding of discriminatory purpose."); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact."). *Cf.* 42 U.S.C. § 1973 (noting that Section 2 of the VRA does not establish "a right to have members of a protected class elected in numbers equal to their proportion in the population.").

- The drafters of the voting-procedure change were cognizant of race in their efforts. *Shaw v. Reno*, 509 U.S. 630, 646 (1993) ("[T]he legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination."); *see also Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process.").

- The voting-procedure change fails to optimize or maximize the number of majority-minority districts. *Miller*, 515 U.S. at 924 ("The State's policy of adhering to other districting principles instead of creating as many majority-minority districts as possible does not support an inference that the plan 'so discriminates on the basis of race or color as to violate the Constitution . . . .'" (quoting *Beer*, 425 U.S. at 141)); S.

19

REP. 109-295, at 17 (2006) ("The language 'any discriminatory purpose' [in Section 5] does not permit a finding of discriminatory purpose that is based, in whole or part, on a failure to adopt the optimal or maximum number of majority-minority districts or compact minority opportunity districts.").

- The voting-procedure change is dilutive in violation of Section 2 of the VRA. *Bossier Parish I*, 520 U.S. at 487-88 ("[A] jurisdiction's single decision to choose a redistricting plan that has a dilutive impact does not, without more, suffice to establish that the jurisdiction acted with a discriminatory purpose."); *Shaw v. Hunt*, 517 U.S. 899, 913 n.6 (1996) ("[W]e doubt that a showing of discriminatory effect under § 2, alone, could support a claim of discriminatory purpose under § 5.").

- The voting-procedure change does not guarantee that a minority group can elect their preferred candidates of choice in proportion to the group's share of the population. *Bolden*, 446 U.S. at 75-76 (plurality op.) ("The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization."); *see also id.* at 86 (Stevens, J., concurring in the judgment) ("Neither *Gomillion* [*v. Lightfoot*, 364 U.S. 339 (1960)] nor any other case decided by this Court establishes a constitutional right to proportional representation for racial minorities.").

- The voting-procedure change seeks to maintain or increase partisan advantage. *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."); S. REP. 109-295, at 17 (2006) ("The language 'any discriminatory purpose' [in Section 5] does not permit . . . a finding of discriminatory purpose based on a determination that the plan seeks partisan advantage or protects incumbents.").

Likewise, any other showing about the process or outcome of a covered voting-procedure change that fails to demonstrate purposeful, invidious intent to discriminate against persons *because of* their race, ethnicity, or national origin does not establish a violation of the Fourteenth or Fifteenth Amendment and, therefore, does not defeat preclearance under

20

Section 5 of the VRA.

> **B.      The Court Should Construe and Apply Section 5's Purpose Prong Narrowly to Avoid Constitutional Infirmities.**

Congress's decision to limit revised Section 5's purpose prong to conduct that itself violates the Fourteenth or Fifteenth Amendment avoids at least one constitutional pitfall—it obviates any inquiry into whether Congress could employ its enforcement powers under those Amendments to target a broader range of conduct through Section 5's purpose element. *Cf. United States v. Georgia*, 546 U.S. 151, 158 (2006) (noting that "no one doubts that § 5 [of the Fourteenth Amendment] grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the States for *actual* violations of those provisions"); *United States v. Raines*, 362 U.S. 17, 26 (1960) (explaining that, because "the complaint clearly charged a violation of the Fifteenth Amendment," then "the statute, if applicable only to this class of cases, would unquestionably be valid legislation under that Amendment").

Still, this limit on Section 5's purpose prong does not wholly secure that provision's constitutional footing.  For in Section 5, Congress has not simply created a remedy for *proven* constitutional violations; rather, it has imposed upon certain jurisdictions the extraordinary burden of suspending *all* changes in their voting procedures until they affirmatively *disprove* that those changes were motivated by invidious racial discrimination in violation of the Fourteenth or Fifteenth Amendment.  42 U.S.C. § 1973c.

The "serious constitutional questions" raised by this requirement are well known.  *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2513 (2009).  In particular, Section 5 preclearance exacts "substantial federalism costs." *Id.* at 2511 (internal quotation marks and citation omitted); *accord Bossier Parish II*, 528 U.S.  at 336; *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999); *Bossier Parish I*, 520 U.S. at 480; *Miller*, 515 U.S. at 926.  Among these, "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller*, 515 U.S. at 915.[5]  Moreover, that intrusion may no longer be "justified by current needs." *See Nw. Austin*, 129 S. Ct. at 2512.  At the least, current needs may not warrant Section 5's selective coverage, which represents a departure from the bedrock constitutional principle that the States enjoy "equal sovereignty." *See id.* (quoting *United States v. Louisiana*, 363 U.S. 1, 16 (1960)).

And even aside from these structural concerns, Section 5 "imposes upon a covered jurisdiction the difficult burden of proving the *absence* of discriminatory purpose." *Bossier Parish I*, 520 U.S. at 480.  Not only is it "never easy to prove a negative," *Elkins v. United States*, 364 U.S. 206, 218 (1960), it is particularly "unfair" to require a party to negate a subjective mental state, *see Patterson v. New York*, 432 U.S. 197, 211 n.13 (1977) (quoting *People v. Patterson*, 347 N.E.2d 898, 909 (N.Y. 1976) (Breitel, C.J., concurring)) (noting

---

5.   *See* U.S. CONST. art. I, § 2 & amend. X; *Growe v. Emison*, 507 U.S. 25, 34 (1993) ("'We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.'" (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)); *see also Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) (op. of Black, J.) ("No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices.").

problem in allocating to the prosecution the burden of disproving that the defendant acted with extreme emotional distress).  Imposing such a burden on a State (and, here, its 181 individual legislators) in the context of one of the core functions reserved to it by the Constitution certainly exacerbates the substantial federalism problems outlined above.

The Court should endeavor to construe and apply Section 5's purpose prong in a manner that at least mitigates these constitutional concerns.  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  Such a construction may be found in existing precedent.  The Supreme Court has recognized that "[e]lectoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests." *Miller*, 515 U.S. at 915.  In litigation, that discretion manifests in part in a *presumption* that a state legislature has acted in "good faith."  *Id.*  Courts must heed this presumption, as well as "the intrusive potential of judicial intervention into the legislative realm," in "assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery or trial to proceed." *Id.* at 916-17 (citing, *inter alia*, FED. R. CIV. P. 56).

Given that this good-faith presumption informs the requisite showing in a redistricting suit, and that Section 5 aims to assess redistricting plans "as a whole," *Ashcroft*, 539 U.S. at 479, it should suffice for this stage of a preclearance case that a State make a *prima facie* showing through competent evidence that its redistricting plans were motivated by ordinary districting principles and, therefore, not by any invidious unconstitutional purpose. *Cf. Miller*,

515 U.S. at 916-17.   That should be enough to shift the burden to any party opposing preclearance to make a clear and cogent demonstration to the contrary before a trial is required—particularly on the compressed schedule that Congress knew would be necessary to preclear voting-procedure changes for upcoming elections.   *Cf.* 42 U.S.C. § 1973c(a) (providing for administrative preclearance within sixty-day period).   This framework at least tempers the serious constitutional concerns identified above.   Indeed, it is this sort of narrow construction of Section 5's purpose prong that underlies Texas's willingness to assume Section 5's constitutionality for purposes of this action and to reserve any applicable legal claims in that regard.   Complaint, Intro. Para. (Doc. 1).

**C.**    **The Plans Do Not Have the Purpose of Denying or Abridging the Right to Vote on Account of Race, Color, or Language Minority Because They Were Not Motivated by Any Discriminatory Purpose.**

Applying the standard discussed above, the evidence below conclusively establishes that each of the redistricting plans at issue in this action was motivated by ordinary districting principles and, therefore, not by any invidious unconstitutional purpose.   Accordingly, the Court should declare that the plans do not have the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group because they are not motivated by any discriminatory purpose.

**1.**    **United States Congress**

The impetus for redistricting Texas's U.S. Congressional Districts was that the State's population growth, as revealed by the decennial census, demonstrated that Texas would be allotted four additional congressional districts and would need to equalize all districts'

24

populations in accord with the United States Constitution's "one person, one vote" principle. U.S. CONST. amend. XIV; *Reynolds v. Sims*, 377 U.S. 533, 566 (1964); Davis Depo. at 12:22-13:4, 20:4-9 (Exhibit 32);[6] *see also* Declaration of Burt Solomons ¶ 1 (Exhibit 25).[7]

The Texas Legislature also had to ensure that the new congressional plan complied with the VRA. H.J. of Tex., 82d Leg., 1st C.S. S9 (2011) (statement of Rep. Solomons) (Exhibit 33) (explaining efforts to "determine a compliance with the Voting Rights Act, Sections 2 and 5"); *id.* at S10 (acknowledging "several important elements to comply with the Voting Rights Act"); *id.* at S64 (describing Legislature's use of retrogression analysis); Downton Depo. Vol. I at 31:6-16 (Exhibit 30) (explaining use of demonstration maps and review of majority-minority districts to comply with Sections 2 and 5 of the VRA), 62:7-8 ("The map had to comply with the Voting Rights Act"); Davis Depo. at 12:22-13:5 (Exhibit 32) (stating that the staff was trying to satisfy "all the legal requirements of the Voting Rights Act"), 20:4-11 (agreeing that congressional plan had to comply with Sections 2 and 5 of the VRA).

Aside from meeting these legal obligations, the Texas Legislature sought to adhere to "traditional redistricting principles." Davis Depo. at 13:6-9 (Exhibit 32); *accord* H.J. of Tex., 82d Leg., 1st C.S. S62 (2011) (statement of Rep. Solomons) (Exhibit 33) (explaining that "there are a number of traditional redistricting matters that you look at" in redrawing

---

6. Doug Davis is an employee of the Texas Senate.

7. State Representative Burt Solomons served as Chair of the House Redistricting Committee during the 82d Legislature.

congressional districts).  Among these, the Legislature sought to maintain communities of interest,  H.J. of Tex., 82d Leg., 1st C.S. S64 (2011) (statement of Rep. Solomons) (Exhibit 33); Davis Depo. at 13:6-8 (Exhibit 32); to avoid pairing incumbents, H.J. of Tex., 82d Leg., 1st C.S. S11 (2011) (statement of Rep. Solomons) (Exhibit 33); Davis Depo. at 53:25-54:4, 54:10-18 (Exhibit 32); to avoid splitting cities where possible, H.J. of Tex., 82d Leg., 1st C.S. S11-S12 (2011) (statement of Rep. Solomons) (Exhibit 33); and to preserve the geographic cores of existing districts where possible, *id.* at S64; Davis Depo. at 53:25-54:10 (Exhibit 32).

At no point during the process of redistricting Texas's U.S. Congressional Districts did any member of the Texas Legislature, any staff to any member of the Texas Legislature, or anyone else propose a change that was offered for the purpose of harming any voter or group of voters on account of their race, ethnicity, or national origin.  Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26);[8] Declaration of Ryan Downton ¶ 1 (Exhibit 27);[9] Declaration of Gerardo Interiano ¶ 1 (Exhibit 28);[10] Declaration of Doug Davis ¶ 1 (Exhibit 29).  The legislative leadership would not have permitted any such proposal to be brought to the floor for debate or consideration.  Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26).  The only consideration of race in

---

8. State Senator Kel Seliger served as chair of the Senate Redistricting Committee during the 82d Legislature.

9. Ryan Downton served as general counsel for the House Committee on Redistricting during the 82d Legislature.

10. Gerardo Interiano is an employee of the Texas House of Representatives whose primary responsibility during the 82d Legislature was drafting and analyzing proposed Texas House of Representatives maps.

the process leading to passage of Texas's U.S. Congressional Districts redistricting plan related to compliance with the VRA's mandates. Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26).

Because the congressional map was not drawn with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group, it does not violate Section 5 and should be precleared.

### 2.    Texas House of Representatives

The impetus for redistricting the Texas House of Representatives was that the State's population growth, as revealed by the decennial census, demonstrated a need to equalize the House districts' populations in accord with the United States Constitution's "one person, one vote" principle and the Texas Constitution's similar equal-representation mandate. U.S. CONST. amend. XIV; *Reynolds*, 377 U.S. at 566; TEX. CONST. art. III, §§ 26, 28; *see* H.J. of Tex., 82d Leg., R.S. S99 (2011) (statement of Rep. Solomons) (Exhibit 34); Downton Depo. Vol. I at 13:16-22 (Exhibit 30); Interiano Depo. Vol. I at 45:7-9 (Exhibit 31); *see also* Declaration of Burt Solomons ¶ 1 (Exhibit 25).

In the process of redrawing the House districts to achieve equal representation, the Texas Legislature was required to heed other legal constraints. H.J. of Tex., 82d Leg., R.S. S100, S119 (2011) (statement of Rep. Solomons) (Exhibit 34) (noting goal of passing legal map); Downton Depo. Vol. I at 12:25-13:7 (Exhibit 30) (same); Interiano Depo. Vol. I at 44:20-45:6 (Exhibit 31) (same). For example, the Texas Constitution requires that the Legislature not unnecessarily divide a county between districts if the county has sufficient

population for its own district.  TEX. CONST. art. III, § 26; *see* H.J. of Tex., 82d Leg., R.S. S99 (2011) (statement of Rep. Solomons) (Exhibit 34) (referring to "need to comply with the county line rule under Article III, Section 26 of the Texas Constitution, which forbids us from breaking county lines"); *id.* at 120-21, 124-25 (statements of Rep. Solomons) (explaining that Texas Constitution's county-line mandate dictated number of districts in Nueces County and Harris County); *id.* at 215 (statement of Rep. Solomons) (explaining that the Texas Legislature could not violate the county-line rule to achieve other goals); Interiano Depo. Vol. I at 52:24-53:7 (Exhibit 31) (explaining refusal to draw districts that would violate county-line rule); *see also* Downton Depo. Vol. I at 13:16-20 (Exhibit 30) (noting need to comply with Texas Constitution).

Of course, the Texas Legislature also had to ensure that the new House plan complied with the VRA.  H.J. of Tex., 82d Leg., R.S. S112 (2011) (statement of Rep. Solomons) (Exhibit 34) (explaining that "we did try to . . . meet what we thought we needed to do under the Voting Rights Act" and that "one of the things I tried to go on is basically what the numbers are and what I was advised that we needed to do for certain districts to try to ensure compliance with the Voting Rights Act"); Downton Depo. Vol. I at 15:8-26:19 (Exhibit 30) (explaining efforts to comply with the VRA), Vol. II at 86:20-87:1; Interiano Depo. Vol. I at 129:17-130:6 (Exhibit 31) (noting that legal compliance, including VRA compliance, was the "number one" priority for the House map).

Aside from meeting these legal obligations, the Texas Legislature sought to achieve other goals.  Among these, the Legislature wanted to minimize the pairing of incumbents in

28

new districts. H.J. of Tex., 82d Leg., R.S. S99 (2011) (statement of Rep. Solomons) (Exhibit 34); Interiano Depo. Vol. II at 65:24-66:5 (Exhibit 31).   Because some pairings were unavoidable due to population shifts within the State, the Legislature sought to mitigate the effects of such pairings by not pairing incumbents from opposing parties, thereby "giv[ing] each member the opportunity to win their district."   *Id.*; *accord* Interiano Depo. Vol. I at 61:20-62:5, Vol. II at 32:9-18, 36:7-17 (Exhibit 31) (explaining that goal in drawing districts "was to make sure that every member of the Legislature had the opportunity to be re-elected"). More generally, the Legislature wanted to accommodate the input of members and interest groups when appropriate.   *See* H.J. of Tex., 82d Leg., R.S. S115 (2011) (statement of Rep. Solomons) (Exhibit 34).

At no point during the process of redistricting the Texas House of Representatives did any member of the Texas Legislature, any staff to any member of the Texas Legislature, or anyone else propose a change that was offered for the purpose of harming any voter or group of voters on account of their race, ethnicity, or national origin.   Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26); Declaration of Ryan Downton ¶ 1 (Exhibit 27); Declaration of Gerardo Interiano ¶ 1 (Exhibit 28); Declaration of Doug Davis ¶ 1 (Exhibit 29). The legislative leadership would not have permitted any such proposal to be brought to the floor for debate or consideration.   Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26).   The only consideration of race in the process leading to passage of the Texas House of Representatives redistricting plan related to compliance with the VRA's mandates.   Declaration of Burt Solomons ¶ 2 (Exhibit 25);

Declaration of Kel Seliger ¶ 2 (Exhibit 26).

Because the Texas House of Representatives map was not drawn with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group, it does not violate Section 5 and should be precleared.

### 3.    Texas Senate

The impetus for redistricting the Texas Senate was that the State's population growth, as revealed by the decennial census, demonstrated a need to equalize the Senate districts' populations in accord with the United States Constitution's "one person, one vote" principle and the Texas Constitution's similar equal-representation mandate. U.S. CONST. amend. XIV; *Reynolds*, 377 U.S. at 566; TEX. CONST. art. III, §§ 26, 28; S.J. of Tex., 82d Leg., R.S. A-1 (2011) (statement of Sen. Seliger) (Exhibit 36); *see* Declaration of Burt Solomons ¶ 1 (Exhibit 25). The Legislature also was required to comply with the VRA. S.J. of Tex., 82d Leg., R.S. A-1 (2011) (statement of Sen. Seliger) (Exhibit 36) ("Texas must comply with both Section 2 and [Section 5] of the Voting Rights Act"); *id.* at A-12 ("I was particularly careful as we went through this map, to pay attention to the Voting Rights Act."); *see also* Davis Depo. at 156:14-22 (Exhibit 32) (explaining need to comply with Section 5 when working on Senate plan).

At no point during the process of redistricting the Texas Senate did any member of the Texas Legislature, any staff to any member of the Texas Legislature, or anyone else propose a change that was offered for the purpose of harming any voter or group of voters on account of their race, ethnicity, or national origin. Declaration of Burt Solomons ¶ 2 (Exhibit 25);

Declaration of Kel Seliger ¶ 2 (Exhibit 26); Declaration of Ryan Downton ¶ 1 (Exhibit 27);

Declaration of Gerardo Interiano ¶ 1 (Exhibit 28); Declaration of Doug Davis ¶ 1 (Exhibit 29).

The legislative leadership would not have permitted any such proposal to be brought to the

floor for debate or consideration.  Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration

of Kel Seliger ¶ 2 (Exhibit 26).   The only consideration of race in the process leading to

passage of the Texas Senate redistricting plan related to compliance with the VRA's

mandates.  Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2

(Exhibit 26).

Because the Texas Senate map was not drawn with the purpose of denying or abridging

the right to vote on account of race, color, or membership in a language minority group, it

does not violate Section 5 and should be precleared.

### 4.    Texas State Board of Education

The impetus for redistricting the Texas State Board of Education was that the State's

population growth, as revealed by the decennial census, demonstrated a need to equalize the

Board districts' populations in accord with the United States Constitution's "one person, one

vote" principle and the Texas Education Code's similar mandate for decennial

reapportionment.  U.S. CONST. amend. XIV; *Reynolds*, 377 U.S. at 566; TEX. EDUC. CODE §

7.104(a)-(b);  *see* H.J. of Tex., 82d Leg., R.S. 1810 (2011) (statement of Rep. Solomons)

(Exhibit 35); *see also* Declaration of Burt Solomons ¶ 1 (Exhibit 25).

In the process of redrawing the Board districts to achieve equal representation, the

Texas Legislature was required to heed other legal constraints.  H.J. of Tex., 82d Leg., R.S.

1811 (2011) (statement of Rep. Solomons) (Exhibit 35) (noting goal of passing legal map). The Legislature had to ensure that the new Board plan complied with the VRA.  *Id.* at 1810 (explaining that "[i]n order to meet the requirements of the Voting Rights Act, we cannot regress the five minority-majority districts from being able to elect the candidate of their choice" and that "[a] retrogression analysis has been done on all the districts"); *see also* Davis Depo. at 156:14-22 (Exhibit 32) (explaining need to comply with Section 5 when working on Board plan).  As part of this effort, the Legislature redrew the districts to be "as compact as possible."  H.J. of Tex., 82d Leg., R.S. 1810 (2011) (statement of Rep. Solomons) (Exhibit 35).

In the course of meeting these legal obligations, the Texas Legislature also adhered to "traditional redistricting princip[les]" in redrawing the Board districts.  *Id.*  For example, the Legislature sought to protect incumbents by "enhanc[ing] the strength of the prevailing party" in each district and "not pair[ing] any incumbents."  *Id.*  The Legislature also sought to "maintain[] communities of interest . . . and the core of previous districts, counties, and cities."  *Id.*  Along these lines, the Legislature reduced the number of school districts that were split between two Board districts.  *Id.* at 1811.  Finally, the Legislature endeavored to respond to input from the public.  *Id.* at 1810-11.

At no point during the process of redistricting the Texas State Board of Education did any member of the Texas Legislature, any staff to any member of the Texas Legislature, or anyone else propose a change that was offered for the purpose of harming any voter or group of voters on account of their race, ethnicity, or national origin.  Declaration of Burt Solomons

¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26); Declaration of Ryan Downton ¶ 1 (Exhibit 27); Declaration of Gerardo Interiano ¶ 1 (Exhibit 28); Declaration of Doug Davis ¶ 1 (Exhibit 29). The legislative leadership would not have permitted any such proposal to be brought to the floor for debate or consideration. Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26). The only consideration of race in the process leading to passage of the Texas State Board of Education redistricting plan related to compliance with the VRA's mandates. Declaration of Burt Solomons ¶ 2 (Exhibit 25); Declaration of Kel Seliger ¶ 2 (Exhibit 26).

Because the Texas State Board of Education map was not drawn with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group, it does not violate Section 5 and should be precleared.

CONCLUSION

The Court should grant the State's motion for summary judgment and declare : (1) that the State's redistricting plans for U.S. Congress, Texas House of Representatives, Texas Senate, and Texas State Board of Education neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority and otherwise fully comply with section 5 of the Voting Rights Act; and (2) that the State's redistricting plans for U.S. Congress, Texas House of Representatives, Texas Senate, and Texas State Board of Education may be implemented immediately.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID MORALES
Deputy First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation

DAVID C. MATTAX
Director of Defense Litigation

*/s/ David J. Schenck*
DAVID J. SCHENCK
Deputy Attorney General for Legal Counsel

J. REED CLAY, JR.
Special Assistant and Senior Counsel to the
Attorney General

BRUCE D. COHEN
Special Assistant to the Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.] (512) 936-0596
[Fax] (512) 474-2697
*david.schenck@oag.state.tx.us*

COUNSEL FOR PLAINTIFF

34

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via the Court's electronic notification system to the following parties on September 14, 2011:

Daniel J. Freeman
U.S. DEPARTMENT OF JUSTICE
Voting Section, Civil Rights Division
950 Pennsylvania Avenue, NW
NWB Room 7203
Washington, DC 20530
*daniel.freeman@usdoj.gov*

John M. Devaney
Marc Erik Elias
PERKINS COIE, LLP
700 13th Street NW, Suite 700
Washington, DC 20005-2000
*melias@perkinscoie.com*
*jdevaney@perkinscoie.com*

Nina Perales
MEXICAN AMERICAN LEGAL
DEFENSE & EDUCATIONAL
FUND, INC.
110 Broadway, Suite 300
San Antonio, TX 78205
*nperales@maldef.org*

Ray Velarde
1216 Montana Avenue
El Paso, TX 79902
*velardelaw2005@yahoo.com*

Robert Stephen Notzon
1507 Nueces Street
Austin, TX 78701-1501
*robert@notzonlaw.com*

Mark A. Posner
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
*mposner@lawyerscommittee.org*

John Kent Tanner
3743 Military Road, NW
Washington, DC 20015
*john.k.tanner@gmail.com*

Joseph Gerald Hebert
191 Somervelle Street, Suite 405
Alexandria, VA 22304
*jghebert@comcast.net*

*/s/ David J. Schenck*
DAVID J. SCHENCK