IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:11-cv-01303 |
| UNITED STATES OF AMERICA, *et al.*, | ) | (RMC-TBG-BAH) |
| | ) | Three-Judge Court |
| Defendants, | ) | |
| | ) | |
| WENDY DAVIS, *et al.,* | ) | |
| | ) | |
| Defendant Intervenors, | ) | |
| | ) | |
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| | ) | |
| GREG GONZALES, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| TEXAS LEGISLATIVE BLACK CAUCUS, | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| | ) | |
| TEXAS LATINO REDISTRICTING TASK FORCE, | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| | ) | |
| TEXAS STATE CONFERENCE OF NAACP BRANCHES, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT-INTERVENORS' JOINT MEMORANDUM
## IN OPPOSITION TO TEXAS' SUMMARY JUDGMENT MOTION:
## SECTION 5 LEGAL STANDARDS

This memorandum is respectfully submitted, jointly, by all defendant- intervenor groups, in opposition to the State of Texas' motion for summary judgment [Doc. 41], to identify the legal standards governing this declaratory judgment action under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.  Intervenors will file separate memoranda applying the legal standards to the redistricting plans at issue.  In accord with Judge Collyer's urging that briefing be direct and straightforward, intervenors set out the governing legal standards using an outline format.[1]

As set forth below, the Texas has committed two clear legal errors in its summary judgment argument.  First, as to whether the new redistricting plans have a prohibited discriminatory effect, Texas wrongly asserts that this Court should utilize a simplistic, bright-line rule for identifying the election districts in which minority voters have an ability to elect their preferred candidates of choice (a key issue in the "effect" analysis").  Section 5 caselaw plainly holds that no such bright-line rule exists, and that this Court must evaluate minority voters' "ability to elect" by reviewing a variety of electoral factors.  While this may involve a more complex analysis than the State desires, the State's wishes in this regard do not accurately reflect the law, and indeed the State fails to cite any Section 5 authority for the bright-line rule it proposes.

Second, as to whether the new plans have a prohibited discriminatory purpose, Texas wrongly seeks to shift the burden of proof it bears on this issue (as well as on the "effect" issue) from itself to the defendants.  Since Section 5 was enacted in 1965, covered jurisdictions have

---

[1] Certain of the intervenor groups also will include some additional legal points in their separate briefs, regarding issues relevant to their particular opposition to the State's summary judgment motion.

had the burden of demonstrating that their voting changes have neither a discriminatory purpose nor a discriminatory effect.

For these reasons (as well as for the reasons set forth in intervenors' additional briefing), Texas' summary judgment motion should be denied.

## I.   Overview of the Section 5 Preclearance Requirement

A.   *Section 5 prohibits both discriminatory purpose and discriminatory effect*:  To obtain preclearance, jurisdictions covered by Section 5 must demonstrate that each new voting "qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, or color, or [membership in a language minority group]."[2]

B.   *Burden of proof*:  Section 5 jurisdictions bear the burden of proof.[3]

C.   *Section 5 coverage*: Texas is a jurisdiction covered by Section 5,[4] and Section 5 applies to redistricting plans.[5]

D.   *Scope of this Court's legal review*: This Court is required to make the Section 5 discriminatory "purpose" and "effect" determinations for all three redistricting plans before it.

---

[2] 42 U.S.C. 1973c(a).  Section 5 prohibits discrimination "on account of race, or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 U.S.C. § 1973b(f)(2)]."  Section 4(f)(2) prohibits discrimination based on membership in a "language minority group." Section 14(c)(3) of the Act, 42 U.S.C. § 1973*l*(c)(3) defines "language minority group" to include "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage."

Section 5's prohibition on voting changes that have a discriminatory purpose or effect has been the legal standard since Section 5 was enacted in 1965.  Pub. L. No. 89-110, 79 Stat. 437, 439 (1965).  Originally, the prohibition concerned discrimination "on account of race or color."  *Id.*  The further prohibition on discrimination on account of language-minority group membership was added by Congress in 1975.  Pub. L. No. 94-73, 89 Stat. 400, 400-02 (1975).

[3] *Georgia v. Ashcroft*, 539 U.S. 461, 471 (2003); *Georgia v. United States*, 411 U.S. 526, 538 (1973); *South Carolina v. Katzenbach*, 383 U.S. 301, 328, 335 (1966); 28 C.F.R. § 51.52(a).

[4] 28 C.F.R. Pt. 51 App.

[5] *Georgia v. United States*, 411 U.S. at 531; 28 C.F.R. § 51.13(e).

This Court's review is not limited to the plans opposed by Defendant United States or to the specific districts challenged by the United States.[6]

## II.  Section 5 "Effect" Standard

A.  *Discriminatory effect means retrogression*:  Pursuant to the Supreme Court's 1976 decision in *Beer v. United States*, the Section 5 "effect" standard means that covered jurisdictions may not obtain preclearance for retrogressive voting changes, *i.e.*, voting changes "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."[7]

B.  *Retrogression comparison*:  For redistrictings, the retrogression standard requires a comparison between minorities' "effective exercise of the electoral franchise" under the proposed plan (a predictive judgment) and the existing plan (the "benchmark").[8]  As matters now stand, the benchmark plans in this case are the plans implemented for U.S. Congress, the state House, and the state Senate in the 2010 elections in Texas.[9]  However, the United States District Court for the Western District of Texas, in *Perez v. State of Texas*, no. 5:11-cv-360, and *Davis v. Perry*, 5:11-cv-788, is considering whether to order interim redistricting plans into effect for the Texas congressional delegation and the Texas House (*Perez*, Doc. 391), and for the Texas Senate (*Davis*, Doc. 15), for elections in 2012.  If that court adopts its own plans, they become the

---

[6] *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 72-73 (D.D.C. 2002), *vacated and remanded on other grounds*, 539 U.S. 461 (2003)

[7] 425 U.S. 125, 141.  A voting change that is ameliorative, or that is neither retrogressive nor ameliorative, does not violate the Section 5 "effect" standard.  *City of Lockhart v. United States*, 460 U.S. 125, 134 & n.10 (1983).

[8] *Reno v. Bossier Parish School Board*, 520 U.S. 471, 478 (1997) ("*Bossier I*") (discussing prior Supreme Court decisions).

[9] The benchmark plan is the last legally enforceable plan "in force or effect."  *Riley v. Kennedy*, 553 U.S. 406 (2008); Dep't of Justice Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 470 (Feb. 9, 2011) ("2011 Guidance"); 28 C.F.R. 51.54(c)(1).  It usually (although not always) is the case that the plan used in the most recent election is the benchmark plan.  *See Georgia v. Ashcroft*, 195 F. Supp. 2d  at 37.

benchmark plans in this litigation for determining whether Texas' 2011 plans for Congress and the state House are retrogressive.[10]

C. *For redistrictings, retrogression is a plan-wide determination*:  A redistricting plan is retrogressive when the plan, as a whole, is retrogressive.  This necessarily requires an examination of changes made to individual districts (*i.e.*, whether, in individual districts, minorities' "effective exercise of the electoral franchise" is reduced, increased, or unchanged).  Once the district-specific determinations are made, the ultimate retrogression determination is made by assessing the new plan's net effect on minorities' "effective exercise of the electoral franchise."[11]

D. *Retrogression here focuses on minorities' ability to elect candidates of choice*:  A redistricting plan reduces minorities' "effective exercise of the electoral franchise," and thus is retrogressive, when the plan reduces the ability of minority voters to elect candidates of their choice to the legislative body at issue.

1. The "ability to elect" standard is specified in the statutory language of Section 5, pursuant to Congress' 2006 amendments to the Voting Rights Act.[12]  These amendments clarified Congress' intent regarding the meaning of Section 5's discriminatory "effect"

---

[10] *State of Mississippi v. Smith*, 541 F. Supp. 1329, 1333 (D.D.C. 1982).  Redistricting plans prepared and adopted by federal courts are not subject to Section 5 preclearance, unless they reflect the policy choices of the covered jurisdiction.  *McDaniel v. Sanchez*, 452 U.S. 130, 138, 153 (1981).

[11] *Georgia v. Ashcroft*, 539 U.S. at 479 ("[I]n examining whether the new plan is retrogressive, the inquiry must encompass the entire statewide plan as a whole.  [Citation omitted.]  Thus, while the diminution of a minority group's effective exercise of the electoral franchise in one or two districts may be sufficient to show a violation of § 5, it is only sufficient if the covered jurisdiction cannot show that the gains in the plan as a whole offset the loss in a particular district.").

[12] Pub.. L. No. 109-246, 120 Stat. 577, 580-811 (2006) *codified at* Sections 5(b) and 5(d) of the Voting Rights Act, 42 U.S.C. § 1973c(b) (a voting change "that has the purpose of or will have the effect of diminishing the ability of [minority] citizens . . . to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of [Section 5]") and § 1973c(d) (Section 5 "protect[s] the ability of [minority] citizens to elect their preferred candidates of choice").

prohibition, returning the "effect" analysis to the "ability to elect" focus that existed prior to the

Supreme Court's 2003 decision in *Georgia v. Ashcroft*.[13]

      2.  Minority voters have an "ability to elect" when the evidence demonstrates that: a) a

single minority group likely may elect a candidate of its choice; or b) two or more minority

groups typically form electoral coalitions and this coalition likely has an "ability to elect."[14]

"Ability to elect" does not mean, however, that minority-preferred candidates are assured of

victory.[15]

      E.  *Judging whether minorities have an "ability to elect" in the districts at issue*:

Assessing whether there is an "ability to elect" requires an analysis of all the relevant electoral

---

[13] In *Ashcroft*, the Supreme Court created a new, four-part "totality of the circumstances" test for retrogression that included "ability to elect" and three other factors.  539 U.S. at 482-84.  As recently explained by United States District Judge Bates of this Court, "[i] reauthorizing  the Act in 2006, Congress expressed concern that the Georgia v. Ashcroft framework had introduced 'substantial uncertainty' into the administration of a statute that was 'specifically intended to block persistent and shifting efforts to limit the effectiveness of minority political participation.'"  *Shelby County v. Holder*, 2011 U.S. Dist. LEXIS 107305 (D.D.C. Sep. 21, 2011), at 35-35, *quoting* H.R. Rep. No. 109-478 (2006), at 70, *appeal filed*, no. 11-5256 (Sep. 23, 2011).  The House Report for the 2006 reauthorization further clarified that "in amending Section 5 to add a new subsection (b), the Committee makes clear that in making preclearance determinations under Section 5, the comparative 'ability [of the minority community] to elect preferred candidates of choice' is the relevant factor to be evaluated when determining whether a voting change has a retrogressive effect . "  H. R.Rep. No. 109-478, at 71; *see also* S. Rep. 109-295, at 21 (2006) ("[T]he bill rejects the Supreme Court's interpretation of section 5 in *Georgia v. Ashcroft*, and establishes that the purpose of section 5's protection of minority voters is, in the words of the bill, to protect the ability of such citizens to elect their preferred candidates of choice.") (internal quotation marks omitted).  It is important to note, however, that other notations of Section 5 law by the Supreme Court in *Ashcroft* were not addressed by Congress in the 2006 amendments, and thus remain valid guideposts for resolving this litigation.

    The pre-*Ashcroft* authorities that endorsed the "ability to elect" standard included: *Georgia v. Ashcroft*, 195 F. Supp. 2d at 73 ("the new apportionment plan must not have the effect or purpose of providing minority voters with less opportunity to elect candidates of choice than did the previous plan"); *City of Rome v. United States*, 446 U.S. 145, 183-84 (1980) (the new election system was retrogressive because it "significantly decreased the opportunity for . . . a Negro candidate [to be elected]."); *Beer v. United States*, 425 U.S. at 141-42 (the new redistricting plan was not retrogressive because it would allow one to two minorities to be elected whereas the old plan did not allow any to be elected); Dep't of Justice Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 66 Fed. Reg. 5412, 5413 (Jan. 18, 2001) ("The effective exercise of the electoral franchise usually is assessed in redistricting submissions in terms of the opportunity for minority voters to elect candidates of their choice.").

[14] *Georgia v. Ashcroft*, 539 U.S. at 480-81.

[15] *Georgia v. Ashcroft*, 195 F. Supp. 2d at 74.

circumstances affecting elections in a particular district; there is no single statistic (*e.g.,* the minority citizen voting-age-population percentage or voter registration percentage) which is determinative of whether there is an "ability to elect."[16]  This multi-factor approach sometimes is referred to as a "functional analysis" of the electoral process.[17]

    1.  The relevant circumstances include, most particularly, the size of the district's minority population (considering citizenship rates, voting age population, and voter registration),[18] and whether and to what extent voting is racially polarized.[19]  Other relevant factors may include whether several minority groups form electoral coalitions, the role of incumbency in past election results, and factors that affect turnout rates by race (such as socioeconomic factors and a history of voting discrimination).[20]  The assessment also may

---

[16] *Georgia v. Ashcroft*, 539 U.S. at 480 ("No single statistic provides courts with a shortcut to determine whether a voting change retrogresses from the benchmark.") (internal quotation marks omitted), 485 (referring to the "many factors relevant in assessing whether a minority group is able to elect a candidate of choice"); *Georgia v. Ashcroft*, 195 F. Supp. 2d at 74 ("While courts have frequently considered the number of 'majority-minority' districts as indicative of minority voting strength, the parties in this matter apparently agree that Section 5 is not an absolute mandate for maintenance of such districts. This agreement is entirely proper."), 76 ("In a Section 5 case, this court's analysis . . . is fact-intensive and must carefully scrutinize the context in which the proposed voting changes will occur."), 79 ("The legal standard is not total population, voting age population, voting age citizen population or registration, but the ability to elect. The Supreme Court repeatedly has declined to elevate any of these factual measures to a magic parameter.") (internal quotation marks omitted); 2011 Guidance, 76 Fed. Reg. at 747 ("the Attorney General does not rely on any predetermined or fixed demographic percentages at any point in the [retrogression] assessment.").

[17] 2011 Guidance, 76 Fed. Reg. at 7471.

[18] *Georgia v. Ashcroft*, 195 F. Supp. 2d  at 78-79; 2011 Guidance, 76 Fed. Reg. at 7471.

[19] *Georgia v. Ashcroft*, 539 U.S. at 485 ("it is of course true that evidence of racial polarization is one of many factors relevant in assessing whether a minority group is able to elect a candidate of choice"); *Georgia v. Ashcroft*, 195 F. Supp. 2d at 76 ("In particular, the level of racially polarized voting, or the degree to which there is a correlation 'between the race of a voter and the way in which the voter votes,' *Thornburg v. Gingles,* 478 U.S. 30, 53 & n.21 . . . (1986), sheds light on whether a decrease in districts' minority populations will produce an impermissibly retrogressive effect.").

[20] *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 439-40 (2006) (history of voting discrimination in Texas; that history's political, social, and economic legacy; and its present day impact on minority electoral opportunity).

include recent electoral trends, and any likely future changes to the relevant electoral circumstances.[21]

2.   Texas agrees that retrogression must be evaluated in terms of whether there is a reduction in minorities' "ability to elect."[22]  However, Texas then argues that "ability to elect" is determined solely by relying on two bright-line population statistics: Texas contends that all districts in which Hispanics constitute a majority of the citizen voting age population are *ipso facto* Hispanic "ability to elect" districts, and that these are the only Hispanic "ability to elect" districts; and, similarly, Texas contends that all districts in which blacks constitute more than 40 percent of the voting age population are *ipso facto* "ability to elect" districts for black voters, and that these are the only such districts in the plans.  Texas does not analyze any other electoral factors, such as polarized voting, turnout rates, and coalitional voting by two or more minority groups.[23]  Texas' statement of the law on this fundamental issue constitutes clear legal error and therefore, on this basis alone, Texas has failed to meet its burden of demonstrating the absence of a discriminatory effect.  Its summary judgment motion, accordingly, must be denied.

a.   As indicated, Section 5 authority directly on point holds that "ability to elect" must be determined based on a multi-factor analysis of the relevant electoral circumstances.  Citizen voting age data and voting age data are relevant, but are not determinative.  Texas does not cite to these authorities in its summary judgment filings.

b.   Instead, Texas cites to cases that concern Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and which address one of the legal prerequisites for establishing a Section 2

---

[21] *League of United Latin American Citizens v. Perry*, 548 U.S. at 438-39 (recent trends); *City of Pleasant Grove v. United States*, 479 U.S. 462,471 (1987) (future effects).

[22] Memorandum in Support of Plaintiff's Motion for Summary Judgment [Doc. 41], at 5 ("Texas Memorandum").

[23] *Id.* at 5-6; Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment [Doc. 41], at 4-6 (congressional plan ), 6-7 (House plan), & 8-9 (Senate plan) ("Texas Statement of Material Facts").

violation (the so-called first *Gingles* factor). Without citation to any Section 5 authority, the State argues that the population statistic that defines this Section 2 legal prerequisite also defines the factual circumstances in which there is a Section 5 "ability to elect."[24] But, as the State itself notes,[25] the Section 2 "equal opportunity" test and the Section 5 retrogression test are completely different from one another, and the Supreme Court has held that it is irrelevant in assessing the Section 5 "effect" of a redistricting plan whether the plan does or does not satisfy Section 2 of the Act.[26] Accordingly, that a particular population metric has been incorporated into the Section 2 legal test does not mean that it defines the factual circumstances in which minorities have an "ability to elect" for purposes of Section 5.[27]

c. The State itself implicitly recognizes that Section 2's bright-line population statistic does not and cannot serve as the sole criterion for assessing the Section 5 "ability to elect." The State contends that the determinant of black voters' "ability to elect" is a 40 percent share of the voting age population, however, that population proportion would not satisfy Section 2 legal requirements.[28] Put differently, the State's proposed 40-percent bright-line statistic neither is proper under Section 5 or Section 2, and is something that the State has simply created as a matter of convenience for purposes of this case.

---

[24] Texas Memorandum, at 6; Texas Statement of Material Facts, at 4 n.2.

[25] Statement of Material Facts, at 2.

[26] *Georgia v. Ashcroft*, 539 U.S. at 478 ("We refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard.").

[27] The Supreme Court has explained that, in the context of Section 2's legal framework, the incorporation of a bright-line population statistic in the Section 2 test serves a variety of important interests. *Bartlett v. Strickland*, 129 S. Ct. 1231, 1244 (2009) ("We find support for the majority-minority requirement in the need for workable standards and sound judicial and legislative administration."). In so ruling, the Court emphasized that it was not thereby incorporating the same bright-line statistic into the Section 5 retrogression analysis because, as the Court reaffirmed, "[t]he inquiries under §§ 2 and 5 are different." *Id.* at 1249.

[28] *Bartlett v. Strickland*, 129 S. Ct. at 1241-43.

3.  In assessing whether minority voters have an "ability to elect," the racially polarized voting analysis examines whether minority voters are politically cohesive and whether white voters cast their ballots as a bloc to oppose minority voters' preferred candidates.[29]  In Texas, racially polarized voting is a well recognized fact of political life.[30]  Texas elections may simultaneously evidence racial polarization and partisan polarization, but, as the Supreme Court has recognized, the presence of the latter does not negate or refute the presence of the former.[31]

F. *Judging whether there is a meaningful reduction in the ability to elect in a particular district*:  Not every change in the size of a district's minority population, even in the context of racially polarized voting, will occasion a change in the "ability to elect"; functionally-speaking, some increases and decreases will be meaningful and others will be essentially meaningless.  The Attorney General, in carrying out his administrative preclearance responsibilities, has concluded that districts should be categorized as either providing an "ability to elect" or not,[32] and therefore, according to the Attorney General, there is a meaningful electoral change when a district switches from one to the other.  This respects Congress' 2006 determination that Section 5 "protect[s] the ability of [minority] citizens to elect their preferred candidates of choice."[33]  However, courts also have indicated that a third category of "ability to elect" districts can exist – those where the likelihood or not of there being an "ability to elect" is in approximate equipoise,

---

[29] *See League of United Latin American Citizens v. Perry*, 548 U.S. at 427; *Thornburg v. Gingles*, 478 U.S. at 56; *Georgia v. Ashcroft*, 195 F. Supp. 2d at 76.  As indicated in these cases, courts evaluate group voting behavior by receiving testimony from expert witnesses who use social science analytic techniques to estimate group voting behavior.

[30] *See League of United Latin American Citizens v. Perry*, 548 U.S. at 427.

[31] *Id.* at 423-25, 427-28.

[32] 2011 Guidance, 76 Fed. Reg. at 7471.

[33] 42 U.S.C. § 1973c(d).

*i.e.*, a "swing" district.[34]  Thus, a district also undergoes a meaningful change in the "ability to

elect" if it switches to being a swing district from a full "ability to elect" districts, or switches

from a "swing" status to one in which there is not an "ability to elect."

      G. *Judging whether there is a plan-wide reduction in the "ability to elect"*: For purposes

of making the plan-wide retrogression comparison, there are, accordingly, three basic groups of

districts: a) "ability to elect" loss districts; b) "ability to elect" gain districts; and c) districts with

no change in the "ability to elect."  The "loss" category includes districts in which a full "ability

to elect" will be completely lost, and districts in which there will be a negative change to or from

being a swing district for minority voters.  Likewise, the "gain" category includes districts that

change from no ability to full "ability to elect," and districts in which there will be a positive

change to or from being a swing district for minority voters.

      1.  Where the total number of districts in the new and old plans remains the same,

retrogression is assessed by determining the net numerical district change affecting the "ability to

elect," using the categories of districts identified above.

      2.  Where there is a change in the total number of election districts – as in the Texas

congressional redistricting plan, which includes an increase in the number of congressional

districts from 32 to 36 – the determination, of necessity, is somewhat different.  The fact that

Texas has four more districts in the new plan must be taken into account in making the

retrogression assessment.[35]  Thus, in order make an "apples-to-apples" comparison between the

---

[34] *See League of United Latin American Citizens v. Perry*, 548 U.S. at 439-40 (recognizing the significance of minority voters emerging opportunity to elect a candidate of choice.)

[35] *See City of Lockhart v. United States*, 460 U.S. at 131-32.  If the number of "ability to elect" districts remains the same despite an increase in the total number of districts, there clearly is a possibility that minorities' "effective exercise of the electoral franchise," *Beer v. United States*, 425 U.S. at 141, will be reduced.   Here, the increase in the number of congressional districts is relevant to the retrogression analysis notwithstanding the fact that the increase itself is not subject to Section 5 review, since it is federally mandated.  *See Young v. Fordice*, 520 U.S. 273, 290 (1997).

"ability to elect" in the two plans, the Court must make a percentage comparison, *i.e.,* the Court must compare the percentage of "ability to elect" districts in the new 36-district plan to the percentage of such districts in the existing 32-district plan.[36]

H.   *Availability of alternative, non-retrogressive plans*:  If there is a plan-wide reduction in minorities' "ability to elect," the final determination is whether alternative redistricting plans are available that are not retrogressive.[37]  This recognizes the obvious proposition that jurisdictions must redistrict within the parameters set by the Constitution, including the one-person, one-vote requirement,[38] and the prohibition on excessive race-based redistricting.[39]  As with all aspects of this litigation, Texas bears the burden of demonstrating that there are no alternative plans available for avoiding any reduction in the "ability to elect" occasioned by its new redistricting plans.

### III.  Section 5 "Purpose" Standard

A.   *Section 5 prohibits the implementation of voting changes that purposefully seek to minimize minority voters' opportunity to participate in the political process*:  Section 5 prohibits the implementation of voting changes, including redistricting plans, which have any discriminatory purpose.

---

[36] *See Abrams v. Johnson*, 521 U.S. 74, 97-98 (1997) (comparing percentage of "ability to elect" districts in Georgia's new 11-district plan to percentage of such districts in Georgia's former 10-district plan, and holding that the percentage reduction (less than one percentage point) in that instance was *de minimus* and insignificant, since otherwise the rule would be that "each time a State with a majority-minority district was allowed to add  one new [congressional] district because of population growth, it would have to be majority-minority.").   Here, intervenors' argument is not that all four of Texas' new congressional districts need be "ability to elect" districts in order to avoid retrogression, but rather that Texas' decision to keep the same number of "ability to elect" districts, when the overall number of districts increased by four, *is* retrogressive.

[37] *Georgia v. Ashcroft*, 539 U.S. at 479; *Georgia v. Ashcroft*, 195 F. Supp. 2d at 83-84; 2011 Guidance, 76 Fed. Reg. at 7472.

[38] *E.g.*, *Reynolds v. Sims*, 377 U.S. 533 (1964).

[39] *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995); *Shaw v. Reno*, 509 U.S. 630, 649 (1993) .

1.   The "any discriminatory purpose" standard is specified in the statutory language of Section 5, pursuant to Congress' 2006 amendments to the Voting Rights Act.[40]  These amendments clarified Congress' intent regarding the meaning of Section 5's "discriminatory purpose" prohibition, returning the "purpose" analysis to the "any discriminatory purpose" focus which existed prior to the Supreme Court's decision in 2000 in *Reno v. Bossier Parish School Board*.[41]

2.   Thus, a redistricting plan may violate Section 5 if: a) it was drawn with a purpose to cause retrogression; and/or b) it was drawn with a discriminatory purpose to minimize minorities' "ability to elect" even though the purpose was not to retrogress, *i.e.,* even though the plan is not retrogressive or the district at issue is not involved in any retrogressive effect.[42]  A voting change violates the "purpose" standard if one of the underlying purposes was discriminatory; discriminatory purpose need not be the sole purpose in order to deny preclearance.[43]

---

[40] Pub.. L. No. 109-246, 120 Stat. 577, 581 (2006) *codified at* Section 5(d) of the Voting Rights Act, 42 U.S.C. § 1973c(c) (in Section 5, "the term 'purpose' . . . shall include any discriminatory purpose").

[41] 528 U.S. 320 ("*Bossier II*").  In *Bossier II*, the Supreme Court held that the Section 5 "purpose" standard only concerns the purpose to retrogress.  As Judge Bates recounted in his recent *Shelby County* decision, "[i]n 2006, the House Judiciary Committee explained that Bossier II's limitation of the 'purpose' prong had been inconsistent with Congress's intent that Section 5 prevent not only purposefully retrogressive discriminatory voting changes, but also those '[v]oting changes that "purposefully" keep minority groups "in their place."'"  *Shelby County v. Holder*, 2011 U.S. Dist. LEXIS 107305, at 34 *quoting* H.R. Rep. 109-478, at 68.

The pre-*Bossier II* authorities that relied on the "any discriminatory purpose" standard include: *Busbee v. Smith*, 549 F. Supp. 544 (1982) *aff'd* 459 U.S. 1166 (1983); *City of Pleasant Grove v. United States*, 479 U.S. 462, 469, 471 n.11 (1987); *City of Richmond v. United States*, 422 U.S. 358, 378-79 (1975).

[42] *E.g.*, *Busbee v. Smith*, *supra* (black population percentage increased in the one existing black-majority district from 50% to 57%, but plan violated the "purpose" standard since it was motivated by a purpose to deny black voters a district in which they would have a clear opportunity to elect their preferred candidate).  It should be noted, however, that the Section 5 "purpose" standard does not mean that jurisdictions have a per se obligation to maximize the number of "ability to elect" districts.  *Miller v. Johnson*, 515 U.S. at 924-27; 2011 Guidance, 76 Fed. Reg. at 7471; 28 C.F.R. § 51.59(b).

[43] *Village of Arlington Heights*, 429 U.S. 252, 265-66 (1977).

B.  *Conducting the "purpose" analysis by reviewing a range of circumstantial evidence*: The Section 5 "purpose" analysis relies, in general, on the framework established by the Supreme Court in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*[44] for utilizing a variety of circumstantial evidence considerations to analyze discriminatory purpose under the Constitution.[45]

C.  *Using map analyses to assess whether discriminatory purpose exists*: In conducting an *Arlington Heights* analysis, the starting point is the impact of the proposed plan.[46]  In this regard, the decision not to draw one or more available "ability to elect" districts typically involves the manipulation of district lines using one or both of the following techniques.  First, a jurisdiction may disperse ("fragment") minority population among several districts.  For example, a minority population may be large enough and sufficiently geographically concentrated to constitute an electorally-significant majority in one district (in the context of racially polarized voting) but, instead, the population is dispersed into several districts in which minority voters constitute ineffective political minorities.  Second, a jurisdiction may unnecessarily "pack" minority voters into one district with a high minority percentage, where the minority population is large enough and sufficiently geographically concentrated to provide minority voters with an "ability to elect" in several districts (in the context of racially polarized voting).[47]  Fragmentation and packing provide strong evidence of a discriminatory purpose, although they must be considered along with other circumstantial evidence to determine whether an inference of discriminatory purpose is supported.

---

[44] 429 U.S. at 266-68.

[45] *Bossier I*, 520 U.S. at 488; 2011 Guidance, 76 Fed. Reg. at 7471; 28 C.F.R. § 51.57.

[46] 429 U.S. at 266.

[47] *E.g.*, *Voinovich v. Quilter*, 507 U.S. 146, 153-54 (1993) (describing these techniques); 28 C.F.R. § 51.59(a).

D.  The State of Texas agrees that the Section 5 "purpose" standard prohibits preclearance of a redistricting plan that was motivated, in part, by "any discriminatory purpose." However, the State wrongly seeks to shift the burden of proof from itself to the defendants.

1.  The State argues that some narrowing of the "purpose" standard is necessary because of asserted concerns relating to Section 5's constitutionality.  But the Supreme Court repeatedly has upheld the constitutionality of Section 5,[48] and United States District Judge Bates of this Court only recently ruled that Congress' 2006 reauthorization of Section 5 is constitutional.[49] The State does not challenge the constitutionality of Section 5 in this case, and the two paragraphs it devotes to alleging some possible constitutional infirmity[50] do not, in light of the precedent that stands against the State's position, provide a basis on which this Court may implement Section 5 in a manner contrary to Congress' intent.

2.  The narrowing of the "purpose" standard that the State proposes – that this Court should presume that the three redistricting plans at issue were adopted in good faith – is contrary to Congress' allocation of the burden of proof (risk of non-persuasion) to the State (which at all times in this litigation has the burden of demonstrating that its redistricting plans were not adopted with a discriminatory purpose).  The allocation of the burden to covered jurisdictions is

---

[48] *Lopez v. Monterey County*, 525 U.S. 266, 282-85 (1999) (rejecting an as-applied constitutional challenge); *City of Rome v. United States*. 446 U.S. at 173-182 (upholding Section 5's "effect" standard, rejecting a federalism challenge, and upholding Congress' 1975 Section 5 reauthorization); *Georgia v. United States*, 411 U.S. at 482 (reaffirming Section 5's constitutionality); *South Carolina v. Katzenbach*, 383 U.S. at 329-32, 334-35 (upholding 1965 enactment of Section 5, and the Section 4(a) coverage formula).

[49] *Shelby County v. Holder, supra.  See also Nw. Austin Mun. Utility District No. One v. Mukasey*, 573 F. Supp.  2d 221 (D.D.C. 2008) (three-judge court) (upholding 2006 reauthorization), *rev'd on other grounds sub nom.*, *Nw. Austin Mun. Utility District No. One v. Holder*, 129 S. Ct. 2504 (2009) (not deciding the constitutional issue).

[50] Texas Memorandum, at 22-23.

a fundamental part of the preclearance remedy, reflecting Congress' intent "to shift the advantage of time and inertia from the perpetrators of the evil to its victims."[51]

### III.  Conclusion

This memorandum of law sets forth the joint position of all intervenor groups as to the legal principles that govern the resolution of this case, and identifies the legal errors made by the State of Texas in its motion.  Intervenors will file separate memoranda applying the pertinent legal principles to the redistricting plans at issue in this litigation.

October 25, 2011

Respectfully submitted,

FOR INTERVENOR MEXICAN
AMERICAN LEGISLATIVE CAUCUS

/s/ Mark A. Posner
Jon Greenbaum (D.C. Bar No. 489887)
Mark A. Posner (D.C. Bar No. 457833)
Lawyers' Committee For Civil Rights
Under Law
1401 New York Avenue, NW
Suite 400
Washington, D.C. 20005
(202) 662-8389 (phone)
(202) 628-2858 (fax)
Washington, D.C. 20006
mposner@lawyerscommittee.org

Jose Garza (*pro hac vice*)
Law Office of Jose Garza
7414 Robin Rest Dr.
San Antonio, Texas 98209
(210) 392-2856
garzapalm@aol.com

Joaquin G. Avila
P.O. Box 33687
Seattle, Washington 98133
Texas State Bar # 01456150
(206) 724-3731
jgavotingrights@gmail.com

---

[51] *South Carolina v. Katzenbach*, 383 U.S. at 328.

FOR INTERVENORS WENDY DAVIS,
ET AL.

/s/ J. Gerald Hebert_____
J. Gerald Hebert (D.C. Bar No. 447676)
191 Somerville Street, #405
Alexandria, VA 22304
(703) 628-4673
hebert@voterlaw.com

Paul M. Smith
Michael Desanctis
Jessica Ring Amunson
Caroline Lopez
Jenner & Block LLP
1099 New York Ave., N.W.
(202) 639-6000 (phone)
(202) 639-6066 (fax)

FOR INTERVENORS GREG GONZALES,
ET AL.

s/ John M. Devaney_____
John M. Devaney (D.C. Bar No. 375465)
Marc Erik Elias (D.C. Bar No. 442007)
Kevin J. Hamilton (*pro hac vice*)
Perkins Coie LLP
700 13th Street, NW, Suite 600
Washington, DC 20005-3960

Renea Hicks (*pro hac vice*)
Law Office of Max Renea Hicks
101 West 6th Street
Austin, Texas 78701
(512) 480-8231 (phone)
(512) 480-9105 (fax)
rhicks@renea-hicks.com

FOR INTERVENOR TEXAS
LEGISLATIVE BLACK CAUCUS

/s/ John K. Tanner_____
John K. Tanner (DC Bar No. 318873)
3743 Military Road, NW
Washington, DC  20015
(202) 503-7696
john.k.tanner@gmail.com

17

FOR INTERVENOR TEXAS LATINO
REDISTRICTING TASK FORCE

/s/ Nina Perales_____
Nina Perales (D.C. Bar No. TX0040)
Marisa Bono (*pro hac vice*)
Rebecca M. Couto (*pro hac vice*)
Mexican American Legal Defense &
Educational Fund
110 Broadway, Suite 300
San Antonio, Texas 78205
(210) 224-5476 (telephone)
(210) 224-5382 (facsimile)
nperales@maldef.org,
mbono@maldef.org
rcouto@maldef.org

Karen M. Soares (D.C. Bar No. 503295)
Jorge M. Castillo (*pro hac vice*)
Fried, Frank, Harris, Shriver &Jacobson
LLP
801 17th Street, NW
Washington, DC 20006

FOR INTERVENORS TEXAS STATE
CONFERENCE  OF NAACP BRANCHES,
ET AL.

/s/ Allison J. Riggs_____
Allison J. Riggs (*pro hac vice*)
Anita S. Earls
Southern Coalition for Social Justice
1415 W. Highway 54, Suite 101
Durham, NC 27707
(919)-323-3380 (phone)
(919)-323-3942 (fax)
allison@southerncoalition.org

Robert S. Notzon  (D.C. Bar No. TX0020 )
Law Office of Robert S. Notzon
1507 Nueces Street
Austin, Texas 78701
(512)-474-7563 (phone)
(512)-474-9489 (fax)
Robert@NotzonLaw.com

FOR INTERVENOR LEAGUE OF
UNITED LATIN AMERICAN CITIZENS

/s/ Luis Roberto Vera, Jr._____
Luis RobertoVera, Jr. (*pro hac vice*)
LULAC National General Counsel
The Law Offices of Luis Roberto Vera, Jr.
& Associates
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205-2260
(210) 225-3300 (phone)
(210) 225-2060 (fax)
lrvlaw@sbcglobal.net


## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2011, I electronically served the foregoing via ECF on all other parties in this litigation.

s/ Mark A. Posner_____