# EXHIBIT 33

```
              THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
STATE OF TEXAS,               )
        Plaintiff,            )
                              )
VS.                           )
                              )
UNITED STATES OF AMERICA AND  )
ERIC H. HOLDER, JR., IN HIS   )
OFFICIAL CAPACITY AS ATTORNEY )
GENERAL OF THE UNITED STATES, )
        Defendants,           )
                              )
WENDY DAVIS, ET AL,           )  CIVIL ACTION NO.
        Defendant-Intervenors,)  1:11-EV-1303
                              )  (RMC-TBG-BAH)
MEXICAN AMERICAN LEGISLATIVE  )  THREE-JUDGE COURT
CAUCUS,                       )
        Defendant-Intervenors,)
                              )
GREG GONZALEZ, ET AL,         )
        Defendant-Intervenors,)
                              )
TEXAS LEGISLATIVE BLACK       )
CAUCUS,                       )
        Defendant-Intervenors,)
                              )
TEXAS LATINO REDISTRICTING    )
TASK FORCE,                   )
        Defendant-Intervenor, )
                              )
TEXAS STATE CONFERENCE OF     )
NAACP BRANCHES, ET AL,        )
        Defendant-Intervenors.)


     ***********************************************

                   ORAL DEPOSITION OF

                 JOHN ALFORD, Ph.D.

                  OCTOBER 25, 2011

     ***********************************************
```

John Alford, Ph.D.                                      October 25, 2011

2

1              ORAL DEPOSITION OF JOHN ALFORD, Ph.D., produced as

2      a witness at the instance of the Davis Intervenors, was

3      duly sworn, was taken in the above-styled and numbered

4      cause on the OCTOBER 25, 2011, from 10:05 a.m. to

5      6:26 p.m., before Chris Carpenter, CSR, in and for the

6      State of Texas, reported by machine shorthand, at the

7      offices of Attorney General of Texas, 209 West 14th

8      Street, Ground Floor, Austin, Texas 78701, pursuant to

9      the Federal Rules of Civil Procedure and the provisions

10     stated on the record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S
 2        FOR THE PLAINTIFF, STATE OF TEXAS:
 3              David J. Schenck
                OFFICE OF THE ATTORNEY GENERAL
 4              6th Floor
                209 W.14th Street
 5              Austin, TX  78701
                (512) 936-1342
 6              david.schenck@oag.state.tx.us
 7        FOR THE GONZALEZ INTERVENORS:
 8              Max Renea Hicks
                (appearing for)
 9              John M. Devaney
                PERKINS COIE, LLP
10              700 Thirteenth St. NW, Suite 600
                Washington, D.C. 20005-3960
11              (202) 4343-1624
                jdevaney@perkinscoie.com
12
          FOR THE DEFENDANT, UNITED STATES OF AMERICA:
13
                Bryan L. Sells
14              U.S. DEPARTMENT OF JUSTICE
                CIVIL RIGHTS DIVISION
15              950 Pennsylvania Avenue, NW
                Room 7264
16              Washington, DC  20530
                (202) 305-0115
17              bryan.sells@usdoj.gov
18        ALSO PRESENT:
19              Randy Stevenson, Ph.D.
20
21
22
23
24
25
```

INDEX

Appearances.......................................2
Stipulations pages attached after Page..........240
JOHN ALFORD, Ph.D.
        Examination by Mr. Sells..................5
        Examination by Mr. Hicks................170
        Further Examination by Mr. Sells........212
        Further Examination by Mr. Hicks........221
        Examination by Mr. Schenck..............224
        Further Examination by Mr. Sells........236

Signature and Changes...........................237

Reporter's Certificate..........................239

EXHIBITS

NO. DESCRIPTION                            PAGE MARKED

  1     Alford Report                            8

  2     Alford CV                               12

  3     Hypothetical 1                          26

  4     Hypothetical 2                          28

  5     Hypothetical 3                          29

  6     Hypothetical 4                          32

  7     Racially Polarized Voting Analysis      82

  8     Districts Plan C100                     90

  9     Plan Stats Report                       92

 10     Hypothetical 5                         120

```
 1                    MR. SELLS:  Bryan Sells for the
 2        Defendants, United States, and Eric Holder.
 3                    MR. HICKS:  Renea Hicks for the Defendant-
 4        Intervenors Gonzalez.
 5                    MR. SCHENCK:  David Schenck for the
 6        Declaratory Plaintiff, State of Texas.
 7                    MR. STEVENSON:  Randy Stevenson with the
 8        Declaratory Plaintiff, State of the Texas.
 9                         JOHN ALFORD, Ph.D.,
10        having been first duly sworn to testify the truth, the
11        whole truth, and nothing but the truth, testified as
12        follows:
13                         EXAMINATION
14        BY MR. SELLS:
15            Q.    Would you please state your name for the
16        record?
17            A.    John Alford.
18            Q.    Dr. Alford, did you bring someone with you
19        today from Rice University?
20            A.    No, I did not.
21            Q.    Who is Randy Stevenson?
22            A.    He's a colleague of mine at Rice University.
23            Q.    Okay.  So when I said bring, how did Randy
24        Stevenson get here?
25            A.    I don't know.
```

John Alford, Ph.D.                           October 25, 2011

20

1    of exogenous elections, in the reconstructed election

2    sense, reconstituted election sense, that they allow you

3    to cover the full geography of the proposed district,

4    and endogenous elections don't.

5         Q.   So endogenous elections don't exist for the a

6    proposed plan, right?

7         A.   They exist for a proposed plan, but not for the

8    totality of the plan.  So they'll -- if you look at an

9    exogenous election report, the endogenous elections are

10   almost always included in the basic printout, but they

11   are included as in -- so if I looked at proposed

12   District 1, I would see endogenous elections for old

13   District 1, as well as perhaps District 2 and District

14   12, and whatever the geography that had been added to

15   the district.  So I would see a subset of the old

16   district, or the proposed district and with other

17   districts brought in.  And since those are different

18   elections, they just don't -- they're not easy to sum up

19   into something that is gives you as full a picture as an

20   exogenous election.  But assuming the exogenous election

21   exists in a geography larger than an encompassing

22   geography for the proposed district.

23        Q.   Are endogenous elections generally regarded as

24   more probative?

25        A.   Yes.  If you can -- again, if you have the

John Alford, Ph.D.                          October 25, 2011

 1      capability to -- a sufficient number and range of

 2      endogenous elections, they are generally preferred and

 3      considered more probative than exogenous elections.

 4          Q.   And do you consider them more probative under

 5      those circumstances?

 6          A.   Well, it does depend on what you're trying to

 7      understand about the geography.  If you're trying to

 8      understand how -- most of this analysis is developed for

 9      the purpose of understanding Gingles 2 and 3, so

10      understanding cohesion and polarization.  And if your

11      purpose is to understand how it is that voters cast

12      votes, particularly where there are candidates from

13      racial minorities, then understanding how they vote in

14      the endogenous election is more useful than

15      understanding how they vote in exogenous election, if

16      the two are otherwise equal.

17          Q.   I heard you mention just a moment ago races

18      with minority candidates in them?

19          A.   Yes.

20          Q.   If I call those interracial elections, will you

21      understand what I mean?

22          A.   Yes.

23          Q.   If you have a term you prefer, I would be happy

24      to use that.

25          A.   I don't have a shorthand term.  I don't know

John Alford, Ph.D.                                    October 25, 2011

22

```
 1    one.  There should be one, because it's something we use

 2    as lot, right, particularly the feature -- what I would

 3    assume by that you mean a contest that features a

 4    serious minority candidate and a serious majority

 5    candidate, basically, so an Anglo and a Hispanic and an

 6    Anglo and a black, so that you have a full chance to see

 7    voters express their preferences for the race and

 8    ethnicity of candidates in a single election.  So I'll

 9    assume that's what you're referencing by interracial

10    contest.

11         Q.    Okay.  And why are interracial contests, as you

12    have described them, important?

13         A.    They are important cause they help us

14    understand the degree to which the race or ethnicity of

15    a particular candidate might affect the voting behavior

16    of groups in the electorate.

17              So, in particular, in assessing cohesion

18    and polarization, they will help us understand the

19    degree to which minority voters, for example, vote

20    cohesively for minority candidates when they are not --

21    when all of the candidates are not, for example,

22    minority candidates, and there is actually competition.

23              And then they will help us understand the

24    degree to which Anglo voters will vote in opposition to

25    minority candidates in an election, again if there's --
```

John Alford, Ph.D.                                    October 25, 2011

23

1    if we have -- they have the opportunity to do so.

2        Q.   Do interracial elections help us to understand

3    whether minority voters have the ability to elect

4    candidates of their choice?

5        A.   They certainly -- they certainly are helpful in

6    that analysis that leads us to being able to make some

7    judgment about electing candidates of choice in some

8    circumstances, yes.  They may not be the only

9    information that will be useful, but they are certainly

10   useful in making that judgment.

11       Q.   How so?

12       A.   They -- in a context, for example, where

13   peoples' vote is, in fact, being driven by preferences

14   for candidates of a particular race or ethnicity, they

15   help us utilize that degree of voting cohesion or voting

16   opposition in combination with demographic information,

17   like the proportion of registered voters, for example,

18   to draw conclusions about how the intersection of those

19   two factors might affect ability to elect candidates of

20   choice.  And they both -- they both help us understand

21   what the candidate of choice is, and then help us

22   understand the ability to elect, given the context of

23   the district.

24       Q.   If your analysis showed that minority voters

25   were only able to elect their candidates in

1    noninterracial elections, in other words, Anglo-Anglo

2    elections, but were not able to elect their candidates

3    of choice in interracial elections when they preferred a

4    minority candidate, would you say under those

5    circumstances that minority voters had the ability to

6    elect their preferred candidates of choice?

7         A.   And maybe this is good time to make clear that

8    I'm -- I will try not to offer legal opinions.  I used

9    to think I had legal opinions, but I don't think so

10   anymore.  I have been disabused of the notion that I

11   have any clue as to how all this works out as a legal

12   matter.  But as a -- I mean, I do have a -- sort of, as

13   my take on this, in a research sense or in a personal...

14   My view of that is that a situation in which minorities

15   have a chance to -- an opportunity to elect only

16   candidates that would not be their preferred candidate,

17   if there was a candidate of their race or ethnicity, is

18   not an opportunity to elect a candidate of choice.

19        Q.   It's kind of like an opportunity to have any

20   flavor of ice cream as long as it's vanilla?

21        A.   I mean, in a sense it is.  I mean, and I don't

22   want to be unfair, because I know this is one of those

23   really difficult areas where there is a big separation

24   between what we might use something for to understand

25   how voters are voting, and then what a court might use

John Alford, Ph.D.                                    October 25, 2011

25

```
 1        something for as a standard for making a judgment, for
 2        example, about a district where there -- where those may
 3        be two quite -- quite different issues.
 4                    So I think the -- you know, candidate of
 5        choice in the -- in a nonlegal sense, a candidate of
 6        choice just means the candidate that received the most
 7        votes from that group.  And so that may be -- there is a
 8        candidate choice of minorities regardless of the nature
 9        of the contest at the level of candidates.  And those
10        are candidates of choice.  And so in that sense,
11        minorities are electing candidates of choice.  I guess,
12        I don't think that that's -- despite some language to
13        the contrary, I don't -- I assume that's not the actual
14        point of having a Voting Rights Act.
15        Q.    Since you have mentioned candidates of choice,
16        I'd like to give you a couple of hypotheticals, if I
17        might, and ask you about the candidates of choice in
18        these hypotheticals, okay?
19        A.    All right.
20        Q.    It's probably easiest if I write them down, so
21        that we don't have keep all of these numbers in our
22        head.  Is that okay?
23        A.    I would appreciate that.
24        Q.    And I will go ahead and mark these as exhibits,
25        and so the world can forever see my awful handwriting.
```

1        A.    Yes.  So two basic things:  One is for my own

2    purposes producing tables that brought together

3    information that sat in different tables.  So when I

4    look at the demographics of districts, for example, I

5    would want to see both Spanish surname voter and citizen

6    proportions for Hispanic and black in a single table,

7    and TLC doesn't produce them as a single table.  It

8    produces the Spanish surname voter in an election table;

9    it produces VAP and general population in a table, and

10   it produces citizenship in a separate table.  And so

11   what I would want to see, in looking at a district, is

12   see all of the demographics in one place, so that I

13   could look across a row.

14       Q.    And so did someone construct that report for

15   you?

16       A.    No.  In the end, that was -- that was one of

17   the things that -- because of a variety of time

18   constraints and other data issues, we never actually got

19   a nice table with everything in one place.  So I spent

20   my time flipping between reports.

21       Q.    I know that feeling.

22             Did the state ever do any custom reports

23   at your instruction?

24       A.    The one thing that we developed across this

25   period of time is the capability for the state to do an

John Alford, Ph.D.                                    October 25, 2011

52

1        ecological inference analysis rather than the analysis
2        they had been doing, which was an ecological regression
3        analysis.  So there -- at some point, that, the sort of
4        ecological regression estimates were produced, I would
5        guess had not been produced before, and were produced
6        specifically for this issue, primarily to parallel.  So
7        this came, sort of, later on, the parallel analysis done
8        by several of the experts, the plaintiffs' experts in
9        the Section 2 case.
10            Q.    When did this take place that you developed the
11       EI analysis with the state?
12            A.    I don't really know when that process started,
13       in the sense that I just can't recall when that
14       discussion got going.  But it's been an evolving
15       project.  So it basically continued to evolve over the
16       course of preparing my expert report for the Section 2
17       case.  But I don't know exactly when that process
18       started.  There's a lot of back and forth in getting
19       that worked out.
20            Q.    Was EI something that you used and relied on
21       prior to the passage of the plans?
22            A.     It's not something I have traditionally used,
23       but Richard Engstrom has convinced me that it's the
24       better way to go.  So I had done this analysis for
25       another case in which he was the expert on the other

1    side.  And in the -- as the reports came in, it was

2    clear -- and so I knew that he would be using that

3    technique, and I was convinced that thus it would be

4    useful to be able to replicate that.  And we started

5    discussion earlier.

6              As it turned out, other experts were also

7    relying on that.  So it became kind of a central

8    methodology for that -- for this case.  But it's -- and

9    I'd say this is the first case where I relied primarily

10   on ecological inference results as opposed to ecological

11   regression results.

12       Q.   Okay.  But the question I am trying to answer

13   is whether you used EI that you developed with the state

14   in the time period between your initial engagement and

15   when the governor signed the bills much later?

16       A.   No, I don't know -- not that I know of.  Or

17   wait a minute.  I should clarify that.  When I first

18   discussed EI with the state data people, they had said

19   that they were -- that they had been working on trying

20   to implement EI and were having some issues about how

21   exactly to do that.  And so I don't -- it's possible

22   that that -- what they were working on there, that that

23   process had something to do with -- with what would have

24   occurred before the signing of the bills.  The analysis

25   that was produced for me was not produced at that point,

John Alford, Ph.D.                                    October 25, 2011

54

1     but I guess it's possible there was an analysis

2     produced.

3         Q.    So among all of the data that was available to

4     you from various arms of the state, did you have a

5     standard package of reports that you wanted to receive

6     for any given plan?

7         A.    I -- sort of -- I don't know about a package of

8     reports, but, you know, the basic information that I

9     wanted to have for -- for the plans.  So I wanted the --

10    obviously, the full set of demographics, including

11    citizenship and the registered vote data.  And I wanted

12    the reconstituted election analysis.  And then to the

13    extent that we could get cohesion analysis that let us

14    address basically the cohesion analysis that was being

15    presented by the plaintiffs' experts in the Section 2

16    case, I wanted cohesion analysis.

17        Q.    Anything other than those three things that you

18    regularly relied on in the course of your work?

19        A.    I can't think of any.

20        Q.    The first item you mentioned, a full set of

21    demographics, did that come from Red Apple in one of the

22    Red reports, or did that come from some other source?

23        A.    I think almost everything came from -- my

24    recollection, at least, is almost all of that came in a

25    Red report.  So that I know the citizenship analysis I

John Alford, Ph.D.                                    October 25, 2011

1    was looking at, and I'm pretty sure was out of a Red

2    report.  The reconstituted elections are Red 225.  And

3    certainly the SSRV is out of the -- that's available

4    even on District Viewer, right?  That's in the -- what

5    they call their election report in District Viewer.

6         Q.   The reconstituted election analysis, the Red

7    225 report --

8         A.   Yes.

9         Q.   -- did you ever receive reconstituted election

10   analysis that was prepared by the Office of the Attorney

11   General?

12        A.   They had a reconstituted election analysis

13   based on a subset of elections, so it was not the full,

14   here are all the elections in the jurisdiction.  So I

15   think it was a -- I think an index of ten elections.

16   And I received that for -- I'm sure for baseline and

17   probably for the adopted plans.

18        Q.   Have you heard that report being referred to as

19   the DEA report?

20        A.   That sounds familiar.  I remember thinking,

21   when I saw it, that it sounded like something quite

22   different than what it was.

23        Q.   I think that's stands for District Election

24   Analysis.

25        A.   I think that's correct.

John Alford, Ph.D.                                    October 25, 2011

1        Q.   The third item you mentioned was the cohesion

2    analysis.  That was regression analysis performed by the

3    Office of the Attorney General?

4        A.   I think -- and so the first thing I saw, there

5    was a regression report being prepared by the Office of

6    the Attorney General using ordinary least squares in a,

7    kind of an experimental attempt to do something EI-like

8    when we talked about that.  Yes.  I don't think that's

9    TLC.  I think that's -- that's something that's done at

10   Office of the Attorney General.

11       Q.   I want to try to get a sense of when you were

12   doing your work with these materials.  Were you

13   reviewing these materials and analyzing these materials

14   for proposed plans as well as the final adopted plans?

15       A.   I don't think I did any analysis on proposed

16   plans.  I think the -- that first set of information I

17   got was for proposed plans, because I don't think

18   anything had been adopted at that stage.  So I was

19   working on that to get an idea of sort of what was

20   available, but not for the purpose of actually analyzing

21   a particular proposed plan.

22                There was -- one of the times that I

23   visited with the AG's office, there was discussion of, I

24   think, maybe a DEA number for a proposed plan.  And

25   that's the only time I recall any discussion about --

1    specifically about sort of comparing proposed plans.

2    And that was not a -- and that's not a comparison I did,

3    but just a comparison that somebody else had done of --

4    I think it may have been -- I don't know if it was -- I

5    think it was -- I don't know -- proposed against

6    proposed or proposed against baseline.  But there was

7    discussion about a DEA number for a plan.

8        Q.    I'm not sure I understand what you mean by a

9    DEA number.

10       A.    And so this -- again, the -- this index of ten

11   elections that was being -- the report that was being

12   prepared where you could look at the -- you know, what

13   proportion of the ten selected elections the Democratic

14   candidate was elected.  And so there was some discussion

15   about some district in a proposed plan and about, you

16   know, what variation of that number meant; that was a

17   six different than a four or something like that.

18       Q.    Did you have any view on whether a six is

19   different than a four?

20       A.    I don't actually remember what the particular

21   comparison was.  But my recollection is, I didn't think

22   that those were -- that those two numbers -- and I think

23   they represented -- I think now the number was one thing

24   in one proposed plan and one thing in another proposed

25   plan, and they struck me as basically substantively the

John Alford, Ph.D.                                    October 25, 2011

58

1      same number.  So I said I don't think it matters; that

2      those are substantively the same number.

3           Q.   Is it still your view today that six out of ten

4      elections and winning four out of ten elections is

5      substantively the same?

6           A.   Again, I don't think that was the -- I'm just

7      giving that as an example.  I don't think those were the

8      actual -- I'm fairly sure those weren't the actual

9      numbers, because I think they are -- I mean, I would

10     have been prompted to say, well, they may not be

11     substantively different, because this is a selected

12     index, and they are fairly close to each other, and we

13     don't know anything about their representativeness.

14     But, I mean, I certainly wouldn't have said -- you know,

15     that's -- you know, one of those is above five and one

16     is below five, so there will be a lot of made of that,

17     whether it's substantively different or not.  So my

18     recollection is it's two numbers fairly close to each

19     other, but both on the same side of five, which would

20     lead me to think it really doesn't matter, right?

21               But in terms of your general point, no, I

22     don't think making a lot of small differences on

23     selected or competitive indexes of election outcome is

24     terribly useful.

25          Q.   Why not?

John Alford, Ph.D.                                    October 25, 2011

1        A.   Well, whether the elections are selected at

2    random or whether they are the complete set of available

3    elections or whether they are selected for some

4    particular purpose, I mean, they can be selected for the

5    purpose of making an index look a certain way.  They can

6    be selected without regard to what they might look

7    like.  But regardless, they are selections.

8              I think there is some advantage to having

9    the selection be all the elections that were presented

10   to us, and all the ones we have actual data for.  So I

11   kind of have a preference for a more comprehensive

12   index, but I understand why other people like more

13   selective indexes.  But in all of those cases, they are

14   simply what we had available to look at, and they

15   represent a limited set of the possible realities.

16             We were using them to make -- so there is

17   uncertainty built into that itself, and then we are

18   using it, typically, to make some -- or often to make

19   some projection in which we are gauging a possible

20   future.  And given the uncertainty in both of those

21   tasks, I think it's important to be cognizant, something

22   that's -- I point out someplace that I think there is

23   some distinction being made between a 50 percent number

24   and at 48 percent number.  That's just -- and the data

25   doesn't support that kind of a degree of difference.

John Alford, Ph.D.                                    October 25, 2011

1              And I think the other -- the other thing

2       that I think is -- I think having some bright line

3       standard in which, for example, 51 means something very

4       different than 49, it can be really useful in something

5       where like 51 really does mean something different than

6       49, like in the outcome of an election, where one person

7       gets elected and the other doesn't.  51 percent of the

8       elections breaking one way versus 49 percent of the

9       elections, but nobody is being elected by that.  It's

10      not comprehensive in any broader sense.

11              So I think they are -- that's not a very

12      large difference, and it doesn't become a more important

13      difference when it straddles some arbitrary line like

14      50.  98 and 99 are not really different than each other,

15      and 97 and 99 aren't really different than each other,

16      and 49 and 51 aren't different than each other in this

17      context.

18              So I think there is much too much being

19      made about the notion that somehow -- that this data is

20      exact or that this data provides the ability to make

21      brightline distinctions.  I think it provides the

22      ability to characterize, generally characterize

23      performance in districts, generally characterize some

24      districts as performing better than others.  But I think

25      you can easily make too much the distinction,

John Alford, Ph.D.                                    October 25, 2011

61

1    particularly where the differences are small, or where

2    the differences are one index to another.  I think you

3    basically look at all the indexes.

4              And my view is that the indexes pretty

5    much tell you the same thing substantively, but that

6    they often do tell you something differently

7    mathematically.  And they don't have any mathematical

8    properties by magic.  They just have the ones that we

9    get from analyzing the data.  And in this case, they are

10   -- they are not particularly precise estimates of either

11   the past or the future.

12   Q.   Do you think the indexes can be useful to

13   measure changes from a benchmark district to a proposed,

14   if you hold the races in the index constant?

15   A.   I think if you hold the -- again, if you're

16   comparing apples to apples, they can be helpful in

17   comparison, again, you know, keeping in mind that they

18   characterize kind of ranges.  I think they characterize

19   districts that are almost certain to elect, districts

20   that are -- that are almost certain not to elect, and

21   then districts that will sometimes elect and sometimes

22   not elect.  I think that's probably -- if I was going to

23   divide them up kind of in the ranges, I think that's

24   kind of the range.  And as you get in, but like there is

25   no precise number that says one point here, this is a

John Alford, Ph.D.                                    October 25, 2011

62

1    whatever, right, but just to those characterized general

2    ranges.

3              So to the extent you compare apples to

4    apples and you've got an existing plan versus a proposed

5    plan and they are clearly in different parts of that

6    range, I think that can be -- that can be helpful.  I

7    think that's exactly why you would want to do this.

8    It's not -- it doesn't take into account some other

9    things that are important that we would need to think

10   about, but it's useful -- that's a useful piece of

11   information to have when we're looking -- so looking

12   toward a district's performance, our future expectation

13   about an adopted district's performance, I think that's

14   a useful piece of information about the district.

15        Q.   Can indexes help you determine whether

16   performance is more likely than not to happen?

17              MR. SCHENCK:  Object to the extent it

18   calls for a legal opinion.  I know that Dr. Alford

19   indicated at the beginning he is comfortable talking

20   about social science, and I don't want to over object.

21   I know you've got a deposition to take here.  But to the

22   extent that you're okay with him answering on his

23   opinion, understanding that it's a social science

24   opinion, that's fine.  Is that okay?

25              MR. SELLS:  Sure.

John Alford, Ph.D.                                    October 25, 2011

63

```
 1            A.   Certainly in the sense that we're looking at

 2       them retrospectively, they tell us something about

 3       likely -- more likely than not or less likely than

 4       not.  In the sense that we're projecting toward the

 5       future, we don't really have a very -- obviously, in the

 6       sense of the index itself, we're not reporting any

 7       measures of -- that would suggest that our index is in

 8       fact a projection or an estimate.  That is, we don't

 9       have standard errors associated with this as we project

10       forward, precisely because we -- given the nature of

11       this technique, we don't know what -- how we could

12       construct, necessarily, those standard errors, whether

13       that would -- we would actually be -- have a useful way

14       of knowing exactly how much we don't -- we don't know.

15                 So I think if you're - if you're basically

16       saying can this give us a brightline standard between

17       likely to elect and not likely to elect, that's going to

18       be just basically say at this percentage, the district

19       performs, and at one point below, that it doesn't

20       perform.  I mean, given what I have said previously,

21       you're probably aware, I wouldn't think that was

22       particularly useful.

23                 I do think as you move out on the

24       extremes, I think they give you -- they certainly -- I

25       would certainly be comfortable saying that they tell us
```

John Alford, Ph.D.                                  October 25, 2011

64

 1    something about the likelihood.  I mean, as that index

 2    falls towards zero, it indicates that the likelihood of

 3    electing is dropping.  Obviously, it's not zero.  And

 4    that's part of the dispute in this case is, we have

 5    several districts that have indexes of zero and have

 6    elected candidates of choice.  So that's -- that in

 7    itself suggests that if the index can be zero across 48

 8    elections, and yet in elections -- precisely the same

 9    election in which the index is zero, the candidate of

10    choice being elected in that election tells us that it

11    can't be a perfect predictor of the future, because it

12    isn't even a perfect predictor of the past.

13              So I think -- I still thinks it obviously

14    adds some information, so we know that this is a less

15    likely event to occur, but we can't say it won't occur.

16    And the reverse being true as well.  A district could

17    appear to perform at a hundred percent, and not perform

18    in a particular election.  But the likelihood that a

19    district won't perform I think -- begin treating this in

20    fairly broad ranges, the likelihood a district won't

21    perform in the future increases as the index for the

22    elections drops.

23         Q.   (BY MR. SELLS) Is the reverse of that also

24    true, that the likelihood that a district will

25    perform --

John Alford, Ph.D.                                    October 25, 2011

65

```
 1        A.    Yes.

 2        Q.    -- is uncertain but also increases?

 3        A.    So again, all other things being equal, right?

 4   There are other things we would want to think about; is

 5   there an incumbent and so forth.  But all other things

 6   being equal, the reverse is true as well; that that

 7   factor, as we are thinking about that in our looking

 8   toward the future of the district, that would, again,

 9   tell -- give us a sense of the likelihood that the

10   district would elect a candidate of choice as opposed to

11   a simple dichotomy of it's going to elect or it's not

12   going to elect.

13        Q.    Going back to those three categories of data

14   that you used, that is, the demographics, the

15   reconstituted elections, and the regression analysis,

16   starting with the demographics, tell me how you used

17   that in your analysis.

18        A.    Well, I think the most -- the most obvious use

19   of the demographics is to assess whether a district is a

20   majority-minority district or not.  So that gives you an

21   indication of, is the district majority-minority, as

22   well as some indication of how -- how majority-

23   minority.  Is it narrowly majority-minority?  Is it

24   substantially majority-minority?  It gives you some idea

25   of the mix of race and ethnicity in the district,
```

John Alford, Ph.D.                                    October 25, 2011

66

1        independent of which group is the majority group in the

2        district, so you can see whether there is a balance of

3        other groups.

4                For Hispanic districts, the Spanish

5        surname registration number gives you, I think, a very

6        good on-the-ground indicator of the potential for

7        Hispanics to control elections in the district.  It

8        gives you -- I believe gives you a better -- looking

9        across districts, it gives you a better indicator of the

10       actual --- it gives you a kind of a control on CVAP

11       estimation, the stability of which varies a bit.  And I

12       think that's probably it.

13       Q.   What's the point of looking at demographic data

14       to determine whether a district is majority or minority?

15       A.   Well, I think there's a practical reason to do

16       it, and then there is a legal reason to do it.  I think

17       the practical reason to do it is that, if you're looking

18       at a district, and you can be reasonably confident that

19       there is a voter majority in a particular ethnic group,

20       then you have established a kind of practical baseline

21       for the district, which is, is this a group that voting

22       cohesively could withstand any attempt to vote

23       cohesively against it.

24       Q.   Does total population tell you that?

25       A.   No, it doesn't.

John Alford, Ph.D.                                    October 25, 2011

67

1          Q.   Does voting age population tell you that?

2          A.   Not always, no.

3          Q.   Does citizen voting age population tell you

4     that?

5          A.   It's closer.

6          Q.   Does Spanish surname voter registration tell

7     you that?

8          A.   It gets you probably the best number we've got

9     for that issue related to whether Hispanic voters can

10    control a district.  So they are certainly well

11    positioned to control a district if they are the

12    majority, outright majority of the registered voters.

13    That seems to me that that -- basically the only issue

14    to be overcome, then, is relative turnout, and if you

15    are politically cohesive and actually in a fight where

16    these issues really matter, presumably, then given the

17    current election system in Texas, I don't think turnout

18    issues are -- any longer represent really insurmountable

19    barriers.  You basically can -- you should be able to

20    come fairly close to matching turnout.

21              And certainly, if you think about pulling

22    back from that, if Hispanics have a total population

23    majority in a district, how likely is that voting

24    cohesively they could turn out and control the election.

25    In some districts in Texas, that's very likely, and in

John Alford, Ph.D.                                    October 25, 2011

68

```
 1        other districts, it's physically impossible.  So just as
 2        a number, it just doesn't really help you a lot.
 3                    If you have age differences, in which you
 4        have in the Hispanic population, so that the VAP number
 5        would be a better number.  If you have citizen numbers.
 6        If you have areas where 50 percent of the adult
 7        Hispanics are not citizens, then you're going have
 8        registration differences.
 9                    For all of the issues about the estimation
10        of CVAP in the current round of redistricting, it -- and
11        there are issues with that -- it does track more closely
12        with registered voter proportions than does VAP or total
13        population.  So I think those two numbers, you're
14        getting closer to what you would need on the ground to
15        control a district.
16            Q.   What you are really trying to get at are
17        eligible voters, right?
18            A.   Yes.
19            Q.   For African Americans, is it also true that
20        citizen voting age population is going to get you closer
21        to the number of eligible voters than either total
22        population or voting age population?
23            A.   Yes.
24            Q.   And, in fact, in a district that has a high
25        noncitizen Hispanic population, you would want to look
```

1       at African American citizen voting age population share

2       because it's likely to be higher than the voting age

3       population share because of the presence of those

4       noncitizens, right?

5           A.    That's correct.  So in a district that's

6       mainly -- that's overwhelmingly composed of blacks and

7       Anglos, there is not going to be much substantive

8       difference.  There will be a VAP difference, because

9       there are -- the black population is a younger

10      population, though not as much younger as it used to

11      be.  But citizenship levels are roughly comparable

12      between Anglos and blacks.  They are not -- they are

13      often not for Hispanics.  There are areas where that is

14      not true at all.  They are comparable across all three.

15              But for many areas in Texas, particularly

16      urban areas, there are substantial differences.  And so

17      in that setting, I would be more comfortable with

18      citizen numbers across the board.  I would be most

19      comfortable with registered voter numbers, but unlike

20      Georgia, where you register by race, you don't in Texas,

21      and so that's a -- that leaves you with an uneven data

22      set.

23              There is some analysis you can do with

24      SSVRRV, depending on how you like those initials.  I've

25      always liked them SS -- SSRV, and the state likes them

1    SSVR.  But the Spanish surname voter allows you to do

2    some analysis there that's more precise for Hispanics,

3    but in the process, you give up the opportunity to have

4    a comparable measure for blacks and for Asians where you

5    don't have registration.

6         Q.   If you are looking at an urban district, say,

7    in Harris County or Dallas County, where you might have

8    a significant presence of blacks and Hispanics, you

9    would want to look at the CVAP for both groups so you

10   could compare apples to apples, if you were trying to

11   get at eligible voter strength?

12        A.   Yes.  So that's -- I mean, that's the way I

13   would view -- if I was looking at 18th in Harris County,

14   for example, I mean, that's -- that's how I would view

15   that population is by looking at the CVAP.

16        Q.   The black CVAP?

17        A.   The -- yeah, black, Anglo, and Hispanic CVAP.

18   I mean, the 18th is basically -- I mean, it's

19   essentially like a 50-50 district, I think.  In black

20   citizen population, it's about -- it's either at or just

21   under 50 percent; whereas in VAP, it's probably, what,

22   40 percent, something like that.  So generally, though,

23   blacks districts that have been in the 45 percent range,

24   at least in Texas, have been above 50 percent in black

25   CVAP.

John Alford, Ph.D.                                    October 25, 2011

1       Q.   The second thing you mentioned, the

2   reconstituted election analyses, how did you use those

3   as you an undertook your work?

4       A.   Again, as we have discussed a bit, the

5   reconstituted election analysis lets you do one thing

6   that's fairly obvious, which is, you can look at the

7   existing districts and how they performed over the last

8   decade, and then you can look at how -- how exogenous

9   elections would have played out in the -- in various

10  proposals, again, over the last past decade.

11              So it gives you an actual -- an actual

12  view of the districts, existing districts in the past,

13  and a pretty good hypothetical of the proposed districts

14  in the past, but that is a hypothetical. And then from

15  that, you could -- you can basically make some

16  presumptions about the future of both -- both what would

17  have happened in the existing districts had they gone

18  forward, and what might happen in various proposed

19  districts, in terms of likelihood to -- for example, in

20  terms of the likelihood to elect candidates of a

21  particular ethnicity, in terms of likelihood of electing

22  candidates of a particular party, in terms of the

23  likelihood of electing candidates of choice.  So you can

24  -- that's an analysis you can play forward where there

25  are reconstituted elections.

John Alford, Ph.D.                                    October 25, 2011

72

1        Q.    I heard you say that the reconstituted election

2    analyses of proposed plans are just pretty good.  You

3    qualified that statement.  Can you tell me what you

4    meant by that?

5        A.    Well, the -- I mean, the -- you have -- you

6    have an actual election in the district that you can

7    compare to the reconstituted elections going back in the

8    existing districts.  So in a sense, you have a kind of a

9    check on that, that allows you to do -- I mean, the one

10   thing it allows you to do is, as you look across those

11   districts, you can see if there is a particular

12   statewide race, for example, that tracks more closely

13   with the endogenous election, and then you have sort of

14   some confidence on where that number is likely to fall

15   as opposed to relying on something -- I mean, some

16   people like to rely on a -- like a high watermark number

17   for a particular party or something like that, and they

18   are -- because you have the endogenous election, you can

19   look at that against the endogenous election.

20              And the voters that are voting are -- that

21   are -- in your reconstituted elections of those results

22   are all for voters who actually saw that ballot, in the

23   sense that when you reconstitute a statewide election,

24   they saw the ballot that you're interested in that

25   district, because they actually see the representative

John Alford, Ph.D.                                    October 25, 2011

73

1    in that district as well as the governor's race, and

2    that isn't strictly true when you move backward in

3    proposed districts.

4              So those are -- my guess is that in the

5    great scheme of things, those are quite modest

6    differences.  But that's the -- what one of those is --

7    one of those -- one of those things represent actual

8    votes that were accumulated in that way, and therefore

9    reflected a ballot, and the other reflects strictly a

10   reconstituted election.

11       Q.   Will proposed districts that split VTDs or

12   precincts introduce error into the reconstituted

13   analysis of those proposed districts?

14       A.   When you have -- when a district splits the

15   VTD, it will always introduce some degree of error.

16   There a variety of ways you can -- there are decisions

17   you can make about how to handle splitting a VTD, but

18   splitting VTDs do reduce the accuracy of

19   reconstituting.  And so that would be another area where

20   that's more likely to occur in a proposed than it is in

21   an existing plan, obviously.  So that would introduce --

22   and the degree of error depends, obviously, on the

23   number, the relative number of split precincts to the

24   number of precincts in the -- in the district.

25              And in addition to the -- at least

John Alford, Ph.D.                                    October 25, 2011

74

1     potentially to the -- to the possibility that the split

2     precincts may in some way be unique or unusual to the

3     district, to the extent that those kinds of precincts

4     are already represented in the mix of precincts in the

5     districts, they don't produce -- they don't produce big

6     differences, but there -- I mean, they certainly could

7     be a reason for caution.

8          Q.   So I heard you say basically two things that

9     would give you reason for caution.  Number one is if the

10     share of the population that comes from split precincts

11     is large as a share of the population of the district as

12     a whole?

13          A.   Yes.

14          Q.   Okay.  And the other thing is if there is some

15     bias in the way the precinct is split so that there is

16     not uniformity of voting patterns across the precinct;

17     is that right?

18          A.    And then, again, that depends on how the

19     precinct is actually being allocated, right?  So if all

20     the split precincts are being left out or left in, or if

21     they are, you know, plus, minus 50, it's going to -- how

22     much of that will affect it depends on how they're being

23     allocated.  But certainly the more -- the more different

24     that is from -- basically the more actual information

25     that is introduced by that, the more likely it would be

John Alford, Ph.D.                                    October 25, 2011

75

1      to affect the index number.

2           Q.   Did you conduct any analysis of the effect of

3      split precincts upon any of reconstituted election

4      analyses that you looked at?

5           A.   No.

6           Q.   The last item of data that you mentioned were

7      the regression analyses.  I think you also called them

8      cohesion analyses.  Can you tell me how you used those

9      in the course of your work?

10          A.   I guess the most basic use is to establish a

11     candidate of choice, and because that -- as it turns

12     out, that's relatively straightforward, because it

13     establishes that the candidate of choice of black voters

14     is a Democrat, and the candidate of choice of Hispanic

15     voters is a Democrat, and the candidate of choice of

16     Anglo voters is the Republican.  And so that turns out

17     to make, sort of, the rest of the process pretty easy.

18                You basically just -- that's -- that's

19     what you find, right?  So there are some -- obviously,

20     there is more of interest there than just that.  There

21     is -- the level of cohesion for black voters is very

22     high.  That analysis shows that uniformly across the

23     state.  The level of cohesion for Hispanic voters is not

24     as high as for black voters, and varies much more across

25     the state than black cohesion does.  Anglo cohesion is

John Alford, Ph.D.                                    October 25, 2011

76

```
 1    lower than black cohesion and also variable across the
 2    state.
 3         Q.    And when you said that you find that blacks and
 4    Hispanics prefer the Democratic candidate, you are
 5    talking about in Texas, right?
 6         A.    Yeah.  This analysis is all for Texas.
 7         Q.    Okay.
 8         A.    I think it probably applies to some other
 9    states, and I know there are states that it wouldn't
10    apply to parts of, certainly.
11         Q.    Well, I just want to be clear that you are
12    saying that based upon these regression analyses that
13    you looked at for Texas, and you are not making some
14    general assumption about those racial groups?
15         A.    Right.  Each of the characterizations I made
16    are based exclusively on data for Texas and extensively
17    on data for Texas.  There is a lot of data for Texas,
18    and not just data I analyze, but data that the other
19    experts and the plaintiffs' experts in the Section 2
20    trial analyzed.  So we've got lots of analysis now of
21    Texas elections all over Texas.  And everything I said
22    there is -- could basically -- it's a reasonable
23    characterization that all of that evidence from all of
24    the experts, with the exception, maybe, of Allan
25    Lichtman.
```

John Alford, Ph.D.                                    October 25, 2011

1          Q.   Dr. Alford, across all of those extensive

2     analyses that you looked at and that you just discussed,

3     do you recall ever having seen data that led you to

4     conclude that black voters had preferred a Republican

5     candidate?

6          A.   I don't see any indication from this decade of

7     elections that -- any of the analyses I saw that showed

8     that black candidates preferred the Republican candidate

9     in the generally election.

10         Q.   Black voters, you mean?

11         A.   Black voters.  Sorry.

12         Q.   And across all those analyses, did you see any

13    data that led you to conclude that Hispanic voters

14    preferred the Republican candidate?

15         A.   Again, the cohesion there is lower, so there

16    are several pieces of evidence that suggest that there

17    is as much as a 60-40 split, 40 percent Republican, 60

18    percent Democrat.  But I didn't see anything that

19    suggested anyplace where there was like a 51 percent

20    Republican split in the Hispanic vote.  So the candidate

21    of choice, for Hispanics and blacks in all the analyses

22    I have seen in partisan elections, is the Democrat in

23    the partisan election.  It's just more cohesively a

24    choice for blacks than it is for Hispanics.

25         Q.   By the way, have you analyzed any nonpartisan

1    elections?

2         A.   Yes.

3         Q.   In the course of this work in the Texas

4    redistricting process?

5         A.   In the course of this analysis, only to the

6    extent that people sometimes refer to primaries as

7    nonpartisan elections, and certainly, you can't vote a

8    straight party ticket, and so they are not partisan in

9    that sense, in the sense that the candidates all share

10   partisanship.  But they are not truly nonpartisan in the

11   sense that -- well, I shouldn't say truly nonpartisan,

12   because we all know in the current era, there is no such

13   thing as truly nonpartisan.  But they are not legally

14   nonpartisan, I guess, in the strict sense that, say, a

15   nonpartisan school board election, for example, where

16   there is no party identification on the ballot.  There

17   is no party primary process.  So I haven't looked at any

18   of those kind of elections, but I certainly looked at

19   primaries where voting takes place without a party cue.

20        Q.   So getting back to the regression analyses that

21   you got from the Office of the Attorney General, how

22   would you go about identifying which candidates were the

23   candidates of choice of minorities in a particular

24   district?

25        A.   The analysis gives you an indication of the

John Alford, Ph.D.                                    October 25, 2011

79

1      proportion of vote being cast for particular

2      candidates.  If you have a two-candidate race, then you

3      just look for the candidate receiving the majority, the

4      estimated majority of the vote from that particular race

5      or ethnic group.  In a three-party race, you can look

6      for the candidate receiving the plurality of the

7      vote.  It just depends on how you want to -- some people

8      treat that differently, but that's the basic procedure.

9      You look at the estimated distribution of votes, and

10     sort of keeping in mind the sort of limitations of that

11     analysis, you make that determination based on where the

12     majority of the vote is being cast based on the

13     estimate.

14         Q.   And how would you use those three items of

15     data, the demographic analysis, the reconstituted

16     election analysis, and the regression analysis, to make

17     a determination in a particular election about whether

18     minority voters were able to elect their preferred

19     candidate of choice?

20         A.   In a particular election or in a particular

21     district, you would just look at the -- so you have

22     candidate of choice based simply on where the majority

23     of the vote or the plurality of the vote is being cast

24     by that group, and then you simply look at who won the

25     election.

John Alford, Ph.D.                                        October 25, 2011

80

1          Q.    On the reconstituted election analysis?

2          A.    If you're doing -- if you're doing

3     reconstituted election analysis on the reconstituted

4     election analysis, if you're doing endogenous analysis

5     on the endogenous election.  So whether you are looking

6     at an endogenous election or a reconstituted election or

7     exogenous elections, that's the basic.  You know the

8     candidate of choice.  So in this case, that, again,

9     turns out to be a straightforward procedure.  You simply

10    look at whether the Democrat won the election.  As long

11    as they are partisan elections, the Democrat wins the

12    election, and then the candidate of choice, the

13    minorities in the district, a place for blacks and

14    Hispanics, won the election.

15         Q.    Did you conduct any analysis of endogenous

16    elections over the course of your work for the state

17    this year?

18         A.    It seems to me that there are some -- I mean,

19    certainly -- you know, the discussion of how many times

20    did this candidate get elected, or, you know, did the

21    candidate of choice get elected in 2010, right, so that

22    in a -- I don't know what you call it -- a historical

23    sense, there is certainly discussion of that.

24                And I think there is -- at some point,

25    there is probably -- we probably did some cohesion and

1    polarization analysis on -- and I'm just not certain

2    that it was actually done.  And I think at some point

3    this issue came up and someone said, "Well, how do you

4    know in this specific election that the candidate of

5    choice was a Democrat?"  And so I think it's possible

6    that there was some analysis to confirm that at some

7    point.  But that's -- I don't think I relied on that in

8    making my -- my determinations in my report are based on

9    the more general analysis.

10              So, I mean, I have seen, from other

11   experts, election analysis on the endogenous elections,

12   and I think we may have confirmed that analysis -- I

13   want to add that to the compass of the things in which I

14   have not ever seen an example of an election in which

15   the candidate of choice of Hispanic or black voters was

16   the Republican candidate in the general election,

17   barring, of course, the Republican candidate not having

18   a Democratic opponent.  And Republicans running against

19   Libertarians, they are the candidate of choice of

20   everybody in an election, except, perhaps, Libertarians.

21              MR. SCHENCK:  It's a little bit after

22   1:00.  When would you like to break?

23              MR. SELLS:  This is a good time.  I was

24   just going to suggest that.  So let's go off the record

25   for lunch.

1          statewide analysis, and I think that was a helpful thing

2          to have, the statewide numbers.

3                    And I think in -- if I'm not confusing one

4          of the other cases going on at this moment, I think

5          there was a supplemental analysis in which Engstrom may

6          have run EI on -- specifically on the 23rd and 27th,

7          which I think, I can't remember if we actually

8          replicated or not, but it didn't look to me like it was

9          out of line.  I don't know that I -- I was late in the

10         stream of things, but I think -- I certainly would have

11         been comfortable relying on that for those districts.

12             Q.   Well, did you use anyone's EI analysis to

13         construct an index number or some sort of indication of

14         how many elections out of ten were won by the candidate

15         of choice of minority voters?

16             A.   Well, I said, I didn't see in any of our

17         analysis or anyone else's analysis any indication that

18         there was -- where there was any election in the

19         statewide database in which the candidate of choice was

20         not the Democrat.  So the indexes that I used were based

21         simply on counting the number of Democrats that win in

22         the elections, not based on doing that analysis

23         independently for each of those contests.

24             Q.   Who prepared the indexes that you looked at?

25             A.   I did.  Well, we said earlier that there was

John Alford, Ph.D.                                        October 25, 2011

90

1    the -- a ten election index that was -- so this -- I

2    mean, I don't know.  But I assume this is prepared

3    primarily for the purposes of helping with the drawing

4    of plans.  And I assume that's what the ten race index

5    was originally prepared for as well.  So I have seen

6    that, and I talk about that in the report.  But the

7    index of the 48 contests, I just did that myself out of

8    Red 225.

9         Q.   I would like to show you what I'll mark as

10   Government Exhibit 8.

11             (Exhibit 8 marked for identification.)

12        Q.   (BY MR. SELLS) And I'm going to ask if you

13   recognize that document?

14             MR. SELLS:  David, I do have a copy of

15   this for you.

16             MR. SCHENCK:  Okay.  Brian, you did take

17   the deposition of the LTS people, right?

18             MR. SELLS:  Yes, I did.

19             MR. SCHENCK:  Okay.

20             MR. SELLS:  It seems like a year ago.

21             MR. SCHENCK:  Yeah.  I just want to make

22   sure.  I think we have talked about these before in the

23   other deposition.  You got what you needed there from

24   them, right?

25             MR. SELLS:  I think I got a lot of what I

John Alford, Ph.D.                                    October 25, 2011

91

```
 1    needed from them.
 2                    MR. SCHENCK:  Okay.  Good.
 3                    MR. SELLS:  But their perspective is not
 4    necessarily the same as Dr. Alford's, of course.
 5                    MR. SCHENCK:  Sure.
 6         Q.    (By MR. SELLS) Do you recognize this document
 7    or something like it?
 8         A.    I mean, it's -- this looks, to me -- I can't
 9    say for certain, but it looks to me like this is the ten
10    election index that we talked about earlier.  I mean, I
11    counted.  There's ten elections, so I'm guessing, and
12    they look like -- that they seemed like familiar
13    elections.  So I'm guessing this would be the ten
14    election index.  And so it -- and I'm assuming this is
15    congressional; is that right?
16         Q.    Plan C-100 is congressional, yes.
17         A.    Right.  And I don't know what the 118 is, but
18    it must be some proposed.
19         Q.    Well, my question to you is:  Were you ever
20    provided a spreadsheet that looked similar to this in
21    form?
22         A.    It's very possible.  I mean, there was -- you
23    know, at one point, there was just an FTP site set up
24    for information, and then I was also shipped,
25    overnighted a set of thumb drives that had all kinds of
```

John Alford, Ph.D.                                    October 25, 2011

92

 1     volumes of material on them.  And I think -- I mean,

 2     there was -- we talked earlier about there was some

 3     discussion about index differences across two districts

 4     at a meeting.  This may have been -- something like this

 5     may have been what was being discussed there.

 6                 So, it doesn't look unfamiliar to me, but

 7     it's not something that I -- I didn't have a lot of

 8     these, or, I mean, I didn't have, sort of, this kind of

 9     format.  For example, I didn't have a C-100 and a C-185

10     that I was relying on to do, you know, these kinds of

11     index numbers, whatever.  More typically, what I would

12     just see is an index number.  Somebody would say this is

13     this plan is a 6 out of 10, and this plan is a 3 out of

14     10, something like that.

15          Q.   Okay.  I'm going to ask essentially the same

16     question about this next exhibit, which is Number 9.

17                 (Exhibit 9 marked for identification.)

18          Q.   (BY MR. SELLS) Do you recognize this document?

19          A.   Again, I may well have been provided this, but

20     I don't -- I don't recognize the document.  I have seen

21     a lot of things like this and this information in a lot

22     different places, but I don't recall actually seeing

23     this particular set of information on one table in this

24     form.

25          Q.   What is this a table of?

John Alford, Ph.D.                                    October 25, 2011

93

1          A.   Well, it's congressional, and it looks like

2     it's the 36th District, so it's some proposed plan.

3     Population, the black voting age proportion, the

4     Hispanic voting page proportion, the black plus Hispanic

5     proportion, and then what I assume would be the vote

6     percent in 2010, general Republican for Perry, and

7     Republican vote percent for General Abbott.

8          Q.   Do you see in the upper left-hand corner in the

9     cell B2, is a RA-300?

10         A.   Yes.

11         Q.   Do you remember receiving RA reports from time

12    to time?

13         A.   I may have.  I don't specifically recall at

14    this point.  I don't recall a RA.

15         Q.   Next I would like you to focus on your work in

16    the Perez versus Perry case, the Section 2 case?

17         A.   All right.

18         Q.   Which I think was a consolidated set of cases.

19    But do you know what litigation I am talking about?

20         A.   Yes.

21         Q.   And did you play a role in that case?

22         A.   Yes.

23         Q.   What was your role?

24         A.   I was one of the experts for the state.

25         Q.   Do you recall when you specifically turned your

John Alford, Ph.D.                                    October 25, 2011

94

1    attention to that case?

2         A.   There -- so we have laid out, kind of, sort of

3    the preliminary things that were done to put in place

4    the ability to analyze data for that.  And then the --

5    with the expert reports coming in from the plaintiffs

6    would have been when I basically shifted over to

7    focusing on -- directly on that case.

8         Q.   What were you asked to do in that case?

9         A.   To respond to a subset of the expert reports.

10   So there were lots of -- there were lots of plaintiffs.

11   There were lots of reports, and there was a very short

12   time schedule.  So I was asked to respond to a subset of

13   the expert reports to deal with the -- the kind of

14   overarching background issues related to Sections 2 and

15   3.  So things like the degree of cohesion in various

16   groups and polarization and so forth, to the extent that

17   it applied to all of the plans.  And then to the extent

18   that dealing with specific plans, to focus on the

19   congressional plan.

20        Q.   Who was tasked with focusing on the other

21   plans?

22        A.   I don't know.

23        Q.   Were you ever asked to look the House plan, for

24   example?

25        A.   When we talk about early on, there was some

1    discussion of the House plan in terms of, you know, some

2    district performance kinds of things.  And I am sure

3    that, and obviously, in a very general way, talking

4    about how, you know, how all of these issues might apply

5    to any plan early on.  And I just don't recall that

6    there was -- I mean, I was focused on trying get through

7    the analysis, the expert reports, and deal with the

8    congressional side.  There may have been some parallel

9    kinds of things that had come up related to the House

10   plan, but other than my report on the House plan, I

11   didn't testify on the House plan.

12        Q.   Do you know if anyone else was working on the

13   House plan?

14        A.   You know, I assume there was some testimony

15   about the House plan, but I don't know what the -- you

16   know, who would have been actually doing that or what

17   nature of that was.  I didn't attend the whole trial, so

18   I don't -- I don't know.

19        Q.   I'm going to ask my question again, so that I'm

20   sure that I understand your answer, because I may not

21   have been clear.  But do you know whether there was

22   someone else tasked with analyzing the House plan in the

23   Perez versus Perry litigation for State of Texas?

24        A.   I know that Randy Stevenson was doing some

25   parallel analysis, but I don't know who he was doing

John Alford, Ph.D.                                    October 25, 2011

96

1     that for.  And I know he was -- when he was working with

2     David Faulk and the OAG's office in setting up the

3     programs to do all the analysis and work through the EI

4     stuff, I know that involved both House and

5     congressional.  Maybe other, I don't know.  But I know

6     it involved House and congressional.  But I don't -- I

7     know I wasn't -- he wasn't doing that to provide it to

8     me, so... And I don't know who he was doing it to

9     provide it to.

10         Q.    You said a moment ago that you had some initial

11    or early discussions of the House district performance

12    with the performance of the House plan?

13         A.    Yes.

14         Q.    Can you tell me what you meant by that?

15         A.    So there was -- in a meeting this issue came

16    up.  We had some -- there was some discussions back and

17    forth about -- so we had an initial meeting where I sort

18    of laid out what I thought were the, sort of, reasonable

19    ways to approach both the data issues and analysis

20    related to constructing plans and dealing with Section 2

21    and Section 5.  And then, sort of, later in the process,

22    there were some discussions about, sort of, particular

23    -- so, no, I didn't do any analysis after that on any of

24    the proposed plans.  But there were discussions about

25    something like an index like this.  This one, you know,

 1    performs in 1 out of 10, this one performs in 2 out of

 2    10, or 3 out of 10.  And some question about is that a

 3    -- as we talked about here, would that be an important

 4    difference, is that not an important difference.

 5              So basically, asking me what I thought of,

 6    given this analysis that had been done, what I thought

 7    of that difference between two somethings, I don't know,

 8    between adopt -- they weren't adopted, but plans about

 9    to be adopted or plans in discussion, something like

10    that.

11              So I was not sent information and asked to

12    do analysis on the plans, but there were some

13    discussions where there was some of this kind of stuff

14    that had been developed, and basically I was asked what

15    I took to be, sort of, how did this fit in to what I had

16    talked about before about generally, these are the kinds

17    of things you want to look at or this is what these

18    things mean.

19         Q.   And what was your response?

20         A.   On the one -- the one time I recall

21    specifically, there was some difference that was a small

22    difference in index values and roughly what I would

23    consider to be the same range, and I said I don't think

24    that that -- that that in itself is not really the way

25    to choose between these two plans; that I think that's

1    not the -- that's not a determining choice between the

2    two plans.  If that's -- you know, if there's other

3    things that are involved, other things are involved.

4    But if this is what it's about, I wouldn't say a plan

5    would or would not fly on the basis of that just one --

6    that one difference.  And I don't recall exactly what,

7    in all this stuff, that difference was, except that it

8    was -- it was a difference that was -- that I considered

9    to be substantively unimportant, either in size or in

10   the fact that it was all in the same range.

11        Q.   Was that a discussion of a particular district,

12   or the plan as a whole?

13        A.   My recollection is that that was discussions of

14   particular districts and focusing on a particular --

15   there was a later discussion about the congressional

16   plan, where I think that was focused on 23.  And then

17   this earlier discussion about the House plan, I have no

18   idea.  Basically from the beginning, did not follow the

19   issues in the House plan closely at all.  So I have no

20   idea what district it might have been or set of

21   districts, but...

22        Q.   When did this initial meeting take place at

23   which you laid out your understanding of Section 2 and

24   Section 5?

25        A.   There was a general discussion before I was

John Alford, Ph.D.                                    October 25, 2011

99

```
 1    under contract, so we just came up to talk about the
 2    idea and sort of exchange views, thought it was useful
 3    to have at least some idea of what I might think about
 4    doing.  So we talked about that at that meeting.
 5              And then there was a subsequent meeting
 6    with -- I think it was maybe more or some different set
 7    of people, I don't know -- where we sort of went through
 8    in sort of more detail here are the -- here are the data
 9    products, here's the ones that I think are sort of
10    things important, here's where things not important.
11       Q.   And when did that meeting take place?
12       A.   I would guess probably in April, but I'm -- it
13    would be more toward the end of April.
14       Q.   Okay.  So there were two such meetings, an
15    initial meeting before you went under contract and a
16    lengthier meeting afterwards?
17       A.   Yes.
18       Q.   Is that correct?
19       A.   Yes.
20       Q.   Who else was at the initial meeting?
21       A.   The initial meeting.  David was at the initial
22    meeting.  Stacey Napier was at the meeting.  I'm trying
23    to think.  Who else would have been there?  Oh, David
24    Mattax would have been at the meeting.  Bruce Cohen
25    might have been there.  That's -- I mean, I'm sort of
```

1    trying to look around the table, but since we had

2    several meetings in that same room with different

3    people.  I didn't see General Abbott.

4         Q.   How about David Faulk?

5         A.   No.

6         Q.   Any members of the legislature?

7         A.   Let me back up.  David Faulk could have been

8    there.  I just don't recall David Faulk being there.

9    When I said no, it was if I was certain of that, but I

10   don't think David Faulk was there.  But he could have

11   been.  I don't think there were any members of the

12   legislature there unless they were masquerading as

13   attorneys.  I didn't see any -- any members of the

14   legislature.

15        Q.   Any staff members of the legislature that you

16   remember at that initial meeting?

17        A.   Not that I know of.

18        Q.   And who was at the second meeting that you

19   talked about at the end of April?

20        A.   It's the similar cast of characters.  I don't

21   remember specifically who might have been at one or the

22   other.

23        Q.   And going back to the initial meeting, what did

24   you lay out as your understanding of Section 5?

25             MR. SCHENCK:  I'm going to object to the

 1          extent it calls for a legal conclusion.  Subject to our

 2          earlier understanding, I'm fine with him answering.

 3                    MR. SELLS:  Sure.

 4          A.    I mean, I think I mostly laid out sort of what

 5          -- basically what I saw as my role in the process, that

 6          my role was to provide, sort of, factual information

 7          that was relevant to Section 5 and Section 2 that would

 8          be useful for them in making decisions that would be

 9          sort of something they could rely on in the sense that

10          it would be the kind of thing they could expect to see

11          from other experts, regardless of whose side they were

12          on, that I wasn't going to provide analysis that wasn't

13          just what the analysis was.  I suggested they retain me

14          as a consulting expert, so that if they didn't like what

15          I said, they could get rid of me.

16                    I told them I would charge more if I was

17          testifying expert than a consulting expert, because it

18          wasn't as much fun.  We talked about, based on my

19          previous work with David Faulk, that, sort of, how that

20          would work, that there is a great deal of work that

21          needed to be done and that most of the early work would

22          not be, sort of, not directly applicable work, but would

23          be sort setting the stage for doing the kinds of things

24          that we would need to do.

25                    And I'm not -- I have this discussion with

John Alford, Ph.D.                                    October 25, 2011

102

```
 1        lots of potential employers at various times, so I'm not
 2        sure exactly what.  I certainly would have said
 3        something about, sort of, basic notions about
 4        retrogression, that basically retrogression is going
 5        backwards, and that that's sort of kind of baseline kind
 6        of consideration, and then beyond that, you got broader
 7        issues, Section 2, that they are not exactly the same
 8        issues, that there's kind of an uncertain standing of
 9        where I am concerned, with basically with, you know,
10        what's the factual information that's useful here.
11        There's -- in my view, at least, there is more certainty
12        about the demographics side of Section 5 and more
13        certainty about, sort of, the Gingles one, two, three
14        threshold on Section 2.  And it's less clear how Gingles
15        fits in to Section 5, other than it somehow has to fit
16        in, but it's not really clear how.
17                    So sort of that's, sort of, what I was
18        trying to lay out was kind of what would be the -- what
19        kind of factual information and in what kind of form
20        could be provided for those two tasks.  And I think
21        that's -- I think that's pretty much it.
22        Q.   I heard you say that Section 5 is about going
23        backwards.  Did you indicate how you would measure
24        whether a proposed plan went backwards?
25        A.   I may have.  I don't -- I mean, I don't recall
```

1    that specifically.  I mean, I think that -- I'm sort of

2    illustrating uses of data, which was kind of the purpose

3    there, that that would have been, sort of, the

4    discussion about the kinds of demographic data that let

5    you characterize districts in existing plans and in

6    adopted plans.  So the importance of citizenship data,

7    the importance of SSRV.  I just don't know beyond that.

8        Q.    Jumping ahead to the second meeting, which you

9    said happened at the end of April, did you discuss your

10   understanding of how a plan goes backwards and how you

11   would measure that?

12       A.    I think there -- I'm not certain if it was in

13   that meeting or some later conversation that there may

14   have been more discussion of the role of the

15   reconstituted election analysis and giving you some idea

16   about district performance.  I think that's about it.

17       Q.    At any time during either the first meeting or

18   the second meeting, did you say or express the view that

19   retrogression could be measured simply on the basis of

20   demographic data?

21       A.    I don't think so.

22       Q.    And that wouldn't be consistent with your

23   understanding, as a social scientist, of what

24   retrogression is, right?

25       A.    I am not sure there is a social science

John Alford, Ph.D.                                    October 25, 2011

104

 1        understanding of what retrogression is.  But, again, I'd

 2        love to say we got that all worked out, and it's just

 3        confusing in the legal arena.

 4                  But I think -- I mean, that's one of the

 5        things that we specifically discussed, was that this is

 6        not going to be something where you can simply do a

 7        clear-cut analysis and just have a simple answer for

 8        it.  I think that's something everybody was well aware

 9        of; that this was going to be -- I don't think anybody

10        thought at any point that this was not going to be

11        litigated, right?  So this is Texas.  We litigate all of

12        our redistricting.  So it's pretty clear we are headed

13        into a litigation situation, and that that would be -- I

14        mean, I just never -- my view has always been that you

15        need to know what all the information is.  You can have

16        your own legal opinions about which piece of that's

17        important or not important or whatever, but that's not

18        my job, to work all of that out, thankfully.  My job is

19        just to -- so that you know what the facts are.  So I

20        would -- I would not provide someone with just a pure

21        demographic analysis for retrogression unless the

22        situation was basically, you know.

23                  And so, I mean, I have certainly done

24        Department of Justice filings for small municipalities

25        where there simply isn't an issue, you're basically

John Alford, Ph.D.                                    October 25, 2011

105

1      moving a few people around; all of the population
2      numbers and demographics stay the same for the minority
3      districts, and they're filed like that, and there was no
4      election analysis done of any kind.  But in a state
5      case, so that just doesn't -- I just don't think
6      that's -- again, it's Texas, a state case in Texas.  So
7      maybe there are some states where it's so uncontested
8      and uncontroversial, that that's all you need.  But I
9      just don't think -- it really doesn't matter what I
10     thing is the appropriate standard.  Other people don't
11     think that, and therefore, you're going to have to be
12     prepared to deal with more than just, you know, a simple
13     demographic analysis.  I mean, you have to have more
14     than that.
15         Q.    Okay.  Well, I want to be as crystal clear as
16     we can be here today, and specifically I want to know --
17     I want you to confirm that you never told anyone at
18     either of these two meetings that retrogression could be
19     measured in this case by simply referencing demographic
20     data.
21         A.    Well, I mean, if you mean could be in the sense
22     that, you know, if you want to make the case that this
23     is what Section 5 is about, then you can just measure
24     that with demographic data.  I mean, I certainly would
25     -- I don't know if I said that, but I would say that.

1          But if someone wants to -- if someone

2     wants to advance their case on the basis that this is

3     what Section 5 is about, it's about districts that are

4     majority and that districts that remain majority, then

5     all you would need to advance that is demographic

6     data.  But that's not my view of what would be the most

7     effective way to move forward on getting preclearance.

8          Q.   Okay.  Let me try asking it a third way:  At

9     either of these two meetings, did you advise anyone that

10    according to your understanding, that retrogression is

11    measured simply by reference to demographic data?

12         A.   No, I don't think so.

13                   THE COURT REPORTER:  I could take a break?

14                   MR. SELLS:  Certainly.

15                   (Recess from at 2:49 p.m. to 2:57 p.m.)

16         Q.   (By MR. SELLS) At either of the two meetings

17    that we have been discussing, were you asked to give an

18    opinion on whether the House plan was retrogressive?

19         A.    The State House.  I don't want to get confused

20    about this, because I think of the national government,

21    the House, to me, is the Congress.  I think -- I mean,

22    at that stage, I think we were still talking about

23    standards and information I could provide.  I don't

24    think there was -- I don't think there was some

25    discussion of that sort.

John Alford, Ph.D.                                    October 25, 2011

107

```
 1          Q.   When did your attention turn to this case, the
 2     Section 5 case, and Section 5 issues generally?
 3          A.   Well, basically after the completion of trial
 4     in the Section 2 case.
 5          Q.   And that was in September sometime?
 6          A.   Yes.
 7          Q.   And you hadn't done any Section 5 analysis
 8     before then?
 9          A.   I don't -- well, I don't recall anything
10     specifically related to Section 5.  Obviously, there
11     is -- you know, there's lots of overlap in terms of the
12     kinds of analysis.  But I don't think I had done
13     anything that was -- I could be wrong.  There's just a
14     lot -- there was a lot going on in that six weeks.  So I
15     don't -- I don't know.  But offhand, I don't recall
16     anything that was Section 5 as distinct from Section 2.
17          Q.   Did you receive any instructions about your
18     role in the Section 5 case?
19          A.   At some point, I was told that they would --
20     that they would need a report.  I'm not sure that before
21     that I was even clear.  I have not been involved in a,
22     as I said before, in a Section 2 case that has gone to
23     the D.C. Court, so I really didn't know how this would
24     be handled.  But they told me that they would need a
25     report and a deadline for the report, and that's what I
```

John Alford, Ph.D.                                    October 25, 2011

108

1    recall.  I started working on my report.

2         Q.   You don't recall any other any other

3    instructions?

4         A.   I think I was sent a copy of the motion for

5    summary judgment when it was produced, the DOJ

6    response.  I can't remember if it was one or two.

7    Basically there was one general and then one specific.

8    And there was some discussion that I would be responding

9    to the -- primarily to the specific, the indications of

10   concern from DOJ, you know, beyond just sort of the

11   general retrogression analysis.  And that's what I

12   recall.

13        Q.   When you say you were asked to respond to

14   specific areas of concern, can you be more detailed as

15   to what your instructions were?

16        A.   I don't -- I don't recall in any more detail

17   than that.  So, I mean, I was looking through, basically

18   saying I'm going to respond to the dealing with the

19   district issues that are here, and then as I -- there

20   was -- I think somebody else put together -- or Stacey

21   Napier maybe put together a list of the specific

22   districts that were being mentioned either by Justice or

23   by intervenors.  So I wanted to be able to look at the

24   intervenor list without necessarily going through and

25   reading through all of that.  I think that's -- but I

1    think that's pretty much it.

2        Q.   You weren't told how to respond or what sort of

3    analysis you should put in your report?

4        A.   I'm just trying to recall a specific

5    conversation.  So, I mean, I think there was some back

6    and forth about -- about the particular districts.  I

7    don't recall anything of this sort of, in that sense of

8    it, you know, this should be -- this kind of analysis

9    should be in or this kind of analysis shouldn't or...  I

10   don't recall that.

11       Q.   I would like to draw your attention to House

12   District 27 in the benchmark plan, which happens to be

13   the one that you have in front of you, the regression

14   for, but you don't necessarily need to refer to

15   that.  Do you have House District 27 in mind?

16       A.   I'm just looking at the -- and I don't -- off

17   the top of my head, I don't know a thing about House

18   District 27.  It looks like it is, according to this, 36

19   percent black, 23 percent Hispanic, about 5 percent

20   Asian, and it looks as though it's got strong

21   performance numbers.

22       Q.   Do you recall whether the minority-preferred

23   candidate won election to the House from District 27?

24       A.   I don't recall, but I was given this number, so

25   I would assume that that would be the case.

John Alford, Ph.D.                                    October 25, 2011

110

```
 1        Q.    Is that a district in which you would conclude
 2     that minority voters have the ability to elect
 3     candidates of their choice to the Texas House?
 4               MR. SCHENCK:   Objection.   Calls for a
 5     legal conclusion.   Subject to the objection, the witness
 6     will answer.
 7        A.    Well, the effectiveness numbers would indicate
 8     that it's a democratic majority district, and I would
 9     assume that's what we would see.   Looking at any of the
10     exogenous analysis, it's -- it's not a majority black or
11     a majority Hispanic district, so it would have to be a
12     coalition district to reach minority status -- or
13     majority status.   And so, I mean, that -- it's, in my
14     view, would not be an effective Hispanic district or an
15     effective black district.   It would be a coalition
16     district.   So in the general election, the candidate of
17     choice of blacks, Hispanics, and Anglos, Anglo Democrats
18     in that election will the Democrat, and the candidate of
19     choice of black, Hispanic, and Anglo Republicans would
20     be the Republican, and if the Democratic candidate is
21     elected, then in the general election, that would be the
22     election of candidate of choice of black and Hispanic
23     voters.
24        Q.    (By MR. SELLS) That was a rather long answer to
25     what I intended it, and it was a pretty simple yes-or-no
```

John Alford, Ph.D.                              October 25, 2011

1      question.  But I think it was yes, that you would

2      conclude that the minority-preferred candidate of choice

3      was elected -- or the minority voters have the ability

4      in that district --

5                   MR. SCHENCK:  Objection.  Asked and

6      answered.

7          A.   And I'm not trying to split hairs or anything,

8      but I've had some bad experience with basically saying

9      things that seem to me to be obvious and responsive, and

10     then having them turned back around in ways that are --

11     that obviously take them out of context.

12                  So I just want to make clear that -- that

13     I don't think there is evidence that blacks and

14     Hispanics constitute a single cohesive minority.  I

15     think they are politically cohesive in this district.

16                  Lacking political cohesion, I think --

17     well, you just said that the minority candidate of

18     choice was elected suggests there is -- it's maybe a

19     combined minority, or that we can just say that's the

20     minority candidate of choice.

21                  And these groups are not politically

22     cohesive, so in the -- in the general election, the

23     candidate that gets -- that will become the candidate of

24     is choice, by virtue of the Democratic nomination, I

25     suspect would be elected in this district.

John Alford, Ph.D.                                    October 25, 2011

112

```
 1              So I just want to be clear that I don't
 2     think that this is -- that this is a district that has
 3     -- I mean, it's not a district that I would analyze, if
 4     I was looking at a set of districts for this purpose,
 5     simply because it's not a district that has a majority-
 6     minority population, in which that minority population
 7     is a politically cohesive minority.
 8          Q.   (By MR. SELLS) Have you done any analysis as to
 9     whether -- scratch that.
10              Do you know who has represented that
11     district over the course of the last decade?
12          A.   No, I don't.
13          Q.   If I were to tell that you it has been
14     represented by either a Hispanic or a black Democrat
15     over the last decade, would that affect your conclusion?
16          A.   No.
17          Q.   How could a Democrat win that seat if that
18     Democrat is not the candidate of choice of both black
19     and Hispanic voters, given the demographic numbers that
20     you have just identified for me?
21          A.   By being the candidate of choice of one of
22     those groups plus Anglos.
23          Q.   But you don't know whether that is in fact the
24     case, do you?
25          A.   No.  You were just saying how could they,
```

1    and that's how they could.

2         Q.    But you have said earlier that in every race

3    you have looked at, the Democrat is always the candidate

4    of choice in the general election?

5         A.    Well --

6         Q.    Of minority voters, I should add.

7         A.    Right.  I mean, so I'm assuming that roughly 40

8    percent of the voters are Anglos?

9         Q.    Do you have the numbers in front of you?

10        A.    It's 36.4 percent black and 23.2 percent

11   Hispanic, so that should mean something like half, or

12   maybe a little better than half, of the turned-out vote

13   might be minority.

14        Q.    You're saying that based on the voting age

15   population figures?

16        A.    Yes.

17        Q.    And you don't -- you haven't run any turn-out

18   analysis of that district, have you?

19        A.    No.

20        Q.    If it turned out that in fact black voters are

21   a much more substantial share of the turnout, would that

22   affect your view?

23        A.    Well, the larger the share they make up of the

24   turnout, then the more cohesive the -- but that would

25   preclude certain other mathematical possibilities.

John Alford, Ph.D.                                    October 25, 2011

114

1          Q.   Have you done any analysis of the endogenous

2     races in District 27 to determine whether the candidate

3     who prevailed in each of the five general elections over

4     the last decade was in fact the candidate of choice of

5     black and Hispanic voters in that district?

6          A.   I'm sorry.  Was this -- do you know if this was

7     one of the districts that was in either the Justice or

8     any of the intervenors?  I don't see it.

9          Q.   I don't believe it's in your report.

10         A.   Then there may have been some analysis, but

11    what I was focusing analysis on were districts that have

12    been raised as issues by either the Justice Department

13    or by the intervenors.  So if there was analysis done, I

14    probably haven't looked at it directly.

15              I would assume that it would show that

16    blacks vote cohesively for the Democratic candidate in

17    the general election, probably about 90 percent; that it

18    would show Hispanics voting cohesively in the general

19    election for the Democratic candidate, probably at a

20    level below that, 80 percent; and Anglos probably voting

21    -- Anglos are a little trickier, because it would depend

22    on where the district is located.  But Anglos voting for

23    the Republican candidate at 70 something percent maybe.

24         Q.   So that's an instance where Hispanics voters

25    would have had the ability to elect their candidate of

John Alford, Ph.D.                                    October 25, 2011

115

```
 1        choice over the course of the decade, because their

 2        candidate of choice would have been the Democratic

 3        candidate, right?

 4            A.    Right.

 5            Q.    And that's an instance where black voters would

 6        have had the ability to elect candidates of their

 7        choice, because their candidate of choice would have

 8        been the Democratic candidate and they would have

 9        favored that Democratic candidate quite heavily,

10        according to your analysis?

11            A.    Right.  So in the general election, both blacks

12        and Hispanics in the general would have the chance to

13        elect their candidate of choice.

14                    But, I mean, the issue for me, and I

15        assume the reason that it's not listed somewhere else,

16        is just -- I don't know why it's not listed somewhere

17        else.  But the issue for me is, what we have just said

18        is true of any Democratic district in the United

19        States.  Minorities, blacks and Hispanics -- well,

20        immediately, you got to take out Miami.

21                    So let's just say for Texas, for any

22        Democratic district in Texas, it's true that blacks and

23        Hispanics located in Democratic districts vote for their

24        candidate of choice, typically the Democrat in the

25        general election, and if the district is majority
```

```
 1     Democratic, that candidate is elected.  And if it's not
 2     majority Democratic, the candidate is not elected.
 3                  So, my beginning for this analysis is to
 4     assume that the benchmark districts in state of Texas
 5     are not all the Democratic districts in the state of
 6     Texas.  Well, I mean, that's the assumption that I made
 7     in going into the analysis.  And then beyond that,
 8     looked specifically at districts that were identified as
 9     districts in question by intervenors or by the Justice
10     Department.
11         Q.   But this is a majority-minority district,
12     right?
13         A.   In a combined -- I mean, as a coalition
14     district or...
15         Q.   I'm not characterizing it as anything as other
16     than majority-minority.
17         A.   All right.  Yeah, but as long as you don't mean
18     anything legal by majority-minority.  If you add up the
19     minorities, they constitute a majority in the district.
20         Q.   Is that true at the VAP level?
21         A.   Well, it's certainly true at the VAP level.
22         Q.   Is it true at the CVAP level?
23         A.   Again, I'm going on the data that's in front of
24     me, which is from Lisa Hanley's report.  But I assume
25     it's reliable, and in that case, it's true at the CVAP
```

John Alford, Ph.D.                                    October 25, 2011

117

1    level as well.  We don't have the SSRV here, so I don't

2    know what it is.  I assume it's lower than the 23

3    percent, but probably -- my guess would be about 19,

4    something like that.  So, I mean, it could be a close

5    call in terms of voters, but, again, I'm not concerned.

6              My concern is not with, if when we add all

7    those up, we come up with a close call.  I mean, they

8    can all add up to 56 percent, or they can all add up to

9    46 percent.  It's that they -- it's that none of them

10   individually adds up to 50 percent plus one.  So it's a

11   coalition district.  And there is just no evidence

12   anywhere that blacks and Hispanics are cohesive in the

13   Democratic primary, and in fact, vote, more often than

14   not, vote for opposite candidates.

15             And my view is that if -- if a group is

16   not -- if a group is politically cohesive, they will

17   support the same candidates in the primary.  If they

18   don't support the same candidates in the primary, then

19   to argue that they end up supporting the same candidate

20   in the general election is just simply not a useful way

21   of characterizing an election system that's functioning

22   in the way that the Voting Rights Act envisions an

23   election system function.

24        Q.   And if the law turns out not to support that

25   view, you would conclude that this an ability-to-elect

John Alford, Ph.D.                                    October 25, 2011

1    district for minorities?

2         A.    Then I would want to do the actual analysis on

3    the district.  I didn't do -- or discuss that in my

4    report, because I would not assume that that's -- that's

5    the case.  But if it turns out that is the case, then

6    that's -- then you would go about doing that analysis

7    by, as you did, as was the case for the other districts.

8                So I'm not objecting to the -- to the way

9    this is done, just simply to the fact that it's -- it's

10   a district that is majority only in the sense that you

11   put together two groups that in Texas are not

12   politically cohesive.

13        Q.    If there is a substantial number of blacks and

14   Hispanic voters in a district, are they required to

15   settle on a candidate at some point before the election

16   process begins?

17               MR. SCHENCK:  Objection.  Calls for a

18   legal conclusion.

19        A.    I don't think they are required to do

20   anything.  I think they're -- they're allowed to have

21   their own candidates of choice, which they evidently

22   do.  I have no problem with that.

23               And I just think it's -- these are groups

24   that either -- that you basically either can treat as a

25   single group or you can't.  If you can treat them as a

 1     see if they are a majority, that gets us out of the
 2     influence district issue.  If that's a majority, then
 3     you've got a majority district, and then you would
 4     simply move on to looking at the -- at whether in the
 5     adopted plan, that number had been moved up or down and
 6     across the majority line.  If you want to make a
 7     brightline cut at reducing a majority district to a
 8     minority district, and then looking at the reconstituted
 9     elections, if the district was performing in the old
10     plan, if the district is likely to perform similarly in
11     the new plan.
12         Q.   Well, just as to the benchmark plan, if it
13     turned out that cohesion in the primary was not required
14     and cohesion in the general, and if we were only trying
15     to determine whether the benchmark district was one in
16     which minority voters had the ability to elect, and it
17     turned out that the Democratic candidate won
18     overwhelmingly in all five general elections over the
19     course of the decade, what further analysis would you
20     want to do, to determine whether that is, in fact, a
21     district in which minority voters have the ability to
22     elect candidates of their choice to the House?
23         A.   I mean, I would want to see the statewide
24     numbers as well, just because if you're going to be
25     comparing this to another district, that's going to be

John Alford, Ph.D.                                    October 25, 2011

137

```
1      your comparison baseline.  But I don't think you would

2      have to have those numbers, in the sense of just asking

3      that question about past performance of the district.

4           Q.   I want to turn your attention to District 148

5      in the benchmark House plan.

6           A.   All right.  And just to simplify, is this a

7      district that I'll find --

8           Q.   In your report?  I don't think so.

9           A.   Okay.

10          Q.   It's mentioned in your report, but I don't

11     think it's in any of your tables.

12          A.   And is this a black or Hispanic district?

13          Q.   It's a Hispanic district.

14          A.   Hispanic district.  All right.

15          Q.   And I'll represent to you, as an officer of the

16     court, that it has been represented by Jessica Farrar,

17     herself an Hispanic, for much more than this decade.  I

18     don't know if her first election was '94, I think.

19     Maybe '92.  Maybe '96.  But she has won reelection over

20     the course of the decade.

21          A.   All right.

22          Q.   Do you need more information to determine if

23     Representative Farrar is the minority candidate of

24     choice in that district?

25          A.   Representative Farrar is a Democratic?
```

John Alford, Ph.D.                                    October 25, 2011

138

1     Q.   She is.

2     A.   Then I would be fairly certain that she is the

3     candidate of choice of minorities in the district.

4     Q.   And do you need more information to determine

5     whether 148 is a district in which minority voters have

6     the ability to elect candidates of their choice to the

7     Texas House?

8     A.   Again, we're, like, basically have the same

9     issue here.  This is a -- Hispanics constitute about 40

10    percent of the voters or the citizen population in the

11    district, so, so long as the district is drawn to be

12    Democratic, they will have the ability in the general to

13    elect the candidate of their choice.

14    Q.   And have they demonstrated that ability by

15    electing and reelecting Jessica Farrar over the last

16    decade?

17    A.   Yes.

18    Q.   I'm going to ask the same -- the same question

19    with regard to benchmark District 149, which I know is

20    one that you have analyzed; at least you have analyzed

21    the primary elections in exogenous contests.

22    A.   All right.

23    Q.   But that's one in which Representative Hubert

24    Vo has won election and reelection since 2002, I

25    believe.  Let me double check that.

John Alford, Ph.D.                                    October 25, 2011

139

```
 1                    MR. SELLS:  Does that sound right to you?

 2                    MR. SCHENCK:  It sounds about right.

 3        Q.    (BY MR. SELLS) I think he first won election in

 4   2004, maybe.  But he certainly has been reelected in

 5   2010, 2008, and 2006.

 6        A.    Yes.

 7        Q.    First of all, is that a majority-minority

 8   district?

 9        A.    Well, here, we have to go three -- three

10   minorities to get to the majority, because it's not

11   majority in terms of black and Hispanic.  It's not

12   majority in terms of Asian and Hispanic, or Asian and

13   black.  But if we add Asian, black, and Hispanic, then

14   we get majority.

15        Q.    So yes, it is majority-minority district?

16        A.    Again, if by that definition you mean summing

17   up those three minority groups and you reach a majority,

18   then that would be true.

19        Q.    That's a majority of CVAP?

20        A.    That's a majority of CVAP.

21        Q.    Okay.  And based on Hubert Vo's reelection, I

22   believe three times to the House to from District 149,

23   would that be a district in which minority voters have

24   demonstrated the ability to elect a candidate of choice

25   to the House?
```

John Alford, Ph.D.                                    October 25, 2011

140

1          A.   Again, assuming -- I don't think I have seen

2     the -- do we have the general election -- I'm not sure

3     that I have seen general election analysis in that

4     district for Asian.  I don't know how the Asian -- I

5     don't what the cohesion analysis is for Asian in that

6     district.  That may be someplace, but I'm not seeing it

7     right now.

8               So when we talked earlier about that we

9     have bundles of evidence that allow us to be fairly

10    cavalier about saying that blacks are likely voting --

11    the candidate of choice of black voters is the

12    Democrats, the candidate of choice of Hispanic voters is

13    the Democrat, we don't have the same kind of analysis to

14    say offhand that the candidate of choice of Asian voters

15    is a Democrat.

16              So with that caveat, I would say in

17    electing Hubert Vo, blacks are electing their candidates

18    of choice, black voters in that district.  Hispanic

19    voters in that district are electing their candidate of

20    choice in the general election, and I'm not sure about

21    Asian voters.

22              MR. SELLS:  Would now be an okay time to

23    take a short break?

24              THE WITNESS:  Sure.

25              (Recess from 3:53 p.m. to 4:05 p.m.)

```
 1              MR. SELLS:  Back on the record after
 2      another short break.
 3         Q.    (BY MR. SELLS) We talked about benchmark House
 4      Districts 27 and 148.  I don't want to spend as much
 5      time on the next one, but I want to direct your
 6      attention to benchmark Congressional District 18, and I
 7      simply want to ask maybe by way of summary:  Is this
 8      another district where essentially the only thing that
 9      is preventing you from concluding that it is a district
10      in which minority voters have the ability to elect
11      candidates of their choice to the U.S. House is this
12      assumption that cohesion in primaries is required for
13      that conclusion?
14         A.    In 18, it would depend on -- and my
15      recollection of 18 is that it's 49 percent black,
16      something like that.  Is that even close to being
17      correct?  I see you shaking your head.
18         Q.    I don't have those numbers committed to memory.
19         A.    Well, so my recollection is -- my recollection
20      is that the black CVAP for 18 is right around 49
21      percent, somewhere in that range, so that's an open
22      question as to whether that's a majority black district
23      or not.  It certainly would give me a Red Apple.  In
24      five minutes, I can make it a majority black district.
25      And I guess that's where, I think, to be a little bit
```

John Alford, Ph.D.                                    October 25, 2011

142

1      careful about -- that's why I think it's important to

2      look carefully at the minority numbers.  So that's --

3      rather than being a district that's balanced between two

4      or three minorities, that's a district that is at or

5      close to being at a majority black district, as are the

6      other two black congressional districts.

7           Q.   But benchmark Congressional District 18 would

8      be a majority-minority if you aggregated them?

9           A.   If you -- well, if you aggregated minorities,

10     it would be -- clearly be majority-minority.  But I

11     think it's -- there was also a question on whether it's

12     a majority-minority on black alone.  It's not on

13     Hispanic, not close, of course.  But I think it is very

14     close to being majority, if not majority black citizen

15     voting age population.

16          Q.   Well, do you conclude, as it is now, that

17     benchmark Congressional District 18 is a district in

18     which black voters have the ability to elect candidates

19     of their choice to Congress?

20          A.   Yes.

21          Q.   Sticking with the congressional plan, but

22     turning now to the proposed plan, is proposed

23     Congressional District 35 one in which you conclude that

24     minority voters will have the ability to elect

25     candidates of their choice to Congress?

```
 1          A.    (Viewing documents.) Yes.

 2          Q.    And it's also your conclusion that proposed

 3    District 23 is not a district in which minority voters

 4    will have the ability to elect candidates of their

 5    choice to Congress, right?

 6          A.    I guess we better be careful here, because I

 7    think this maybe exactly where I tend get into trouble.

 8                MR. SCHENCK:  Let me object to the extent

 9    it calls for a legal conclusion, but subject to the

10    objection, you may answer.

11          A.    All right.  So I don't think there is any

12    question that Hispanics have the ability to elect a

13    candidate choice in the 23rd.  They have a majority of

14    the registered vote.  54 or 55 percent of the registered

15    voters are Hispanic.  So Hispanics have the ability to

16    elect a candidate of choice in that district, and that

17    ability can't be defeated by cohesive Anglo block

18    voting.  That's why you make a district majority-

19    minority.  So it's a majority-minority district.  It's a

20    single majority-minority district.  It's Hispanic.

21    Hispanics, all Hispanics have to do is turn out and vote

22    as cohesively as Anglo voters turn out and vote, and

23    they control the district.  So in that sense, and in

24    just a numerical sense, that's an ability to elect

25    district.  That's just a fact.  There is an ability to
```

John Alford, Ph.D.                                October 25, 2011

144

1      elect a candidate of choice there.

2                    Then I think if you move to the sort of

3      the functional analysis that DOJ is recommending, you

4      would want to say how likely is that to happen under

5      that district, and that's where you look at the election

6      analysis.  And what you see in the election analysis is

7      that basically current patterns of cross-over voting and

8      turnout remain in place, but that's not likely to happen

9      all that often.  And so if you are looking for a

10     district that will -- that will perform regularly,

11     that's a district that probably is not going to be one

12     of your better performing districts.  But I don't think

13     there's any question that it still is an ability-to-

14     elect district.

15          Q.   As you have just --

16          A.   And again, as -- which is -- yeah, what I have

17     just said is what I am thinking of.  And if there is

18     some -- if ability to elect means something else in a

19     legal sense, I apologize.  In the sense that Hispanics,

20     if they vote as cohesively as Anglos, cannot be blocked

21     in their choice by Anglo block voting.  It's an ability-

22     to-elect district.  It's a majority Hispanic registered

23     voter district.

24          Q.   Okay.  But your analysis is that more likely

25     than not, Hispanics will not elect their candidate of

John Alford, Ph.D.                                October 25, 2011

145

1       choice to Congress in that seat?

2                   MR. SCHENCK:  Objection, calls for a legal

3       conclusion.

4           A.   Based on the election analysis, as well as just

5       the past history of the 23rd, I'd say, you know, even

6       without election analysis, anybody would say that's got

7       to be a toss-up proposition for the 23rd.  It's always

8       been a problematic district in all of its incarnations.

9                   But based on the election analysis, I

10      would say that -- I mean, all other things being equal,

11      my projection would be that that would not be a district

12      that I would count as a district that is -- has a high

13      probability of electing a candidate of choice based on

14      the statewide election returns and the reconstituted

15      election analysis.

16          Q.   (By MR. SELLS) Would you say a less than 50

17      percent probability?

18                  MR. SCHENCK:  The same objections.

19          A.   I mean, I would prefer to say the -- that is

20      less than 50 percent is kind of -- its performance

21      index, almost no matter how you calculate it, is below

22      50 percent.  How that actually -- we don't really know

23      how that turns into -- we have no analysis from anybody

24      that connects those performance indexes in a

25      regressional analysis to actual performance by going

John Alford, Ph.D.                                    October 25, 2011

 1    back, say, to 2000 and looking forward.  It would be an

 2    interesting thing to do.

 3              So I would hesitate to say that that term

 4    translates directly into the likelihood of performing.

 5    So a district that performs half the time in statewide

 6    elections may or may not be a 50-50 chance of performing

 7    in a given election.  But it certainly -- its past

 8    performance is less than -- it elects candidates of

 9    choice less than half the time.  So I'd say -- and I

10    think it's roughly -- isn't it roughly the same

11    territory as Herbert Vo's district, if I'm not mistaken?

12         Q.   (By MR. SELLS) Well, I'm not sure I would agree

13    with that because --

14         A.   I'm just thinking in terms of the index.

15    Again, I'm just trying to make my point that we can't

16    just translate the probabilities directly, because I

17    think Herbert Vo's district is a 19 percent performing

18    district.  And I don't think it automatically means that

19    there's only a 19 percent chance of electing Herbert Vo.

20         Q.   Turning back to the House side, again, on the

21    proposed, is it your conclusion that minority voters in

22    the House District 35 will be more likely than not able

23    to elect candidates of their choice to the State House?

24         A.   Yes.

25         Q.   That they will be?

John Alford, Ph.D.                                    October 25, 2011

147

```
1            A.    That they will be able to elect candidates of

2       choice.

3            Q.    On what do you base that conclusion?

4            A.    It has a hundred percent performance index.

5            Q.    Are we talking about the same district here,

6       proposed district 35 on the State House side?

7            A.    I'm sorry.  House for me always means House of

8       Representatives.  I can't help it.  I'm a national

9       politician.  When you say the House, it's House of

10      Representatives, and I guess -- I don't know what they

11      -- do they call it the House of Representatives in

12      Texas?  Do they really?  Well, amazing.  So there you

13      go.  Okay.  Let's -- they should be forced to start

14      their numbering at 37.

15                  So I guess the question on State House

16      District 35 is that the -- the exogenous number is below

17      50, so, and it's certainly not a certain district, but

18      it's in sort of -- it's in that -- it's in that 50

19      percent range plus or minus.

20           Q.    Do you disagree with Lisa Hanley's conclusion

21      that it is not an ability-to-elect district?

22           A.    Maybe I'm looking at the wrong -- hold on.  So

23      this is H-283.  This proposed District 35.  So this is a

24      district that's 53 percent Spanish surname registered

25      voters and elect Democrats half the time?  Well, in the
```

John Alford, Ph.D.                                    October 25, 2011

148

1      sense that its Hispanic surname registered voter

2      majority has the ability to elect in the sense that if

3      Hispanics vote cohesively, at least as cohesively as

4      Anglos, then they can't be blocked out by nonHispanic

5      voters.  And then turning to the election analysis, it

6      looks like it's basically a toss-up district in terms of

7      its performance, elects Democrats half the time,

8      Republicans half the time.

9               So I wouldn't say that it's not -- I

10     wouldn't say it's a district that doesn't provide the

11     ability to elect, and I wouldn't say it was a district

12     that would not -- and based on this analysis, we would

13     expect it to perform sometimes and not perform

14     sometimes.  So it's not going be a district that would

15     be basically kind of an automatic, you know, performing

16     district like C18, but it's certainly a district that's

17     -- that is where voters have elected Democrats and where

18     Hispanics are a majority of the registered voters.

19         Q.   And when you say Democrats win half the time

20     there you're weighting -- w-e-i-g-h-t-i-n-g -- white-

21     white contests, the same as interracial contests, right?

22         A.    I count everybody as a Democrat who runs on the

23     Democratic ticket.  I don't discriminate on the basis of

24     race or ethnicity.  But I can look back here and see

25     what the -- right?  We can get -- well, so Lisa gets a

1    40, and the big number is a 48, and in the REA or the

2    DEA, it's a 4.  So I guess everybody is in the --

3    somewhere in that 40 percent range, which, I think is

4    that -- I think of that range that sits around the

5    middle there, that kind of 40 to 60 area.  I mean,

6    everybody agrees that there is -- obviously, that's --

7    regardless of how you look at that, there are a

8    substantial number of minority Democrats are being

9    elected in the district and a substantial number of

10   Democrats are being elected in the district.

11        Q.    And there is also no question that that

12   district gets worse from the benchmark to the proposed,

13   right?

14        A.    Gets worse in what sense?  Does it -- are you

15   talking about worse in demographics or worse in vote

16   performance?

17        Q.    Vote performance.

18        A.    (Viewing documents.) It doesn't look that

19   different to me, but maybe I'm missing something.  And I

20   think I -- I had it at 58, and now it's at 48.

21        Q.    It's a 20 percent drop?  That's not significant

22   to you?

23        A.    I mean, it's ten percentage points, 58 to 48.

24        Q.    So roughly 18 percent?

25        A.    I mean, it's -- I guess it's more likely to be

John Alford, Ph.D.                                    October 25, 2011

154

```
 1          A.   Right.

 2          Q.   So at some point, you have to make that

 3     determination, right?

 4          A.   Right.  And currently, based on the DOJ

 5     guidance, that worse off has to -- has to be this

 6     functional analysis that involves election performance

 7     and so forth.

 8          Q.   Well, let me ask you a different question.

 9               If you were to do that analysis based on

10     numbers, you'd want to be comparing apples to apples,

11     and so you'd want to look at CVAP, right?

12          A.   Right.

13          Q.   Okay.  So you'd want to look at, if it were

14     simply a brightline test, excuse me, based on the

15     demographic numbers that you were just talking about

16     that are available to everyone, you would want to look

17     at districts, the number of districts in which minority

18     voters are a majority of the citizen voting age

19     population in the district, right, and compare that with

20     the number of districts in which minority voters are the

21     citizen voting age population majority in the proposed

22     plan?

23          A.   Correct.

24          Q.   Right?  And minority voters in that case would

25     be worse off if there were fewer majority-minority CVAP
```

1    districts, right?

2         A.   Correct.

3         Q.   Okay.  If that's not the standard, how do you

4    go about determining whether there is a -- whether the

5    ability of minority voters to elect candidates have been

6    diminished?

7         A.   I think that's a difficult question in part

8    because that earlier demographic standard simply, right,

9    as tractable as it is, glosses over some stuff.  And so

10   it's made tractable by glossing over some stuff.  So it

11   is tractable, but there it is. And in this functional

12   analysis, you are trying to basically to reapproach that

13   and not gloss over some of those things.  And I think

14   that's the reason that there -- and one reason to gloss

15   them over is that they are -- they are not as tractable

16   in an analytical question.

17             And in a case that works you would like to

18   be -- my preference, as I said before, is everybody has

19   the same facts, and then they can figure out what to do

20   with them.  And here, we have this kind of changing set

21   of facts.  I mean, I'm pleased that they are as close as

22   they are in terms of the elections that were selected

23   and the basic results in terms of performance.  But they

24   aren't as precise, and they represent -- the notion that

25   part of the tractability of the brightline standard on

John Alford, Ph.D.                                    October 25, 2011

1      population is that it doesn't attempt to take into

2      account the relative stability of the individual

3      districts, but just looks at the number of districts.

4      So you've got 12 districts that are majority in the old

5      plan, and 12 districts are majority in the new plan, so

6      I can check it off.  But the 12 districts might be more

7      or less secure or other kinds of things.  And the issue

8      there is that that means that there is some number,

9      then, that isn't 12.  That it's something else, right,

10     because districts can have fractional value.  So the

11     district that never -- that never elects, to me, would

12     seem to have some lower fractional value than a district

13     that always elects.  But I don't know exactly how that

14     fractional value ought to be figured in.

15              So I guess if you're -- if you try, sort

16     of meld the two standards, which has an appeal to it,

17     then if you think about, so if you had a district that

18     was 50 plus 1, and it went to 50 minus 1, it's off the

19     list, right?  It's retrogression.  The district was

20     majority.  It's minority.  It's gone.  So if you have a

21     district that elects in 26 out of 48, and then the

22     district elects in 25 or 23 out of 48, it's like is that

23     -- is that basically everything up is on the list, and

24     everything off is off the list, or is the comparison

25     between them what's relevant?  So if a district performs

1    76 percent of the time, and in the new plan, performs 74

2    percent of time, that's backwards.  Is that off?  Is

3    that no longer a district?

4              So given that we don't -- on the basis of

5    these numbers, we don't have a clear divider between

6    performance and nonperformance, but we have a gradation,

7    it makes it more difficult to decide what you're going

8    do with that gradation.  Do you sum that up across

9    districts?  Do you simply look for any, however slight,

10   difference in the index?  I just don't -- I just don't

11   -- I just think that's not -- if that was the standard,

12   then that should have been the enunciated standard.  I

13   thought the enunciated standard was that this would be a

14   functional, a broadly functional analysis which, to me,

15   suggested something more like a totality of

16   circumstances, in which case, any one particular number

17   would not be a brightline number, but you'd take all

18   those numbers in context and say what does this -- I

19   mean, to me, I take all these numbers in context, and I

20   look at the plan, and I don't think any one of those,

21   aside from where there has been a brightline standard

22   established on population.  I just don't think that you

23   can take any of these others and just say automatically

24   if it's dropped by a percentage point or two percentage

25   points or five percentage points, that therefore, this

John Alford, Ph.D.                                    October 25, 2011

158

```
 1      is not a performing district and this was a performing

 2      district, given that the districts may have been

 3      performing at about the same level in both of the -- in

 4      both of the plans.

 5           Q.   Do you know how many years the Voting Rights

 6      Act has been in effect?

 7           A.   More than 50?  Does that seem reasonable?

 8           Q.   If I reminded you that it's the Voting Rights

 9      Act of 1965, would that help?

10           A.   Less than 50?

11           Q.   Yeah.  I think it's about 46.

12           A.   Coming up on a big anniversary?

13           Q.   Is that right?

14           A.   Most of our lifetime?

15           Q.   And do you know how old the retrogression

16      standard is?

17           A.   The retrogression standard, it must be almost

18      as old, I would think.

19           Q.   And do you know whether the courts have been

20      applying the retrogression standard over the course of

21      those many decades?

22           A.   I assume they have.

23           Q.   Have you undertaken to read any of the cases in

24      which courts have applied the retrogression standard in

25      the context of redistricting?
```

John Alford, Ph.D.                                    October 25, 2011

159

```
 1          A.   I read parts of some of the cases.

 2          Q.   Which cases have you read?

 3          A.   I couldn't even tell you names of them.  That's

 4     one good reason why I didn't go to law school.  I'm not

 5     good at citation, which actually hurts in my profession

 6     as well.  But I mean, that's -- you know, my sense, my

 7     broad sense of that area is that there just seems to be

 8     a lot of back and forth going on, and maybe it's clear

 9     to lawyers, but, you know, it's not clear to me that all

10     that has been worked out in some completely

11     straightforward way; otherwise, I assume we wouldn't be

12     here.  But that's just -- and certainly what I have read

13     hasn't -- hasn't provided me with -- in this particular

14     area of statistical analysis, I don't recall reading a

15     case in which this kind of data was brought in and there

16     is some new brightline standard as there is in the

17     Gingles 1.

18          Q.   Is it impossible for you to conceive of

19     operationalizing making minority voters worse off in

20     some way that would actually look at election results?

21          A.   No.  I think we can -- we can operationalize

22     that.  I don't think we want to deceive ourselves about

23     the precision in which we can operationalize it.  But I

24     think we can -- again, we can sort of divides districts

25     up into districts that are very likely to elect and
```

John Alford, Ph.D.                                October 25, 2011

1    districts that are likely to elect sometimes not others

2    and districts that are not very likely to elect, and

3    then on that basis, we could make comparisons about

4    which districts are, sort of, much more likely to elect

5    or much less likely to elect or whatever we want to do

6    within those -- within those regions.

7         Q.   And if the standard were more likely than not

8    to elect, you could implement that too, right?

9         A.   And we can do that in one of two of ways:  We

10   could do that in this kind of, you know, being sensible

11   about what that data actually tells us, or we could do

12   it in just a purely mechanical sense.  But if we do it

13   in a purely mechanical sense, then we're going to have

14   to have some firm definition of what goes into the

15   sausage grinder, because otherwise, the number that

16   comes out is not going to be a single number, it's going

17   to be, as it is here, it's all these different numbers.

18   Are we supposed to use elections that only involve

19   minority candidates?  Does it have to be with major

20   party opposition?  Does it have to go back a decade?

21   Does it include everything or just the major states,

22   right?

23             So, you'll have to fix all those

24   definitions before you'll be able to then say, okay,

25   here's -- there is some degree of arbitrariness in that,

John Alford, Ph.D.                                    October 25, 2011

161

1    and there's some degree of arbitrariness in the result,

2    but that's what we're going to live with, and here's the

3    standard.  It's, you know, 50 percent, or because that's

4    a pleasing number for everybody, or it's 80 percent or

5    it's 20 percent.

6          Q.    And if we decided to do this not in a

7    mechanistic way that you just described, but rather to

8    rely on all relevant evidence to make our conclusion

9    about whether minority voters are more likely than not

10   to be able to elect candidates of their choice, we could

11   do that, right?

12         A.    I think you can -- yeah, right.  You can try to

13   sum those up in some kind of subjective way, which I

14   think is probably more realistic, given the variability

15   of the data, and then more problematic from the

16   perspective of jurisdictions who are trying to apply

17   that in advance in making districting decisions, so...

18         Q.    But if one were concerned about protecting

19   minority voting rights, you would want to look at all

20   relevant data to make as accurate a decision as you

21   could about that, wouldn't you?

22         A.    I mean, there are time limits even for us, and

23   we're involved in a lengthy legal proceeding after the

24   fact.  When you are trying to draw districts, you look

25   at lots of information, including lots of information

John Alford, Ph.D.                                    October 25, 2011

162

1      that helps you to protect minority districts.  But I'm

2      not sure that the kind of analysis we are talking about

3      here us is likely to be completely available on the spot

4      to redistrictors.  And I'm not -- and certainly, I would

5      not have -- like I said, I think if you -- if you want

6      this kind of analysis to form a basis, then it needs to

7      be specified to jurisdictions in that way.

8           Q.   This kind of analysis was available to the

9      State of Texas in the 2011 redistricting process, right?

10          A.   Some form of this, yes.

11          Q.   And in fact, some form of that is one of the

12     exhibits that you have in front of you, right?

13          A.   Right.

14          Q.   The regression analyses.  I think it's

15     Exhibit 7.

16          A.   The retrogression or the regression?

17          Q.   Regression.

18          A.   Yes.

19          Q.   This morning, you mentioned that -- or I asked

20     you if your report contained all the opinions that you

21     anticipate expressing in this case, and you carved out a

22     little exception for responding to Lisa Hanley's

23     report.  Do you expect to offer opinions about Lisa

24     Hanley's report?

25          A.   Assuming I'll be asked to, yes.

John Alford, Ph.D.                                    October 25, 2011

163

1          Q.   Have you been asked to?

2          A.   No.  In the sense of writing a response or a

3     report in response to her report?

4          Q.   That's one sense in which it could be.

5          A.   As far as I know, unless I got an e-mail while

6     I was in here, I haven't been asked to write a report in

7     response to her report.  But obviously, as we have

8     discussed here, how her report matches up this report

9     and so forth is all being discussed, so...

10          Q.   Have you formed any opinions about Lisa

11     Hanley's report at this time?

12          A.   I have not had a chance to do anything beyond

13     read through it, so I haven't looked very carefully.

14     And some of the things we have talked about are things

15     where I have been trying to go back and forth between

16     the two.  I mean, the two things that I have -- there

17     does seem to be, sort of, lots of -- I don't want to say

18     confusion, but there is sort of a question like which

19     districts belong in the tables, what to do with

20     coalition districts and so forth.  So there are tables

21     in there and sub tables and so forth.  So, I mean, there

22     is some question there.

23              I had some question about switching, or

24     basically comparing endogenous to exogenous, going back

25     and forth.  I mean, I think you got a -- when you

John Alford, Ph.D.                                    October 25, 2011

1    compare the -- if you're just going to come up with a

2    numerical comparison of an adopted plan against a

3    benchmark plan, then you're going to have to look at --

4    you're going to have to look at exogenous elections.

5    You don't have anything else to look at.

6              So I think it's useful, obviously useful

7    to look at endogenous, and that's part of all -- you

8    want to keep in your head when you're thinking about the

9    plans as a whole.  But I don't think you can just

10   basically make a kind of apples to oranges comparison.

11       Q.   And do you think that Lisa Hanley makes an

12   apples to oranges comparison?

13       A.   I don't know, because like I said, all I did

14   was just read through it.  But it looked -- I mean, at

15   some point, there was some discussion about some

16   mathematical way of combining the endogenous and

17   exogenous indexes, or if this is over that, then this

18   goes to something.  I can't remember what the detail

19   was.  But I remember thinking that it's not at all

20   obvious to me what choice you would make or why you

21   would make a particular choice in how you combine those

22   up.  And certainly, unless the final comparison is

23   exogenous to exogenous, then I would be uncomfortable

24   with some mechanical combination without other

25   justification of endogenous, exogenous numbers.

John Alford, Ph.D.                                    October 25, 2011

1        Q.   Would it be fair to say that comparing

2    exogenous to exogenous gives you a sense of the change

3    from the benchmark to the proposed, but looking at the

4    endogenous elections in the benchmark gives you the best

5    sense of whether the district is currently able to elect

6    or I should say minority voters in the district are

7    currently able to elect candidates of their choice in

8    that district?

9        A.   It gives you an indication of if they have

10   elected candidates of choice in the district.  I don't

11   think that's a better measure, necessarily, of ability

12   to elect, because it's a measure much more dependent on

13   the nature of the candidates and candidacies and so

14   force.  So the ability is a function of, if we sweep the

15   slate clean and start over and people want to know where

16   to run for office, then we're going to say, you know,

17   take a look at the minority numbers, right, and take a

18   look at the Democratic performance of the district.  I

19   mean, that's the way you decide how likely -- if you're

20   going to put money into running in a district, look at

21   the numbers on the district, and those numbers are how

22   Democratic is this district and what are the minority

23   population numbers in the district.

24            So I think those are quite good numbers

25   for going forward.  And there is certainly something in

1        the -- but endogenous is a single election often with a
2        single candidate, and I think is -- again, mechanically
3        combining them, I think, is something my quick -- at
4        least my quick look at Lisa's report -- and this is
5        something I would want to look at much more carefully --
6        but my quick count was that if we just count exogenous,
7        the new plan has more over 50 percent exogenous, which I
8        take to be some standard of hers, that if we just look
9        at districts that are exogenous districts performing,
10       there are more exogenous performance above 50 percent in
11       the new plan than they were in the baseline plan.
12                  And I think the same is true if you just
13       ignore performance altogether and just look at the, you
14       know, at the population numbers.  I think there's, there
15       you gain a district or something based on her table.
16                  So I think those -- again, those are both
17       two, sort of, straightforward ways of looking at that
18       analysis.  And I know that's not -- her analysis
19       involves some more issues that I haven't worked through,
20       in terms of how she combines indexes and so forth.  But
21       at least those two things look to me to be -- based on
22       that comparison, looked to me to be indicators that the
23       proposed plan is probably not going backwards, on at
24       least those two measures, from the baseline.
25            Q.   Are you talking about the House or the

John Alford, Ph.D.                                    October 25, 2011

1    congressional plan?

2         A.   Well, I'm talking about the House plan.  And by

3    this plan, actually, the State House plan.

4         Q.   Okay.

5         A.   The congressional is another issue.

6         Q.   Any other opinions about Lisa Hanley's report?

7         A.   Not off the top of my head.

8         Q.   Would you agree with me that it's beautifully

9    written and extremely well reasoned?  (Laughing.)  I'm

10   just kidding.  You don't have to answer that.

11        A.   I have a lot of respect for Lisa Hanley, and I

12   think she has undertaken the task with verve, and for a

13   political scientist, she does write remarkably well.  So

14   I'll agree with you with that.

15             I think we might -- well, I think we

16   clearly disagree about the upshot of all of this, but

17   what I'm hoping is, if I can look at this carefully

18   enough, that we are disagreeing about interpretation,

19   which is fine to have in a report, but it's ultimately

20   the responsibility of someone other than Lisa and I, and

21   that we can kind of reduce -- what I would hope to do in

22   a response is to reduce our two reports to a set of

23   facts we agree on, and then let somebody else decide

24   what to make of it.

25        Q.   Last week, I deposed designees of the Office of

1          MR. SCHENCK:  Thank you.  Pass.

2                    FURTHER EXAMINATION

3     BY MR. SELLS:

4          Q.   I want to ask a follow-up question based on

5     Mr. Schenck's last line of questioning there, talking

6     about the number of districts in the benchmark and

7     proposed plans.  And you have read Lisa Hanley's

8     report.  It is clear you all have a disagreement about

9     whether certain districts are -- districts in which

10    minority voters have an ability to elect, right?

11         A.   I wouldn't want to hear her answer to that

12    question, because I'm not sure we would disagree about,

13    sort of, a raw ability to elect.  But I think we have

14    some disagreement about how to characterize districts in

15    terms of election performance.

16         Q.   You have a dispute about whether these

17    districts will likely elect in the future, don't you?

18         A.   So we have a disagreement about election

19    performance as opposed to just simple ability to elect.

20         Q.   Okay.

21                    MR. SELLS:  That's it.

22                    MR. SCHENCK:  Okay.  Read and sign.

23                    (Signature reserved.)

24                    (Deposition concluded at 6:26 p.m.)

25

John Alford, Ph.D.                                October 25, 2011

237

CHANGES AND SIGNATURE

      RE: STATE OF TEXAS VS. U.S.A, ET AL

PAGE  LINE  CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

    I, JOHN ALFORD, Ph.D., have read the foregoing

deposition and hereby affix my signature that same is

true and correct, except as noted above.


                  _____

                  JOHN ALFORD, Ph.D.

John Alford, Ph.D.                                    October 25, 2011

238

```
 1      THE STATE OF _____)

 2      COUNTY OF_____)

 3

 4           Before me,_____, on this day

 5      personally appeared JOHN ALFORD, Ph.D., known to me (or

 6      proved to me under oath or through_____

 7      (description of identity card or other document) to be

 8      the person whose name is subscribed to the foregoing

 9      instrument and acknowledged to me that they executed the

10      same for the purposes and consideration therein

11      expressed.

12           Given under my hand and seal of office

13      this_____day of _____, 2011.

14

15

16                         _____

                           NOTARY PUBLIC IN AND FOR

17                         THE STATE OF _____

18

19

20

21

22

23

24

25
```

John Alford, Ph.D.                                    October 25, 2011

239

1                THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
      STATE OF TEXAS,              )
3          Plaintiff,             )
                                   )
4      VS.                         )
                                   )
5      UNITED STATES OF AMERICA AND   )
       ERIC H. HOLDER, JR., IN HIS  )
6      OFFICIAL CAPACITY AS ATTORNEY )
       GENERAL OF THE UNITED STATES, )
7          Defendants,            )
                                   )
8      WENDY DAVIS, ET AL,         )   CIVIL ACTION NO.
           Defendant-Intervenors,  )   1:11-EV-1303
9                                  )   (RMC-TBG-BAH)
       MEXICAN AMERICAN LEGISLATIVE )  THREE-JUDGE COURT
10     CAUCUS,                     )
           Defendant-Intervenors,  )
11                                 )
       GREG GONZALEZ, ET AL,       )
12         Defendant-Intervenors,  )
                                   )
13     TEXAS LEGISLATIVE BLACK     )
       CAUCUS,                     )
14         Defendant-Intervenors,  )
                                   )
15     TEXAS LATINO REDISTRICTING  )
       TASK FORCE,                 )
16         Defendant-Intervenor,   )
                                   )
17     TEXAS STATE CONFERENCE OF   )
       NAACP BRANCHES, ET AL,      )
18         Defendant-Intervenors.  )
19                REPORTER'S CERTIFICATION
                DEPOSITION OF JOHN ALFORD, Ph.D.
20                    OCTOBER 25, 2011
21          I, Chris Carpenter, Certified Shorthand Reporter in
22     and for the State of Texas, hereby certify to the
23     following:
24         That the witness, JOHN ALFORD, Ph.D., was duly sworn
25     by the officer and that the transcript of the oral

John Alford, Ph.D.                                    October 25, 2011

240

1    deposition is a true record of the testimony given by
2    the witness;
3         That the deposition transcript was submitted on the
4    _____day of _____, 2011, to the witness or to the
5    attorney for the witness for examination, signature and
6    return to_____, by
7    _____, 2011; and if returned, the original
8    transcript will forwarded to J. Gerald Hebert, the
9    custodial attorney;
10        That the amount of time used by each party at the
11   deposition is as follows:
12        Mr. Sells: 3 hour, 52 minutes
         Mr. Hicks: 1 hour, 1 minute
13        Mr. Schenck:  17 minutes
14

        I further certify that I am neither counsel for,
15
    related to, nor employed by any of the parties or
16
    attorneys in the action in which this proceeding was
17
    taken, and further that I am not financially or
18
    otherwise interested in the outcome of the action.
19
        Certified to by me this 26th day of October, 2011.
20
21

22        Chris Carpenter, Texas CSR 1151
          Expiration Date:  12/31/2012
23        3101 Bee Caves Road, Suite 220
          Austin, TX  78746
24        (512)328-5557
          Firm Registration No. 283
25