IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                        )
                                       )
            Plaintiff,                 )
                                       )
    v.                                 )        Case No. 11-CV-01303
                                       )        (RMC-TBG-BAH)
UNITED STATES OF AMERICA,              )        [Three-Judge Panel]
and ERIC H. HOLDER, JR. in his         )
official capacity as Attorney General  )
of the United States,                  )
                                       )
            Defendants,                )
                                       )
WENDY DAVIS, *et al.,*                  )
                                       )
            Defendant-Intervenors.     )
                                       )

**PLAINTIFF STATE OF TEXAS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT**

**Deposition of Theodore Arrington**

Exhibit 11

Theodore S. Arrington, Ph.D.                    October 25, 2011

**1**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

THE STATE OF TEXAS          )CIVIL ACTION NO.
    Plaintiff              )1:11-cv-01303-RMC
vs.                         )
THE UNITED STATES OF        )
AMERICA and ERIC H. HOLDER, )
JR., in his Official        )
capacity as Attorney        )
General of the United States )
    Defendant              )

Deposition of Theodore S. Arrington, Ph.D.

Washington, D.C.

October 25, 2011

9:12 a.m.

Reported by: Bonnie L. Russo

Job No. 284394

**2**

1  Deposition of Theodore S. Arrington, Ph.D. held
2  at:
3
4
5
6      United States Department of Justice
7          1800 G Street, N.W.
8          Washington, D.C.
9
10
11
12
13
14
15
16
17
18
19
20
21  Pursuant to Notice, when were present on behalf
22  of the respective parties:

**3**

1  APPEARANCES:
2  On behalf of the Plaintiff:
3  BRUCE D. COHEN, Esq.
4  DAVID MATTAX, Esq.
5  OFFICE OF THE ATTORNEY GENERAL
6  209 W. 14th Street
7  Austin, Texas 78701
8  512-463-0879
9
10  On behalf of the Defendant:
11  TIMOTHY F. MELLETT, Esq.
12  United States Department of Justice
13  1800 G Street, N.W.
14  Washington, D.C.
15  202-514-2000
16
17
18
19
20
21
22

**4**

1          C O N T E N T S
2  EXAMINATION OF THEODORE S. ARRINGTON   PAGE
3  BY MR. COHEN              5, 244
4  BY MR. MELLETT               241
5
6          EXHIBITS
7  1    Declaration of          8
8       Theodore S. Arrington, Ph.D.
9  2    Colored Maps (8)         169
10
11
12
13
14
15
16
17
18
19
20
21  (Exhibits attached with transcript.)
22



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

5

1          P R O C E E D I N G S
2    THEODORE S. ARRINGTON, Ph.D.,
3    was called for examination by counsel and,
4    after having been duly sworn by the Notary, was
5    examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR PLAINTIFF
7         BY MR. COHEN:
8       Q.   State your name for the record, Dr.
9    Arrington.
10      A.   My name is Theodore Arrington.
11      Q.   Where do you currently reside?
12      A.   I reside in Albuquerque, New Mexico.
13      Q.   And how are you currently employed?
14      A.   I'm currently retired.
15      Q.   Before you were retired, how were
16   you then employed?
17      A.   I was a professor of political
18   science at the University of North Carolina at
19   Charlotte.
20      Q.   UNCC?
21      A.   That's correct.
22      Q.   I understand you were a professor of

6

1    political science at UNCC.  Tell me the courses
2    that you taught at UNCC.
3       A.   I taught research methods, the
4    introduction to American politics.  Since I was
5    chair for a long time, those were the two I
6    chose to teach.  But before that, I taught
7    Congress, Presidency and electoral behavior.
8       Q.   Did you ever teach psychology?
9       A.   No, I did not.
10      Q.   Did you ever teach criminal science?
11      A.   Criminal science?
12      Q.   Yes, sir.
13      A.   No.
14      Q.   I'm going to ask a favor.  You have
15   been deposed an awful lot, I suspect?
16      A.   Yes.
17      Q.   We both talk softly, but we are both
18   speaking up because we are both -- want to make
19   sure we can hear each other, but let's make
20   certain that I finish a question before you
21   answer, and I will do my very best not to cut
22   you off with a question while you are speaking.

7

1       A.   Agreed.
2       Q.   Okay.
3          MR. MELLETT:  Counsel, just wanted
4    to let you know that in terms of the report --
5    and maybe now is a good time or whatever, is
6    that we had again some clerical errors.  There
7    are things.  I mean, you can go and you can
8    look at it.
9          There's a number that may have been
10   -- that was wrong in a chart.  There's the name
11   of a county that is wrong, things like that.
12         So what we have and what we can do
13   maybe after you introduce his report, we can
14   also introduce that, just to let you know that
15   we were planning on making the changes to that
16   report in what we are filing today.
17         MR. COHEN:  That's fine.  Thank you.
18         THE WITNESS:  There are some other
19   corrections of the same things that occur in
20   other paragraphs, so that would need to be
21   corrected as well.
22         BY MR. COHEN:

8

1       Q.   So for example, there may be more
2    than one instance in which you refer to Trey
3    Martinez Fisher as being from south Texas,
4    rather than Bexar, but here is the first place
5    you noticed it?
6       A.   That's an example.
7       Q.   But it may not be that one.
8       A.   Not that one, but that idea, yes.
9          MR. COHEN:  Well, let's go ahead and
10   have this document marked as Arrington Exhibit
11   1.
12         (Deposition Exhibit No. 1 was marked
13   for identification.)
14         BY MR. COHEN:
15      Q.   And can you identify that document,
16   sir?
17      A.   This is my declaration in this case.
18      Q.   There are exhibits to it, also.  We
19   will or will not get to those later, but I
20   recognize that's your declaration without the
21   exhibits?
22      A.   Without the maps, that's correct.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

---

9

1    Q.    And what was your purpose in
2  preparing that declaration?
3    A.    To determine whether the State of
4  Texas intended to discriminate when it drew the
5  Congressional and House plans.
6    Q.    And so we are clear, sort of the
7  errata sheet that you handed me just before we
8  identified that exhibit, these are corrections
9  to Exhibit 1?
10   A.    That is correct.
11         MR. COHEN:  If it's okay with
12  counsel, at the close of the deposition, we
13  will actually attach this to Exhibit 1 so it's
14  just part of it, with the understanding that
15  these corrections will actually be made in a
16  copy that you may be filing with the court.
17         MR. MELLETT:  That's correct.
18         BY MR. COHEN:
19   Q.    Why were you asked to determine
20  whether the State of Texas intentionally -- I'm
21  sorry.  I'm going to make sure I use the word
22  -- you said "intentionally" drew its maps to

---

10

1  discriminate --
2    A.    To discriminate.
3    Q.    Why were you asked to do that?
4    A.    I assume because it's part of the
5  case.
6    Q.    Part of a Section 5 case in which
7  the contention of the United States is that
8  Texas intentionally discriminated?
9    A.    I guess so.  They don't tell me why
10  they want me to look at something.  They just
11  say, would you look at this.
12   Q.    Did they tell you they want to know
13  -- they want you to make a declaration with
14  respect to whether the United States -- I'm
15  sorry, the State of Texas intentionally
16  discriminated?
17   A.    Actually, what they asked me to do
18  was to determine whether that was true.
19   Q.    Okay.  You're not an attorney,
20  right?
21   A.    I am not an attorney.
22   Q.    I congratulate you for that, sir.

---

11

1    A.    Thank you.
2    Q.    In a court case, say a robbery, in
3  which one of the elements is intent, who
4  determines whether the suspect or the defendant
5  intentionally committed an act?
6         MR. MELLETT:  Objection.  Relevance.
7         THE WITNESS:  I assume the jury does
8  or the judge.
9         BY MR. COHEN:
10   Q.    In a -- in an appellate case, who
11  determines what the intention was of a
12  legislature that enacted a statute like
13  Congress or a state legislature?
14   A.    The judges.
15   Q.    In your -- I assume you wrote
16  professionally when you were at UNCC?
17   A.    I did.
18   Q.    Did you ever write about motive?
19   A.    No.
20   Q.    Who are the recognized experts in
21  your field on intent?
22   A.    So far as I know, there are none.

---

12

1    Q.    If I were to look at the -- by the
2  way, I just finished graduate school, so when I
3  ask this as -- I'm going to ask this as a grad
4  student as well as an attorney.  I got my
5  graduate degree in history.  I spent a lot of
6  time in the grad school library.
7         If I were to go to the graduate
8  library at my university and go to the
9  political science articles on motive or intent
10  of a legislature, where would I start looking?
11   A.    You would start looking under those
12  names, under those names, under those words.
13  Whether you would find anything is a separate
14  question.
15   Q.    And if I turned in my 20-resource
16  paper to my professor, how would she know the
17  good ones from the bad ones?  The good sources
18  from the Wikipedias?
19   A.    By the citations.
20   Q.    Okay.  Now you told me a moment ago
21  you are not sure -- you can't cite any of that
22  literature as we sit here right now; is that



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                October 25, 2011

13

1  right?
2       MR. MELLETT:  Objection.
3  Mischaracterizing the testimony.
4       BY MR. COHEN:
5       Q.   Can you cite any of that literature
6  right now?
7       A.   What literature?
8       Q.   Literature that I -- in which
9  recognized experts on intent or motive discuss
10  intent or motive of legislatures.
11       A.   You are talking political
12  scientists?
13       Q.   Yes, sir.
14       A.   I'm not aware that there are any
15  political scientists who publish things on
16  intent of the legislature.
17            Now, it does sometimes come up in
18  the legal context, so that political scientists
19  who study the courts have undoubtedly published
20  some stuff on that subject, but that is not my
21  field.  My field is elections.
22       Q.   Okay.  Now, I understand your

14

1  purpose here today -- if we look at Paragraph 2
2  of the report in front of you, to determine
3  whether the plans for -- C185 and H283, we'll
4  call it that, they were intentionally drawn to
5  minimize, cancel out or reduce the ability of
6  minority voters in Texas to elect
7  representatives of their choice.
8            I understand that you are able to
9  identify facts which lead you to believe there
10  was intent or not intent, but am I to
11  understand that it's your actual opinion that
12  they were intentionally drawn to minimize,
13  cancel out or reduce the ability of minority
14  voters to elect representatives of their
15  choice?
16       A.   Yes.
17       Q.   Have you ever given such an opinion
18  before?
19       A.   Yes.
20       Q.   To what courts?
21       A.   To the Federal District Court in
22  Northern Mississippi.

15

1       Q.   What was the nature of that case?
2       A.   It was the United States versus Ike
3  Brown.
4       Q.   Who was Mr. Brown?
5       A.   Mr. Brown is an African-American
6  Democratic party leader in Noxubee County,
7  Mississippi, and the United States alleged that
8  Mr. Brown and his cohorts were discriminating
9  against white voters in Noxubee County, and I
10  was the expert witness for the United States.
11       Q.   And what was the basis of your
12  intent finding there?
13       A.   Are you asking me what data did I
14  use?
15       Q.   Yes.
16       A.   Newspaper accounts of events and
17  personal interviews with participants and also
18  a review of the depositions of people who
19  refused to be interviewed.
20       Q.   And was this before a one judge
21  court?
22       A.   It was.

16

1       Q.   Was there a jury?
2       A.   It was.
3       Q.   Did you testify to the jury -- did
4  you testify in open court?
5       A.   Yes.
6       Q.   Was it your finding that there was
7  intent in the end or was it the jury's finding
8  that there was intent in the end?
9       A.   There was no jury.
10       Q.   Then I misunderstood.  The question
11  was:  You testified but there was just a judge?
12       A.   Just a judge, en banc.
13       Q.   Oh, it's three judges?
14       A.   No, no.  I'm sorry.  Just the one.
15  It's a county case.
16       Q.   That's what I thought.  I thought
17  you said en banc, I thought maybe there was
18  more than one.
19            But there was a bench trial?
20       A.   There was a bench trial.
21       Q.   That's the word you are trying to
22  use.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

17

1      A.   Remember, I'm not a lawyer so these
2  terms sometimes get confused.
3      Q.   I understand.  I'm not a political
4  scientist.  I'm always confused.
5      A.   It was a bench trial.
6      Q.   So it's a bench trial to one federal
7  judge?
8      A.   That's correct.
9      Q.   You testified before the judge in
10  open court?
11      A.   I did.
12      Q.   And you said the evidence that you
13  looked at allowed you to determine that Mr.
14  Brown and his cohorts had intent to
15  discriminate.
16      A.   That's correct.
17      Q.   And in the end, the judge made a
18  ruling as to whether there was intent to
19  discriminate.
20      A.   Yes.
21      Q.   Okay.  Tell me what research you did
22  for this case.

18

1      A.   I collected information -- well, let
2  me start -- I collected the same kind of
3  information that Dr. Handley did, that is, the
4  materials provided by the State of Texas on the
5  benchmark and proposed plans, including
6  reconstructed election data on those districts.
7      Q.   We usually use the word
8  reconstituted election data.  I imagine that's
9  the same thing.
10      A.   Reconstructed -- I have used several
11  different terms.  I don't know that there is a
12  term of art that is referred.
13      Q.   I just want to make sure we are
14  talking about the same thing.
15      A.   That's right.  You just take the
16  precincts that are in that district and you say
17  what happened when you put those all together.
18      Q.   Yes, sir.
19      A.   The demographic data for those
20  plans, the materials, the expert witness
21  reports and testimony from the Section 2 case
22  on the same subject, which you are familiar

19

1  with.
2          MR. COHEN:  We familiar with that,
3  sir?
4          MR. MATTAX:  I am.
5          MR. COHEN:  We are familiar with
6  that case.
7          MR. MATTAX:  I tried that one.  If
8  you have any questions, I will be happy to
9  answer them for you.
10          THE WITNESS:  Of course, that
11  involves census data as well.
12          BY MR. COHEN:
13      Q.   Yes.
14      A.   I think that is the data sets I
15  relied upon.  Then from those, I determined
16  independently of Dr. Handley what I thought the
17  minority districts in the benchmark and the
18  proposed plans are.
19          Now, when I say "minority district,"
20  let me be clear.  I'm simply saying a district
21  in which minority voters are able to elect a
22  candidate of their choice, and if we can agree

20

1  on that, then I can just use that term without
2  confusion, because I do not mean necessarily a
3  district in which minorities are a majority,
4  that is -- if I meant --
5      Q.   We will use that term for --
6  "majority-minority district" as opposed to a
7  minority district; is that right?
8      A.   Right.  A minority district only
9  means they have the ability to elect a
10  candidate of their choice.
11          If I mean majority minority, I'll
12  use that term, because it's going to be a long
13  day, and there's going to be lots of times I'm
14  going to say minority district or Hispanic
15  district or black district, and I don't want
16  you to be confused when I do that please.
17      Q.   Sure.  But let me -- that is a good
18  ground rule.  Minority district means a
19  district in which a given minority has the
20  ability to elect a candidate of its choice?
21      A.   That's correct.
22      Q.   How do we discern that?



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

21

1      A.   You discern that most importantly
2  for the benchmark by whether or not they have
3  done it.  It's very simple.  Those are called
4  endogenous elections.  Elections for the office
5  that we're talking about, that would be either
6  Congress or the House.
7          That is your premier measurement for
8  the benchmark, because you have that data.  If
9  that has been an on-again, off-again thing,
10 then you can use the reconstructed statewide
11 data as a supplement to push you over the edge
12 and say, yes, it is a minority district or no,
13 it is not.
14         For the proposed plans, you don't
15 have that data quite obviously because those
16 are proposed districts, so you have to use the
17 exogenous, that is, the statewide data and then
18 you have to use some judgment.  You can -- you
19 look at the proportion of the voters in that
20 district or at least voting-age population,
21 that is, black, Hispanic, Anglo, other.  You
22 look at that.

22

1          You look at the results of those
2  reconstructed data and you come to a judgment
3  as to whether that would be a minority district
4  or not.
5      Q.   Now, am I correct that the first
6  step you take is analysis of endogenous
7  elections?
8      A.   That is correct.
9      Q.   Well, how do you know that a
10 district -- well, how do you know which
11 districts to look at, to even do the endogenous
12 analysis, or is it that just you look at every
13 district and first do the endogenous analysis?
14     A.   Well, there are many ways you can do
15 it.  Let me tell you what I did.
16     Q.   Yes, sir.
17     A.   Looking at the endogenous elections,
18 that is, the elections for the House in the
19 case of the House and the Congress for the
20 other.
21     Q.   Sure.
22     A.   You can identify the districts that

23

1  are clearly -- I'm going to use -- that are
2  clearly minority districts.  Then you can look
3  at the others and see whether there is any
4  others that are like them, that are like those,
5  in terms of the demographic data, and then from
6  that, you got 150 districts and you can say,
7  well, here are roughly 50, 47, roughly 50, let
8  me just stay with that number for right now,
9  but roughly 50.
10         These are districts in which the
11 minority voters are able to elect a candidate
12 of their choice.  Here is a hundred, which that
13 clearly is not the case, and then you know
14 which ones to look at.
15     Q.   Now, you said -- you said -- well,
16 we're going to go back to our term.
17         You said you look at some and you
18 know they are clearly minority districts.  Is
19 that because you had clearly looked at the
20 demographics of that district first?
21     A.   No, because I have clearly looked to
22 see which ones are electing Hispanics and

24

1  blacks.
2      Q.   Does that mean that a district with
3  just -- well -- I guess -- here is what I am
4  trying to understand.
5          We have districts in Texas in which
6  there are Anglos elected.  We have districts in
7  which there are Asians elected.  We have
8  districts in which there are Hispanics and we
9  have districts with African-Americans elected.
10         So is the first step to see where
11 the Asians, the Hispanics and the
12 African-Americans have been elected?
13     A.   Yes.  The first step.  But let me
14 continue.
15     Q.   Okay.
16     A.   Once I have identified the -- those
17 districts, then I know the demographics of
18 those districts.  I also know that there are
19 some where clearly the percentage Anglo is so
20 big that they are not going to work.  Now there
21 is a middle ground there, and that is where
22 something like say District 137 falls, where it



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

25

1  has the demographics that clearly indicate that
2  the minority can elect the candidate of their
3  choice, but so far, they have elected a white
4  Democrat.
5       In other words, when you look at the
6  demographics of the district, when you look at
7  the elections -- statewide-elections
8  re-combined, you say that is a district that
9  clearly minorities can elect a candidate of
10 their choice. Multiracial, to be sure, but
11 they can. They have chosen not to at this
12 point.
13      So you may identify, as I did, one
14 or two districts that turns out you're really
15 dealing with 149, 137, in that -- in kind of in
16 that, and 149 of course elected an Asian, who
17 is a protected minority.
18      Q.   Is the district protected or are you
19 saying that Asians are protected --
20      A.   Voters.
21      Q.   -- or both?
22      A.   No.  The district is not protected.

26

1  Asian voters are protected.  Hispanic voters,
2  black voters.  We group them into districts,
3  however.
4       Q.   Okay.  I understand.  I just want to
5  make sure we are using the same terms.  And so
6  we are clear, District 137, that is Mr.
7  Hockberg's district?
8       A.   That's correct.  Please correct me
9  if I miss -- if I had said 138, and you knew it
10 was 137, let's try to get on the same --
11      Q.   That's what I'm doing now, and the
12 other district to which you referred was 139?
13      A.   149.
14      Q.   149.  That's Mr. Vo?
15      A.   That's correct.
16      Q.   Let's turn to Paragraph 9 -- well,
17 so if I understand your methodology, first you
18 look at -- you find those districts, you know
19 the demographics, you know the endogenous
20 results, and then you take the next step which
21 is to find the middle ground, districts which
22 are not absolutely clearly the Anglo-dominated,

27

1  aren't absolutely sort of slam dunk safe
2  districts, as that term is used for minorities,
3  but there is a middle ground where they are
4  able to elect them, but sometimes, as with
5  District 137, it is a multiracial group of
6  minorities.  Is that the middle ground?
7       A.   No.  Actually, what I'm saying is
8  that there may be districts where a white
9  Democrat has been elected that are still
10 districts in which -- that are still minority
11 districts.  They are districts in which the
12 minority can elect the candidate of the choice.
13 Their choice just happens to have been a white
14 guy so far.
15      Q.   Is it ever a white Republican?
16      A.   The answer to that in Texas is no.
17      Q.   Is it ever an Hispanic Republican?
18      A.   The answer to that is no.
19      Q.   So we're clear, it's always a
20 Democrat?
21      A.   In Texas!  All I can do is -- you
22 look at the data.

28

1       Q.   Yes, sir.
2       A.   I can't predict the future.  I can't
3  say that there's never been an exception, but
4  in looking at the data produced by your boss on
5  every district in the proposed plan and every
6  district in the benchmark, I didn't find any
7  examples of any Republicans being the candidate
8  of choice of Hispanics.  Certainly not of
9  blacks.  Asians, yeah, who knows.  I can't
10 testify one or the other on Asians.
11      Q.   The data are either unavailable or
12 inconclusive with respect to Asian voters?
13      A.   That's correct.
14      Q.   How do you determine the difference
15 between partisan preference and race
16 preference?
17      A.   Depends on what data I have
18 available.
19      Q.   Did you do it in this case?
20      A.   Let me think about that.  I think
21 the answer to that is yes and no.  You like
22 those answers?



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                          October 25, 2011

29

1    Q.   Let's start with the yes and then
2  let's move over to no, okay?
3    A.   The answer is that race and
4  partisanship are very closely intertwined in
5  Texas. You can clearly determine how people of
6  different races -- and when I say "races," I'm
7  inferring ethnicity, if that is all right?
8    Q.   Of course.
9    A.   You can clearly determine how people
10 of different races vote.
11   Q.   Yes.
12   A.   There is no question about that.
13   Q.   Uh-huh.
14   A.   You can clearly determine that if a
15 person were to make a statement that said, I
16 hate black people, there is no question that is
17 not a partisan statement.  It's a racial
18 statement.
19   Q.   Understood.
20   A.   But if you don't have that, then
21 it's very difficult to parse out what is
22 partisan alone and what is racial alone, and

30

1  what is, in fact, the invariant combination of
2  the two that go together, and that cannot be
3  separated in terms of the way people behave.
4        Now, can you separate it in terms of
5  what people think?  I don't have any evidence
6  of what people think.  What I have evidence of
7  is what people did, and what they did has
8  racial implications, as well as partisan ones.
9    Q.   Okay.  Tell me the -- did you look
10 at the same exogenous elections as Dr. Handley
11 did?
12   A.   For the purposes that she did, the
13 answer is yes.  For the purposes of analyzing
14 proposed districts other than the state's
15 proposal, like H201 for example, the MALC plan.
16   Q.   M-A-L-C?
17   A.   Yes.  I used additional data that
18 was supplied, again, by your boss.
19   Q.   And by my "boss," you mean by the
20 Office of the Attorney General of Texas?
21   A.   Yes.  Or by the TLC.
22   Q.   Texas Legislative Council?

31

1    A.   It would be one or the other.
2    Q.   Did you use any elections in which a
3  Republican Hispanic ran against an Anglo
4  Democrat?
5    A.   Yes.
6    Q.   What elections were those?
7    A.   I would have to look at the
8  materials to remember them.
9    Q.   Is it cited in your report?
10   A.   No.  That kind of detail is not in
11 the report.  But if you will remember, the
12 materials that the Attorney General provided,
13 and you go through that, there is a whole list
14 of -- I think there must be 20 elections
15 starting in '02 and several of those, in fact,
16 featured -- these are statewide elections.
17       Several of these indeed did feature
18 Hispanic Republicans, and one or two -- a black
19 Republican as well.
20   Q.   If I told you there is closer to 50
21 elections, does that sound correct, or are we
22 talking about a different form?

32

1    A.   I don't remember 50.  There are
2  about four pages and there is one about six or
3  eight on each page, so I don't remember that
4  many.
5        Now there is a separate document
6  that I got more recently which has a much
7  larger list, which includes districted offices.
8  Now, the problem with that is those districts
9  don't necessarily correspond to the proposed
10 districts, so some of those can't be used.
11   Q.   Understood.  So for example, one of
12 the statewide elections that is not a
13 districted election is an at-large Supreme
14 Court Justice seat, in which the Chief Justice
15 of the Supreme Court, Chief Justice Jefferson,
16 ran as a -- he didn't run as a black
17 Republican.  He ran as a Republican, right?  He
18 just happens to be African-American, and he ran
19 against a white Democratic challenger.
20       Does that sound correct to you?  You
21 will accept that as correct?
22   A.   I will accept that as correct



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

33

1  without having the data in front of me.
2     Q.   Or without having Chief Justice
3  Jefferson in front of you, right?
4     A.   The materials provided told me
5  whether he was black or white.  I didn't have
6  to rely -- and I relied on that.
7     Q.   Okay.  And chief Justice Jefferson
8  got a very high percentage of the Republican
9  vote and a very low percentage of the
10 Democratic vote.  Does that sound correct to
11 you?
12    A.   I am sure it is.
13    Q.   In fact, he got -- if I recall, a
14 very, very small percentage of the
15 African-American vote.  Does that sound correct
16 to you?
17    A.   I'm sure that is true.
18    Q.   So is it fair to assume that the
19 African-Americans were not voting on the basis
20 of race?
21    A.   No.  They were choosing, as
22 African-Americans, the candidate that they felt

34

1  would reflect their values.  That's their
2  choice.
3     Q.   Yes, sir.
4     A.   They looked at the candidate.  They
5  looked at his party label, perhaps they looked
6  at his statements.  I wouldn't know.  But they
7  chose the Democratic candidate, and that's
8  their choice as a race.
9          On the other hand, Anglos did vote
10 for Jefferson.  I'm sure -- I don't have it in
11 front of me, but I'm absolutely certain that's
12 true.  They were saying this is the guy who
13 reflects our values and chose accordingly.
14    Q.   If I understand what you are saying,
15 they chose -- independent of Chief Justice
16 Jefferson's race, not because of it, not in
17 spite of it, but independent of it.  It sounds
18 to me like that is how both sides were voting.
19    A.   May I rephrase?
20    Q.   Of course.
21    A.   They chose independently of his
22 race.  They did not choose independently of

35

1  their race.
2     Q.   Did -- do you have any facts that
3  would lead you to suspect that the Anglos voted
4  because the Democrats were black?  That the
5  Anglos voted the way they did because the
6  Democrats are black -- or the blacks are
7  Democrats, rather.
8          MR. MELLETT:  I'm sorry.  And you
9  are talking about in this particular contest?
10         MR. COHEN:  Yes.
11         THE WITNESS:  That they voted the
12 way they did because --
13         BY MR. COHEN:
14    Q.   The blacks are Democrats?
15    A.   Because blacks are Democrats.
16    Q.   Yes.
17    A.   Evidence in this case of that, no.
18    Q.   Do you know of any other election in
19 which -- in Texas, of the 20 or so statewide --
20 we're talking about the ones you looked at, in
21 which -- let's wait one second.  I'm sorry,
22 both of us have trouble with our hearing and

36

1  there are people walking by.
2          Do you know of any evidence in any
3  of the other exogenous elections that you
4  looked at, in which the Anglos voted -- and
5  which the evidence suggested, Anglos voted as
6  they did because the Democrats supporting the
7  Democratic candidate were Hispanic or black?
8     A.   No.  There is no data on that.
9     Q.   Let's turn to Paragraph 9 of your --
10 I think you called it declaration.  I may just
11 call it your report, but we are talking about
12 the same document.
13         Now you say in the very first
14 sentence that the United States Supreme Court
15 provides guidelines for courts and the kinds of
16 evidence that could be used to determine
17 intent.
18         Now, the Supreme Court -- it's more
19 than guidelines.  It's the required precedent,
20 isn't it?
21    A.   Yes, I would agree with that.
22    Q.   And then you said that -- we will



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

37

1  call it the Texas Legislative Counsel, TLC,
2  when we speak today.  You said that TLC
3  summarized these guidelines in their August
4  2011 publication called:  "State and Federal
5  Law Governing Redistricting in Texas."
6         Almost by definition, their August
7  2011 publication was not available to the
8  legislature in that form when the legislature
9  convened in January of 2011.  Is that a fair
10 statement?
11     A.   That's correct.
12     Q.   We can pretty much look at a
13 calendar and figure that August generally comes
14 after January in a year, right?  Do you know
15 why it didn't come out until August?
16     A.   No, I don't know why it didn't come
17 out until August.  There is a slide show on the
18 web that -- my understanding is they showed it
19 to the legislature early in the process called
20 Redistricting 101, very nice title, which
21 summarizes much the same material.
22     Q.   And that's the basis of your

38

1  suggestion at the end of that paragraph that
2  says the discussion's worth quoting because it
3  was certainly similar to the legal instructions
4  given to the Texas legislature as they began
5  the redistricting process; is that right?
6     A.   Yes, except it really should have
7  said advice rather than instructions, since the
8  TLC can't really instruct the legislature.
9     Q.   That's what I was going to ask you.
10 What role do you understand the TLC to play
11 with respect to the legislature?
12     A.   Well, of course, they are the
13 techies.  They are the guys that keep RedAppl,
14 that is R-E-D and then A-P-P-L up and running,
15 and because they have staff that has been
16 through this cycle several times, they are in a
17 position to give advice about how to get
18 through it successfully.
19     Q.   Do you know who else the legislature
20 was taking advice from?
21     A.   Well, we know they were taking
22 advice from representatives of the

39

1  congressional delegation.  We know they were
2  getting advice from probably nearly everybody,
3  and official advice -- and certainly from the
4  Attorney General's Office, I would think they
5  would be getting advice as well, but I'm
6  hypothesizing here.  I don't know that.
7     Q.   You don't know.
8     A.   I do know that TLC is the guys they
9  have to go to because they are the guys who
10 keep RedAppl up and running.
11     Q.   Understood.
12     A.   You can't do it without that.
13        What I'm trying to identify here are
14 simply official sources that indicate the
15 position of Texas with regard to these matters.
16     Q.   Is it your understanding that TLC's
17 position reflects the official position of the
18 State of Texas?
19     A.   No.
20     Q.   Okay.  Let's talk about Paragraph 10
21 briefly.
22        You cite a case called Reno against

40

1  Bossier Parish School Board.  I think we
2  usually call this Bossier Parish II; is that
3  right?
4     A.   That's correct.
5     Q.   Roman II.  And you note there that
6  in that case, the Supreme Court set a stringent
7  version of discriminatory intent in Section 5
8  cases, which you quote as "intent to
9  retrogress."
10        Do you know why the Supreme Court
11 did that?
12     A.   No.
13     Q.   Now --
14     A.   That's a legal conundrum.  I mean,
15 it's a morass having to do with Section 2 and
16 Section 5, and I don't pretend to understand
17 it.
18     Q.   To be -- just between us, sir, I
19 don't pretend to understand it either.  Okay?
20        You note in the next sentence though
21 that Congress overturned part of that decision
22 in 2006, I guess, by adding the broader


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

41

1  standard of quote "intent to discriminate."
2        Is it my understanding, based on
3  what we just candidly agreed with each other or
4  confided in each other, that you don't have any
5  position on whether Congress exceeded its
6  authority in doing so?
7     A.   No.
8     Q.   When you taught political science,
9  did you teach Federalism to undergraduates?
10    A.   I did.
11    Q.   And part of Federalism is a
12 recognition of -- well, the 10th Amendment,
13 isn't it?
14    A.   The 10th Amendment, but also the
15 other provisions of the Constitution including
16 Article 1, Section 8.
17    Q.   Which identifies what Congress's
18 authority is with respect to regulation of the
19 states?
20    A.   That's correct.
21    Q.   And what the state's authority is
22 with respect to regulation of itself?

42

1     A.   That's correct.
2     Q.   Okay.
3     A.   The Federalism also comes up in a
4  couple other places in the Constitution, but I
5  can't cite the sections right now.
6     Q.   You did pretty good with Article 1,
7  Section 8, sir.
8     A.   I taught for 40 years.  What can I
9  say.
10    Q.   You mentioned RedAppl which you talk
11 about briefly in Paragraph 11.  Have you ever
12 used RedAppl?
13    A.   No.
14    Q.   Did you have access to RedAppl
15 during the time that you were doing the
16 research for this?
17    A.   No.
18    Q.   Have you ever seen RedAppl used?
19    A.   No.
20    Q.   How are you familiar with RedAppl?
21    A.   I have been using GIS systems like
22 RedAppl for 20 years, maybe a little bit longer

43

1  than that.  My experience with that is they all
2  do the same thing, which icon you click on and
3  how to save the files, so you don't spend ten
4  hours and then have it lost overnight, varies,
5  but they basically all do the same thing.
6     Q.   Like Fred's in Florida or Map ToDo.
7  That is a commercial program, isn't it?
8     A.   That's correct.
9     Q.   As you indicated, RedAppl was
10 developed by TLC?
11    A.   That's my understanding.  I don't
12 have evidence of that, but some states buy an
13 off-the-shelf product.  Other states have a
14 redistricting council like TLC, that goes on
15 and on and on and they develop their own
16 system.
17    Q.   You don't have an opinion as to
18 whether RedAppl is better or worse than other
19 systems?
20    A.   I do not.
21    Q.   You mentioned, in that Paragraph 11,
22 a redistricting application used by the

44

1  Department of Justice supplied by Texas in the
2  census.  What application was that?
3     A.   I don't have its name.  It's one
4  that has been developed by the Department of
5  Justice.  It doesn't have a catchy name like
6  RedAppl.  It may have one, but they haven't
7  told me what it is.
8     Q.   Do you know what RedAppl stands for?
9     A.   No, application obviously,
10 redistricting application, yeah.
11    Q.   You do, in fact, know what it stands
12 for.
13        Did you have access to the
14 redistricting application used by the
15 Department of Justice?
16    A.   I did.
17    Q.   How did you get that access?
18    A.   I came here to this very basement
19 and walked into the door and sat down with a
20 techie and used it.
21    Q.   When did you do that?
22    A.   Two weeks ago.



an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

45

1  Q.   Two weeks ago is about the beginning
2  of October?
3  A.   No, it was later than that.
4  Q.   Second week of October?
5  A.   Second week of October, I think.
6  All the days run together when you spend every
7  day working on this stuff.
8  Q.   Yes, sir.  We can take judicial --
9  we will stipulate to that part.
10      Had you ever used the DOJ's
11 redistricting application before that?
12 A.   Yes, but I think it has changed
13 since the last time.  They are always
14 tinkering.
15 Q.   Would you agree with me that my
16 boss, the Office of the Attorney General,
17 provided substantial information, both to the
18 public and to the Department of Justice?
19 A.   Yes.
20 Q.   Is there any information that you
21 needed for your analysis that you didn't have?
22 A.   That I didn't have?

46

1  Q.   Yes, sir.
2  A.   No, but there was data that Texas
3  provided to the Department of Justice and then
4  to me, just a few days -- just a day, in fact,
5  before this was due, which I needed but I did
6  get it.  I just got it late enough that it was
7  difficult to digest.
8  Q.   Understood.  So we're clear, you
9  don't have any specific reason to believe that
10 the State of Texas or for that matter, the
11 Office of the Attorney General, had intent to
12 delay providing that information to you?
13 A.   I have no evidence of that.
14 Q.   Your headline -- or your heading
15 between Paragraph 15 and 16, I guess -- is that
16 protecting Republican incumbents harms ability
17 to elect.  That's the ability of minorities to
18 elect their candidate of choice; is that right?
19 A.   Yes.
20 Q.   Is protecting Republican incumbents
21 by itself unlawful?
22 A.   No.

47

1  Q.   Is it unlawful if the Republicans
2  who were doing the protecting do so with the
3  specific knowledge that most of the Democrats
4  are Hispanic Democrats?
5  A.   Let me backtrack briefly.
6  Q.   Of course.
7  A.   I'm not a lawyer.  I don't know what
8  is lawful and what isn't.  What I know is that
9  the way in which they went about protecting
10 these particular Republicans harmed the ability
11 of Hispanics in those districts to elect a
12 candidate of their choice.
13      That is a political question which
14 I'm qualified to opine about.  Whether it's
15 lawful or not, you lawyers get to fight about.
16 Q.   Does it matter to -- in your
17 opinion, to the notion of intent whether or not
18 the Republicans knew that the Hispanics were
19 loyal Democrats?
20 A.   Yes, and they did know that.
21 Q.   How does it affect the question in
22 your mind?

48

1  A.   The people who drew the districts
2  understood that the data from Texas, which
3  politicians understand intuitively and
4  political scientists have to grub to get, is
5  that Hispanics vote for Democrats, even if the
6  Republican candidate is a Hispanic.
7      Knowing that, they know they have to
8  change either the proportion of Hispanics in a
9  district or the proportion of well-organized
10 active Hispanics in a district in order to
11 increase the chances that a Republican --
12 whether Hispanic or Anglo, can win that
13 district.
14      So they understand that this is an
15 either-or thing.  If you help these Republicans
16 to be reelected, and we're talking here about
17 districts in which Republicans won in 2010, if
18 you're going to help them get reelected, you
19 have to change either the number of Hispanics
20 in a district or which Hispanics are in that
21 district.  One or the other.  Otherwise, 2010
22 could be a fluke.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

49

1    Q.    Now I understand percentage of
2    Hispanics completely.  I want to talk about the
3    percentage or the number of well-organized
4    Hispanics, that is to say Hispanics who are
5    more likely to get out the vote and actually
6    vote?
7        A.    That's correct.  The Hispanics who
8    turn out to vote.  That is how you can tell
9    when these districts have been changed, because
10   you can look at the total vote in the proposed
11   district as opposed to the total vote in the
12   benchmark district from data provided by the
13   Attorney General.
14       Q.    Isn't there a third -- let me
15   suggest something to you, that it is much
16   easier for me to understand what you said if
17   you replaced Hispanic with African-American
18   because, as you indicated earlier,
19   African-Americans have a very high turnout --
20   maybe you didn't say that --
21       (Short recess for fire alarm.)
22       (The record was read as requested.)

50

1        BY MR. COHEN:
2        Q.    Let me see if I can get us back on
3    track.
4            You stated earlier that it's pretty
5    much a given, I think in modern political--
6    American political science that
7    African-Americans turn out very heavily for
8    Democrats.  That's just a given, right?  We
9    talked about that with Chief Justice Jefferson
10   earlier this morning, right?
11       A.    They turn out very heavily relative
12   to Hispanics, not very heavily relative to
13   Anglos.
14       Q.    Or relative to perhaps senior
15   citizens and other groups, but
16   African-Americans are -- we are all AARP here.
17   It's okay, Dr. Arrington.
18           They are -- they turn out better
19   than Hispanics -- at a higher number than
20   Hispanics, and pretty predictably Democratic,
21   correct?
22       A.    Yes.

51

1        Q.    Hispanics do not turn out as well or
2    as in high numbers as African-Americans,
3    correct?
4        A.    Yes.
5        Q.    But they also don't turn out in as
6    high numbers predictably Democratic; isn't that
7    right?
8        A.    Yes.
9        Q.    So while we may be talking 90 plus
10   for African-Americans, irrespective of where
11   they are specifically in Texas, with Hispanics,
12   it is somewhere between -- do you have a number
13   of Hispanics who predictably voted Democratic
14   in Texas?
15       A.    Between 70 and 80 percent, roughly,
16   70s and 80s.
17       Q.    So what we may be talking about is
18   predictably, at least -- about, rather, as much
19   as 30 percent Hispanic vote for the Republican,
20   right?
21       A.    As much as in some elections.
22       Q.    Okay.  So it seems to me that there

52

1    are more than the -- we talked about sort of
2    two ways to titrate the process.  You can
3    change the percentage of Hispanics in a
4    district.  You can change the number of
5    well-organized Hispanics in the district, but
6    it seems to me a third option is to put in
7    districts where you believe you've captured
8    part of that 30 percent, rather than part of
9    that 70 percent.  Does that make sense to you?
10       A.    Hypothetically, one could do that.
11       Q.    And if one could do it well -- if
12   one could do it, would that be -- what would
13   that portend to you -- sorry, what inference
14   would you draw from that?
15       A.    I don't understand the question.
16       Q.    Okay.  That is fair.
17           You have stated several times in
18   your declaration that various facts cause you
19   to draw a determination of the intent to
20   discriminate.  If a map drawer were to look at
21   a map, and with some degree of reliability
22   predict these Hispanics are part of the 30



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

53

1    percent who will predictably vote Republican,
2    and that map drawer were to take that 30
3    percent and put it into a particular district
4    by itself, do you draw an inference from that,
5    that causes you to believe that that map drawer
6    had discriminatory intent?
7        A.   Remember, that is all very
8    hypothetical.
9        Q.   Okay.
10       A.   Because I don't think you can, in
11   fact, get that information from RedAppl.
12       Q.   I agree.
13       A.   And you need that.
14       Q.   At least I agree that that is your
15   understanding of RedAppl.  I agree that this is
16   a hypothetical question based on that fact.
17       A.   I don't have sufficient facts to
18   tell you that.  It might still be
19   discriminatory.
20       Q.   Why?
21       A.   Well, because you still have the
22   situation where Hispanics are mostly voting for

54

1    some other candidate, and so if you are
2    increasing the Republican percentage in a
3    district that is a minority district, however
4    you do it, you are -- and if you do it
5    sufficiently that that district is no longer a
6    minority district, then that is an effect of
7    discrimination.
8        Q.   So that we are clear, effectively,
9    you have described a situation in which
10   Hispanic voters are being diluted by other
11   Hispanic voters.  Is that a fair statement,
12   that their voting strength is being diluted by
13   other Hispanic voters?
14       A.   Yes.
15       Q.   We were at Paragraph 16.  Actually,
16   this started with a discussion of the header
17   for that.
18            In the second sentence, you say that
19   all the experts in the Section 2 case,
20   including Texas's expert, Dr. John Alford,
21   agreed that Hispanic voters almost never choose
22   Republican candidates in general elections.

55

1        First, do you know Dr. Alford?
2        A.   I have never met him.
3        Q.   Are you familiar with his work?
4        A.   I am.
5        Q.   Any reason to believe that Dr.
6    Alford is not an expert recognized in the
7    field?
8        A.   I have not looked at his vita.  The
9    things that I have looked at from Dr. Alford
10   are not anywhere near this stuff.  He is into
11   the biological roots of political behavior,
12   very different from anything involved here.
13           So I don't know whether he has the
14   kind of experience that Dr. Handley, for
15   example, has.  I would have to look at his vita
16   and I've never done that.  I have just read
17   some of his articles.
18       Q.   Fair enough.  I'm going to take you
19   to the last sentence of Paragraph 16, and sort
20   of ask a specific question that we generally
21   asked previously.
22           You said there's a firm foundation

56

1    for your opinion that the Democrats elected in
2    these districts -- there is I think what you
3    would call Hispanic districts or minority
4    districts that had the ability to elect
5    Hispanic candidates of their choice, before
6    2010, were candidates of choice of Hispanic
7    voters, but in those districts, if I'm clear,
8    the Republicans elected in 2010 were not the
9    candidate of choice of those Hispanic voters.
10   Did you look at --
11           That is just referring to that last
12   sentence.  Did you look at any primary
13   elections when you specifically analyzed the
14   facts that gave rise to that firm foundation
15   for your opinion?
16       A.   Yes.  The polarized voting analysis
17   that the Attorney General presented includes a
18   whole list of Democratic primaries.
19       Q.   It does.
20       A.   It includes no Republican primaries.
21       Q.   Actually, my question is:  Are you
22   aware of any finding -- did you make -- strike



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

57

1  that.
2      Did you make any findings with
3  respect to whether the Hispanic candidate of
4  choice in those primaries is also the
5  African-American candidate of choice in those
6  primaries?
7      A.   When you say a "finding," are you
8  asking me whether I have an opinion based on
9  that data, or are you asking me whether I've
10 expressed it in this report?
11     Q.   I'm sorry.  The question is the
12 former.  Do you have an opinion in that
13 respect?
14     A.   The data generally indicates that
15 African-Americans do not support Hispanics in
16 primaries.
17     Q.   In the general election, they --
18 both groups, both minority groups,
19 African-American and Hispanics, tend to vote
20 for the Democratic candidate?
21     A.   Yes.
22     Q.   Do you know the term "tension

58

1  district?"
2      A.   Tension district?
3      Q.   Yes, sir.
4      A.   I have never heard that term.
5      Q.   Paragraph 17, the first sentence,
6  Page 6, you make reference to a subtle fashion.
7  Changes to District 35 and 117 in subtle
8  fashion, so that the ability of Hispanic voters
9  to elect a representative of their choice is
10 reduced.
11     Now, am I to understand that the
12 subtle fashion is along the lines of what we
13 discussed a few moment ago?
14     A.   Yes.
15     Q.   That is to say, an increase in the
16 number of -- it can't even be an absolute
17 increase in the number of Hispanic -- of HCVAP,
18 but there is either a lower turning out number
19 of Hispanics or a higher percentage likely to
20 vote Republican; is that right?
21     A.   That's correct.
22     Q.   You chiefly talk about instances in

59

1  which -- in districts, I think you said where
2  Hispanics were less mobilized or slightly less
3  Democratic, so that is both of those
4  possibilities, right?
5      A.   Yes.
6      Q.   Now, what does it mean to be
7  slightly less Democratic, and that's with a
8  capital D.  You are not suggesting that they
9  are anything other than a party but what do you
10 mean by slightly less Democratic?
11     A.   Well, as we talked about earlier,
12 there are some elections in which Hispanics
13 vote about 70 percent for the Democrat and some
14 where it's more in the 80s, so 70 percents
15 would be slightly less Democratic than the 80s.
16     Q.   That's what I thought.  Paragraph
17 18, I guess it is the penultimate sentence:
18 "Evidently those who drew and defended these
19 lines believe that Hispanics were less likely
20 than Anglos to vote for an Hispanic
21 Republican."
22     Now again, this is kind of a

60

1  specific indicator of something that we talked
2  about on a more general basis before, and
3  that's -- that they are not voting on the basis
4  of the race of the candidate, but it's your
5  position that they still are voting on the
6  basis of race, right?
7      A.   Yes.
8      Q.   And that is because Hispanics see in
9  a Democrat, irrespective of whether that
10 Democrat is Anglo, Hispanic or perhaps
11 African-American in a general election, they
12 still see in that candidate a candidate whose
13 positions are more likely consonant with their
14 own or congruent with their own?
15     A.   Yes, I believe that, but I want to
16 be very specific.  It's because the voting is
17 racially-polarized, and beyond that, I'm
18 hypothesizing about why they do what they do.
19     Q.   Understood.  So you don't have a --
20 again, so we are clear and with respect to this
21 sentence here in Paragraph 18, you don't
22 believe that the Hispanics are less likely --



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

61

1  that almost by definition, you don't believe
2  that the Hispanics are less likely than the
3  Anglos to vote for an Hispanic Republican
4  because the Republican is Hispanic.  Hispanics
5  by -- that is to say, that Hispanics would be
6  more likely to vote for an Hispanic if she were
7  a Democrat, right?  Hispanics don't vote
8  against Hispanics because they are Hispanic,
9  right?
10     A.   Right.
11     Q.   Hispanics don't vote against the
12  candidate because the candidate is Hispanic.
13     A.   That's correct.
14     Q.   They vote against the Hispanic
15  because the Hispanic is a Republican, correct?
16     A.   Yes.
17     Q.   Anglos -- I think if I understand
18  your position with respect to the same
19  sentence, Anglos vote for a Republican
20  irrespective of whether that -- Anglos in Texas
21  vote relatively -- well, similar numbers.  I
22  think there is still 30 percent or so who

62

1  consistently vote Democrat or 40 percent.
2  Would you agree with me?
3     A.   I would have to review it, but that
4  sounds about right.  We call that crossover
5  vote.
6     Q.   But that 60 percent are still voting
7  consistently Republican regardless of whether
8  the candidate is Hispanic, African-American or
9  Anglo, right?
10     A.   That's correct.
11     Q.   Okay.  Paragraph 26?
12     A.   20 what?
13     Q.   26.  Last sentence.  You're talking
14  about District 117 in Bexar County.  Bexar is
15  B-E-X-A-R.  You would never know it if I didn't
16  say that, right?
17          You say -- you are talking about
18  District 117, that's -- do you know that's
19  Representative Garza's district; is that right,
20  John Garza's district?
21     A.   If you say so.
22     Q.   Will you take my word for it?

63

1     A.   I think so.  I'll take your word for
2  it.
3     Q.   And Representative Garza is
4  Hispanic.  He's a self-identified Hispanic.
5     A.   That I do know, yes.
6     Q.   Do you know who his opponent was in
7  2010?
8     A.   I do not.
9     Q.   If I told you his name was Mr.
10  Leibowitz, and Mr. Leibowitz is -- I don't know
11  if he self-identifies as an Anglo, but he's
12  known in those parts as an Anglo, okay?
13     A.   Yes.
14     Q.   You will take that --
15     A.   I will take that word from you.
16     Q.   Now, his district is majority
17  Hispanic in both the benchmark, his being 117,
18  in both the benchmark and what you all refer to
19  as the proposed plan; is that correct?
20     A.   That's correct.
21     Q.   But, quoting you, Dr. Handley's
22  exogenous data analysis indicates that the

64

1  district changed politically so that it is no
2  longer an Hispanic election district, and this,
3  I gather, is another one of these instances in
4  which there is more Hispanics but they are
5  different.  They have a different political
6  character than the Hispanics who previously
7  comprised the majority of the district, right?
8     A.   Yes.
9     Q.   And your suggestion in Paragraph 27
10  is that it was done on the basis of turnout.
11     A.   No.  The turnout is one of the two
12  indicators of the change.  One indicator of the
13  change is the exogenous election results.  The
14  other is the turnout.
15     Q.   I'm sorry.  You suggest in Paragraph
16  27 that the methodology that the mapmakers used
17  was to move out Hispanics with -- I'm sorry.
18          We have talked before about three
19  different things that can be done.  We can
20  change the percentage of Hispanics and in this
21  case, the numbers are still an absolute
22  majority of citizen voting age population



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                                    October 25, 2011

65

1  Hispanic, correct?
2      A.   I would have to look, but I will
3  take your word for it.
4      Q.    So you have said before, you agree
5  with me, there are three things you can do.
6  You can change the percentage of Hispanics, and
7  here it's still north of 50.  You can change
8  the well-organized Hispanic percentage, the
9  turnout, I guess we'd say, or you can put in
10  more Hispanics who tend to vote Democrat -- I'm
11  sorry, who tend to vote Republican, correct?
12      A.   Hypothetically, those are the three
13  ways that you can do it, assuming you have the
14  data and RedAppl to do the latter.
15      Q.    And here in 27, you are really
16  talking about No. 2, the well-organized
17  Hispanics, that you have taken out the higher
18  turnout communities and you have put in those
19  lower turnout communities, right?
20      A.   I know that's what 27 says, but let
21  me correct that it could be any of those first
22  two.  It could be a matter of organization

66

1  rather than -- it could be a matter of
2  organization or it's a matter of turnout.  It
3  could be a matter of -- what was your second
4  one?  We've got the turnout and we've got --
5      Q.    The third one is the more Republican
6  than the --
7      A.   More Republican.
8      Q.    That's actually the third one.  The
9  first one is percentages -- numbers of
10  Hispanics.
11      A.   The other one I'm re-reaching for is
12  the exogenous data, because that is in RedAppl,
13  so that in fact, when one moves a precinct, one
14  can tell that that's become more Republican or
15  less Republican.
16         Whether you can tell in RedAppl that
17  that's because there are more Hispanic
18  Republicans or just more Republicans is a
19  separate thing, and if the Hispanic turnout is
20  low in this unit that I have moved, this
21  precinct that I've moved, it will become more
22  Republican, but that's not because more

67

1  Hispanics have voted that way, it's just
2  because it's more Republican.
3      Q.    I got you.  You've described what
4  amounts -- I won't call it a shortcoming in
5  RedAppl, but what you've described is I think a
6  characteristic of RedAppl, that is, there are
7  some things you can tell from the data and some
8  things you can't tell from the data, correct?
9      A.   That's correct.
10      Q.    Is that also true of the Department
11  of Justice redistricting application that
12  you've referred to?
13      A.   It's true of any redistricting
14  application.
15      Q.    Now if you, Dr. Arrington, or me, an
16  attorney, who knows something about this, but
17  isn't intimately familiar with Bexar County or
18  Maverick County or any of the 252 other
19  counties in Texas, if you or I were to sit down
20  to RedAppl, we are to some extent limited to
21  using RedAppl.  I mean, we know the
22  capabilities of RedAppl and we know its

68

1  shortcomings, but for example, if we wanted to
2  redraw a line, we are redrawing a line based
3  solely on the data that we see on RedAppl, on
4  the screen, right?  That's sort of the
5  definition of using RedAppl.  You agree with me
6  with that?
7      A.   You are talking you or I doing it?
8      Q.    Exactly.
9      A.   The answer to that is yes.
10      Q.    But if John Garza, Representative
11  Garza from the 117th District in Bexar County
12  says, I want that neighborhood over there, or I
13  want that neighborhood over there, and he says
14  he wants it because they are wealthier or
15  because their landowners and not renters, or
16  because there is a really nice office complex
17  there where he could probably get some campaign
18  contributions, now he, John Garza, presumably
19  knows the makeup of that block much better than
20  you or I do, just looking at the data we see on
21  RedAppl.  Would you agree with me on that?
22      A.   Yes.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

69

1       MR. MELLETT: Objection. Leading.
2  In the sense of -- if you want to ask what he
3  knows about Garza, that's fine, but I have
4  given you a lot of latitude here, Counsel, in
5  terms of the questions, but I -- in terms -- if
6  you want to ask him what he knows, then that's
7  fine.
8       MR. COHEN: Is your objection that
9  it's a leading question?
10      MR. MELLETT: Uh-huh.
11      MR. COHEN: Okay. The objection is
12 noted for the record.
13      BY MR. COHEN:
14   Q.   You can answer the question if you
15 are able.
16   A.   Well, of course, I don't know
17 Representative Garza, so I don't know how
18 well-connected he is to his district. I can
19 hypothesize that many representatives would be
20 able to do what you indicate.
21   Q.   Would you agree with me that just as
22 a general notion, a representative knows his or

70

1  her district better than you or I know their
2  district?
3    A.   As a general notion, not applied to
4  anybody in particular, in my experience that
5  would be true.
6    Q.   One would hope so, correct?
7    A.   There are lots of hopes that
8  representatives don't fulfill.
9    Q.   I understand that, believe me, but I
10 just -- you will certainly agree with me the
11 possibility and, indeed, the hopeful
12 expectation that legislators know their
13 districts better than people who are not
14 elected to represent that district.
15   A.   I admit the possibility. I'm not
16 sure what I hope.
17   Q.   All right.
18      Paragraph 29. Let's go to that last
19 sentence which crosses over from Page 8 to Page
20 9. You say: "When partisanship leads line
21 drawers to take an action which they know has a
22 disproportionate negative impact on Hispanic

71

1  voters, it is evidence of intent to
2  discriminate."
3       That is -- you cite for that, a case
4  called Garza against County of Los Angeles, a
5  1999 circuit case. Were you part of that case,
6  sir?
7    A.   I was not.
8    Q.   Would you agree with me that --
9  well, you taught government for a long time.
10 You would agree with me that the Supreme Court
11 is the final arbiter of such things, not the
12 9th Circuit, correct?
13   A.   You're asking a legal question, but
14 as a political scientist, I know that is true.
15   Q.   So if the Supreme Court said
16 something later and contrary to this, then you
17 would take the Supreme Court as the final
18 arbiter on issues such as this?
19   A.   No, I would let you lawyers figure
20 out whether it contradicts this or not.
21   Q.   Even better. Okay. Well now we
22 talk about the county line rule.

72

1    A.   Do we have to?
2    Q.   Well, sir, if you didn't write it in
3  there, I wouldn't have to raise it, but you
4  did, so I will.
5    A.   Just making a joke.
6    Q.   All right. Tell me the basis of the
7  county line rule in Texas as you understand it.
8  Not the basic rule, but its origin.
9    A.   It's in the Texas Constitution.
10   Q.   Does it predate the Texas
11 Constitution to your knowledge?
12   A.   I do not know.
13   Q.   Is it your opinion that the county
14 line rule is -- was imposed for racial reasons,
15 or was it race neutral reasons?
16   A.   I do not know.
17   Q.   Would you agree with me that the
18 county line rule is a traditional redistricting
19 principal utilized in Texas?
20   A.   Observing county lines is a
21 traditional districting principal. The county
22 line rule is a way to implement that in Texas.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

73

1    Q.   Does the fact that it's in the
2  Constitution in Texas put it on a different
3  plain than other traditional redistricting
4  principles?
5    A.   That's -- I think that is a legal
6  question.
7    Q.   In your opinion?
8    A.   In my opinion, it has more force
9  because it's in the Constitution than if it
10  were just statutory.
11    Q.   Well, even beyond statutory, there
12  are some -- well -- there are some principles
13  like, you know, we like to give -- I won't use
14  Texas as an example.  I will use -- well, North
15  Carolina.
16        We like to give the -- even if we
17  got an extra district -- if we got three extra
18  districts to play with, we like to give one to
19  Piedmont, one to the Coastal Shore and one to
20  the Hills, as an example.  That might be a
21  rule.  I don't know if it is.
22        But that might be a rule, everybody

74

1  in the legislature understands it, but that
2  falls sort of on a different plain than a
3  statutory rule, doesn't it?  It's nice to
4  follow, but there is no statute that requires
5  it.
6    A.   We call it a tradition.
7    Q.   Sure.  That's why it's called
8  traditional redistricting principles.  If we
9  can agree, there is tradition and then there's
10  statutes and maybe we can say statutes in
11  constitutions together, and then what comes
12  above that?
13    A.   Federal law.
14    Q.   Federal law.  Is federal law -- let
15  me think.
16        Does federal law harmonize with --
17  now, with traditional redistricting principles,
18  or does it subsume federal -- state and
19  traditional redistricting principles, in your
20  opinion?
21    A.   Can you rephrase that for me?  I'm
22  lost.

75

1    Q.   Sure.  If there is a way to
2  harmonize federal law and traditional
3  redistricting principles, do they both live
4  side-by-side, or is the presence of the federal
5  law a reason to completely eliminate state
6  redistricting principles, the traditional
7  redistricting principles?
8    A.   Again, you are asking me a legal
9  question.
10    Q.   Uh-huh.  Well, I am asking you your
11  understanding of it, because you just said a
12  moment ago, your understanding -- and I
13  understand this to be your lay understanding,
14  that federal law is above state statutory
15  redistricting principles, and I just want to
16  understand -- if the two can live side-by-side,
17  do they, or is the fact that there is a federal
18  law reason to just sort of -- is that reason
19  why the state redistricting principles would no
20  longer be followed?
21    A.   It would be -- you have an "if" in
22  there, if they can be harmonized.  Of course,

76

1  if they can be harmonized, then they are not in
2  contradiction with each other.
3    Q.   That is not always the law of
4  Federalism, of the nature -- of the difference
5  between -- well, of Article 6.  Remember that
6  one?  The supremacy clause?
7        Sometimes the fact that there's a
8  federal law is reason enough, the state law to
9  be off the books.  Sometimes, there is an
10  attempt to harmonize them.
11        And it's your contention, if I
12  understand it, that the way that the State of
13  Texas applied the whole county line notion, the
14  county line rule of Article 326, Section 26 of
15  the Texas Constitution, didn't properly apply
16  federal law or didn't harmonize the two.  Is
17  that a correct statement?
18    A.   No.  What I would say is that I
19  looked at what they did, and what they did was
20  they applied the county line rule in such a way
21  as to eliminate District 33 and in such a way
22  as to -- and the way they interpret it, in such



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

77

1  a way as to reduce the representation in Harris
2  County, and that is all I can say. Whether
3  that was appropriate or not, that is a legal
4  question for you guys to figure out.
5      Q.   Fair enough. Now elimination of
6  District 33. That's Nueces County district?
7      A.   That's Nueces County district.
8      Q.   Do you know where Nueces County is?
9      A.   Yeah, Corpus Christi.
10     Q.   Corpus, right. And so if I slip and
11 call it Corpus, rather than Nueces, we're still
12 talking about Nueces County, right?
13     A.   (Witness nodding head.)
14 N-U-E-C-E-S, is that right?
15     Q.   Yes.
16     A.   I know it when I am seeing it, but I
17 don't normally spell things aloud.
18     Q.   That is Nueces County.
19         So in your understanding of Nueces
20 County, once it had three districts and one of
21 those districts was a protected district, it
22 had to remain a protected district regardless

78

1  of the county line rule; is that a correct
2  statement?
3      A.   You're asking me a legal question
4  again.
5          What I said was they -- the state,
6  you -- I may sometimes slip and say you, and I
7  realize you are not the State of Texas.
8      Q.   Yes, sir.
9      A.   But the State of Texas interpreted
10 the rule in such a way as to remove District 33
11 and draw two districts just within Nueces
12 County.
13     Q.   Right.
14     A.   Whereas before, there were two
15 districts, one was basically Corpus. One was
16 rural areas and then there was a part that was
17 attached to counties outside.
18         I am describing what they did. I am
19 saying that by interpreting it that way, they
20 eliminated that district.
21     Q.   Okay. I'm going to ask you a
22 question that is -- that seeks that you divorce

79

1  your understanding of federal law from this --
2  from this particular question.
3          Is it your understanding that the
4  whole county line rule was improperly applied
5  in determining that there were just those two
6  districts in Nueces County for the 2010 census?
7      A.   You are asking me whether they
8  violated the county line rule when they
9  interpreted it the way they did.
10     Q.   That's what I'm asking. I'm not
11 asking whether it was incorrect to do so in
12 light of federal law. I'm simply asking
13 whether they applied the county line rule
14 properly if their blinders were on as to
15 federal law?
16     A.   Keeping in mind that I am
17 interpreting this constitutional provision as a
18 political scientist would, as a person who does
19 redistricting would, and my interpretation
20 could be incorrect, but with that "if" in
21 there, I think they applied it appropriately.
22 They applied it in terms of the letter of the

80

1  law.
2      Q.   Yes, sir. I'm not going to misquote
3  with saying, well, there, Dr. Arrington said
4  they applied it correctly. You are saying they
5  applied it correctly if we separate out any
6  questions of whether they should have done
7  something differently because of federal law?
8      A.   Yes. But let me also add, there are
9  other ways that are also in harmony with it,
10 which it could have been done.
11     Q.   Those are what?
12     A.   As I understand it, the MALC 201
13 plan has two districts there, and then part of
14 the district, six percent, as I remember, is
15 attached to another county. That also is not a
16 violation of the county line rule.
17     Q.   Is that surplus population as you
18 understand it?
19     A.   That's surplus in population, yeah.
20     Q.   Do you know the difference -- and
21 again, if you don't, it's okay. This is
22 strange stuff.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

81

1    Do you know the difference between a
2  county cut and surplus population?
3    A.   Yeah.  Well, one is a count of
4  population and the other is whether the
5  district cuts the county.  They are different
6  things.
7    Q.   I guess we have some funny
8  terminology in this lawsuit and in Texas
9  regarding the county line rule some.  So we use
10 the term spillover sometimes.  Do you know that
11 term?
12   A.   Yes.
13   Q.   Spillover in this instance would be
14 that six percent?
15   A.   Would be that six percent.
16   Q.   What's the difference between
17 spillover and -- spillover is also surplus of
18 population.  That's the same term, okay?  Would
19 you agree with me?
20   A.   Yes.
21   Q.   So would you agree -- do you --
22 let's take it one step back.

82

1    How many violations of the county
2  line rule are there in the proposed plan -- the
3  plan --
4    A.   House plan?
5    Q.   Yes.
6    A.   Obviously, the House plan.
7    Q.   Of course.
8    A.   My understanding is that there's
9  one.
10   Q.   One.  But there is actually several
11 counties -- if you look at the map.  You think,
12 well, this county district goes over to another
13 county, I mean, half a county or this half of a
14 county, but I think you are correct.  Do you
15 know what that one county is?
16   A.   I don't remember the name of it, but
17 I have cited it in my thing.
18   Q.   If I said Henderson County, would
19 that sound right?
20   A.   No, it doesn't sound right.  Maybe
21 there were two.
22   Q.   Henderson --

83

1    A.   No, you're right.  Henderson.
2    Q.   Paragraph 35.
3    A.   There's a Henderson County in North
4  Carolina, so I had to think about it.
5    Q.   Is that where Hendersonville is?
6    A.   No, they don't ever do it that way.
7    Q.   They don't.  They don't do it in
8  Texas or anywhere else.
9    A.   Ash County and Ashville are not the
10 same thing at all.
11   Q.   Do you know what makes Henderson
12 County a violation of the county line rule,
13 whereas other counties are simply spillovers or
14 surplus?
15   A.   Because Henderson is small enough
16 that it should have been kept whole, according
17 to the rule.
18   Q.   And do you know why Henderson was
19 violated -- do you know why Henderson County
20 line -- Henderson County was the one place in
21 which the county line rule was violated?
22   A.   No.

84

1    Q.   Do you know whether there is any
2  affect on the county line rule if Nueces County
3  -- for example, using the MALC H21 plan, do you
4  know if there is any affect on the county line
5  rule if six percent of Nueces County is spilled
6  over into the county north of it?
7        MR. MELLETT:  Objection.  Vague.  I
8  don't understand what you mean by county
9  line -- the effects of county --
10       BY MR. COHEN:
11   Q.   Do you know if it causes any county
12 line rule violation anywhere else in the county
13 -- I mean, in the state if they violate that
14 there?
15   A.   I do not.
16   Q.   Is it at least conceivable to you
17 that if you make a small move -- if you violate
18 one county line rule -- I'm sorry, if you spill
19 over into one county one place that you begin
20 to move other districts other places because
21 the population still has to be accounted for on
22 -- you know, within a ten percent variance on a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

85

1  one-to-one basis, right?
2      A.   Yes.  When you change one district,
3  it has a spillover effect elsewhere.
4      Q.   Let's be careful with spillover
5  because --
6      A.   I'm sorry.
7      Q.   -- spillover is a term of art in
8  Texas.  But it certainly has an effect upstream
9  or downstream because you are drawing a map.
10  It's a Venn Diagram.  It gets no larger, right?
11     A.   It has a hydraulic effect.
12     Q.   Indeed, it does.
13          Now the second -- you said in
14  Paragraph 37 that the Nueces area is
15  historically and geographically connected to
16  areas south to the Mexican border.  What is
17  your basis for that?
18     A.   Examination of the benchmark plan
19  for both Congress and also for the House.
20     Q.   But historically, do you go back any
21  further than the year 2000 or 2006?
22     A.   No.

86

1      Q.   Geographically, I will agree Nueces
2  is in south Texas.
3      A.   Thank you.
4      Q.   But historically, you don't have any
5  independent knowledge that -- besides the 2000
6  benchmark plans or 2000 and 2006 benchmark
7  plans.
8      A.   2000 and the 2003 plan.  Whatever
9  date we give it for Congress.
10     Q.   The paragraph before that, you say
11  in the end of Page 10:  "Previous plans have
12  sometimes had such splits."  That's splits of
13  the county lines according to the TLC.
14          "Such noncompliance over several
15  redistricting" -- Paragraph 36, sir.  "Over
16  several redistricting cycles brings up the
17  question of whether the county line rule is a
18  strict requirement or merely a strong
19  suggestion."
20          What, sir, is merely a strong
21  suggestion?  Is that something that's honored
22  in the breach?

87

1      A.   No, you are not following the rest
2  of the sentence.  "When following the rule
3  conflicts with compliance with Section 5 of
4  other federal requirements."
5      Q.   Indeed, you are right.  I thought
6  that was -- when I looked down, I thought that
7  was the next sentence.
8          So how do we know when following it
9  is noncompliant with Section 5 or other federal
10  requirements, if we are the Texas legislature
11  sitting here.
12     A.   When following takes a minority
13  district and makes it a not minority district.
14     Q.   Now, Henderson County -- and you can
15  check your statistics if you want or any data
16  you want, Henderson County was split.  There
17  was no protected district.  There was no
18  protected district in Henderson County.
19     A.   That's my understanding.
20     Q.   Do you know where Henderson is?
21     A.   Right offhand, no, it's not in
22  south, I don't think.

88

1      Q.   If I told you it's just to the
2  southeast of what's called the Metroplex, the
3  Dallas-Fort Worth area, kind of tucked in
4  southeast of Kaufman and Dallas County.  Do you
5  know where that area is?
6      A.   I know what southeast of that
7  Metropost would be.
8      Q.   The Metroplex, we call it, and I
9  don't know why.  Do you know why the map
10  drawers said they had to split Henderson
11  County?
12     A.   No.
13          MR. MELLETT:  Objection.  Asked and
14  answered.
15          BY MR. COHEN:
16     Q.   It's not your contention that
17  Henderson was split or that the county line
18  rule was violated with respect to Henderson
19  County for a race-based reason, correct?
20          MR. MELLETT:  Objection.  Asked and
21  answered.  He said he didn't know.
22          THE WITNESS:  Yes, that's correct.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

89

BY MR. COHEN:
2    Q.   But it is your contention that in
3  Nueces County, the whole county line rule
4  should have been violated for what amounts to a
5  race-based reason, correct?
6    A.   No.  My testimony is that that might
7  be one way one would go, and one might use the
8  spillover business in order to create two
9  districts that would be minority districts in
10  Nueces and then spill over, which would not be
11  a violation of the county line rule.
12    Q.   But doing that, would be treating
13  Nueces -- we agreed a few moments ago, I think,
14  that if we took out federal law compliance,
15  that the whole county line rule was adhered to
16  in the determination that Nueces would get two
17  districts, not three, and that there would not
18  be spillover, correct?
19    A.   It did not have three before.  It
20  had two and a part.
21    Q.   Two and a part, and then it went
22  just to two whole?

90

1    A.   To two.
2    Q.   What Texas calls drop-in county.
3  Have you heard that term?
4    A.   No, I have not.
5    Q.   We will talk about drop-ins in just
6  a minute, but it's your contention that that
7  was okay, if we take out any consideration of
8  federal law, but that -- because federal law
9  applies and there was a protected district,
10  that Nueces County should have gotten a
11  different treatment than it got, correct?
12    A.   A different treatment that would not
13  necessarily have been a violation of the county
14  line rule.  That's correct.
15    Q.   And you agreed with me that there is
16  a possibility, but you don't know
17  authoritatively, whether that nonviolation of
18  the whole county line rule would, in fact, have
19  caused a violation somewhere else?
20    MR. MELLETT:  Objection.  Asked and
21  answered.
22    THE WITNESS:  I do not know.

91

BY MR. COHEN:
2    Q.   Back to Paragraph 37, the last
3  sentence:  "Representatives in that region,"
4  that is south Texas or the Nueces County area?
5    A.   That's the south Texas area.
6    Q.   "They objected on the floor of the
7  House to the way the districts were drawn, but
8  their amendments were defeated."
9       Were they defeated along racial
10  lines or political lines, if you know?
11    A.   I know they were defeated along
12  partisan lines.  I do not know whether -- how
13  the Hispanic Republicans voted.
14    Q.   What about the black Republicans?
15    A.   Or the black Republicans.
16    Q.   What about the Anglo Democrats?
17    A.   I do not know.  That data was not
18  available.
19    Q.   It was not available?
20    A.   Well, I mean, let me retract that.
21  I did not look at it.
22    Q.   Okay.

92

1    A.   I think it's online somewhere, but I
2  did not look at it.
3    Q.   Now we talk about Harris County, and
4  I'm going to introduce that term that I
5  mentioned just a moment ago, drop-in county.
6  In Texas -- you don't know the term "drop-in;"
7  is that right?
8    A.   No.
9    Q.   Drop-in usually refers to a county
10  in which there is one or more than one
11  district, but they are all whole districts and
12  they are all within the county, so that there
13  is no spillover.
14       Most of them are unsurprisingly big
15  cities.  El Paso, Bexar County, Dallas County.
16  They are -- they have enough for an exact
17  number, you know, and Harris County was
18  treated, as you discuss here, as a drop-in
19  county, and the question was whether to give it
20  24 or 25 districts.  Is that a fair statement?
21    A.   Yes.
22    Q.   Do you know why Harris County had 25


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1  districts in the benchmark?
2      A.  No.
3      Q.  Do you know if it was a -- do you
4  know if it was a violation of the apportionment
5  process to give Harris County 25 ten years ago?
6      A.  No.  However, the given that it's a
7  one half, less than one half over, I would
8  think you could certainly apportion that among
9  25 and stay within the ten percent.
10     Q.  By one half, you mean one half a
11 district?
12     A.  One half a district.
13     Q.  In fact, in the old 2000 plan, it
14 was 24.44.  Does that sound correct?
15     A.  I have got numbers here and I'm not
16 sure that they're -- but yeah, it is 24.4
17 something.
18     Q.  In the new one, it is 24.41?
19     A.  I think that's correct.
20     MR. MATTAX:  To be fair for the
21 record, 21.46 to 24.46 to 24.41.
22     MR. COHEN:  Thank you.

94

1      THE WITNESS:  24.46 and 24.41.
2  Good, I got it right.
3      MR. MELLETT:  It's in Paragraph 40
4  of his report.
5      THE WITNESS:  I thought those
6  figures were right, but I --
7      MR. MATTAX:  I think he said 44.
8      MR. COHEN:  It's Paragraph 40.
9  That's right.
10     BY MR. COHEN:
11     Q.  So let's go back to that first
12 question again, the question that we asked
13 about Nueces County.
14         If we take away the obligations
15 under Section 5 and other laws -- and other
16 federal law, is it your contention that the
17 apportionment process including the county --
18 it's the same provision as the Constitution,
19 Article 3, Section 26 of the Texas
20 Constitution, was violated by apportioning
21 Harris County 24 districts?
22     A.  No.  However, you are really saying

95

1  otherwise Mrs. Lincoln, how did you like the
2  play?
3      Q.  No, I'm not.  I'm not.  We usually
4  say in Texas, besides that, Mrs. Kennedy, how
5  was the drive?  But I understand the question.
6      A.  Only in Texas.
7      Q.  The question here is:  In the first
8  instance, one of -- can you apply the county
9  line rule and then the question, as we
10 discussed earlier, can it be harmonized.  And I
11 think your -- by the joke you just made, you
12 are saying there is no way to harmonize the
13 county line rule without recognizing that there
14 are voting rights implications to the decision.
15 Is that what you were saying?
16     A.  Not necessarily.  The county line
17 rule would be followed if Harris had 24 and if
18 it had 25.  In either case, it would be
19 following the rule.  Even with 24, it is
20 possible to draw the districts in Harris County
21 in such a way that you do not drop one of the
22 minority districts.  At 25, it would also be

96

1  possible to draw the lines in such a way as not
2  to drop one of the districts.
3      Q.  So that we are clear, you have got
4  two separate problems or findings with respect
5  to Harris County.  One is that it went from 25
6  to 24, and second, and independent of that,
7  that even at 24, it eliminated a protected
8  district.  Is that a correct statement?
9      A.  That's correct.
10     Q.  Before we leave Page 11, Footnote 5
11 that says -- it's at the very bottom of Page
12 11.
13         "The TLC advised the legislature
14 that they could exceed the ten percent rule in
15 order to comply with the county line rule in
16 accord with some U.S. Supreme Court decisions."
17         Are you familiar with what Supreme
18 Court decisions those are?
19     A.  Yes.  I don't cite decisions because
20 lawyers don't like me to do that especially
21 since I often do it wrong, but there is --
22 there are several Supreme Court decisions, one



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

97

1  I know of where the deviation that was allowed
2  in order to comply with a county line rule, not
3  Texas, but a county line rule is something like
4  18 percent or something like that.
5      Q.   16.4 percent, does that sound about
6  right?
7      A.   Yeah, so there are decisions which
8  say you could violate the one person, one vote
9  rule that we usually use to accommodate a
10  county line rule.
11     Q.   That 16.4 percent, and I think we
12  are talking about the same case.  If I told you
13  that case was in 1973?
14     A.   It's an old case.
15     Q.   That would sound correct to you?
16     A.   I don't remember the date, but it is
17  an old case.
18     Q.   Okay.
19     A.   I do not know whether there is some
20  more recent ones or not.
21     Q.   Fair enough.
22         Now, end of Paragraph 40, you talk

98

1  about the restrictions on rounding direction,
2  and you say: "So far as you can tell, the only
3  restriction on rounding direction is whether
4  there are enough districts in the county to
5  apportion the leftover in such a manner as to
6  abide by reasonable one person, one vote
7  standards.  If that can't be done, then the
8  leftover would have to be a district going with
9  an adjacent county."
10         You indicated that so far as you can
11  tell.  Tell me what you base that on.
12     A.   My reading of the county line rule.
13     Q.   Did you look at any of the cases
14  that have been interpretative of the county --
15     A.   No.
16     Q.   The decision to round down in Harris
17  flies -- this is Paragraph 41, directly
18  against --
19     A.   Can I add something?
20     Q.   Of course, sir.
21     A.   There is also the pure logic of the
22  matter.  If a district is -- if a county is

99

1  only big enough for two or three districts, and
2  you have got a certain amount of -- what did
3  you call it, slop-over?  That's not the term
4  you used.
5      Q.   Spillover.
6      A.   Spillover.  I mean, by logic, you
7  can't stay within whatever bounds of one
8  person, one vote you set.  I mean, that' just
9  logical.  It has nothing to do with reading the
10  statute.  It's just plain mathematics.
11     Q.   Understood.  Is it your contention
12  that the rule was applied inconsistently across
13  -- I'm sorry, the rounding directions were
14  applied inconsistently during the 2011
15  redistricting cycle?
16     A.   I'm sure it's true by definition, it
17  was 24 -- 25 in 2000 and this time it's 24.
18     Q.   I'm sorry.  Maybe you misunderstood
19  my question.
20         I understand the two contentions
21  with respect to Harris County.  One, that it
22  went from 25 to 24, and two, that even within

100

1  24, a protected district was eliminated.  Let's
2  set that aside.
3          Is it your contention that the
4  rounding rules were applied across the state in
5  2011 inconsistently?  That is to say, did
6  Harris County get a different treatment for its
7  rounding rule than any of the other 253
8  counties in Texas?
9      A.   I don't know.
10     Q.   Would that change your -- strike
11  that.
12     A.   You can't round down everywhere.
13  You'd have population left over.  Where you
14  round down in one place, you have to round up
15  in another one.
16     Q.   That's kind of what I am asking.
17  You indicate, as far as you can tell, the old
18  restrictions on rounding down are one person,
19  one vote, but I'm trying to find out whether
20  you think there is anywhere in the state that
21  got a different treatment than Harris County
22  got.  Harris County got a round down of 24.1,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

101

1  this time.  It got a round up ten years ago at
2  24.46, correct?
3         Now, would it surprise you if I told
4  you that there were counties that thought they
5  were entitled to an extra district because they
6  had 10.6 in 2000, but they saw Harris County
7  get rounded up from 24.46, but they got rounded
8  down from 10.6?
9         MR. MELLETT:  Objection.  Assuming
10  facts not in evidence.
11         BY MR. COHEN:
12     Q.   Would that surprise you?
13     A.   I am rarely surprised at what people
14  demand.
15     Q.   In your opinion, did that -- if that
16  county existed, would that county have had a --
17  more of a right to an 11th seat than Harris
18  County had to a 25th seat ten years ago?
19  Again, using the numbers 10.6 and 24.46.
20     A.   No.  The reason I say that is the
21  map drawers have a clear obligation to watch
22  out for these minority districts, and in

102

1  Harris, you have got half of the total
2  districts are minority districts, so when you
3  reduce it from 25 to 24, you are putting
4  pressure on the ability to maintain those
5  districts.
6     Q.   You are doing so, if I understand
7  your answer, primarily on the basis of the
8  federal voting laws; is that correct?
9     A.   Primarily on the basis of what?
10     Q.   Federal voting law, whether it's
11  Section 2, Section 5 or --
12     A.   I'm the political scientist here.
13  I'm simply saying that when you make that
14  decision, it has an impact on the ability to
15  elect -- minorities to elect candidates of
16  their choice, because so much of that minority
17  that has their choice is in Harris County.
18     Q.   Yes, sir.  I'm just trying to
19  understand that you are suggesting that whether
20  that county -- whether it had 10.6 had a better
21  claim to its 11th seat than Harris County did
22  with 24.46 to its 25th seat, was a decision

103

1  that is guided not primarily by the county line
2  rule, but primarily by protection of the -- by
3  application of race to the process.  That is
4  not a controversial way to say what you just
5  said, is it?
6     A.   I'm not sure I would express it that
7  way.  I would simply say that the decision to
8  round up or down in any particular county has
9  lots of implications.  One of them is the
10  effect it has on minority districts.  There are
11  also other considerations.
12     Q.   What is another one?
13     A.   Politics.
14     Q.   Politics?
15     A.   Maybe there is somebody who is
16  really important in this other county that
17  wants an additional one.
18     Q.   What else?
19     A.   Those are the simple mathematics.
20  If you round up in one place, then there is
21  less available someplace else.
22     Q.   Right.  But I am trying to

104

1  understand your notions of fairness, and my
2  question was:  Did -- if we tease out, take out
3  the protection of minorities, again,
4  understanding that is taking out a pretty big
5  chunk of your analysis.
6         If we take that out of the analysis,
7  a county with 10.6 has a better claim for an
8  11th seat than a county with 24.46, doesn't it,
9  for that 25th seat?
10     A.   I don't have enough information to
11  make that decision.  I mean, if that is all you
12  know, then the question is yes, they do have a
13  better claim.  That is simple mathematics.
14     Q.   But there are other factors
15  spinning?
16     A.   But there are lots of other factors.
17  Even beyond Section 5, lots of other factors.
18     Q.   Now, you suggest that the decision
19  to round down in Harris, in 41, it flies
20  directly against any claim by the state to be
21  acting to protect incumbents and to prepared
22  pairing, and it does this because -- well, you



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                          October 25, 2011

105

1  went from 25 to 24 and obviously, one had to be
2  -- if they applied as a drop-in county, as they
3  did, then necessarily someone has to go?
4      A.   The music stopped and somebody
5  didn't have a chair.
6      Q.   Just the way I imagined it.
7          Now that is also true anywhere else
8  in the state in which the apportionment
9  changed, right?  That some seats had to go, and
10  when the music played, several other incumbents
11  were going to have to be paired against others?
12     A.   No.
13     Q.   It's not true?
14     A.   There are 150 seats.  That didn't
15  change.  And there are 25 in Harris.
16     Q.   Yes.
17     A.   Okay?  So there is no reason why
18  you'd necessarily pair an additional person
19  elsewhere because you had 25 in Harris.
20     Q.   I'm sorry.  I understand completely
21  what you are saying there.  I'm saying that
22  other parts of the state faced a similar issue

106

1  that as some parts went up in population,
2  others went down, happened independent of
3  Harris County, but there are other incumbents
4  who find themselves paired with other
5  incumbents if they're going to run next year in
6  2012?
7      MR. MELLETT:  Are you asking him
8  whether he knows that, or are you representing?
9      BY MR. COHEN:
10     Q.   I'm asking:  Isn't that a correct
11  statement?
12     A.   Yes.  There are several pairs in the
13  proposed plan.
14     Q.   So it wasn't just in Harris County
15  that incumbents were paired to run against each
16  other?
17     A.   That's correct.
18     Q.   The concern here is that the state's
19  plan pairs an Anglo Democrat and an Asian
20  Democrat at Districts 137 and 149.  That's the
21  concern.
22     A.   No.  The concern is that they paired

107

1  two candidates who are candidates of choice of
2  minority voters, whatever their ethnic
3  background might be.
4      Q.   Understood.  Are those districts --
5  they are districts in which the minorities have
6  been able to elect their candidate of choice.
7  Are those districts that had to be protected
8  under Section 5, as you understand it?
9      A.   Are you asking whether you could
10  create another district someplace else to
11  compensate for that?
12     Q.   No, sir.
13     A.   No, you are just asking -- yes, they
14  did need to be protected.
15         Now again, I don't want you to trap
16  me into making legal decisions, because I get
17  -- you know, practicing law without a license
18  here.  As a political matter, if they are not
19  protected, then the representation of
20  minorities declines.
21         All I can say is these are districts
22  which elected candidates of choice.  In the

108

1  proposed plan, one of them doesn't exist.  That
2  is all I can say.  Whether it is a violation of
3  the law is for the judge to say or judges en
4  banc.
5      Q.   Okay.  How about three-court panel?
6  Why don't we just call it a three-judge panel,
7  and guys, I'm sorry, a three-judge panel and
8  just go with that.
9      MR. MELLETT:  I hope we don't have
10  the whole DC bar there.
11     THE WITNESS:  I just hate it when I
12  use the wrong term, even if it's not my field.
13     BY MR. COHEN:
14     Q.   I understand completely.  We will
15  try to avoid bivariant analysis for the same
16  reason, dependent and independent variables.
17         In fact, you indicate in Paragraph
18  42 that you are not -- I'm unclear.  Do you
19  reach a different conclusion than Dr. Handley
20  about District 149?
21     A.   No, I do not.
22     Q.   What is a multi -- you defined for



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

109

1  me earlier a minority district and a
2  majority-minority district, we talked about
3  that, and you indicated you don't know what a
4  tension district is, and that's fine, but what
5  is a multiracial election district?
6      A.   It's a district in which it isn't
7  clear from the data which minority group
8  dominates, or in which maybe none of them
9  dominate, but they have to come to some
10 agreement.
11     Q.   Do you know the term pull, haul and
12 trade?
13     A.   Pull, haul what?
14     Q.   And trade.
15     A.   No.  Must be another Texanism.
16     Q.   No, sir.  This one is from
17 the Supreme Court.  Supreme Court, I believe
18 has said, in districts just as you described,
19 where nobody has got a clear majority, that the
20 groups have to pull, haul and trade to come to
21 some sort of consensus.
22         Is that how you would describe

110

1  Representative Vo's district?
2      A.   I'm not sure those are the words I
3  would use, but I think what you're getting at
4  is yes.  They are a coalition and they have to
5  come to agreements within the coalition.
6      Q.   Paragraph 45, you talked about --
7  actually, this sort of introduces one of
8  several of the alternative plans that were
9  proposed.  Now, and this particular one is by
10 LULAC, that's all caps, L-U-L-A-C, and it was
11 called H286.  It's a proposed plan.  It's
12 available on RedAppl or on DistrictViewer;
13 isn't that right?  Was that where you saw it?
14     A.   Yes.
15     Q.   Now you indicated that it was
16 prepared for the Section 2 case.  Did you do
17 Section 2 analysis of H286?
18     A.   Define what you mean by "Section 2
19 analysis."  I did the analysis that I've
20 presented here.
21     Q.   Sure.  You did compactness?
22     A.   No.

111

1      Q.   You did population deviation?
2      A.   I looked at that, but I don't think
3  I presented it.  I went down to the MALC plan,
4  because I did the intensive there.
5      Q.   Did you do what we would call a
6  Gingles, G-I-N-G-L-E-S, one, two and three
7  analysis of H286?
8      A.   Now I'm not sure quite what you
9  mean, and I was involved, in fact, in the
10 Gingles case.
11     Q.   Cool.
12     A.   I go back a long way, yeah.  Is the
13 voting racially polarized?  Well, you and I
14 have agreed, no question that it is.  Are
15 Hispanics cohesive in their voting?
16 Absolutely.  Are blacks cohesive in their
17 voting?  Absolutely.  Asians, who knows?
18         Is this district one in which the
19 minority is compact enough and numerous enough
20 to elect a candidate of their choice?  I think
21 you go into that one.
22         And the answer is -- I did a little

112

1  bit of analysis of these.  I did a more
2  in-depth analysis of the MALC 201 plan.  And I
3  say here, in fact, I do not have enough
4  information on this plan in order to be able to
5  say that all of these districts would perform,
6  but in fact, the analysis I did do said that
7  they probably will, most of them probably will.
8      Q.   Is it a fair statement that the
9  Section 2 Court is the place that will
10 determine the propriety of H286?
11     A.   Well, it is an illustrative plan in
12 that case.  It is not supposed to be something
13 that the court would necessarily adopt.  It is
14 just saying, here is what you can do.  That is
15 part of the Gingles analysis.
16     Q.   Did you make a determination of
17 whether the Anglos were voting as a block for
18 the purpose of suppressing the minority vote in
19 the district?
20     A.   I have no way to get into the minds
21 of voters and say what was their intent?  Do
22 they have racial animus when they vote that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

113

1  way?  Do they just resent the fact that the
2  Democrats are -- a lot of the -- almost all of
3  the blacks and most of the Hispanics are
4  Democrats, or are they just -- like Republicans
5  better?  All I can say is they vote largely for
6  the Republican candidates.
7      Q.   Well, we do know, or at least we
8  agreed before that there is evidence that in
9  Texas, Republican minority candidates have been
10  elected in statewide elections, right?
11      A.   Yes.
12      Q.   And also in local elections?
13      A.   Yes.
14      Q.   And that -- to the extent that there
15  is a candidate of choice of the Anglos, whether
16  statewide or in those specific districts, that
17  the candidate of choice was -- of the Anglos,
18  one, either because of or notwithstanding his
19  or her racial minority status, correct?
20      A.   His or her, talking about the
21  candidate?
22      Q.   Yeah.

114

1      A.   Right.  Regardless of the ethnicity
2  and race of the candidate, Anglos choose
3  Republicans.
4      Q.   So at least we know that.  You are
5  right.  We don't got into the voting booth with
6  the voter, and we don't go into that voter's
7  head to figure out why he or she is voting as
8  they do, but we do know that minority
9  Republicans are able to be elected in a -- by
10  -- in districts in which Anglos are a majority,
11  correct?
12      A.   In some cases, that's correct.
13      Q.   I notice on Table 3 in which you did
14  analysis of the minority election districts in
15  Harris County, under MALC's 201 plan, that you
16  didn't look at HCVAP, Hispanic citizen voting
17  age population.  Is there a reason?
18      A.   Yes.  The reason was that they -- is
19  that the paper copies of the lists of voters
20  probably coming from an Excel file did not
21  contain that information in a handy fashion and
22  you can cut right to the chase by looking at

115

1  percent SSVR.
2      Q.   That is because it is fairly close
3  to HCVAP in most cases?
4      A.   Yes, you want to get as close as you
5  can get to the proportion of voters and VAP
6  gives you some, CVAP gets you better, SSVR
7  gives you the best measure of that.
8      Q.   Okay.
9          MR. COHEN:  Let's take a break for a
10  few minutes.
11          (A short recess was taken.)
12          BY MR. COHEN:
13      Q.   Now you indicated a few moments ago
14  that you actually did more thorough and
15  traditional Section 2 analysis for what you
16  call the MALC plan, H201, correct?
17      A.   That's correct.  I looked at the
18  exogenous election data for the MALC plan.
19      Q.   Did you do a Shaw analysis?  Do you
20  know that term?
21      A.   I present the compactness scores for
22  the MALC plan.

116

1      Q.   You do.
2      A.   And that is kind of a first step in
3  the Shaw analysis.
4      Q.   I understand.  Did you do what we,
5  in Texas, and in the Section 2 case have called
6  LULAC v. Perry analysis?
7      A.   You'll have to tell me what that is.
8      Q.   Sure.  Are you familiar with LULAC
9  v. Perry?
10      A.   I'm familiar with the case.  I have
11  not read it recently.
12      Q.   There was a big long district, I
13  think in 2006, they called it the bacon strip,
14  is that right?  The bacon strip district.  Do
15  you know that term?
16      A.   No, but I've heard lots of terms for
17  these districts.
18      Q.   This one was about 300 miles.  It
19  went from like Austin all the way down to the
20  Rio Grande, and it was referred to in the
21  courts as the bacon strip, because it's a long
22  thin district.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

117

1       Did you do any analysis along those
2   lines -- of communities of interest, for
3   example?
4       A.   No.
5       Q.   Okay.  Is it fair to surmise that a
6   plan like H201, which was proposed in a Section
7   2 Court, will be scrutinized that way by the
8   Section 2 Court?
9       MR. MELLETT:  Objection.
10  Speculation.
11      THE WITNESS:  Things come up in
12  court.  They get lots of scrutiny.  201 was
13  presented to the legislature, but it may also
14  have appeared in a Section 2 case.
15      BY MR. COHEN:
16      Q.   Okay.  Fair enough.
17      Now you note in Paragraph 60 that
18  there were alternative plans proposed for
19  Dallas County.
20      A.   Yes.
21      Q.   But as you note in that second page
22  of Paragraph 60 that carries over:  "These

118

1   alternatives were not part of the proposal
2   debater on the floor of the House and proposed
3   amendments to the chairman's plan to provide
4   additional minority election districts were
5   routinely defeated by party line votes."
6       I assume for this analysis also, you
7   did not -- I'm sorry, for this statement also,
8   you did not analyze the racial lines along
9   which votes were made, only the party lines,
10  right?
11      A.   That's correct.
12      Q.   Do you have a reason to believe that
13  race was a more important reason than party for
14  the vote that any legislator made on the floor?
15      A.   Almost all of the minority members
16  of the House, those who are themselves
17  minorities, were elected as candidates of
18  choice in minority districts.  There are a few
19  black Republicans, maybe it's two, I forget how
20  many.
21      There are several Hispanic
22  Republicans, but they are very much a minority

119

1   of that group, and both adhered to their -- I
2   don't know what they did, but because I don't
3   know how those individuals voted.  There was a
4   party line vote and almost all of the
5   candidates who are themselves minorities are
6   Democrats, not all, but almost all, and all of
7   the candidates of choice of minority voters are
8   Democrats.
9       Q.   So it's clear the state was
10  conscience that voting down a Democratic
11  amendment was -- had the effect of also voting
12  down a proposal that would affect Democrats who
13  are minorities, right?
14      A.   Correct.
15      Q.   So we're clear, on Paragraph 63, we
16  used the term once before, but I'm not sure we
17  formally defined it.
18      You indicated that:  "Although you
19  have no data from Texas on voting for Asian
20  candidates, other than the success of
21  Representative Vo in District 149, some
22  political scientists have found that the Anglo

120

1   crossover vote for Asian candidates is often
2   higher than that for blacks or Hispanics."
3       Let's define formally what Anglo
4   crossover vote is.
5       A.   That is where Anglos -- the
6   crossover vote is where the Anglos vote for the
7   minority-preferred candidate.
8       Q.   Do they do that --
9       A.   Term of art in the Gingles analysis.
10      Q.   Do they do that for racial reasons?
11      A.   They do it for any number of
12  reasons.  They do it because there are strong
13  Democrats in their family or they do it because
14  they have sympathy for minority members,
15  probably lots of other reasons.
16      Q.   Maybe they just like that candidate
17  better?
18      A.   Maybe they just -- maybe they just
19  like that candidate.  That would be the case in
20  some elections.
21      Q.   Okay.  And you said Democrat.  But,
22  for example, in Florida it might be voting for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                          October 25, 2011

121

1    the Republican?
2        A.   You mean in a Cuban community?
3        Q.   Yes, sir.
4        A.   That's correct.
5        Q.   Okay.  Does the crossover vote
6    become part of the -- well, strike that.  Let
7    me be more direct.
8            If there is not a sufficient voting
9    age population of the minority in the district
10   to effectively elect their candidate of choice
11   unless they have a predictable percentage of
12   Anglo crossover vote, are they still entitled
13   to the protection of Section 5 against
14   retrogression?
15       A.   Are you -- you're asking a legal
16   question, so I don't --
17       Q.   I'm certainly asking your --
18       A.   Yeah, I know.  But let me rephrase
19   it.
20           Is it -- is it -- in my
21   interpretation, a minority district, that is, a
22   district in which the minority can elect a

122

1    candidate of their choice if they can only do
2    so because there is a certain level of
3    crossover vote, the answer is yes.  That's a
4    minority election district.
5        Q.   Okay.
6        A.   And that's almost always true.
7        Q.   Okay.  Almost always true that the
8    minority requires a percentage of effective --
9    of crossover note?
10       A.   Requires a certain level of
11   crossover vote.
12       Q.   Okay.
13       A.   Not always.  Just almost always.
14       Q.   Does an absolute majority of --
15   well, Hispanic citizen voters or black citizen
16   voters or Asian citizen voters, do they need a
17   percentage of Anglo crossover in order to elect
18   their candidates consistently?
19       A.   Hypothetically?
20       Q.   Yes, sir.
21       A.   Hypothetically, you could -- you
22   could pack so many minorities of a particular

123

1    kind into a district that they wouldn't care
2    what the Whites did, but you don't usually draw
3    the districts at that level.  It requires
4    drawing a Shaw violation district, if I can use
5    that term.
6        Q.   Of course.
7        A.   Or it would require -- and it
8    requires, by definition, packing, putting more
9    minorities in there than is really necessary
10   for them to elect a candidate of their choice.
11       Q.   Okay.  How do you know when you have
12   crossed the packing line, if I can use that --
13   if I can make that term up as we speak?  How do
14   you know you packed too many people in?
15       A.   Well, in a benchmark plan, you
16   simply look at the results in the endogenous
17   elections.
18       Q.   And if it's ten out of ten, you've
19   done too many?  That's what I mean -- how do I
20   know?  You titrate back until you're no longer
21   at -- performing?
22       A.   You're asking how do you know that a

124

1    district is packed?
2        Q.   Yes, sir.
3        A.   You compare it usually to other
4    districts that are similar to it.
5        Q.   Okay.
6        A.   I mean, because by definition, it's
7    ten out of ten.  And from 2002 right through
8    2010, the minority candidate always wins.
9        Q.   Uh-huh.
10       A.   So you're at the max, but there are
11   going to be some districts that are at that max
12   that are not packed.
13       Q.   Okay.
14       A.   That's what you're asking?
15       Q.   I guess, yeah.
16       A.   And the answer is you have to
17   compare it to other similar districts that are
18   less packed, but are still also producing.
19       Q.   Got you.
20           Is this -- I guess I'm trying to
21   understand if there is a clear standard in your
22   mind for doing what you just said.  Is it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

125

1  comparing two counties of similar size or
2  similar racial proportionality?
3        MR. MELLETT:  And this is the clear
4  standard for packing, is that what we're --
5        MR. COHEN:  Yes.
6        THE WITNESS:  We're talking about
7  two districts, not two counties.
8        Q.    If I said, "counties" I meant
9  districts.
10       A.    Yeah, I know what you meant.  Yes,
11  that's correct.  This is not rocket science.
12  That's why you hire political scientists to do
13  it.  You use judgment.
14       Q.    Uh-huh.
15       A.    You're looking at all the minority
16  districts across the state to see if there's
17  variation, to see what works and what doesn't
18  work.
19       Q.    You talked a lot about -- in the 60s
20  and 70s, Paragraph 60s and 70s, about the
21  attempt to get the MALC plan.  MALC, by the
22  way, is Mexican American Legislative Caucus,

126

1  right?
2        A.    Yes.
3        Q.    Okay.  It's essentially the Hispanic
4  members of the Texas House of Representatives
5  and the Texas Senate?
6        A.    Yes.  I don't know if it includes
7  all of them or not.
8        Q.    Okay.  Do you know whether
9  Republicans are members of it?
10       A.    That's what I don't know.
11       Q.    Okay.  Do you know whether it's only
12  Mexican Americans?  Only Hispanic?  The term is
13  usually "Hispanic."  Do you know whether it's
14  only Hispanics?
15       A.    Judging by its title, I would assume
16  it's only Mexican Americans, but I don't know
17  whether others have joined it.
18       Q.    Okay.
19       A.    Caucuses are usually people of a
20  particular type, but I don't know in this case.
21       Q.    Okay.  It was such a good question I
22  forgot why I asked it.

127

1        Hang on a second.
2        How many changes -- I gather there
3  were -- that from your analysis of what went on
4  on the floor of the House and perhaps also of
5  the redistricting committee, that there were a
6  series of amendments as well as alternative
7  plans proposed by MALC and others, but that
8  they were rejected -- and I think several
9  times, you say, along party lines?
10       A.    Yes, that's correct.
11       Q.    How many changes would have been
12  appropriate in your mind?  How many of those
13  proposals would have had to have been accepted
14  for us to know that -- for you to be able to
15  make a determination that there was no intent
16  to discriminate, as you've indicated?
17       A.    Well, a minimum of four.  Putting
18  back 149, 33, 35 and 117.
19       Q.    Okay.
20       A.    And perhaps an additional one or two
21  to account for additional Hispanic growth in
22  the last ten years, but at least those four.

128

1        Q.    Okay.  Let's look at Paragraph 80
2  for just one second.  It takes us back to --
3  the bottom of Page 24, sir.
4        What you indicate in the first
5  sentence is:  "Line drawers lack political data
6  when they split precincts."
7        Now, are we talking about voter
8  registration or precisely how they voted?
9        A.    My understanding is that implies
10  both of those because the data in RedAppl is
11  entered at the precinct level.  So --
12       Q.    But we're talking about --
13       A.    -- we're talking both of those.
14       Q.    But we're actually talking about
15  data that are more discrete than the precinct
16  level?
17       A.    Right.
18       Q.    Okay.
19       A.    But I don't know for certain --
20       Q.    Okay.
21       A.    -- that there isn't voter -- I would
22  be highly doubtful that there is any voter



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

129

1  turnout data allocated to the block level
2  except on the basis of allocating the
3  population.
4    Q.    Understood.
5          And when you refer to line drawers
6  here, again, we're talking sort of about the
7  generic line drawer using -- sitting down to
8  the RedAppl terminal.  We're not necessarily
9  talking about a legislator who might have more
10 specific ideas, correct or not, about his or
11 her district.  You will agree with me on that
12 right?
13   A.    Whoever does it.
14   Q.    Okay.  Similarly, Paragraph 82 you
15 indicate that citizenship numbers for districts
16 are not available in "realtime" as districts
17 are being drawn on RedAppl, but a legislator
18 who has a notion, again, right or wrong, about
19 the citizenship makeup of the district might
20 have information based on real life in the
21 district irrespective of what RedAppl displays
22 for the map drawer, correct?

130

1    A.    Hypothetically, such a person might
2  have that information.
3    Q.    Okay.  I was curious about this
4  article by Henry Brady and John McNulty.  It's
5  cited on Paragraph 89.
6          American Political Science Review, I
7  gather is a peer-reviewed journal?
8    A.    Oh, yes.  It's the premier
9  peer-reviewed article -- journal in the
10 discipline.
11   Q.    Okay.  Do you know of anyone who
12 brought this to the attention of the
13 legislature when it was issued in February of
14 this year?
15   A.    No, I doubt if anyone did.
16   Q.    Every pause I take is a few
17 paragraphs that I'm passing by, so take these
18 pauses with --
19       MR. MELLETT:  Take more pauses.
20       MR. COHEN:  Take these pauses with a
21 nice old grain of salt.
22       BY MR. COHEN:

131

1    Q.    Now, I looked at your analysis of
2  split precincts that really goes from page --
3  about 27 for several pages after that I think.
4    A.    Uh-huh.
5    Q.    And if I understand what you
6  describe as racially-directed movements of
7  blocks or movements of precincts or parts of
8  precincts --
9    A.    Uh-huh.
10   Q.    -- essentially -- well, explain it
11 to me so that the Court has a good shorthand
12 for what you say occurred.
13   A.    The question is whether the block
14 that's moved out of its precinct is
15 significantly different racially than the rest
16 of the precinct.  And I applied a statistical
17 standard of that in order to determine whether
18 those movements are worth looking at --
19   Q.    Sure.
20   A.    -- whether they're large or whether
21 they're small.
22   Q.    And most of the them --

132

1    A.    Whether those differences are large
2  or small, excuse me.
3    Q.    The deltas or -- okay.
4          And you note, I think, that there
5  are larger percentages of minority populations
6  in urban areas.  And explain your finding with
7  respect to metropolitan areas and the splitting
8  of the precincts and the effect on -- the
9  effect that race had on them.
10   A.    Minority districts in metropolitan
11 areas and Anglo districts in metropolitan areas
12 are about equally likely to have at least one
13 split.  But the minority districts have far
14 moor splits, significantly more splits than do
15 the Anglo districts.
16   Q.    And is that higher percentage of
17 Hispanic splits or African-American splits?
18   A.    I threw all the minorities together.
19   Q.    Okay.  Is it fair to say that more
20 splits of likely Democratic precincts than
21 likely Republican precincts?
22   A.    Yes, because in the urban areas, the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

133

1  Anglo districts are the Republican districts.
2      Q.   Okay.
3      A.   -- and the minority districts are
4  the Democratic districts.  There may be an
5  exception or two, but generally that's the
6  case.
7      Q.   Now, you said in Paragraph 100 that
8  you see racially-directed movements among the
9  districts that were minority election districts
10  in both the benchmark and in the proposed
11  planning.  And then you say, "In order to
12  provide an appearance of non-retrogression,
13  only one of the districts listed in Table
14  11" -- and that's District 117, let's confirm
15  that is John Garza's district in Bexar County?
16      A.   That's correct.
17      Q.   Okay.  That's the only one that
18  changed enough from the benchmark to their
19  proposed plan that it ceased to be a minority
20  election district, right?
21          It just says, "Ceased to be a
22  minority election district."  I assume we want

134

1  an indefinite article there, right?
2      A.   The only one in Table 11 because
3  Table 11 does not include the districts that
4  didn't have any splits.  And 33 and 149
5  disappeared, so you can't trace -- you can't
6  trace where it went.  It doesn't make any sense
7  because they were moved.
8      Q.   I understand.
9          But what is your evidence that the
10  specific intent was to provide an appearance of
11  non-retrogression?
12      A.   The answer to that has to do with
13  the state's case, which is that you can do a
14  bright line analysis and determine that you
15  have a certain number of minority districts
16  because it -- the districts are above this
17  bright line and that you meet your Section 5
18  challenge because they're the same or slightly
19  more, but no deficit.  And as Dr. Handley
20  points out, that's not the way to do the
21  analysis.
22      Q.   Isn't it possible, then, that the

135

1  intent was -- if the state is wrong about its
2  methodology but sincere about its methodology,
3  isn't it possible that it wasn't in order to
4  provide an appearance of non-retrogression, but
5  it was simply chasing a Camaro.  It was
6  following the wrong standard.  Isn't that
7  possible?
8      A.   In social science as opposed to the
9  physical sciences --
10      Q.   Yes, sir?
11      A.   -- lots of things are possible, but
12  you have to ask the question what is probable.
13      Q.   Okay.
14      A.   What is likely to be the case.  I
15  have to make lots of assumptions about the
16  state in order to accept that particular
17  hypothesis.
18      Q.   Okay.
19      A.   That they're incompetent --
20      Q.   All right.
21      A.   -- that they don't know what they're
22  doing --

136

1      Q.   Okay.
2      A.   -- that they don't understand the
3  districts --
4      Q.   Okay.
5      A.   -- and I'm not willing to make all
6  those assumptions.  So the minimum simplest
7  explanation is always the best unless you have
8  contrary evidence and the simplest explanation
9  is they knew exactly what they were doing and
10  they did it.
11      Q.   Okay.  Isn't part of what they were
12  doing -- and when we say, "they," we'll say the
13  Republicans who were at the helm.  Isn't it
14  part of what they were doing trying to shore up
15  John Garza's district as a -- as a -- as
16  Republican a district as possible?
17      A.   Well, again, when you make a
18  district as Republican as possible, by
19  definition, that makes it impossible for the --
20  or less likely -- and, in this case, perhaps
21  impossible for the Hispanic preferred candidate
22  to win.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

137
1    Q.    Okay.
2    A.    You're doing the one, you're doing
3  the other.
4    Q.    Okay.  All right.  Understood.
5         But you will agree with me that
6  that's a different specific intent than trying
7  to provide an appearance of non-retrogression,
8  won't you?
9    A.    That it's all part of the same
10  picture.  Because the state is also smart
11  enough to know that it has to get this plan
12  passed Federal court.
13    Q.    Okay.
14    A.    And so you have to do something to
15  make that possible.
16    Q.    All right.
17    A.    And they have chosen a particular
18  approach, which is different from the approach
19  that I would take and different from the
20  approach that Dr. Handley would take.  While at
21  the same time it's clear to me from reviewing
22  the data that they wanted to shore up these

138
1  Republicans in Hispanic districts that had won
2  in 2010.
3    Q.    More specifically, these are
4  Hispanic Republicans, aren't they, with respect
5  to at least Mr. Garza?
6    A.    They're not candidates of choice.
7    Q.    Okay.
8    A.    You have got districts that are
9  Hispanic districts which now have Republican,
10  not candidates of choices -- exception of that
11  would be Pena --
12    Q.    Okay.
13    A.    -- because he ran as a Democrat.
14    Q.    He won as a Democrat?
15    A.    Yeah, exactly.
16    Q.    Okay.
17    A.    And they wanted -- they clearly --
18  the evidence is clear as I can get it, they
19  wanted to shore up those districts so they
20  could hold those districts.
21    Q.    Uh-huh.
22    A.    And to do that you have to make them

139
1  districts, which, in fact, the Hispanics cannot
2  elect a candidate of their choice because the
3  Hispanics don't go for Republicans.
4    Q.    Got you.
5    A.    Even if they're Hispanic
6  Republicans.
7    Q.    Understood.
8         Now, you say in Paragraph 102 that
9  the conclusion you reach is that the line
10  drawers must have been using what is called
11  shading, showing the racial character of the
12  blocks.
13         Does shading show anything else?
14  Are there other shades that can be drawn on
15  RedAppl?
16    A.    You had asked me earlier whether I
17  ever used RedAppl.
18    Q.    Uh-huh.
19    A.    Okay.  You can't use a political
20  shading because you don't have data for
21  individual blocks.  So what's left is the
22  census, which you do have for individual

140
1  blocks.  So unless you are moving blocks around
2  at random, and I can't believe they have done
3  that, then they must have been doing it on the
4  basis of some kind of information and the only
5  information in RedAppl at the block level is
6  racial.
7    Q.    Understanding that, as we've said
8  previously, any outside information that a line
9  drawer brings to the terminal when she sits
10  down to use it can also inform that decision,
11  correct?
12    A.    It can.  Again, in my opinion you
13  can't account for 512 splits on the basis of
14  that kind of knowledge.
15    Q.    Okay.
16    A.    A couple here and a couple there,
17  but not that number.
18    Q.    How many districts -- I'm sorry.
19         How many precincts are there in
20  Texas?
21    A.    Several thousand.  I have seen the
22  number, but I don't have it off the top of my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

141

1    head.  A lot.
2       Q.    A lot?
3       A.    A lot.  It's a big state.
4       Q.    What effect did the county line rule
5    have on over or under population of minority
6    districts in the 2011 process, the House
7    process?
8       A.    Can you restate that?
9       Q.    Sure.
10          Do you know of any effect that the
11   county line ruled would have had on under
12   population or overpopulation of minority
13   districts in the House?
14      A.    Well, I gave one example in the
15   report.  The decision to have 24 rather than 25
16   in Harris means that those are all going to be
17   systematically -- you went to 24, so they're
18   all going to be systematically overpopulated.
19      Q.    In the large districts?
20      A.    Yes.
21      Q.    Okay.
22      A.    But I accounted for that.  I mean, I

142

1    noted that.  Other than that, I don't know that
2    it would have any necessary effect.
3       Q.    Well, it certainly does -- it's
4    going to have a similar effect in any county
5    that is a -- we've used the term "drop-in
6    county," would you agree with me?  It would
7    have some effect one way or the other, or it
8    can?
9       A.    Yeah, but I don't know that it would
10   systematic.  That it would produce them -- I do
11   not know -- I can't think of a reason why they
12   would be systematically overpopulated because
13   of the county line rule, other than the Harris
14   decision, obviously, made that case.
15      Q.    Well, by application of the county
16   line rule, there's either going to be a --
17   there's going to be some sort of surplus or
18   not, isn't there?  So, for example, if
19   there's -- strike that.
20          By application of the county line
21   rule, there is not going to be one person/one
22   vote.  I mean, the county line rule makes that

143

1    difficult, doesn't it?
2       A.    No, because you have three options.
3    If the county is large enough you can round up
4    and round down --
5       Q.    Sure.
6       A.    -- and if that doesn't work, you
7    take the surplus an add it to another one.  So
8    you have lots of leeway.  You might get into a
9    situation where -- I'm sorry.  I still can't --
10   I still can't figure out a logical reason why
11   the county line rule would dictate that the
12   minority districts would be systematically
13   overpopulated other than what I've already said
14   is the case with Harris, and that's a
15   significant number of the minority districts.
16      Q.    Well -- and I didn't necessarily
17   overpopulate.  They could be under populated,
18   too?
19      A.    They could be under populated
20   because of it.
21      Q.    Okay.
22      A.    But you're going to have a surplus

144

1    here and a change there.  It shouldn't be a
2    systematic difference.
3       Q.    It seems it would be more likely in
4    urban counties that are dropping counties than
5    in other counties --
6       A.    It depends on whether you're
7    rounding up or rounding down when you drop it
8    in.
9       Q.    Of course.  But that rounding is
10   going to take place in the urban county -- in
11   the drop-in counties, which are urban counties,
12   right?
13      A.    That's correct.
14      Q.    Southwest Texas out by Port David,
15   they're not looking at 9 or 10 legislators in a
16   single county there, are they?  They're not
17   looking at nine or ten people in large parts of
18   those counties during the daytime, right?  So
19   the skew is going to happen more frequently
20   whether it's over or under when there's drop in
21   counties, right?
22      A.    Right.  That's correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                          October 25, 2011

145

1    Q.   Okay.
2    A.   Let me retract my agreement with
3    you.
4    Q.   Okay.
5    A.   Because the county line rule also
6    applies when you're dealing with those little
7    bitty counties -- now, they're big in my area,
8    but -- because they're all about the same in
9    land area, but, as you pointed out, they have
10   very small populations.
11   Q.   Uh-huh.
12   A.   The county line rule requires you to
13   hook them together until you get a district --
14   Q.   Right.
15   A.   -- and that might also produce an
16   overage or an underage.
17        Bad grammar.
18   Q.   Shortage?
19   A.   A surplus or deficit in your
20   population deviations and you get to the
21   situation where you add one more county and
22   it's too much, you take one away, it's too

146

1    little.  So I don't know whether the county
2    line rule in, fact, suggests that the minority
3    districts -- which are, indeed, concentrated in
4    urban areas -- would necessarily be more --
5    less likely to be near the zero point than what
6    Anglo districts because of the county line
7    rule.  That's a factual question.  I wouldn't
8    know whether it's true or not.
9    Q.   It's a correct statement to say that
10   you didn't analyze those numbers?
11   A.   I did not analyze that.
12   Q.   Okay.  Is there an amendment -- I'm
13   looking at your discussion of the floor debate,
14   Page 39, 40.  Is there an amendment of which
15   you're aware that was voted down, was made by a
16   Democrat, by a minority Democrat, that would
17   not have aided a democratic, whether that
18   Democrat or another, in the election process?
19   A.   All of the amendments which would
20   have increased the number of minority districts
21   and/or would have taken a district which is
22   weak and made it stronger would have helped

147

1    democrats.
2    Q.   Okay.  We assume that the
3    legislature was conscious of that fact?
4    A.   I assume that.  These are practicing
5    politicians.
6    Q.   Okay.  Let's get back to an issue we
7    talked about just a little while ago.
8    Paragraph 129, similar language you cited to
9    somewhere else.
10   A.   Paragraph 29?
11   Q.   I'm sorry.  129.
12   A.   Oh, good.
13   Q.   I told you, sir, we're going forward
14   here.
15        You described what was a pretty
16   solidly partisan process, which is not unusual
17   for Texas.  Is it -- have you studied Texas
18   politics previously?
19   A.   You're asking more than one
20   question.  Is it unusual anywhere, the answer
21   is no.  Redistricting is a partisan process --
22   Q.   Okay.

148

1    A.   Unless you have a bipartisan or
2    nonpartisan commission do it like in Arizona.
3    Q.   Sure.
4        Have you studies Texas previously?
5    A.   Have I studied Texas previously?
6    I'm aware of Texas' history with redistricting,
7    but I'm not putting myself forward as an expert
8    on Texas politics.
9    Q.   If I told you that some people that
10   Texas politics is a contact sport, you would
11   not disagree with me there?
12   A.   Football is big in Texas, from what
13   I hear.
14   Q.   You say:  "The proposed plan was
15   drawn by Republicans, successfully defended by
16   Republicans, and reflects their intent
17   throughout."  That makes sense?
18   A.   That's correct.
19   Q.   Okay.  You say:  "They compromised
20   to maintain minority election districts only to
21   the extent that they believe was minimally
22   necessary to create an appearance of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

149

1    non-retrogression."
2         Now, is it your belief that that --
3    that what they believed was different from what
4    they -- well, you said they believed was
5    minimally necessary to create an appearance of
6    non-retrogression.
7         Now, is it your testimony that the
8    specific intent of the Texas legislature was
9    only to create an appearance of
10   non-retrogression as opposed to what was
11   minimally necessary to not retrogress?
12       A.   I think it's a combination of the
13   two.  Remember, there are 50, roughly.  I mean,
14   there's 47, you know, minority districts.
15   Almost all of those are left essentially
16   untouched.
17       Q.   Okay.
18       A.   But there were these districts,
19   Hispanic districts in which Republicans were
20   elected in 2010, and those were focused in on
21   and changed so that they would not be minority
22   districts.  But in several of those cases, 33

150

1    and 149 are just gone.  But in the other cases,
2    they actually had increased Hispanic
3    population, maybe even increased Spanish voting
4    age population, but not better performance.
5         And so I am trying to account for
6    that pattern.  It is a pattern that is in the
7    chairman's plan.  It's not something that got
8    changed on the floor.  When it comes out from
9    the committee, there it is.
10       Q.   But if it was -- if it was, in fact,
11   the intent of the -- the belief of the
12   legislature that increasing, we'll say Hispanic
13   citizen voting age population, was sufficient
14   and they did so, as you just testified, then is
15   it's true to say that they were trying to do
16   the minimum that would appear to not
17   retrogress, but instead, they were doing the --
18   what they believed was -- in your words -- "the
19   minimum" to not retrogress; isn't that right?
20   It's a big leap, isn't it, to go from one to
21   the other?
22       A.   No.

151

1    Q.   Okay.
2    A.   Because there's a difference between
3    what is legally required, which I am not
4    testifying on, and the effect of the things
5    that they did.
6    Q.   Understood.
7    A.   The effect of the things they did
8    were to change these four districts so that
9    they are not any longer minority districts.
10   Q.   Okay.
11   A.   All right.  Now, they knew they were
12   doing that.  Accomplished politicians.
13   Q.   Right.
14   A.   They knew exactly what they were
15   doing.  And the Hispanic members, including
16   Representative Garza objected to that.
17   Q.   John Garza?
18   A.   Yeah.
19   Q.   You mean because he's a member of
20   MALC?
21   A.   Yeah.
22        Well, no, because he specifically

152

1    said -- as my understanding, now, I'm delving
2    in my memory now --
3    Q.   Okay.
4    A.   -- that he, indeed, felt that they
5    objected to the way in which 117 had been
6    constructed.
7    Q.   Okay.
8    A.   All right.  But that's -- I don't
9    know have a specific reference for that.  Lay
10   that aside for a second.
11        That MALC certainly and the Hispanic
12   members such as Martinez Fisher, and so forth,
13   who spoke on the floor, certainly were
14   objecting to the way these districts were drawn
15   and what to happened.  Okay?
16        So I think everybody knew what was
17   happening, all right?  And, in fact, the
18   position of the state of Texas is that they did
19   meet Section 5 on the basis of that bright line
20   analysis.  Okay?  So I think they understood
21   exactly the difference between what appears to
22   be the case in their bright line analysis and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

153

1    what actually happened.
2         Now, whether they thought that the
3    Court would buy their analysis or not, or
4    whether they thought this would at least get
5    them to the court, I can't do that. I am only
6    testifying that they understand the difference
7    between the bright line standard, which they
8    have -- which you have presented, the state has
9    presented, and the facts about these districts
10   and that they understood that difference.
11        And then, furthermore, there was no
12   effort to increase the number of districts
13   which would reflect the increase in Hispanic
14   population.
15   Q.    Is that required under Section 5 in
16   your opinion?
17   A.    That's a legal question. I don't
18   know.
19   Q.    Okay.
20   A.    As a political matter, I think it
21   should be. That's a separate question.
22   Q.    Okay. My colleague, David, has

154

1    pointed out that several times you've referred
2    to these four districts?
3    A.    Yes.
4    Q.    Just --
5    A.    149, 33, 35, and 117.
6    Q.    Thought so. Just wanted to make
7    sure we're talking about the same ones.
8    A.    They are the four identified by Dr.
9    Handley, and I agreed with her analysis.
10   Q.    Okay. Now, the very last thing that
11   you say in your discussion of the House plan is
12   that you neither -- Paragraph 140, you neither
13   claim nor deny that this intent is motivated by
14   racial or ethnic animus?
15   A.    Yes.
16   Q.    Tell me what you mean by that.
17   A.    I don't know whether those who drew
18   and defended the plans hate Black people and
19   Hispanics or not.
20   Q.    Okay. You do know that they're
21   Republican?
22   A.    I do know that they're Republicans.

155

1    Q.    They know they're Republican,
2    presumably, right?
3    A.    I hope so.
4    Q.    We hope so.
5         And more specifically, they know
6    that in Texas the minorities -- the Hispanics
7    and the African-Americans, the minorities at
8    issue in this case tend to vote fairly
9    predictably Democratic, correct?
10   A.    I'm absolutely certain that they do
11   know that.
12   Q.    Okay.
13        MR. COHEN: Why don't you say we
14   break for lunch.
15        (A short recess was taken.)
16        BY MR. COHEN:
17   Q.    Let's start by talking about Dr.
18   Handley's findings with respect to the
19   Congressional plan. And just so we sort of
20   start from the very high level, if I understand
21   what Dr. Handley said in her report, there were
22   ten -- in the benchmark plan ten effective

156

1    minority districts out of 32 Congressional
2    districts. In the enacted plan, there are ten
3    out of 36 congressional districts.
4         Do you agree with that math?
5    A.    I believe that's her testimony.
6    That's correct.
7    Q.    I'm sorry. Do you agree with --
8    A.    Do I agree with what she did, yes, I
9    do.
10   Q.    Okay. So you agree that there are
11   ten under the old plan and ten under the new
12   plan?
13   A.    Yes.
14   Q.    Is that retrogressive to you?
15   A.    Well, I believe that retrogression
16   is a legal term. It's not a term that
17   political scientists use.
18   Q.    Okay.
19   A.    Does it amount to the loss of
20   representation and the loss of ability to elect
21   candidates of their choice by minority voters,
22   the answer is yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

157

1    Q.   Okay.
2    A.   It's the same thing, but it's
3 political science.
4    Q.   Okay.  So you don't draw a legal
5 conclusion about whether this is retrogression
6 under Section 5, but you do have an opinion as
7 to what you just said, right?
8    A.   I hope I have an opinion to what I
9 just said.  Yes, I think so.
10    Q.   But you distinguish it from the
11 specific question of whether that's
12 retrogression under Section 5?
13    A.   Yeah.  I try to avoid making legal
14 decisions.
15    Q.   Fair enough.
16       Okay.  District 27, the current
17 District 27 is in -- that's basically in Nueces
18 County; isn't it, sort of that part of
19 Southeast Texas, right?
20    A.   That's correct.  I think so.
21    Q.   Do you know much about the
22 demographics of that part of Texas?

158

1    A.   Only what I've learned from the
2 statistics on those two districts.
3    Q.   And what do you know about it?  What
4 have you looked at?
5    A.   And we're talking about the district
6 that's centered in Nueces?
7    Q.   Yes, sir.
8    A.   Yeah.  Well, it was heavily Hispanic
9 before and now it's heavily Anglo.
10    Q.   What do you know about the Hispanics
11 who live there?
12    A.   Only what I can see from the
13 statistics.
14    Q.   Okay.  Do you know if there is a
15 similarity or a -- can you compare and contrast
16 the Hispanics in Nueces County, for example,
17 with the Hispanics in Bexar County?
18    A.   No.
19    Q.   Only by density or by objective
20 criteria like that, I suspect, right?
21    A.   No.  I mean, I can look at the
22 statistics and tell whether they're higher or

159

1 lower socioeconomic status and so forth when
2 the census data on that come out, which they're
3 not yet.
4    Q.   Okay.  Do you know why they
5 elected -- why that district, District 27
6 elective Representative Farenthold in 2010?
7    A.   Sure.  It was a Republican.
8    Q.   Farenthold, F-A-R-E-N-T-H-O-L-T.
9       And he's a white Republican; is that
10 right?
11    A.   I think that's right.
12    Q.   Okay.
13    A.   It was a Republican year.
14 Republicans won in lots of districts they
15 hadn't won before.
16    Q.   Why?
17    A.   Recession, bounce back from
18 President Obama.  Just being fed up and you
19 vote against the incumbent.  I mean, there are
20 lots of reasons.
21    Q.   And you say, "bounce back from
22 President Obama."  I guess "bounce back" from

160

1 the election of 2008?
2    A.   Right.  That's a -- that's not the
3 technical term we would use, but it is the same
4 idea, that there is a surge in decline.
5 Presidential elections you get a surge and in
6 the off year it declines.
7    Q.   Sure.
8    A.   There's evidence across the world
9 that that happens.
10    Q.   Sort of midterm?
11    A.   Midterm madness.  It happens
12 everywhere.  It turns out it's not an American
13 phenomenon.  It's a human phenomenon.
14    Q.   That's interesting.
15    A.   It is, isn't it?
16    Q.   Yeah.
17       Now, the endogenous elections for
18 the Congressional map really are only --
19 there's only three of them for the last cycle.
20 That's a correct statement, isn't it?  2006,
21 2008, 2010.
22       MR. MELLETT:  In which districts?



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

161

1     MR. COHEN:  Well, it's certainly
2  for --
3     THE WITNESS:  Depends on which
4  district.  Because the ones that were redrawn,
5  you only have three.  You have five for the
6  others.
7     BY MR. COHEN:
8  Q.   Right.
9     And what did you look at for -- did
10  you do endogenous examination of District 27?
11  A.   Yes, I did.
12  Q.   And what did you find there?
13  A.   As I remember -- and I think I wrote
14  it down, in fact.
15  Q.   Okay.  Good.
16  A.   No, I didn't.  I wrote it down for
17  the House districts.
18     As I remember, the Democrat one in
19  2007, in '06 and '08, and we know the
20  Republican one in '10 --
21  Q.   Yes, sir.
22  A.   -- I don't remember before that.

162

1  Q.   Republicans also won the House of
2  Representative seats in the last election.
3  Both the incumbents, whether two incumbents in
4  Nueces County or two plus a third, I guess you
5  should say.  Do you know if those were
6  Republicans or Democrats?
7  A.   No.
8     You mean in the House now?
9  Q.   Yes, sir, in the Texas House.
10  A.   No, not off the top of my head.
11  Q.   Okay.  Do you know anything about
12  the local elected officials in Nueces County?
13  A.   No.
14  Q.   Is it possible -- I'm not saying
15  factual because I don't know if you've analyzed
16  it, but is it possible that the election in
17  2010 is merely a trend, the start of trend
18  toward less performing districts?
19     Does that question make sense?
20  A.   Hypothetically, is it possible?
21  Q.   Yeah.
22  A.   Well, as I said before, in politics

163

1  anything is possible.
2  Q.   Sure.
3  A.   I don't think so.
4  Q.   Okay.  Do you have --
5  A.   I have seen these things come around
6  and go around before.
7  Q.   Did you do trend analysis for the
8  purposes of this declaration?
9  A.   You only have three or four
10  elections doing a trend analysis.  It's
11  worthless.
12  Q.   Well, that's certainly, I guess,
13  possible with respect to endogenous elections.
14  But there are other statistical criteria you
15  could use?
16  A.   Yeah, but I didn't look at any other
17  elections.
18  Q.   Oh, okay.  I think you draw a
19  distinction between Districts 23 and 27.  The
20  changes to 27 were fairly dramatic so that
21  basically much of the old 27 is the new 34,
22  correct?

164

1  A.   I don't remember what it's new of,
2  but it is a dramatic change.  It's really --
3  Nueces is the only common area between the two
4  districts.
5  Q.   Okay.  And the old 27 is a much more
6  Republican district, correct?
7  A.   The old 27?
8  Q.   The new -- the 27 under the new
9  plan?
10  A.   Yeah, absolutely.
11  Q.   Okay.  All right.  On the other
12  hand, 23 you say the changes -- so those are
13  pretty, I think you said drastic changes in
14  geography.  But the changes in 23 are subtle?
15  A.   Right.
16  Q.   And I'm reading from the top of Page
17  48 at Paragraph 143.  And those subtle changes
18  are, I guess you say, similar to District 35
19  and 117 in the House?
20  A.   That's correct.
21  Q.   The House of Representatives.
22     And by that you mean they used one



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

165

1  of those three techniques that we've talked
2  about repeatedly today.  Either change in the
3  Hispanic percentage, change the percentage of,
4  I think, what you termed "well-organized"
5  Hispanic voters, or increase the number of
6  reliably Republican Hispanic voters, correct?
7      A.   Slightly.
8      Q.   That's slightly correct or slightly
9  changed?
10     A.   No, no, no.  It's slightly changed.
11 I was giving you only the slightly changed.
12     Q.   Okay.  Now, you say this was done by
13 deleting or splitting effective well-organized
14 Hispanics communities such as in Maverick and
15 Bexar Counties.
16          What do you know about Maverick
17 County?
18     A.   Only the differences that you get
19 when you put it in or take it out in terms of
20 the turnout.  I really have no information
21 other than that, that I can rely upon.
22     Q.   Sure.

166

1          Do you know how many -- do you know
2  what the HVACP is of Maverick County?
3      A.   Not off the top of my head.
4      Q.   Okay.  And Bexar County, similarly,
5  what do you know about Bexar County?
6      A.   It's a big urban area and this
7  Congressional district takes only a piece of
8  it.
9      Q.   Sure.
10     A.   So what I know about Bexar County
11 doesn't tell me necessarily what is what about
12 that part of it.
13     Q.   Understood.
14     A.   You can see that within Bexar County
15 the areas that were put in and taken out in one
16 of my maps.  So...
17     Q.   Yes, sir.
18     A.   No, you can't see it in one of my
19 maps, but I have looked at it on a map.
20     Q.   Okay.  Now, the question you raise
21 in Paragraph 145, whether there's a
22 legitimate -- I'm sorry -- a reasonable or

167

1  legitimate justification why the creation of
2  new Hispanic election districts should be at
3  the cost of the ability to elect those
4  Hispanics who remain in proposed districts, 23
5  and 27, isn't that in the first instance, a
6  Section 2 question rather than a Section 5
7  question?
8      A.   Well, again, I'm not making a legal
9  judgment on it one way or the other.  I'm
10 saying that it is not the case that in order to
11 create Hispanic districts in these new
12 districts that you had necessarily to dismember
13 or weaken 23 and 27.  That's all I'm saying.
14     Q.   Okay.  Do you know authoritatively
15 whether there was sufficient population to both
16 create the new District 34 as a performing
17 Hispanic district and retain District 27 as a
18 performing Hispanic district?
19     A.   Specifically, no.  What I do know is
20 alternative plans who do, in fact, create
21 additional minority districts over and above
22 the ten.

168

1      Q.   Sure.
2      A.   Whether that involved that tradeoff
3  that you just indicated or not, I don't know.
4      Q.   Okay.
5      A.   I mean, that's a more complicated
6  question.
7      Q.   Are these -- just for the record,
8  are these proposed maps or plans that you drew
9  or that you studied based on proposals that
10 were in RedAppl and perhaps presented to the
11 Section 2 court?
12     A.   The latter.
13          BY MR. COHEN:
14     Q.   We're going to mark a collective
15 exhibit as Exhibit 2.  That's going to be all
16 the maps from your report, if that's okay.  But
17 let's make sure we have a complete set.
18          I've got eight here, correct?
19     A.   That's correct.
20          MR. COHEN:  Okay.  Why don't you --
21 I can actually give you a set, too.
22          MR. MELLETT:  All right.  Great.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

169

1      (Deposition Exhibit No. 2 was marked
2   for identification.)
3      THE WITNESS:  The map 6, 7, t that
4   will be attached to the revised declaration are
5   the same as this except that it will focus in
6   better on the county of interest.  You can see
7   how this one focuses in on a good portion of
8   the eastern part of the state, where all you
9   really need to see is Harris County and just a
10  little bit of the counties around it.  But,
11  otherwise, they'll be the same.
12     BY MR. COHEN:
13  Q.   Yes, sir.  Thank you.
14     You will note, by the way, if we
15  look at Map 7 you can see Henderson County in
16  the southeast.
17  A.   Good.
18  Q.   So now you know where Henderson
19  County is.
20     All right.  Now, I was going to
21  talk, actually, first about Map 7, Paragraph
22  148 is where you refer to it on Page 49.

170

1   A.   Uh-huh.
2   Q.   And you discuss swoop -- this is
3   where you used the word "swoop."
4   A.   I just love the word.
5   Q.   Map 7 in Table 16 you write:  "Show
6   how several Anglo election districts from
7   outside Dallas County swoop in to grab and
8   crack Hispanic voters."
9   A.   Uh-huh.
10  Q.   Okay.  Show me which districts
11  you're talking about on Map 7.
12  A.   Okay.  First, we're dealing with
13  map -- with District 5, which comes from
14  Kaufman.  Kaufman is over here on the right and
15  you can see that the county line is broken, of
16  course.  I'm not criticizing that.
17  Q.   Yes, sir.
18  A.   And it goes right on in in a strange
19  shape and picks up some of this yellow and some
20  of this red.
21  Q.   Uh-huh.
22  A.   Okay.  That's 5.  And number 6 comes

171

1   in from Ellis.  Okay?
2   Q.   Uh-huh.
3   A.   Ellis is south and it comes in -- it
4   goes over to part of Tarrant County here, but
5   it goes up into the Dallas area and picks up
6   lots of red and orange.  You see that?
7   Q.   Uh-huh.
8   A.   Okay.  And then 24, which is in
9   Tarrant and Denton.  So Denton is, of course,
10  to the north and it picks up part of Tarrant
11  County, which has very little population of any
12  kind.  A lot of that is vacant evidently.  And
13  then picks up scattering of Hispanics around
14  there.  And then 32 comes in from Collin, which
15  is to the north.
16  Q.   Is that District 32 -- oh, I see.
17  A.   Yeah, 32.  And it comes in and comes
18  down and then the funny little shape picks up a
19  little bit here and there.  Some of them pick
20  up more than others.
21  Q.   Uh-huh.
22  A.   And then I noted that totally within

172

1   Dallas is this Black election district, Number
2   30, which does contain a good deal of Hispanic
3   population as well.
4   Q.   Uh-huh.
5   A.   And then you can add either the
6   subtotal of just the ones that swoop in, or
7   the -- or you can include the Black district or
8   you can exclude the Black district.  And the
9   total number of people, 624,000 Hispanic
10  population.
11  Q.   Do you know which of these districts
12  is represented by incumbents?
13  A.   I have no idea.  Not without
14  looking.
15  Q.   Sure.  Okay.
16  A.   Well, they all have an incumbent.
17  Q.   I guess the answer is which is
18  represented by an incumbent who plans to run?
19  A.   No, I don't know anything about
20  which incumbents plan to run.
21  Q.   And do you know which of these is
22  represented by Democratic incumbents?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

173

1     Actually, they would all necessarily
2  be represented by incumbents.  We could have
3  new districts.  But you're correct, these are
4  all districts with incumbents?
5     A.  Yeah.  I mean, I don't know which of
6  these have white Democrats.  None of these
7  have -- none of these that swoop in have --
8     Q.  Did I mention white Democrats?
9     A.  Huh?
10    Q.  Did I -- did I say -- I did say --
11 said by Democrats.  I didn't say by white
12 Democrats.
13    A.  None of these are minority districts
14 except 30.
15    Q.  Okay.  So the only Democratic
16 district that you're aware of are the ones that
17 you mentioned is District 30?
18    A.  Without looking at the list.
19    Q.  Okay.  Now, Sheila Jackson Lee's
20 district?  Does that sound right?
21    A.  Thirty, yeah.
22    Q.  Okay.  Now, you mentioned District

174

1  24, which you said comes down from Denton
2  County.  In fact, it just takes up a small part
3  of Southeastern Denton County, Carrollton,
4  Texas, right, or Plano?
5     A.  No.  That's correct.  And it's
6  mostly Tarrant.
7     Q.  It's -- well, is it mostly Tarrant
8  or is it mostly Dallas County?
9     A.  I haven't looked at the -- which is
10 more.
11    Q.  Okay.
12    A.  I mean, there's a lot of vacant
13 land.  There's a lake there or something, I
14 guess.  I don't know.
15    Q.  Well, likewise, District 32, you
16 know, you talked about that which has a portion
17 of Collin County and then a portion of
18 Northeast Dallas County.  Actually, the
19 majority -- if I were -- isn't it just true to
20 say that it swoops up into Collin?  It seems to
21 me it has much more of Dallas County than it
22 has Collin, doesn't it?

175

1     A.  You could say that.
2     Q.  Okay.  Now, Paragraph 151 references
3  Table 17 talks about Tarrant County.  Tarrant
4  County is where Forth Worth is, right?
5     A.  That's correct.
6     Q.  Okay.  It says:  "While there's not
7  enough Hispanic population for a Hispanic
8  election district" -- and that's what we were
9  calling before a Hispanic district -- one where
10 Hispanics would be able to effectively elect
11 the candidate of their choice, right?
12    A.  That's correct.
13    Q.  While there's not one -- enough
14 population for Hispanic election district
15 totally within Tarrant County, there is enough
16 minority population for a biracial district
17 totally within the county.
18       What is a biracial district?
19    A.  A district which has a large number
20 of both Hispanics and Blacks, and therefore can
21 elect a candidate of their choice.
22    Q.  Do Blacks and Hispanics -- I think

176

1  we already discussed before --
2     A.  We did.
3     Q.  -- the notion that in primaries,
4  Blacks and Hispanics don't necessarily vote for
5  the same candidate?
6     A.  That's correct.
7     Q.  We talked about that before.
8       Okay.  How do you know whether it's
9  a Black district or a Hispanic district?
10    A.  You can't know for sure until the
11 elections have occurred in the district, but
12 you can make a reasonable guess based on the
13 number of SSVR versus the percentage of Black.
14    Q.  VVAP?
15    A.  VAP.
16    Q.  Right.
17       As a legislature, how was the Texas
18 legislature supposed to decide whether this
19 biracial district should lean Hispanic or lean
20 Black?
21    A.  I think the answer to that is when
22 you're drawing the districts, you want to try



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

177

1  to draw some or both in order to represent each
2  of the groups.  And if possible if you can
3  separate them, you do that.  If there -- if the
4  way their populations arranged, you can't.  So
5  the only thing you can draw is a multi-racial
6  district, then that's what you draw.
7       Q.   And it's your contention that that's
8  required as a matter of Section 5 law, or you
9  don't make a contention?
10      A.   If you keep asking me legal
11  questions, I won't give you an answer.
12      Q.   Okay.
13      A.   Is it something that the legislature
14  should do in order to provide equal
15  representation for equal representation and
16  equal ability to elect candidates of their
17  choice, the answer is yes, they should do that.
18  And if they fail to do that, then the
19  representation, in this situation, where you've
20  gone from 32 to 36 districts, if you failed to
21  do that, then their representation is actually
22  decreased.  Their ability to elect candidates

178

1  of their choice has actually decreased.
2       Q.   Got you.
3            Okay.  Now, Paragraph 152 correctly
4  notes that there's no county line rule for
5  Congressional districts.
6       A.   That's correct.
7       Q.   But the fact that it's in the
8  Constitution, the Texas Constitution suggests
9  that Texas takes the community interest in
10  counties seriously.
11           Now, do you know of any fact other
12  than the presence of Article 3, Section 26 in
13  the Constitution that supports the proposition
14  that Texas takes the community interest in
15  counties seriously?
16      A.   No.
17      Q.   Okay.  And, in fact, it's correct
18  that in Texas, like every other state in the
19  union, there is a much -- there is a mandatory
20  closer adherence to one person/one vote
21  principles for Congressional districts than
22  there is for a state House redistricting,

179

1  correct?
2       A.   Yes.
3       Q.   Okay.  So this next sentence says:
4  "Yet all three of these major urban counties."
5  I guess that's talking about Bexar Travis --
6  I'm sorry -- Dallas, Harris and Tarrant.
7            That's what you were discussing
8  about?
9       A.   Tarrant, Dallas and Harris.
10      Q.   Okay.  Yet all three of these major
11  urban counties were sliced up in bizarre
12  fashion in order to crack Hispanic or biracial
13  communities within these counties.
14           Well, the notion of slicing up the
15  county is only -- I guess you would say bizarre
16  or a violation of traditional districting
17  principles if the whole county principle is a
18  traditional Texas Congressional principle,
19  correct?
20      A.   No.  There's a difference between a
21  whole county principle that says that you have
22  to keep them together, like the county line

180

1  rule.  And one that says you respect the county
2  lines insofar as you can do so.
3       Q.   Right.
4            Okay.  And irrespective -- I guess
5  as you're saying there, irrespective of whether
6  there is a whole county principle, there still
7  should be respect for the county line to the
8  extent possible as a community of interest?
9       A.   Respecting county lines in any
10  districting is the most frequently cited
11  traditional districting principle, aside from
12  one person/one vote, of course.
13      Q.   What about predicting of incumbents?
14      A.   No.  That's way down the list.  You
15  have to look at all -- you have to look at the
16  relative value of each thing and certainly that
17  predicting incumbents is a districting
18  principle.  No question about it.  But it has a
19  much lower priority than these other things.
20      Q.   Isn't it relatively high priority to
21  the incumbent?
22      A.   Yes.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

181

1    Q.   Okay.  Paragraph 155 makes
2  references to Table 18.  And I think this is
3  analysis that you did of what constitutes
4  minority election plans in districts in a
5  couple of MALC plans, right, Plans C163 and
6  C166; is that right?
7    A.   Yes.  And, remember, there's a
8  correction there, because 166 is not a MALC
9  plan, but...
10   Q.   Okay.  Explain what the -- what's
11 identified as the eco score for 2010 for the
12 two districts that are there.
13   A.   Yeah.  That's the percentage of the
14 statewide elections or -- let me start it this
15 way: I used two kinds of elections.  All
16 exogenous.  It shouldn't say eco.  It should
17 say XO.
18   Q.   Okay.
19   A.   I'm sorry about that.  Typo.
20       First of all, statewide elections,
21 partisan general elections.  And then second,
22 districted elections in which a very

182

1  significant proportion of the vote in that
2  district corresponds to the vote in the
3  district.
4    Q.   By "corresponds" you mean has a
5  similar geographic?
6    A.   Includes the same people.
7    Q.   Okay.
8    A.   So I can look at the vote for the
9  at-large elections for especially the top of
10 the ticket, say, governor, for example.
11   Q.   Sure.
12   A.   And then when I look down and if
13 we've got a district where the vote is about --
14 the total vote cast is about the same, then
15 that's a district which corresponds to the
16 district that I'm looking at, whether it's
17 District 5 in Plan 163 or 9, or whatever it is.
18   Q.   So, for example, so I'm clear, we
19 have 15 state board of education seats in
20 Texas.
21   A.   Uh-huh.
22   Q.   So one of those SBOE seats, if

183

1  within its territory is the bulk of, say,
2  District 16 --
3    A.   I would say almost all.
4    Q.   Almost all.
5        Okay.  Then you would look at not
6  only the governor election or the gubernatorial
7  election, but also that SBOE seat?
8    A.   You do understand.
9    Q.   Okay.  Okay.
10   A.   And that's why the numbers are not
11 all -- why the numbers are not all in the same
12 sequence where it would be -- where you have
13 exactly ten and you look at the same ten for
14 everybody, then the scores have got to be 10,
15 90, 80, 70, 60, but you'll notice it varies
16 because of the number of races that I include.
17   Q.   Sure.
18   A.   So I included as many as I could
19 from the materials that the attorney general's
20 office sent me for this plan.
21   Q.   Do you know how many elections --
22   A.   For these plans.

184

1    Q.   Do you know how many elections you
2  looked at for each of these plans?
3    A.   No, not off the top of my head.  It
4  was at least seven or eight for each of them.
5  Some of these districts are so cut up, both in
6  terms of the old districts, where the election
7  was held, and the new one, that you don't have
8  as many.  But it's certainly seven or eight in
9  any case.
10   Q.   And your methodology for choosing
11 the election, the exogenous elections you
12 looked at was essentially as many as -- covered
13 substantially as many statewide or districted
14 elections as covered the same territory?
15   A.   That's correct.
16   Q.   Okay.  So I'm clear, that's a
17 different methodology than Dr. Handley used,
18 right?
19   A.   It is.  She did not analyze these
20 plans.
21   Q.   Okay.  Is there a reason --
22   A.   Well, let me rephrase.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

185

1      It's the same methodology.  It's a
2  slightly different set of districts.
3      Q.    Different -- it's a different
4  selection?
5      A.    Set of elections.
6      Q.    Different process for selecting the
7  districts?
8      A.    That's correct.
9      Q.    Okay.  Is there a reason why you
10  used as many districts as you could?
11      A.    I thought the more districts --
12  remember, these are proposed plans.
13      Q.    Yes, sir.
14      A.    Okay?
15          They're also Congressional plans.
16  And since I didn't have as much evidence as I
17  would have liked to have, I've got the VAPs and
18  the SSVR.  I wanted to get as good a measure as
19  I could on these exo scores.
20      Q.    Okay.
21      A.    So I chose a few more rather than
22  using a more narrow band.  They don't vary too

186

1  much, I will tell you, that you're going to get
2  the same results.  So you're not surprised at
3  that, I'm sure.
4      Q.    Sir, little surprises me.  I have
5  two children under ten.
6          Now, I understand that you did three
7  types of compactness analysis for these two
8  plans; is that right?
9      A.    For the House I used three.  For
10  this -- for this I used only one.
11      Q.    Okay.  Did you do community of
12  interest analysis?
13      A.    No.  Community of interest analysis
14  is far beyond the kind of analysis that I can
15  do in a case like this.  It would take a much
16  more in-depth study over very -- it would take
17  weeks and it would probably involve data that's
18  not available yet.
19      Q.    Okay.  How long did it take you to
20  do this analysis?
21      A.    I have been working on it for
22  what -- for over a month.  But, remember, some

187

1  data became available only a day or two before
2  this, and second of all there was some analysis
3  I could not do until I got Dr. Handley's
4  report.  So -- and that came in relatively
5  late.
6          Because I was asked not to duplicate
7  what she did in order not to anger the judges,
8  because you have been that route, I was -- I
9  did my own analysis, but I couldn't then
10  proceed until I knew whether I agreed with her
11  or not.
12      Q.    Sure.
13      A.    So some things were delayed.  So a
14  lot of it was done later than earlier.
15      Q.    Is it fair to say that a -- well,
16  you just indicated that some of your research
17  was dependent upon Dr. Handley's report?
18      A.    Not so much dependent on it as
19  making sure that I agreed with her or that I
20  didn't before I finalized so much of the draft.
21      Q.    Is it fair to say that some portion
22  of your report was based on either OAG work or

188

1  TLC work?
2      A.    Oh, sure.  They supplied data.
3      Q.    Okay.  Did they do more than supply
4  data?
5      A.    Oh, yeah.  The attorney general's
6  polarized racial voting analysis gives all
7  kinds of information that one would call
8  analysis and not just -- certainly not raw
9  data.  There is raw data in that analysis, but
10  there's also analysis -- ecological regression
11  analysis and so forth.
12      Q.    And any idea how much time it would
13  have taken you to do that sort of data, given
14  the raw data to do that sort of analysis?
15      A.    An enormous amount of time.  I
16  couldn't even begin to estimate it.
17      Q.    Months?
18      A.    It's not a matter of days.  It's a
19  matter of hours.
20      Q.    Okay.
21      A.    I would say hundreds of hours.
22      Q.    Hundreds of hours?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                                    October 25, 2011

189

1      A.   And that's assuming that I could get
2   the data in a good format from the state --
3      Q.   Right.
4      A.   -- that -- so that I could analyze
5   it.
6      Q.   And -- sure.
7           Okay.  Table 19 might be what we
8   could call a bottom line analysis because it
9   shows a higher number of Hispanic districts for
10  both the C163, which is a MALC plan and C166,
11  which, I think, you indicated is not?
12     A.   Now, remember, those two figures for
13  number of Hispanic districts and those were
14  changed in the paper that I gave you.  So I
15  think that's the right one.  Or is it the other
16  one?  I'm sorry.  It's the House one that was
17  changed.  So this one, 19 is okay.
18     Q.   Okay.
19     A.   Sorry about that.
20     Q.   No, no, no.  That's fine.
21          C163 shows five more districts,
22  Hispanic districts.  C166 shows three more than

190

1   the C185, the enacted plan.
2           Did you do performance analysis for
3   these districts?
4      A.   I have to think of what I have done.
5   The answer to that is yes.  I'm trying to
6   remember what I did for the Congress and what I
7   did for the House.
8      Q.   Okay.
9      A.   I think the answer to that is that
10  yes, I did this as well.  I'm just trying to
11  remember.  I don't have -- I didn't bring notes
12  with me, so...
13     Q.   Okay.
14     A.   Go ahead.
15     Q.   Your report doesn't include the
16  performance analysis?
17     A.   That's because I didn't get the
18  figures that I wanted from the state of Texas
19  until the day before this was due.
20     Q.   Okay.  I'm going to ask that
21  question just as before.  Did you request the
22  information directly from the state of Texas,

191

1   or did you get it from --
2      A.   No.  Everything I did I had to go
3   through the Department of Justice.  They don't
4   let me talk to you.
5      Q.   Okay.  TLC, for example, has a large
6   online website.  Have you accessed that?
7      A.   Yes.  Yes.  But I could not find for
8   these plans that reconstructed exogenous data.
9      Q.   Okay.
10     A.   It may be on there and so it may be
11  my fault, but I could not -- I could not find
12  it.
13     Q.   Similarly, did you check the Section
14  2 court record for that data?
15     A.   I don't have access to that, and I
16  don't know how I would do that.
17     Q.   Okay.  Did you -- again, for these
18  two districts -- we've already discussed this.
19     A.   You -- I want to warn you about my
20  memory.
21     Q.   Yes, sir.
22     A.   I'm almost certain I did this

192

1   reconstructed data for the relevant house
2   districts.  And, in fact, I think I have those
3   figures there.  I'm not sure that I actually
4   did it for the 163 and 166.  I think I did, but
5   I'm not certain.  And I'm not willing, as we
6   sit here, to say what I found because I can't
7   remember that I did it.
8      Q.   Well -- and that's -- that's
9   sufficient for -- I guess for us to move on.
10  For our purposes you don't have an opinion as
11  to whether C163 or C166 would perform, all 12
12  districts, all ten districts, all three
13  districts, correct?
14     A.   I think I have to say yes.
15          MR. MATTAX:  Yes, you do have an
16  opinion or yes?
17          BY MR. COHEN:
18     Q.   You would say, yes, that's correct?
19     A.   Yes, that's correct.
20          MR. MATTAX:  Thank you.
21          MR. COHEN:  I understood it, Mr.
22  Mattax.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

193

1    MR. MATTAX:  All right.  I'm dense.
2    THE WITNESS:  Thank you.
3    BY MR. COHEN:
4    Q.   Here's an interesting comment that I
5  think takes us back to something we discussed
6  in the House, too.  Paragraph 164, it's the
7  penultimate sentence:  "Thus, splitting
8  precincts cannot be useful in shaping districts
9  in partisan terms, unless the line drawer
10 depends on the known relationship of race and
11 partisanship."
12    Now, that seems to me a little
13 different than the explanation of split
14 precincts that we had in the house.  But it's
15 the same concept?
16    A.   It is the same concept.
17    Q.   Okay.  And, in fact, there is a
18 third possibility and that's that the line
19 drawer has specific knowledge of the precincts
20 in question, correct?
21    A.   That's a hypothetical possibility.
22    Q.   Does being conscious of the known

194

1  relationship between race and partisanship make
2  a line drawer a racist?
3    A.   I haven't made any judgment.  You
4  remember, the last sentence in the House is
5  also the last sentence here.
6    Q.   I do.
7    A.   I'm not making any judgments about
8  people who are racist.  I'm simply looking at
9  the question of whether they took actions which
10 impeded the election of minority -- impeded the
11 ability of voters to elect candidates of their
12 choice.
13    Q.   Okay.
14    A.   That's all I'm looking at, and
15 whether that was a known factor and so forth.
16    Q.   And Table 19 is similar to the
17 analysis we discussed earlier because it
18 analyzes the -- I guess it's just the straight
19 count or average count of precincts split and
20 not split between minority and non-minority
21 districts; is that right?
22    A.   It also shows the number of blocks

195

1  moved in minority and Anglo districts and also
2  the number of voting age population moved out
3  of their precinct.
4    Q.   Okay.  And you describe that in
5  Paragraph 168 as the racial nature of the
6  census blocks.  Do you see that Paragraph 168?
7    A.   Yes.
8    Q.   The racial nature.  But it's also
9  just based on what you mentioned a few moments
10 ago, you said there's a known relationship
11 between race and partisanship, right?
12    A.   That's correct.
13    Q.   So it could be the racial nature --
14 there is a racial nature to the census blocks,
15 but there's also a partisan nature to the
16 census blocks that were moved, true?
17    A.   That is correct.  Keeping in mind,
18 however, that we have already seen that
19 political relationship -- that relationship is
20 tight enough to mean something, but it's
21 unreliable.  In other words, you may increase
22 the Hispanic vote in a district while actually

196

1  decreasing its ability to elect a Hispanic
2  candidate of choice.
3    Q.   In which case, either you have
4  really good knowledge of the Hispanics who are
5  voting in that area or you have really bad
6  knowledge of Hispanics in that area; is that
7  right?
8    A.   Again, those are both hypothetical
9  possibilities.
10    Q.   Isn't the third possibility that the
11 Hispanics aren't voting with the cohesiveness
12 that the predictive models would predict?
13    A.   What we have already seen that it
14 varies.  In some elections their cohesion is
15 70, some elections their cohesion is in the
16 80s.  So it does vary from election to election
17 and from place to place.
18    Q.   Is there any predictability to that?
19    A.   If you have an enough local
20 knowledge you might be able to predict that.
21    Q.   What if you have just -- I'm sorry.
22 Did I interrupt you?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

197

1   A.   No.
2   Q.   What if you have just straight
3   socioeconomic data?
4   A.   Remember, the social economic data
5   is ten years out-of-date now.  So whether I
6   would rely on that or not, that's a very iffy
7   proposition.  You're already talking about
8   something that's not a really strong
9   relationship, that is, the relationship between
10  socioeconomic status and how they vote.
11  Q.   Yes, sir.
12  A.   Now, whether they vote, that's
13  pretty strong.  Okay?  But how they vote,
14  whether they vote Democrat or Republican,
15  that's not strongly related to socioeconomic
16  status anywhere anymore.
17  Q.   That's true for all races?
18  A.   Yeah.  It's pretty much true
19  everywhere.  Otherwise, Connecticut would be a
20  Republican state and Mississippi would be a
21  Democratic state, and it ain't so.
22       Now, just to make sure, I'm not

198

1   saying there isn't a relationship.  I'm simply
2   saying it's not very strong anymore.  That's
3   all.
4   Q.   Okay.  But you did say that local
5   knowledge -- local knowledge is probably a
6   better predictor if your local knowledge is
7   good than raw or outdated socioeconomic data?
8   A.   No, I didn't say that.  Then raw or
9   outdated socioeconomic status, I'm not sure
10  which is worse.  Local knowledge, in my
11  experience, often is not as good as even bad
12  data, but the data is bad.  It's ten years
13  out-of-date.  I wouldn't know how to rank which
14  of those is worse.  They're both very iffy.
15  Q.   Is it fair to surmise that a
16  legislator trusting her own local knowledge is
17  more likely to make a decision based on her own
18  local knowledge than she is on what you just
19  described as bad or dated socioeconomic data?
20       MR. MELLETT:  Objection.
21  Speculation.
22       THE WITNESS:  Depends on the

199

1   legislator.  Some legislators have a great
2   appreciation for statistics and some trust
3   their gut.
4       BY MR. COHEN:
5   Q.   Okay.  It's not unlawful for her to
6   trust her gut, is it?
7   A.   Not in and of itself, no.  But,
8   again, I don't know what's lawful and what
9   isn't.
10  Q.   Okay.  It's not politically unsound
11  for her to trust her gut, is it?
12  A.   Now, I don't know what's politically
13  unsound.  You mean from her perspective of
14  getting reelected next time, or from the
15  perspective of doing what's right?
16  Q.   Well, let's go with what we
17  determined earlier is probably a paramount
18  importance to her as an incumbent and say the
19  former?
20  A.   Reformulate the question because we
21  now hooked a couple questions together.
22  Q.   It may not be the most statistically

200

1   sound way to approach a question for a
2   legislator, but if she relies on her gut
3   feeling about her district, she's not doing
4   anything -- well, unusual, is she?
5   A.   I like that question.  She is
6   certainly not doing anything unusual.
7   Q.   Okay.  Paragraph 181 from
8   onionboys@hotmail.com, this is an e-mail from
9   Mr. Doug Davis, apparently to Eric Opiela and
10  Gerardo Interiano, right?
11  A.   That's correct.
12  Q.   And I think you earlier, in your
13  declaration, not in this deposition, identified
14  Mr. Opiela as -- at that point counsel to
15  either Lamar -- Lamar Smith, right, who's a
16  congressman from Bexar County?
17  A.   My understanding is he is a -- more
18  than that.  He's an attorney for the Republican
19  delegation from Texas.
20  Q.   Okay.  Do you know that for a fact,
21  or that's just your understanding?
22  A.   That's my understanding.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

201

1    Q.   Okay.  And Mr. Interiano,
2    GInteriano, that's Gerardo Interiano, what do
3    you know about him?
4    A.   He's a major line drawer for the
5    speaker.
6    Q.   Okay.  For Speaker Straus?
7    A.   Yeah.
8    Q.   S-T-R-A-U-S, one S.
9    A.   I have identified them in ellipses.
10   Q.   Earlier places?
11   A.   Earlier places, yes.
12   Q.   Okay.  And here it's basically
13   forwarding an e-mail from Representative Smith,
14   I think?
15   A.   That's correct.
16   Q.   Which forwarded a plan?
17   A.   Which forwarded a plan of action,
18   but not a plan in the sense that we have been
19   discussing it.
20   Q.   Okay.  Before it was a proposal, I
21   think is what it said?
22   A.   Yeah.

202

1    Q.   We don't -- the attachment is not
2    here, so we don't know what the proposal looked
3    like?
4    A.   The attachments were not included in
5    what I got.
6    Q.   Okay.  And it shows the
7    expectation -- let's see.  The date of this
8    was --
9    A.   Early.
10   Q.   It's January of 2011, so it's
11   actually before the census data.
12   A.   Several months before.
13   Q.   Yeah.
14        Well, it's certainly before it was
15   clear that Texas would get 36 districts.  But
16   it appears that there were starting to be a
17   consensus that that would be it because it says
18   it creates four new districts as allowed by the
19   census results.  And then the four are one in
20   east, one in central, one in south Texas, and
21   then one in the DFW area, right?
22   A.   Yes, that's what it says.

203

1    Q.   Okay.  And it says -- and it
2    proposes a new Voting Rights Act district in
3    DFW.  You take that to be what we called a
4    minority district?
5    A.   Yes.
6    Q.   Okay.
7    A.   And it also says one of the Anglo
8    districts would be converted into a voting
9    rights district.
10   Q.   Right.
11        Do you know if Mr. Interiano or
12   anyone else attempted to effect this plan?
13   A.   I do not.
14   Q.   Okay.  Do you know Mr. Interiano's
15   ethnicity?
16   A.   I do not know him.
17   Q.   Let me ask a question that goes back
18   to the way you've described intent or purpose.
19   Paragraph 183, "Over time, the process more
20   clearly focused on creating new Republican
21   districts, protecting Republican incumbents,
22   and maintaining exactly enough minority

204

1    election districts to convince the courts that
2    the plan does not retrogress."
3        Let's talk about that one by one.
4    Clearly focused on creating new Republican
5    districts -- that's increased in the Republican
6    majority in the Texas delegation, right?
7    A.   That's correct.
8    Q.   Okay.  Protecting Republican
9    incumbents, now, is that at the cost of
10   Democratic incumbents, or is that with
11   indifference to Democratic incumbents, or is
12   that in addition to protecting Democratic
13   incumbents?
14   A.   You're saying Democratic incumbents
15   rather than minority incumbents?
16   Q.   Yes, sir.
17   A.   Okay.  The answer is it's certainly
18   indifferent to Democratic incumbents in
19   general, white Democratic, for example, but not
20   in difference to Hispanic and Black incumbents
21   because they know there has to be a -- there
22   has to be as many districts as they had before



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

205

1  if they're going to get preclearance. And,
2  here, you're focusing on only 36. You don't
3  have all these 150.
4      Q.   Sure.
5      A.   You've got 36. And they know if
6  they come in at nine, the Court is going to
7  redraw the plan.
8      Q.   Who are the white Republicans -- I'm
9  sorry.
10         Who are the white Democratic
11 incumbents?
12     A.   Doggett would be one.
13     Q.   Do you know of any others besides
14 Lloyd Doggett?
15     A.   I think Green is white, isn't he?
16     Q.   One of the Greens is, yes, sir.
17     A.   Yeah. Yeah. One of the Greens.
18 That's right, there's more than one Green.
19         I would have to look at the list.
20     Q.   Okay. So your opinion is that there
21 was no particular interest in protecting
22 Representative Doggett; is that right?

206

1      A.   I don't know whether there was
2  interest in that or not. I mean, that seems to
3  be controversial in terms of whether one of
4  these districts are ones that may have been
5  intended for Hispanic, that he might win.
6  That's in one or another of these e-mails. So
7  I don't know whether the effort was.
8          What I'm saying is that the -- as
9  they went on, they ended up in a situation
10 where they did create two new Hispanic
11 districts and they disposed of two for a net
12 gain of zero.
13     Q.   This is 2327 for 3435?
14     A.   That's correct.
15     Q.   Okay. Well, the third thing that
16 you list here is, as the focus of the process,
17 maintaining exactly enough minority election
18 districts to convince the courts that the plan
19 does not retrogress. Now, put another way,
20 isn't it true that that's simply doing the
21 minimum not to retrogress?
22     A.   Doing the minimum not to retrogress

207

1  if you buy numbers rather than percentage
2  representation as the criteria.
3      Q.   Sure.
4          So, I mean, that is to say if the
5  courts are convinced that the Texas legislature
6  has done enough, then quite simply the plan has
7  not retrogressed, right?
8      A.   That's a legal question. I can only
9  testify that it's the same number of districts
10 where now there's 36, and therefore minorities
11 have lost representation.
12     Q.   I understand.
13         And I guess I should say
14 retrogressed pursuant to Section 5. If the --
15 if Texas has, in fact, convinced the courts
16 that the plan does not retrogress, then it's
17 intent was -- came to fruition, right? They
18 convinced the court that they didn't
19 retrogress?
20     A.   I can't answer that question.
21         What I'm dealing with here is
22 whether their intent was to match what the

208

1  representation that minorities have or not and
2  their intention was not to do that because
3  you've gone to 36 districts and you still have
4  only ten.
5      Q.   The Texas legislature never had the
6  clear focus of convincing Dr. Theodore
7  Arrington that they didn't retrogress. That's
8  a correct statement, isn't it?
9      A.   No. I don't express an opinion.
10 They have the responsibility to convince the
11 three-judge panel that they didn't retrogress.
12 And they will make the decision they will make,
13 and they -- and I hope they will take my
14 opinion into account.
15     Q.   Okay. Even in January you write in
16 Paragraph 184, Page 61: "Plans were being
17 discussed to figure out what the Voting Rights
18 Act would require." About the third sentence,
19 I think.
20     A.   Now, you remember, I changed this
21 defeated Republican. I mean, that's been
22 altered because I hate nicknames.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                                    October 25, 2011

209

1    Q.   Okay.
2    A.   So I have no evidence that they have
3    drawn districts for defeated Republicans.
4    Q.   Okay.  So where it says, "No former
5    Congressman," this is making reference to
6    your --
7    A.   To Quito?
8    Q.   Quico?
9    A.   Quico.
10        That's as bad as Bexar County.  You
11   have no know how that's done.
12   Q.   I guess that's right.
13   A.   That's right.
14   Q.   Q-U-I-C-O.
15        And Canseco is C-A-N-S-E-C-O.
16        And so now we're talking about Eric
17   Opiela's e-mail to Lamar Smith, Lamar Smith 21.
18   And this is the e-mail at Paragraph 185 where
19   he says:  "I don't think we messed with Quico's
20   district for your sake and his."
21        Quico, in this case, is, as you
22   know, current incumbent Republican congressman?

210

1    A.   That's correct.
2    Q.   Quico Canseco, he's a Republican in
3    District 23, right?  He's the incumbent in
4    District 23?
5    A.   He's the incumbent.  Which number, I
6    don't remember.
7    Q.   Okay.  So this not only changes your
8    reference to former rather than current
9    congressmen, you recognize this is an
10   attempt -- you recognize this is an attempt
11   to support a Republican incumbent, correct?
12   A.   To support a Republican incumbent,
13   yeah, sure.  To support several Republican
14   incumbents.
15   Q.   Okay.  Strangely, Mr. Opiela is
16   discussing with Congressman Smith would it help
17   if basically there were a switch.  You,
18   Congressman Smith, would be willing to
19   represent the constituents in Edwards County in
20   exchange for giving Mr. Canseco 3,000 more
21   residents in Bexar County, right?
22   A.   Sounds right.

211

1    Q.   We need a yes or a no?
2    A.   No.  Sounds right.
3    Q.   Okay.  Now, in the end, the decision
4    was not Eric Opiela's or Lamar Smith to make or
5    Quico Canseco's, for that matter.  It was, in
6    fact, the Texas legislature's, right?
7    A.   Depends on what you mean by, "in
8    fact," and the last analysis, was it the plan
9    that was worked out by these folks, in part, by
10   this exchange of e-mails and, in part,
11   undoubtedly by telephone calls and other
12   things, was the plan that came back from the
13   chairman.  And three days later they were
14   debating it on the floor of the Senate and it
15   wasn't significantly changed.  So in terms of
16   the minority districts, what these folks did in
17   this time period when they're exchanging these
18   memos, that set the whole thing in place.
19   Q.   Do you know if Mr. Smith or Mr.
20   Opiela, if either of them were in contact with
21   the rest of the Texas delegation?
22   A.   Yes.  My understanding is that Lamar

212

1    Smith was selected by the delegation to be
2    their representative in this process and there
3    are other e-mails that I've even cited here
4    where you were making exchanges between a
5    number of the congressmen.
6    Q.   Sure.
7        Were those exclusively the
8    Republican numbers or the delegation or was Mr.
9    Smith sort of the principal point of contact
10   for all members?
11   A.   Well, he may have been appointed as
12   a principal contact for the whole delegation,
13   but my -- the e-mails would seem to show that
14   it was a Republican operation.
15   Q.   Okay.  I'm looking at Paragraph 186.
16   You show this as a -- December 24th, the day
17   before Christmas, Eric Opiela is writing to
18   Congressman Smith, Mr. Interiano, Mr. Davis,
19   and he's forwarding a blog from the New York
20   Times.  Seems to be odd that Mr. Opiela would
21   admit that he reads the blogs in the New York
22   Times.  That is a curious point for a Texas



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

213

1  politician, but he says early in the process --
2  I'm sorry.  You say, "Early in the process, the
3  line drawers were well aware of the tradeoffs
4  between drawing minority election districts and
5  Republican prospects."
6          By that, you're saying as early as
7  Christmas Eve 2010, the Republican people who
8  were drawing maps understood that the more
9  minority election districts, the less likely
10 the Republicans to garner seats, is that it?
11     A.   Yes.
12     Q.   They probably knew that even before
13 Christmas Eve, didn't they?
14     A.   They may have.
15     Q.   Okay.  There's nothing unlawful
16 about Mr. Opiela passing this along to Doug
17 Davis, is there?
18     A.   A little louder.
19     Q.   There's nothing improper or unlawful
20 about Mr. Opiela passing along this New York
21 Times blog?
22     A.   First place, I'm not a lawyer, so I

214

1  don't know what's lawful or unlawful.  You want
2  to phrase it in some other kind of terms?
3      Q.   Sure.
4          Is there anything improper in your
5  mind about Mr. Opiela passing this along to
6  Doug Davis, Mr. Interiano, and his boss, Mr.
7  Smith?
8      A.   No.
9      Q.   Okay.  Paragraph 188 is this e-mail
10 from Congressman Smith to a woman who works on
11 the speaker's staff, S. Davis.  And he says
12 he's been talking with Tom Phillips who is the
13 retire chief justice of the Texas Supreme
14 Court, as you identify him, and also Sam
15 Cooper.  And it looks like he is explaining the
16 process that six months later the state of
17 Texas decided to undergo, that is, to seek
18 preclearance through the courts rather than
19 from the Department of Justice, right?
20     A.   That's correct.
21     Q.   Same thing, is there something in
22 your mind inappropriate about Chairman Smith

215

1  having explained the process -- actually,
2  having explained what Chief Justice Phillips
3  explained to him in the process?
4      A.   No.  I mean, not necessarily.
5      Q.   Similarly, Paragraph 189,
6  Congressman Marchant wanted to represent his
7  granddaughters' school, which is actually --
8  which then, I think, was on the wrong side of
9  the street from Congressman Sessions' district.
10         Was there any problem with
11 Congressman Marchant wanting to represent his
12 granddaughters?
13     A.   No.
14         What do you mean by "problem"?  You
15 mean, is it unethical for him to make that
16 request?
17     Q.   Yes.
18     A.   No.
19     Q.   Okay.  It's kind of sweet, isn't it?
20     A.   No comment.
21     Q.   This next e-mail is from someone
22 named Dub Maines, and you identify Dub Maines

216

1  as deputy district director to Congressman Joe
2  Barton, a Republican from Texas, right?
3      A.   Actually, this is an e-mail from Dub
4  Maines, which was passed on from Corbin Casteel
5  to Interiano.
6      Q.   Okay.  And who's Corbin Casteel?
7      A.   I understand that Corbin Casteel who
8  works Red Rocks Strategies is a Republican
9  affiliated political -- that's a politically --
10 a Republican-affiliated politically advisor's
11 group.
12     Q.   Is he a map drawer?
13     A.   I do not know.
14     Q.   Okay.  He's got sort of a -- what
15 amounts to a Dub Maines parade of terribles
16 here, doesn't he?  "If a map is not
17 precleared," he writes, at the beginning of
18 Page 65, "then it is as if nothing had ever
19 been drawn.  The courts will draw the map
20 Denova," D-E-N-O-V-A.
21     A.   I think it should be novo, but
22 that's all right.  Go ahead.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

217

1    Q.   "As they did in 2001. Doggett,"
2  D-O-G-G-E-T-T, "will be reelected. Canseco
3  will not be.  Farentholt will not be.  They
4  will likely split the baby on the four new
5  seats.  The Ds pick up a net of four seats.
6  The Rs pick up a net of zero seats."
7         Is --
8         MR. MELLETT:  Just to represent,
9  this is a paraphrase of the e-mail.
10        MR. COHEN:  I don't think so.
11        MR. MELLETT:  Oh, okay.  I got you.
12 I see where.
13        THE WITNESS:  She's reading it.
14        MR. COHEN:  I can't make this stuff
15 up.
16        BY MR. COHEN:
17    Q.   Mr. Maines is describing, again, a
18 parade of terribles from the perspective of
19 the -- of either -- from at least from his own
20 perspective, but sort of a worse-case scenario
21 for Republicans in redistricting, isn't he?
22        MR. MELLETT:  Objection.

218

1  Speculation.
2         THE WITNESS:  He's describing his
3  opinion of what he thinks will happen if it's
4  not precleared.
5         BY MR. COHEN:
6     Q.   Is there anything wrong with his
7  expressing his opinion, in your mind?
8     A.   No.
9     Q.   Now, is there anything wrong,
10 likewise, with the messages from an individual,
11 whose name we don't know, to and from
12 Congressman Sessions saying, please call
13 Congressman Barton and tell Mr. Maines that --
14 this I am paraphrasing -- stop making such
15 calls or stop sending such e-mails?
16        Is there anything wrong with
17 Congress -- with whomever sent these messages
18 to say maybe Dub is not speaking correctly or
19 at all?
20    A.   Or that he's not speaking wisely.
21    Q.   Wisely?
22    A.   No.  I mean, there's nothing

219

1  wrong -- there's nothing unethical about that.
2     Q.   And do we know who Dale is?  There's
3  D-A-L-E.
4     A.   I have tried to find out who Dale is
5  and I'm not sure which -- what Dale that is.
6     Q.   Okay.  Is it possible that Dale is
7  the one who Dub is essentially quoting?  That
8  Dub got his information from Dale?
9         MR. MELLETT:  Objection.
10 Speculation.
11        THE WITNESS:  As I say, I just don't
12 know.
13        BY MR. COHEN:
14    Q.   Okay.  Paragraph 194, you say:  "The
15 racial and ethnic nature of the districts" -- I
16 guess we're talking about minority districts --
17 "cannot be separated from the partisan nature.
18 But minority districts are in a class by
19 themselves as disproportionate targets because
20 of their reliability for democratic candidates
21 of choice."
22        This, I guess, refers to what we

220

1  said Mr. Opiela realized as early as Christmas
2  Eve, that less minority districts, the greater
3  Republican opportunity.  Is it sort of a zero
4  sum game; is that right?
5     A.   I can't answer any question that has
6  the word "opportunities" in it.  You want to
7  rephrase it without the word "opportunities"?
8     Q.   Sure.
9         Minorities are in a district --
10 minority districts are in a class by
11 themselves, you say, because of their
12 reliability for Democratic candidates of
13 choice.  And with that, what you are saying, if
14 I understand it, sir, is that there is a clear
15 relationship between minority districts and
16 Democratic candidates likely to be elected?
17    A.   Likely to be elected especially in
18 bad years.
19    Q.   Especially in bad years.
20        Okay.  And it's your understanding
21 that the state legislature was aware of this
22 relationship?



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

221

1   A.   Yes.
2   Q.   Okay.  Because, as you say in the
3  next sentence, these are plain common sense
4  political facts, right?
5   A.   Yes.
6   Q.   So we don't need an expert to opine
7  on whether the legislature actually knew of
8  this relationship.  This is pretty plain common
9  sense stuff, correct?
10   A.   Yes.
11   Q.   Okay.  Now, Paragraph 195, you say:
12  "Only racial information is available at the
13  block level to make the splits and the racial
14  nature of these actions is statistically
15  convincing."
16         Once more, you are saying racial as
17  opposed to citizenship or political, right?
18   A.   Yes, that's correct, because a
19  citizenship is not available in RedAppl as you
20  draw --
21   Q.   Right.
22   A.   -- and the political information

222

1  would be unreliable.  It would be an
2  indication, but it would not be a reliable
3  indication.  It would be less -- let me
4  rephrase that.
5         It would be less reliable than if
6  you moved whole precincts.
7   Q.   Oh, okay.  And the problem is that
8  sort of in for a penny in for a pound with
9  respect to precinct.  A precinct is either
10  shaded one color or another; is that right?
11   A.   That's correct.
12   Q.   Okay.  But if you had knowledge of
13  the blocks as a drawer, you would bring that --
14  you could use that information as you do --
15  there's nothing that precludes your using your
16  personal knowledge of the district, including
17  at the block level, from influencing your
18  ability to make --
19   A.   Hypothetically, one could that if
20  one had that kind of knowledge.  That's harder
21  than it sounds, given the way GIS systems
22  appear.  You look at the shape of a district

223

1  and you try to figure out which block is that.
2  How is that done?
3   Q.   Sure.
4   A.   And is that where my Aunt Matilda
5  lives?  I mean, it's -- that's harder than you
6  make it sound.  Hypothetically could one do it?
7  Hypothetically, one could do it.
8   Q.   Now, while you're doing it with a
9  realtime system like RedAppl, though, any
10  necessary counter billing changes would be
11  made, that is to say, if you take in a block,
12  and therefore take on additional population,
13  that's done realtime so that you don't have to
14  do the math?
15   A.   That's right.  You don't have to do
16  the math.  The pop changes as you go.
17         MR. COHEN:  Let's take a break.
18         (A short recess was taken.)
19         BY MR. COHEN:
20   Q.   We're back on the record and I would
21  like to ask you to turn to -- back to Table 19.
22  I'm sorry, sir.  I have the wrong table.  There

224

1  may be two Table 19s.  Is that what's going on?
2  There sure are.
3   A.   There are two Table 19s.
4         MR. MATTAX:  How confusing.
5         THE WITNESS:  Sorry about that.
6         BY MR. COHEN:
7   Q.   That's okay.
8         I'm talking about the Table 19
9  attached to Paragraph 161.
10   A.   The first Table 19?
11   Q.   Okay.  In it you indicate, as we
12  said, before that MALC C163 has 12 Hispanic
13  districts, C166 has ten and then that there are
14  three Black districts in each.  I would ask
15  that for the record you identify what those 12
16  and ten districts are, and if it helps,
17  paragraph -- I'm sorry -- Table 18 is at
18  Paragraph 154 on Page 52.
19   A.   Oh, well, as you can see from Table
20  18, I think there's only one Table 18, the
21  minority districts in both 163 and 166 are
22  listed and I not only list the demographics



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

225
1   Anglo VAP, Black VAP, Hispanic VAP, percent
2   SSVR, but also the exo score, the exogenous
3   score when I look at recompiled election data.
4       Q.   Sure.
5       A.   Okay.  And, as you can see, this is
6   in 2010.  Now, 2010 is a bad year.  And so --
7       Q.   Bad year for Republicans?  I'm
8   sorry.  For Democrats?
9       A.   Bad year for Democrats.  Bad year
10  for minority voters.  Okay?
11       And, as you can see, there's 23 is
12  pretty low in 2010, a bad year.  33 is so so in
13  a bad year.  It's nearly 50/50.  That's pretty
14  good, actually.  36 looks really low because
15  it's 18.  Then going to plans 166, 23 is pretty
16  low at about 21, and again 33 at 18.  But I
17  have flagged all of those because they -- all
18  of those were 100 percent in 2008.
19       Q.   Got you?
20       A.   So all of these listed -- and so it
21  turns out -- thank you for reminding me -- I
22  did do a performance score for 166 and 163.  I

226
1   misspoke when we talked earlier.
2       Q.   Understood.
3       A.   And all of these performed.
4       Q.   Okay.  So we're clear, the 15
5   districts from 163 and the 13 districts from
6   166 are the districts that are right in front
7   of us here, right?
8       A.   That's correct.
9       Q.   Okay.  Could you just -- well, this
10  will be easier.  Just identify the three Black
11  districts.
12       A.   Sure.  9, 18 and 30.
13       Q.   That's true in both districts?
14       A.   That's 163.  9, 18, 30, that's
15  correct.
16       Q.   Okay.  So, for example, District
17  34 -- well, we've talked about District 34.
18  That's sort of like the new 34?
19       MR. MATTAX:  This is a different
20  district.
21       MR. COHEN:  Oh, I'm sorry.  Of
22  course, that's right.

227
1       BY MR. COHEN:
2       Q.   Plan C163 it is 42 percent Anglo
3   voting age population, 11 percent Black voting
4   age population, and 25 percent SSVR?
5       A.   Uh-huh.
6       Q.   Correct?
7       A.   Uh-huh.
8       Q.   Is this a Black district?  I'm
9   sorry.  You said this was a Hispanic district?
10       A.   This is a Hispanic district.
11       Q.   Okay.  And with 25 percent SSVR able
12  to perform a hundred percent?
13       A.   In the general elections, yeah.
14       Q.   Okay.  Is this a multi-racial
15  district?  I think we used that term before.
16       A.   Remember, the only real indication
17  of whether it's a Hispanic district or a Black
18  district is election results, endogenous
19  election results.  Trying to determine which it
20  is when it's just a proposed district, before
21  it's been used is very difficult.  I would say
22  it is probably -- and we're dealing with 34 --

228
1   probably a Hispanic district, but that's only a
2   probable.  I can't go any further than that.
3       If you're looking at District 15,
4   for example, in 163, I think you will agree no
5   question.  Spanish -- Hispanic district.
6       Q.   It's got an absolute -- it's got
7   almost a super majority SSVR?
8       A.   Yeah.  No question.
9       Q.   Okay.
10       A.   And for the three Black districts
11  given, as we've discussed before, the greater
12  turnout of Blacks, those are going to be Black
13  districts.  These others could be multi-racial.
14  Lots of things could happen.  But it's clear
15  from the performance that minority voters would
16  have a -- would have the ability to elect
17  candidates of their choice in all of these
18  districts.
19       Q.   Getting back to the -- we'll call it
20  the XO score for District 33, you mentioned
21  it's 46 for 2010, which is a pretty good score
22  in an off -- in a bad year for Democratic,



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

229

1  right?
2      A.   It is, yes.
3      Q.   Okay.  Is that a performing score?
4      A.   Is that a what kind of score?
5      Q.   Is that a performing score?
6           Well, I guess we don't know because
7  we don't know if the next number is 50 or 48.
8  Part of it depends on how many elections went
9  into it?
10     A.   Right, that's correct.
11     Q.   So it's probably just one under 50
12  percent?
13     A.   Oh, that's absolutely true, because
14  there weren't enough in any of these that it
15  would make more than four.  I mean, there
16  weren't 25 to look at in any of these.
17     Q.   Understood.
18     A.   So it would be one under.
19     Q.   Okay.  So if it's one under half,
20  would we say that was performing or not
21  performing?
22     A.   I wouldn't make that judgment on the

230

1  basis of one election.  I would look at at
2  least two.  That's why I did '08 and '10
3  because you've got a really good Democratic
4  year and good Republican year.  When you put
5  those two together, you get a good notion of
6  whether these are districts which will provide
7  an ability to elect.
8      Q.   Now, if I averaged the two --
9      A.   No, I wouldn't average the two.  I
10  would look to see what they can do in good
11  years and what they can do in bad years and if
12  they're able to -- if they get wiped out, if
13  they just get wiped out in a bad year --
14     Q.   Like 100 to 38?
15     A.   And they do only so so in a good
16  year, I would say -- I'm probably not willing
17  to say that's a minority district.  I mean,
18  it's a matter of judgment.  And you have to
19  also look at the -- at these VAP figures, and
20  you make the best judgment you can make.
21     Q.   Okay.  Let's look at Table 16, which
22  I have on Page 50.

231

1           Now, you identify here something we
2  talked about earlier which is the Hispanic
3  population inside Dallas County and that was
4  sort of -- I guess that was moved.  In order to
5  create these new districts, these were moved
6  from other counties inside Dallas County.
7           Did I say that right?  Or into
8  districts that are inside Dallas County?
9      A.   No.  That's not the way I would say
10  it, but I don't think it's important.
11     Q.   Why don't you just go ahead and
12  restate what it is.
13     A.   These are districts which are Anglo
14  districts which are partly in Dallas County and
15  partly in surrounding counties; Kaufman, Ellis,
16  and so forth.
17     Q.   Well, we talked about swooping?
18     A.   Swooping, yes.  Swoops on down in
19  and grabs some Hispanic population.  Cracks
20  that Hispanic population.
21     Q.   Okay.  Do you know the VAP of the
22  Hispanic population that you identified in

232

1  these categories?
2      A.   No.  If I knew that I would have
3  presented that rather than the pop.  The reason
4  is that when you look at the county by county
5  analysis of these Congressional districts, it
6  shows the VAP in the district, but for the VAP
7  in each county in the district it only shows
8  the pop.
9      Q.   Okay.  Do you know anything about
10  the demographics of the Hispanic population in
11  Dallas County?
12     A.   I know that in the past they've had
13  a lower socioeconomic status and a lower
14  citizen rate than, say, the Hispanics in
15  Harris.
16     Q.   Okay.  Go to Paragraph 183.  This, I
17  think, sort of ties into something we just
18  talked about.  "The process," the process of
19  dealing with Congressman Smith, et cetera, "was
20  not open to minority representatives and it
21  disproportionately affected them as it
22  restricted representation of their explosive



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

233

1  population growth and resulted this a loss of
2  relative representation."
3       The next to the last sentence of
4  Paragraph 183. Now, the explosive population
5  growth to which you refer is the large number
6  of Hispanics by which the Texas population
7  increased from 2000 to 2010 census, right?
8       A.  That's correct.
9       Q.  Okay. Similar question, do you know
10 the citizen versus non-citizen breakdown for
11 that large explosive -- for what you refer to
12 as explosive population growth?
13      A.  I have seen the figures. I don't
14 have them off the top of my head.
15      Q.  Okay. But, similarly, a notion of
16 how much of that growth is voting age
17 population versus how much --
18      A.  I have also seen those figures, but
19 I don't have them off the top of my head.
20 Those are all census figures readily available.
21      Q.  Okay. Again, I wanted to finish the
22 question, but I think you finished it just

234

1  fine.
2       A.  I'm sorry. I beg your pardon.
3       Q.  Did you do any analysis -- well,
4  tell me what analysis you did of whether the
5  new Texas, the explosive population growth,
6  Hispanic population growth is sufficiently
7  compact that districts were required to be
8  drawn?
9       A.  In both Harris and Dallas there is
10 enough -- there's more than enough Hispanic
11 population to make a Congressional district
12 solely within Dallas County.
13      Q.  Okay.
14      A.  Now, I don't have the citizen VAP
15 numbers for just Dallas County from those other
16 districts, but there are more than enough
17 population to indicate that there would be more
18 than enough citizen VAP to do that. Or at
19 worst, a multi-racial district.
20      Q.  Okay. And that would be a district
21 made up of African-Americans and Hispanics in
22 Dallas County?

235

1       A.  That's correct.
2       In other words, having two
3  Congressional districts totally within Dallas,
4  instead of having one Black district and then
5  several White districts that swoop in.
6       Q.  Got you.
7       District 35 is not -- let's see.
8       District 35, is that a protected
9  district?
10      MR. MELLETT: This is in the
11 proposed plan?
12      BY MR. COHEN:
13      Q.  In the proposed plan.
14      Is that a minority district in the
15 proposed plan?
16      A.  Yeah, I believe it is. Two of the
17 new ones, that is, with a number higher than 32
18 are. Isn't that one of them?
19      Q.  I think so.
20      What about district --
21      A.  It's 34 and 35, are the two.
22      Q.  What about proposed District 20? In

236

1  the new plan is that a minority district?
2       A.  Have you got the table where it
3  shows the stats on that?
4       MR. MATTAX: 47, is that it?
5       MR. COHEN: Yeah. There's one in my
6  Table 14, Page 47. I think that's one of them.
7       THE WITNESS: Table on 47 shows how
8  the things are distributed. 23 and 27 are
9  distributed.
10      BY MR. COHEN:
11      Q.  We had two Table 18s and -- but that
12 was --
13      MR. MELLETT: I believe that was the
14 MALC plan.
15      MR. COHEN: Yeah. I just want to
16 make sure we're talking about the right
17 district.
18      BY MR. COHEN:
19      Q.  So does Table 20 retrogress -- I
20 mean, Table 20, a minority district -- is
21 District 20 a minority district in the new
22 plan?



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

237

1    A.  I'm still looking for which of my
2  tables, if any, has the statistics for the
3  proposed plan.
4       Okay.  Here they are for proposed
5  plan --
6    Q.  And where are you, sir?
7    A.  I'm on Page 59, Table 22.
8    Q.  Okay.  So Table 20 is -- I mean --
9  sorry.
10       District 20 in the proposed plan is,
11  in fact --
12    A.  57 percent SSVR.  That's a Hispanic
13  district.
14    Q.  Okay.  Let's turn back to Page 64.
15  We're back to what Dub Maines was writing.  Bud
16  wrote:  "The committee passed map badly
17  retrogresses CD20 without creating a new VRA
18  district.  CD35 is in no way a VRA district."
19       By the way, we see greater than
20  signs.  Those typically just show up when an
21  e-mail is being reprinted.  We don't think that
22  was in the original, do we, at least we don't

238

1  believe it was?
2    A.  There was lots of garbage in these
3  e-mails.  That's not a problem.
4    Q.  Well, except in this instance, the
5  garbage seems to be sort of what Dub Maines
6  said, isn't it?  Because he said that the map
7  badly retrogresses CD20 and that CD35 is in no
8  way a VRA district.  That's changed -- at least
9  either he's wrong or something has changed
10  since he has written that, right?
11       MR. MELLETT:  Counsel, I guess
12  objection as to mischaracterization.  I mean,
13  you're -- you were talking about you had him
14  identify C185.  This talks about the committee
15  plan, not the C185, which you had just had him
16  identify.
17       MR. COHEN:  Okay.
18       BY MR. COHEN:
19    Q.  Well -- and my question is:  In the
20  final plan, there is no retrogression for CD20,
21  is there?
22    A.  Well, you just said there's not.

239

1  CD20 is still a minority district, according to
2  your table.
3    Q.  And more than that, CD35 is, in
4  fact, a VRA district, correct?
5    A.  Not commenting one way or the other
6  on whether Mr. Maines was right or wrong, the
7  statements you made about 20 and 35 are
8  correct.  They're both minority districts.
9    Q.  Okay.  Am I correct that the data
10  you have in front of you at Table 22 doesn't
11  tell you one way or the other whether the
12  committee map, committee-passed map was
13  correctly or incorrectly described by Mr.
14  Maines?
15       MR. MELLETT:  That's C125?
16       MR. COHEN:  I think so, yeah.
17       THE WITNESS:  I can only analyze the
18  plan as I have.  Maines, assuming he's looking
19  at the same plan, doesn't agree with me.  It
20  doesn't mean he's wrong.  It just means he
21  doesn't agree with me.
22       BY MR. COHEN:

240

1    Q.  It could mean he's wrong, though,
2  right?
3    A.  It could mean he's wrong.  It could
4  mean he's right.
5    Q.  Okay.  Where did you get these
6  e-mails?
7    A.  Where did I what?
8    Q.  Where did you get these e-mails?
9    A.  I got them from the Department of
10  Justice.  They asked for them as part of
11  discovery.
12    Q.  Do you know that authoritatively?
13    A.  That's the way they get everything.
14    Q.  Okay.  I mean, that's your
15  assumption?
16    A.  I mean, they may have just requested
17  it rather -- informally, rather than formally.
18  That, I couldn't tell you.
19    Q.  Okay.  So you don't know where they
20  got them from?
21    A.  No.
22    Q.  Okay.  That's fine.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

241

1   A.   They got them from you, but how they
2   got them, I don't know.
3        MR. COHEN:  I thank you for your
4   time Dr. Arrington, I know you've come a long
5   way for this deposition.  And I have no further
6   questions.  I pass the way.
7        EXAMINATION BY COUNSEL FOR DEFENDANT
8        BY MR. MELLETT:
9   Q.   Okay.  I do have two questions.
10       One, let me follow-up on -- and this
11  has to do, again, with what we were just
12  talking about with Dub Maines.  Can I refer you
13  back to Table 22?
14  A.   That's page what?
15  Q.   59.
16  A.   Okay.
17  Q.   Now, if you look under the
18  Solomons-Seliger plan, C125 on District Number
19  20, do you see where that is?
20  A.   Uh-huh.
21  Q.   And the statistics that are there,
22  in order to determine whether or not this

242

1   district was an ability to elect district, what
2   would you need to do?
3   A.   I would need to at least add to this
4   data the exogenous election results to see if
5   it would perform.
6   Q.   So as we look at this chart you
7   could not tell me right now whether or not
8   District 20 would provide an ability elect or
9   would not?
10  A.   I would not be comfortable with
11  making that decision without also looking at
12  actual election results.
13  Q.   Okay.  Second question, and this has
14  to do with socioeconomic data.  Did you look at
15  any socioeconomic data in looking at the
16  Congressional plan?
17  A.   No.
18  Q.   Did you look at -- you're aware of
19  the American Community Survey, right?
20  A.   I am.
21  Q.   Okay.  And are you aware that the
22  American Community Survey provides

243

1   socioeconomic data?
2   A.   I am aware of that.
3   Q.   Okay.  Did you look at any of the
4   socioeconomic data from the American Community
5   Survey in making any assessment regarding the
6   Congressional fund?
7   A.   I did not.
8   Q.   Okay.  Likewise, there has been a
9   discussion about socioeconomic data in the
10  Section 2 case, Perez versus Perry.  Did you
11  review any of that information regarding
12  socioeconomic data?
13  A.   I did.
14  Q.   Okay.  And what did you review?
15  A.   That Hispanics and Blacks have lower
16  socioeconomic status than Anglos.
17  Q.   And in general for Texas?
18  A.   In general protected?
19  Q.   I was going to say is this in
20  general for Texas where -- what's the geography
21  for --
22  A.   Oh, throughout the state.

244

1   Everywhere.
2   Q.   Okay.  Did you also look at any of
3   the information in the Section 2 case regarding
4   historical discrimination?
5   A.   I did with regard to what happened
6   in each of the previous redistricting cycles.
7   But only that.
8   Q.   And so as far as this report, you
9   didn't make any assessment regarding
10  socioeconomic data or its relation to
11  historical discrimination for the report you
12  did here?
13  A.   I did not.
14       MR. MELLETT:  Thank you.  No further
15  questions.
16  FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
17       BY MR. COHEN:
18  Q.   So I'm clear, and you have looked at
19  the reports from the Section 2 case?
20  A.   I did.
21  Q.   Okay.  But you don't -- do you have
22  an opinion for the -- as an expert on -- you



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                                        October 25, 2011

245

1  don't have -- clearly, you said you don't have
2  an opinion as an expert on the history of
3  discrimination in Texas and whatever lingering
4  effects those may have had, correct, on
5  contemporary society, right?
6      A.   I have -- not as part of my study.
7  As a political scientist, I have read about the
8  history of discrimination throughout the south,
9  including in Texas.
10     Q.   Sure.
11     A.   And so I am aware of that.
12     Q.   But you don't express an opinion
13 with a certitude that you're willing to state
14 under oath the specific effects that the
15 history of discrimination in Texas --
16     A.   It's not what I was asked to look
17 at.
18     Q.   Sure.
19          And, similarly, you looked at the
20 socioeconomic reports of other experts in the
21 Section 2 case?
22     A.   That's correct.

246

1      Q.   But you don't -- you disclaim for
2  purposes of this declaration and this
3  deposition the -- either the expertise or the
4  purpose of stating an opinion as to the
5  lingering effects of whatever socioeconomic
6  condition Blacks and Hispanics find themselves
7  in Texas.  Is that a correct statement?
8          MR. MELLETT:  Objection to the
9  characterization of disclaim expertise.  I
10 think his previous statement spoke for itself.
11         BY MR. COHEN:
12     Q.   I think that was with respect to
13 history.  We're talking about socioeconomic.
14     A.   Yes.  But the lower socioeconomic
15 status of Hispanics and Blacks is known to be a
16 barrier to their participation.  That's the
17 most well-established fact in social science.
18 And so I know that as a background, just as I
19 know as a background that Texas had de jure
20 segregation.  Just as I know as a background
21 that Democrats used to totally control the
22 redistricting process.  There are lots of

247

1  general principles I need.  I didn't need the
2  socioeconomic status in order to arrive at the
3  conclusions I had arrived at in this report.
4      Q.   And, as we sit here today, you don't
5  claim any ability to quantify the bearing that
6  de jure discrimination may have had or the
7  White Man's Primary in Texas or any of the
8  other past instances of discrimination?  As an
9  expert, you're aware of them because they're
10 part of the political history of the south and
11 the state of Texas, but nothing you stated
12 today or in your declaration purports to
13 quantify the effect of those past historical
14 instances on the data that you discussed for
15 the past six hours; is that right?
16     A.   When I say, "quantify," that's
17 slightly different from having an effect.
18 Okay?  I mean, it's clearly those things have
19 an effect to depress turnout and political
20 participation.
21     Q.   Right.
22     A.   Again, that's the most

248

1  well-established principle of social science.
2  Beyond that, quantifying and saying how much
3  does it, I cannot do that.
4      Q.   Okay.  And is that --
5      A.   I have not attempted to do that.
6      Q.   Sure.
7          Is that equally true for the
8  socioeconomic data?
9      A.   Yeah.  Exactly.
10         MR. COHEN:  Then I've got no further
11 questions.
12         Thank you, Dr. Arrington.
13         (Whereupon, the proceeding was
14 concluded at 3:27 p.m.)
15
16
17
18
19
20
21
22



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Theodore S. Arrington, Ph.D.                    October 25, 2011

249

1  DEPOSITION ERRATA SHEET
2  Our Assignment No. 284394
3  Case Caption:  State of Texas
4  vs. United States
5
6      DECLARATION UNDER PENALTY OF PERJURY
7  I declare under penalty of perjury that I have
8  read the entire transcript of my Deposition
9  taken in the captioned matter or the same has
10  been read to me, and the same is true and
11  accurate, save and except for changes and/or
12  corrections, if any, as indicated by me on the
13  DEPOSITION ERRATA SHEET hereof, with the
14  understanding that I offer these changes as if
15  still under oath.
16
17  Signed on the_____day of _____,
18  20__.
19  _____
20   Theodore S. Arrington, Ph.D.
21
22

251

1  DEPOSITION ERRATA SHEET
2  Page No._____ Line No._____ Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____ Line No._____ Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____ Line No._____ Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____ Line No._____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____ Line No._____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____ Line No._____ Change to:_____
18  _____
19  Reason for change:_____
20
21  SIGNATURE:_____DATE_____
22   Theodore S. Arrington, Ph.D.

250

1      DEPOSITION ERRATA SHEET
2  Page No._____ Line No._____ Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____ Line No._____ Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____ Line No._____ Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____ Line No._____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____ Line No._____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____ Line No._____ Change to:_____
18  _____
19  Reason for change:_____
20
21  SIGNATURE_____DATE:_____
22   Theodore S. Arrington, Ph.D.

252

1      CERTIFICATE OF NOTARY PUBLIC
2   I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18  _____
19    Notary Public in and for
20    the District of Columbia
21
22  My Commission expires:  May 31, 2015



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com