IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-CV-01303 |
| | ) | (RMC-TBG-BAH) |
| UNITED STATES OF AMERICA, | ) | [Three-Judge Panel] |
| and ERIC H. HOLDER, JR. in his | ) | |
| official capacity as Attorney General | ) | |
| of the United States, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| WENDY DAVIS, *et al.,* | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**PLAINTIFF STATE OF TEXAS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT**

**Deposition of Lisa Handley**

Exhibit 15

# In The Matter Of:

*State of Texas v.*
*United States of America, et al.*

---

*Lisa Handley, Ph.D.*
*October 24, 2011*

---

*Feder Reporting Company*
*810 Capitol Square Place, SW*
*Washington, D.C. 20024*
*(202)863-0000*
*feder@federreporting.com*

Original File Handley-10-24-11z.txt
**Min-U-Script® with Word Index**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2
   STATE OF TEXAS                 :
 3          Plaintiff            :
                                 :
 4    vs.                        :
                                 :
 5  UNITED STATES OF AMERICA:
    and ERIC H. HOLDER, JR.,:
 6  in his official capacity:
    as Attorney General of  :
 7  the United States        :
              Defendants     :
 8                               :
    WENDY DAVIS, et al.        :
 9      Defendant-Intervenors :
                                 :
10  MEXICAN AMERICAN     : Civil Action No.
    LEGISLATIVE CAUCUS   : 1:11-EV-1303
11    Defendant-Intervenor : (RMC-TBG-BAH)
                        : Three-Judge Court
12  GREG GONZALES, et al.  :
       Defendant-Intervenors :
13                               :
    TEXAS LEGISLATIVE       :
14  BLACK CAUCUS            :
       Defendant-Intervenor :
15                               :
    TEXAS LATINO            :
16  REDISTRICTING TASK FORCE:
       Defendant-Intervenor :
17                               :
    TEXAS STATE CONFERENCE  :
18  of NAACP BRANCHES, et al:
       Defendant-Intervenors :
19
                     Washington, D.C.
20                   October 24, 2011
21  Deposition of:
22          LISA HANDLEY, Ph.D.,
```

Page 2

```
 1  called for oral examination by counsel for
 2  Plaintiff, at the offices of the U.S.
 3  Department of Justice, Civil Rights Division,
 4  1800 G Street, N.W., 7th Floor, Washington,
 5  D.C., beginning at 12:05 p.m., before Zev V.
 6  Feder, CSR, a Notary Public in and for the
 7  District of Columbia, when were present on
 8  behalf of the respective parties:
 9
10  On Behalf of the Plaintiff:
11  BY:  DAVID C. MATTAX, ESQ.
     BY:  BRUCE D. COHEN, ESQ., ESQ.
12       Office of the Attorney General of Texas
         209 West 14th Street, 8th Floor
13       Austin, Texas 78701
         (512) 463-0879
14
     On Behalf of the Defendants:
15
     BY:  TIM MELLETT, ESQ.
16       U.S. Department of Justice
         Civil Rights Division
17       Room 7254-NWB
         950 Pennsylvania Avenue, N.W.
18       Washington, D.C.  20530
         (202) 307-6262
19
20
21
22
```

Page 3

```
 1  On behalf of Defendant-Intervenor Texas Latino
    Redistricting Task Force:
 2
 3    BY: NINA PERALES, ESQ. (Via Telephone)
    Mexican American Legal Defense &
 4  Educational Fund
    110 Broadway, Suite 300
 5  San Antonio, Texas 78205
    (210) 224-5476
 6
 7    + + +
 8      C O N T E N T S
 9    WITNESS: LISA HANDLEY, Ph.D.
10    EXAMINATION BY:  PAGE
11  MR. MATTAX              6
12  MR. COHEN              190
13  MR. MELLETT             -
14    EXHIBITS
15  DEPOSITION NO.    MARKED FOR IDENTIFICATION
16  1.  "United States' Identification of
      Elections Considered"           73
17
18  2.  "A Section 5 Voting Rights Analysis of
      the Proposed Texas State House Plan"    75
19
20  3.  "A Section 5 Voting Rights Analysis of
      the Proposed Texas Congressional Plan"   75
21
22
```

Page 4

```
 1
 2      EXHIBITS (Continued)
 3  DEPOSITION NO.     MARKED FOR IDENTIFICATION
 4    4.  "District Election Analysis,
      Congressional Districts - PlanC100, 2010
    General Election                        103
 5
 6    5.  "A Voting Rights Analysis of the Proposed
      Alaska State Legislative Plans:  Measuring the
 7      Degree of Racial Bloc Voting and Determining
      the Effectiveness of Proposed Minority
 8  Districts"                             142
 9    6.  "District Election Analysis, House
      Districts - PlanH100, 2010 General
10  Election"                              176
11    7.  "Population and Voter Data with Voter
      Registration Comparison, House Districts -
12  PlanH100"                              187
13
14
15
16
17
18
19
20
21
22
```

Page 5

1
2    P R O C E E D I N G S
3  Whereupon,
4    LISA HANDLEY, Ph.D.
5  was called for examination by counsel and,
6  having been duly sworn by the Notary, was
7  examined and testified as follows:
8    **MR. MATTAX:** Since we have someone
9  on the phone, let's state our appearances for
10  the record.
11    My name is David Mattax.  I am
12  with the Attorney General's Office.  I am here
13  for the State of Texas.
14    **MR. COHEN:** I am Bruce Cohen with
15  the Attorney General's Office, too.
16    **MR. MELLETT:** I am Tim Mellett and
17  I am with the United States.
18    **MS. PERALES:** Nina Perales for the
19  Latino Task Force, Defendant-Intervenor.
20    Good morning, Dr. Handley.
21    **THE WITNESS:** Good morning.
22    **MR. MATTAX:** Is there anyone else

Page 6

1  on the telephone?  (Pause.)
2    Thank you.
3  EXAMINATION BY COUNSEL FOR PLAINTIFF
4    **BY MR. MATTAX:**
5  Q.  Would you please state your name?
6  **A.  Lisa Handley.**
7  Q.  Would you briefly describe what
8   your occupation is?
9  **A.  I am a director of a company and I**
10   **specialize in consulting, mostly for the U.N.**
11   **these days.**
12  Q.  And in your capacity as a
13   consultant for the U.N., what does that
14   entail?
15  **A.  I do post-conflict elections, help**
16   **set up elections in places like Afghanistan.**
17    **MR. COHEN:** Let's take one second.
18    (Discussion off the record.)
19    **BY MR. MATTAX:**
20  Q.  In addition to post-conflict
21   elections consulting, have you done any
22   consulting with respect to redistricting in

Page 7

1  the United States?
2  **A.  Yes, a considerable amount.**
3  Q.  And this election cycle, have you
4   done any consulting?
5  **A.  I have.**
6  Q.  For which?  Please describe what
7   that is.
8  **A.  I am working for the State of**
9   **Alaska, which is a Section 5 state, and they**
10   **have asked me to come in and ensure that the**
11   **plan that they drew would meet Section 5**
12   **standards.**
13    **I am working with Miami-Dade**
14   **County, which is not a Section 5 jurisdiction**
15   **but it is, of course, a Section 2**
16   **jurisdiction.**
17    **I am working with the State of**
18   **Massachusetts.**
19    **I have done some work in Colorado.**
20    **That's all I can remember, at the**
21   **moment, anyway.**
22  Q.  We should also add the one that

Page 8

1   you are here to testify about today.
2  **A.  Yes.**
3  Q.  What is the one you are going to
4   testify about today?
5  **A.  The Justice Department has asked**
6   **me to look into the proposed plans, House and**
7   **Congress, for the State of Texas.**
8  Q.  Has the Department of Justice
9   asked you to look at the Senate plan for the
10   State of Texas?
11  **A.  No.**
12  Q.  Did you ask them why they didn't
13   ask?
14  **A.  No.**
15  Q.  Have you looked at the Senate
16   plan?
17  **A.  No.**
18  Q.  Did you file a report in this
19   case?
20  **A.  I filed two reports.  One for**
21   **Congress; one for the State House.**
22  Q.  Did you file a report in the State

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 9

1  of Alaska case?
2  A.  Yes.  It wasn't a case.
3  Q.  Can you explain what report you
4  filed in Alaska?
5  A.  The redistricting commission asked
6  me to look into voting patterns and I wrote a
7  report that discussed the voting patterns and
8  then, when they drew a plan, I also looked at
9  that plan and appended the report to discuss
10  the plan that they drafted and accepted.
11  Q.  And did that plan find
12  retrogression or not?
13  A.  It precleared the Justice
14  Department a week or two ago.
15  Q.  Did you file any type of report in
16  Miami-Dade County?
17  A.  No.  I take that back.  I did do a
18  five page report.  As to whether it went to
19  the Commissioner or not, I am not sure.
20  Q.  Since that is Section 2, that
21  would not have been sent to the Justice
22  Department for any reason, to your knowledge?

Page 10

1  A.  That's correct.
2  Q.  You said something for the State
3  of Massachusetts.  Was there a report there?
4  A.  No.
5  Q.  And what about Colorado?
6  A.  A brief report for the attorney.
7  I don't know if it went to the redistricting
8  commission or not.
9  Q.  So in the report you did for
10  Colorado with respect to the redistricting
11  commission, what were you looking at?
12  Section 2 or Section 5?
13  A.  Section 2.
14  Q.  And with respect to Section 2, did
15  you find they needed to draw any additional
16  districts in Colorado?
17  A.  I looked at one very specific
18  area, the San Luis Valley, where there was
19  already a district.  And I recommended that
20  they maintain that district.
21  Q.  And when you made determinations
22  with respect to whether a state retain a

Page 11

1  district, what are you looking for in trying
2  to make that determination?
3  A.  Whether the voting is polarized or
4  not and, if the district ceased to be there,
5  whether I thought that the minority-preferred
6  candidate would be elected.
7  Q.  In determining racial
8  polarization, what procedure do you use to
9  make that determination?
10  A.  I use three approaches.
11  Homogeneous precinct analysis, bivariate
12  ecological regression, and ecological
13  inference.
14  Q.  What do those three things
15  measure?
16  A.  They are estimates of the group's
17  voting patterns.
18  Q.  And so do you do that for each
19  different minority group, or for the majority
20  group, or for which groups do you do that?
21  A.  Well, it depends.  For example, in
22  Alaska, when we do it for the nonnative

Page 12

1  population and the native population, but you
2  would do each group individually.
3  Q.  And at what level do you need to
4  find voting patterns to establish that it is
5  racially polarized?  How do we know what is
6  racially polarized?
7  A.  If whites voting alone would have
8  elected different candidates than minorities
9  voting alone, voting would have been
10  polarized.
11  Q.  So if I understand that, if I have
12  a figure that says 51 percent of whites would
13  vote for candidate X and 51 percent of a
14  minority would vote for candidate Y, would
15  that constitute racial polarization?
16  A.  Yes.
17  Q.  Upon what do you reach that
18  conclusion?  Is that something you came up
19  with on your own?  Is that something based
20  upon other people's research?  Is that based
21  upon a court case?
22  A.  Thornburg v. Gingles.

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

---

Page 13

1  Q.   So we are clear on the record,
2  your interpretation of Thornburg v. Gingles,
3  is it a 51 percent of -- we are assuming the
4  white would be the majority in my example
5  here -- of the white majority votes for one
6  candidate, and 51 percent of a minority votes
7  for another candidate, that constitutes racial
8  polarization?
9  **A.   That is how you interpret the**
10 **separate electorates test, yes.  That is not**
11 **typically the case.  But under those**
12 **circumstances, yes.  Again, you very rarely,**
13 **if ever, find those circumstances.**
14 Q.   What sort of circumstances do you
15 normally find?
16 **A.   I should take that back.  For**
17 **example, in Alaska it may be the case that you**
18 **find a majority of whites voting one way and a**
19 **very large majority of whites voting for the**
20 **native-preferred candidate.  But that**
21 **certainly wasn't the case in the elections**
22 **that I looked at in Texas, for example.**

---

Page 15

1  **all three estimates showing that.  I am not**
2  **necessarily sure that, in an instance where it**
3  **is that close, all three estimates would**
4  **consistently show that.**
5  Q.   So when you say that you can't
6  make this determination based on a single
7  contest, how many contests do you generally
8  need?
9  **A.   If you are trying to determine if**
10 **voting is racially polarized or not, you would**
11 **look at as many endogenous contests as is**
12 **practicable, I suppose.**
13 Q.   Let's define for the record what
14 you mean by an endogenous contest.
15 **A.   The office at issue.**
16 Q.   And so taking a typical
17 Congressional race, and, again, in Texas there
18 may be variations depending on when maps were
19 drawn, but let's just take a typical ten year
20 period between one census and another,
21 theoretically you would have five elections
22 for Congress.  Would that be correct?

---

Page 14

1  Q.   I guess, so I can be clear on the
2  general propositions, before we get to the
3  specific -- if I get to Alaska -- I am not
4  going to get to Alaska since I didn't look at
5  Alaska -- but before you get to the specific
6  things in Texas, I am trying to get to the
7  understanding of how you determine racial
8  polarization.
9     Getting back to my hypothetical,
10 let's assume that there is a Congressional
11 district and you look at it and you see that
12 51 percent of one racial group votes for
13 candidate X and 49 percent votes for candidate
14 Y, and it flips, depending on if it is two
15 races in that district.  Let's say the whites
16 vote 51 for candidate X and let's say blacks
17 vote 51 percent for candidate Y.  Then that
18 would be a racially polarized district?
19 **A.   That particular contest would be**
20 **polarized.  You wouldn't make a decision on**
21 **the basis of a single contest.**
22 **Once again, you would have to have**

---

Page 16

1  **A.   Yes.**
2  Q.   And you look at those five races
3  and that would be your endogenous elections.
4  Is that right?
5  **A.   Yes.**
6  Q.   So if in those five elections
7  three of them went one way and two of them
8  went the other way, what would you conclude
9  from that?
10 **A.   That in a majority of cases the**
11 **contests were polarized.**
12 Q.   Are there other races you would be
13 looking at in that Congressional district?
14 Let me strike that and posit what else
15 happens.  We all know in a Congressional
16 district you will have lots of races.
17 Generally speaking, I am sure in some places
18 maybe it is not the case.  But in most places
19 a Congressional district will be made up of a
20 number of State House districts, for example.
21 Would it help the analysis to look
22 at what happened in State House races to

---

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 17

1 determine whether or not there is racially
2 polarized voting in that Congressional
3 district?
4 A.  Yes.  If you didn't have a
5 sufficient number of endogenous elections, you
6 would presumably go to exogenous elections.
7 Q.  So define for us what exogenous
8 means.
9 A.  Elections for offices not at
10 issue.  So, in your example, the State House
11 contests.
12 Q.  And what about looking at -- if a
13 district had a metropolitan area, for example,
14 of some size, would it be useful to look at
15 metropolitan elections for City Council, for
16 judges, things like that?
17 A.  If necessary, yes.
18 Q.  And, likewise, going at a broader
19 level, is it useful to look at statewide
20 offices and how the voters in a particular
21 district voted in a statewide office?
22 A.  Yes.

Page 18

1 Q.  Let's get back to the example that
2 we posited in the five endogenous elections in
3 a particular Congressional district and, in
4 our hypothesis, three voted for, one time, for
5 let's say the Democrat, for lack of a better
6 way to do this, and two for the Republican.
7 That's my hypothesis.  Are you with me so far?
8 A.  Yes.
9 Q.  What if I look at the statewide
10 races and found that the majority of them
11 voted Republican?  Would that change your
12 conclusion that, based on endogenous, that a
13 Democrat would win that district?  Strike
14 that.  That's not what you were talking about.
15     Would that change your conclusion
16 that was a racially polarized district?
17 A.  I am sorry.  The endogenous
18 elections we have three of the five being
19 polarized.
20 Q.  Correct.
21 A.  And then the statewide they are
22 polarized, as well?

Page 19

1 Q.  The other way.  They vote
2 differently.  So, for example, let's just say,
3 for example, let's start with there is a
4 minority candidate for the Congressional race.
5 And that minority candidate runs five times
6 and wins three times, and an Anglo candidate
7 wins twice.  Would you consider that racially
8 polarized?
9 A.  What we are doing in the racially
10 polarized, we are seeing how whites and
11 Hispanics vote.  So when you say that the
12 white wins twice, I am going to assume what
13 you mean is that the majority of whites voted
14 which way and the majority of Hispanics voted
15 which way.
16     MR. MELLETT: I will ask you not
17 to assume.  Anything there, he can clarify his
18 question, if he wants to know about voters or
19 if he wants to know about candidates.
20     BY MR. MATTAX:
21 Q.  I haven't gotten to that level of
22 detail right now.  I am looking at the

Page 20

1 overall, who one the race.
2     What I am trying to find out is,
3 what I am hypothesizing is this is what I
4 would consider to be a dichotomy, that in this
5 particular Congressional district we are
6 positing that three of the five times, let's
7 call it the Hispanic, the Hispanic won that
8 race, but in looking at the statewide
9 elections that the majority of the candidates
10 that won were Anglo.  Would that make a
11 difference in your analysis?
12 A.  I am sorry, that is somewhat
13 irrelevant to my analysis.  But you are not
14 telling me what some Hispanics are actually
15 voting.
16 Q.  Let's do it this way, then.  Let's
17 get back to my hypothetical of the 51 percent.
18 Again, this is trying to get an understanding
19 of how your analysis works.  Not trying to
20 apply it to real world situations right now.
21 Just so I can understand.
22     Let's say in our Congressional

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 21

1  district that we have five elections and three
2  of them go for the minority and two of them go
3  for the nonminority. And if you look at that,
4  you are seeing that the majority of the
5  Hispanics in that district voted for the
6  minority candidate three times out of five.
7  And then the other two times, what would be
8  the explanation, then? Would it be lack of
9  turnout? Or that they changed their mind as
10  to why, if you determine that was racially
11  polarized, that the Democrat didn't continue
12  to win? Excuse me, that the Hispanic didn't
13  continue to win.
14  **A.   You haven't filled in all the**
15  **pieces there yet.**
16  Q.   What pieces have I omitted?
17  **A.   What are the Hispanics doing in**
18  **the contests in which -- you didn't even tell**
19  **me how they voted. You simply said, okay, in**
20  **two instances the Anglo wins and in three**
21  **instances the Hispanic wins. Is that correct?**
22  Q.   Uh-huh.

Page 22

1  **A.   What I need to know is what**
2  **Hispanics and whites are doing in terms of**
3  **their voting behavior to make an assumption**
4  **about racially polarized voting.**
5  Q.   What if the Anglo voters in the
6  district are voting for Hispanic candidates at
7  more than 50 percent? Would that show racial
8  polarization?
9  **A.   It is not the race of the**
10  **candidate. It is whether the candidate is**
11  **preferred by Hispanic voters or not.**
12  Q.   So in determining whether
13  Hispanics prefer a candidate or not, then is
14  it the party or how do you determine that, if
15  it is not the race? How are we putting a
16  label on the Hispanic-preferred candidate of
17  choice? By party?
18  **A.   No, we look at how Hispanics**
19  **voted.**
20  Q.   So if Hispanics voted for a
21  Republican Hispanic, would that be the
22  candidate of choice?

Page 23

1  **A.   If the majority of Hispanics voted**
2  **for a Hispanic Republican, then the Hispanic**
3  **Republican would be the minority-preferred**
4  **candidate in that instance.**
5  Q.   And if the majority of Hispanics
6  voted for an Anglo in a particular district
7  would the Anglo be the candidate of choice?
8  **A.   Yes.**
9  Q.   In looking at endogenous elections
10  in our proposed sort of hypothetical district,
11  if both candidates were Anglo could there be a
12  minority candidate of choice?
13  **A.   Yes.**
14  Q.   And how would one determine which
15  of the Anglos was the minority candidate of
16  choice?
17  **A.   You would determine the percentage**
18  **of minorities that supported either candidate,**
19  **both candidates.**
20  Q.   So in our five elections for a
21  Congressional district in a ten year period,
22  would you just look, then, at those five

Page 24

1  elections and see what the minorities, how the
2  minorities voted in those five elections to
3  determine who the candidate of choice was for
4  that district, or would you need to look at
5  the exogenous elections, too?
6  **A.   It depends on what we are doing.**
7  Q.   Help me out on that. When would I
8  not look at exogenous elections and when would
9  I look for exogenous elections?
10  **A.   If I wanted to know how the**
11  **district fared in electing minority-preferred**
12  **candidates to a specific office, that office**
13  **would be most relevant, yes.**
14  Q.   When would I look at exogenous
15  elections, then? For what purpose would I use
16  those?
17  **A.   If you were doing an interracial**
18  **bloc voting analysis and you had, say, an**
19  **insufficient number of endogenous elections,**
20  **you would go to exogenous elections.**
21  Q.   What is the sufficient number of
22  endogenous elections upon which you can base

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 25

1  your conclusion?
2  **A.  What conclusion --**
3  Q.  What is -- sorry to interrupt.
4  What is the minimum number of endogenous
5  elections upon which you can base a conclusion
6  that there is racially polarized voting in a
7  Congressional district?
8  **A.  I don't have an answer to that.**
9  **It depends on the circumstances.**
10  Q.  But there could be circumstances
11  where, if I understand your testimony
12  correctly, there are an insufficient number of
13  endogenous elections to determine whether
14  there is racially polarized voting and you
15  would look at exogenous elections?
16  **A.  If, for example, I had a**
17  **jurisdiction in which only one minority ran**
18  **for the office one time, I would certainly go**
19  **to exogenous elections.**
20  Q.  How do you weave in, if you will,
21  the exogenous elections into your analysis to
22  determine whether or not there is racially

Page 26

1  polarized voting in that district?
2  **A.  How do I weave them in?**
3  Q.  Let me ask it a different way.
4  You concluded -- under this hypothetical, you
5  are assuming that you didn't have enough
6  endogenous elections to be confident in your
7  conclusion.  Okay?
8  **A.  Okay.**
9  Q.  Then you say, okay, now I will
10  look at exogenous elections to see if it gives
11  me more data.  Correct?
12  **A.  Okay.**
13  Q.  What data do you look at and then
14  how does that data ultimately influence your
15  decision?
16  **A.  It depends on the circumstances.**
17  **I mean, any individual case is different.  I**
18  **don't know how to answer that in the abstract.**
19  Q.  What I am trying to get at, in
20  general terms, is why -- how do you use an
21  exogenous election to add to your analysis of
22  the endogenous elections?  What other data

Page 27

1  does it give you?
2  **A.  It gives me more contests with**
3  **minority candidates in them to determine if**
4  **voting is polarized or not when there is a**
5  **minority candidate.**
6  Q.  What if there aren't enough
7  minority candidates in a particular district?
8  Is there a way to determine whether there is
9  racially polarized voting, then?
10  **A.  You could look at contests with**
11  **only white candidates, I suppose, but the**
12  **preferred method is to focus on elections that**
13  **offer minorities an opportunity to vote for a**
14  **minority candidate.**
15  Q.  We are in a bit of a quandary,
16  then.  If we are in a situation, then, where
17  you have a district -- let's hypothize this
18  one -- where only white candidates run, and
19  you have a substantial minority population in
20  that district.  Can you ever determine whether
21  there is racially polarized voting if there
22  just aren't any minorities that ever run?

Page 28

1  **A.  Do you mean for that particular**
2  **office or do you mean in general?**
3  Q.  Let's start with for that
4  particular office.  Then we can move on.
5  Let's just assume that for that particular
6  Congressional district in our five election
7  time frame it is always two Anglos running
8  against each other.  Can you determine whether
9  there is racially polarized voting based on
10  endogenous elections?
11  **A.  You can certainly see what the**
12  **voting patterns were for those candidates.  If**
13  **the whites and minorities prefer different**
14  **candidates, the voting would, in fact, be**
15  **polarized.  The problem would come if you**
16  **didn't find polarization.  You would still not**
17  **know what would happen if you had a minority**
18  **candidate running.**
19  Q.  In determining Section 2 or
20  Section 5, is all you are looking at whether a
21  particular area is racially polarized?  Are
22  there other things you have to look at for the

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 29

1  analysis you performed?
2  A.  Well, the analysis is different
3  whether you are looking at Section 2 or
4  Section 5.  The comparable part is -- well, it
5  is different.
6  Q.  Let's start out, what is the same
7  and what is not the same?  Is there anything
8  that is the same?
9  A.  In both instances you would be
10  determining if voting was polarized or not.
11  Under Section 2 you would see if, for example,
12  the minorities met the first prong of Gingles,
13  and if you could draw a district and yet
14  neglected to draw a district, given that was
15  polarized and minorities were cohesive.
16      Under Section 5 you would be
17  determining how many effective districts.
18  That is, how many districts provide minorities
19  with the ability to elect under a benchmark
20  plan versus a proposed plan.
21  Q.  Does the cohesiveness of the
22  voters make a difference under Section 5?

Page 30

1  A.  (Pause).  The cohesiveness would
2  come in to play if you were talking about
3  whether you had an effective district or not.
4  So, indirectly, I suppose so.
5  Q.  What do you mean by an effective
6  district?
7  A.  I am using the word effective
8  interchangeably with ability to elect.  That
9  is, a district that usually elects a
10  minority-preferred candidate to office.
11  Q.  What does usually elects a
12  minority-preferred candidate mean?
13  A.  Certainly more than 50 percent of
14  the time.
15  Q.  Now, when a new map is drawn
16  during a redistricting, I presume, since the
17  districts -- theoretically, I suppose, the
18  districts could remain identical.  But let's,
19  for my hypothetical, presume the districts do
20  not remain identical.  They are drawn
21  differently.  There is a different geographic
22  shape to them.  How can one determine whether

Page 31

1  or not the new districts are effective or not
2  effective?
3  A.  In Texas we had a lot of
4  information about proposed districts.  We had
5  something particularly valuable and that is
6  recompiled election results.
7  Q.  And what is a recompiled election
8  result?
9  A.  Statewide elections that occurred
10  under the old districts were retabulated up to
11  conform to the new proposed district lines.
12  So we could determine if a particular
13  candidate would carry that proposed district
14  or not.
15  Q.  And why is that useful?
16  A.  It would allow you to see if the
17  minority-preferred candidates were carrying
18  the proposed districts.
19  Q.  I guess I am a little confused
20  there because we have a new district.  Would
21  you determine -- in looking at the new
22  district, what elections are you looking at in

Page 32

1  the new district to determine if the
2  minority-preferred candidate continues to
3  elect?
4  A.  What we can't do most of the time
5  is look at endogenous elections because, in
6  fact, the lines have changed, so we have to
7  turn to statewide elections that include
8  minority candidates to determine if that
9  minority would carry the newly configured
10  district.
11  Q.  And what happens if you get a
12  situation where the minority doesn't carry
13  that new district, looking at the exogenous
14  elections?  Then what do you do?  What is the
15  next step in your analysis?
16  A.  Well, I would be looking at that
17  over -- I would look at that pattern over more
18  than one election, but the idea would be to
19  look at a series of elections and determine if
20  the minority-preferred candidate carried that
21  district.
22  Q.  And I guess that's what I am a

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 33

1   little confused about.  You keep saying the
2   minority-preferred candidate but you are
3   looking at, I assume, a group of exogenous
4   elections.  Are you talking about the
5   minority-preferred candidate in each of those
6   exogenous elections?
7   A.  That's correct.
8   Q.  So in looking at the exogenous
9   elections, would you first have to determine
10  in each election who the minority-preferred
11  candidate is?
12  A.  That's correct.
13  Q.  And in any particular
14  Congressional district, I assume there are
15  dozens of exogenous elections.  You can look
16  at these reports but I am just saying in
17  general terms.  There is more than one
18  exogenous election in a Congressional
19  district, obviously.
20      MR. MELLETT:  Is this in reference
21  to Texas?  Is this a specific question?
22      BY MR. MATTAX:

Page 34

1   Q.  In general.  I would assume, if
2   you say statewide, in any state you are going
3   to have a governor or something else.  You
4   have more than one exogenous election in any
5   particular Congressional district.
6   A.  Yes.
7   Q.  So how do you pick which ones to
8   look at, I guess?  Do you look at them all?
9   A.  What are we attempting to do here?
10  Q.  We are getting back to determining
11  now whether or not, since you have a new
12  district, whether or not the -- I guess the
13  way to put it would be you determine that a
14  candidate won the majority of the endogenous
15  elections.  More than 50 percent of the time
16  that candidate won the endogenous elections.
17  So that becomes the preferred candidate of
18  choice.
19      Now we have a new district so we
20  are going to look at exogenous elections to
21  see if that person is going to win those
22  elections.  We are guessing.  We are trying to

Page 35

1   figure out whether those new districts will
2   elect that person.  I assume that's the point
3   of the exercise.
4   A.  Okay.
5   Q.  Is that the point of the exercise?
6   Is that what you are doing?
7   A.  I don't know what you mean by
8   "that person" but the point of the exercise is
9   to determine whether the proposed district
10  would elect a minority-preferred candidate.
11  Q.  Since there is more than one
12  exogenous election, how does one decide which
13  ones to pick?  Or does one look at them all?
14  Or both?
15  A.  Both what?
16  Q.  Pick some or look at all of them?
17  A.  (Pause.)
18  Q.  So we can understand, are we
19  picking or choosing or do we have a
20  methodology to choose?  For example, I am not
21  going to look at the dogcatcher in that county
22  because it is too small of an election.  Or I

Page 36

1   am not going to look at the governor because
2   it is too big of an election.  How do we
3   decide which endogenous elections to look at
4   to see if it works?
5   A.  Exogenous elections.
6   Q.  Exogenous, yes.
7   A.  First you are going to need a
8   contest that encompasses at least that area.
9   So dogcatcher isn't going to work.  It is too
10  small an area in that particular district,
11  since we are talking, I guess, about
12  Congressional districts.
13  Q.  Congressional is our issue here
14  right now.
15  A.  So in terms of Congressional
16  districts, we are going to have to turn to
17  statewide contests.
18  Q.  Okay.
19  A.  The second thing you want is you
20  want a minority candidate who is competing in
21  that office.  And not only a minority
22  candidate but we need to know that that

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 37

1 minority candidate is minority-preferred.
2 Q.  So what if, on the statewide
3 level, you don't have any minority candidates?
4 You just have Anglos.  Can you not do the
5 exogenous analysis?
6 A.  You could.  It would not tell you
7 nearly as much.
8 Q.  What would it tell you?
9 A.  Well, it would tell you that, for
10 example, a white minority-preferred candidate
11 might win this contest.  It wouldn't tell you
12 if a minority minority-preferred candidate
13 would win this contest.  So if the white
14 minority-preferred candidate didn't win, then
15 you might be able to assume that a minority
16 minority-preferred candidate didn't win.
17 However, if the white minority-preferred
18 candidate won, I am not sure that you could
19 assume from that that the minority
20 minority-preferred candidate would win.
21 Q.  So if I understand that, it would
22 be, in your view, a valid assumption to make,

Page 38

1 if the Anglo minority-preferred candidate
2 lost, under that analysis, that a minority
3 minority-preferred candidate would also lose?
4 A.  Yes, if voting were polarized,
5 yes.
6 Q.  But you could not conclude that if
7 an Anglo minority-preferred candidate won, you
8 could not conclude that a minority
9 minority-preferred candidate would win.  Is
10 that correct?
11 A.  If voting was polarized, that's
12 correct.
13 Q.  Why not?  Why couldn't you make
14 that determination?
15 A.  Because whites might be willing to
16 vote for a white minority-preferred candidate
17 but not for a minority minority-preferred
18 candidate.
19 Q.  Is it also the case for different
20 minorities, different minority groups?  In the
21 sense, if you had multiple minority groups, is
22 it possible that a minority group would not be

Page 39

1 as willing to vote for a different minority
2 candidate?
3 A.  Do you want to elaborate on that
4 question?
5 Q.  I am taking as an assumption your
6 answer that you can't determine whether, if a
7 minority -- if an Anglo minority-preferred
8 candidate wins an election, you can't conclude
9 that the minority minority-preferred candidate
10 would win.
11 A.  That's correct.
12 Q.  What I am positing now is, what if
13 you had multiple minorities in a district,
14 more than one?  Would the same hold true?
15 Let's say, for example, that a minority
16 Hispanic had been winning in the past and the
17 exogenous elections would indicate a minority
18 black would now win.  Would that be relevant
19 to whether or not the Hispanic
20 minority-preferred candidate would still be
21 effective in that district?
22 A.  Well, the first thing you would do

Page 40

1 is determine if the minority-preferred
2 candidate was, in fact, preferred by each and
3 every minority group that you were interested
4 in.  So if the Hispanic candidate was, in
5 fact, black-preferred, that would tell you
6 something.  If that Hispanic candidate was not
7 black-preferred -- I am getting my groups
8 mixed up -- then the fact that the
9 Hispanic-preferred candidate won would not
10 tell you very much about what would happen
11 with a black-preferred candidate.
12 Q.  So then it is important to
13 determine, for purposes of whether a Hispanic
14 candidate is preferred or a black candidate is
15 preferred, to determine how within a
16 particular district blacks voted, Hispanics
17 voted, if I understand your answer correctly.
18 A.  You would want to know if your
19 candidate was preferred by Hispanic voters and
20 by black voters.
21 Q.  Do you ever look at exogenous
22 elections in existing districts to make a

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 41

1  determination as to whether the
2  minority-preferred candidate would win in an
3  existing district or do you only look at
4  endogenous elections?
5      MR. MELLETT: Just to be clear,
6  are we talking in general or is this
7  specifically --
8      MR. MATTAX: In general.
9      THE WITNESS: I am sorry, repeat
10  the question.
11      BY MR. MATTAX:
12  Q.  Do you only look at the exogenous
13  elections to determine whether, in a new map,
14  a district is performing or is there some
15  relevance to using exogenous elections to
16  determine if a district is performing for a
17  benchmark?
18  **A.  The first part of the question and**
19  **second part part didn't get together.**
20  Q.  Let's go back to my five elections
21  in a ten year cycle.  Let's say an Hispanic
22  wins five out of five.  And let's say that the

Page 42

1  Hispanic candidate of choice loses a hundred
2  percent of every exogenous election anybody
3  can ever find.  What is that district?
4  **A.  You said Hispanic candidate.  Do**
5  **you mean a Hispanic-preferred candidate?**
6  Q.  Correct.  Or perhaps -- this is
7  two answers.  Let's assume it is
8  Hispanic-preferred.  Then I want to have
9  another.  I have got to figure out what that
10  means.  What does it mean to have an Hispanic
11  elected five out of five times and then the
12  conclusion being that's an Hispanic candidate
13  of choice.  But then looking at every
14  exogenous election, the Hispanic candidate of
15  choice doesn't win.  What would that tell us
16  about that district?
17  **A.  That Hispanics are able to elect**
18  **their candidate of choice to the office at**
19  **issue.**
20      **I am assuming that we are talking**
21  **about Hispanic-preferred.  That's why I asked**
22  **you that question.**

Page 43

1  Q.  We will use Hispanic-preferred.
2      Then what would explain the fact
3  that, in the exogenous elections, the Hispanic
4  candidate of choice doesn't win?
5  **A.  I could posit some possibilities.**
6  Q.  Okay.
7  **A.  Would you like me to do that?**
8  Q.  If you would like.
9  **A.  Perhaps a Hispanic-preferred**
10  **candidate is getting white crossover vote.**
11  Q.  Let's stop there.  There is one
12  example.  In this example, if the
13  Hispanic-preferred candidate is getting white
14  crossover vote in order to win five out of
15  five elections, is that a protected district
16  in a benchmark plan?
17      **MR. MELLETT:** When you say
18  protected, do you mean under Section 5?
19      **MR. MATTAX:** Let's start with
20  Section 5.
21      **THE WITNESS:** I need a little more
22  information than that.

Page 44

1      **BY MR. MATTAX:**
2  Q.  Let's assume -- and I will just
3  pull these numbers out of my head -- that you
4  have 60 percent Hispanic voting age population
5  in a district, 40 percent Anglo voting age
6  population that comprises the district, and in
7  the Congressional race the Hispanic candidate
8  of choice -- let's not even say candidate of
9  choice.  Let's use Ds and Rs to make it
10  easier.  Let's just say the Hispanic Democrat
11  wins five out of five endogenous elections and
12  a Republican wins every single exogenous
13  election.  What kind of a district is it?
14  **A.  What kind of a district is it?**
15  Q.  Is it a performing district?  Is
16  it a crossover district?  Is it an "I don't
17  know what the district is"?  Is it a "That
18  doesn't make sense" district?  "Your
19  statistics must be wrong"?
20  **A.  It is a Congressional district**
21  **that minority candidates, minority voters are**
22  **able to elect their candidate of choice**

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

---

Page 45

1   consistently throughout the decade.
2   Q.  Can you make a conclusion based on
3   that that it is a protected district under
4   Section 5?
5   A.  I would say it is a protected
6   district under Section 5, yes.
7   Q.  This is what I am driving at.  So
8   the fact that in the exogenous elections the
9   minority-preferred candidate never wins is not
10  relevant to determine whether it is a
11  protected district?
12  A.  Let's say, for example, minorities
13  say, "I can elect a candidate of choice to
14  Congress but I am never going to succeed in
15  statewide elections so I am not even going to
16  cast a ballot for statewide office.  My
17  candidate will never win."  It doesn't mean
18  that the Congressional district is not a
19  protected district.
20  Q.  What reason would I have to not
21  vote, then -- let's get back, then, to
22  positing a different scenario versus that type

---

Page 46

1   of a candidate winning five out of five
2   elections.  Let's say it wins three out of
3   five.  What explanation then could there be
4   for that person who is a minority-preferred
5   candidate of choice in that district losing
6   two out of five elections?
7   A.  I can start positing some
8   examples.  Is that what you want me to do?
9   Q.  My question is, if they are losing
10  two out of five, it can't be because they
11  didn't feel like they could win in a statewide
12  race, because that's not the issue there.  And
13  so they would be voting, you would assume, for
14  that candidate, wouldn't you?
15  A.  Yes.
16  Q.  So why would they lose, then, if
17  it was a performing minority district?
18  A.  It is possible, for example, that
19  whites turned out in a higher than average
20  amount and that the whites who turned out were
21  less likely to vote for that candidate.
22  Q.  Did you look at trending at all to

---

Page 47

1   see, over that ten year period, whether
2   election patterns were changing?
3   A.  Be more specific.
4   Q.  What would this tell you about a
5   district?  The Hispanic-preferred candidate of
6   choice in the first election cycle wins 60
7   percent of the vote.  In the second election
8   cycle 55 percent of the vote.  In the third
9   election cycle 51 percent of the vote.  So he
10  has won three in a row.  And the fourth
11  election cycle 48 percent of the vote.  He
12  loses.  And in the fifth election cycle
13  45 percent of the vote.  He loses.  Is that a
14  performing district?
15  A.  I did look at the possibility that
16  that was a trend, so I guess the answer to
17  your -- what was the original question?
18  Q.  Did you look at trending?
19      MR. MELLETT: Is this specific to
20  Texas or is this general, again?
21      BY MR. MATTAX:
22  Q.  Right now we are talking general.

---

Page 48

1   Do you think trending is important to look at,
2   is what I am driving at, and I gave you an
3   example of what I meant by trending.  Would
4   that be important to your analysis?
5       And there could be two answers.
6   One answer could be, "I never look at
7   trending, ergo, it is not relevant to my
8   analysis," or, "I always look at trending
9   because it is relevant to my analysis."  Let's
10  start with that question.
11      MR. MELLETT: Well, I think there
12  could be -- I don't think she should be
13  limited to two answers.  I think you should
14  answer as you think is most appropriate.
15      BY MR. MATTAX:
16  Q.  Do you always consider trending in
17  your analysis?
18  A.  No.
19  Q.  Do you ever consider trending in
20  your analysis?
21  A.  Yes.
22  Q.  When?

---

Page 49

1  A.  When I have a wealth of data in
2  front of me and it is possible to look at
3  patterns over the course of the decade, I do
4  to some degree look at patterns over the
5  decade.
6  Q.  So let me go back to my
7  hypothetical and you tell me whether you think
8  this is a performing district.
9      In my hypothetical, in election
10  one the Hispanic-preferred candidate got 60
11  percent of the vote and won.  Election two,
12  55 percent of the vote and won.  Election
13  three, 51 percent of the vote and won.
14  Election four, 49 percent of the vote and
15  lost.  Election five, 45 percent of the vote
16  and lost.  Would that trending be relevant to
17  a conclusion as to whether that was a
18  performing district or not?
19  A.  I guess what I would do in that
20  instance is go back and actually look and see
21  if I was losing Hispanic population in that
22  district.

Page 50

1  Q.  And that could be an explanation,
2  less Hispanics there?
3  A.  That's correct.
4  Q.  What if you were gaining Hispanic
5  population?
6  A.  (Pause.)  I guess I would look to
7  see if I was gaining Hispanic citizen
8  population or not.
9  Q.  What difference does that make?
10  A.  (Pause.)
11  Q.  What difference does Hispanic
12  citizen voting age population make to that
13  analysis?
14  A.  If the district was gaining
15  population but losing Hispanic citizen voting
16  age population, then it is losing Hispanic
17  voters.
18  Q.  So in determining the number of
19  Hispanic voters in a district, you look at
20  citizen voting age population?
21  A.  If you have it.  You could also
22  look at spanish surname voter registration.

Page 51

1  Q.  What is that?
2  A.  It is a look at the number of
3  spanish surnames appearing on the voter
4  registration list.
5  Q.  Why is that relevant?
6  A.  It would give you an indication of
7  what proportion of your population was in
8  fact -- what proportion of your registered
9  voter population was Hispanic.
10  Q.  Is looking at SSVR percentages
11  relevant in a Section 5 case?
12  A.  It depends on what you mean by
13  relevant.  It is something you could consider.
14  Q.  Let me ask a different question.
15      Do you ever look at SSVR in forming opinions
16  in Section 5 cases?
17  A.  If I were looking at trending, for
18  example, I might look at SSVR.
19  Q.  What type of trending?
20  A.  To determine if I was losing
21  Hispanic voter population or gaining Hispanic
22  voter population.

Page 52

1  Q.  So is it more important for
2  trending purposes to look at SSVR to determine
3  whether you are gaining or losing spanish
4  voting population or just the voting age
5  population of Hispanics?
6  A.  If I was attempting to determine
7  if I were gaining or losing Hispanic voters, I
8  would have to turn to SSVR if I had it rather
9  than voting age population.
10  Q.  And the reason for that is?
11  A.  Because Hispanic voting age
12  population wouldn't necessarily indicate if I
13  had voters or not.
14  Q.  Is that because Hispanic voting
15  age population includes noncitizens?
16  A.  That's correct.
17  Q.  So then in looking at a Section 5
18  analysis, for purposes of determining whether
19  a district is electing a preferred candidate
20  of choice, a minority, does it make any
21  difference whether you look at SSVR or
22  Hispanic citizen -- excuse me, Hispanic voting

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 53

1  age population?  How is it relevant in
2  Section 5 between voting age population and
3  spanish surname voter registration?
4  **A.  Both are relevant.  Neither of**
5  **them alone tells me very much at all, however.**
6  Q.  So what do you need to look at
7  besides those two things?
8  **A.  In making a Section 5**
9  **determination?**
10  Q.  Yes.
11  **A.  I need to be able to determine if**
12  **the district is electing a minority-preferred**
13  **candidate or not.**
14  Q.  Let me write these down.
15  What else?  Anything else?
16  **A.  Well, to determine the benchmark,**
17  **what I am doing is looking to see if the**
18  **Hispanic-preferred candidate,**
19  **minority-preferred candidate, is consistently**
20  **winning.  And then in terms of the proposed**
21  **plan, I need to determine if I think the**
22  **district is likely to elect a**

Page 54

1  **minority-preferred candidate.**
2  Q.  And then in determining whether a
3  district is protected, do you need to look at
4  SSVR?
5  **MR. MELLETT:** This is, again,
6  Section 5?
7  **MR. MATTAX:** Section 5.
8  **THE WITNESS:** It is certainly
9  something I could look at.  What I am much
10  more interested in is whether the district is
11  an effective minority district.  That could
12  come into play but, again, it is whether it is
13  electing the minority-preferred candidate
14  consistently that is the focus.
15  **BY MR. MATTAX:**
16  Q.  So my next hypothetical would be,
17  what if the SSVR district was 40 percent
18  Hispanic and your analysis showed that it was
19  electing the Hispanic-preferred candidate of
20  choice, would you say that was a protected
21  district?
22  **A.  You would have to give me a little**

Page 55

1  **more information about that district but**
2  **probably.**
3  Q.  So if there is not 50 percent of
4  the Hispanic citizen or SSVR in that district,
5  but you say it is protected, does that mean it
6  is a crossover district?
7  **A.  I don't know.  What is a crossover**
8  **district?**
9  Q.  I think my understanding of a
10  crossover district -- let me ask this.  Have
11  you never heard of a crossover district?
12  **A.  I don't use the term.**
13  Q.  Let's describe what terms you use
14  for districts.  Do you have different terms
15  for district or is it just one term, a
16  minority-preferred candidate of choice elects
17  to that district, or are there different terms
18  for that?
19  **A.  (Pause.)**
20  Q.  Let me back up, give you a
21  hypothetical.  You have a district with 80
22  percent citizen Hispanics in it and they vote

Page 56

1  for the Hispanic-preferred candidate of choice
2  in that district.  It seems to me, without any
3  white voters at all, you have enough Hispanics
4  in that district to elect a Hispanic-preferred
5  candidate.  Are you with me so far?
6  **A.  With you.**
7  Q.  I have a district with 40 percent
8  Hispanic citizen voting age population in it.
9  It seems to me that they are not going to, on
10  a regular basis, be able to elect their
11  candidate of choice by themselves because they
12  are not 50 percent of the district.  Are you
13  with me so far?
14  **A.  Still with you.**
15  Q.  So when you see a district that
16  has 40 percent Hispanic and yet you call it
17  protected, then what is being added to that
18  district?  Are there whites voting for that
19  Hispanic candidate of choice?  Is that what
20  makes it a performing district?
21  **A.  Could be whites, could be blacks,**
22  **could be Asians.**

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 57

1 Q.   Does it make any difference in
2 your analysis who it is?
3 **A.   If the minority-preferred minority**
4 **candidate is consistently elected, it is an**
5 **effective district.**
6 Q.   Then I take it it doesn't make any
7 difference to you whether it is whites
8 crossing over or blacks as to whether or not
9 it is a performing district.
10 **A.   That's correct.**
11 Q.   So then when we go through your
12 analysis, I will ask you a series of questions
13 but I assume the answer is going to be no.
14 That when I see one of these districts, it may
15 be 30 percent, 40 percent Hispanic, and you
16 have concluded that they are performing
17 districts, that you did not determine who else
18 was voting besides Hispanics for that
19 candidate.
20      MR. MELLETT: Objection.  Assuming
21 facts not in evidence.  We need to have
22 specific districts.

Page 58

1      BY MR. MATTAX:
2 Q.   So is it possible that you did do
3 that analysis, then?
4 **A.   What analysis?**
5 Q.   Determine who in addition to
6 Hispanics was voting for the preferred
7 candidate of choice, in a district that had
8 less than 50 percent Hispanic citizen voting
9 age population.
10      MR. MELLETT: Same objection in
11 that you are talking about this in general.
12 If you have a specific question about a
13 district, let's ask about the specific
14 district.
15      BY MR. MATTAX:
16 Q.   Then I will ask the question this
17 way.  In your analysis of Texas, Section 5,
18 were there any districts that you looked at
19 that were less than 50 percent Hispanic
20 citizen voting age population that you
21 consider to be performing districts that you
22 did an analysis in to determine who else

Page 59

1 besides the Hispanics were voting for the
2 Hispanic candidate of choice?
3 **A.   That's sort of a two part**
4 **question.  Do you want to break it into its**
5 **two parts?**
6 Q.   Let's go to the first part.  Were
7 there any districts in Texas in your analysis
8 that had less than 40 percent Hispanic citizen
9 voting age population that you said were
10 protected?
11 **A.   I would have to look at my report.**
12 Q.   Okay.
13      Which report are you looking at?
14 **A.   I have two reports in front of me.**
15 **One is the State House report --**
16      MR. MELLETT: Do you want to mark
17 it as an exhibit?
18      MR. MATTAX: Sure.  I want to see
19 which one she is referring to.
20      BY MR. MATTAX:
21 Q.   Are you going to refer to both of
22 them for this?

Page 60

1 **A.   Could do.**
2 Q.   For purposes of answering my
3 question.
4 **A.   Does your question refer to both**
5 **of them?**
6 Q.   No.  My question referred to, did
7 you do an analysis of any district that was
8 less than 40 percent Hispanic citizen voting
9 age population that you found was protected to
10 determine who besides Hispanics were voting
11 for their preferred candidate of choice.  You
12 said, "I will have to look at my report."  And
13 my question is, which report do you want to
14 look at?
15 **A.   That wasn't your question.  Your**
16 **question was did I find any districts with**
17 **less than 50 percent Hispanic citizen voting**
18 **age population effective.  I said you had to**
19 **break it into two parts.  I think that was the**
20 **question you asked me.  And that is what I am**
21 **going to refer to in my report.**
22 Q.   We will get to your reports in a

Page 61

1  little bit.
2      **MR. MELLETT:** So we aren't going
3  to the reports?  We are not going to introduce
4  them right now?
5      **MR. MATTAX:** We are still doing
6  general stuff.
7      **MR. MELLETT:** You can put your
8  reports away.
9      **MR. MATTAX:** I have copies here.
10  We can mark them at the appropriate time.
11      **BY MR. MATTAX:**
12  Q.   You said -- let me see if I
13  recollect your testimony correctly.  Correct
14  me if I am wrong.  I mentioned the term
15  crossover.  You either said you didn't know
16  the term or you didn't use it.  Is it you have
17  never heard of it or that you just don't use
18  it?
19  **A.  I don't use the term.**
20  Q.   What about the term coalition?
21  Have you heard of that?
22  **A.  Yes.**

Page 62

1  Q.   Do you use that?
2  **A.  (Pause).  I am not sure.  Possibly**
3  **in my writings I have.**
4      **(Discussion off the record.)**
5      **BY MR. MATTAX:**
6  Q.   Influence.  Have you ever heard of
7  that district?  Have you ever heard of that
8  term?
9  **A.  Yes.**
10  Q.   Competitive?
11  **A.  Yes.**
12  Q.   So tell me, if you know, what you
13  think the definition of crossover is.
14  **A.  (Pause.)**
15  Q.   Do you have a view on what a
16  crossover district is?  Yes or no?
17      **MR. MELLETT:** Are you talking
18  about in a specific setting?  Is this tied to
19  something specific?
20      **MR. MATTAX:** Voting rights.
21      **MR. MELLETT:** Any voting rights
22  anywhere somebody is using the term crossover?

Page 63

1      **MR. MATTAX:** If she has heard of
2  it, and if she is aware of it, and if she has
3  an understanding of what it means.  If the
4  answer is no, that's fine.
5      **MR. MELLETT:** I will object on
6  vagueness.
7      **THE WITNESS:** Repeat the question?
8      **BY MR. MATTAX:**
9  Q.   Have you ever heard someone use
10  the term crossover district?
11  **A.  Yes.**
12  Q.   Where did you hear that?
13  **A.  I am not sure.**
14  Q.   Have you ever read it in a court
15  case?
16  **A.  Possibly.**
17  Q.   Do you know what court case that
18  may have been?
19  **A.  No.**
20  Q.   Have you ever heard the term
21  coalition district?
22  **A.  Yes.**

Page 64

1  Q.   Where have you heard the term
2  coalition district?
3  **A.  I can't specify.  I don't know.**
4  Q.   Have you ever read it in a court
5  case?
6  **A.  I don't know.**
7  Q.   Influence district, have you ever
8  heard the term influence district?
9  **A.  Yes.**
10  Q.   Where did you hear that?
11  **A.  I couldn't specify.**
12  Q.   And I think we mentioned
13  competitive district, as well.  Have you heard
14  the term competitive district?
15  **A.  Yes.**
16  Q.   Where have you heard that?
17  **A.  Again, I can't point to a specific**
18  **source.**
19  Q.   Have you ever heard of that in a
20  court -- do you ever recall reading that in a
21  court case anywhere?
22  **A.  It was an issue in the Arizona**

Page 65

1  litigation that I was involved in.
2  Q.  So what was the Arizona
3  litigation?
4  A.  This is a decade ago.
5     Arizona has a law that districts
6  must be as competitive -- that a plan must
7  offer some degree of competitiveness.  I am
8  not really sure.
9  Q.  In what context do you recall
10  being involved in that?
11  A.  A colleague and I were involved in
12  the court case.  My colleague did the
13  competitiveness part of the analysis.  I did
14  the voting rights part of the analysis.
15  Q.  And in the context of a voting
16  rights analysis do you ever -- is the term
17  competitive district ever used, to your
18  knowledge, in the context of voting rights
19  analysis?
20  A.  I am not sure what you mean.
21  Q.  Let's do it this way, then.
22     Does the term crossover, in a

Page 66

1  Section 5 case, have a defined meaning, to
2  your knowledge?
3  A.  Does the word crossover -- repeat
4  the whole question.
5  Q.  Does the term crossover, in a
6  Section 5 analysis, have a defined meaning to
7  your knowledge?
8     MR. MELLETT: Objection.  Vague.
9  I am not sure if you are talking about court
10  cases, if you are talking about her analysis.
11     MR. MATTAX: I will ask another
12  question.
13     BY MR. MATTAX:
14  Q.  Does the term crossover have a
15  defined legal meaning in a Voting Rights Act
16  case, to your knowledge?
17  A.  I am not specifically aware of a
18  definition of crossover.
19  Q.  Do you have a general
20  understanding of what it means?
21  A.  I think people might -- I think I
22  know what it means but I am not positive.

Page 67

1  Q.  What do you think it means?
2  A.  Let me back up.  I don't even have
3  a definition of it well enough versed in my
4  mind to deal with that word.
5  Q.  I take it, then, that you wouldn't
6  have an opinion on whether a crossover
7  district is protected under Section 5 of the
8  Voting Rights Act.
9  A.  That would be correct.  I don't
10  have an opinion.
11  Q.  In the context of a Section 5
12  Voting Rights Act case, do you know what a
13  coalition district is?
14     MR. MELLETT: Again, for
15  clarification, are you talking about a
16  specific court case that you are referring to?
17  What is the -- are you talking about her
18  analysis?  Again, I am unclear.
19     BY MR. MATTAX:
20  Q.  Do you have a definition in terms
21  of Section 5 for a coalition district?
22  A.  I have used the word coalition

Page 68

1  district.  Whether you mean specifically under
2  Section 5, I guess I don't have a definition
3  for coalition district specific to Section 5.
4     (Discussion off the record.)
5     (A recess was taken.)
6     BY MR. MATTAX:
7  Q.  We are back on the record after a
8  short break.  Let me finish up this line of
9  questioning and then we will move on to mark
10  some of this stuff.
11     We were talking about coalition
12  districts.  I think I had asked you if you had
13  a definition of them.  Then I think you were
14  interrupted.  Did you have a definition,
15  within the context of Section 5, as to what a
16  coalition district is, or have you ever used
17  that term?
18  A.  I believe I have used the term.  I
19  don't know if I have used it specifically in
20  the context of Section 5.  But in the context
21  of voting rights in general, I have used the
22  term.

Page 69

1 Q.   And how did you use the term?
2 A.   **Coalition district would be a**
3 **district in which more than one minority group**
4 **voted consistently together to elect a**
5 **minority-preferred candidate.**
6 Q.   And do you have an opinion as to
7 whether or not a coalition district is a
8 protected district under Section 5 of the
9 Voting Rights Act?
10 A.   **I wonder if you are using that**
11 **term differently when you ask that question.**
12 Q.   Okay.
13     MR. MELLETT: Do you --
14     THE WITNESS: I don't think she is
15 finished with her answer.
16     MR. MELLETT: I was just trying to
17 clarify, is that in the way that she uses it?
18 Is that your question?  As opposed to some
19 other definition of coalition?
20     MR. MATTAX: However she wanted to
21 answer the question is fine with me.
22     THE WITNESS: You could have a

Page 70

1 district that was, for example, 50 percent
2 hispanic, 30 percent black, and it would
3 consistently elect a minority-preferred
4 candidate.  And I would say in that instance
5 it is protected.
6     BY MR. MATTAX:
7 Q.   What about an influence district?
8 Have you ever heard that term used before?
9 A.   **Yes.**
10 Q.   What is your understanding of what
11 that term means?
12 A.   **An influence district is a**
13 **district in which minorities have an influence**
14 **over who is elected but is unable to**
15 **consistently elect candidates of their choice.**
16 Q.   Do you have an opinion as to
17 whether or not an influence district is
18 protected under Section 5?
19 A.   **(Pause).  I would say that that is**
20 **a legal question that I am unclear of the**
21 **answer to.**
22 Q.   Have you ever participated in

Page 71

1 filing any amicus curiae briefs with any
2 courts with respect to any of these terms we
3 have been talking about today, taking an
4 opinion as to whether they are protected under
5 Section 5, or -- let's start with that
6 question.
7     MR. MELLETT: Do you mean whether
8 she?
9     MR. MATTAX: She.  Whether she has
10 participated or assisted in the filing of any
11 amicus curiae briefs that dealt with any of
12 the terms we have been discussing today,
13 specifically crossover districts, coalition
14 districts, or influence districts.
15     THE WITNESS: I don't remember.
16     BY MR. MATTAX:
17 Q.   Lastly, I think we talked about
18 the term competitive district.  Do you have a
19 definition or do you have an understanding of
20 what a competitive district is in a Section 5
21 voting rights analysis case?
22     MR. MELLETT: Objection.  Asked

Page 72

1 and answered.
2     MR. MATTAX: Was it?
3     MR. MELLETT: Yes.  We talked
4 about the whole situation with Arizona.
5     MR. MATTAX: I apologize.  Then
6 she said at the end of the day that she didn't
7 remember.  I'm trying to find out if she has
8 an understanding of what a competitive
9 district is.
10     THE WITNESS: The word
11 competitive, as I described it with regard to
12 Arizona, was --
13     BY MR. MATTAX:
14 Q.   Was not Section 5?
15 A.   **That's correct.  It was political**
16 **competitiveness.**
17 Q.   So for purposes of the Voting
18 Rights Act you have not heard the term
19 competitive used?
20 A.   **I may have run across it.  I don't**
21 **use it myself.**
22 Q.   And you don't recall ever seeing

Page 73

1 that in a court case or any knowledge of it?
2    MR. MELLETT: (Inaudible to
3 reporter.)
4    MR. MATTAX: Arizona she said was
5 political, not Voting Rights Act.
6    BY MR. MATTAX:
7 Q.   Now I am just trying to clarify
8 whether, in a Voting Rights Act context, you
9 have ever used it or heard it.
10 A.  I may have.
11 Q.   But you don't recollect right now?
12 A.  No.
13    MR. MATTAX: Let's mark this big
14 thing here so we can get it out of your way.
15 That is Exhibit 1.
16    (Document referred to marked
17 Deposition Exhibit No. 1 for identification
18 and subsequently attached to the deposition.)
19    BY MR. MATTAX:
20 Q.   Let me show you what has been
21 marked as Deposition Exhibit Number 1. Have
22 you ever seen this document before?

Page 74

1 A.  I have not.
2    Well, I haven't seen these first
3 few pages.
4 Q.   Let me direct you to the second
5 page.
6    On the second page, in the third
7 paragraph, the first sentence says the United
8 States has identified retrogression from the
9 benchmark to the proposed plan in five
10 districts in the Texas House of
11 Representatives:  33, 35, 41, 117, and 149.
12    Do you agree with that statement?
13 A.  I would have to refresh my memory
14 by looking at my own report.
15 Q.   Let's go ahead then -- hold on.
16    (Discussion off the record.)
17    BY MR. MATTAX:
18 Q.   Would you like to look at your
19 House plan first?
20 A.  These are House-specifics.
21    MR. MATTAX: Let's mark as Exhibit
22 Number 2 Section 5 Voting Right Analysis of

Page 75

1 Proposed State House Plan prepared by Lisa
2 Handley.
3    (Document referred to marked
4 Deposition Exhibit No. 2 for identification
5 and subsequently attached to the deposition.)
6    BY MR. MATTAX:
7 Q.   Let me hand you what has been
8 marked as Handley Exhibit Number 2.  Can you
9 identify this for the record, please?
10 A.  Yes.  This is the report I
11 prepared for this case for the State House
12 plan.
13 Q.   Did you also propose a report for
14 the Congressional plan?
15 A.  Yes.
16    MR. MATTAX: Let me mark this as
17 Handley Number 3.
18    MR. MELLETT: Let me go off the
19 record for a second.
20    (Discussion off the record.)
21    (Document referred to marked
22 Deposition Exhibit No. 3 for identification

Page 76

1 and subsequently attached to the deposition.)
2    BY MR. MATTAX:
3 Q.   Let me hand you what has been
4 marked as Handley Deposition Exhibit Number 3.
5 Could you identify that, please?
6 A.  This is the report I prepared for
7 this case for the Congressional plan.
8 Q.   Let me go back to the question we
9 had on the table, which was with respect to
10 Handley Deposition Exhibit Number 1, which is
11 the United States' Identification of Elections
12 considered.  And on page two it identifies
13 five districts that the United States claims
14 retrogressed from the benchmark plan:
15 Districts 33, 35, 41, 117 and 49.
16    My question to you was do you
17 agree with that?
18 A.  I am going to look at my report
19 and answer that question.
20 Q.   Please do.
21 A.  (Pause).  33 I agree with.
22    35 I agree with.

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

---

Page 77

1    **41 I can't make the determination.**
2    **117 I agree with.**
3    **149 I agree with.**
4  Q.  How do you characterize those
5  districts?  Or do you characterize those
6  districts in your report?
7  **A.  How do I characterize them?**
8  **(Pause).**
9       **I characterize them as effective**
10 **districts under the benchmark plan; as not**
11 **effective districts under the proposed plan.**
12 Q.  Let's turn to, it looks like,
13 page 6 of Exhibit 1, which is the United
14 States report.
15      As best I can tell, it looks like
16 the United States is asserting that Benchmark
17 Congressional District 23 and Benchmark
18 Congressional District 27 retrogressed.  Is
19 that your understanding from reading this
20 page?  And if you need to take your time,
21 please do.
22      MR. MELLETT:  Objection.  The

---

Page 78

1  document speaks for itself.  And she has
2  already said she had not seen this document
3  before.
4       MR. MATTAX:  I understand that.
5  That's why I gave her the opportunity to take
6  her time to read it.  I need to know whether
7  she agrees with your conclusions or not.  This
8  is what the United States has asserted.  I
9  want to know if your expert agrees with what
10 the United States asserted.
11      THE WITNESS:  Okay.  So you would
12 like me to read this page?
13      BY MR. MATTAX:
14 Q.  I would like you to tell me
15 whether or not you agree with what the United
16 States has asserted here.  If you need to read
17 this in detail, please do.  If you can tell me
18 right now without reading it, that's fine,
19 too.  I just need to know whether you agree
20 with what the United States has said in this
21 document.
22 **A.  (Pause).  Okay.  This document**

---

Page 79

1  **just explains what the United States looked at**
2  **in making their determination.  I am not sure**
3  **what I am supposed to agree with or not.**
4  Q.  Did the United States determine
5  whether or not those districts retrogressed?
6       **MR. MELLETT:**  You are asking the
7  United States, not her?  Is that your
8  question?
9       **MR. MATTAX:**  I am asking for her
10 understanding of that document.  It advises
11 her as to whether or not -- let me just put it
12 this way.
13      **BY MR. MATTAX:**
14 Q.  Do you agree with the analysis of
15 the United States of America in the case in
16 which you filed an expert report?
17      **MR. MELLETT:**  Objection in terms
18 of vagueness.  If you are asking specifically
19 what her findings are on 23 and 27, why don't
20 we go there?
21      **MR. MATTAX:**  Let me ask my
22 question again.

---

Page 80

1       **BY MR. MATTAX:**
2  Q.  The United States of America has
3  filed a pleading in the United States District
4  Court alleging what they think is wrong with
5  the Texas plan.  My question is, as the expert
6  for the United States of America, do you agree
7  with the United States of America?  Yes or no?
8       **MR. MELLETT:**  Objection.  She
9  already said that she hadn't read this
10 specific document.  If what you want her to do
11 is to read the document, then we can go ahead
12 and do that.  But she already said she didn't
13 read this specific document.
14      **BY MR. MATTAX:**
15 Q.  So, as we sit here today, you
16 don't have an opinion as to whether your
17 report is consistent with or not consistent
18 with the United States' position in this case?
19 **A.  I don't know what the United**
20 **States' position in this case is.  I have not**
21 **read their brief.**
22 Q.  Thank you.  Let's put that out of

---

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 81

1  the way.  Since you haven't read it, there is
2  no reason to consider it.
3      So let's look it your
4  Congressional report.
5      (Discussion off the record.)
6      BY MR. MATTAX:
7  Q.  Let's focus, then, on your
8  Congressional report.  I am looking at the
9  introduction to your report.  I see that
10  minority voters -- I am looking at the very
11  middle of it.  It says minority voters have
12  the ability to elect minority-preferred
13  candidates.  I am paraphrasing.  You can add
14  to this.  I am not going to use the
15  percentages.  I am not looking at the specific
16  numbers right now.
17      Does your report conclude that in
18  the benchmark plan there are ten Congressional
19  districts that minority-preferred candidates
20  can elect their candidate of choice?
21  A.  Yes.
22  Q.  And does your report conclude

Page 82

1  that, in the proposed plan, there are ten
2  districts in which the minority-preferred
3  candidate can elect their candidate of choice?
4  A.  Yes.
5  Q.  My question, then, is there are
6  no -- there are the same number of districts
7  in both plans that can elect their candidate
8  of choice.  Is that correct?
9  A.  Well, there is a different number
10  of districts in the two plans.  So there are
11  ten out of 32 in the benchmark, and ten out of
12  36 in the proposed plan.
13  Q.  Is it your understanding of
14  retrogression that you could still retrogress
15  even if you keep the same number of districts
16  performing?
17  A.  In the instance where you both
18  increase the number of districts, the minority
19  population increases but the number of
20  minorities in effective minority districts
21  decreases, I would say you have retrogression.
22  Q.  What I am trying to drive at here

Page 83

1  is the difference between a Section 2 case and
2  a Section 5 case.  We discussed earlier that
3  you are familiar with Section 2 cases.  In
4  Section 2 cases, I understand, there has been
5  growth or an additional district that could be
6  drawn, a minority opportunity district that
7  could be drawn.
8      Is that a fair statement of what a
9  Section 2 case is all about?  And, if not,
10  please characterize it however you would like
11  to.
12  A.  Well, there wouldn't necessarily
13  have to be growth.  There could be an instance
14  where you have no minority district and one
15  could have easily been drawn.  I don't know
16  that growth is necessarily relevant to
17  Section 2.  It might be.
18  Q.  So Section 2, then, would be that
19  after a -- during a redistricting cycle, a
20  minority district could be drawn that hadn't
21  been drawn before?  Is that what we are
22  saying?

Page 84

1  A.  Well, Section 2 isn't relevant
2  just to redistricting.  In a general sense
3  Section 2 is, could you have drawn more
4  minority districts in a situation where
5  minorities are cohesive, whites are bloc
6  voting against minorities, and also they meet
7  the first prong of Gingles.  That is, they are
8  sufficiently large and geographically compact
9  to create the district.
10  Q.  What I am trying to understand is
11  the difference between a Section 5 case and a
12  Section 2 case.  Because it seems to me that
13  you have ten districts in the benchmark plan
14  and ten districts in the proposed plan, the
15  same number of districts.  Isn't that correct?
16  A.  Again, you don't have the same
17  number of districts.  You have 32 districts in
18  the benchmark and 36 districts in the proposed
19  plan.
20  Q.  You have the same number of
21  performing districts, according to your
22  analysis?

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 85

1  A.  You have ten in the benchmark and
2  ten in the proposed.  However, you have 32
3  districts in the benchmark and 36 in the
4  proposed.
5  Q.  And my question is, you are
6  hypothesizing, I suppose, that you should have
7  drawn an additional or more Hispanic
8  districts.  And the question is, is that a
9  Section 2 issue or a Section 5 issue?  Because
10  you have the same number of performing
11  districts between both plans.  Ten and ten.
12  But you are saying it is retrogressive,
13  indicating you think they needed to draw more.
14  And I am trying to understand, what is the
15  point of Section 2 and what is the point of
16  Section 5?
17  A.  Section 5 is looking to see if
18  minorities have the same ability to elect.
19  And, in fact, they had 31 percent of the
20  districts effective in the benchmark but it
21  declines to less than 28 percent in the
22  proposed plan.

Page 86

1      Moreover, you have fewer
2  minorities in effective minority districts in
3  the proposed plan than in the benchmark.  Both
4  of those seem relevant to a Section 5 case to
5  me.
6  Q.  Are you familiar with any court
7  case that has held that, when keeping the same
8  number of districts between two plans,
9  nevertheless, it is retrogression because you
10  didn't create another one?
11      MR. MELLETT: Objection to the
12  characterization in terms of you are talking
13  about an increase in districts but you aren't
14  talking about the number of total, the
15  denominator.  You are talking about the
16  numerator.
17      BY MR. MATTAX:
18  Q.  Are you aware of a court case that
19  supports your conclusion?
20  A.  What conclusion?
21  Q.  That this plan retrogresses
22  because it did not increase the number of

Page 87

1  minority districts.
2  A.  In a situation in which the number
3  of districts overall increased by four?
4  Q.  Correct.
5  A.  I don't think there has been an
6  instance where the number of districts have
7  increased by four.
8  Q.  So what is the basis for your
9  conclusion?  Just your personal view?
10  A.  (Pause.)  My personal view checked
11  with some attorneys.
12  Q.  What attorneys did you check with?
13  A.  At the very least, some Department
14  of Justice attorneys.
15  Q.  Let me try to steer clear of
16  privilege here.
17      I will be blunt about it.  Did the
18  Department of Justice attorneys instruct you
19  whether or not you should find retrogression
20  or not?
21  A.  No.
22  Q.  What prompted you, then, to seek

Page 88

1  guidance from the Department of Justice?
2  A.  I told them what my findings were
3  and said I was unclear, in terms of the law,
4  whether my argument was my own argument or
5  legally based.
6  Q.  And your argument is basically a
7  proportionality argument?
8      MR. MELLETT: Objection to
9  characterization.  It mischaracterizes what
10  the witness has stated.
11      BY MR. MATTAX:
12  Q.  Would you characterize your
13  argument as a proportionality argument?
14  A.  Proportionality is part of it.
15  Again, in terms of raw numbers, we do have
16  fewer blacks and Hispanics, particularly
17  Hispanics, in effective districts.  So it is
18  two part.  It is -- it is really three part.
19  Not only do you have an increase in the number
20  of seats, but you have an increase that
21  increases, in large measure, due to a growth
22  in Hispanic population.  And the third

Page 89

1   component of that is the fact that now fewer
2   Hispanics reside in effective minority
3   districts.
4   Q.   Let me provide you this
5   hypothetical, then.  Would you still conclude
6   that the proposed plan retrogresses if the
7   proportion of the districts was the same, but
8   fewer minorities live in the districts that
9   elect the candidate of choice?
10  A.   Repeat the question?
11  Q.   You gave me two reasons why you
12  think the Texas map, the Congressional map,
13  retrogresses.  One, that a smaller percentage
14  of the districts elects the candidate of
15  choice, and a fewer number of blacks and
16  Hispanics reside in an effective minority
17  district.  Is that correct?
18  A.   That's correct.
19  Q.   My hypothetical was, what if the
20  percentage was the same but fewer blacks and
21  Hispanics resided in the effective minority
22  districts.  Would that make a difference?

Page 90

1   Strike that.  Would that still be
2   retrogression?
3   A.   I guess it would depend on the
4   circumstances.  If you were, for example,
5   packing minorities in order to do that -- it
6   would depend on the circumstances,
7   circumstance-specific.  You would have to give
8   me a very specific example.
9   Q.   What percentage of the growth of
10  Hispanics in Texas was citizens?
11  A.   I don't know the answer to that.
12  Q.   Let's turn to page five of your
13  report.  Turn to District 23, table two.
14      You noted there that this is the
15  benchmark plan, I presume?
16  A.   That's correct.
17  Q.   Do you know what the percentage of
18  Hispanic voting age population is in the
19  proposed plan?
20  A.   For District 23?  I could look at
21  the table further back in the report and tell
22  you.

Page 91

1   Q.   Is it relevant?
2   A.   Well, you just asked the question,
3   so I assume --
4   Q.   Before we get to it, if you don't
5   think it is relevant, I don't want to have you
6   waste your time.  Do you think it is relevant
7   to your analysis what the percentage of
8   Hispanic voting age population is in
9   District 23 in making a determination as to
10  whether District 23 is performing or not?
11  A.   In some circumstances, it could be
12  relevant.  Say, for example, you took a
13  district that was 60 percent and you made it
14  20 percent.  That would be relevant.  Let's
15  say you took a district that was 60 percent
16  and made it 61 percent.  No, it wouldn't be
17  relevant.  So it depends on the circumstances.
18  Q.   Is this a district where -- what
19  kind of district is this?  Do they keep the
20  percentage the same or did they decrease it?
21  A.   I will look at the table and tell
22  you.  (Pause).

Page 92

1       What percentage?
2   Q.   Percentage of Hispanic voting age
3   population.
4   A.   Percentage of Hispanic voting age
5   population in 23.  62.8 in the benchmark and
6   63.8 in the proposed.
7   Q.   So a marginal increase.
8   A.   Is that a question?
9   Q.   Yes, that was a question.  That is
10  a marginal increase?
11  A.   Well, it is an increase of one
12  percentage point.
13  Q.   Which is pretty marginal?
14  A.   Could be.
15  Q.   As opposed to a substantial
16  decrease, as you were discussing before?
17  A.   It is not a substantial decrease.
18  Q.   What about the Hispanic citizen
19  voting age population?  Did that remain the
20  same, increase or decrease?
21  A.   In the benchmark it is 58.4.  In
22  the proposed it is 58.5.

Case 1:11-cv-01303-RMC-TBG-BAH   Document 94-6   Filed 11/01/11   Page 26 of 66

State of Texas v.                                                                    Lisa Handley, Ph.D.
United States of America, et al.                                                    October 24, 2011

Page 93

1  Q.   And in Spanish surname voter
2  registration?
3  A.   It is 52 in the benchmark and 54.1
4  in the proposed.
5  Q.   Does the proposed -- based on
6  those numbers alone, could you make a
7  determination as to whether a district gave
8  the Hispanics the opportunity to elect their
9  candidate of choice?
10  A.   No.
11  Q.   Why cannot a district that has
12  58.4 percent of the citizen voting age
13  population not provide that group the
14  opportunity to elect the candidate of their
15  choice?
16  A.   Because, when you look at election
17  performance, you will see that that district
18  simply cannot elect the Hispanic-preferred
19  candidate in the exogenous index, which is all
20  we have to go on in the proposed plan.
21  Q.   I think we are mixing and matching
22  our questions.  I am trying to not find out

Page 94

1  what you think happened, but why that doesn't
2  have the opportunity to do it.
3      It seems like 58.4 percent is more
4  than ample people to control the district.
5  A.   (Pause.)
6  Q.   Or 58.5 percent.
7  A.   I wouldn't look at just the
8  percentage.  I would look at the effectiveness
9  of the district to determine if it is
10  effective or not.
11  Q.   I understand that.  You are
12  answering a different question than I am
13  asking.  I am asking the question, doesn't
14  that give them the opportunity to do it?
15  Doesn't that give -- 58.5 percent seems to me
16  to be a sufficient majority of the population
17  in that district that, if that group of voters
18  voted cohesively, they could, if they chose
19  to, elect the candidate of their choice.
20      MR. MELLETT:  Objection.  It has
21  been asked and answered.
22      MR. MATTAX:  No, it has not.  She

Page 95

1  has said she looked at performance.
2      MR. MELLETT:  You don't like the
3  answer but the fact is that she is giving you
4  an answer to your question.
5      BY MR. MATTAX:
6  Q.   Why doesn't it have the
7  opportunity to elect?
8  A.   I guess that I am a little bit
9  confused about your terminology, on the one
10  hand.  Because I don't use -- I mean,
11  opportunity to elect sounds like Section 2
12  versus Section 5, which is, is it effective
13  and does it continue to be effective.
14      It was effective.  It isn't
15  effective.
16  Q.   The exogenous minority effective
17  index is 40 percent for this district, isn't
18  it?
19  A.   In the benchmark.
20  Q.   And you consider that to be an
21  effective district?
22  A.   I consider it to be a district in

Page 96

1  which two-thirds of the time the
2  minority-preferred candidate was elected.  The
3  endogenous index is 67.
4  Q.   How many elections is that?
5  A.   How many elections is what?
6  Q.   67 percent.
7  A.   In the three elections in which
8  this district had that shape, two of them
9  produced a Hispanic-preferred candidate.
10  Q.   So your testimony is two out of
11  three elections is sufficient to make a
12  determination?
13  A.   Two out of three elections is all
14  we have for this particular district.  It was
15  redrawn in 2006.
16  Q.   I understand that.  That's all the
17  elections we have.  My question isn't that is
18  all the elections we have.  My question is, is
19  that enough elections for you as an expert to
20  make a determination, based solely on three
21  elections, that that is an effective district?
22  A.   Those are the only districts --

Page 97

1  those are the only elections that exist for
2  that district.  And the question is how
3  effective is that district?  Well, two out of
4  three times it elected the minority-preferred
5  candidate?
6  Q.  And the exogenous elections, how
7  many times did it elect the minority-preferred
8  candidate?
9  A.  40 percent of the time in the
10  benchmark.
11  Q.  Is that two out of five elections?
12  A.  It is not two out of five.
13  Q.  How many elections is it?
14  A.  It is 40 percent.
15  Q.  Of how many elections?
16  A.  There are -- I am sorry, that's
17  right.  Sorry about that.  It is two out of
18  five.
19  Q.  How many endogenous elections will
20  the candidate win in the proposed plan?
21  A.  My best prediction is none.
22  Q.  And that is based upon the

Page 98

1  exogenous election results?
2  A.  That is correct.  Since the
3  district changed its shape and the individuals
4  that reside in it, the only way I have to
5  estimate how well that district will do is to
6  look at exogenous elections.  It is not the
7  case in the benchmark.  It is the case in the
8  proposed plans.
9  Q.  In the benchmark plan do you know
10  how many, looking at all the elections, and
11  let's just say 20,000 -- I wish it was
12  20,000 -- 2010, if you look at all the
13  elections in Benchmark 23, do you know how
14  many preferred candidates of choice won?
15  A.  I don't know what you are talking
16  about.
17  Q.  How many exogenous elections were
18  reported for District 23 in 2010?
19  A.  How many exogenous elections were
20  reported?  No idea what you are talking about.
21      (Discussion off the record.)
22      BY MR. MATTAX:

Page 99

1  Q.  Where did you select your
2  exogenous elections from?
3  A.  Do you mean the specific report?
4  It is a report produced by the State of Texas.
5  Q.  My question is, in that report, do
6  you know how many exogenous elections there
7  are?
8  A.  No.
9  Q.  For 2010?
10  A.  Do I know how many exist for 2010?
11  Correct.
12  A.  No.
13  Q.  Would it make any difference to
14  your analysis to look at those elections?
15  A.  What elections?
16  Q.  Those additional exogenous
17  elections for 2010 in Benchmark District 23.
18  A.  That's not how I constructed my
19  index.
20  Q.  My question was, would it make any
21  difference to your analysis if we looked at
22  them?

Page 100

1  A.  Given that my index included only
2  one election from each year, no.
3  Q.  What about exogenous?  Would it
4  make a difference to your exogenous?
5  A.  I am sorry, I thought you said
6  exogenous.  I am sorry.  I misunderstood your
7  question.
8      MR. MELLETT:  I thought you had
9  said exogenous, too.
10      BY MR. MATTAX:
11  Q.  That's what I thought.  You said
12  you only looked at how many exogenous
13  elections?
14  A.  One for each year.
15  Q.  For how many years?
16  A.  2002, 4, 6, 8 and 10.  One for
17  each of those years, exogenous elections.
18  Q.  So you have looked at a total of
19  eight elections to determine whether District
20  23 is performing or not in the benchmark plan?
21  A.  There were three endogenous
22  elections, which are more important.  So I

Page 101

1    don't want you to throw them all together.
2  Q.  But the total elections you looked
3    at is eight over --
4  **A.   Three elections are included in**
5  **the endogenous index; five in the exogenous**
6  **index.**
7  Q.  Do you know how many -- I think
8    you have already answered that.  Let me see if
9    I can find something to mark.
10       Let's go off the record for a
11   second.
12       (Discussion off the record.)
13       (A recess was taken at 2:11 p.m.)
14       (The deposition resumed at 3:28
15   p.m.)
16       **BY MR. MATTAX:**
17  Q.  If you can look at Deposition
18   Exhibit Number 3 which is the Congressional,
19   please.  And we were looking at page five of
20   that when we last left.
21       Did we want to try to call
22   somebody on the phone?

Page 102

1       **MR. MELLETT:** I am sorry, that's
2    right.
3       (Discussion off the record.)
4       **BY MR. MATTAX:**
5  Q.  Let's go back on the record.
6       When we broke some time ago we had
7    been discussing the difference between
8    endogenous and exogenous minority
9    effectiveness index.  And particularly I was
10   referring to your table two.
11       Let's go back and refresh.  With
12   respect to the exogenous minority
13   effectiveness index and the benchmark plan,
14   you show District 23 at a 40.  Please describe
15   what you meant by that.
16  **A.   It means that in two of the five**
17  **elections included in my index the**
18  **minority-preferred minority candidate carried**
19  **the existing benchmark district.**
20  Q.  So by contrasting three of the
21   five elections you looked at, they would not
22   have?

Page 103

1  A.  That's correct.
2  Q.  And then we were discussing where
3    you got that data from.  And I believe you
4    said it was from some reports that were
5    generated by the State of Texas.
6       Let me mark what is called Red 225
7    and let us hope this is the report you were
8    referring to.  This is Red 225 from the 2010
9    general election.  Mark that as Number 4.
10       (Document referred to marked
11   Deposition Exhibit No. 4 for identification
12   and subsequently attached to the deposition.)
13       **BY MR. MATTAX:**
14  Q.  Let me hand you what has been
15   marked as Handley Exhibit Number 4.
16       Would this be the election results
17   from which you looked at your elections?
18  **A.  No.**
19  Q.  Do you know what report it was?
20  **A.  I marked it in here.  Hold on a**
21  **second.**
22  Q.  Let's take a look and see if we

Page 104

1    have one here.
2  **A.   (Pause).  On page four, RMPVA**
3  **multi-underscore all candidates standard,**
4  **underscore, PLANC100 is where I got the data.**
5  Q.  Is there an attachment to your
6    report that shows what those elections were
7    which you looked at?
8  **A.  Well, right in that paragraph**
9  **where I took the report name is the list of**
10  **elections.**
11  Q.  Let's look at Appendix B.
12       (Pause.)
13  **A.  Okay.**
14  Q.  Is Appendix B the elections you
15   were looking at?
16  **A.  Yes.**
17  Q.  Since we are looking at District
18   27, then, which of the four race -- you said
19   you looked at five races.  Which were the two
20   that the minority-preferred candidate didn't
21   win, and which are the three that the
22   minority-preferred candidate did not win, if I

Page 105

1 am understanding this correctly?
2    MR. MELLETT: What district are
3 you talking about?
4    MR. MATTAX: 23. We are still
5 talking about 23.
6    MR. MELLETT: I thought you said
7 27.
8    MR. MATTAX: I am incorrect. I
9 apologize. Thank you for correcting me.
10 I think the only issue we probably
11 have with the Congressional plan is 23, so
12 let's focus on 23.
13    THE WITNESS: And the question?
14    BY MR. MATTAX:
15 Q. Well, according to your exogenous
16 table you have an exogenous minority
17 effectiveness index of 40.
18 A. Okay.
19 Q. I think we discussed that means
20 that two elections the minority candidate
21 wins; two exogenous elections the minority
22 candidate will win; and three elections the

Page 106

1 minority candidate lost. Is that correct?
2 A. That's correct.
3 Q. Now I am looking at Appendix B
4 attached to your report. Is this table
5 showing those results?
6 A. Yes.
7 Q. Now what I am asking, based on
8 Appendix B, what are the three races in which
9 the minority candidate lost in the exogenous
10 races?
11 A. The 2004 GE Court of Criminal
12 Appeals.
13 Q. Okay. Play six?
14 A. The 2006 lieutenant governor,
15 general election. And the 2010 lieutenant
16 governor.
17 Q. Let me have you look at what has
18 been marked as Handley Exhibit 4.
19 Are you familiar with the Red
20 Apple Reports that are generated by the Texas
21 Legislative Council?
22 A. Well, I have seen some of them. I

Page 107

1 don't know how many there are. I would have
2 to say it depends on which one you are talking
3 about.
4 Q. Let's look at Red 225. Do you
5 know what this report does?
6 A. I know a little bit about it.
7 Q. What do you know about it?
8 A. That this is recompiled election
9 results for a whole bunch of contests.
10 Q. So if you turn to page 62 of 91,
11 which shows up here in the top right-hand
12 corner, look for District 23. Which is on
13 page 62. It is about halfway through.
14 A. I see.
15 Q. Or just look for District 23.
16 A. (Pause). Okay. I have District
17 23.
18 Q. And this would include the
19 lieutenant governor -- this is the Plan C100
20 which is the benchmark plan. Correct?
21 A. Plan C100 is the benchmark plan,
22 yes.

Page 108

1 Q. This would show on this data from
2 the legislative council that, in fact, as you
3 said, Lieutenant Governor Dewhurst beat Chavez
4 Thompson in the lieutenant governor's race.
5 A. That's correct.
6 Q. And the difference was about,
7 according to the data -- it speaks for
8 itself -- but it is 54.4 percent and
9 41.7 percent, is that correct, according to
10 this document?
11 A. Yes.
12 Q. Did you look at any of the other
13 races that are in District 23 to determine who
14 won the race?
15 A. I did not other than the
16 endogenous contest.
17 Q. So, for example, you will see
18 District 11, which is kind of bizarre. It has
19 four votes at the very top. So that is
20 something to completely throw out since that
21 it is not in District 11. Do you see what I
22 am saying, then?

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 109

1  A.  Yes.
2  Q.  Then U.S. Rep 23, that was your
3  endogenous election?  Canseco and Rodriguez.
4  A.  Yes.
5  Q.  And that's where Canseco won?
6  A.  Correct.
7  Q.  And you claim he is not the
8  candidate of choice?
9  A.  That's correct.
10  Q.  And is he a Republican?
11  A.  That's correct.
12  Q.  Then you see the next race is the
13  governor, right below, 23?
14  A.  Yes.
15  Q.  And did a Republican win that
16  race?
17  A.  The Republican won that race.
18  Q.  And then the Dewhurst race, which
19  we just discussed, Dewhurst was a Republican?
20  A.  Yes.
21  Q.  And the Attorney General's race?
22  A.  Yes.

Page 110

1  Q.  The next race was not contested.
2  And land commissioner, and a Republican won
3  that race, as well?
4  A.  (Pause.)
5  Q.  Comptroller.  Well, it was
6  contested with a Libertarian.
7      MR. COHEN: And a Green Party?
8      BY MR. MATTAX:
9  Q.  And a Green Party.  I shouldn't
10  say noncontested.  The two major parties
11  didn't contest that race.
12  A.  Okay.
13  Q.  I can go through this whole list.
14  But I can represent to you, my basic data on
15  this shows in the 2010 election approximately
16  50 Republicans won and approximately 15
17  Democrats won in races in District 23.
18      Does that fact have any effect on
19  your analysis as to whether or not District 23
20  was performing or not?
21  A.  No.
22  Q.  Why not?

Page 111

1  A.  Well, because you lumped a whole
2  bunch of elections across years I am not sure
3  of to determine this.  That's not what I did.
4      First of all, the election had to
5  have a minority candidate in it.  I suspect
6  most of these do not.  Second, I chose one
7  from each year so that, for example, 2010
8  wasn't overrepresented.  Neither was 2008.
9  So, no.
10  Q.  Would this give you any indication
11  of whether or not District 23 was a Republican
12  district or a Democratic district?
13  A.  Not without knowing more
14  information.
15  Q.  If you went back and looked at
16  2008, would going through these numbers tell
17  you whether it was a Republican district or a
18  Democratic district?
19  A.  Again, you would have to go
20  through and tell me a bit about each of these
21  elections.  And, again, if you have got
22  elections with four people in it -- I mean, I

Page 112

1  haven't really looked at each of these
2  elections and the percentage of people from
3  that election that fall in this district.  So
4  I can't answer that question.
5  Q.  Would it be relevant if a lot of
6  Hispanic Democrats lost in this district?
7  A.  Not without more information.
8  Q.  Would it be relevant if Hispanic
9  Republicans won in this district?
10  A.  Not without more information.
11  Q.  Given the fact that there were
12  approximately 65 contested elections in
13  District 23, why wouldn't you look at more
14  information in those elections versus just
15  relying on just five elections during a ten
16  year time period?
17  A.  I was interested in only contests
18  that included minorities who are
19  minority-preferred.  And I didn't want to
20  overrepresent any given year.  Hence I chose
21  one from each year.
22      Now, I did actually compare, for

Page 113

1  example, the one that I chose to another top
2  of the ticket to make sure that I would get
3  the same results. But I specifically chose
4  one top of the ticket contest.
5  Q. And I guess we will just move on
6  from this and talk about a couple of other
7  things. But I guess what is interesting to me
8  in District 23 is you concluded that the
9  District 23 and Plan C100 elected the minority
10  candidate choice based on three elections.
11  A. That is the only three endogenous
12  elections that existed.
13  Q. And the five exogenous elections
14  you looked at the minority-preferred candidate
15  of choice did not win the majority of the
16  time, did they?
17  A. That's correct.
18  Q. Based upon the representation
19  which I have made to you, and the data will
20  speak for itself, at least in the 2010
21  election of approximately 65 contests,
22  50 percent, 50/50 of them went to the

Page 114

1  Republicans. And you did no analysis to
2  determine if that affected your conclusion?
3  A. Certainly not irrelevant.
4  Q. What if Congressman Canseco had
5  won -- what if this is all postponed until
6  2012 -- so we are going to do a hypothetical
7  here -- and Congressman Canseco wins the 2012
8  election.
9     MR. MELLETT: Just for
10  clarification, so we have the exact same
11  district?
12     MR. MATTAX: Yes. Same district.
13     BY MR. MATTAX:
14  Q. Let's assume the same district.
15  And he won the 2012 election. It was two to
16  two. Who would the minority-preferred
17  candidate of choice be?
18  A. Who would the minority-preferred
19  candidate of choice be?
20  Q. Right.
21  A. Well, it would depend on who the
22  majority of the Hispanics voted for. We need

Page 115

1  to include that.
2  Q. Would it be a performing district?
3  A. Who did the majority of Hispanics
4  vote for?
5  Q. Let's assume they voted for Ciro
6  Rodriguez. Let's assume Ciro Rodriguez and
7  Representative Canseco, they were the two that
8  ran the last race.
9  A. They did run in 2010.
10  Q. And the Republican, Canseco, beat
11  the Democrat, Ciro Rodriguez. Correct?
12  A. Yes.
13  Q. And it is your view that
14  Congressman Canseco was not the preferred
15  candidate of choice?
16  A. That's correct. The majority of
17  Hispanics did not vote for him.
18  Q. Let's assume that happens again in
19  the next election. So in 2012 Representative
20  Canseco wins again. Would it change your
21  analysis as to who the preferred candidate of
22  choice was?

Page 116

1  A. No.
2  Q. Would it change your analysis of
3  whether it was a protected district?
4     MR. MELLETT: Are you referring to
5  Section 5?
6     MR. MATTAX: Correct. Under
7  Section 5.
8     THE WITNESS: I am assuming what
9  you mean is now you have four elections?
10     BY MR. MATTAX:
11  Q. Four endogenous elections tied two
12  to two.
13  A. Tied two to two.
14     Luckily, I didn't have to answer
15  that question because 50 percent is a toughy.
16  Q. Well, I know we used the term
17  competitive election in a different context
18  earlier. But I know there has been that
19  discussion at least in the Section 2
20  litigation. But to me it seems like a
21  competitive district is where you have two
22  relatively evenly matched candidates and,

Page 117

1  depending on circumstances, one can win or the
2  other one can win.
3      What I am trying to drive at is,
4  when you have a district like that, where you
5  have two Hispanic candidates, both of whom
6  have enough people to win, apparently, since
7  they both won, how do you pick which one is
8  supposed to win?
9  **A.  (Pause.)**
10 Q.  Isn't that what we are doing here?
11 Picking which one we want to win doing this
12 analysis?
13 **A.  How do I pick which one is**
14 **supposed to win?  I have no idea how to answer**
15 **that question.**
16 Q.  So the question is, really, do
17 they have the opportunity to win?
18     **MR. MELLETT:** Are you talking
19 about the Section 2 contest?
20     **MR. MATTAX:** Section 5.  This is
21 all Section 5.
22     **THE WITNESS:** I would say that the

Page 118

1  district -- I guess I would posit a sliding
2  scale of effectiveness, and I am not sure
3  where the courts would come down on a 50/50.
4      **BY MR. MATTAX:**
5  Q.  Have you been in a case in which
6  the courts have had to address the situation
7  where you only had three endogenous elections,
8  which were two to one, and five exogenous
9  elections, which were two to three, to have a
10 court determine whether or not that was a
11 protected district?
12 **A.  I don't know.**
13 Q.  Are you basing your determination
14 that this is a protected district based upon
15 your personal opinion?
16 **A.  Based upon the fact that the**
17 **minority-preferred candidate won the office in**
18 **question more than half of the time.  So,**
19 **usually.**
20 Q.  Two out of three times.
21 **A.  (Indicating.)  Usually.**
22 Q.  Let's turn to page -- look at this

Page 119

1  Appendix A which I think is a summary of the
2  different districts in the different plans.
3      **MR. MELLETT:** This is still in
4  three?
5      **MR. MATTAX:** Yes, Exhibit 3, your
6  Appendix A.
7      **THE WITNESS:** I wonder if I could
8  make a correction to this report.
9      **BY MR. MATTAX:**
10 Q.  If you believe it is inaccurate in
11 any way, you should make a correction to this
12 report.  And today would be a better day to do
13 it than tomorrow, so I don't have to redepose
14 you.
15 **A.  Appendix C, Summary Table of State**
16 **of Texas Data Used to Correct Exogenous Index**
17 **for benchmark Districts.  In fact, that is the**
18 **proposed district.  That was a cut and paste**
19 **in which I didn't change the word to proposed.**
20 **I believe the same is true in that**
21 **other report.**
22     **MR. MELLETT:** Counsel, just to let

Page 120

1  you know, that when we file tomorrow, we are
2  going to go ahead and make that correction
3  because it is a clerical error.
4      **BY MR. MATTAX:**
5  Q.  So Appendix C should read Proposed
6  Districts?
7  **A.  That's correct.**
8  Q.  Appendix B, is that correct?  Any
9  changes to Appendix B?
10 **A.  No, that is the benchmark.**
11 Q.  Appendix A?
12 **A.  No.**
13 Q.  Appendix D?
14 **A.  No.**
15 Q.  Since I am on D, real quick, is
16 this your racially polarized voting analysis?
17 **A.  This is the results of two**
18 **contests that I analyzed personally.**
19 Q.  For what purpose did you analyze
20 them?
21 **A.  To determine, in the instance of**
22 **Congressional District 23, if Canseco was the**

Page 121

1   Hispanic-preferred candidate or not.  And in
2   the instance of Congressional District 29
3   whether Green was the Hispanic-preferred
4   candidate or not.
5   Q.   And do you have any claims that
6   District 29 retrogressed?
7   A.   No.
8   Q.   So the sum and substance of your
9   racially polarized analysis for CD 23 is
10  contained in Appendix D?
11  A.   Repeat the question?
12  Q.   Is there any other data besides
13  the one chart for the 2010 general election in
14  Appendix D showing racially polarized voting
15  analysis for CD 23?
16  A.   Is there anything else in the
17  report?  Is that the question?
18  Q.   Yes.
19  A.   There is nothing else in the
20  report.
21  Q.   Let's go --
22  A.   Sorry, that's not true.  Let me

Page 122

1   think about this for a second.  (Pause.)
2         Appendix B indicates the results
3   of a racially polarized set of contests in 23.
4   Q.   Okay.  Understood.
5         Look at your Appendix A now.  Just
6   looking at the Hispanic districts right now,
7   you have listed 23 -- and this is going to be
8   a little repetitive but I want to make sure I
9   understand this chart.
10        You have listed 23 in the
11  election-focused column as being effective.
12  Is that correct?
13  A.   Under the benchmark.
14  Q.   And that is based on the three
15  endogenous elections?
16  A.   Correct.
17  Q.   And you have not listed it as
18  effective under the election-focused approach
19  in the proposed plan?
20  A.   That is correct.
21  Q.   And that is based on exogenous
22  elections?

Page 123

1   A.   Correct.
2   Q.   Under the benchmark plan it was
3   not a performing district under the exogenous
4   elections, either?
5   A.   The district got a 40 on the
6   exogenous index.
7         They did perform.
8   Q.   Do you consider that 40 percent to
9   be a performing district?
10  A.   Again, the endogenous index is
11  more relevant in the benchmark than the
12  exogenous index.
13  Q.   But for purposes of comparing,
14  since there are no endogenous election results
15  for the proposed district, I am just trying to
16  say comparing the exogenous elections in the
17  benchmark plan, the proposed plan, they were
18  both less than 50 percent?
19  A.   It went from 40 percent to
20  zero percent.
21  Q.   And you have 34 as a new district.
22  Is that performing?

Page 124

1   A.   Yes.
2   Q.   And 35 as a new district, and that
3   is performing?
4   A.   According to the election-focused.
5   Not according to the State of Texas.
6   Q.   But according to you, you would
7   consider it performing?
8   A.   That's correct.
9   Q.   So that's where you end up with
10  saying there were seven performing in the
11  benchmark and seven performing in the proposed
12  plan?
13  A.   Yes.  23 was not performing.  35
14  is performing.
15  Q.   If 23, based on exogenous -- this
16  is a hypothetical.  Bear with me.  If CD 23 in
17  the benchmark plan based upon exogenous
18  elections is considered not to be performing,
19  would that change your opinion as to whether
20  or not the Congressional plan violated
21  Section 5?
22  A.   I wouldn't make a decision based

Page 125

1    on the exogenous elections, given that I have
2    endogenous elections.
3    Q.   Let's go back to the
4    proportionality real quick.  Then we will move
5    on to the House.
6        (Discussion off the record.)
7        BY MR. MATTAX:
8    Q.   In looking at your ultimate
9    conclusion on retrogression, I believe you
10   compared -- let's go to the bottom of this
11   page, the last page of your appendix, the back
12   of your Appendix A here.
13       You were saying 10 out of 32 was
14   the benchmark plan and 10 out of 36 is the
15   proposed plan.  Therefore, it is
16   retrogressive.  Is that correct?
17   A.   I am sorry, I didn't hear the last
18   part of it.
19   Q.   It is 10 out of 36 under the
20   proposed plan and that's what makes it
21   retrogressive?
22   A.   Sorry.  Repeat the question from

Page 126

1    the beginning.
2    Q.   In looking at your totals down
3    here in this chart, you have 10 out of 32
4    districts in the benchmark plan, and 10 out of
5    36 in the proposed plan, and then you have
6    percentages underneath them showing 31.3
7    percent and 27.7 percent.
8    A.   That's correct.
9    Q.   Are those percentages what lead
10   you to conclude that it is retrogressive?
11   A.   In part, yes.
12   Q.   If you were to eliminate the black
13   districts, what impact if any would that have
14   on your conclusion?
15   A.   I am sorry?
16   Q.   Well, are you suggesting you could
17   have drawn additional black districts in this
18   plan or there was a retrogression of black
19   districts?
20   A.   There were -- yes.  The answer is
21   yes.
22   Q.   There was a retrogression of black

Page 127

1    districts?
2    A.   That's correct.
3    Q.   Which district was retrogressed?
4    A.   Using the -- there were, again, 32
5    districts in the benchmark and 36 districts in
6    the proposed.  So you went from 9.4 to 8.3.
7    Q.   Correct.
8        So, based upon that, you concluded
9    that the black Congressional districts
10   retrogressed, as well?
11   A.   (Pause.)
12   Q.   Is that correct?
13   A.   (Pause.)  Yes, the percentage is
14   lower.
15   Q.   Does that mean that you concluded
16   they retrogressed?
17   A.   I guess I would have to say I
18   focused on the plan as a whole and totaled up
19   the numbers.  But, percentage-wise, it is
20   lower.
21   Q.   Well, let's assume, then, in
22   response to that, that District 23 had

Page 128

1    remained effective under your analysis.  Then
2    looking at your appendix, that would have been
3    11 out of 36.  Would that have been
4    retrogressive?
5    A.   (Pause.)  I don't think so, but I
6    would need you to do the percentages for me.
7    I don't believe so.
8    Q.   Well, if the percentage was lower,
9    would it retrogress?
10   A.   Possibly.
11       MR. MATTAX: Can we take a break
12   and get a calculator?
13       (Discussion off the record.)
14       MR. MATTAX: While we are doing
15   that let me just look through my notes here.
16       (Pause.)
17       (Discussion off the record.)
18       MR. MELLETT: 30.55 percent.
19       MR. COHEN: That's what I got,
20   too.
21       BY MR. MATTAX:
22   Q.   Assuming the election-focused

Page 129

1   approach in the proposed plan was
2   30.55 percent, which is less than
3   31.3 percent, the percentage in the election
4   focused approach in the benchmark plan, would
5   you conclude that the proposed plan violated
6   Section 5?
7 **A.  I suppose I would need to know, at**
8 **least in part, how many of the additional**
9 **districts could have been Hispanic.**
10 **Certainly, if you could only draw one**
11 **additional Hispanic district, it would be**
12 **unavoidable retrogression, in which case it**
13 **would not be retrogressive.**
14  Q.  But you do conclude that, based on
15  mere percentages, it was retrogression.  The
16  question would be whether it was unavoidable
17  retrogression?
18 **A.  No.  As I said before, in part, it**
19 **was based on the percentages.  There was also**
20 **the fact that you had fewer minorities in**
21 **effective seats.**
22 **    And the fact that you could have**

Page 130

1 **created an additional Hispanic district and**
2 **did not.**
3  Q.  But we were under my operating
4  assumption that you had 11 out of 36
5  districts.  And, we were trying to do a
7  so I can understand your analysis here.
8      Under the hypothetical there are
9  11 out of 36 performing districts in the
10  proposed plan, and there were 10 out of 32
11  districts in the benchmark plan, which means
12  that the proposed plan would have
13  30.55 percent and the benchmark would have
14  31.3 percent.
15      My question to you was, would that
16  be a retrogressive plan?
17 **A.  The answer is there is not enough**
18 **information.**
19  Q.  So percentages are insufficient to
20  make a determination?
21 **A.  Not in all cases.  Say the**
22 **percentage went from 60 to 30.  It would**

Page 131

1   depend.
2     **MR. MATTAX:** Let me confer with
3   him for five minutes, see if we are done with
4   Congress.  Then we will start on the House.
5     (Discussion off the record.)
6     (A recess was taken.)
7     **BY MR. MATTAX:**
8  Q.  We are getting back to your
9   Congressional report, which is Exhibit
10  Number 3, I think.  Turn to Page 3.
11  Footnote 5.
12      Could you just read for the record
13  what this paragraph says and then, after that,
14  what you interpret it to mean?
15 **A.  Footnote 5?**
16  Q.  Yes.
17 **A.  U.S. Department of Justice**
18 **guidelines state:  "In determining whether the**
19 **ability to elect exists in the benchmark plan**
20 **and whether it continues in the proposed plan,**
21 **the Attorney General does not rely on any**
22 **predetermined or fixed demographic percentages**

Page 132

1 **at any point in the assessment.  Rather, in**
2 **the Department's view, this determination**
3 **requires a functional analysis of the**
4 **electoral behavior within the particular**
5 **jurisdiction or election district.  As noted**
6 **above, census data alone may not provide**
7 **sufficient indicia of electoral behavior to**
8 **make the requisite determination."**
9  Q.  And you cited this in your report?
10 **A.  That's correct.**
11  Q.  For what purpose?
12 **A.  (Pause).  For the purpose of**
13 **indicating that I was not the only one that**
14 **thought you should go beyond simply looking at**
15 **the demographics of the composition of the**
16 **district.**
17  Q.  Did you perform the functional
18  analysis referred to by the Department of
19  Justice here?
20 **A.  Indeed, yes.**
21  Q.  So is this the functional analysis
22  that the Department of Justice has adopted?

Page 133

1  A.  This is the analysis I did.
2  Q.  How do we know if it is the
3  functional analysis that the Department of
4  Justice is referring to in this Federal
5  Register site?
6  A.  I guess you would have to ask the
7  Department of Justice.
8  Q.  So it could be different?
9  A.  This was certainly a functional
10  analysis.
11  Q.  So if someone were to do a
12  functional analysis and disagreed with you,
13  how would we know which analysis the Attorney
14  General thought was proper?  Could we, from
15  what you have read or what you know?
16  A.  Well, I assume the Justice
17  Department could tell you.  Perhaps a judge
18  could tell you.
19  Q.  But you couldn't know now, as we
20  sit here today?
21  A.  I couldn't know what?
22  Q.  What the correct functional

Page 134

1  analysis is you are supposed to perform.
2  A.  I believe I have done the correct
3  functional analysis.  By functional, I take it
4  to mean election approach.
5  Q.  So has this effectiveness index
6  been adopted by other experts?
7  A.  I don't know.
8  Q.  Has this effectiveness index been
9  adopted by the Department of Justice?
10  A.  I don't know if they adopt
11  indexes.
12  Q.  Do you know what functional
13  analysis the State of Texas should have used
14  based on this guidance?
15  A.  I know they should have looked at
16  more than demographics.  They should have
17  looked at elections with minority-preferred
18  minority candidates.
19  Q.  Do you know whether or not that
20  was done?
21  A.  I know lots and lots of
22  information was out there to do it.  I saw no

Page 135

1  signs that it was used in the complaint.
2  Q.  Have you reviewed any of the
3  discovery in this case or in the Section 2
4  case to determine whether it was done?
5  A.  Discovery?  I am afraid I don't
6  know what the term --
7  Q.  Depositions.
8     MR. MELLETT:  Can I just -- I am
9  unsure in terms of your question.  Are you
10  talking about whether or not there have been
11  any experts that have conducted a functional
12  analysis or whether the State of Texas did it?
13     MR. MATTAX:  No, I just asked her
14  the question as to whether or not the State of
15  Texas did a functional analysis and she said
16  she was not sure.
17     Let's just ask the question again.
18  We will start over.
19     BY MR. MATTAX:
20  Q.  Do you know whether or not the
21  State of Texas did a functional analysis in
22  drawing the Congressional and, for that,

Page 136

1  matter, the House plan?
2  A.  I know the State of Texas compiled
3  all the information making it possible.  And I
4  know it didn't show up in the complaint.
5  Beyond that, I couldn't say.
6  Q.  Are there other functional
7  analyses that could be done besides the
8  effectiveness index?
9  A.  Well, the effectiveness index is
10  my term for looking at the actual performance,
11  electoral performance of the district.  I
12  think that functional analysis means electoral
13  performance, whether you call it index or not.
14  You might call it something else.
15  Q.  If the State of Texas looked at
16  say ten elections for electoral performance
17  versus five, would that be acceptable to the
18  Department of Justice?
19  A.  Not necessarily.
20  Q.  Why not?
21  A.  It depends on the elections.  It
22  depends on the years.  It depends on the

Page 137

1  candidates.
2  Q.  And what guidance does the
3  Department of Justice give you to tell you
4  what elections to look at?
5  **A.  Since the aim is looking at the**
6  **ability of minority candidates,**
7  **minority-preferred minority candidates to win,**
8  **I guess I have that degree of direction.  I**
9  **also know that endogenous elections are more**
10 **probative than exogenous elections.**
11 Q.  Did you get any instructions from
12 the Department of Justice in this case on
13 whether to look at five general elections for
14 exogenous, or ten or twenty?
15 **A.  Do you mean did I -- no, I did the**
16 **analysis first.**
17 Q.  So there is nothing written down
18 anywhere, there is nothing anybody told you to
19 say, when you do your effectiveness index,
20 here is the way we want you to do it?
21 **A.  There might be something written**
22 **down.  I don't know.**

Page 138

1  Q.  Do different experts approach this
2  task differently?
3  **A.  Do different experts approach this**
4  **what differently?**
5  Q.  Do they approach the task of
6  determining the effectiveness of elections in
7  a manner different than you?
8  **A.  I don't know.**
9  Q.  I guess my question is your
10 methodology is not universally accepted?
11 **A.  What methodology?**
12 Q.  The effectiveness index concept
13 you use, picking five general elections and
14 the methodology that went into your report in
15 this case?
16 **A.  I think the word methodology is**
17 **misused.  But I don't know of any sort of**
18 **rules suggesting that you look at five**
19 **elections.**
20 Q.  So I am clear on the record, why
21 did you only pick five general elections for
22 your exogenous comparison?

Page 139

1  A.  I picked one from --
2  MR. MELLETT: Objection.  Asked
3  and answered.  We have done this before.
4  BY MR. MATTAX:
5  Q.  Humor me.  I apologize.  Then we
6  will move on.
7  **A.  I picked one for each year that**
8  **there was an election during the period we are**
9  **talking about, between redistrictings.  I did**
10 **that because I didn't want any given year, any**
11 **single year to dominate.  Second of all, I**
12 **chose a top of the ticket Hispanic -- an**
13 **election that occurred that included a**
14 **Hispanic candidate that I knew was**
15 **Hispanic-preferred.**
16 Q.  Did you look at any primary
17 elections?
18 **A.  What do you mean by did I look at**
19 **any?**
20 Q.  Were any primary election results
21 included in any of the analyses that you have
22 put forward in your reports?

Page 140

1  **A.  I have analyzed a primary election**
2  **or two, yes.**
3  Q.  Which primaries did you analyze in
4  the Congressional map?
5  **A.  None in the Congressional map.**
6  **Well, none that I can remember.**
7  **Do you mean that I personally**
8  **analyzed?**
9  Q.  That you personally analyzed.
10 **A.  That's correct.**
11 Q.  Or that were part of your report?
12 **A.  That's correct.**
13 Q.  So there were no -- so the record
14 is clear, there were no primaries that either
15 you analyzed or that comprise your report for
16 the Congress.  Is that correct?
17 **A.  I believe that's correct.**
18 Q.  You mentioned, and I think you
19 have mentioned you only filed -- I think we
20 had some discussion on whether the report was
21 filed or not.  But I do want to mention, you
22 said you prepared one report for the State of

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 141

1    Alaska showing there was no retrogression in
2    the State's plan for this cycle.  Is that
3    correct?
4    **A.  That's correct.**
5    Q.  So that would have been done very
6    recently?
7    **A.  About 70 days ago I suppose it is**
8    **was filed with the Department of Justice.**
9    Q.  Is the methodology used in that
10   report the same as the methodology you used
11   here?
12   **A.  In Alaska we had no statewide**
13   **elections that included minorities that were**
14   **minority-preferred.  So, in fact, there were**
15   **not five elections that I could look at in**
16   **terms of recompiled election results.**
17   Q.  For exogenous elections?
18   **A.  That's correct.**
19   Q.  So with respect to endogenous
20   elections, did you perform the same type of
21   analysis?
22   **A.  Yes.**

Page 142

1    Q.  As you sit here today, is there
2    anything inconsistent in that report that you
3    can think of today with the reports that you
4    filed in this case?
5    **A.  No.**
6    Q.  I am not going to spend time going
7    over it, but I am going to mark it for the
8    record.  Then we can look at it, and ask you a
9    couple of questions.
10      **MR. MATTAX:** Let me mark Number 5.
11   (Document referred to marked
12   Deposition Exhibit No. 5 for identification
13   and subsequently attached to the deposition.)
14      **BY MR. MATTAX:**
15   Q.  Let me represent to you that I
16   looked on the internet and found this report.
17   It has your name on it.  So you will need to
18   take your time to look at that and tell me if
19   this is, in fact, the plan -- excuse me, the
20   report you filed in Alaska.  Take your time to
21   make sure it is the right report.
22   **A.  (Pause).  It is.**

Page 143

1    Q.  Turn to page 21 of 31 of this
2    report.  I noticed a terminology that you used
3    in this report we haven't talked about today.
4    **A.  I am sorry, repeat the page?**
5    Q.  21 of 31.
6       It says under the benchmark
7    plan -- and I am looking under 4.1, the third
8    paragraph.  In the middle of that paragraph it
9    says, "One district that might best be
10   characterized as an equal opportunity
11   district, District 6."
12      What is an equal opportunity
13   district, in your mind?
14   **A.  Here I meant a district that did**
15   **not elect a candidate of choice on every**
16   **occasion, an endogenous candidate of choice on**
17   **every occasion.**
18   Q.  Did you conclude, then, that
19   District 6 was a protected district in this
20   plan?
21   **A.  Yes.**
22   Q.  Was District 6 maintained?

Page 144

1    **A.  Yes.**
2       **Well, District 6 was redrawn, but**
3    **the same number of districts were maintained.**
4    Q.  Help me.  I am sorry.  Did that
5    change your answer?  Was District 6 performing
6    and did it still perform?  Or was it redrawn?
7    **A.  The same number -- the state was**
8    **completely redrawn, so there is no District 6**
9    **that looks like the old district.  District 6**
10   **was included in the benchmark number and the**
11   **number of districts in the benchmark number**
12   **showed up in the proposed plan.**
13   Q.  Let me turn to page 28 of 31 and
14   help me understand what you meant by this
15   quotation you have here.
16      It says -- and we are getting back
17   to this District 6.  And you have the
18   benchmark plan provided four effective and at
19   least one equal opportunity district.
20      So was District 6 an effective
21   district or not?
22   **A.  It was a protected district.**

Page 145

1  Q.  Where does it say that, so I will
2  know?
3  **A.  Again, if you count up the number**
4  **of districts in the benchmark and compare it**
5  **to what is proposed, you will see the same**
6  **number.**
7  Q.  Could you do that for me real
8  quick?  I don't want to spend much more time
9  on this.  If you can tell me the numbers, that
10  would be useful.
11  **A.  Okay.  The benchmark included four**
12  **effective and one equal opportunity.  The**
13  **proclamation plan included five effective**
14  **districts.  That would be four plus one, five.**
15  **The proclamation plan, five.**
16  Q.  The next chart I am looking at has
17  six in it.  That is what is confusing me a
18  little bit.
19  **A.  It includes Southeast Alaska,**
20  **which is not benchmark District 6.**
21  Q.  Are there six performing then?
22  **A.  District 34 is in Southeast**

Page 146

1  **Alaska.  It is not performing but it has a**
2  **substantial Alaskan native population and,**
3  **hence, it is included in this chart.**
4  Q.  District 34?
5  **A.  It is District 5 in the old plan**
6  **and District 34 --**
7  Q.  I got you.
8      Let me see if there is anything
9  else I saw on this.  If not, we will move on.
10  (Pause).
11      Do different districts have to
12  have different percentages of minority voters
13  in which to become effective?
14  **A.  You have to do a functional**
15  **analysis.  It may be the case that a district**
16  **in one specific area can elect, as in Alaska,**
17  **at 40 percent, while another district in a**
18  **different area requires a higher percentage.**
19  Q.  Why would that be?
20  **A.  It could be turnout.  It could be**
21  **white versus minority turnout.  It could be**
22  **something else.**

Page 147

1  Q.  Could it be the crossover of the
2  white vote?
3  **A.  Yes, it could be.**
4  Q.  What is -- let's go ahead and look
5  at the House plan now.  So we can look at
6  the -- to follow right up on what we were just
7  talking about.  Look at the House plan, which
8  I think we have marked as Number 2.
9      You have one of these districts --
10  I will find it here -- that only has 20 -- I
11  am looking at page five of your report and it
12  looks like it is District 137.  It only has
13  25.6 HCVAP.  But I think you have
14  characterized this as a Hispanic district.  Is
15  that correct?
16  **A.  I will look at mine.  (Pause).**
17      **MR. MELLETT:** I am sorry, what was
18  the number?
19      **MR. MATTAX:** 137.
20  (Discussion off the record.)
21      **THE WITNESS:** You have to repeat
22  the question.

Page 148

1      **BY MR. MATTAX:**
2  Q.  I am looking at page five of your
3  report.  I am looking at a chart that says
4  table one.  I am looking at a district that
5  says 137 that has a percentage HCVAP as
6  25.6 percent.  The way I interpreted your
7  report was you called that an Hispanic
8  district.
9      My question is, is that true,
10  question 1?  Do you consider 137 an Hispanic
11  district?
12  **A.  The district is 59.8 percent**
13  **Hispanic in voting age population.  So, yes, I**
14  **consider that Hispanic district.**
15  Q.  Do you consider that a performing
16  district?
17  **A.  I do.**
18  Q.  So my question is, with
19  25.6 percent of the population, that can't be
20  performing based solely on the Hispanic vote,
21  can it?
22  **A.  It could be Hispanics are voting**

Page 149

1  **with blacks and they are electing.  It could**
2  **be that whites aren't turning out in this**
3  **district.  Well, so, you know, the answer is I**
4  **don't know.  It could be Hispanics alone.  It**
5  **might not be Hispanics alone.**
6  Q.  Could it be Hispanics and whites?
7  **A.  It could be.**
8  Q.  Would that be a crossover
9  district, like we were discussing in Alaska?
10  **A.  A crossover district?**
11  Q.  Right.
12  MR. MELLETT: Objection.
13  Mischaracterized the testimony.
14  MR. MATTAX: I thought that's what
15  she said in Alaska.  That's okay.
16  BY MR. MATTAX:
17  Q.  If whites cross over to vote with
18  Hispanics, in your view, would that create a
19  protected district?
20  **A.  I need more information than that.**
21  Q.  Let me give you a hypothetical.
22  You have a district that has 25.6 percent

Page 150

1  Hispanic citizen voting age population, and
2  the turnout is 100 percent and they all vote
3  for the Hispanic candidate.  Would that be
4  sufficient to elect their candidate of choice?
5  **A.  It would depend.**
6  Q.  What analysis did you do of
7  District 137 to answer that question?
8  MR. MELLETT: Do you mean in your
9  hypothetical?
10  MR. MATTAX: She has listed it as
11  an effective performing district.  I assume
12  she did some analysis to determine how
13  25.6 percent HCVAP could be a performing
14  district.
15  MR. MELLETT: I am sorry, you had
16  just gone from your hypothetical.  You are off
17  your hypothetical?  That's what I wanted to
18  clarify.
19  MR. MATTAX: Sure.
20  BY MR. MATTAX:
21  Q.  We will stay on the hypothetical.
22  I am just trying to figure out if 25.6 percent

Page 151

1  of the HCVAP vote for the minority candidate
2  and 25 percent of the Anglos vote for the
3  minority candidate, which would create a
4  majority, would you consider that a crossover
5  district?
6  **A.  I know that blacks voted for the**
7  **candidate.  I don't know if whites did or not.**
8  **I can't remember.**
9  Q.  I am just trying to be clear on
10  what your analysis.  I am not trying to put
11  words in your mouth here.  I just want to know
12  what you did or didn't do.
13  Do you know if 137 is or is not a
14  white crossover district?
15  **A.  I know that the district elects**
16  **the Hispanic-preferred candidate.  Whether it**
17  **does that with no white vote or some white**
18  **vote, I do not know.**
19  Q.  What about 51 that also has
20  45.8 percent HCVAP?  Does that do that with
21  white crossover vote?
22  **A.  I don't know.**

Page 152

1  Q.  And 148 that has 42.1, does that
2  do that with white crossover vote?
3  **A.  I don't know.**
4  Q.  And District 90 that has 47.9,
5  does that do that with white crossover vote?
6  **A.  I am sorry, which district?**
7  Q.  90.
8  **A.  (Pause).  I misspoke.  I can**
9  **answer these questions to some degree.**
10  **90 and 137, I did do a racial bloc**
11  **voting analysis of the 2010 general.  There**
12  **was white crossover vote.  Whether that was**
13  **sufficient to elect the candidate of choice, I**
14  **am unclear about that.  But there is white**
15  **crossover vote.**
16  Q.  Let me ask the opposite of the
17  question, then.  Without the white crossover
18  vote, would it have been sufficient to elect
19  the candidate of choice?
20  **A.  I don't know the answer to that.**
21  Q.  Let's go back to Government
22  Exhibit Number 1.  You don't have to get it if

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 153

1  you remember.  I asked you a question about
2  whether you agreed with, on the House side,
3  districts that they had mentioned.  And they
4  mentioned 33.
5      Let's try to find 33 on your chart
6  here on the benchmark plan.
7      So 33, here, I see has 80 percent
8  endogenous and 60 percent exogenous, looking
9  at your chart here.  Is that correct?
10 A.  Yes.
11 Q.  The one right above it, 78, which
12 has 56.2 percent HCVAP, has 20 percent
13 endogenous and 20 percent exogenous.  Is that
14 correct?
15 A.  That is.
16 Q.  And then let me jump up to another
17 one that has a 20 percent exogenous, which is
18 74.  Do you consider this one performing?
19 A.  It has a 100 on the endogenous
20 index, which in terms of the benchmark, is
21 more probative.  So, yes.
22 Q.  We may come back to this chart in

Page 154

1  a minute.  But let me jump to your chart table
2  three which is on page seven.
3      When you say additional benchmark
4  minority State House districts, what does that
5  mean?
6  A.  These are districts that are more
7  than 50 percent minority in composition that
8  elect minorities that are minority-preferred
9  to office.
10 Q.  Do you know whether these
11 districts require white voters to vote to
12 elect the minority candidates of choice?
13 A.  There may or may not be crossover
14 vote.
15 Q.  Do you know if the crossover vote
16 is necessary to elect the candidate of choice?
17 A.  I do not.
18 Q.  Would it make any difference to
19 your analysis if it did?
20 A.  That factor alone, no.
21 Q.  Just sticking with this table so
22 we can sort of focus on one thing for a while

Page 155

1  and try to go through a sort of series of
2  questions with it.
3      In table three you have four
4  districts that you call additional benchmarks:
5  Numbers 27, 120, 46 and 149.  Did you do any
6  racially polarized voting analyses of those
7  districts?
8  A.  Yes.
9  Q.  Is that included in your report?
10 A.  (Pause).  No.
11 Q.  Was that data provided -- was the
12 data establishing racial polarization in those
13 districts provided to the United States
14 Government?
15 A.  I am sorry?
16 Q.  Let me back up.  You testified
17 that with Districts 27 -- this is House
18 Districts 27, 120, 46 and 149, that you did a
19 racially polarized voting analysis.  Is that
20 correct.
21 A.  No.
22 Q.  You did not do one?

Page 156

1  A.  You asked me if I did any of those
2  districts.  I did do it of one of those
3  districts.
4  Q.  Thank you.  Which district did you
5  do it for?
6  A.  149.
7  Q.  Is that included in your report?
8  A.  No, it is not.
9  Q.  So the record is clear, for 27,
10 120, and 46, you did not do a racially
11 polarized voting analysis.  Is that correct?
12 A.  I better back up.  I am not
13 positive.  I don't think I did.
14 Q.  And for 149 you recall doing one.
15 Is that correct?
16 A.  Yes.
17 Q.  And is that included in your
18 report?
19 A.  No.
20 Q.  Is any of the data underlying that
21 analysis, was that given to the Department of
22 Justice?

Page 157

1  A.  Well, I assume so.
2  Q.  Do they have it?  Do they have the
3  data underlying that?
4  A.  That's where I got, yes.
5  Q.  It is a little difficult, since I
6  don't have it in your report.  But do you
7  recall what your findings were on District
8  149?
9  A.  I looked at 149 to ensure that
10  blacks and Hispanics were supporting the
11  incumbent.  And I looked at 2000 -- at least
12  2008 and 2010.  And the analysis showed that
13  blacks and Hispanics did support the Asian
14  Democrat.
15  Q.  Looking at these statistics it
16  would appear to me that neither the blacks nor
17  the Hispanics nor the Asians could elect their
18  candidate of choice by themselves.  Is that
19  fair to say?
20  A.  It would depend on turnout rates.
21  Q.  So for purposes of your analysis,
22  is it your understanding of the Voting Rights

Page 158

1  Act that, if a minority can elect their
2  preferred candidate of choice but could only
3  do so with the assistance of either other
4  minorities or Anglo voters, that that district
5  would be a protected district?
6     MR. MELLETT:  Under Section 5 of
7  the Voting Rights Act?
8     MR. MATTAX:  Under Section 5 of
9  the Voting Rights Act.
10     THE WITNESS:  It would depend on
11  the circumstances.
12     BY MR. MATTAX:
13  Q.  What circumstances would those be?
14  A.  In this particular instance we
15  have a minority consistently elected in a
16  district in which minorities control the
17  district.
18  Q.  So is it an Asian district, then?
19  A.  It is a minority district.
20  Q.  Just so I can understand your
21  analysis, if I had a district that was
22  26 percent black citizen voting age population

Page 159

1  and 26 Hispanic citizen voting age population,
2  and your analysis showed that they elected the
3  candidate of choice, that would be a protected
4  district?
5  A.  I can't answer that without more
6  information.
7  Q.  Is it important to determine
8  whether or not the blacks support the Hispanic
9  candidate of choice in a primary to determine
10  whether or not the black candidate of choice
11  is elected in a general election?
12  A.  In a district that it is
13  not majority-- you will have to give me --
14  Q.  In a district that is not majority
15  black.
16  A.  Repeat the question with all of
17  the information.
18  Q.  Sure.  Is it important to
19  determine, in determining whether a district
20  elects the black candidate of choice, in a
21  district that has an equal number of Hispanics
22  and black voters of voting age population and

Page 160

1  citizens, to determine whether, in a primary,
2  the district elects the black candidate of
3  choice?
4  A.  That would be very useful
5  information to have.
6  Q.  If you had primary information
7  that showed, in a district, that in the
8  primaries Hispanics voted -- hypothetically,
9  in a primary you had a black candidate and you
10  had an Hispanic candidate in the primary.  If
11  the Hispanics voted overwhelmingly for the
12  Hispanic candidate and the blacks voted
13  overwhelmingly for the black candidate, would
14  the Hispanic candidate be the black candidate
15  of choice in that district?
16  A.  You are talking about a primary
17  election-specific to that office, in other
18  words?
19  Q.  Correct.
20  A.  So a particular candidate runs
21  State House for any primary in which their
22  choice is different.

Page 161

1  Q.   In which there is a competition
2  between an Hispanic candidate and a black
3  candidate.  My question is, if the blacks vote
4  in that district for the black candidate, is
5  the Hispanic candidate the black candidate of
6  choice?
7  A.   Under the circumstances that I
8  just mentioned, that is, that is the office at
9  issue, no.  Well, they are the candidate of
10 choice once you come to the general.  But
11 certainly not in the primary.
12 Q.   Let's look at page nine of your
13 report.
14      I am looking at Footnote 14.  Can
15 you elaborate on what you are trying to
16 establish with Footnote 14?
17 A.   That the Hispanic who ran -- I was
18 trying to determine if the Hispanic who ran
19 was the Hispanic-preferred candidate or not.
20      Maybe I mean if the Hispanic who
21 won.  Because there could have been two
22 Hispanics against each other.

Page 162

1  Q.   So if the Hispanic who won was a
2  Republican in an Hispanic district that could
3  elect the Hispanic candidate of choice, would
4  that make the Republican the Hispanic
5  candidate of choice?
6  A.   I would need to do a racial bloc
7  voting analysis to determine if it was the
8  Hispanic-preferred candidate.
9  Q.   Going back to the United States'
10 identification of elections considered, they
11 mentioned 149, which we have just discussed a
12 moment ago.  That was the district that we
13 discussed that has an Asian.
14 A.   Yes.
15 Q.   They also mentioned Districts 35,
16 41 and 117.  Are those Republican or
17 Democratic districts?
18 A.   I don't know.
19 Q.   Is the incumbent a Republican?
20 A.   I can look and see.
21 Q.   Okay.
22 A.   Give me the numbers again.

Page 163

1  Q.   33.
2  A.   (Pause).  33 is represented by a
3  Hispanic Republican.
4  Q.   35.
5  A.   35 is currently represented by a
6  Hispanic Republican.
7  Q.   41.
8  A.   41 is represented by a Hispanic
9  Democrat.
10 Q.   Who is that?
11 A.   No.  Hispanic Republican.
12 Q.   And 117?
13 A.   He was a Hispanic Democrat when he
14 was elected.  Sorry.  He is now a Republican.
15 Q.   And 117?
16 A.   What is the question?
17 Q.   117, who are they represented by?
18 A.   A Hispanic Republican.
19 Q.   So if my understanding is correct,
20 of the five districts the United States has
21 identified, they have identified 149, which
22 you characterized as an additional benchmark

Page 164

1  minority district that has 26 percent blacks
2  citizen voting age population, 19 percent
3  Hispanic, and 16 percent Asian.  Then they
4  identified four districts held by a
5  Republican.
6  A.   The four districts are currently
7  represented by Hispanic Republicans.
8  Q.   I believe you said that you didn't
9  have an opinion on 41, so let's skip that.
10      But is it your opinion that the
11 Republicans in Districts 33, 35 and 117 are
12 not the candidates of choice?
13 A.   35, 78 and 117?
14 Q.   No.  33, 35 and 117.
15 A.   Yes, that's correct.
16 Q.   Is that because they are
17 Republicans?
18 A.   No, that's because I did a racial
19 bloc voting analysis.
20 Q.   But they are Hispanics, though.  I
21 assume there is no racial animus by Hispanics
22 against Hispanics.  Or is my assumption

Page 165

1   incorrect in those districts?
2   **A.  I did a racial bloc voting**
3   **analysis and the Hispanics preferred a**
4   **Democrat whether he was Hispanic or not.**
5   Q.  Is it your conclusion then, at
6   least in Districts 33, 35 and 117, the race of
7   the candidate is irrelevant?
8   **A.  It is my conclusion that Hispanics**
9   **did not prefer the Hispanic Republican.  I**
10  **don't know if the opposition was Republican --**
11  **not Republican.  Whether the opposition was**
12  **Hispanic or not.**
13      MR. MATTAX: Let's go off the
14  record for a second.
15      (Discussion off the record.)
16  **BY MR. MATTAX:**
17  Q.  I guess this is what I am driving
18  at to try to understand, when you are talking
19  about the Hispanic candidate of choice in
20  Texas, it seems like you are saying it is just
21  who the Democrat is.
22      MR. MELLETT: Objection.

Page 166

1   Mischaracterization of testimony.
2   **BY MR. MATTAX:**
3   Q.  We have three districts we just
4   talked about where it was the Republican
5   candidate was an Hispanic.  And you concluded
6   they were not the candidate of choice.
7   **A.  I did a racial bloc voting**
8   **analysis and determined they were not the**
9   **candidate of choice.**
10  Q.  Obviously, it is not based upon
11  race, then, that determined it.  The voters
12  aren't voting based on race.
13  **A.  I can only tell you that the**
14  **Hispanic-preferred candidate in these contests**
15  **was not the Hispanic Republicans.**
16  Q.  In what circumstances would you
17  consider an Hispanic Republican district to be
18  a protected district?
19  **A.  I don't know what you mean by**
20  **Hispanic Republican district.**
21  Q.  A district in which an Hispanic
22  Republican is the incumbent.

Page 167

1   **A.  That's not a -- the district is**
2   **not a Hispanic Republican district.**
3   Q.  Are there any circumstances in
4   which a district -- or the incumbent is an
5   Hispanic Republican, is a protected district?
6   **A.  In Florida.**
7   Q.  I take it, then, that you don't
8   believe there are any such districts in Texas?
9   **A.  I didn't see any instance of a**
10  **district in which Hispanics, a majority of**
11  **Hispanics preferred a Republican Hispanic.**
12  Q.  Well, in order for a Republican
13  Hispanic to win a district in Texas, would you
14  agree with me, based on your analysis, that
15  Anglo voters would have to vote for that
16  Hispanic?
17  **A.  In the examples that I looked at,**
18  **the Hispanic Republican won with white vote,**
19  **not Hispanic vote.**
20  Q.  So is it your view that if Anglos
21  vote for a Hispanic candidate, there is still
22  racial polarization?

Page 168

1   **A.  There is racial polarization if**
2   **Anglos and Hispanics consistently vote for**
3   **different candidates irrespective of the race**
4   **of the candidates.**
5   Q.  And I guess this is what I am
6   trying to drive at.  In your understanding of
7   the Voting Rights Act, if Republican Hispanics
8   are winning in Texas, with Anglo support,
9   then, obviously, Anglos in those districts
10  don't have any discriminatory view or any
11  problem voting for an Hispanic in those
12  districts?
13      MR. MELLETT: Objection.
14      **BY MR. MATTAX:**
15  Q.  Otherwise, they couldn't be
16  elected?
17      MR. MELLETT: Objection.  Calls
18  for speculation as to what is or is not in the
19  voters' minds in terms of discriminatory
20  intent.
21      **BY MR. MATTAX:**
22  Q.  Sure.  Do you have an

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 169

1 understanding of the point of the Voting
2 Rights Act, why it was enacted?
3 **A. I do.**
4 Q. What is your understanding?
5 **A. From my perspective what I am**
6 **attempting to determine is if voting is**
7 **polarized or not. And if voting is polarized,**
8 **whether the minority-preferred candidate is**
9 **usually losing. And, if so, then we need to**
10 **protect minority groups, whether it is**
11 **Section 2 or Section 5, from a bloc voting**
12 **majority.**
13 Q. And I believe your testimony is
14 that, in making that determination, it is
15 irrelevant what the race of the candidate is?
16 **MR. MELLETT:** Objection.
17 Mischaracterizes testimony.
18 **BY MR. MATTAX:**
19 Q. Answer the question.
20 **A. I am looking at the voting**
21 **patterns of the voters and not the race of the**
22 **candidates. Although, when I do a racial bloc**

Page 170

1 **voting analysis, I focus on candidates that**
2 **include minorities so that**
3 **minorities do, in fact, have the option to**
4 **vote for minority candidates.**
5 Q. So what I am trying to find out is
6 how do we determine, in a situation that we
7 have described in Districts 33, 35 and 117,
8 where the incumbent is a Republican Hispanic,
9 but he is not the preferred candidate of
10 choice of the minorities -- it can't be based
11 on race because he is the candidate of the
12 same race?
13 **A. What can't be based on race?**
14 Q. The decision.
15 **A. What decision?**
16 Q. Whatever the decision to vote is.
17 You are going to either vote for him or
18 against him.
19 **A. Okay.**
20 Q. So it must be based on party.
21 **A. What must be based on party?**
22 Q. The decision to vote.

Page 171

1 **A. The decision to vote? I don't**
2 **think so.**
3 **MR. MELLETT:** Is there a question?
4 **BY MR. MATTAX:**
5 Q. If it is not based upon the race
6 of the candidate, why would someone -- I am
7 trying to find out, you have an Hispanic
8 candidate and you have a majority Hispanic in
9 the district. Do you have any belief as to
10 whether Hispanics vote for Hispanic candidates
11 because of their race?
12 **A. I did a racial bloc voting**
13 **analysis and determined that Hispanics did not**
14 **vote for the Hispanic Republican in the three**
15 **contests that we are talking about in 2010.**
16 Q. Did they vote for an Hispanic
17 Democrat or a white Democrat?
18 **A. I could possibly answer that**
19 **question. Give me the districts again.**
20 **MR. COHEN:** 117.
21 **BY MR. MATTAX:**
22 Q. 117.

Page 172

1 **A. 117, a white Democrat.**
2 **MR. MELLETT:** 35.
3 **MR. MATTAX:** You can look at 35,
4 if you would like.
5 She said give her a district. I
6 gave her a district.
7 (Discussion off the record.)
8 **THE WITNESS:** 35, a Hispanic
9 Democrat.
10 **BY MR. MATTAX:**
11 Q. And he lost to an Hispanic
12 Republican? Or she lost to an Hispanic
13 Republican?
14 **A. I don't know if it is a he or she.**
15 **But the Hispanic Republican won.**
16 Q. And 33?
17 **A. We don't have 33 here. (Pause).**
18 Q. If I were to begin an analysis to
19 determine whether or not I was going to
20 retrogress, in looking at Hispanic
21 districts -- because I think you are aware the
22 State of Texas chose to look at districts that

Page 173

1    were greater than 50 percent Hispanic citizen
2    voting age population.
3        What metric did you choose to
4    start your looking?  Every district in the
5    state, all 150?
6    **A.   No.  The first thing I did was a**
7    **threshold representation chart in which I**
8    **looked at the percentage minority of all of**
9    **the districts and who was elected, whether a**
10   **minority was elected or not.  And determined,**
11   **that, in fact, no minorities were elected from**
12   **districts under 50 percent minority.  So I**
13   **focused on districts over 50 percent minority.**
14   **And then did a functional analysis looking at**
15   **the election -- looking at the elections**
16   **within those districts to determine if they**
17   **were effective or not.**
18   Q.   Is that what your table four is
19   purporting to represent?
20   **A.   I am sorry.  You were talking**
21   **about the benchmark.  Table four is the**
22   **proposed district.**

Page 174

1    Q.   I am sorry.  Is that what you did
2    in table one?
3    **A.   Yes.**
4    Q.   Turning back to 137, since we
5    talked about that a bit, and if we compare the
6    two tables, you have 25 percent -- 25.6
7    percent HCVAP in the benchmark for 137.
8    That's table one.
9    **A.   Say the number again?**
10   Q.   25.6.
11   **A.   25.6 HCVAP.**
12   Q.   Right.
13   **A.   Uh-huh.**
14   Q.   And the proposed district you have
15   26.3 percent HCVAP.
16   **A.   Yes.**
17   Q.   Do you consider both of those to
18   be Hispanic districts?
19   **A.   They are consistently electing the**
20   **Hispanic-preferred candidate.  So, yes.**
21   Q.   Do you believe in your racially
22   polarized voting analysis that, as a general

Page 175

1    proposition, Hispanics prefer Democrats as
2    their preferred candidates of choice?
3        **MR. MELLETT:** Just to be clear, is
4    this all elections in Texas?
5        **MR. MATTAX:** Yes.
6        **MR. MELLETT:** Thank you.
7        **THE WITNESS:** I guess that would
8    be a problem in nonpartisan elections.
9        **BY MR. MATTAX:**
10   Q.   I am sorry?
11   **A.   In nonpartisan elections I expect**
12   **Hispanics aren't voting for Democrats.**
13   Q.   In partisan elections, do you
14   expect them to vote for Democrats?
15   **A.   In Texas, Hispanics tend to vote**
16   **Democratic, yes.  They don't necessarily, for**
17   **example, in Florida.  But they do in Texas.**
18   Q.   So regardless of the percentage of
19   the citizen voting age population in a
20   district, if it elected a Democrat and it had
21   Hispanics in it, would it be a protected
22   district?

Page 176

1    **A.   You would have to give me more**
2    **information than that.**
3        **MR. MATTAX:** Let's take a short
4    break so I can figure out where my documents
5    are.
6        (A recess was taken.)
7        **MR. MATTAX:** Let's mark this as
8    Exhibit 6.
9        (Document referred to marked
10   Deposition Exhibit No. 6 for identification
11   and subsequently attached to the deposition.)
12       **BY MR. MATTAX:**
13   Q.   Let me show you what has been
14   marked as Exhibit Number 6.  We have been
15   talking about 117.  So let's see if we can
16   find 117.  It will be in order so it is
17   probably going to be about two-thirds of the
18   way through.
19       Why don't we state for the record
20   what the numbers are.  If you wish to take the
21   time to go through them all, you may.
22       But in looking at the 2010 general

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

Page 177

1  election in House District 117, and all of the
2  different elections that are listed here, and
3  looking at all the districts listed here that
4  occur in District 117 in the 2010 general
5  election under the benchmark plan, I count 42
6  races in which the Republican won and three in
7  which the Democrat won.
8       Would that be relevant to your
9  analysis?
10 A.  Not without knowing a great deal
11 about this contest, no.
12      And that one specific year, in any
13 case.
14 Q.  Well, if we went back, would it
15 make any difference if we went back multiple
16 years?  I am just talking about the principle
17 of looking at the number of Republicans that
18 win versus the number of Democrats.  Is that
19 useful?
20 A.  Not without knowing more about the
21 contests.  For example, did they include a
22 minority candidate?

Page 178

1  Q.  We know, for example, lieutenant
2  governor, because you looked at it, the third
3  one down, included a minority candidate that
4  lost.  Is that relevant?
5  A.  I am sorry, repeat the question.
6  Q.  Lieutenant governor.
7  A.  Lieutenant governor included a
8  Hispanic candidate.  That's correct.
9  Q.  And the Hispanic lost.  Would that
10 be relevant?
11 A.  I included that in my index, yes.
12 Q.  And what about land commissioner?
13 In this district, Republican Patterson got
14 51 percent and the Democrat 45 percent.
15 A.  Again, I already looked at an
16 election in that particular year and
17 determined that the exogenous election index
18 for that particular year would be zero.
19 Q.  So I guess the fact that the tally
20 was 42 to 3 doesn't add anything to your
21 analysis because you already concluded that it
22 wasn't performing?

Page 179

1  A.  I would never have lumped all of
2  those elections in there.  But, in fact, I did
3  conclude it wasn't performing.
4  Q.  Did you --
5  A.  In that particular year.
6  Q.  I understand.
7       We talked about trending, I think,
8  earlier on in your deposition.  Did you do any
9  trending analysis to see whether this district
10 was trending Republican?
11 A.  I looked to see if districts were
12 losing Hispanic population when I looked at
13 trending.
14 Q.  Is it relevant to determine
15 whether or not Hispanics tend to be voting
16 more for Republicans over time?
17 A.  Is it relevant to what?
18 Q.  To your analysis.
19      MR. MELLETT: Objection.  Assumes
20 facts not in evidence.
21      BY MR. MATTAX:
22 Q.  In a trending analysis, is it

Page 180

1  relevant to determine whether or not Hispanics
2  are voting for more Republicans over time or
3  is that not relevant?
4  A.  I am not even really sure what you
5  mean by trending analysis.
6  Q.  Sure.  Let's take a court drawn
7  district, District 23 in Congress, that was
8  drawn by a court to elect the preferred
9  candidate of choice.  Is it electing the
10 preferred candidate of choice, then?
11 A.  It did not in 2000 -- I am sorry,
12 which district?  I am sorry.
13 Q.  Congressional 23.
14 A.  You switched districts on me.
15      Congressional District 23 did not
16 elect the Hispanic-preferred candidate in
17 2010.  It did in the other two Congressional
18 contests.
19 Q.  If we look at those percentages,
20 if two or three Hispanic percentage points
21 change, in other words, a few Hispanics who
22 used to vote Democrat decide to vote

Page 181

1  Republican and that shifts the makeup of the
2  district, does that affect your analysis at
3  all?
4  **MR. MELLETT:** So this is a
5  hypothetical?
6  **MR. MATTAX:** Correct.
7  **THE WITNESS:** If the
8  Hispanic-preferred candidate shifts from
9  Democratic to Republican?  Is that what we are
10  saying?
11  **BY MR. MATTAX:**
12  Q.  No.  I am just saying -- what I am
13  trying to establish is the concept, which you
14  can agree with or disagree with, that the
15  districts are not static, that just because an
16  Hispanic may vote for a Democrat one day does
17  not necessarily mean they will vote for a
18  Democrat the next day, that there are other
19  factors in there.  I am trying to see whether
20  or not it plays into your analysis, if at all,
21  that there would be data, if there is data
22  showing a district, fewer Hispanics in a

Page 182

1  district voting Democrat and more Hispanics in
2  a district voting Republican.  Is that
3  relevant to your analysis at all?
4  **A.  I still don't have enough facts.**
5  **Are we now talking about the**
6  **Hispanic-preferred candidate being Republican?**
7  Q.  No.  Because not enough people
8  have changed their votes.  Say, for example,
9  that in one district 20 percent of Hispanics
10  vote for a Republican and the next year
11  40 percent of the Hispanics vote for
12  Republican.  Would the Republican be the
13  Hispanic candidate of choice?
14  **A.  Are we basing a trend on two**
15  **elections?**
16  Q.  I am just giving you those facts.
17  I am asking you what your analysis would be.
18  **A.  It is not enough to establish a**
19  **trend.**
20  Q.  So you would not be able to
21  determine in that situation who the Hispanic
22  candidate of choice was?

Page 183

1  **A.  I would.  I would do a racial bloc**
2  **voting analysis to determine that.  I wouldn't**
3  **look at whatever hypothetical you are**
4  **proposing.**
5  Q.  I guess what I am trying to do is
6  place the two ends of the spectrum into this
7  racial bloc voting analysis here.  Because I
8  think we have already identified the fact that
9  Anglos do vote for Hispanic Republicans.  I
10  think you will agree with me on that.
11  **A.  In the contests that I analyzed,**
12  **Anglos voted for the Hispanic Republican.**
13  Q.  We are making the assumption in
14  your analysis that the districts were static.
15  In other words, that this district was
16  racially polarized and it was voting and the
17  Hispanics were voting for the Democratic
18  candidate, and, therefore, the Democratic
19  candidate was the candidate of choice.  That's
20  what your analysis has shown in some of the
21  districts.  Is that correct?
22  **A.  There is a lot of different pieces**

Page 184

1  **to that.  I don't know why you would say this**
2  **district is static.  I don't know why -- you**
3  **are going to have to do better.**
4  Q.  Sure.  You are trying to project
5  over the next ten years what a district is
6  supposed to look like when you do this
7  Section 5 voting analysis, aren't you?
8  **A.  No.**
9  Q.  Let's do this hypothetical.  This
10  is what I am driving at here.  Then maybe we
11  can move off of this.
12  You have five endogenous elections
13  in that ten year period.  And the first one it
14  votes Democrat, the second one it votes
15  Democrat, the third one it votes Democrat, the
16  fourth one it votes Republican, and the fifth
17  one it votes Republican.  Yet your racially
18  polarized voting continues to show the
19  Hispanic candidate of choice is a Democrat.
20  Is it relevant to you that that
21  trend towards voting Republican, that that
22  district is now electing a Republican?  Is it

Page 185

1  relevant to you to find out why?  Or do you
2  simply look at your racially polarized voting
3  analysis and say, well, the Democrat is the
4  preferred candidate of choice; it doesn't make
5  any difference that in the last two elections
6  the Republican won?
7  A.  (Pause.)  I did a racial bloc
8  voting of contests and determined whether I
9  had the Hispanic-preferred candidate or not.
10  So I am a little bit puzzled what it is that
11  you think I should be doing here.
12  Q.  Well, what we have is a situation
13  where the current incumbent in several
14  districts is an Hispanic Republican that,
15  based on your analysis, needs to be removed,
16  because they won the election --
17     MR. MELLETT: Objection to the
18  characterization about "needs to be removed."
19     BY MR. MATTAX:
20  Q.  Your view is they are not the
21  Hispanic candidate of choice and, therefore,
22  the district has to be drawn in such a way

Page 186

1  that someone else gets elected.  Right?
2  A.  The candidate is not the
3  Hispanic-preferred candidate.  Whether you
4  keep him in that district and up the
5  percentage -- I mean, it is not based on what
6  that candidate -- where that candidate is
7  sitting.  It is based on the fact that he is
8  not the Hispanic-preferred candidate.  I am
9  not saying anything about where you should put
10  him.
11  Q.  Give me a second to look at the
12  chart.
13     You can look at Appendix A if you
14  want, too.  I think we talked about most of
15  these.
16     MR. MELLETT: I am sorry, this is
17  in the House plan?
18     MR. MATTAX: The House plan,
19  Appendix A.  (Pause).
20     I don't have an extra copy of this
21  for some reason.  Let me go ahead and mark --
22  this is Red 202.  We will just go through this

Page 187

1  exercise very quickly.
2     Red 202 is a summary of the voter
3  registration data for House districts in Plan
4  100, the benchmark plan.  Districts,
5  obviously, 1 through 150.  Let's mark that as
6  the next exhibit, Number 7.
7     (Document referred to marked
8  Deposition Exhibit No. 7 for identification
9  and subsequently attached to the deposition.)
10     BY MR. MATTAX:
11  Q.  Based upon your understanding of
12  the guidance given by the Department of
13  Justice as to how to determine whether or not,
14  when you are drawing a map in this cycle, your
15  map complies with the Voting Rights Act, how
16  would you identify the districts that you
17  would need to look at to make sure they don't
18  retrogress?
19     MR. MELLETT: Objection.  Lack of
20  foundation.  We haven't established that she
21  has actually looked at this at all.
22     BY MR. MATTAX:

Page 188

1  Q.  This is a map that shows the
2  percentages of the Anglo voters and the black
3  voters.
4  A.  This is not a map.
5  Q.  Excuse me, a chart.  A chart that
6  shows the percentages of the different voters
7  in the districts.
8     I guess what I am trying to find
9  out, based on the guidance, as you understand
10  it from the DOJ, how is the legislature
11  supposed to identify which districts to be
12  concerned about?
13     MR. MELLETT: Objection.  Calls
14  speculation on the possible legislature.
15     BY MR. MATTAX:
16  Q.  What would be your understanding
17  from the guidance the DOJ has given as to how
18  the legislator would do that, if you were
19  advising the legislator, legislature, based on
20  the guidance DOJ has given?
21  A.  I would do an election-specific
22  analysis like the state actually did do.

Page 189

1 Q. Of a 150 different --
2 **A. They did a lot more than that.**
3 **Actually, they did it for the Senate and the**
4 **Congress, as well.**
5 Q. Based on that analysis, if it was
6 concluded that a particular district elected
7 less than 50 percent of the preferred
8 candidate of choice, would it be safe for the
9 legislature to assume that was not a protected
10 district?
11 **MR. MELLETT:** Is this on the
12 benchmark or the proposed?
13 **MR. MATTAX:** On the benchmark.
14 **THE WITNESS:** Is this the
15 endogenous or the exogenous?
16 **BY MR. MATTAX:**
17 Q. On the data that you said the
18 state had that you just mentioned.
19 **A. I know the data that I used. I**
20 **don't know what additional data the state had.**
21 Q. All right. Let's just have that.
22 We don't need to go over that anymore.

Page 190

1 **MR. MATTAX:** Let's take a five
2 minute break and finish up and go home.
3 (Discussion off the record.)
4 (A recess was taken.)
5 **BY MR. COHEN:**
6 Q. Dr. Hanley, you have talked
7 extensively about the three endogenous
8 elections in Congressional District 23.
9 Right?
10 **A. Yes.**
11 Q. Are you familiar with the facts of
12 the first of those three elections, 2006?
13 **A. Familiar with the facts? I guess**
14 **it would depend on the facts you are referring**
15 **to.**
16 Q. Did you know there was a runoff
17 for that election?
18 **A. Possibly.**
19 Q. Do you know what the margins were
20 for that election?
21 **A. I might have looked at it at some**
22 **point. I don't know off the top of my head,**

Page 191

1 no.
2 **MR. COHEN:** I have no further
3 questions. I pass the witness.
4 **MR. MATTAX:** Any questions?
5 **MR. MELLETT:** I have no questions.
6 (Discussion off the record.)
7 **THE WITNESS:** I will waive.
8 (By stipulation of counsel, and
9 agreement of the witness, reading and
10 signature waived.)
11 (Whereupon, at 5:54 p.m., the
12 deposition was concluded.)
13 + + +
14
15
16
17
18
19
20
21
22

Page 192

1 CERTIFICATE OF NOTARY PUBLIC
2 I, Zev V. Feder, the officer
3 before whom the foregoing deposition was
4 taken, do hereby certify that the witness,
5 whose testimony appears in the foregoing
6 deposition, was duly sworn by me; that the
7 testimony of said witness was taken by me in
8 shorthand and thereafter reduced to computer
9 type under my direction; that said deposition
10 is a true record of the testimony given by
11 said witness; that I am neither counsel for,
12 related to, nor employed by any of the parties
13 to which this deposition was taken; and
14 further, that I am not a relative or employee
15 of any attorney or counsel employed by the
16 parties hereto, nor financially or otherwise
17 interested in the outcome of the action.
18
19
                                    _____
                                    Notary Public in and for
20                                  The District of Columbia
21 My Commission Expires:
   April 14, 2012
22

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

## 1

**1 (9)**
  3:16;73:15,17,21;76:10;
  77:13;148:10;152:22;187:5
**10 (7)**
  100:16;125:13,14,19;126:3,4;
  130:10
**100 (3)**
  150:2;153:19;187:4
**11 (5)**
  108:18,21;128:3;130:4,9
**110 (1)**
  3:4
**117 (19)**
  74:11;76:15;77:2;162:16;
  163:12,15,17;164:11,13,14;
  165:6;170:7;171:20,22;172:1;
  176:15,16;177:1,4
**120 (3)**
  155:5,18;156:10
**137 (9)**
  147:12,19;148:5,10;150:7;
  151:13;152:10;174:4,7
**14 (2)**
  161:14,16
**148 (1)**
  152:1
**149 (10)**
  74:11;77:3;155:5,18;156:6,
  14;157:8,9;162:11;163:21
**15 (1)**
  110:16
**150 (3)**
  173:5;187:5;189:1
**16 (1)**
  164:3
**19 (1)**
  164:2
**190 (1)**
  3:12

## 2

**2 (29)**
  3:18;7:15;9:20;10:12,13,14;
  28:19;29:3,11;74:22;75:4,8;
  83:1,3,4,9,17,18;84:1,3,12;85:9,
  15;95:11;116:19;117:19;135:3;
  147:8;169:11
**2:11 (1)**
  101:13
**20 (6)**
  91:14;147:10;153:12,13,17;
  182:9
**20,000 (2)**
  98:11,12
**2000 (1)**
  157:11;180:11
**2002 (1)**
  100:16
**2004 (1)**

106:11
**2006 (3)**
  96:15;106:14;190:12
**2008 (3)**
  111:8,16;157:12
**2010 (18)**
  98:12,18;99:9,10,17;103:8;
  106:15;110:15;111:7;113:20;
  115:9;121:13;152:11;157:12;
  171:15;176:22;177:4;180:17
**2012 (4)**
  114:6,7,15;115:19
**202 (2)**
  186:22;187:2
**21 (2)**
  143:1,5
**210 (1)**
  3:5
**224-5476 (1)**
  3:5
**225 (3)**
  103:6,8;107:4
**23 (42)**
  77:17;79:19;90:13,20;91:9,
  10;92:5;98:13,18;99:17;100:20;
  102:14;105:4,5,11,12;107:12,
  15,17;108:13;109:2,13;110:17,
  19;111:11;112:13;113:8,9;
  120:22;121:9,15;122:3,7,10;
  124:13,15,16;127:22;180:7,13,
  15;190:8
**25 (2)**
  151:2;174:6
**25.6 (9)**
  147:13;148:6,19;149:22;
  150:13,22;174:6,10,11
**26 (3)**
  158:22;159:1;164:1
**26.3 (1)**
  174:15
**27 (8)**
  77:18;79:19;104:18;105:7;
  155:5,17,18;156:9
**27.7 (1)**
  126:7
**28 (2)**
  85:21;144:13
**29 (2)**
  121:2,6

## 3

**3 (9)**
  3:20;75:17,22;76:4;101:18;
  119:5;131:10,10;178:20
**3:28 (1)**
  101:14
**30 (3)**
  57:15;70:2;130:22
**30.55 (3)**
  128:18;129:2;130:13
**300 (1)**
  3:4

**31 (4)**
  85:19;143:1,5;144:13
**31.3 (3)**
  126:6;129:3;130:14
**32 (7)**
  82:11;84:17;85:2;125:13;
  126:3;127:4;130:10
**33 (14)**
  74:11;76:15,21;153:4,5,7;
  163:1,2;164:11,14;165:6;170:7;
  172:16,17
**34 (4)**
  123:21;145:22;146:4,6
**35 (16)**
  74:11;76:15,22;124:2,13;
  162:15;163:4,5;164:11,13,14;
  165:6;170:7;172:2,3,8
**36 (10)**
  82:12;84:18;85:3;125:14,19;
  126:5;127:5;128:3;130:4,9

## 4

**4 (5)**
  100:16;103:9,11,15;106:18
**4.1 (1)**
  143:7
**40 (17)**
  44:5;54:17;56:7,16;57:15;
  59:8;60:8;95:17;97:9,14;
  102:14;105:17;123:5,8,19;
  146:17;182:11
**41 (7)**
  74:11;76:15;77:1;162:16;
  163:7,8;164:9
**41.7 (1)**
  108:9
**42 (2)**
  177:5;178:20
**42.1 (1)**
  152:1
**45 (3)**
  47:13;49:15;178:14
**45.8 (1)**
  151:20
**46 (3)**
  155:5,18;156:10
**47.9 (1)**
  152:4
**48 (1)**
  47:11
**49 (3)**
  14:13;49:14;76:15

## 5

**5 (59)**
  3:18,20;7:9,11,14;10:12;
  28:20;29:4,16,22;43:18,20;
  45:4,6;51:11,16;52:17;53:2,8;
  54:6,7;58:17;66:1,6;67:7,11,21;
  68:2,3,15,20;69:8;70:18;71:5,
  20;72:14;74:22;83:2;84:11;

85:9,16,17;86:4;95:12;116:5,7;
  117:20,21;124:21;129:6;
  131:11,15;142:10,12;146:5;
  158:6,8;169:11;184:7
**5:54 (1)**
  191:11
**50 (18)**
  22:7;30:13;34:15;55:3;56:12;
  58:8,19;60:17;70:1;110:16;
  113:22;116:15;123:18;154:7;
  173:1,12,13;189:7
**50/50 (2)**
  113:22;118:3
**51 (12)**
  12:12,13;13:3,6;14:12,16,17;
  20:17;47:9;49:13;151:19;
  178:14
**52 (1)**
  93:3
**54.1 (1)**
  93:3
**54.4 (1)**
  108:8
**55 (2)**
  47:8;49:12
**56.2 (1)**
  153:12
**58.4 (3)**
  92:21;93:12;94:3
**58.5 (3)**
  92:22;94:6,15
**59.8 (1)**
  148:12

## 6

**6 (16)**
  3:11;77:13;100:16;143:11,19,
  22;144:2,5,8,9,17,20;145:20;
  176:8,10,14
**60 (7)**
  44:4;47:6;49:10;91:13,15;
  130:22;153:8
**61 (1)**
  91:16
**62 (2)**
  107:10,13
**62.8 (1)**
  92:5
**63.8 (1)**
  92:6
**65 (2)**
  112:12;113:21
**67 (2)**
  96:3,6

## 7

**7 (2)**
  187:6,8
**70 (1)**
  141:7
**73 (1)**

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

3:16
**74 (1)**
153:18
**75 (2)**
3:18,20
**78 (2)**
153:11;164:13
**78205 (1)**
3:5

---

**8**

**8 (1)**
100:16
**8.3 (1)**
127:6
**80 (2)**
55:21;153:7

---

**9**

**9.4 (1)**
127:6
**90 (3)**
152:4,7,10
**91 (1)**
107:10

---

**A**

**ability (6)**
29:19;30:8;81:12;85:18;
131:19;137:6
**able (6)**
37:15;42:17;44:22;53:11;
56:10;182:20
**above (2)**
132:6;153:11
**abstract (1)**
26:18
**acceptable (1)**
136:17
**accepted (2)**
9:10;138:10
**according (7)**
84:21;105:15;108:7,9;124:4,
5,6
**across (2)**
72:20;111:2
**Act (13)**
66:15;67:8,12;69:9;72:18;
73:5,8;158:1,7,9;168:7;169:2;
187:15
**actual (1)**
136:10
**actually (6)**
20:14;49:20;112:22;187:21;
188:22;189:3
**add (4)**
7:22;26:21;81:13;178:20
**added (1)**
56:17
**addition (2)**

6:20;58:5
**additional (12)**
10:15;83:5;85:7;99:16;
126:17;129:8,11;130:1;154:3;
155:4;163:22;189:20
**address (1)**
118:6
**adopt (1)**
134:10
**adopted (3)**
132:22;134:6,9
**advises (1)**
79:10
**advising (1)**
188:19
**affect (1)**
181:2
**affected (1)**
114:2
**Afghanistan (1)**
6:16
**afraid (1)**
135:5
**Again (25)**
13:12;14:22;15:17;20:18;
47:20;54:5,12;64:17;67:14,18;
79:22;84:16;88:15;111:19,21;
115:18,20;123:10;127:4;
135:17;145:3;162:22;171:19;
174:9;178:15
**against (1)**
28:8;84:6;161:22;164:22;
170:18
**age (31)**
44:4,5;50:12,16,20;52:4,9,11,
15;53:1,2;56:8;58:9,20;59:9;
60:9,18;90:18;91:8;92:2,4,19;
93:12;148:13;150:1;158:22;
159:1,22;164:2;173:2;175:19
**ago (5)**
9:14;65:4;102:6;141:7;
162:12
**agree (14)**
74:12;76:17,21,22;77:2,3;
78:15,19;79:3,14;80:6;167:14;
181:14;183:10
**agreed (1)**
153:2
**agreement (1)**
191:9
**agrees (2)**
78:7,9
**ahead (5)**
74:15;80:11;120:2;147:4;
186:21
**aim (1)**
137:5
**Alaska (16)**
7:9;9:1,4;11:22;13:17;14:3,4,
5;141:1,12;142:20;145:19;
146:1,16;149:9,15
**Alaskan (1)**
146:2

**alleging (1)**
80:4
**allow (1)**
31:16
**alone (8)**
12:7,9;53:5;93:6;132:6;
149:4,5;154:20
**Although (1)**
169:22
**always (3)**
28:7;48:8,16
**America (4)**
79:15;80:2,6,7
**American (1)**
3:3
**amicus (2)**
71:1,11
**amount (2)**
7:2;46:20
**ample (1)**
94:4
**analyses (3)**
136:7;139:21;155:6
**Analysis (114)**
3:18,20;11:11;16:21;20:11,
13,19;24:18;25:21;26:21;29:1,
2;32:15;37:5;38:2;48:4,8,9,17,
20;50:13;52:18;54:18;57:2,12;
58:3,4,17,22;59:7;60:7;65:13,
14,16,19;66:6,10;67:18;71:21;
74:22;79:14;84:22;91:7;99:14,
21;110:19;114:1;115:21;116:2;
117:12;120:16;121:9,15;128:1;
130:7;132:3,18,21;133:1,3,10,
12,13;134:1,3,13;135:12,15,21;
136:12;137:16;141:21;146:15;
150:6,12;151:10;152:11;
154:19;155:19;156:11,21;
157:12,21;158:21;159:2;162:7;
164:19;165:3;166:8;167:14;
170:1;171:13;172:18;173:14;
174:22;177:9;178:21;179:9,18,
22;180:5;181:2,20;182:3,17;
183:2,7,14,20;184:7;185:3,15;
188:22;189:5
**analyze (1)**
120:19;140:3
**analyzed (6)**
120:18;140:1,8,9,15;183:11
**Anglo (15)**
19:6;20:10;21:20;22:5;23:6,
7,11;38:1,7;39:7;44:5;58:4;
167:15;168:8;188:2
**Anglos (9)**
23:15;28:7;37:4;151:2;
167:20;168:2,9;183:9,12
**animus (1)**
164:21
**answered (4)**
72:1;94:21;101:8;139:3
**Antonio (1)**
3:5
**anymore (1)**

189:22
**apologize (3)**
72:5;105:9;139:5
**apparently (1)**
117:6
**Appeals (1)**
106:12
**appear (1)**
157:16
**appearances (1)**
5:9
**appearing (1)**
51:3
**appended (1)**
9:9
**Appendix (21)**
104:11,14;106:3,8;119:1,6,
15;120:5,8,9,11,13;121:10,14;
122:2,5;125:11,12;128:2;
186:13,19
**Apple (1)**
106:20
**apply (1)**
20:20
**approach (7)**
122:18;129:1,4;134:4;138:1,
3,5
**approaches (1)**
11:10
**appropriate (2)**
48:14;61:10
**approximately (4)**
110:15,16;112:12;113:21
**area (7)**
10:18;17:13;28:21;36:8,10;
146:16,18
**argument (6)**
88:4,4,6,7,13,13
**Arizona (6)**
64:22;65:2,5;72:4,12;73:4
**Asian (4)**
157:13;158:18;162:13;164:3
**Asians (2)**
56:22;157:17
**asserted (3)**
78:8,10,16
**asserting (1)**
77:16
**assessment (1)**
132:1
**assistance (1)**
158:3
**assisted (1)**
71:10
**assume (25)**
14:10;19:12,17;28:5;33:3,14;
34:1;35:2;37:15,19;42:7;44:2;
46:13;57:13;91:3;114:14;115:5,
6,18;127:21;133:16;150:11;
157:1;164:21;189:9
**Assumes (1)**
179:19
**assuming (6)**

Case 1:11-cv-01303-RMC-TBG-BAH   Document 94-6   Filed 11/01/11   Page 53 of 66

State of Texas v.                                                                                                                Lisa Handley, Ph.D.
United States of America, et al.                                                                                              October 24, 2011

**13:3;26:5;42:20;57:20;116:8;**
128:22
**assumption (6)**
22:3;37:22;39:5;130:4;
164:22;183:13
**attached (8)**
73:18;75:5;76:1;103:12;
106:4;142:13;176:11;187:9
**attachment (1)**
104:5
**attempting (3)**
34:9;52:6;169:6
**Attorney (6)**
5:12,15;10:6;109:21;131:21;
133:13
**attorneys (4)**
87:11,12,14,18
**average (1)**
46:19
**aware (4)**
63:2;66:17;86:18;172:21
**away (1)**
61:8

**B**

**back (30)**
9:17;13:16;14:9;18:1;20:17;
34:10;41:20;45:21;49:6,20;
55:20;67:2;68:7;76:8;90:21;
102:5,11;111:15;125:3,11;
131:8;144:16;152:21;153:22;
155:16;156:12;162:9;174:4;
177:14,15
**ballot (1)**
45:16
**base (2)**
24:22;25:5
**based (40)**
12:19,20;15:6;18:12;28:9;
45:2;88:5;93:5;96:20;97:22;
106:7;113:10,18;118:14,16;
122:14,21;124:15,17,22;127:8;
129:14,19;134:14;148:20;
166:10,12;167:14;170:10,13,20,
21;171:5;185:15;186:5,7;
187:11;188:9,19;189:5
**basic (1)**
110:14
**basically (1)**
88:6
**basing (2)**
118:13;182:14
**basis (3)**
14:21;56:10;87:8
**Bear (1)**
124:16
**beat (2)**
108:3;115:10
**become (1)**
146:13
**becomes (1)**
34:17

**begin (1)**
172:18
**beginning (1)**
126:1
**behalf (1)**
3:1
**behavior (3)**
22:3;132:4,7
**belief (1)**
171:9
**below (1)**
109:13
**benchmark (64)**
29:19;41:17;43:16;53:16;
74:9;76:14;77:10,16,17;81:18;
82:11;84:13,18;85:1,3,20;86:3;
90:15;92:5,21;93:3;95:19;
97:10;98:7,9,13;99:17;100:20;
102:13,19;107:20,21;119:17;
120:10;122:13;123:2,11,17;
124:11,17;125:14;126:4;127:5;
129:4;130:11,13;131:19;143:6;
144:10,11,18;145:4,11,20;
153:6,20;154:3;163:22;173:21;
174:7;177:5;187:4;189:12,13
**benchmarks (1)**
155:4
**besides (6)**
53:7;57:18;59:1;60:10;
121:12;136:7
**best (3)**
77:15;97:21;143:9
**better (4)**
18:5;119:12;156:12;184:3
**beyond (2)**
132:14;136:5
**big (2)**
36:2;73:13
**bit (8)**
27:15;61:1;95:8;107:6;
111:20;145:18;174:5;185:10
**bivariate (1)**
11:11
**bizarre (1)**
108:18
**black (22)**
39:18;40:14,20;70:2;126:12,
17,18,22;127:9;158:22;159:10,
15,20,22;160:2,9,13,14;161:2,4,
5;188:2
**black-preferred (3)**
40:5,7,11
**blacks (16)**
14:16;40:16;56:21;57:8;
88:16;89:15,20;149:1;151:6;
157:10,13,16;159:8;160:12;
161:3;164:1
**bloc (13)**
24:18;84:5;152:10;162:6;
164:19;165:2;166:7;169:11,22;
171:12;183:1,7;185:7
**blunt (1)**
87:17

**both (16)**
23:11,19;29:9;35:14,15;53:4;
59:21;60:4;82:7,17;85:11;86:3;
117:5,7;123:18;174:17
**bottom (1)**
125:10
**break (6)**
59:4;60:19;68:8;128:11;
176:4;190:2
**brief (2)**
10:6;80:21
**briefly (1)**
6:7
**briefs (2)**
71:1,11
**broader (1)**
17:18
**Broadway (1)**
3:4
**broke (1)**
102:6
**Bruce (1)**
5:14
**bunch (2)**
107:9;111:2

**C**

**C100 (3)**
107:19,21;113:9
**calculator (1)**
128:12
**call (6)**
20:7;56:16;101:21;136:13,
14;155:4
**called (3)**
5:5;103:6;148:7
**Calls (2)**
168:17;188:13
**came (1)**
12:18
**can (59)**
7:20;9:3;14:1;19:17;20:21;
24:22;25:5;27:20;28:4,8,11;
30:22;33:15;35:18;37:4;42:3;
45:2,13;46:7;61:7,10;73:14;
75:8;77:15;78:17;80:11;81:13,
20;82:3,7;101:9,17;110:13,14;
117:1,2;128:11;130:7;135:8;
140:6;142:3,8;145:9;146:16;
147:5;148:21;152:8;154:22;
158:1,20;161:14;162:20;
166:13;172:3;176:4,15;181:14;
184:11;186:13
**candidate (214)**
11:6;12:13,14;13:6,7,20;
14:13,13,16,17;19:4,5,6;21:6;
22:10,10,13,16,22;23:4,7,12,15,
18;24:3;27:5,14;28:18;30:10,
12;31:13;32:2,20;33:2,5,11;
34:14,16,17;35:10;36:20,22;
37:1,10,12,14,16,18,20;38:1,3,7,
9,16,18;39:2,8,9,20;40:2,4,6,9,

11,14,14,19;41:2;42:1,4,5,12,
14,18;43:4,10,13;44:7,8,22;
45:9,13,17;46:1,5,14,21;47:5;
49:10;52:19;53:13,18,19;54:1,
13,19;55:16;56:1,5,11,19;57:4,
19;58:7;59:2;60:11;69:5;70:4;
81:20;82:3,3,7;89:9,14;93:9,14,
19;94:19;96:2,9;97:5,8,20;
102:18;104:20,22;105:20,22;
106:1,9;109:8;111:5;113:10,14;
114:17,19;115:15,21;118:17;
121:1,4;139:14;143:15,16;
150:3,4;151:1,3,7,16;152:13,19;
154:16;157:18;158:2;159:3,9,
10,20;160:2,9,10,12,13,14,14,
20;161:2,3,4,5,5,9,19;162:3,5,8;
165:7,19;166:5,6,9,14;167:21;
169:8,15;170:9,11;171:6,8;
174:20;177:22;178:3,8;180:9,
10,16;181:8;182:6,13,22;
183:18,19;184:19;185:4,9,
21;186:2,3,6,6,8;189:8
**candidates (37)**
12:8;19:19;20:9;22:6;23:11,
19;24:12;27:3,7,11,18;28:12,
14;31:17;32:8;37:3;44:21;
70:15;81:13,19;98:14;104:3;
116:22;117:5;134:18;137:1,6,7;
154:12;164:12;168:3,4;169:22;
170:1,4;171:10;175:2
**Canseco (9)**
109:3,5;114:4,7;115:7,10,14,
20;120:22
**capacity (1)**
6:12
**carried (2)**
32:20;102:18
**carry (3)**
31:13;32:9,12
**carrying (1)**
31:17
**case (46)**
8:19;9:1,2;12:21;13:11,17,21;
16:18;26:17;38:19;51:11;63:15,
17;64:5,21;65:12;66:1,16;
67:12,16;71:21;73:1;75:11;
76:7;79:15;80:18,20;83:1,2,9;
84:11,12;86:4,7,18;98:7,7;
118:5;129:12;135:3,4;137:12;
138:15;142:4;146:15;177:13
**cases (6)**
16:10;51:16;66:10;83:3,4;
130:21
**cast (1)**
45:16
**CD (3)**
121:9,15;124:16
**ceased (1)**
11:4
**census (2)**
15:20;132:6
**certainly (9)**
13:21;25:18;28:11;30:13;

54:8;114:3;129:10;133:9;
161:11
**change (8)**
18:11,15;115:20;116:2;
119:19;124:19;144:5;180:21
**changed (4)**
21:9;32:6;98:3;182:8
**changes (1)**
120:9
**changing (1)**
47:2
**characterization (3)**
86:12;88:9;185:18
**characterize (6)**
77:4,5,7,9;83:10;88:12
**characterized (3)**
143:10;147:14;163:22
**chart (14)**
121:13;122:9;126:3;145:16;
146:3;148:3;153:5,9,22;154:1;
173:7;186:12;188:5,5
**Chavez (1)**
108:3
**check (1)**
87:12
**checked (1)**
87:10
**choice (79)**
22:17,22;23:7,12,16;24:3;
34:18;42:1,13,15,18;43:4;44:8,
9,22;45:13;46:5;47:6;52:20;
54:20;55:16;56:1,11,19;58:7;
59:2;60:11;70:15;81:20;82:3,8;
89:9,15;93:9,15;94:19;98:14;
109:8;113:10,15;114:17,19;
115:15,22;143:15,16;150:4;
152:13,19;154:12,16;157:18;
158:2;159:3,9,10,20;160:3,15,
22;161:6,10;162:3,5;164:12;
165:19;166:6,9;170:10;175:2;
180:9,10;182:13,22;183:19;
184:19;185:4,21;189:8
**choose (2)**
35:20;173:3
**choosing (1)**
35:19
**chose (7)**
94:18;111:6;112:20;113:1,3;
139:12;172:22
**circumstances (16)**
13:12,13,14;25:9,10;26:16;
90:4,6;91:11,17;117:1;158:11,
13;161:7;166:16;167:3
**circumstance-specific (1)**
90:7
**Ciro (3)**
115:5,6,11
**cited (1)**
132:9
**citizen (21)**
50:7,12,15,20;52:22;55:4,22;
56:8;58:8,20;59:8;60:8,17;
92:18;93:12;150:1;158:22;

159:1;164:2;173:1;175:19
**citizens (2)**
90:10;160:1
**City (1)**
17:15
**claim (1)**
109:7
**claims (2)**
76:13;121:5
**clarification (2)**
67:15;114:10
**clarify (4)**
19:17;69:17;73:7;150:18
**clear (9)**
13:1;14:1;41:5;87:15;138:20;
140:14;151:9;156:9;175:3
**clerical (1)**
120:3
**close (1)**
15:3
**coalition (13)**
61:20;63:21;64:2;67:13,21,
22;68:3,11,16;69:2,7,19;71:13
**COHEN (9)**
3:12;5:14,14;6:17;110:7;
128:19;171:20;190:5;191:2
**cohesive (2)**
29:15;84:5
**cohesively (1)**
94:18
**cohesiveness (2)**
29:21;30:1
**colleague (2)**
65:11,12
**Colorado (4)**
7:19;10:5,10,16
**column (1)**
122:11
**commission (3)**
9:5;10:8,11
**Commissioner (3)**
9:19;110:2;178:12
**compact (1)**
84:8
**company (1)**
6:9
**comparable (1)**
29:4
**compare (3)**
112:22;145:4;174:5
**compared (1)**
125:10
**comparing (2)**
123:13,16
**comparison (1)**
138:22
**competing (1)**
36:20
**competition (1)**
161:1
**Competitive (12)**
62:10;64:13,14;65:6,17;
71:18,20;72:8,11,19;116:17,21

**competitiveness (3)**
65:7,13;72:16
**compiled (1)**
136:2
**complaint (2)**
135:1;136:4
**completely (2)**
108:20;144:8
**complies (1)**
187:15
**component (1)**
89:1
**composition (2)**
132:15;154:7
**comprise (1)**
140:15
**comprises (1)**
44:6
**Comptroller (1)**
110:5
**concept (2)**
138:12;181:13
**concerned (1)**
188:12
**conclude (12)**
16:8;38:6,8;39:8;81:17,22;
89:5;126:10;129:5,14;143:18;
179:3
**concluded (9)**
26:4;57:16;113:8;127:8,15;
166:5;178:21;189:6;191:12
**conclusion (18)**
12:18;18:12,15;25:1,2,5;26:7;
42:12;45:2;49:17;86:19,20;
87:9;114:2;125:9;126:14;165:5,
8
**conclusions (1)**
78:7
**conducted (1)**
135:11
**confer (1)**
131:2
**confident (1)**
26:6
**configured (1)**
32:9
**conform (1)**
31:11
**confused (3)**
31:19;33:1;95:9
**confusing (1)**
145:17
**Congress (8)**
8:7,21;15:22;45:14;131:4;
140:16;180:7;189:4
**Congressional (45)**
3:20;14:10;15:17;16:13,15,
19;17:2;18:3;19:4;20:5,22;
23:21;25:7;28:6;33:14,18;34:5;
36:12,13,15;44:7,20;45:18;
75:14;76:7;77:17,18;81:4,8,18;
89:12;101:18;105:11;120:22;
121:2;124:20;127:9;131:9;

135:22;140:4,5;180:13,15,17;
190:8
**Congressman (3)**
114:4,7;115:14
**consider (18)**
19:7;20:4;48:16,19;51:13;
58:21;81:2;95:20,22;123:8;
124:7;148:10,14,15;151:4;
153:18;166:17;174:17
**considerable (1)**
7:2
**Considered (4)**
3:16;76:12;124:18;162:10
**consistent (2)**
80:17,17
**consistently (11)**
15:4;45:1;53:19;54:14;57:4;
69:4;70:3,15;158:15;168:2;
174:19
**constitute (1)**
12:15
**constitutes (1)**
13:7
**constructed (1)**
99:18
**consultant (1)**
6:13
**consulting (4)**
6:10,21,22;7:4
**contained (1)**
121:10
**contest (12)**
14:19,21;15:7,14;36:8;37:11,
13;108:16;110:11;113:4;
117:19;177:11
**contested (3)**
110:1,6;112:12
**contests (20)**
15:7,11;16:11;17:11;21:18;
27:2,10;36:17;107:9;112:17;
113:21;120:18;122:3;166:14;
170:2;171:15;177:21;180:18;
183:11;185:8
**context (9)**
65:9,15,18;67:11;68:15,20,
20;73:8;116:17
**continue (3)**
21:11,13;95:13
**continues (3)**
32:2;131:20;184:18
**contrasting (1)**
102:20
**control (2)**
94:4;158:16
**copies (1)**
61:9
**copy (1)**
186:20
**corner (1)**
107:12
**correcting (1)**
105:9
**correction (3)**

119:8,11;120:2

**correctly (4)**
25:12;40:17;61:13;105:1

**Council (3)**
17:15;106:21;108:2

**counsel (4)**
5:5;6:3;119:22;191:8

**count (2)**
145:3;177:5

**County (3)**
7:14;9:16;35:21

**couple (2)**
113:6;142:9

**course (2)**
7:15;49:3

**court (17)**
12:21;63:14,17;64:4,20,21;
65:12;66:9;67:16;73:1;80:4;
86:6,18;106:11;118:10;180:6,8

**courts (3)**
71:2;118:3,6

**create (4)**
84:9;86:10;149:18;151:3

**created (1)**
130:1

**Criminal (1)**
106:11

**cross (1)**
149:17

**crossing (1)**
57:8

**crossover (32)**
43:10,14;44:16;55:6,7,10,11;
61:15;62:13,16,22;63:10;65:22;
66:3,5,14,18;67:6;71:13;147:1;
149:8,10;151:4,14,21;152:2,5,
12,15,17;154:13,15

**curiae (2)**
71:1,11

**current (1)**
185:13

**currently (2)**
163:5;164:6

**cut (1)**
119:18

**cycle (10)**
7:3;41:21;47:6,8,9,11,12;
83:19;141:2;187:14

---

# D

**data (24)**
26:11,13,14,22;49:1;103:3;
104:4;108:1,7;110:14;113:19;
119:16;121:12;132:6;155:11,
12;156:20;157:3;181:21,21;
187:3;189:17,19,20

**David (1)**
5:11

**day (4)**
72:6;119:12;181:16,18

**days (2)**
6:11;141:7

---

**deal (2)**
67:4;177:10

**dealt (1)**
71:11

**decade (4)**
45:1;49:3,5;65:4

**decide (3)**
35:12;36:3;180:22

**decision (8)**
14:20;26:15;124:22;170:14,
15,16,22;171:1

**declines (1)**
85:21

**decrease (4)**
91:20;92:16,17,20

**decreases (1)**
82:21

**Defendant-Intervenor (2)**
3:1;5:19

**Defense (1)**
3:3

**define (2)**
15:13;17:7

**defined (3)**
66:1,6,15

**definition (9)**
62:13;66:18;67:3,20;68:2,13,
14;69:19;71:19

**degree (4)**
49:4;65:7;137:8;152:9

**Democrat (26)**
18:5,13;21:11;44:10;115:11;
157:14;163:9,13;165:4,21;
171:17,17;172:1,9;175:20;
177:7;178:14;180:22;181:16,
18;182:1;184:14,15,15,19;
185:3

**Democratic (7)**
111:12,18;162:17;175:16;
181:9;183:17,18

**Democrats (6)**
110:17;112:6;175:1,12,14;
177:18

**demographic (1)**
131:22

**demographics (2)**
132:15;134:16

**denominator (1)**
86:15

**Department (20)**
8:5,8;9:14,22;87:13,18;88:1;
131:17;132:18,22;133:3,7,17;
134:9;136:18;137:3,12;141:8;
156:21;187:12

**Department's (1)**
132:2

**depend (8)**
90:3,6;114:21;131:1;150:5;
157:20;158:10;190:14

**depending (3)**
14:14;15:18;117:1

**depends (10)**
11:21;24:6;25:9;26:16;51:12;

---

91:17;107:2;136:21,22,22

**DEPOSITION (22)**
3:15;73:17,18,21;75:4,5,22;
76:1,4,10;101:14,17;103:11,12;
142:12,13;176:10,11;179:8;
187:8,9;191:12

**Depositions (1)**
135:7

**describe (4)**
6:7;7:6;55:13;102:14

**described (2)**
72:11;170:7

**detail (2)**
19:22;78:17

**determination (17)**
11:2,9;15:6;38:14;41:1;53:9;
77:1;79:2;91:9;93:7;96:12,20;
118:13;130:20;132:2,8;169:14

**determinations (1)**
10:21

**determine (65)**
14:7;15:9;17:1;21:10;22:14;
23:14,17;24:3;25:13,22;27:3,8,
20;28:8;30:22;31:12,21;32:1,8,
19;33:9;34:13;35:9;39:6;40:1,
13,15;41:13;46:10;51:20;
52:2,6;53:11,16,21;57:17;58:5,
22;60:10;79:4;94:9;100:19;
108:13;111:3;114:2;118:10;
120:21;135:4;150:12;159:7,9,
19;160:1;161:18;162:7;169:6;
170:6;172:19;173:16;179:14;
180:1;182:21;183:2;187:13

**determined (6)**
166:8,11;171:13;173:10;
178:17;185:8

**determining (12)**
11:7;22:12;28:19;29:10,17;
34:10;50:18;52:18;54:2;
131:18;138:6;159:19

**Dewhurst (3)**
108:3;109:18,19

**dichotomy (1)**
20:4

**difference (18)**
20:11;29:22;50:9,11;52:21;
57:1,7;83:1;84:11;89:22;99:13,
21;100:4;102:7;108:6;154:18;
177:15;185:5

**different (33)**
11:19;12:8;26:3,17;28:13;
29:2,5;30:21;38:19,20;39:1;
45:22;51:14;55:14,17;82:9;
94:12;116:17;119:2,2;133:8;
138:1,3,7;146:11,12,18;160:22;
168:3;177:2;183:22;188:6;
189:1

**differently (5)**
19:2;30:21;69:11;138:2,4

**difficult (1)**
157:5

**direct (1)**
74:4

---

**direction (1)**
137:8

**director (1)**
6:9

**disagree (1)**
181:14

**disagreed (1)**
133:12

**discovery (2)**
135:3,5

**discriminatory (2)**
168:10,19

**discuss (1)**
9:9

**discussed (6)**
9:7;83:2;105:19;109:19;
162:11,13

**discussing (5)**
71:12;92:16;102:7;103:2;
149:9

**Discussion (20)**
6:18;62:4;68:4;74:16;75:20;
81:5;98:21;101:12;102:3;
116:19;125:6;128:13,17;131:5;
140:20;147:20;165:15;172:7;
190:3;191:6

**district (334)**
10:19,20;11:1,4;14:11,15,18;
16:13,16,19;17:3,13,21;18:3,13,
16;20:5;21:1,5;22:6;23:6,10,21;
24:4,11;25:7;26:1;27:7,17,20;
28:6;29:13,14;30:3,6,9;31:11,
13,20,22;32:1,10,13,21;33:14,
19;34:5,12,19;35:9;36:10;
39:13,21;40:16;41:3,14,16;
42:3,16;43:15;44:5,6,13,14,18;
16,17,18,20;45:3,6,11,18,19;
46:5,17;47:5,14;49:8,18,22;
50:14,19;52:19;53:12,22;54:3,
10,11,17,21;55:1,4,6,8,10,11,15,
17,21;56:2,4,7,12,15,18,20;
57:5,9;58:7,13,14;60:7;62:7,16;
63:10,21;64:2,7,8,13,14;65:17;
67:7,13,21;68:1,3,16;69:2,3,7,8;
70:1,7,12,13,17;71:18,20;72:9;
77:17,18;80:3;83:5,6,14,20;
84:9;89:17;90:13,20;91:9,10,
13,15,18,19;93:7,11,17;94:4,9,
17;95:17,21,22;96:8,14,21;97:2,
3;98:3,5,18;99:17;100:19;
102:14,19;104:17;105:2;
107:12,15,16;108:13,18,21;
110:17,19;111:11,12,12,17,18;
112:3,6,9,13;113:8,9;114:11,12,
14;115:2;116:3,21;117:4;118:1,
11,14;119:18;120:22;121:2,6;
123:3,5,9,15,21;124:2;127:3,22;
129:11;130:1;132:5,16;136:11;
143:9,11,11,13,14,19,19,22;
144:2,5,8,9,9,17,19,20,21,22;
145:20,22;146:4,5,6,15,17;
147:12,14;148:4,8,11,12,14,16;
149:3,9,10,19,22;150:7,11,14;

Case 1:11-cv-01303-RMC-TBG-BAH   Document 94-6   Filed 11/01/11   Page 56 of 66

State of Texas v.                                                      Lisa Handley, Ph.D.
United States of America, et al.                                      October 24, 2011

151:5,14,15;152:4,6;156:4;
157:7;158:4,5,16,17,18,19,21;
159:4,12,14,19,21;160:2,7,15;
161:4;162:2,12;164:1;166:17,
18,20,21;167:1,2,4,5,10,13;
171:9;172:5,6;173:4,22;174:14;
175:20,22;177:1,4;178:13;
179:9;180:7,7,12,15;181:2,22;
182:1,2,9;183:15;184:2,5,22;
185:22;186:4;189:6,10;190:8

**districts (134)**
10:16;16:20;29:17,18;30:17,
18,19;31:1,4,10,18;35:1;36:12,
16;40:22;55:14;57:14,17,22;
58:18,21;59:7;60:16;65:5;
68:12;71:13,14,14;74:10;76:13,
15;77:5,6,10,11;79:5;81:19;
82:2,6,10,15,18,20;84:4,13,14,
15,17,17,18,21;85:3,8,11,20;
86:2,8,13;87:1,3,6;88:17;89:3,7,
8,14,22;96:22;119:2,17;120:6;
122:6;126:4,13,17,19;127:1,5,5,
9;129:9;130:5,9,11;144:3,11;
145:4,14;146:11;147:9;153:3;
154:4,6,11;155:4,7,13,17,18;
156:2,3;162:15,17;163:20;
164:4,6,11;165:1,6;166:3;
167:8;168:9,12;170:7;171:19;
172:21,22;173:9,12,13,16;
174:18;177:3;179:11;180:14;
181:15;183:14,21;185:14;
187:3,4,16;188:7,11

**Document (17)**
73:16,22;75:3,21;78:1,2,21,
22;79:10;80:10,11,13;103:10;
108:10;142:11;176:9;187:7

**documents (1)**
176:4

**dogcatcher (2)**
35:21;36:9

**DOJ (3)**
188:10,17,20

**dominate (1)**
139:11

**done (10)**
6:21;7:4,19;131:3;134:2,20;
135:4;136:7;139:3;141:5

**down (6)**
53:14;118:3;126:2;137:17,
22;178:3

**dozens (1)**
33:15

**Dr (2)**
5:20;190:6

**drafted (1)**
9:10

**draw (5)**
10:15;29:13,14;85:13;129:10

**drawing (2)**
135:22;187:14

**drawn (14)**
15:19;30:15,20;83:6,7,15,20,
21;84:3;85:7;126:17;180:6,8;

185:22

**drew (2)**
7:11;9:8

**drive (3)**
82:22;117:3;168:6

**driving (1)**
45:7;48:2;165:17;184:10

**Ds (1)**
44:9

**due (1)**
88:21

**duly (1)**
5:6

**during (4)**
30:16;83:19;112:15;139:8

## E

**earlier (3)**
83:2;116:18;179:8

**easier (1)**
44:10

**easily (1)**
83:15

**ecological (2)**
11:12,12

**Educational (1)**
3:4

**effect (1)**
110:18

**effective (39)**
29:17;30:3,5,7;31:1,2;39:21;
54:11;57:5;60:18;77:9,11;
82:20;85:20;86:2;88:17;89:2,
16,21;94:10;95:12,13,14,15,16,
21;96:21;97:3;122:11,18;128:1;
129:21;144:18,20;145:12,13;
146:13;150:11;173:17

**effectiveness (12)**
94:8;102:9,13;105:17;118:2;
134:5,8;136:8,9;137:19;138:6,
12

**eight (2)**
100:19;101:3

**either (6)**
23:18;61:15;123:4;140:14;
158:3;170:17

**elaborate (2)**
39:3;161:15

**elect (41)**
29:19;30:8;32:3;35:2,10;
42:17;44:22;45:13;53:22;56:4,
10;69:4;70:3,15;81:12,20;82:3,
7;85:18;89:9;93:8,14,18;94:19;
95:7,11;97:7;131:19;143:15;
146:16;150:4;152:13,18;154:8,
12,16;157:17;158:1;162:3;
180:8,16

**elected (19)**
11:6;12:8;42:11;57:4;70:14;
96:2;97:4;113:9;158:15;159:2,
11;163:14;168:16;173:9,10,11;
175:20;186:1;189:6

**electing (9)**
24:11;52:19;53:12;54:13,19;
149:1;174:19;180:9;184:22

**election (62)**
7:3;26:21;28:6;31:6,7;32:18;
33:10,18;34:4;35:12,22;36:2;
39:8;42:2,14;44:13;47:2,6,7,9,
11,12;49:9,11,12,14,15;93:16;
98:1;100:2;103:9,16;106:15;
107:8;109:3;110:15;111:4;
112:3;113:21;114:8,15;115:19;
116:17;121:13;123:14;129:3;
132:5;134:4;139:8,13,20;140:1;
141:16;159:11;173:15;177:1,5;
178:16,17;185:16;190:17,20

**election-focused (4)**
122:11,18;124:4;128:22

**Elections (157)**
3:16;6:15,16,21;13:21;15:21;
16:3,6;17:5,6,9,15;18:2,18;
20:9;21:1;23:9,20;24:1,2,5,8,9,
15,19,20,22;25:5,13,15,19,21;
26:6,10,22;27:12;28:10;31:9,
22;32:5,7,14,19;33:4,6,9,15;
34:15,16,20,22;36:3,5;39:17;
40:22;41:4,13,15;42:5;43:3,15;
44:11;45:8,15;46:2,6;76:11;
96:4,5,7,11,13,17,18,19,21;97:1,
6,11,13,15,19;98:6,10,13,17,19;
99:2,6,14,15,17;100:13,17,19,
22;101:2,4;102:17,21;103:17;
104:6,10,14;105:20,21,22;
111:2,21,22;112:2,12,14,15;
113:10,12,13;116:9,11;118:7,9;
122:15,22;123:4,16;124:18;
125:1,2;134:17;136:16,21;
137:4,9,10,13;138:6,13,19,21;
139:17;141:13,15,17,20;
162:10;173:15;175:4,8,11,13;
177:2;179:2;182:15;184:12;
185:5;190:8,12

**election-specific (2)**
160:17;188:21

**electoral (5)**
132:4,7;136:11,12,16

**electorates (1)**
13:10

**elects (7)**
30:9,11;55:16;89:14;151:15;
159:20;160:2

**eliminate (1)**
126:12

**else (13)**
5:22;16:14;34:3;53:15,15;
57:17;58:22;121:16,19;136:14;
146:9,22;186:1

**enacted (1)**
169:2

**encompasses (1)**
36:8

**end (2)**
72:6;124:9

**endogenous (44)**

15:11,14;16:3;17:5;18:2,12,
17;23:9;24:19,22;25:4,13;26:6,
22;28:10;32:5;34:14,16;36:3;
41:4;44:11;96:3;97:19;100:21;
101:5;102:8;108:16;109:3;
113:11;116:11;118:7;122:15;
123:10,14;125:2;137:9;141:19;
143:16;153:8,13,19;184:12;
189:15;190:7

**ends (1)**
183:6

**enough (10)**
26:5;27:6;56:3;67:3;96:19;
117:6;130:17;182:4,7,18

**ensure (2)**
7:10;157:9

**entail (1)**
6:14

**equal (5)**
143:10,12;144:19;145:12;
159:21

**ergo (1)**
48:7

**error (1)**
120:3

**ESQ (1)**
3:3

**establish (4)**
12:4;161:16;181:13;182:18

**established (1)**
187:20

**establishing (1)**
155:12

**estimate (1)**
98:5

**estimates (3)**
11:16;15:1,3

**even (6)**
21:18;44:8;45:15;67:2;82:15;
180:4

**evenly (1)**
116:22

**evidence (2)**
57:21;179:20

**exact (1)**
114:10

**EXAMINATION (3)**
3:10;5:5;6:3

**examined (1)**
5:7

**example (32)**
11:21;13:4,17,22;16:20;
17:10,13;18:1;19:2,3;25:16;
29:11;35:20;37:10;39:15;43:12,
12;45:12;46:18;48:3;51:18;
70:1;90:4,8;91:12;108:17;
111:7;113:1;175:17;177:21;
178:1;182:8

**examples (2)**
46:8;167:17

**Excuse (4)**
21:12;52:22;142:19;188:5

**exercise (4)**

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

35:3,5,8;187:1
**exhibit (24)**
59:17;73:15,17,21;74:21;
75:4,8,22;76:4,10;77:13;
101:18;103:11,15;106:18;
119:5;131:9;142:12;152:22;
176:8,10,14;187:6,8
**EXHIBITS (1)**
3:14
**exist (2)**
97:1;99:10
**existed (1)**
113:12
**existing (3)**
40:22;41:3;102:19
**exists (1)**
131:19
**exogenous (76)**
17:6,7;24:5,8,9,14,20;25:15,
19,21;26:10,21;32:13;33:3,6,8,
15,18;34:4,20;35:12;36:5,6;
37:5;39:17;40:21;41:12,15;
42:2,14;43:3;44:12;45:8;93:19;
95:16;97:6;98:1,6,17,19;99:2,6,
16;100:3,4,6,9,12,17;101:5;
102:8,12;105:15,16,21;106:9;
113:13;118:8;119:16;122:21;
123:3,6,12,16;124:15,17;125:1;
137:10,14;138:22;141:17;
153:8,13,17;178:17;189:15
**expect (2)**
175:11,14
**expert (4)**
78:9;79:16;80:5;96:19
**experts (4)**
134:6;135:11;138:1,3
**explain (2)**
9:3;43:2
**explains (1)**
79:1
**explanation (3)**
21:8;46:3;50:1
**extensively (1)**
190:7
**extra (1)**
186:20

**F**

**fact (26)**
28:14;32:6;40:2,5,8;43:2;
45:8;51:8;85:19;89:1;95:3;
108:2;110:18;112:11;118:16;
119:17;129:20,22;141:14;
142:19;170:3;173:11;178:19;
179:2;183:8;186:7
**factor (1)**
154:20
**factors (1)**
181:19
**facts (7)**
57:21;179:20;182:4,16;
190:11,13,14

**fair (2)**
83:8;157:19
**fall (1)**
112:3
**familiar (5)**
83:3;86:6;106:19;190:11,13
**far (3)**
18:7;56:5,13
**fared (1)**
24:11
**Federal (1)**
133:4
**feel (1)**
46:11
**few (2)**
74:3;180:21
**fewer (8)**
86:1;88:16;89:1,8,15,20;
129:20;181:22
**fifth (2)**
47:12;184:16
**figure (5)**
12:12;35:1;42:9;150:22;
176:4
**file (4)**
8:18,22;9:15;120:1
**filed (9)**
8:20;9:4;79:16;80:3;140:19,
21;141:8;142:4,20
**filing (2)**
71:1,10
**filled (1)**
21:14
**find (21)**
9:11;10:15;12:4;13:13,15,18;
20:2;28:16;42:3;60:16;72:7;
87:19;93:22;101:9;147:10;
153:5;170:5;171:7;176:16;
185:1;188:8
**findings (3)**
79:19;88:2;157:7
**fine (3)**
63:4;69:21;78:18
**finish (2)**
68:8;190:2
**finished (1)**
69:15
**first (16)**
29:12;33:9;36:7;39:22;41:18;
47:6;59:6;74:2,7,19;84:7;111:4;
137:16;173:6;184:13;190:12
**five (58)**
9:18;15:21;16:2,6;18:2,18;
19:5;20:6;21:1,6;23:20,22;24:2;
28:6;41:20,22,22;42:1,11,11;
43:14,15;44:11,11;46:1,1,3,6,
10;49:15;74:9;76:13;90:12;
97:11,12,18;101:5,19;102:16,
21;104:19;112:15;113:13;
118:8;131:3;136:17;137:13;
138:13,18,21;141:15;145:13,14,
15;147:11;148:2;163:20;
184:12;190:1

**fixed (1)**
131:22
**flips (1)**
14:14
**Florida (2)**
167:6;175:17
**focus (6)**
27:12;54:14;81:7;105:12;
154:22;170:1
**focused (3)**
127:18;129:4;173:13
**follow (1)**
147:6
**follows (1)**
5:7
**Footnote (4)**
131:11,15;161:14,16
**Force (2)**
3:1;5:19
**forming (1)**
51:15
**forward (1)**
139:22
**found (3)**
18:10;60:9;142:16
**foundation (1)**
187:20
**four (17)**
49:14;87:3,7;104:2,18;
108:19;111:22;116:9,11;
144:18;145:11,14;155:3;164:4,
6;173:18,21
**fourth (2)**
47:10;184:16
**frame (1)**
28:7
**front (2)**
49:2;59:14
**functional (17)**
132:3,17,21;133:3,9,12,22;
134:3,3,12;135:11,15,21;136:6,
12;146:14;173:14
**Fund (1)**
3:4
**further (2)**
90:21;191:2

**G**

**gaining (6)**
50:4,7,14;51:21;52:3,7
**gave (5)**
48:2;78:5;89:11;93:7;172:6
**GE (1)**
106:11
**general (28)**
14:2;26:20;28:2;33:17;34:1;
41:6,8;47:20,22;58:11;61:6;
66:19;68:21;84:2;103:9;
106:15;121:13;131:21;133:14;
137:13;138:13,21;152:11;
159:11;161:10;174:22;176:22;
177:4

**generally (2)**
15:7;16:17
**General's (3)**
5:12,15;109:21
**generated (2)**
103:5;106:20
**geographic (1)**
30:21
**geographically (1)**
84:8
**gets (1)**
186:1
**Gingles (4)**
12:22;13:2;29:12;84:7
**given (10)**
29:14;100:1;112:11,20;
125:1;139:10;156:21;187:12;
188:17,20
**gives (2)**
26:10;27:2
**giving (2)**
95:3;182:16
**Good (2)**
5:20,21
**Government (2)**
152:21;155:14
**governor (10)**
34:3;36:1;106:14,16;107:19;
108:3;109:13;178:2,6,7
**governor's (1)**
108:4
**great (1)**
177:10
**greater (1)**
173:1
**Green (3)**
110:7,9;121:3
**group (10)**
11:19,20;12:2;14:12;33:3;
38:22;40:3;69:3;93:13;94:17
**groups (5)**
11:20;38:20,21;40:7;169:10
**group's (1)**
11:16
**growth (5)**
83:5,13,16;88:21;90:9
**guess (26)**
14:1;31:19;32:22;34:8,12;
36:11;47:16;49:19;50:6;68:2;
90:3;95:8;113:5,7;118:1;
127:17;133:6;137:8;138:9;
165:17;168:5;175:7;178:19;
183:5;188:8;190:13
**guessing (1)**
34:22
**guidance (7)**
88:1;134:14;137:2;187:12;
188:9,17,20
**guidelines (1)**
131:18

**H**

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

**half (1)**
118:18
**halfway (1)**
107:13
**hand (4)**
75:7;76:3;95:10;103:14
**HANDLEY (11)**
3:9;5:4,20;6:6;75:2,8,17;76:4,
10;103:15;106:18
**Hanley (1)**
190:6
**happen (2)**
28:17;40:10
**happened (2)**
16:22;94:1
**happens (3)**
16:15;32:11;115:18
**HCVAP (9)**
147:13;148:5;150:13;151:1,
20;153:12;174:7,11,15
**head (2)**
44:3;190:22
**hear (3)**
63:12;64:10;125:17
**heard (16)**
55:11;61:17,21;62:6,7;63:1,9,
20;64:1,8,13,16,19;70:8;72:18;
73:9
**held (2)**
86:7;164:4
**help (5)**
6:15;16:21;24:7;144:4,14
**Hence (2)**
112:20;146:3
**higher (2)**
46:19;146:18
**Hispanic (142)**
20:7,7;21:12,21;22:6,11,21;
23:2,2;39:16,19;40:4,6,13,19;
41:21;42:1,4,10,12,14;43:3;
44:4,7,10;49:21;50:4,7,11,15,
16,19;51:9,21,21;52:7,11,14,22,
22;54:18;55:4;56:8,16,19;
57:15;58:8,19;59:2,8;60:8,17;
70:2;85:7;88:22;90:18;91:8;
92:2,4,18;112:6,8;117:5;122:6;
129:9,11;130:1;139:12,14;
147:14;148:7,10,13,14,20;
150:1,3;159:1,8;160:10,12,14;
161:2,5,17,18,20;162:1,2,3,4;
163:3,6,8,11,13,18;164:3,7;
165:4,9,12,19;166:5,15,17,20,
21;167:2,5,11,13,16,18,19,21;
168:11;170:8;171:7,8,10,14,16;
172:8,11,12,15,20;173:1;
174:18;178:8,9;179:12;180:20;
181:16;182:13,21;183:9,12;
184:19;185:14,21
**Hispanic-preferred (30)**
22:16;40:9;42:5,8,21;43:1,9,
13;47:5;49:10;53:18;54:19;
56:1,4;93:18;96:9;121:1,3;
139:15;151:16;161:19;162:8;

166:14;174:20;180:16;181:8;
182:6;185:9;186:3,8
**Hispanics (66)**
19:11,14;20:14;21:5,17;22:2,
13,18,20;23:1,5;40:16;42:17;
50:2;52:5;55:22;56:3;57:18;
58:6;59:1;60:10;88:16,17;89:2,
16,21;90:10;93:8;114:22;115:3,
17;148:22;149:4,5,6,18;157:10,
13,17;159:21;160:8,11;161:22;
164:20,21,22;165:3,8;167:10,
11;168:2,7;171:10,13;175:1,12,
15,21;179:15;180:1,21;181:22;
182:1,9,11;183:17
**hold (3)**
39:14;74:15;103:20
**home (1)**
190:2
**Homogeneous (1)**
11:11
**hope (1)**
103:7
**House (24)**
3:18;8:6,21;16:20,22;17:10;
59:15;74:10,19;75:1,11;125:5;
131:4;136:1;147:5,7;153:2;
154:4;155:17;160:21;177:1;
186:17,18;187:3
**House-specifics (1)**
74:20
**Humor (1)**
139:5
**hundred (1)**
42:1
**hypothesis (2)**
18:4,7
**hypothesizing (2)**
20:3;85:6
**hypothetical (24)**
14:9;20:17;23:10;26:4;30:19;
49:7,9;54:16;55:21;89:5,19;
114:6;124:16;130:6,6,8;149:21;
150:9,16,17,21;181:5;183:3;
184:9
**hypothetically (1)**
160:8
**hypothize (1)**
27:17

**I**

**idea (3)**
32:18;98:20;117:14
**identical (2)**
30:18,20
**IDENTIFICATION (11)**
3:15,16;73:17;75:4,22;76:11;
103:11;142:12;162:10;176:10;
187:8
**identified (5)**
74:8;163:21,21;164:4;183:8
**identifies (1)**
76:12

**identify (4)**
75:9;76:5;187:16;188:11
**impact (1)**
126:13
**important (7)**
40:12;48:1,4;52:1;100:22;
159:7,18
**inaccurate (1)**
119:10
**Inaudible (1)**
73:2
**include (5)**
32:7;107:18;115:1;170:2;
177:21
**included (17)**
100:1;101:4;102:17;112:18;
139:13,21;141:13;144:10;
145:11,13;146:3;155:9;156:7,
17;178:3,7,11
**includes (2)**
52:15;145:19
**inconsistent (1)**
142:2
**incorrect (2)**
105:8;165:1
**increase (9)**
82:18;86:13,22;88:19,20;
92:7,10,11,20
**increased (2)**
87:3,7
**increases (2)**
82:19;88:21
**incumbent (6)**
157:11;162:19;166:22;167:4;
170:8;185:13
**Indeed (1)**
132:20
**index (25)**
93:19;95:17;96:3;99:19;
100:1;101:5,6;102:9,13,17;
105:17;119:16;123:6,10,12;
134:5,8;136:8,9,13;137:19;
138:12;153:20;178:11,17
**indexes (1)**
134:11
**indicate (2)**
39:17;52:12
**indicates (1)**
122:2
**indicating (3)**
85:13;118:21;132:13
**indication (2)**
51:6;111:10
**indicia (1)**
132:7
**indirectly (1)**
30:4
**individual (1)**
26:17
**individually (1)**
12:2
**individuals (1)**
98:3

**inference (1)**
11:13
**influence (9)**
26:14;62:6;64:7,8;70:7,12,13,
17;71:14
**information (16)**
31:4;43:22;55:1;111:14;
112:7,10,14;130:18;134:22;
136:3;149:20;159:6,17;160:5,6;
176:2
**instance (11)**
15:2;23:4;49:20;70:4;82:17;
83:13;87:6;120:21;121:2;
158:14;167:9
**instances (3)**
21:20,21;29:9
**instruct (1)**
87:18
**instructions (1)**
137:11
**insufficient (3)**
24:19;25:12;130:19
**intent (1)**
168:20
**interchangeably (1)**
30:8
**interested (3)**
40:3;54:10;112:17
**interesting (1)**
113:7
**internet (1)**
142:16
**interpret (2)**
13:9;131:14
**interpretation (1)**
13:2
**interpreted (1)**
148:6
**interracial (1)**
24:17
**interrupt (1)**
25:3
**interrupted (1)**
68:14
**into (9)**
8:6;9:6;25:21;54:12;59:4;
60:19;138:14;181:20;183:6
**introduce (1)**
61:3
**introduction (1)**
81:9
**involved (3)**
65:1,10,11
**irrelevant (4)**
20:13;114:3;165:7;169:15
**irrespective (1)**
168:3
**issue (10)**
15:15;17:10;36:13;42:19;
46:12;64:22;85:9,9;105:10;
161:9

## J

**judge (1)**
133:17
**judges (1)**
17:16
**jump (2)**
153:16;154:1
**jurisdiction (4)**
7:14,16;25:17;132:5
**Justice (20)**
8:5,8;9:13,21;87:14,18;88:1;
131:17;132:19,22;133:4,7,16;
134:9;136:18;137:3,12;141:8;
156:22;187:13

## K

**keep (4)**
33:1;82:15;91:19;186:4
**keeping (1)**
86:7
**kind (4)**
44:13,14;91:19;108:18
**knew (1)**
139:14
**knowing (3)**
111:13;177:10,20
**knowledge (6)**
9:22;65:18;66:2,7,16;73:1

## L

**label (1)**
22:16
**lack (3)**
18:5;21:8;187:19
**land (2)**
110:2;178:12
**large (3)**
13:19;84:8;88:21
**last (5)**
101:20;115:8;125:11,17;
185:5
**Lastly (1)**
71:17
**Latino (2)**
3:1;5:19
**law (2)**
65:5;88:3
**lead (1)**
126:9
**least (8)**
36:8;87:13;113:20;116:19;
129:8;144:19;157:11;165:6
**left (1)**
101:20
**Legal (3)**
3:3;66:15;70:20
**legally (1)**
88:5
**Legislative (2)**

**legislator (2)**
188:18,19
**legislature (4)**
188:10,14,19;189:9
**less (11)**
46:21;50:2;58:8,19;59:8;
60:8,17;85:21;123:18;129:2;
189:7
**level (4)**
12:3;17:19;19:21;37:3
**Libertarian (1)**
110:6
**lieutenant (8)**
106:14,15;107:19;108:3,4;
178:1,6,7
**likely (2)**
46:21;53:22
**likewise (1)**
17:18
**limited (1)**
48:13
**line (1)**
68:8
**lines (2)**
31:11;32:6
**LISA (4)**
3:9;5:4;6:6;75:1
**list (3)**
51:4;104:9;110:13
**listed (6)**
122:7,10,17;150:10;177:2,3
**litigation (2)**
65:1,3;116:20
**little (11)**
31:19;33:1;43:21;54:22;61:1;
95:8;107:6;122:8;145:18;
157:5;185:10
**live (1)**
89:8
**look (107)**
8:6,9;9:6;14:4,11;15:11;16:2,
21;17:14,19;18:9;21:3;22:18;
23:22;24:4,8,9,14;25:15;26:10,
13;27:10;28:22;32:5,17,19;
33:15;34:8,8,20;35:13,16,21;
36:1,3;40:21;41:3,12;46:22;
47:15,18;48:1,6,8;49:2,4,20;
50:6,19,22;51:2,15,18;52:2,21;
53:6;54:3,9;59:11;60:12,14;
74:18;76:18;81:3;90:20;91:21;
93:16;94:7,8;98:6,12;99:14;
101:17;103:22;104:11;106:17;
107:4,12,15;108:12;112:13;
118:22;122:5;128:15;137:4,13;
142:8,18;147:4,5,7,16;161:12;
162:20;172:3,22;180:19;183:3;
184:6;185:2;186:11,13;187:17
**looked (32)**
8:15;9:8;10:17;13:22;58:18;
79:1;95:1;99:21;100:12,18;
101:2;102:21;103:17;104:7,19;

111:15;112:1;113:14;134:15,
17;136:15;142:16;157:9,11;
167:17;173:8;178:2,15;179:11,
12;187:21;190:21
**looking (55)**
10:11;11:1;16:13;17:12;
19:22;20:8;23:9;28:20;29:3;
31:21,22;32:13,16;33:3,8;
42:13;51:10,17;52:17;53:17;
59:13;74:14;81:8,10,15;85:17;
98:10;101:19;104:15,17;106:3;
122:6;125:8;126:2;128:2;
132:14;136:10;137:5;143:7;
145:16;147:11;148:2,3,4;153:8;
157:15;161:14;169:20;172:20;
173:4,14,15;176:22;177:3,17
**looks (4)**
77:12,15;144:9;147:12
**lose (2)**
38:3;46:16
**loses (3)**
42:1;47:12,13
**losing (10)**
46:5,9;49:21;50:15,16;51:20;
52:3,7;169:9;179:12
**lost (10)**
38:2;49:15,16;106:1,9;112:6;
172:11,12;178:4,9
**lot (4)**
31:3;112:5;183:22;189:2
**lots (3)**
16:16;134:21,21
**lower (3)**
127:14,20;128:8
**Luckily (1)**
116:14
**Luis (1)**
10:18
**lumped (2)**
111:1;179:1

## M

**maintain (1)**
10:20
**maintained (2)**
143:22;144:3
**major (1)**
110:10
**majority (24)**
11:19;13:4,5,18,19;16:10;
18:10;19:13,14;20:9;21:4;23:1,
5;34:14;94:16;113:15;114:22;
115:3,16;151:4;159:14;167:10;
169:12;171:8
**majority- (1)**
159:13
**makes (2)**
56:20;125:20
**makeup (1)**
181:1
**making (6)**
53:8;79:2;91:9;136:3;169:14;

183:13
**manner (1)**
138:7
**many (21)**
15:7,11;29:17,18;96:4,5;97:7,
13,15,19;98:10,14,17,19;99:6,
10;100:12,15;101:7;107:1;
129:8
**map (10)**
30:15;41:13;89:12,12;140:4,
5;187:14,15;188:1,4
**maps (1)**
15:18
**marginal (3)**
92:7,10,13
**margins (1)**
190:19
**mark (14)**
59:16;61:10;68:9;73:13;
74:21;75:16;101:9;103:6,9;
142:7,10;176:7;186:21;187:5
**MARKED (16)**
3:15;73:16,21;75:3,8,21;76:4;
103:10,15,20;106:18;142:11;
147:8;176:9,14;187:7
**Massachusetts (2)**
7:18;10:3
**matched (1)**
116:22
**matching (1)**
93:21
**MATTAX (124)**
3:11;5:8,11,22;6:4,19;19:20;
33:22;41:8,11;43:19;44:1;
47:21;48:15;54:7,15;58:1,15;
59:18,20;61:5,9,11;62:5,20;
63:1,8;66:11,13;67:19;68:6;
69:20;70:6;71:9,16;72:2,5,13;
73:4,6,13,19;74:17,21;75:6,16;
76:2;78:4,13;79:9,13,21;80:1,
14;81:6;86:17;88:11;94:22;
95:5;98:22;100:10;101:16;
102:4;103:13;105:4,8,14;110:8;
114:12,13;116:6,10;117:20;
118:4;119:5,9;120:4;125:7;
128:11,14,21;131:2,7;135:13,
19;139:4;142:10,14;147:19;
148:1;149:14,16;150:10,19,20;
158:8,12;165:13,16;166:2;
168:14,21;169:18;171:4,21;
172:3,10;175:5,9;176:3,7,12;
179:21;181:6,11;185:19;
186:18;187:10,22;188:15;
189:13,16;190:1;191:4
**matter (1)**
136:1
**may (13)**
13:17;15:18;57:14;63:18;
72:20;73:10;132:6;146:15;
153:22;154:13,13;176:21;
181:16
**maybe (3)**
16:18;161:20;184:10

**mean (34)**
15:14;19:13;26:17;28:1,2;
30:5,12;35:7;42:5,10;43:18;
45:17;51:12;55:5;65:20;68:1;
71:7;95:10;99:3;111:22;116:9;
127:15;131:14;134:4;137:15;
139:18;140:7;150:8;154:5;
161:20;166:19;180:5;181:17;
186:5
**meaning (3)**
66:1,6,15
**means (11)**
17:8;42:10;63:3;66:20,22;
67:1;70:11;102:16;105:19;
130:11;136:12
**meant (4)**
48:3;102:15;143:14;144:14
**measure (2)**
11:15;88:21
**meet (2)**
7:11;84:6
**MELLETT (68)**
3:13;5:16,16;19:16;33:20;
41:5;43:17;47:19;48:11;54:5;
57:20;58:10;59:16;61:2,7;
62:17,21;63:5;66:8;67:14;
69:13,16;71:7,22;72:3;73:2;
75:18;77:22;79:6,17;80:8;
86:11;88:8;94:20;95:2;100:8;
102:1;105:2,6;114:9;116:4;
117:18;119:3,22;128:18;135:8;
139:2;147:17;149:12;150:8,15;
158:6;165:22;168:13,17;
169:16;171:3;172:2;175:3,6;
179:19;181:4;185:17;186:16;
187:19;188:13;189:11;191:5
**memory (1)**
74:13
**mention (1)**
140:21
**mentioned (10)**
61:14;64:12;140:18,19;153:3,
4;161:8;162:11,15;189:18
**mere (1)**
129:15
**met (1)**
29:12
**method (1)**
27:12
**methodology (7)**
35:20;138:10,11,14,16;141:9,
10
**metric (1)**
173:3
**metropolitan (2)**
17:13,15
**Mexican (1)**
3:3
**Miami-Dade (2)**
7:13;9:16
**middle (2)**
81:11;143:8
**might (11)**

37:11,15;38:15;51:18;66:21;
83:17;136:14;137:21;143:9;
149:5;190:21
**mind (3)**
21:9;67:4;143:13
**minds (1)**
168:19
**mine (1)**
147:16
**minimum (1)**
25:4
**minorities (31)**
12:8;23:18;24:1,2;27:13,22;
28:13;29:12,15,18;38:20;39:13;
45:12;70:13;82:20;84:5,6;
85:18;86:2;89:8;90:5;112:18;
129:20;141:13;154:8;158:4,16;
170:2,3,10;173:11
**minority (91)**
11:19;12:14;13:6;19:4,5;
21:2,6;23:12,15;25:17;27:3,5,7,
14,19;28:17;32:8,9,12;36:20,
21;37:1,3,12,15,19;38:2,8,17,
20,21,22;39:1,7,9,15,17;40:3;
44:21,21;46:17;52:20;54:11;
57:3;69:3;81:10,11;82:18,20;
83:6,14,20;84:4;86:2;87:1;89:2,
16,21;95:16;102:8,12,18;
105:16,20,21;106:1,9;111:5;
113:9;134:18;137:6,7;146:12,
21;151:1,3;154:4,7,12;158:1,15,
19;164:1;169:10;170:4;173:8,
10,12,13;177:22;178:3
**minority-preferred (59)**
11:5;23:3;24:11;30:10,12;
31:17;32:2,20;33:2,5,10;35:10;
37:1,10,12,14,16,17,20;38:1,3,7,
9,16,17;39:7,9,20;40:1;41:2;
45:9;46:4,13;52,19;54:1,13;
55:16;57:3;69:5;70:3;81:12,19;
82:2;96:2;97:4,7;102:18;
104:20,22;112:19;113:14;
114:16,18;118:17;134:17;
137:7;141:14;154:8;169:8
**minute (2)**
154:1;190:2
**minutes (1)**
131:3
**Mischaracterization (1)**
166:1
**Mischaracterized (1)**
149:13
**mischaracterizes (2)**
88:9;169:17
**misspoke (1)**
152:8
**misunderstood (1)**
100:6
**misused (1)**
138:17
**mixed (1)**
40:8
**mixing (1)**

93:21
**moment (2)**
7:21;162:12
**more (40)**
22:7;26:11;27:2;30:13;32:17;
33:17;34:4,15;35:11;39:14;
43:21;47:3;52:1;54:10;55:1;
69:3;84:3;85:7,13;94:3;100:22;
111:13;112:7,10,13;118:18;
123:11;134:16;137:9;145:8;
149:20;153:21;154:6;159:5;
176:1;177:20;179:16;180:2;
182:1;189:2
**Moreover (1)**
86:1
**morning (2)**
5:20,21
**most (6)**
16:18;24:13;32:4;48:14;
111:6;186:14
**mostly (1)**
6:10
**mouth (1)**
151:11
**move (7)**
28:4;68:9;113:5;125:4;139:6;
146:9;184:11
**much (5)**
37:7;40:10;53:5;54:9;145:8
**multiple (3)**
38:21;39:13;177:15
**multi-underscore (1)**
104:3
**must (5)**
44:19;65:6,6;170:20,21
**myself (1)**
72:21

## N

**name (4)**
5:11;6:5;104:9;142:17
**native (2)**
12:1;146:2
**native-preferred (1)**
13:20
**nearly (1)**
37:7
**necessarily (7)**
15:2;52:12;83:12,16;136:19;
175:16;181:17
**necessary (2)**
17:17;154:16
**need (25)**
12:3;15:8;22:1;24:4;36:7,22;
43:21;53:6,11,21;54:3;57:21;
77:20;78:6,16,19;114:22;128:6;
129:7;142:17;149:20;162:6;
169:9;187:17;189:22
**needed (2)**
10:15;85:13
**needs (2)**
185:15,18

**neglected (1)**
29:14
**Neither (2)**
53:4;111:8;157:16
**nevertheless (1)**
86:9
**new (13)**
30:15;31:1,11,20,21;32:1,13;
34:11,19;35:1;41:13;123:21;
124:2
**newly (1)**
32:9
**next (10)**
32:15;54:16;109:12;110:1;
115:19;145:16;181:18;182:10;
184:5;187:6
**NINA (2)**
3:3;5:18
**nine (1)**
161:12
**noncitizens (1)**
52:15
**noncontested (1)**
110:10
**none (3)**
97:21;140:5,6
**nonminority (1)**
21:3
**nonnative (1)**
11:22
**nonpartisan (2)**
175:8,11
**nor (2)**
157:16,17
**normally (1)**
13:15
**Notary (1)**
5:6
**noted (2)**
90:14;132:5
**notes (1)**
128:15
**noticed (1)**
143:2
**number (51)**
16:20;17:5;24:19,21;25:4,12;
50:18;51:2;73:21;74:22;75:8,
17;76:4,10;82:6,9,15,18,19;
84:15,17,20;85:10;86:8,14,22;
87:2,6;88:19;89:15;101:18;
103:9,15;131:10;142:10;144:3,
7,10,11,11;145:3,6;147:8,18;
152:22;159:21;174:9;176:14;
177:17,18;187:6
**numbers (10)**
44:3;81:16;88:15;93:6;
111:16;127:19;145:9;155:5;
162:22;176:20
**numerator (1)**
86:16

## O

Case 1:11-cv-01303-RMC-TBG-BAH   Document 94-6   Filed 11/01/11   Page 61 of 66

State of Texas v.                                                                    Lisa Handley, Ph.D.
United States of America, et al.                                                    October 24, 2011

**object (1)**
  63:5
**Objection (20)**
  57:20;58:10;66:8;71:22;
  77:22;79:17;80:8;86:11;88:8;
  94:20;139:2;149:12;165:22;
  168:13,17;169:16;179:19;
  185:17;187:19;188:13
**obviously (4)**
  33:19;166:10;168:9;187:5
**occasion (1)**
  143:16,17
**occupation (1)**
  6:8
**occur (1)**
  177:4
**occurred (2)**
  31:9;139:13
**off (24)**
  6:18;62:4;68:4;74:16;75:18,
  20;81:5;98:21;101:10,12;102:3;
  125:6;128:13,17;131:5;147:20;
  150:16;165:13,15;172:7;
  184:11;190:3,22;191:6
**offer (2)**
  27:13;65:7
**Office (17)**
  5:12,15;15:15;17:21;24:12,
  12;25:18;28:2,4;30:10;36:21;
  42:18;45:16;118:17;154:9;
  160:17;161:8
**offices (2)**
  17:9,20
**old (3)**
  31:10;144:9;146:5
**omitted (1)**
  21:16
**Once (2)**
  14:22;161:10
**one (84)**
  6:17;7:22;8:3,20,21;10:17;
  13:5,18;14:12;15:20;16:7;18:4;
  20:1;23:14;25:17,18;27:18;
  30:22;32:18;33:17;34:4;35:11,
  12,13;39:14;43:11;48:6;49:10;
  55:15;57:14;59:15,19;69:3;
  83:14;86:10;89:13;92:11;95:9;
  100:2,14,16;104:1;107:2;111:6;
  112:21;113:1,4;117:1,2,7,11,13;
  118:8;121:13;129:10;132:13;
  139:1,7;140:22;143:9;144:19;
  145:12,14;146:16;147:9;148:4;
  153:11,17,18;154:22;155:22;
  156:2,14;174:2,8;177:12;178:3;
  181:16;182:9;184:13,14,15,16,
  17
**ones (2)**
  34:7;35:13
**only (24)**
  25:17;27:11,18;36:21;41:3,
  12;88:19;96:22;97:1;98:4;
  100:1,12;105:10;112:17;
  113:11;118:7;129:10;132:13;

**operating (1)**
  130:3
**opinion (10)**
  67:6,10;69:6;70:16;71:4;
  80:16;118:15;124:19;164:9,10
**opinions (1)**
  51:15
**opportunity (14)**
  27:13;78:5;83:6;93:8,14;
  94:2,14;95:7,11;117:17;143:10,
  12;144:19;145:12
**opposed (2)**
  69:18;92:15
**opposite (1)**
  152:16
**opposition (2)**
  165:10,11
**option (1)**
  170:3
**order (4)**
  43:14;90:5;167:12;176:16
**original (1)**
  47:17
**Otherwise (1)**
  168:15
**out (48)**
  20:2;21:6;24:7;29:6;35:1;
  41:22;42:9,11;43:14;44:3,11;
  46:1,2,6,10,19,20;72:7;73:14;
  80:22;82:11,11;93:22;96:10,13;
  97:3,11,12,17;108:20;118:20;
  125:13,14,19;126:3,4;128:3;
  130:4,9,10;134:22;149:2;
  150:22;170:5;171:7;176:4;
  185:1;188:9
**over (16)**
  32:17,17;47:1;49:3,4;57:8;
  70:14;101:3;135:18;142:7;
  149:17;173:13;179:16;180:2;
  184:5;189:22
**overall (2)**
  20:1;87:3
**overrepresent (1)**
  112:20
**overrepresented (1)**
  111:8
**overwhelmingly (2)**
  160:11,13
**own (3)**
  12:19;74:14;88:4

## P

**packing (1)**
  90:5
**PAGE (24)**
  3:10;9:18;74:5,6;76:12;
  77:13,20;78:12;90:12;101:19;
  104:2;107:10,13;118:22;
  125:11,11;131:10;143:1,4;
  144:13;147:11;148:2;154:2;

**pages (1)**
  74:3
**paragraph (5)**
  74:7;104:8;131:13;143:8,8
**paraphrasing (1)**
  81:13
**part (15)**
  29:4;41:18,19;59:3,6;65:13,
  14;88:14,18,18;125:18;126:11;
  129:8,18;140:11
**participated (2)**
  70:22;71:10
**particular (23)**
  14:19;17:20;18:3;20:5;23:6;
  27:7;28:1,4,5,21;31:12;33:13;
  34:5;36:10;40:16;96:14;132:4;
  158:14;160:20;178:16,18;
  179:5;189:6
**particularly (3)**
  31:5;88:16;102:9
**parties (1)**
  110:10
**partisan (1)**
  175:13
**parts (2)**
  59:5;60:19
**party (6)**
  22:14,17;110:7,9;170:20,21
**pass (1)**
  191:3
**past (1)**
  39:16
**paste (1)**
  119:18
**pattern (1)**
  32:17
**patterns (9)**
  9:6,7;11:17;12:4;28:12;47:2;
  49:3,4;169:21
**Patterson (1)**
  178:13
**Pause (35)**
  6:1;30:1;35:17;50:6,10;
  55:19;62:2,14;70:19;76:21;
  77:8;78:22;87:10;91:22;94:5;
  104:2,12;107:16;110:4;117:9;
  122:1;127:11,13;128:5,16;
  132:12;142:22;146:10;147:16;
  152:8;155:10;163:2;172:17;
  185:7;186:19
**people (6)**
  66:21;94:4;111:22;112:2;
  117:6;182:7
**people's (1)**
  12:20
**PERALES (3)**
  3:3;5:18,18
**percent (100)**
  12:12,13;13:3,6;14:12,13,17;
  20:17;22:7;30:13;34:15;42:2;
  44:4,5;47:7,8,9,11,13;49:11,12,
  13,14,15;54:17;55:3,22;56:7,12,

**object (1)**
  16;57:15,15;58:8,19;59:8;60:8,
  17;70:1,2;85:19,21;91:3,13,14,15,
  16;93:12;94:3,6,15;95:17;96:6;
  97:9,14;108:8,9;113:22;116:15;
  123:8,18,19,20;126:7,7;128:18;
  129:2,3;130:13,14;146:17;
  148:6,12,19;149:22;150:2,13,
  22;151:2,20;153:7,8,12,12,13,
  17;154:7;158:22;164:1,2,3;
  173:1,12,13;174:6,7,15;178:14,
  14;182:9,11;189:7
**percentage (23)**
  23:17;89:13,20;90:9,17;91:7,
  20;92:1,2,4,12;94:8;112:2;
  127:13;128:8;129:3;130:22;
  146:18;148:5;173:8;175:18;
  180:20;186:5
**percentages (13)**
  51:10;81:15;126:6,9;128:6;
  129:15,19;130:19;131:22;
  146:12;180:19;188:2,6
**percentage-wise (1)**
  127:19
**perform (5)**
  123:7;132:17;134:1;141:20;
  144:6
**performance (6)**
  93:17;95:1;136:10,11,13,16
**performed (1)**
  29:1
**performing (39)**
  41:14,16;44:15;46:17;47:14;
  49:8,18;56:20;57:9,16;58:21;
  82:16;84:21;85:10;91:10;
  100:20;110:20;115:2;123:3,9,
  22;124:3,7,10,11,13,14,18;
  130:9;144:5;145:21;146:1;
  148:15,20;150:11,13;153:18;
  178:22;179:3
**perhaps (3)**
  42:6;43:9;133:17
**period (6)**
  15:20;23:21;47:1;112:16;
  139:8;184:13
**person (4)**
  34:21;35:2,8;46:4
**personal (1)**
  87:9,10;118:15
**personally (3)**
  120:18;140:7,9
**perspective (1)**
  169:5
**PhD (2)**
  3:9;5:4
**phone (2)**
  5:9;101:22
**pick (6)**
  34:7;35:13,16;117:7,13;
  138:21
**picked (2)**
  139:1,7
**picking (3)**
  35:19;117:11;138:13

Case 1:11-cv-01303-RMC-TBG-BAH   Document 94-6   Filed 11/01/11   Page 62 of 66

State of Texas v.                                                     Lisa Handley, Ph.D.
United States of America, et al.                                        October 24, 2011

**pieces (3)**
21:15,16;183:22
**place (1)**
183:6
**places (3)**
6:16;16:17,18
**PLAINTIFF (1)**
6:3
**Plan (88)**
3:18,20;7:11;8:9,16;9:8,9,10,
11;29:20,20;43:16;53:21;65:6;
74:9,19;75:1,12,14;76:7,14;
77:10,11;80:5;81:18;82:1,12;
84:13,14,19;85:22;86:3,21;
89:6;90:15,19;93:20;97:20;
98:9;100:20;102:13;105:11;
107:19,20,21,21;113:9;122:19;
123:2,17,17;124:12,17,20;
125:14,15,20;126:4,5,18;
127:18;129:1,4,5;130:10,11,12,
16;131:19,20;136:1;141:2;
142:19;143:7,20;144:12,18;
145:13,15;146:5;147:5,7;153:6;
177:5;186:17,18;187:3,4
**PLANC100 (1)**
104:4
**plans (7)**
8:6;82:7,10;85:11;86:8;98:8;
119:2
**play (3)**
30:2;54:12;106:13
**plays (1)**
181:20
**pleading (1)**
80:3
**please (10)**
6:5;7:6;75:9;76:5,20;77:21;
78:17;83:10;101:19;102:14
**plus (1)**
145:14
**pm (3)**
101:13,15;191:11
**point (10)**
35:2,5,8;64:17;85:15,15;
92:12;132:1;169:1;190:22
**points (1)**
180:20
**polarization (9)**
11:8;12:15;13:8;14:8;22:8;
28:16;155:12;167:22;168:1
**polarized (42)**
11:3;12:5,6,10;14:18,20;
15:10;16:11;17:2;18:16,19,22;
19:8,10;21:11;22:4;25:6,14;
26:1;27:4,9,21;28:9,15,21;
29:10,15;38:4,11;120:16;121:9,
14;122:3;155:6,19;156:11;
169:7,7;174:22;183:16;184:18;
185:2
**political (2)**
72:15;73:5
**population (49)**
12:1,1;27:19;44:4,6;49:21;

50:5,8,12,15,16,20;51:7,9,21,
22;52:4,5,9,12,15;53:1,2;56:8;
58:9,20;59:9;60:9,18;82:19;
88:22;90:18;91:8;92:3,5,19;
93:13;94:16;146:2;148:13,19;
150:1;158:22;159:1,22;164:2;
173:2;175:19;179:12
**posit (3)**
16:14;43:5;118:1
**posited (1)**
18:2
**positing (4)**
20:6;39:12;45:22;46:7
**position (2)**
80:18,20
**positive (2)**
66:22;156:13
**possibilities (1)**
43:5
**possibility (1)**
47:15
**possible (6)**
38:22;46:18;49:2;58:2;136:3;
188:14
**Possibly (5)**
62:2;63:16;128:10;171:18;
190:18
**post-conflict (2)**
6:15,20
**postponed (1)**
114:5
**practicable (1)**
15:12
**precinct (1)**
11:11
**precleared (1)**
9:13
**predetermined (1)**
131:22
**prediction (1)**
97:21
**prefer (4)**
22:13;28:13;165:9;175:1
**preferred (22)**
22:11;27:12;34:17;40:2,14,
15,19;52:19;58:6;60:11;98:14;
115:14,21;158:2;165:3;167:11;
170:9;175:2;180:8,10;185:4;
189:7
**prepared (4)**
75:1,11;76:6;140:22
**presumably (1)**
17:6
**presume (3)**
30:16,19;90:15
**pretty (1)**
92:13
**primaries (3)**
140:3,14;160:8
**primary (11)**
139:16,20;140:1;159:9;160:1,
6,9,10,16,21;161:11
**principle (1)**

177:16
**privilege (1)**
87:16
**probably (3)**
55:2;105:10;176:17
**probative (2)**
137:10;153:21
**problem (3)**
28:15;168:11;175:8
**procedure (1)**
11:8
**proclamation (2)**
145:13,15
**produced (2)**
96:9;99:4
**project (1)**
184:4
**prompted (1)**
87:22
**prong (2)**
29:12;84:7
**proper (1)**
133:14
**proportion (3)**
51:7,8;89:7
**proportionality (4)**
88:7,13,14;125:4
**propose (1)**
75:13
**Proposed (52)**
3:18,20;8:6;23:10;29:20;
31:4,11,13,18;35:9;53:20;74:9;
75:1;77:11;82:1,12;84:14,18;
85:2,4,22;86:3;89:6;90:19;92:6,
22;93:4,5,20;97:20;98:8;
119:18,19;120:5;122:19;
123:15,17;124:11;125:15,20;
126:5;127:6;129:1,5;130:10,12;
131:20;144:12;145:5;173:22;
174:14;189:12
**proposing (1)**
183:4
**proposition (1)**
175:1
**propositions (1)**
14:2
**protect (1)**
169:10
**protected (29)**
43:15,18;45:3,5,11,19;54:3,
20;55:5,56:17;59:10;60:9;67:7;
69:8;70:5,18;71:4;116:3;
118:11,14;143:19;144:22;
149:19;158:5;159:3;166:18;
167:5;175:21;189:9
**provide (4)**
29:18;89:4;93:13;132:6
**provided (3)**
144:18;155:11,13
**pull (1)**
44:3
**purporting (1)**
173:19

**purpose (4)**
24:15;120:19;132:11,12
**purposes (7)**
40:13;52:2,18;60:2;72:17;
123:13;157:21
**put (7)**
34:13;61:7;79:11;80:22;
139:22;151:10;186:9
**putting (1)**
22:15
**puzzled (1)**
185:10

---

## Q

**quandary (1)**
27:15
**quick (3)**
120:15;125:4;145:8
**quickly (1)**
187:1
**quotation (1)**
144:15

---

## R

**race (31)**
15:17;19:4;20:1,8;22:9,15;
44:7;46:12;104:18;108:4,14;
109:12,16,17,18,21;110:1,3,11;
115:8;165:6;166:11,12;168:3;
169:15,21;170:11,12,13;171:5,
11
**races (12)**
14:15;16:2,12,16,22;18:10;
104:19;106:8,10;108:13;
110:17;177:6
**racial (20)**
11:7;12:15;13:7;14:7,12;
22:7;152:10;155:12;162:6;
164:18,21;165:2;166:7;167:22;
168:1;169:22;171:12;183:1,7;
185:7
**racially (28)**
12:5,6;14:18;15:10;17:1;
18:16;19:7,9;21:10;22:4;25:6,
14,22;27:9,21;28:9,21;120:16;
121:9,14;122:3;155:6,19;
156:10;174:21;183:16;184:17;
185:2
**ran (1)**
25:17;115:8;161:17,18
**rarely (1)**
13:12
**rates (1)**
157:20
**rather (2)**
52:8;132:1
**raw (1)**
88:15
**reach (1)**
12:17
**read (13)**

63:14;64:4;78:6,12,16;80:9,
11,13,21;81:1;120:5;131:12;
133:15
**reading (4)**
64:20;77:19;78:18;191:9
**real (4)**
20:20;120:15;125:4;145:7
**really (5)**
65:8;88:18;112:1;117:16;
180:4
**reason (5)**
9:22;45:20;52:10;81:2;
186:21
**reasons (1)**
89:11
**recall (5)**
64:20;65:9;72:22;156:14;
157:7
**recently (1)**
141:6
**recess (5)**
68:5;101:13;131:6;176:6;
190:4
**recollect (2)**
61:13;73:11
**recommended (1)**
10:19
**recompiled (4)**
31:6,7;107:8;141:16
**record (33)**
5:10;6:18;13:1;15:13;62:4;
68:4,7;74:16;75:9,19,20;81:5;
98:21;101:10,12;102:3,5;125:6;
128:13,17;131:5,12;138:20;
140:13;142:8;147:20;156:9;
165:14,15;172:7;176:19;190:3;
191:6
**Red (6)**
103:6,8;106:19;107:4;
186:22;187:2
**redepose (1)**
119:13
**Redistricting (8)**
3:1;6:22;9:5;10:7,10;30:16;
83:19;84:2
**redistrictings (1)**
139:9
**redo (1)**
130:6
**redrawn (4)**
96:15;144:2,6,8
**refer (3)**
59:21;60:4,21
**reference (1)**
33:20
**referred (9)**
60:6;73:16;75:3,21;103:10;
132:18;142:11;176:9;187:7
**referring (7)**
59:19;67:16;102:10;103:8;
116:4;133:4;190:14
**refresh (2)**
74:13;102:11

**regard (1)**
72:11
**regardless (1)**
175:18
**Register (1)**
133:5
**registered (1)**
51:8
**registration (5)**
50:22;51:4;53:3;93:2;187:3
**regression (1)**
11:12
**regular (1)**
56:10
**relatively (1)**
116:22
**relevance (1)**
41:15
**relevant (33)**
24:13;39:18;45:10;48:7,9;
49:16;51:5,11,13;53:1,4;83:16;
84:1;86:4;91:1,5,6,12,14,17;
112:5,8;123:11;177:8;178:4,10;
179:14,17;180:1,3;182:3;
184:20;185:1
**rely (1)**
131:21
**relying (1)**
112:15
**remain (3)**
30:18,20;92:19
**remained (1)**
128:1
**remember (6)**
7:20;71:15;72:7;140:6;151:8;
153:1
**removed (2)**
185:15,18
**Rep (1)**
109:2
**repeat (10)**
41:9;63:7;66:3;89:10;121:11;
125:22;143:4;147:21;159:16;
178:5
**repetitive (1)**
122:8
**report (68)**
8:18,22;9:3,7,9,15,18;10:3,6,
9;59:11,13,15;60:12,13,21;
74:14;75:10,13;76:6,18;77:6,
14;79:16;80:17;81:4,8,9,17,22;
90:13,21;99:3,4,5;103:7,19;
104:6,9;106:4;107:5;119:8,12,
21;121:17,20;131:9;132:9;
138:14;140:11,15,20,22;
141:10;142:2,16,20,21;143:2,3;
147:11;148:3,7;155:9;156:7,18;
157:6;161:13
**reported (2)**
98:18,20
**reporter (1)**
73:3
**reports (10)**

8:20;33:16;59:14;60:22;61:3,
8;103:4;106:20;139:22;142:3
**represent (3)**
110:14;142:15;173:19
**representation (2)**
113:18;173:7
**Representative (2)**
115:7,19
**Representatives (1)**
74:11
**represented (5)**
163:2,5,8,17;164:7
**Republican (59)**
18:6,11;22:21;23:2,3;44:12;
109:10,15,17,19;110:2;111:11,
17;115:10;162:2,4,16,19;163:3,
6,11,14,18;164:5;165:9,10,11;
166:4,17,20,22;167:2,5,11,12,
18;168:7;170:8;171:14;172:12,
13,15;177:6;178:13;179:10;
181:1,9;182:2,6,10,12,12;
183:12;184:16,17,21,22;185:6,
14
**Republicans (11)**
110:16;112:9;114:1;164:7,11,
17;166:15;177:17;179:16;
180:2;183:9
**require (1)**
154:11
**requires (2)**
132:3;146:18
**requisite (1)**
132:8
**research (1)**
12:20
**reside (3)**
89:2,16;98:4
**resided (1)**
89:21
**respect (8)**
6:22;10:10,14,22;71:2;76:9;
102:12;141:19
**response (1)**
127:22
**result (1)**
31:8
**results (11)**
31:6;98:1;103:16;106:5;
107:9;113:3;120:17;122:2;
123:14;139:20;141:16
**resumed (1)**
101:14
**retabulated (1)**
31:10
**retain (1)**
10:22
**retrogress (4)**
82:14;128:9;172:20;187:18
**retrogressed (7)**
76:14;77:18;79:5;121:6;
127:3,10,16
**retrogresses (3)**
86:21;89:6,13

**retrogression (7)**
9:12;74:8;82:14,21;86:9;
87:19;90:2;125:9;126:18,22;
129:12,15,17;141:1
**retrogressive (7)**
85:12;125:16,21;126:10;
128:4;129:13;130:16
**reviewed (1)**
135:2
**right (24)**
16:4;19:22;20:20;36:14;
47:22;61:4;73:11;74:22;78:18;
81:16;97:17;102:2;104:8;
109:13;114:20;122:6;142:21;
147:6;149:11;153:11;174:12;
186:1;189:21;190:9
**right-hand (1)**
107:11
**Rights (22)**
3:18,20;62:20,21;65:14,16,
18;66:15;67:8,12;68:21;69:9;
71:21;72:18;73:5,8;157:22;
158:7,9;168:7;169:2;187:15
**RMPVA (1)**
104:2
**Rodriguez (4)**
109:3;115:6,6,11
**row (1)**
47:10
**Rs (1)**
44:9
**rules (1)**
138:18
**run (4)**
27:18,22;72:20;115:9
**running (2)**
28:7,18
**runoff (1)**
190:16
**runs (2)**
19:5;160:20

**S**

**safe (1)**
189:8
**same (28)**
29:6,7,8;39:14;58:10;82:6,15;
84:15,16,20;85:10,18;86:7;
89:7,20;91:20;92:20;113:3;
114:10,12,14;119:20;141:10,
20;144:3,7;145:5;170:12
**San (2)**
3:5;10:18
**saw (2)**
134:22;146:9
**saying (11)**
33:1,16;83:22;85:12;108:22;
124:10;125:13;165:20;181:10,
12;186:9
**scale (1)**
118:2
**scenario (1)**

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

45:22

**seats (2)**
  88:20;129:21

**second (15)**
  6:17;36:19;41:19;47:7;74:4,
  6;75:19;101:11;103:21;111:6;
  122:1;139:11;165:14;184:14;
  186:11

**Section (78)**
  3:18,20;7:9,11,14,15;9:20;
  10:12,12,13,14;28:19,20;29:3,4,
  11,16,22;43:18,20;45:4,6;51:11,
  16;52:17;53:2,8;54:6,7;58:17;
  66:1,6;67:7,11,21;68:2,3,15,20;
  69:8;70:18;71:5,20;72:14;
  74:22;83:1,2,3,4,9,17,18;84:1,3,
  11,12;85:9,9,15,16,17;86:4;
  95:11,12;116:5,7,19;117:19,20,
  21;124:21;129:6;135:3;158:6,8;
  169:11,11;184:7

**seeing (3)**
  19:10;21:4;72:22

**seek (1)**
  87:22

**seem (1)**
  86:4

**seems (7)**
  56:2,9;84:12;94:3,15;116:20;
  165:20

**select (1)**
  99:1

**Senate (3)**
  8:9,15;189:3

**sense (3)**
  38:21;44:18;84:2

**sent (1)**
  9:21

**sentence (1)**
  74:7

**separate (1)**
  13:10

**series (3)**
  32:19;57:12;155:1

**set (2)**
  6:16;122:3

**setting (1)**
  62:18

**seven (3)**
  124:10,11;154:2

**several (1)**
  185:13

**shape (3)**
  30:22;96:8;98:3

**shifts (2)**
  181:1,8

**short (2)**
  68:8;176:3

**show (8)**
  15:4;22:7;73:20;102:14;
  108:1;136:4;176:13;184:18

**showed (5)**
  54:18;144:12;157:12;159:2;
  160:7

**showing (6)**
  15:1;106:5;121:14;126:6;
  141:1;181:22

**shown (1)**
  183:20

**shows (5)**
  104:6;107:11;110:15;188:1,6

**side (1)**
  153:2

**signature (1)**
  191:10

**signs (1)**
  135:1

**simply (4)**
  21:19;93:18;132:14;185:2

**single (4)**
  14:21;15:6;44:12;139:11

**sit (3)**
  80:15;133:20;142:1

**site (1)**
  133:5

**sitting (1)**
  186:7

**situation (9)**
  27:16;32:12;72:4;84:4;87:2;
  118:6;170:6;182:21;185:12

**situations (1)**
  20:20

**six (3)**
  106:13;145:17,21

**size (1)**
  17:14

**skip (1)**
  164:9

**sliding (1)**
  118:1

**small (2)**
  35:22;36:10

**smaller (1)**
  89:13

**solely (2)**
  96:20;148:20

**somebody (2)**
  62:22;101:22

**someone (5)**
  5:8;63:9;133:11;171:6;186:1

**somewhat (1)**
  20:12

**sorry (27)**
  18:17;20:12;25:3;41:9;97:16,
  17;100:5,6;102:1;121:22;
  125:17,22;126:15;143:4;144:4;
  147:17;150:15;152:6;155:15;
  163:14;173:20;174:1;175:10;
  178:5;180:11,12;186:16

**sort (6)**
  13:14;23:10;59:3;138:17;
  154:22;155:1

**sounds (1)**
  95:11

**source (1)**
  64:18

**Southeast (2)**

145:19,22

**spanish (5)**
  50:22;51:3;52:3;53:3;93:1

**speak (1)**
  113:20

**speaking (1)**
  16:17

**speaks (2)**
  78:1;108:7

**specialize (1)**
  6:10

**specific (22)**
  10:17;14:3,5;24:12;33:21;
  47:3,19;57:22;58:12,13;62:18,
  19;64:17;67:16;68:3;80:10,13;
  81:15;90:8;99:3;146:16;177:12

**specifically (7)**
  41:7;66:17;68:1,19;71:13;
  79:18;113:3

**specify (2)**
  64:3,11

**spectrum (1)**
  183:6

**speculation (2)**
  168:18;188:14

**spend (2)**
  142:6;145:8

**SSVR (9)**
  51:10,15,18;52:2,8,21;54:4,
  17;55:4

**standard (1)**
  104:3

**standards (1)**
  7:12

**start (10)**
  19:3;28:3;29:6;43:19;46:7;
  48:10;71:5;131:4;135:18;173:4

**State (41)**
  3:18;5:9,13;6:5;7:8,9,17;8:7,
  10,21,22;10:2,22;16:20,22;
  17:10;34:2;59:15;75:1,11;99:4;
  103:5;119:15;124:5;131:18;
  134:13;135:12,14,21;136:2,15;
  140:22;144:7;154:4;160:21;
  172:22;173:5;176:19;188:22;
  189:18,20

**stated (1)**
  88:10

**statement (2)**
  74:12;83:8

**States (20)**
  5:17;7:1;74:8;76:13;77:14,
  16;78:8,10,16,20;79:1,4,7,15;
  80:2,3,6,7;155:13;163:20

**State's (1)**
  141:2

**States' (5)**
  3:16;76:11;80:18,20;162:9

**statewide (14)**
  17:19,21;18:9,21;20:8;31:9;
  32:7;34:2;36:17;37:2;45:15,16;
  46:11;141:12

**static (3)**

181:15;183:14;184:2

**statistics (2)**
  44:19;157:15

**stay (1)**
  150:21

**steer (1)**
  87:15

**step (1)**
  32:15

**sticking (1)**
  154:21

**still (12)**
  28:16;39:20;56:14;61:5;
  82:14;89:5;90:1;105:4;119:3;
  144:6;167:21;182:4

**stipulation (1)**
  191:8

**stop (1)**
  43:11

**strike (3)**
  16:14;18:13;90:1

**stuff (2)**
  61:6;68:10

**subsequently (7)**
  73:18;75:5;76:1;103:12;
  142:13;176:11;187:9

**substance (1)**
  121:8

**substantial (4)**
  27:19;92:15,17;146:2

**succeed (1)**
  45:14

**sufficient (8)**
  17:5;24:21;94:16;96:11;
  132:7;150:4;152:13,18

**sufficiently (1)**
  84:8

**suggesting (2)**
  126:16;138:18

**Suite (1)**
  3:4

**sum (1)**
  121:8

**summary (3)**
  119:1,15;187:2

**support (3)**
  157:13;159:8;168:8

**supported (1)**
  23:18

**supporting (1)**
  157:10

**supports (1)**
  86:19

**suppose (7)**
  15:12;27:11;30:4,17;85:6;
  129:7;141:7

**supposed (6)**
  79:3;117:8,14;134:1;184:6;
  188:11

**sure (24)**
  9:19;15:2;16:17;37:18;59:18;
  62:2;63:13;65:8,20;66:9;79:2;
  111:2;113:2;118:2;122:8;

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

135:16;142:21;150:19;159:18;
168:22;180:4,6;184:4;187:17
**surname (3)**
  50:22;53:3;93:1
**surnames (1)**
  51:3
**suspect (1)**
  111:5
**switched (1)**
  180:14
**sworn (1)**
  5:6

## T

**table (16)**
  76:9;90:13,21;91:21;102:10;
  105:16;106:4;119:15;148:4;
  154:1,21;155:3;173:18,21;
  174:2,8
**tables (1)**
  174:6
**talk (1)**
  113:6
**talked (8)**
  71:17;72:3;143:3;166:4;
  174:5;179:7;186:14;190:6
**talking (34)**
  18:14;30:2;33:4;36:11;41:6;
  42:20;47:22;58:11;62:17;66:9,
  10;67:15,17;68:11;71:3;86:12,
  14,15;98:15,20;105:3,5;107:2;
  117:18;135:10;139:9;147:7;
  160:16;165:18;171:15;173:20;
  176:15;177:16;182:5
**tally (1)**
  178:19
**Task (4)**
  3:1;5:19;138:2,5
**Telephone (2)**
  3:3;6:1
**telling (1)**
  20:14
**tells (1)**
  53:5
**ten (19)**
  15:19;23:21;41:21;47:1;
  81:18;82:1,11,11;84:13,14;
  85:1,2,11,11;112:15;136:16;
  137:14;184:5,13
**tend (2)**
  175:15;179:15
**term (29)**
  55:12,15;61:14,16,19,20;
  62:8,22;63:10,20;64:1,8,14;
  65:16,22;66:5,14;68:17,18,22;
  69:1,11;70:8,11;71:18;72:18;
  116:16;135:6;136:10
**terminology (2)**
  95:9;143:2
**terms (19)**
  22:2;26:20;33:17;36:15;
  53:20;55:13,14,17;67:20;71:2,

12;79:17;86:12;88:3,15;135:9;
141:16;153:20;168:19
**test (1)**
  13:10
**testified (2)**
  5:7;155:16
**testify (2)**
  8:1,4
**testimony (7)**
  25:11;61:13;96:10;149:13;
  166:1;169:13,17
**Texas (38)**
  3:1,5,18,20;5:13;8:7,10;
  13:22;14:6;15:17;31:3;33:21;
  47:20;58:17;59:7;74:10;80:5;
  89:12;90:10;99:4;103:5;
  106:20;119:16;124:5;134:13;
  135:12,15,21;136:2,15;165:20;
  167:8,13;168:8;172:22;175:4,
  15,17
**theoretically (2)**
  15:21;30:17
**Therefore (1)**
  125:15;183:18;185:21
**third (6)**
  47:8;74:6;88:22;143:7;178:2;
  184:15
**Thompson (1)**
  108:4
**Thornburg (2)**
  12:22;13:2
**though (1)**
  164:20
**thought (8)**
  11:5;100:5,8,11;105:6;
  132:14;133:14;149:14
**three (42)**
  11:10,14;15:1,3;16:7;18:4,18;
  19:6;20:6;21:1,6,20;46:2;47:10;
  49:13;88:18;96:7,11,13,20;
  97:4;100:21;101:4;102:20;
  104:21;105:22;106:8;113:10,
  11;118:7,9,20;119:4;122:14;
  154:2;155:3;166:3;171:14;
  177:6;180:20;190:7,12
**threshold (1)**
  173:7
**throughout (1)**
  45:1
**throw (2)**
  101:1;108:20
**ticket (3)**
  113:2,4;139:12
**tied (3)**
  62:18;116:11,13
**Tim (1)**
  5:16
**times (9)**
  19:5,6;20:6;21:6,7;42:11;
  97:4,7;118:20
**today (10)**
  8:1,4;71:3,12;80:15;119:12;
  133:20;142:1,3;143:3

**together (3)**
  41:19;69:4;101:1
**told (2)**
  88:2;137:18
**tomorrow (2)**
  119:13;120:1
**took (3)**
  91:12,15;104:9
**top (6)**
  107:11;108:19;113:1,4;
  139:12;190:22
**total (3)**
  86:14;100:18;101:2
**totaled (1)**
  127:18
**totals (1)**
  126:2
**toughy (1)**
  116:15
**towards (1)**
  184:21
**trend (4)**
  47:16;182:14,19;184:21
**trending (18)**
  46:22;47:18;48:1,3,7,8,16,19;
  49:16;51:17,19;52:2;179:7,9,
  10,13,22;180:5
**true (3)**
  39:14;119:20;121:22;148:9
**try (5)**
  87:15;101:21;153:5;155:1;
  165:18
**trying (31)**
  11:1;14:6;15:9;20:2,18,19;
  26:19;34:22;69:16;72:7;73:7;
  82:22;84:10;85:14;93:22;
  117:3;123:15;130:5;150:22;
  151:9,10;161:15,18;168:6;
  170:5;171:7;181:13,19;183:5;
  184:4;188:8
**turn (11)**
  32:7;36:16;52:8;77:12;90:12,
  13;107:10;118:22;131:10;
  143:1;144:13
**turned (2)**
  46:19,20
**turning (2)**
  149:2;174:4
**turnout (5)**
  21:9;146:20,21;150:2;157:20
**twenty (1)**
  137:14
**twice (2)**
  19:7,12
**two (60)**
  8:20;9:14;14:14;16:7;18:6;
  21:2,7,20;28:7;42:7;46:6,10;
  48:5,13;49:11;53:7;59:3,5,14;
  60:19;76:12;82:10;86:8;88:18;
  89:11;90:13;96:8,10,13;97:3,
  11,12,17;102:10,16;104:19;
  105:20,21;110:10;114:15,16;
  115:7;116:11,12,13,13,21;

117:5;118:8,9,20;120:17;140:2;
161:21;174:6;180:17,20;
182:14;183:6;185:5
**two-thirds (2)**
  96:1;176:17
**type (4)**
  9:15;45:22;51:19;141:20
**typical (2)**
  15:16,19
**typically (1)**
  13:11

## U

**ultimate (1)**
  125:8
**ultimately (1)**
  26:14
**UN (2)**
  6:10,13
**unable (1)**
  70:14
**unavoidable (2)**
  129:12,16
**unclear (4)**
  67:18;70:20;88:3;152:14
**under (34)**
  13:11;26:4;29:11,16,19,22;
  31:10;38:2;43:18;45:3,6;67:7;
  68:1;69:8;70:18;71:4;77:10,11;
  116:6;122:13,18;123:2,3;
  125:19;128:1;130:3,8;143:6,7;
  158:6,8;161:7;173:12;177:5
**underlying (2)**
  156:20;157:3
**underneath (1)**
  126:6
**underscore (1)**
  104:4
**Understood (1)**
  122:4
**United (25)**
  3:16;5:17;7:1;74:7;76:11,13;
  77:13,16;78:8,10,15,20;79:1,4,
  7,15;80:2,3,6,7,18,19;155:13;
  162:9;163:20
**universally (1)**
  138:10
**unsure (1)**
  135:9
**up (20)**
  6:16;12:18;16:19;31:10;40:8;
  55:20;67:2;68:8;107:11;124:9;
  127:18;136:4;144:12;145:3;
  147:6;153:16;155:16;156:12;
  186:4;190:2
**Upon (14)**
  12:17,20,21;24:22;25:5;
  97:22;113:18;114:16;
  124:17;127:8;166:10;171:5;
  187:11
**use (18)**
  11:8,10;24:15;26:20;43:1;

State of Texas v.
United States of America, et al.

Lisa Handley, Ph.D.
October 24, 2011

44:9;55:12,13;61:16,17,19;
62:1;63:9;69:1;72:21;81:14;
95:10;138:13
**used (18)**
65:17;67:22;68:16,18,19,21;
70:8;72:19;73:9;116:16;
119:16;134:13;135:1;141:9,10;
143:2;180:22;189:19
**useful (6)**
17:14,19;31:15;145:10;
160:4;177:19
**uses (1)**
69:17
**using (5)**
30:7;41:15;62:22;69:10;
127:4
**usually (5)**
30:9,11;118:19,21;169:9

**V**

**Vague (1)**
66:8
**vagueness (2)**
63:6;79:18
**valid (1)**
37:22
**Valley (1)**
10:18
**valuable (1)**
31:5
**variations (1)**
15:18
**versed (1)**
67:3
**versus (7)**
29:20;45:22;95:12;112:14;
136:17;146:21;177:18
**Via (1)**
3:3
**view (10)**
37:22;62:15;87:9,10;115:13;
132:2;149:18;167:20;168:10;
185:20
**violated (2)**
124:20;129:5
**vote (66)**
12:13,14;14:16,17;19:1,11;
27:13;38:16;39:1;43:10,14;
45:21;46:21;47:7,8,9,11,13;
49:11,12,13,14,15;55:22;115:4,
17;147:2;148:20;149:17;150:2;
151:1,2,17,18,21;152:2,5,12,15,
18;154:11,14,15;161:3;167:15,
18,19,21;168:2;170:4,16,17,22;
171:1,10,14,16;175:14,15;
180:22,22;181:16,17;182:10,
11;183:9
**voted (23)**
17:21;18:4,11;19:13,14;21:5,
19;22:19,20;23:1,6;24:2;40:16,
17;69:4;94:18;114:22;115:5;
151:6;160:8,11,12;183:12

**voter (8)**
50:22;51:3,9,21,22;53:3;93:1;
187:2
**voters (26)**
17:20;19:18;22:5,11;29:22;
40:19,20;44:21;50:17,19;52:7,
13;56:3;81:10,11;94:17;146:12;
154:11;158:4;159:22;166:11;
167:15;169:21;188:2,3,6
**voters' (1)**
168:19
**votes (11)**
13:5,6;14:12,13;108:19;
182:8;184:14,14,15,16,17
**Voting (125)**
3:18;20;9:6,7;11:3,17;12:4,7,
9,9;13:18,19;15:10;17:2;20:15;
22:3,4,6;24:18;25:6,14;26:1;
27:4,9,21;28:9,12,14;29:10;
38:4,11;44:4,5;46:13;50:12,15,
20;52:4,4,9,11,14,22;53:2;56:8,
18;57:18;58:6,8,20;59:1,9;60:8,
10,17;62:20,21;65:14,15,18;
66:15;67:8,12;68:21;69:9;
71:21;72:17;73:5,8;74:22;84:6;
90:18;91:8;92:2,4,19;93:12;
120:16;121:14;148:13,22;
150:1;152:11;155:6,19;156:11;
157:22;158:7,9,22;159:1,22;
162:7;164:2,19;165:2;166:7,12;
168:7,11;169:1,6,7,11,20;170:1;
171:12;173:2;174:22;175:12,
19;179:15;180:2;182:1,2;183:2,
7,16,17;184:7,18,21;185:2,8;
187:15

**W**

**waive (1)**
191:7
**waived (1)**
191:10
**wants (2)**
19:18,19
**waste (1)**
91:6
**way (23)**
13:18;16:7,8;18:6;19:1,14,15;
20:16;26:3;27:8;34:13;58:17;
65:21;69:17;73:14;79:12;81:1;
98:4;119:11;137:20;148:6;
176:18;185:22
**wealth (1)**
49:1
**weave (2)**
25:20;26:2
**week (1)**
9:14
**Whereupon (2)**
5:3;191:11
**white (27)**
13:4,5;19:12;27:11,18;37:10,
13,17;38:16;43:10,13;56:3;

146:21;147:2;151:14,17,21;
152:2,5,12,14,17;154:11;
167:18;171:17;172:1
**whites (20)**
12:7,12;13:18,19;14:15;
19:10,13;22:2;28:13;38:15;
46:19,20;56:18,21;57:7;84:5;
149:2,6,17;151:7
**whole (6)**
66:4;72:4;107:9;110:13;
111:1;127:18
**willing (2)**
38:15;39:1
**win (34)**
18:13;21:12,13;34:21;37:11,
13,14,16,20;38:9;39:10,18;
41:2;42:15;43:4,14;45:17;
46:11;97:20;104:21,22;105:22;
109:15;113:15;117:1,2,6,8,11,
14,17;137:7;167:13;177:18
**winning (4)**
39:16;46:1;53:20;168:8
**wins (15)**
6,7,12;21:20,20,21;39:8;
41:22;44:11,12;45:9;46:2;47:6;
105:21;114:7;115:20
**wish (2)**
98:11;176:20
**within (4)**
40:15;68:15;132:4;173:16
**without (9)**
56:2;78:18;111:13;112:7,10;
152:17;159:5;177:10,20
**WITNESS (25)**
3:9;5:21;41:9;43:21;54:8;
63:7;69:14,22;71:15;72:10;
78:11;88:10;105:13;116:8;
117:22;119:7;147:21;158:10;
172:8;175:7;181:7;189:14;
191:3,7,9
**won (31)**
20:7;10:34:14,16;37:18;38:7;
40:9;47:10;49:11,12,13;98:14;
108:14;109:5,17;110:2,16,17;
112:9;114:5,15;117:7;118:17;
161:21;162:1;167:18;172:15;
177:6,7;185:6,16
**wonder (2)**
69:10;119:7
**word (7)**
30:7;66:3;67:4,22;72:10;
119:19;138:16
**words (4)**
151:11;160:18;180:21;
183:15
**work (2)**
7:19;36:9
**working (3)**
7:8,13,17
**works (2)**
20:19;36:4
**world (1)**
20:20

**write (1)**
53:14
**writings (1)**
62:3
**written (2)**
137:17,21
**wrong (3)**
44:19;61:14;80:4
**wrote (1)**
9:6

**Y**

**year (19)**
15:19;23:21;41:21;47:1;
100:2,14;111:7;112:16,20,21;
139:7,10,11;177:12;178:16,18;
179:5;182:10;184:13
**years (6)**
100:15,17;111:2;136:22;
177:16;184:5

**Z**

**zero (2)**
123:20;178:18