## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF TEXAS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 11-1303** |
| ) | **(TBG-RMC-BAH)** |
| **UNITED STATES OF AMERICA, and** ) | |
| **ERIC H. HOLDER, in his official** ) | |
| **capacity as Attorney General of the** ) | |
| **United States** ) | |
| ) | |
| **Defendants, and** ) | |
| ) | |
| **Wendy Davis,** *et. al.*, ) | |
| ) | |
| **Intervenor-Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION

Before:  GRIFFITH, Circuit Judge, COLLYER & HOWELL, District Judges.

COLLYER, District Judge:

In the summer of 2011, the Texas legislature redrew the boundaries for voting

districts in the State to account for the report of the 2010 Census that its population had grown in

the last decade by more than four million people, about two-thirds of whom are Hispanic.  As

required by Section 5 of the Voting Rights Act, Texas has asked this Court for a declaratory

judgment that its redistricting plans have neither the purpose nor the effect of denying or

abridging the right to vote on account of race, color, or membership in a language minority

group.  The United States contends that the proposed congressional and State House districts

adversely affect the voting rights of Hispanics.  Various Intervenors assert the same claim as the United States, but some of them target the plans for the State Senate as well.

On November 8, 2011, this Court denied summary judgment to Texas because: 1) Texas used an improper standard and/or methodology to determine which districts afford minority voters the ability to elect their candidates of choice; and 2) material facts remain in dispute regarding whether the plans in fact comply with Section 5 of the Voting Rights Act. Order [Dkt # 106].  This Opinion provides our analysis.

## I.  FACTS

### A.  Procedural Background

On July 19, 2011, Texas filed the instant complaint for declaratory judgment that redistricting plans[1] it adopted to govern elections for the U.S. House of Representatives ("Congressional Plan"), the State House of Representatives ("State House Plan"), the State Senate ("State Senate Plan") (collectively the "Plans"), and the State Board of Education complied with Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.  The United States and several of the Intervenors[2] (collectively with the United States, the "Defendants") filed answers challenging the Congressional Plan, the State House Plan, and the State Senate Plan.  No one

---

[1]  Redistricting is a process by which national, state, and local voting districts are redrawn, normally after each national census because of population changes over the intervening decade.

[2]  This Court has granted seven parties status as Defendant-Intervenors. Each Intervenor contests various aspects of one to three of the plans in their capacity as individual voters, state elected representatives, or civil rights advocacy groups. The Davis Intervenors are Texas State Senators and representatives from districts in the Fort Worth area. The Mexican American Legislative Caucus is a caucus group in the Texas House of Representatives. The Gonzales Intervenors are a group of Hispanic and Black voters residing in Texas. The Texas Legislative Black Caucus is composed of seventeen members of the Texas House of Representatives. The Texas Latino Redistricting Task Force is a group of Hispanic organizations focusing on redistricting and voter registration. The Texas State Conference of NAACP Branches and the League of United Latin American Citizens are civil rights and advocacy groups concerned with minority voting rights in Texas.

challenges the redistricting plans for the State Board of Education.[3]  Texas moved for summary

judgment on September 14, 2011.  The parties engaged in swift discovery, filed briefs and

exhibits, and presented oral argument to this Court on November 2, 2011.

A three-judge court in the Western District of Texas is currently hearing

constitutional challenges and challenges under Section 2 of the Voting Rights Act to these same

redistricting Plans.  Mindful of the fact that our refusal to grant preclearance would require that

court to draw interim plans because of election-related deadlines in Texas, this Court issued an

order denying summary judgment on all three Plans on November 8, 2011.  *See* Dkt. # 106; *see*

*also Perez v. Texas*, No. 5:11-360, Am. Order [Dkt. # 391] (W. D. Tex. Oct. 4, 2011)

(consolidated action); *Davis v. Perry*, No. 5:11-788, Am. Order [Dkt. # 15] (W. D. Tex. Oct. 4,

2011).  The Court now issues its Memorandum Opinion explaining its reasoning.

## B.  Statutory Background

The Voting Rights Act of 1965 ("VRA"), Pub. L. No. 89-110, 79 Stat. 437

(codified as amended at 42 U.S.C. § 1973 *et seq.*), was enacted to counteract attempts by states

and local jurisdictions to evade the Reconstruction Amendments' prohibitions on racial

discrimination in voting.[4]  Litigation and court orders had been slow and often ineffective in

---

[3]  The Texas State Board of Education ("BOE") is composed of fifteen single-member districts.  Texas claimed that the benchmark plan for the BOE contained three Hispanic "opportunity" districts, with a Hispanic Citizen Voting Age Population ("HCVAP") of greater than fifty percent, and two Black "opportunity" districts, with a Black Voting Age Population ("BVAP") of greater than thirty percent.  In the proposed BOE plan, Texas states that there are also three Hispanic "opportunity" districts that have an HCVAP of greater than fifty percent, and two Black "opportunity" districts with BVAPs of greater than thirty percent.  This Court provided the parties another opportunity to object to preclearance of the proposed BOE plan during a teleconference held on September 21, 2011.  After no party voiced opposition, this Court entered declaratory judgment in favor of Texas on that plan on September 22, 2011.  *See* Minute Entry Order (Sept. 22, 2011).  Consequently, the BOE plan is not in contention here.

[4]  The VRA was extended in 1975 to cover members of language minority groups, such as Hispanics.  Through reference to 42 U.S.C. § 1973b(f)(2) in both subsections (a) and (b), Section 5 extends its protection to language minority groups:

curbing the egregious abuses that jurisdictions had used to impede minority voters in the exercise of their constitutionally protected rights. *South Carolina v. Katzenbach*, 383 U.S. 301, 313-14 (1966). The VRA contains a set of "sterner and more elaborate measures" that Congress found necessary to fight the "insidious and pervasive evil which had been perpetrated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Id.* at 309.

The VRA contains a complex remedial scheme "aimed at areas where voting discrimination has been most flagrant." *Id.* at 315. These targeted, temporary remedial measures apply to a state or local political body that is a "covered" jurisdiction as defined by Section 4(b) of the VRA, *i.e.*, one that has been found, according to a statutory formula, to have engaged in voting discrimination. *See* 42 U.S.C. § 1973b(b); *Riley v. Kennedy*, 553 U.S. 406, 413 (2008). Section 5 is one of those temporary remedial measures. It was enacted as "a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as the old ones had been struck down." *Beer v. United States*, 425 U.S. 130, 140 (1976) (quoting H.R. REP. No. 94-196, at 57-58 (1970)).

Section 5 requires covered jurisdictions to obtain preclearance for any changes to voting qualifications, requirements, standards, practices, or procedures either administratively from the Attorney General or from the District Court for the District of Columbia. Section 5 places the burden of proof on the covered jurisdiction to show that the planned change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of

---

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.

42 U.S.C. § 1976b(f)(2).

race or color, or [membership in a language minority group]." 42 U.S.C. § 1973c(a).  Subsection

1973c(b) of the statute further provides that:

> Any voting qualification or prerequisite to voting, or standard,
> practice, or procedure with respect to voting that has the purpose
> of or will have the effect of diminishing the ability of any citizens of
> the United States on account of race or color, or [membership in a
> language minority group], to elect their preferred candidates of
> choice denies or abridges the right to vote . . . .

*Id*. § 1973c(b).  The goal of subsection 1973c(b) "is to protect the ability of such citizens to elect

their preferred candidates of choice."  *Id*. § 1973c(d).  In addition, the statute further explains

that "[t]he term 'purpose'. . . shall include any discriminatory purpose."  *Id*. § 1973c(c).  No

change to a voting practice or procedure, including an electoral redistricting plan, *see Miller v.*

*Johnson*, 515 U.S. 900, 905-06 (1995), may be implemented until preclearance is granted.  *Reno*

*v. Bossier Parish School Bd.* (*Bossier I*), 520 U.S. 471, 477-78 (1997).

Section 5 originally was intended to be in effect for only five years, but Congress

has re-authorized it four times, most recently in 2006 for twenty-five years.[5]  *Nw. Austin Mun.*

*Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2510 (2009).  During the 2006 reauthorization,

Congress amended the statute to clarify what it meant by "effect" and "purpose" under Section 5,

*Shelby Cnty. v. Holder*, No. 10-cv-651, 2011 WL 4375001, at *10-11 (D.D.C. Sept. 21, 2011),

and added language to emphasize that a Section 5 inquiry must focus on whether a proposed

change will "diminish[]" the ability of minority voters "to elect their preferred candidates of

choice." 42 U.S.C. § 1973c(b), (d); H.R. REP. NO. 109-478, at 46 (2006) ("Thus, in amending

Section 5 to add a new subsection (b), the Committee makes clear that in making preclearance

---

[5]  On July 27, 2006, President George W. Bush signed into law the Fannie Lou Hamer, Rosa Parks, & Coretta Scott King Voting Rights Reauthorization & Amendments Act of 2006 ("2006 Amendments"), Pub. L. No. 109-246, 120 Stat. 577 (2006).  This legislation was passed by a vote of 390-33 by the U.S. House of Representatives, and 98-0 by the Senate.

determinations under Section 5, the comparative 'ability [of the minority community] to elect preferred candidates of choice' is the relevant factor to be evaluated . . . ." (alterations in original)).[6]  Speaking broadly, Congress proscribed "any" change that would have such an "effect" because such a change "denies or abridges the right to vote." 42 U.S.C. § 1973c(b).  Thus, a covered jurisdiction will not meet the requirements of Section 5 when a proposed change to a voting procedure or plan would have a retrogressive effect on the "ability" of minority voters to elect candidates of their choice.  *Id.*

The 2006 Amendments also proscribe "any" change that "has the purpose of" diminishing the ability of minority voters to elect candidates of their choice.  Congress sought to ensure that "purpose" was no longer limited to a "retrogressive purpose," as the Supreme Court had held in *Reno v. Bossier* (*Bossier II*), 528 U.S. 320 (2000), *see* 42 U.S.C. § 1973c(b)-(c); H.R. REP. NO. 109-478, at 46, but covered more broadly "*any* discriminatory purpose."  42 U.S.C. § 1973c(c) (emphasis added).

Defendants challenge both the effect of and the purpose behind Texas' redistricting Plans.  In particular, this lawsuit focuses on the Plans' effect on Hispanic and Black voters in Texas and whether these Plans were enacted with a discriminatory purpose aimed at such voters.  For the purposes of the VRA, Hispanic citizens are treated as members of a language minority group.  *See* 42 U.S.C. § 1973l(c)(3) ("'[L]anguage minority group' means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage.").

---

[6]  The House Committee on the Judiciary reported H.R. 9, the Fannie Lou Hamer, Rosa Parks, & Coretta Scott King Voting Rights Reauthorization & Amendments Act of 2006, out of Committee by a vote of 33-1.  There was no dissenting minority opinion to the Committee Report.

### 1. "Effects" Analysis

The Section 5 evaluation of whether a new procedure has "the effect of denying or abridging the right to vote" is not a question of constitutional law but of statutory construction, and is dependent on congressional intent. *Beer*, 425 U.S. at 139-40. By enacting Section 5, Congress aimed to guarantee that minorities' new gains in political participation would not be undone. *Id*. at 140-41. Thus, the Supreme Court has found that the "purpose of [Section] 5 has always been to insure that no voting-procedure changes would be made that would lead to a *retrogression* in the position of racial minorities with respect to their *effective exercise of the electoral franchise*." *Id*. at 141 (emphasis added); *see* 42 U.S.C. § 1973c(d) ("The purpose of [§ 1973(b)] is to protect the ability of such [minority] citizens to elect their preferred candidates of choice.").

Determining whether a new voting plan diminishes the ability to elect and thus has a retrogressive effect on minority voting rights necessarily requires a comparison between the voting plan in place and the proposed plan. *Bossier I*, 520 U.S. at 478. A covered jurisdiction's existing plan serves as the "benchmark" against which the "'effect' of voting changes is measured." *Id*. The Supreme Court has instructed that Section 5 is not ameliorative and the focus of its retrogression analysis is on "freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory." *Beer*, 425 U.S. at 140 (quoting H.R. REP. NO. 94-196, at 57-58) (internal quotation marks omitted). If a plan does not increase the degree of discrimination against a minority voting population, it is entitled to preclearance. *City of Lockhart v. United States*, 460 U.S. 125, 134-35 (1987). For example, plans that preserve or actually increase minority voting strength should be precleared unless they have a discriminatory purpose. *See Georgia v. Ashcroft*, 539 U.S. 461, 477 (2003) (quoting *Lockhart*, 460 U.S. at 134

n.10; *Bush v. Vera*, 517 U.S. 952, 983 (1996)); *Beer*, 425 U.S. at 141 (holding that an

"ameliorative new legislative apportionment cannot violate [Section] 5 unless . . . [it] so

discriminates on the basis of race or color as to violate the Constitution").

   *Beer* described Section 5 as requiring covered jurisdictions to protect minority

groups' "effective exercise of the electoral franchise," which meant the "ability of minority

groups to participate in the political process *and* to elect their candidate of choice." 425 U.S. at

141 (emphasis added).  Although the Supreme Court used this phrase in subsequent decisions, it

was not until *Georgia v. Ashcroft* that the Court provided further explanation of its reasoning.

*Georgia v. Ashcroft* placed greater emphasis on minority *participation* in electoral politics,

holding that a "court should not focus solely on the comparative ability of a minority group to

*elect* a candidate of its choice" but should look to the "totality of the circumstances" regarding

voter participation, including "the extent of the minority group's opportunity to participate in the

political process." 539 U.S. at 479-80 (emphasis added).  Using this analysis, the Court stated

that Section 5 accommodates choices by covered jurisdictions among systems of representation

when redistricting, *i.e.*, a jurisdiction may create "safe" majority-minority districts that may

"virtually guarantee the election of a minority group's preferred candidate"; it may create

districts where a coalition of voters "will help to achieve the electoral aspirations of the minority

group"; or it may add "influence districts," where minorities play a "substantial, if not decisive,

role in the electoral process." *Id*. at 480-83.  The Supreme Court concluded that the lower

court's retrogression analysis had focused too much on decreases in the Black population in

majority-minority districts and had not properly credited increases in coalition and influence

districts under Georgia's proposed redistricting plan, which could offset potential losses in

majority-minority districts.  *Id*. at 486-87.

Congress disagreed with this analysis and amended Section 5 in response to *Georgia v. Ashcroft* during the VRA's 2006 reauthorization.  *See* H.R. REP. NO. 109-478, at 45; S. REP. NO. 109-295, at 18 (2006); *see also LaRoque v. Holder*, 650 F.3d 777, 794 (D.C. Cir. 2011); *Shelby Cnty.*, 2011 WL 4375001, at *11.  The 2006 Amendments clarified that Congress intended a Section 5 inquiry to focus on whether a proposed voting change will diminish the "ability [of minority citizens] *to elect* preferred candidates of choice."  H.R. REP. NO. 109-478, at 46 (emphasis added).  Thus, Congress specified that any change that has the effect of diminishing citizens' ability to elect a candidate of their choice on account of race, color, or membership in a language minority group "denies or abridges the right to vote" within the meaning of Section 5.  42 U.S.C. § 1973c(b); H.R. REP. NO. 109-478, at 46.

By these Amendments, Congress sought to make clear that it was not enough that a redistricting plan gave minority voters "influence"; a plan cannot diminish their ability to elect candidates.  The House Report opined that leaving the *Georgia v. Ashcroft* standard in place would encourage states to disperse minority voters into different voting districts under an "influence" label and that gains made by minority voters in districts where they were represented by the candidate of their choice would be jeopardized.  H.R. REP. NO. 109-478, at 45.

## 2. "Purpose" Analysis

Section 5 also prohibits covered jurisdictions from implementing a plan that is enacted with the "purpose" of "denying or abridging the right to vote on account of race, color, or [membership in a language minority]."  42 U.S.C. § 1973c.  In *Bossier II*, the Supreme Court held that a plan animated by a discriminatory purpose could nonetheless merit preclearance if its purpose was something other than to diminish a minority group's ability to elect their preferred candidates.  The government conceded that the plan proffered by the covered jurisdiction did not

have a retrogressive effect on the voting ability of the minority population. 528 U.S. at 324. The government argued that the Court should nonetheless deny preclearance because facts demonstrated that the plan was enacted with discriminatory intent. *Id*. at 328. In a 5-4 decision, the Supreme Court concluded that "the 'purpose' prong of § 5 covers only retrogressive dilution." *Id*. In other words, Section 5 only prohibited plans that were enacted with the purpose to reduce minorities' ability to elect — whether or not retrogression actually occurred. Section 5 did not, however, "prohibit preclearance of a redistricting plan enacted with a discriminatory but non-retrogressive purpose." *Id*. at 341.

In the 2006 Amendments, Congress clarified that the "purpose" requirement of Section 5 prohibits not only voting plans enacted with a retrogressive purpose, but also plans devised with "any discriminatory purpose." 42 U.S.C. § 1973c(c). The House Report characterized *Bossier II* as a severe limitation on the reach of the "purpose" prong, through which "Congress [had] sought to prevent covered jurisdictions from enacting and enforcing voting changes made with a clear racial animus, regardless of the measurable impact of such discriminatory changes." H.R. REP. NO. 109-478, at 42. According to the House Report, Congress intended to restore the pre-*Bossier II* discriminatory purpose standard:

> Voting changes that "purposefully" keep minority groups "in their place" have no role in our electoral process and are precisely the types of changes Section 5 is intended to bar. To allow otherwise would be contrary to the protections afforded by the 14th and 15th [A]mendment[s] and the VRA. Thus, by clarifying that any voting change motivated by any discriminatory purpose is prohibited under Section 5, the Committee seeks to ensure that the "purpose" prong remains a vital element to ensuring that Section 5 remains effective.

*Id.* at 43.  To that end, Congress endorsed the framework in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to determine "whether voting changes submitted for preclearance were motivated by a discriminatory purpose." *Id.*  Prior to *Bossier II*, courts had relied upon the factors set forth in *Arlington Heights* to assess whether a covered jurisdiction's proposed change to its voting procedures was based upon a discriminatory purpose.  *See Arizona v. Reno*, 887 F. Supp. 318, 322 (D.D.C. 1995); *Busbee v. Smith*, 549 F. Supp. 494, 516-17 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).  Indeed, *Bossier I* instructed lower courts conducting a Section 5 analysis to "look to . . . *Arlington Heights* for guidance," where the Court had "set forth a framework for analyzing 'whether invidious discriminatory purpose was a motivating factor' in a government body's decisionmaking."  520 U.S. at 488 (quoting *Arlington Heights*, 429 U.S. at 266).  The legislative history to the 2006 Amendments and reauthorization of the VRA demonstrate congressional agreement with that approach.

 *Arlington Heights* was not a Voting Rights Act case.  It involved the refusal of the Village of Arlington Heights, Illinois, to re-zone a tract of land for low-income housing, which was challenged as a violation of the Equal Protection Clause of the Fourteenth Amendment.  In reaching its decision in favor of the Village, the Supreme Court identified multiple factors to assess whether the Village's purpose was discriminatory.  429 U.S. at 267-68.  The Court cautioned that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.* at 266; *see also Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (describing such an inquiry as "an inherently complex endeavor").

 "[A]n important starting point," the Court directed, is to consider whether the challenged action "bears more heavily on one race than another."  *Arlington Heights*, 429 U.S. at

11

266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)) (internal quotation marks omitted). In "easy" cases, "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."  *Id.* (citations omitted).  That said, absent a pattern of discrimination which is "stark," an action's "impact alone is not determinative, and the Court must look to other evidence."  *Id.* (footnote omitted).  Courts should consider "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he specific sequence of events leading up [to] the challenged decision [which] also may shed some light on the decisionmaker's purposes"; and "[t]he legislative or administrative history," which can be "highly relevant . . . where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id.* at 267-68.

## C.  Parties' Arguments Regarding the Legal Standard to Measure Retrogressive Effect

Texas and the Defendants contest the standard for measuring whether a proposed redistricting plan would have a retrogressive effect on minority voters' ability to elect their candidates of choice.  Texas relies on voting population demographics alone.  In both its benchmark and proposed plans, Texas counted as ability districts, which it calls "opportunity districts,"[7] those districts in which Blacks make up forty percent of the voting-age population and Hispanics make up fifty percent of the citizen voting-age population.  Texas omitted

---

[7]  Texas' use of "opportunity district" connotes a measure of uncertainty that is not supported by the language of the VRA.  "Opportunity" denotes conditions that are "favorable" to such an outcome.  *See* WEBSTER'S INTERNATIONAL NEW DICTIONARY 1583 (3d ed. 2002) (defining "opportunity" as "a combination of circumstances, time, and place *suitable or favorable* for a particular activity or action" (emphasis added)).  The statutory standard is whether minorities have an "ability to elect" a preferred candidate.  An "ability" denotes the "the physical, mental, or legal power to perform," *id.* at 3, a concept that requires a greater degree of certainty that an event can occur.  Thus, in line with the language of Section 5, this Court references "ability districts" as districts that afford minority voters the electoral power protected under Section 5.  This term is used both for districts that have afforded minority voters the ability to elect their preferred candidate in the past and those that predictively will do so in the future.

consideration of all other factors.  The United States, joined by all Intervenors, argues for a multi-factored "functional" analysis, which starts with an examination of voting-age population but also analyzes additional factors.  *See* Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470 (Feb. 9, 2011).

Texas contends that the 2006 Amendments to Section 5 provide that covered jurisdictions need only maintain those districts where minority voters can control the election and posits that majority-minority districts are best suited to accomplish this goal.  Texas relied on voting-age population statistics to ensure that its proposed redistricting Plans were not retrogressive.  Texas explains that each of its Plans maintains at least the same number of districts as in the benchmark plans in which a specified minority constitutes a percentage of eligible voters sufficient to determine the outcome of elections.  Texas sets this percentage at more than fifty percent of the citizen voting-age population for Hispanics ("HCVAP") and forty percent of the voting-age population for Blacks ("BVAP") in the State.  Texas "defines 'ability to elect' districts based upon . . . demographic data indicating [that] a [single] cohesive racial or ethnic group has the ability to elect candidates of their choice — whether or not the candidate receives support from other voters in the district."  Pl.'s Reply [Dkt. # 92] at 27.  Thus, Texas' arguments that its Plans have no retrogressive effect are solely based upon data measuring minority voting-age population.

Defendants challenge this logic and its results.  All Defendants ask this Court to conclude, consistent with the guidance issued by the DOJ in 2011 ("2011 DOJ Guidance"), that there is no single measure that determines minorities' ability to elect:

> In determining whether the ability to elect exists in the benchmark plan and whether it continues in the proposed plan, the Attorney General does not rely on any predetermined or fixed demographic

> percentages at any point in the assessment." *See* [2011 DOJ Guidance].   Determining whether the ability to elect exists "requires a functional analysis of the electoral behavior within the particular jurisdiction or election district." *Id.* Besides population, this includes an examination of election history and voting patterns within the jurisdiction, voter registration and turnout information.[8]

U.S. Mem. [Dkt. # 79] at 6; *see* Intervenors' Joint Mem. [Dkt # 74] at 7.

Although the United States relies on the multi-factored 2011 DOJ Guidance, the test it offered to measure retrogression, while more comprehensive than Texas' approach, still relied upon a limited set of data.  Using data compiled by the State, the United States' expert, Dr. Lisa Handley, performed a functional election analysis in which she assessed data on statewide elections and elections within specific voting districts in order to identify which districts afford minority voters the ability to elect.  She then recompiled data on certain statewide elections based upon the proposed new boundaries of voting districts and determined how often minority-preferred candidates would succeed in the redrawn districts.  The United States used this data to assert that minority groups' ability to elect would be lost in certain proposed congressional and State House districts.

The Intervenors also take issue with Texas' view that all districts where Hispanic voters constitute a majority of the citizen voting-age population or Black voters constitute forty

---

[8]  The 2011 DOJ Guidance indicates that the DOJ also assesses:

> whether minority concentrations are fragmented among different districts; whether minorities are overconcentrated in one or more districts; whether alternative plans satisfying the jurisdiction's legitimate governmental interests exist, and whether they were considered; whether the proposed plan departs from objective redistricting criteria set by the submitting jurisdiction, ignores other relevant factors such as compactness and contiguity, or displays a configuration that inexplicably disregards available natural or artificial boundaries; and, whether the plan is inconsistent with the jurisdiction's stated redistricting standards.

76 Fed. Reg. 7470-01, at 7472.

percent of the voting-age population are *ipso facto* "ability to elect" districts.  They advocate for a multi-factored approach that accounts for:

- the size of a district's minority population considering citizenship rates;

- voting-age population and voter registration;

- the extent of racially polarized voting;

- the presence of electoral coalitions involving minority voters;

- the role of incumbency in past elections;

- factors that affect turnout rates by race; and

- recent electoral trends.

Intevenors' Joint Mem. at 6-7.

All Defendants contend that Section 5 protections are not limited to districts where a single minority group has the ability to elect its candidate of choice, but extend to districts where one group of minority voters joins together with voters of a different racial or language background to elect the minority voters' candidate of choice.  The United States points to language in the House Report accompanying the 2006 Amendments explaining that Section 5 protects minorities' ability to elect candidates of choice either "directly or coalesced with other voters."  U.S. Mem. at 14 (quoting H.R. REP. NO. 109-478, at 46).  Defendants urge this Court to conclude that the proposed Plans are retrogressive because they do not account for the loss of coalition districts, while Texas contends that such districts are not protected under the VRA.

Defendants also argue that where, as in Texas, a proposed plan contains an increased number of voting districts, the percentage of minority ability districts in the proposed plan should be measured against the percentage of minority ability districts in the benchmark

plan.  Defendants ask this Court to find that the Congressional Plan is retrogressive because it increases the number of electoral districts (in significant part because of the increase in the Hispanic population in Texas), but allegedly does not increase the number of ability districts for Hispanic voters.

Finally, the Intervenors, most specifically the Texas Legislative Black Caucus ("TLBC"), the League of United Latin American Citizens ("LULAC"), and the Texas State Conference of NAACP Branches, assert that Section 5 not only protects against the diminishment of an existing ability to elect, but also the diminishment of an emerging ability to elect.  These Intervenors contend that Section 5's retrogression standard must include an assessment of whether redistricting forestalls emerging minority electoral opportunities in benchmark districts.  They argue that, because a retrogression analysis under Section 5 in some measure looks to the future effect of changes in voting practices, it must protect against the reduction of predictable future gains in minority voting strength.

### D.  Parties' Arguments Regarding the Contested Plans

Applying their own respective retrogression analyses, the parties dispute the alleged retrogressive effect that Texas' proposed restricting Plans will have on minority voters' ability to elect their candidates of choice.  The parties' comparison of the benchmark plans, *i.e.*, the most recent electoral plans in effect for the U.S. House of Representatives, Texas State Senate, and Texas House of Representatives,[9] with Texas' proposed redistricting Plans leads

---

[9]  Texas identified the following benchmark plans.  For the U.S. House of Representatives, the State identified plan C100, which was implemented in 2006 by the U.S. District Court for the Eastern District of Texas in *LULAC v. Perry*, 457 F. Supp. 2d 716 (E.D. Tex. 2006).  For the Texas House of Representatives, it identified plan H100, which was implemented in 2001 by the same district court in *Balderas v. Texas*, No. 01-158, Final Judgment [Dkt # 458] (E.D. Tex. Nov. 28, 2001).  For the Texas State Senate, it identified plan S100, which was implemented in 2001 after it received preclearance from the DOJ.

them to dispute which districts should be counted as minority ability districts in both the benchmark and proposed Plans.[10]

### 1. The Congressional Plan

In its analysis of the benchmark congressional districts, Texas identified, out of a total of thirty-two districts, seven Hispanic ability districts, each of which allegedly has an HCVAP of more than fifty percent.[11]   Texas concedes that under the proposed Congressional Plan, Congressional District ("CD") 27 would no longer be an ability district for Hispanics. Texas counters that this loss is more than offset by two new Hispanic ability districts: approximately 71.7 percent of the citizen voting age population of CD 34 will be Hispanic; 51.9 percent of CD 35 will be as well.  As a result, Texas asserts that its proposed Congressional Plan will add one Hispanic ability district, increasing the number of Hispanic ability districts from seven to eight.  The proposed Congressional Plan will thus, according to Texas, ameliorate rather than retrogress Hispanic voting power in the State.

Texas also asserts that Black voting power in the State will be enhanced under the Congressional Plan.  Currently, only CD 18 has a BVAP of more than forty percent.  With the new plan, CD 30 will also.[12]

The United States agrees that the proposed Congressional Plan does not retrogress Black voting power, and appears to credit Texas with three (not just two) Black ability

---

[10]  For example, Texas identified eight minority ability districts in the benchmark congressional plan while the United States identified ten.  Likewise, Texas identified forty-three minority ability districts in the benchmark plan for the Texas House while the United States identified fifty.

[11]  Texas identified Congressional Districts 15, 16, 20, 23, 27, 28, and 29 as Hispanic ability districts in the benchmark.

[12]  Without explaining its relevance, Texas also points out that CD 9, which has a more than thirty percent but less than forty percent BVAP, will maintain that percentage under the proposed plan.

congressional districts in the Congressional Plan.  According to the United States, CDs 9, 18, and 30 are, and will remain, Black ability districts in both the benchmark and the proposed plan.  The United States argues, however, that Hispanic voting power will retrogress under the proposed Congressional Plan because:  1) Texas' Congressional Plan does not create any new Hispanic ability districts, despite a significant increase in the Hispanic population and four new congressional districts in the State; and 2) CD 23, which Texas counts as a Hispanic ability district under the benchmark, would not be an ability district in the proposed plan.

Both the United States and Texas agree that the proposed Congressional Plan would include at least seven Hispanic ability districts (CDs 15, 16, 20, 28, 29, 34, and 35) and that CD 27, which was a Hispanic ability district under the benchmark, would lose this status. The parties dispute the status of CD 23 under the proposed plan.  Although both agree that CD 23 is a Hispanic ability district under the benchmark, they disagree as to its status under the proposed plan.  Texas asserts that CD 23 will continue to be a Hispanic ability district in the proposed plan because it will have an HCVAP of 58.5 percent.  The United States argues that CD 23's new boundaries, which will allegedly include Hispanics with lower voter turnout, will actually decrease Hispanic voter participation and diminish their ability to elect.  However, the United States agrees that the alleged addition of CDs 34 and 35 as Hispanic ability districts in the proposed Congressional Plan would provide Texas with seven total Hispanic ability districts under the proposed plan.

The Gonzales Intervenors argue that CD 25 should be counted in the benchmark as a minority ability district and that the proposed Congressional Plan has a retrogressive effect on this district.  They argue, with no opposition from Texas, that Hispanic, Black, and fifty percent of White voters in CD 25 have voted cohesively in support of minority preferred

18

candidates.  But CD 25 will lose large numbers of minority voters in the proposed plan, and these voters will be replaced by an influx of White voters whose voting behavior differs substantially from the Whites who voted with minorities in the benchmark.

Finally, the United States and several Intervenors assert that the proposed Congressional Plan is retrogressive because it fails to recognize adequately the significance of the Hispanic contribution to Texas' population growth in the last decade.  According to the 2010 Census, the population of the State has grown by over four million people since 2000, of which approximately two-thirds are Hispanics.  This population surge has resulted in a gain of four seats in the U.S. House of Representatives, increasing the number of Texas delegates from thirty-two to thirty-six, an increase unprecedented for a state fully covered by Section 5.  U.S. Mem. at 22 n.9.  Despite the historic increase in the number of congressional seats, these Defendants argue that Texas drafted a redistricting plan that creates no new Hispanic ability districts.  They argue that this is sufficient evidence that the proposed Congressional Plan is retrogressive, because maintaining at seven the number of Hispanic ability districts in the face of this surge in Hispanic population would reduce the proportion of Hispanic ability districts in Texas' congressional delegation.[13]  Texas responds that a redistricting plan that preserves the pre-existing number of minority ability districts will always satisfy Section 5's retrogression standard.

---

[13]  The United States and the Latino Redistricting Task Force Intervenors calculate that Hispanic voters have the ability to elect preferred candidates in 21.9 percent of the benchmark districts but only in 19.4 percent of the districts in the Congressional Plan.

## 2.  The Texas House of Representatives Plan

In the benchmark plan for the Texas House of Representatives, Texas identifies thirty districts out of a total of 150 that have an HCVAP of more than fifty percent, which, by Texas' measure, afford Hispanic citizens the ability to elect their candidates of choice.[14] According to Texas, the proposed State House Plan will also have thirty districts that have an HCVAP of more than fifty percent, allegedly maintaining the same number of Hispanic ability districts as in the benchmark.  Texas concedes that State House District ("HD") 33, which is currently a Hispanic ability district under the benchmark plan, will no longer be such a district in the proposed State House Plan.  Texas claims, however, that "new" HD 148 will offset that loss. With regard to the Black minority population, Texas identifies eleven districts in the benchmark plan that have a BVAP of more than forty percent, and twelve districts with the same BVAP of more than forty percent in the proposed State House Plan.  The proposed plan adds HD 27 as a new Black ability district.  Based on these population statistics, Texas contends that its proposed State House Plan will not have a retrogressive effect on the ability of Hispanic or Black voters to elect their candidates of choice to the Texas House of Representatives.

The United States and several Intervenors, however, disagree.  Notably, the United States does not believe the proposed State House Plan would retrogress Black voting power.[15]  However, according to the United States and several Intervenors, the State House Plan would retrogress Hispanic voting power.  Based on its retrogression analysis, the United States

---

[14]  The thirty Hispanic ability districts that Texas identifies in the House benchmark plan are districts 31, 33-43, 74-80, 104, 116, 117-119, 123-125, 140, 143, and 145.

[15]  The United States identifies twelve Black ability districts under the benchmark plan, 22, 95, 100, 109-111, 131, 139, 141, 142, 146, and 147.  It identifies HD 27 as a new Black ability district in the proposed State House Plan, which brings its count of such districts to thirteen under the proposed plan.

identifies thirty-four Hispanic ability districts under the benchmark plan, of which three or four will allegedly be lost in the proposed State House Plan.[16]

Additionally, Dr. Handley opines that of four "coalition districts" in the benchmark, where minorities have been able to elect their candidates of choice by uniting with other minority groups, two — HD 149 and HD 27 — will be lost.  In HD 149, a coalition of Hispanic, Black, and Asian voters has repeatedly elected its candidate of choice since 2004, but that ability would be lost under the proposed State House Plan.  Although Dr. Handley also identified HD 27 as a coalition district in the benchmark, she noted that it would change to a Black ability district under the proposed plan.  Due to alleged fracturing in these districts, the United States anticipates a loss of four to five minority ability districts, *i.e.*, HDs 33, 35, 41, 117, and 149, in the State House Plan.

As noted, most Intervenors agree with the United States.  In addition, Intervenors TLBC, LULAC, and the Texas State Conference of NAACP Branches argue that, under the State House Plan, minority voting power would be diminished in HDs 26, 101, 106, and 144, each of which was on the verge of becoming a minority ability district under the benchmark.

### 3.  The Texas State Senate Plan

Out of a total of thirty-one State Senate districts, Texas identifies seven Hispanic ability districts under the benchmark plan in which there is an HCVAP of greater than fifty

---

[16]  The United States asserts that Hispanic voters would lose the ability to elect their candidate of choice in HDs 33, 35, and 117 due to the reconfiguration of the Hispanic population in each district and racially polarized voting. Additionally, the government states that Hispanic voters may also lose their ability to elect in HD 41. The government's expert was "unable to make a determination" regarding this district.  U.S. Mem., Ex. 4 [Dkt. # 79-6] at 1 n.1 (Handley House Report).  Texas argues that HDs 35, 41, and 117 will remain majority-minority, although there will be a decrease in HCVAP in HDs 35 and 41.

percent,[17] and claims the same number based on the same districts in the proposed State Senate

Plan. Additionally, Texas identifies two Black ability districts with a BVAP of more than forty

percent under the benchmark plan, each of which remains such in the proposed State Senate

Plan.[18] The United States has similarly concluded that the proposed State Senate Plan is not

retrogressive.

However, the Davis Intervenors allege that the State Senate Plan is retrogressive

because it fractures Black and Hispanic communities that have formed a working coalition to

elect their candidate of choice in Senate District ("SD") 10.[19] This is not a district deemed by

Texas or the United States to be a minority ability district in the benchmark plan. However, the

Intervenors claim both that it was an ability district in the benchmark and that, due to alleged

fracturing of SD 10's minority communities in the proposed State Senate Plan, minority voters in

this district will no longer be able to elect their candidate of choice. Texas "refutes any argument

that [SD] 10 was 'dismantled'" and further states that SD 10 "in both the benchmark plan and

[the proposed plan] is a crossover district, and not even a particularly strong one. Such districts

are not protected under the VRA." Texas Reply to Senate [Dkt. # 90] at 5.

Another group of Intervenors — TLBC, LULAC, and the Texas State Conference

of NAACP Branches — argues that the proposed State Senate Plan will retrogress minority

voters' ability to elect in SD 15. These Intervenors allege that the combined Black and Hispanic

---

[17] The Hispanic ability districts that Texas identifies in the State Senate benchmark plan are districts 6, 19-21, 26, 27, and 29.

[18] The Black ability districts that Texas identifies in the State Senate benchmark plan are districts 13 and 23.

[19] The Davis Intervenors provide a statement from County Commissioner Roy Brooks that Black and Hispanic leaders "deliberately and aggressively recruited Wendy Davis to run in 2008 . . . . To elect our candidate of choice, Blacks and Hispanics had to come together and vote together, which we did." Davis Statement of Facts [Dkt. # 76-2] at ¶ 4. The Davis Intervenors allege that Senator Davis was elected with ninety-nine percent of the Hispanic and Black vote and that she only received thirty percent of the White vote. *Id*. at ¶ 6.

percentage of total population in proposed SD 15 decreases from 72.3 percent to 66.7 percent and that such a decrease will be electorally significant.  Texas argues in response that "[SD] 15 was not a protected district under the benchmark because it was not a majority-minority district."[20]  Texas Reply to Senate at 4.  According to Texas, "In both the benchmark and [the proposed plan], [SD] 15 is a coalition district" and "such districts are not protected."  *Id.*

## II. STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255; *Talavera*, 638 F.3d at 308.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its

---

[20]  The HCVAP of benchmark SD 15 is twenty-four percent and the BVAP is 26.2 percent, thus, this district is not a majority-minority district for either group individually.

favor.  *Id.*  If the evidence "is merely colorable, or is not significantly probative, summary

judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. ANALYSIS

### A.  Summary Judgment is Inappropriate Because Texas Used an Incorrect Standard to Measure Retrogression

Texas urges this Court to rely solely on voter demographic data to identify

majority-minority districts and to count only such districts as minority ability districts.  This

Court cannot oblige.  We find that a simple voting-age population analysis cannot accurately

measure minorities' ability to elect and, therefore, that Texas misjudged which districts offer its

minority citizens the ability to elect their preferred candidates in both its benchmark and

proposed Plans.  Since Texas used the wrong standard, there are material facts in dispute about

which districts are minority ability districts in the benchmark and proposed Plans.  On this

record, we cannot determine whether the Plans will have a retrogressive effect on Texas'

minority citizens' ability to elect.

Beginning with *Beer*, the Supreme Court has addressed the relationship between

majority-minority districts and a minority group's ability to elect, but has never suggested that

the inquiry required by Section 5 can be satisfied by examining only the number of majority-

minority districts.  In fact, the Court has acknowledged that the inquiry is a complex undertaking.

*See Georgia v. Ashcroft*, 539 U.S. at 480 ("The ability of minority voters to elect a candidate of

their choice is important but often complex in practice to determine."); *see also Holder v. Hall*,

512 U.S. 874, 883-84 (1994) (plurality opinion) ("[T]here may be difficulty in determining

whether a proposed change would cause retrogression . . . .").  Defendants correctly argue that

population demographics provide only a valid starting point, and demonstrating that Hispanics or

24

another minority group constitute a citizen voting-age majority in a district may well not suffice, on its own, to demonstrate that they have the ability to elect. *See, e.g.*, *League of United Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 428 (2006) (observing that "it may be possible for a citizen voting-age majority to lack real electoral opportunity"). Texas has been able to provide no authority to support its reliance on a single-factor test, and we decline to depart from the clear guidance of the Supreme Court's Section 5 precedent that assessing retrogression is a multifaceted, fact-specific inquiry.

In rejecting Texas' standard, this Court starts with the 2006 Amendments to Section 5. The fundamental question is whether any change proposed by Texas "will have the effect of diminishing the ability" of minorities "to elect" their preferred candidates. 42 U.S.C. § 1973c(b). Should there be any doubt, Congress emphasized that the "purpose" of § 1973c(b) is "to protect the ability" of minority citizens "to elect their preferred candidates." *Id.* § 1973c(d). Clearly, "ability to elect" is the statutory watchword.

In making its Amendments, Congress sought to restore the "ability to elect" standard promulgated by the Supreme Court in *Beer*. H.R. REP. NO. 109-478, at 45-46 ("[A] change should be denied preclearance under Section 5 if it diminishes the ability of minority groups to elect their candidates of choice. Such was the standard of analysis articulated by the Supreme Court in *Beer v. United States* . . . ."); *see Beer*, 425 U.S. at 141 (stating that the Section 5 standard "can only be fully satisfied by determining . . . whether the ability of minority groups to participate in the political process and to elect their choices to office is . . . affected"). The House of Representatives identified significant benefits to minority communities under the *Beer* standard. H.R. REP. NO. 109-478, at 45-46. In addition, the House Report specifically commented that "[v]oting changes that leave a minority group less *able to elect* a preferred

candidate of choice, either directly or when coalesced with other voters, cannot be precleared under Section 5." *Id*. at 46 (emphasis added).

Thus, "being able" or "having the power" to elect — in the past (the benchmark) and the future (a proposed redistricting plan) — is what matters under Section 5. This Court concludes that a review of redistricting plans under Section 5 must be concerned with the functioning of the electorate, *i.e.*, whether minority voters will be "effective [in their] exercise of the electoral franchise." *Beer*, 425 U.S. at 141.

Texas perceives "ability" and "opportunity" as interchangeable, but they represent different concepts that serve different purposes. In its motion, Texas identifies minority "opportunity districts" as significant under Section 5. An "opportunity" to elect is meaningful under Section 2 of the VRA, but not necessarily under Section 5.

Section 2 is violated upon a showing that minorities "have less opportunity than other members of the electorate to . . . elect representatives of their choice." 42 U.S.C. § 1973(b). Section 2 "was designed as a means of eradicating voting practices that minimize or cancel out the voting strength and political effectiveness of minority groups"; thus, it "bars *all* States and their political subdivisions from maintaining" any voting practice that, *inter alia*, dilutes the votes of minority citizens. *Bossier I*, 520 U.S. at 479 (internal quotation marks and citation omitted). A plaintiff claiming vote dilution under Section 2 must satisfy the three "*Gingles* factors:" 1) the minority group is sufficiently large and geographically compact to constitute a majority in a single member district; 2) the group is politically cohesive; and 3) there is sufficient bloc voting by the White majority to defeat the minority preferred candidate. *Id*. at 479-80 (citing *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). Under the first *Gingles* factor, a plaintiff must show that a sufficient minority population is present to have the potential or

26

opportunity to elect its preferred representative in a single member district.  *Bartlett v. Strickland*, 129 S. Ct. 1231, 1243 (2009) (plurality opinion) (citing *Gingles*, 478 U.S. at 50 n.17).  That is, Section 2 concerns itself with the possibility of a minority group's present, but *unrealized*, opportunity to elect.  *See Bossier I*, 520 U.S. at 480 ("Because the very concept of vote dilution implies – and, indeed, necessitates – the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice.").  Without such a showing, there can be neither wrong nor remedy.  *Bartlett*, 129 S. Ct. at 1243 (citing *Growe v. Emison*, 507 U.S. 25, 41 (1993)).

Under Section 2, demographic data is necessarily geared towards identifying minority voters' "opportunity" to elect.  Thus, because Texas equates "opportunity" and "ability" districts, it relies on data analysis pertinent to Section 2 to sustain its analysis of retrogressive effect under Section 5.  However, population demographics alone will not fully reveal whether minority citizens' ability to elect is or will be present in a voting district.  Demographics alone cannot identify all districts where the effective exercise of the electoral franchise by minority citizens is present or may be diminished under a proposed plan within the meaning of Section 5.[21]  *See, e.g.*, *LULAC*, 548 U.S. at 428.

The question of retrogressive effect under Section 5 looks at gains that have already been *realized* by minority voters and protects them from future loss.  A Section 5 claim requires a determination of how and where minority citizens' ability to elect is currently present in a covered jurisdiction and how it will manifest itself in a proposed plan.  This requires

---

[21]  Section 2 challenges are most often concerned with vote dilution claims.  This Court uses case law from Section 2 in this Section 5 analysis only as it speaks to circumstances that adversely impact minority citizens' ability to elect.

identifying districts in which minority citizens enjoy an existing ability to elect and comparing

the number of such districts in the benchmark to the number of such districts in a proposed plan

to measure the proposed plan's effect on minority citizens' voting ability. *See Bossier I*, 520

U.S. at 478 ("Retrogression, by definition, requires a comparison of a jurisdiction's new voting

plan with its existing plan."). Determining where and how the ability to elect is present is a

careful inquiry. This Court finds that the simple voting-age population statistics used by Texas

are insufficient, and we cannot be confident that Texas has properly identified existing ability

districts in its benchmark or future ability districts under the proposed Plans. Therefore, this

Court can neither count the former nor compare them to the latter. There are no easy shortcuts in

this inquiry. In particular, language minority status or race does not constitute a simple proxy for

partisan preference in gauging the ability to elect. *See, e.g.*, *Bush v. Vera*, 517 U.S. at 968 ("[T]o

the extent that race is used as a proxy for political characteristics, a racial stereotyping requiring

strict scrutiny is in operation.").

### B.  The Correct Legal Standard Governing Retrogression Analysis

#### 1.  Ability-to-Elect Factors

If population statistics alone are insufficient to determine the existence and

location of ability districts, what factors are relevant to an inquiry into retrogressive effect under

Section 5? Below we outline the types of factors that are relevant for this analysis. Our list of

factors is not exhaustive. It merely highlights the kinds of factors missing from the standard

Texas used to seek preclearance.

At the outset, a court addressing a proposed voting plan under Section 5 must

determine whether there is cohesive voting among minorities and whether minority/White

polarization is present in the jurisdiction submitting the plan. *See, e.g.*, *Georgia v. Ashcroft*, 539

U.S. at 485 ("[I]t is of course true that evidence of racial polarization is one of many factors relevant in assessing whether a minority group is able to elect a candidate of choice . . . ."). Polarized voting occurs when minority and White communities cast ballots along racial or language minority lines, voting in blocs. *See* H.R. REP. NO. 109-478, at 20. Polarized voting between minorities and Whites often renders minority voters powerless to elect their candidate of choice because White voters will not cross over to elect a minority-preferred candidate. *Id*. Furthermore, polarized voting often signals that minority communities in fact prefer different candidates than the majority and helps to identify districts in which minority voters are effective in electing their candidates of choice.

Next, this Court agrees with all parties that population statistics are significant and an important starting point for a retrogression analysis. Drawing a district with a "safe" minority population can essentially guarantee electoral success for minority voters, regardless of challenges posed by racially polarized voting. *See Georgia v. Ashcroft*, 539 U.S. at 480-81 (noting that "majority-minority districts may virtually guarantee the election of a minority group's preferred candidates in those districts"). Even when voting is polarized, a minority group that constitutes a supermajority in a district will likely have the ability to elect its chosen candidate. A district with a minority voting majority of sixty-five percent (or more) essentially guarantees that, despite changes in voter turnout, registration, and other factors that affect participation at the polls, a cohesive minority group will be able to elect its candidate of choice.[22]

---

[22] The Supreme Court found a figure of sixty-five percent of total population to be reasonable to achieve a majority of eligible minority voters in a district. *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 164 (1977). In a similar vein, the three-judge court in *Mississippi v. United States*, 490 F. Supp. 569 (D.D.C. 1979), assessing a Section 5 challenge, found that:

> Low black voter registration and voter turn-out combined with racial bloc voting
> make it necessary for an electoral district in Mississippi to contain a substantial

Where such a circumstance is present, there would be no need to make further inquiries into minority voters' ability to elect. However, when there is no supermajority in a district, a Section 5 analysis must go beyond mere population data to include factors such as minority voter registration, minority voter turnout, election history, and minority/majority voting behaviors.[23]

Determining that minorities have an ability to elect based solely on their numbers in the voting population of a district cannot account for the most fundamental concern of Section 5: the effect past discrimination has on current electoral power. 42 U.S.C. § 1973b(b); *see Riley*, 553 U.S. at 412 (noting that a jurisdiction is covered under Section 5 if among other things, "on one of three specified coverage dates . . . it maintained a literacy requirement or other 'test or device' as a prerequisite to voting"). As the Intervenors note, historical discrimination against Hispanics in Texas has, in some areas of the State, continued to depress their educational and economic conditions such that the mere attainment of citizen voting-age status might have no real effect on their ability to elect representatives of choice. *See Latino Redistricting Task*

---

> majority of black eligible voters in order to provide black voters with an opportunity to elect a candidate of their choice. It has been generally conceded that, barring exceptional circumstances such as two white candidates splitting the vote, a district should contain a black population of at least 65 percent or a black VAP [voting age population] of at least 60 percent to provide black voters with an opportunity to elect a candidate of their choice.

490 F. Supp. at 575. Likewise, the Seventh Circuit used a minority population figure of sixty-five percent in a Section 2 case to identify when minorities are an "effective majority," *i.e.*, whether they have a "realistic opportunity to elect officials of their choice" in a district. *Ketchum v. Byrne*, 740 F.2d 1398, 1410-15 (7th Cir. 1984). *Ketchum* reached its figure by reasoning from a simple voting majority and augmenting it by five percent to account for low voter registration among minority voters, five percent for low voter turnout, and five percent for youthful population. *Id*. at 1415. If *Ketchum* had started with voting-age population, it would not have added five percent for the youthful portion of the minority population. *Id*.

[23] Texas asks this Court to set the percentage for a "safe" district at forty percent BVAP and fifty percent HCVAP. This Court has already noted that, standing alone, these percentages are insufficient to establish the existence of an ability district. Texas' expert seems to agree. Dr. John Alford reports that Hispanic voters will have an ability to elect in a district in which the number of *registered* Hispanic voters exceeds fifty percent. U.S. Mem., Ex. 6 [Dkt. # 79-8] at 4 (Report of Dr. John Alford). In contrast, Texas relied on (citizen) voting-age population statistics alone. Texas' reliance on a forty percent BVAP and not a BVAP greater than fifty percent suggests that Texas also recognizes the importance of factors beyond majority status in determining which districts will provide minority voters the ability to elect.

Force's Statement of Material Facts in Dispute [Dkt. # 78-1] at ¶ 257 ("Lower levels of education, income, and earnings have the lingering effect of lowering Latino [electoral] participation rates, including registering and voting."). The Supreme Court has also noted that "the political, social, and economic legacy of past discrimination for Latinos in Texas may well hinder their ability to participate effectively in the political process." *LULAC*, 548 U.S. at 440 (internal quotation marks and citations omitted). Such a background requires a more complicated retrogression analysis than Texas wants this Court to approve, but it is part and parcel of discerning whether minority voters will be *effective* in their exercise of the electoral franchise. Because the statutory watchword is "ability to elect," data that pertains to actual minority citizen voting strength must be analyzed for each relevant district.

In particular, minority voter registration and minority voter turnout can be important indicators of whether historical barriers to minorities' ability to elect have been eradicated.[24] For example, the Senate Committee on the Judiciary found during the 2006 reauthorization of the VRA that Latino voters nationwide turned out and voted at rates significantly lower than White voters. In addition, the Committee found that in Texas, while 41.5 percent of Latinos were registered to vote, only approximately 29.3 percent turned out in the 2004 election. *See* S. REP. NO. 109-295, at 11. Such findings underscore why Texas' reliance on a bare majority-minority district cannot be used to determine an ability district under Section 5. Given its history, Texas cannot overlook education and employment levels affecting minority electoral participation and remnants of historic discrimination that may continue to affect voting in some areas of the State. Minority voter registration and turnout, together with other evidence

---

[24] Texas provided some such data in its motion and reply brief, but made no arguments regarding its significance for a retrogression inquiry. It continued to rely on population statistics to argue that its Plans do not have a retrogressive effect.

of election results and minority voting behavior, will supplement any court's analysis of population trends when counting ability districts in the benchmark and proposed plans.

Other factors are also relevant in the determination of whether past gains in minority citizens' ability to elect will be diminished by "any" change in voting practices. Although the Supreme Court has never outlined all factors relevant to this inquiry, it has emphasized that retrogression analysis "is often complex in practice to determine."  *Georgia v. Ashcroft*, 539 U.S. at 480.  We conclude that the type of factors relevant to this complex inquiry may include the number of registered minority voters in redrawn districts; population shifts between or among redrawn districts that diminish or enhance the ability of a significant, organized group of minority voters to elect their candidate of choice; an assessment of voter turnout in a proposed district; to the extent discernible, consideration of future election patterns with respect to a minority preferred candidate; and new ability districts that would offset any lost ability district.[25]

Although Intervenors urge this Court to find retrogression when redistricting dismantles a voting district in which a minority group was on the cusp of achieving majority status, this Court will not consider this as a factor in our retrogression analysis.  The argument

---

[25]  Nonetheless, it may be that retrogression in a proposed plan is unavoidable.  Population losses or shifts can decrease minority voter participation.  States and other political jurisdictions legitimately consider geographic (*e.g.*, mountains, water courses) and political (*e.g.*, county lines, city lines) boundaries in drawing election districts.  In some circumstances, a non-retrogressive redistricting plan may not be possible given other legitimate constraints on electoral maps.  This Court agrees with the comment in the 2011 DOJ Guidance:

> There may be circumstances in which the jurisdiction asserts that, because of shifts in population or other significant changes since the last redistricting (*e.g.*, residential segregation and demographic distribution of the population within the jurisdiction, the physical geography of the jurisdiction, the jurisdiction's historical redistricting practices, political boundaries, such as cities or counties, and/or state redistricting requirements), retrogression is unavoidable.

76 Fed. Reg. 7470-01, at 7472.

that the VRA protects predictable *future* gains in minority electoral power is directly at odds with

Section 5's purpose to protect against *retrogressive* effect. *See Beer*, 425 U.S. at 140 (Section 5

was enacted "to shift the advantage of time and inertia from the perpetrators of the evil to its

victim, by freezing election procedures in the covered areas unless the changes can be shown to

be nondiscriminatory." (internal quotation marks and citations omitted)).  Redistricting can have

no retrogressive effect on an ability to elect that has not yet been realized.  *City of Pleasant*

*Grove v. United States*, 479 U.S. 462 (1987), cited by TLBC, LULAC, and the Texas State

Conference of NAACP Branches, does not change this assessment.  As discussed further below,

*Pleasant Grove* was a discriminatory purpose case.  479 U.S. at 471-72.  The decision did not

address whether it would be *retrogressive* to suppress emerging voting strength in a redistricting

effort.  In line with *Beer* and the language of Section 5, this Court finds that evidence of

preventing an emerging ability to elect from crystallizing will not support the contention that a

plan has an impermissible retrogressive effect under Section 5.

   Finally, Texas argues that the United States' analysis of retrogression, reflected in

the 2011 DOJ Guidance, is elusive and expensive.  We disagree.  Although our analysis is not

identical to the 2011 DOJ Guidance, it shares many factors.  The 2011 Guidance is consistent

with the guidance DOJ has been issuing to assess retrogressive effect for the past two decades.[26]

---

[26] The relevant DOJ guidance memoranda are those issued in 2001 and 1987.  In those policy statements, the DOJ (in different administrations and under different Attorneys General) listed factors exceedingly similar, if not identical, to the ones that the DOJ currently asserts are relevant to a Section 5 retrogression analysis.  *Compare* Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 42 U.S. § 1973c, 66 Fed. Reg. 5412-01, at 5413 (Jan. 18, 2001) *with* 76 Fed. Reg. 7470-01, at 7471.  In the 2001 Guidance Memorandum, the DOJ stated that it would begin its retrogression analysis by compiling all relevant census data; such data was "the important starting point" for administrative evaluation of benchmark and proposed plans.  *See* 66 Fed. Reg. 5412-01, at 5413 (indicating that DOJ would review "additional demographic and election data" to assess the "actual effect" of proposed changes on minority populations and explicitly mentioning, as it did in 2011, that it believed that "election history and voting patterns within the jurisdiction, voter registration and turnout information, and other similar information are very important" to a VRA retrogression analysis).  A Notice issued by the DOJ in

Covered jurisdictions, including Texas, have been able to preclear voting plans under its various iterations. [27] Thus, despite Texas' arguments to the contrary, this Court is hard-pressed to find that a multi-factored test — dependent on population analyses and other factors — is too new, too expensive, or too complex for covered jurisdictions to follow.

### 2. Coalition Districts

In counting ability districts, Texas ignored those in which coalitions of minority voters and coalitions of minority and White voters formed to support the minority-preferred candidate. But Section 5 requires such consideration in determining whether minorities have the ability to elect preferred candidates. The statute states no preference for how the minority group is able to elect its preferred candidate, whether by cohesive voting by a single minority group or by coalitions made up of different groups. [28] Indeed, the Supreme Court has recognized the value of voting coalitions formed by minority voters:

> [T]here are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice . . . . [M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground.

---

1987 was very similar. *See* Revision of Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 52 Fed. Reg. 486-01 (Jan. 6, 1987). DOJ noted in 1987 that many covered jurisdictions, much like Texas before this Court, had urged it to adopt a retrogression standard that could be "applied to submitted changes in a fairly mechanical way," but the DOJ declined to adopt such an approach because it would be unrealistic to shorten "[a] Section 5 determination [that] is . . . based on the appraisal of a complex set of facts that do not readily fit a precise formula for resolving the preclearance issues." *Id*. at 486.

[27] *See* Pl.'s Mem.[Dkt. # 41] at 3 ("[I]n 2003 the [Texas] Legislature decided to take up redistricting again and enacted a congressional redistricting plan. That plan was precleared by the Department of Justice . . . .").

[28] The House Report on the 2006 Amendments clearly recognized that coalition districts can work to form an ability district, *see* H.R. REP. NO. 109-478, at 46, and, while the Senate emphasized majority-minority districts, it did not distinguish or discard minority coalition districts. *See* S. REP. NO. 109-295, at 17.

*Georgia v. Ashcroft*, 539 U.S. at 481 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)) (internal quotation marks omitted).  It is simply a fact of political life that in certain districts, a single minority group may not have the ability to achieve desired electoral outcomes independently, but could elect its preferred candidate if it formed either a crossover district by "attract[ing] sufficient crossover votes from white voters," *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993), or a coalition district by partnering with another minority group.[29]

        Texas contends that the 2006 Amendments that overruled *Georgia v. Ashcroft* also rejected the idea that coalition politics should be taken into account under Section 5.  This argument has no support in the text of the Amendments themselves and misreads the legislative history.  Congress only took issue with *Georgia v. Ashcroft* to the extent that it held that states could trade "influence" districts for prior "ability" districts without issue under Section 5.  *See* H.R. REP. NO. 109-478, at 44 ("[T]he Supreme Court would allow the minority community's own choice of preferred candidates to be trumped by political deals struck by State legislators purporting to give 'influence' to the minority community. . . . Permitting these trade-offs is inconsistent with the original and current purpose of Section 5.").  Congress never found that coalition districts could not provide minority citizens with the ability to elect.[30]

---

[29]   Dicta in *Bartlett v. Strickland*, a Section 2 case, differentiated between minority citizens' "own choice" and the choice made by a coalition.  129 S. Ct. at 1244; *see also Voinovich*, 507 U.S. at 154 (comparing crossover districts to "influence" districts).  This Court clarifies that coalition districts for Section 5 purposes are those in which the candidate voted into office by the coalition is the minority-preferred candidate, whether that candidate is a member of the minority or not.  Identification of the minority preferred candidate is a factual question.

[30]   In the Senate Report to the 2006 Amendments, Senator Jon Kyl wrote separately "to explain why [he] believe[s] that Congress *cannot* require that state or local governments create or retain influence or coalition districts."  S. REP. NO. 109-295, at 22 (Additional views of Senator Kyl).  Senator Kyl's individual views regarding the scope of protection afforded to minorities under Section 5 do not change this Court's analysis, or call into question the legislative intent regarding the 2006 Amendments.  First, the Senate Report carries little weight as a piece of legislative history or evidence of legislative intent.  As noted by Senator Patrick Leahy and others, the Senate Report was filed a week *after* the Act had been passed by both houses of Congress.  The Senate Report was not considered by Congress prior to a vote on the legislation, and Congress did not adopt or affirm its findings.  Indeed, "post-

Texas also cites *Bartlett v. Strickland* to argue that the Supreme Court has rejected the notion that a Section 5 analysis can take political coalitions into account, but *Bartlett* is not a Section 5 case and does not deal with coalition districts. *See* 129 S. Ct. at 1242-43 (stating that the Court did not address "coalition-district claims in which two minority groups form a coalition to elect the candidate of the coalition's choice"). Like Section 2 cases before it, a plurality of the Court in *Bartlett* held that a compact minority group needs to have the potential ("opportunity") to constitute a majority in a district for there to be a Section 2 violation. *Id.* at 1244 ("Only once, in dicta, has this Court framed the first *Gingles* requirement as anything other than a majority-minority rule."). Thus, the *Bartlett* Court held that Section 2 does not require states to create potential crossover districts to ensure equal electoral opportunity for minority voters because nothing in Section 2 grants special protection to minority citizens' "right[] to form political coalitions." *Id.* at 1243. Yet, freedom from an obligation to *create* a crossover district under Section 2 does not equate to freedom to *ignore* the reality of an existing crossover district in which minority citizens are able to elect their chosen candidates under Section 5.

Since coalition and crossover districts provide minority groups the ability to elect a preferred candidate, they must be recognized as ability districts in a Section 5 analysis of a benchmark plan. Coalition and crossover districts that continue unchanged into a proposed plan must be counted as well. Our recognition that crossover and coalition districts are ability districts in a benchmark plan is rooted in the fact that there must be discrete data, by way of election returns, to confirm the existence of a voting coalition's electoral power. For example,

---

passage legislative history is a contradiction in terms. Any after-the-fact attempts to re-characterize the legislation's language and effects [cannot] be credited." S. REP. NO. 109-225, at 55 (Additional views of Senators Leahy, Kennedy, Biden, Kohl, Feinstein, Feingold, Schumer, and Durbin). Second, as explained below, the statutory text and the Supreme Court's jurisprudence regarding Section 5 make clear that crossover and minority coalition districts provide minority citizens the ability to elect their candidates of choice.

evidence that a coalition had historical success in electing its candidates of choice would demonstrate that the minority voters in that district had, and would continue to have, an ability to elect their preferred candidates.  Proving the existence of a coalition district will require more exacting evidence than would be needed to prove the existence of a majority-minority district as demonstrating past election performance is vital to showing the existence of an actual coalition district.

By contrast, a state creating a "new" crossover or coalition district simply anticipates, or hopes, that the minority population in the new district will align politically and coalesce with other groups of voters to elect its candidates of choice.  It would be extremely difficult to confirm that minority voters would indeed have the ability to elect in the newly formed district.[31]  Since potential new crossover-coalition districts are "subject to [this] high degree of speculation and prediction," *Bartlett*, 129 S. Ct. at 1245, they can rarely be deemed ability districts in a proposed plan.

### 3. Retrogression in Proportional Versus Absolute Terms

The Defendants argue that retrogression should be assessed on a plan-wide basis, contending that a relative overall decrease in minority citizens' share of electoral districts is

---

[31]  Indeed, a state's attempt to create future crossover districts may lead to the creation of "influence" districts that *Georgia v. Ashcroft* approved and Congress rejected in the 2006 Amendments.  In *Georgia v. Ashcroft*, the Court approved Georgia's creation of new influence and coalition districts in proposed redistricting plans to offset the loss of majority-minority districts in the benchmark.  539 U.S. at 487.  Specifically, the Supreme Court stated that Georgia had probably met its burden of demonstrating non-retrogression because its strategy of increasing Black voting strength by "'unpacking' minority voters in some districts to create more influence and coalitional districts [was] apparent."  *Id.*  As part of the 2006 reauthorization of the VRA, Congress rejected *Georgia's* proposition that creation of influence and coalition districts may be used to offset other losses of a minority population's voting power, specifically amending Section 5 to "make[] clear that . . . the comparative 'ability [of the minority community] to elect preferred candidates of choice' is the relevant factor to be evaluated when determining whether a voting change has a retrogressive effect."  H.R. REP. NO. 109-478, at 46.  The House Report to the 2006 Amendments explained the "concern[] . . . that '[m]inority influence is nothing more than a guise for diluting minority voting strength'" and that "leaving the *Georgia* standard in place would encourage States to spread minority voters under the guise of 'influence' and would effectively shut minority voters out of the political process."  *Id.* at 45.

retrogressive.  According to this argument, Texas' failure to draw one or more *additional* Hispanic ability districts in the Congressional Plan is retrogressive in the face of the Hispanic population growth in Texas that is in large measure responsible for the State's four new congressional seats.  In support, they cite *Georgia v. Ashcroft*:  "[I]n examining whether [a] new plan is retrogressive, the inquiry must encompass the entire statewide plan as a whole."  539 U.S. at 479.  But that language does not support the Defendants' argument.  It was speaking to a state's ability under Section 5 to offset the loss of an ability district in one area of a state by the gain of a new ability district elsewhere.  *Id*.

Texas relies on *Abrams v. Johnson,* 521 U.S. 74 (1997), which rejected the idea that the addition of electoral districts necessarily requires the addition of minority ability districts.  In *Abrams*, Georgia gained a single new congressional district because of a population increase.  This new district was not a minority ability district.  The plaintiffs argued that the new plan was retrogressive because by failing to draw the new district as an ability district, the percentage of majority Black districts in the State decreased from ten percent to nine percent. 521 U.S. at 97.   The Supreme Court rejected the argument, stating that if it found retrogression on such facts, "each time a State with a majority-minority district was allowed to add one new district because of population growth, it would have to be majority-minority.  This the Voting Rights Act does not require."  *Id*. at 97-98.

The United States distinguishes *Abrams*, relying on the substantial growth in Texas' Hispanic population, Texas' four new congressional seats (an unprecedented number for States fully covered by Section 5),[32] and the new provisions of the 2006 Amendments.  It urges

---

[32] Notably, after the 1990 Census, Texas gained three additional congressional seats in response to which it created two new majority Black districts and a majority Hispanic district "with a view to complying with the Voting Rights

this Court to limit *Abrams* to its facts, arguing that although a state need not add a new ability

district for *each* new district, under the facts of this case it was retrogressive for Texas not to add

*any* new ability districts.

This Court concludes that *Abrams* does not control.  Although *Abrams* is clear

that the VRA does not require there to be a new minority ability district for every new

congressional seat, it does not hold that a state's failure to draw new minority districts can never

be retrogressive.  Nevertheless, this Court concludes that Texas' failure to draw new Hispanic

ability districts to match the growth of its Hispanic population was not retrogressive.  Section 5

is limited to preventing "[s]tates from undoing or defeating the rights recently won" by

minorities, *Beer*, 425 U.S. at 140 (quoting H.R. REP. NO. 91-397, at 8) (internal quotation marks

omitted); it does not require states to add additional protections, *id.* (quoting H.R. REP. NO. 94-

196, at 57-58) (internal quotation marks omitted), or to create new minority districts in

proportion to increases in the minority group's population.  *Id.* at 137 n.8 ("This Court has, of

course, rejected the proposition that members of a minority group have a federal right to be

represented in legislative bodies in proportion to their number in the general population.").  Here,

where Texas' percentage gain in congressional seats (12.5%) is similar to Georgia's percentage

gain in *Abrams* (10%), we see no need to require of Texas what the Supreme Court did not

require of Georgia.

Although Texas' alleged failure to account for the significant increase of the

Hispanic population in the State does not establish retrogression, it is relevant to the Court's

evaluation of whether the Congressional Plan was enacted with discriminatory purpose.  A

---

Act."  *See Bush v. Vera*, 517 U.S. at 957.  All three districts, however, were found to be the product of an
unconstitutional racial gerrymander.  *Id*. at 979-86.

redistricting plan that does not increase a minority group's voting power, despite a significant growth in that minority group's population, may provide significant circumstantial evidence that the plan was enacted with the purpose of denying or abridging that community's right to vote.[33] *Cf. City of Pleasant Grove*, 479 U.S. at 471 ("Section 5 looks not only to the present effects of changes, but to their future effects as well . . . . Likewise, an impermissible purpose under § 5 may relate to anticipated as well as present circumstances.").[34]  The Defendants are therefore incorrect as to the form, but not necessarily as to the substance of their argument.  A state's failure to account for a minority group's population growth that results in additional electoral seats, while not conclusive of an unlawful retrogressive effect under Section 5, may be nonetheless highly relevant and probative to the purpose inquiry.

---

[33]  Based upon its identification of minority ability districts, the United States contends that nearly half a million Hispanics would lose their ability to elect in the proposed Congressional Plan.

[34]  In *City of Pleasant Grove*, an "all-white enclave in an otherwise racially mixed area of Alabama," sought preclearance for the annexation of two parcels of land, one vacant and another containing a few white residents.  479 U.S. at 465.  The three-judge district court declined to grant preclearance, concluding that the jurisdiction had failed to demonstrate that the annexations did not have the purpose of abridging the minority population's right to vote.  The Supreme Court affirmed the three-judge court, concluding that there was sufficient evidence to support the allegation that the city was annexing non-Black areas but refusing to annex Black areas.  Despite the fact that there were "no black voters in Pleasant Grove" and the annexations therefore could not have an effect on Black voting in the city, the Court explained:

> [A]n impermissible purpose under § 5 may relate to anticipated as well as present circumstances . . . .  Common sense teaches that appellant cannot indefinitely stave off the influx of black residents and voters . . . .  One means of thwarting this process is to provide for the growth of a monolithic white voting block, thereby effectively diluting the black vote in advance.  This is just as impermissible a purpose as the dilution of present black voting strength.  To hold otherwise would make appellant's extraordinary success in resisting integration thus far a shield for further resistance.  Nothing could be further from the purposes of the Voting Rights Act.

*Id.* at 471-72 (citations omitted).

### C. Discriminatory Purpose

Summary judgment is also not appropriate because Texas has failed to demonstrate that the Plans do not have the purpose of "denying or abridging the right to vote on account of race or color, or [membership in a language minority group]."  Texas argues that its legislators had no animus towards any racial or language minority group but acted from purely partisan motives in drawing its redistricting Plans.  Texas further argues that significant federalism concerns would be raised if a federal court were to examine the actions of its State legislature.[35]  The United States responds that a discriminatory purpose that violates Section 5 does not always require an intent to target a minority group but can include a plan enacted in a discriminatory manner, even if designed to achieve a permissible aim.[36]  The Intervenors present

---

[35]  Texas does not challenge the constitutionality of Section 5, *see* Complaint [Dkt. # 1], but relies on the Constitution as a shield.  Texas argues that the 2006 Amendments only forbid states from making those changes that would themselves violate the Fourteenth Amendment's guarantee of equal protection and the Fifteenth Amendment's guarantee that the right to vote shall not be "denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. CONST. amend XIV, § 2; *id*. amend. XV, § 1.  A simple comparison of Section 5 and these Reconstruction-era Amendments shows that they do not track and Texas' contention cannot be accepted wholesale.  The Fifteenth Amendment does not protect language-minority voters and the Fourteenth Amendment does not apply to a language minority *qua* language minority.  *See Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) ("Language, by itself, does not identify members of a suspect class."); *but see Olagues v. Russoniello*, 797 F.2d 1511, 1521 (9th Cir. 1986) (distinguishing *Soberal-Perez v. Heckler* and stating that a non-English speaking classification is facially neutral but is, for all practical purposes, a classification based on race and national origin and therefore suspect), *vacated as moot*, 484 U.S. 806 (1987).  Thus, while both Amendments are relevant to the legitimacy of a redistricting plan as to other minorities, they are not determinative and provide only guidance as to language minorities, such as Hispanics.

[36]  The United States cites Judge Kozinski's opinion concurring in part and dissenting in part in *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), for this proposition:

> Assume you are an anglo [*sic*] homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

918 F.2d at 778 n.1.

some evidence supporting their claims of discriminatory purpose, but also suggest that further discovery is needed. At oral argument, Texas contended that, even if taken as true, the evidence presented by the United States and Intervenors is insufficient to prove discriminatory intent.

We conclude that there are genuine issues of material fact regarding whether the Plans were enacted with discriminatory intent. As discussed earlier, the 2006 Amendments make illegal *any* changes to voting qualifications, requirements, standards, practices, or procedures that are adopted or pursued in order to deny or abridge the right to vote "on account of" a particular characteristic protected by the statute. 42 U.S.C. § 1973c(a)-(c). As the Supreme Court reminds us in *Arlington Heights*, "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266; *see also Cromartie*, 526 U.S. at 546 ("The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor . . . ."). Such an intensely fact-driven inquiry is typically difficult to resolve at the summary judgment stage.

The United States asserts that there is ample circumstantial evidence of discriminatory purpose with regard to the State House and Congressional Plans that raises a genuine dispute of material facts. Likewise, the Intervenors challenge the Plans overall, their general impact on Hispanic voters,[37] the rushed sequence of events that preceded their adoption, procedural and substantive departures from past practice, and treatment of specific districts and communities within each Plan.

---

[37] For example, there are allegedly no new Hispanic ability districts in the Congressional Plan, despite Hispanics' substantial population growth in Texas. The Gonzales Intervenors allege, however, that although Whites now constitute 45.3 percent of the State's population, Whites are a majority of the voting-age population in twenty-five out of thirty-six congressional districts, an increase from twenty-two in the benchmark.

Texas only countered arguments from the United States and those Intervenors that challenge the State Senate Plan. In its brief and at oral argument, Texas offered three responses to Defendants' claims of discriminatory purpose: 1) the State's obligation to its own Constitution, which specifically bans unnecessarily dividing counties to form voting districts, *see* TEX. CONST. art. III, § 26; 2) political logic: Hispanics are Democrats, Democrats are the party out of power in the State, and, therefore, it is politics not illegal animus that accounts for any alleged circumstantial evidence of discriminatory purpose[38]; and 3) affidavit testimony by Texas legislators and their staff that no discriminatory purpose was espoused by any member of the Texas Legislature, any staff, or anyone else when offering redistricting proposals. Yet Texas has not disputed many of the Intervenors' specific allegations of discriminatory intent. This Court concludes that the United States and Intervenors have provided sufficient evidence to preclude summary judgment and to require further review of the claims of discriminatory purpose directed to all three Plans.

## IV. CONCLUSION

Section 5 requires a multi-factored, functional approach to gauge whether a redistricting plan will have the effect of denying or abridging minority citizens' ability to elect representatives of their choice. It does not lend itself to formalistic inquiry and complexity is inherent in the statute. The ability to elect can rarely be measured by a simple statistical yardstick, as is the essence of Texas' approach. Defendants also challenge all three Plans as discriminatory in purpose, but genuine disputes of material fact preclude summary judgment on

---

[38] *But see Bush v. Vera*, 517 U.S. at 968 ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotyping requiring strict scrutiny is in operation.").

this record.  For these reasons, the motion for summary judgment filed by the State of Texas was

denied.


Date:  December 22, 2011                                         _____/s/_____
                                                                THOMAS B. GRIFFITH
                                                                United States Circuit Judge


                                                                _____/s/_____
                                                                ROSEMARY M. COLLYER
                                                                United States District Judge


                                                                _____/s/_____
                                                                BERYL A. HOWELL
                                                                United States District Judge