# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF TEXAS,** ) | |
| ) | |
|    **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 11-cv-1303** |
| ) | **(RMC)** |
| **UNITED STATES OF AMERICA, and** ) | |
| **ERIC HOLDER, JR., in his official capacity** ) | |
| **as Attorney General of the United States,** ) | |
| ) | |
|    **Defendants,** ) | |
| ) | |
|    **and** ) | |
| ) | |
| **WENDY DAVIS, *et al.*,** ) | |
| ) | |
|    **Defendant-Intervenors.** ) | |
| ) | |

## MEMORANDUM OPINION ON PRIVILEGE CLAIMS

The State of Texas seeks preclearance of its redistricting plans for the U.S. House

of Representatives, State House of Representatives, and State Senate, pursuant to the Voting

Rights Act of 1965, as amended ("VRA"), 42 U.S.C. § 1973 *et seq.*[1]  Preparing for trial in

January 2012, the parties have reached a discovery impasse:  Texas claims that the attorney-client

privilege, the attorney work-product doctrine, and State legislative and statutory privileges shield

various materials from production or testimony here.  The parties filed simultaneous briefs, and

the Court treats those filed by Defendants and Defendant-Intervenors as motions to compel.

---

[1] The Court's December 22, 2011 Opinion recites the factual and statutory background of
this case.  *See* Mem. Op. [Dkt. # 115].

The disputed material falls into three categories.  First are communications between key members of the State Legislature and the three legislative staffers who drew the maps at issue:  Doug Davis, counsel to State Senator Kel Seliger, Chair of the State Senate Redistricting Committee; Ryan Downton, counsel to the State House Redistricting Committee under Chair Burt Solomons; and Gerardo Interiano, counsel to Joe Straus, Speaker of the State House of Representatives.  Each staff counsel will be called as a witness for Texas at trial.  Texas claims all such communications are not subject to discovery.  Second are communications between the Texas Legislative Council and key members of the State Legislature or their staffs. David Hanna, an attorney employed by the Council, has been identified as a witness for Texas during trial.  Texas claims that communications from Mr. Hanna are privileged.  Last are documents containing summaries of racially polarized voting analyses prepared by technical staff of the Office of the Texas Attorney General ("OAG").  Mr. Giberson prepared the summaries; he will be one of Texas' witnesses at trial.  Texas interposed the attorney-client privilege and attorney work-product doctrine when it refused discovery requests from the United States for the summaries.

The United States has asked the Court to resolve these claims by the morning of January 4, 2012, when it has scheduled the depositions of David Hanna and Clare Dyer, another employee of the Texas Legislative Council.  Defendant-Intervenors, the Texas Latino Redistricting Task Force and Wendy Davis, *et al.* ("Davis Intervenors"), and have also filed

motions disputing Texas' claims of privilege.[2]

Taking its cue from the District Court for the Western District of Texas, which has a Section 2 VRA case before it,[3] the Court will not decide whether a State legislative privilege exists and follows into federal court, since Texas will provide all relevant documents under seal. Publication of such documents, if necessary, can be determined at trial. The evidence does not support the claimed attorney-client relationships or application of the attorney work-product doctrine; if Texas wishes to pursue any such privilege, it must provide evidentiary support. Finally, the Court sees nothing in the Texas Government Code or otherwise to support a claim of a legal privilege — to be distinguished from confidentiality — between the State Legislature and the Texas Legislative Council. Except as otherwise specified, Texas will be ordered to produce the requested documents.

# I

The proponent of a privilege in federal court bears the burden of demonstrating facts sufficient to establish the privilege's applicability. *In re Subpoena Duces Tecum*, 439 F.3d 740, 750 (D.C. Cir. 2006); *see Alexander v. F.B.I.*, 192 F.R.D. 32, 33-34 (D.D.C. 2000) (a party bringing a motion to compel bears the initial burden of showing that the information is relevant and discoverable; then the burden shifts to the defendant to prove that the information is privileged). The "basis of privilege" must be "adequately established in the record," *Liberty*

---

[2] The Court recognizes the unremitting work of the attorneys for all parties, on this matter and others concerning Texas redistricting, and thanks them for their tremendous efforts — especially on these briefs, filed in the midst of the holiday season and as they were preparing for oral argument in the Supreme Court on January 9, 2012, and trial in this matter on January 17, 2012. No client could ask for more dedication to its interests.

[3] *See Perez v. Perry*, Civ. No. 5:11-cv-360 (W.D. Tex.).

*Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1303 (D.C. Cir. 1988), through evidence sufficient to establish the privilege "with reasonable certainty." *FTC v. TRW, Inc.*, 628 F.2d 207, 213 (D.C. Cir. 1980).

### A. Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id*. A party asserting the attorney-client privilege must demonstrate that: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or her subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on the law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984). The privilege attaches to an attorney's communication with his client "only insofar as the attorney's communications disclose the confidential communications from the client." *Evans v. Atwood*, 177 F.R.D. 1, 4 (D.D.C. 1997) (quoting *Brinton v. Dep't of State*, 636 F.2d 600, 603-04 (D.C. Cir. 1980)). "A blanket assertion of the privilege will not suffice. Rather, the proponent must conclusively prove each element of the privilege." *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998) (internal citation and quotation

omitted).

The attorney-client privilege does not protect any and all communications between a client and a lawyer.  Courts tend to apply the privilege narrowly because it blocks full disclosure of relevant information.  Routine routing of information through counsel, for instance, may not result in a privileged communication.  *See S. Bell Tel. & Tel. Co. v. Deason*, 632 So. 2d 1377, 1383 (Fla. 1994).  The privilege does not ordinarily protect a client's identity.  *United States v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003).  While the privilege may protect the content of an attorney-client communication from disclosure, it may not protect the facts communicated.  *Mackey v. IBP, Inc.*, 167 F.R.D. 186, 200 (D. Kan. 1996).  Both clients and lawyers can waive the attorney-client privilege.  *See, e.g., Alexander v. FBI*, 186 F.R.D. 128, 134 (D.D.C. 1998).

If a party intentionally waives the attorney-client privilege for part of a conversation or communication, the privilege as to rest of that communication and for any communication related to the same subject matter also is waived, if in fairness they ought to be considered together.  *See* Fed. R. Evid. 502(a); *Williams & Connolly v. S.E.C.*, No. 10-5330, 2011 WL 6118584, *2 (D.C. Cir. Dec. 9, 2011).  A court "retains broad discretion in deciding the appropriate scope of a waiver."  *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 159 F.R.D. 307, 309 (D.D.C. 1994).  Once a privilege has been waived and privileged information made public, the information remains public for all purposes.  *See Navajo Nation v. Peabody Holding Co., Inc.*, 209 F. Supp. 2d 269, 284-84 (D.D.C. 2002) (to the extent documents

were made public, any claim of privilege must fail).[4]

## B. Attorney Work-Product Doctrine

The Federal Rules of Civil Procedure protect from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3). The purpose of the doctrine is to protect the adversary process by ensuring that lawyers work with a "degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). The work-product doctrine "protects factual materials prepared in anticipation of litigation." *Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 620 (D.C. Cir. 1997). Thus, "[a]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work[-]product doctrine . . . ." *Id.* It is "not necessary that litigation be threatened or imminent, as long as the prospect of litigation is identifiable because of claims that have already arisen." *Nat'l Tank Co. v. Brotherton*, 851 S.W.2d 193, 205 (Tex. 1993). Work-product immunity is held by the lawyer, not the client, although either may assert the doctrine during discovery. "The party invoking the privilege, however, has the burden of proving that the memoranda qualify as work product." *Hager v. Bluefield Regional Medical Center, Inc.*, 170 F.R.D. 70, 76 (D.D.C. 1997). "In reviewing the documents claimed to be protected by the work-product privilege, the court must determine whether, in light of the nature of the document or the factual situation in a particular

---

[4] Federal Rule of Evidence 502, effective September 19, 2008, eased the waiver doctrine regarding the scope of waiver upon inadvertent disclosure, *see Williams v. Dist. of Columbia*, No. 06-02076(CKK), 2011 WL 3659308, *3 (D.D.C. Aug. 17, 2011), but did not change the waiver principles cited here.

case, the document can fairly be said to have been prepared or obtained because of the prospect

of litigation." *Jinks-Umstead v. England*, 231 F.R.D. 13, 15 (D.D.C. 2005).

Because protection for attorney work-product is based on a legal doctrine, and not

a "privilege," the protection is qualified and not absolute; it can be overcome if a party "shows

that it has substantial need for the materials to prepare its case and cannot, without undue

hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii); *see*

*also Equal Rights Ctr. v. Post Properties, Inc.*, 247 F.R.D. 208, 211-12 (D.D.C. 2008).  Courts

do not recognize the privilege where to do so would undermine the discovery process and

deprive the Court of important evidence.  *Ex rel. Fago*, 242 F.R.D. 16, 19 (D.D.C. 2007).  The

work-product doctrine relies, in the first instance, on the existence of an attorney-client

relationship.

Texas claims the work-product doctrine protects from discovery three documents

reflecting communications between Mr. Hanna of the Texas Legislative Council and unidentified

members of the Legislature on April 6, 12, and 20 of 2011.  *See* Texas Br. [Dkt. #122] at 6 n.2.

Texas reports that the first redistricting lawsuit was *Teuber v. State of Texas*, Civ. No. 4:11-cv-

00059 (E.D. Tex.), filed on February 10, 2011, a necessary precursor to applicability of the

doctrine.  The *Teuber* suit challenged the Texas' former voting districts and sought to require the

Census Bureau to adjust the census figures used in redistricting to account for undocumented

aliens; it did not involve any challenge to 2011 redistricting efforts by the State Legislature.  *See*

U.S. Resp. [Dkt. #125], Ex. 4 (*Teuber* Complaint).

## C.  State Legislative Privilege

There is no state legislative privilege identified in the Federal Rules of Evidence

and the D.C. Circuit has never recognized one.[5]  The United States urges the Court to avoid

recognizing such a privilege in this case.  Equating immunity for legislative acts to privilege for

legislators' communications, Texas asserts that "state legislators enjoy common-law immunity

from liability for their legislative acts, an immunity that is similar in origin and rationale to that

accorded Congressmen under the Speech or Debate Clause."  *See Supreme Court of Virginia v.

Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732 (1980).  Texas argues that "[e]ffectuating

the intentions of the legislative immunity doctrine, legislators acting within the realm of

legitimate legislative activity, should not be required to be a party to a civil action concerning

legislative activities, nor should they be required to testify regarding those actions."  Texas Br. at

9 (quoting *Miles-Un-Ltd., Inc. v. Town of New Shoreham*, 917 F. Supp. 91, 98 (D.N.H. 1996)).

Texas particularly relies on Supreme Court *dicta,* noting that "[i]n some extraordinary instances

the members [of the decisionmaking body] might be called to the stand at trial to testify

concerning the purpose of the official action, although even then such testimony will frequently

be barred by privilege."  *Village of Arlington Heights v. Metropolitan Housing Development

Corp.*, 429 U.S. 252, 268 (1977).

### D.  Texas Government Code § 323.017

Under Texas State law, the Texas Legislative Council is "an agency of the

legislative branch of state government."  Tx. Gov't Code § 323.001(a).  The Council consists of

the Lieutenant Governor, the Speaker of the State House of Representatives, the Chair of the

---

[5] A legislative privilege has been recognized by the Circuit for members of the U.S. House of Representatives and Senate, rooted in the Speech and Debate Clause of the Constitution and federal statutes.  *See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995).

State House Administration Committee, six State senators and five other members of the State

House of Representatives. *Id.* § 323.001(b).  "The lieutenant governor and the speaker act as the

council during a regular legislative session." *Id.* § 323.001(f).  State law establishes the duties of

the Texas Legislative Council as follows:

> (a) The Council shall:
>
>> (1) study and investigate the functions and problems of state departments, agencies, and officers;
>>
>> (2) conduct investigations and studies and make reports that may be considered useful to the legislative branch of state government;
>>
>> (3) gather and disseminate information for the legislature's use;
>>
>> (4) meet and perform council functions during the legislative interim;
>>
>> (5) make periodic reports to all members of the legislature and keep the legislature fully informed of all issues that may come before the council, any action taken on an issue, and the progress made on an issue;
>> (6) report council recommendations to the legislature and, if appropriate, provide drafts of legislation with the report;
>>
>> (7) assist the legislature in drafting proposed legislation;
>>
>> (8) provide data-processing services to aid members and legislative committees in accomplishing their legislative duties.
>
> (b) By agreement with either house of the legislature or a legislative agency, the council may perform other services or functions for or on behalf of the house or agency.

*Id.* § 323.006.  Many of these duties are non-legal.

Section 323.017 directly speaks to Confidential Communications between

members of the State Legislature and the Texas Legislative Council.  It provides:

> Communications, including conversations, correspondence, and electronic communications, between a member of the legislature or the lieutenant governor or an assistant or employee of the council that relate to a request by the official for information, advice, or opinions from an assistant or employee of the council are confidential.  Information, advice, and opinions given privately by an assistant or employee of the council to a member of the legislature, or the lieutenant governor, acting in the person's official capacity, are confidential.  However, the member or lieutenant governor may choose to disclose all or a part of the communications, information, advice, or opinions to which this section applies, and such a disclosure does not violate the law of this State.

*Id.* § 323.017.  Section 323.020 deals with statistical or demographic analyses performed by the Texas Legislative Council.  *See id.* § 323.020.  Notably, subsections (c) through (g) "do not apply in relation to a statistical or demographic analysis of information related to the redistricting process," *id.* § 323.020(a), despite the otherwise-applicable provision in subsection (c) that "information the council acquires or produces in relation to a statistical or demographic analysis . . . is confidential and not public information."  *Id.* § 323.020(c).[6]

## II

Privilege claims raise complicated issues in litigation.  Some aspects of the

---

[6] Subsection (c) broadly speaks to working drafts and papers; contracts and subcontracts; internal and interagency correspondence; data, data files, data programs, and the like; subsection (d) recognizes that any entity, including a State agency, "does not waive any exception from required disclosure or any privilege not to disclose" because information was provided to the Texas Legislative Council; subsection (e) specifies that a "final report containing a statistical or demographic analysis" by the Council and its cover letter or memorandum are not confidential; subsection (f) provides that contracts or agreements between the council and any state agency are not confidential; and subsection (g) requires that information submitted to the council for a statistical or demographic analysis by the council not be used against the person submitting it in a State agency enforcement proceeding.  Tx. Gov't Code § 232.020 (c) - (g).

current disputes are easier than others, and the Court will start there.

### A.  Davis Intervenors' Motion

The Davis Intervenors seek copies of emails or other written communications between Doug Davis, who drew the State Senate redistricting map, and individual senators. Texas asserts a broad, across-the-board response that all such communications are privileged by the attorney-client and legislative privileges.

Texas does not "claim[] that any individual senators have asserted either legislative or attorney-client privileges in response to [their] discovery requests" *and* "five Anglo senators [Seliger, Huffman, Birdwell, Shapiro and Carona] and the [State S]enate map drawer himself (Doug Davis) have already been deposed and none of them asserted any privileges." Davis Br. [Dkt. #119] at 4-5.  Importantly, Senator Seliger, for whom Mr. Davis works directly, already has provided testimony and did not assert a privilege.  Texas cannot claim an attorney-client privilege between Mr. Davis and any other legislator because, as Texas recognizes, he does not have an attorney-client relationship with the entire legislature.  *See* Texas Resp. at 4 ("Texas does not contend that the map-drawers share an attorney-client relationship with every member of the Texas Legislature.").

The Davis Intervenors also contend that the State's legal counsel, David Mattox, already has represented to the District Court for the Western District of Texas that any privileges have been waived with regard to numerous State legislators.

> The depositions identify certain legislators who had conversations with Mr. Downton; also other witnesses have been deposed that identified other legislators. . . .  We have contacted those legislators and indicated that [their] names would be revealed.  I have heard no objections.  I have seen nothing filed with this Court

> from those legislators, so I believe there is not going to be an
> assertion of legislative privilege by those legislators in respect to
> those depositions in this matter.
>
> Accordingly, we have no objection . . . .

Davis Br., Ex. 4 (*Perry v. Perez* trial transcript) at 5-6.  Ryan Downton served as general counsel

to the State House Committee on Redistricting.  Conversations concerning redistricting between

him and legislators identified in depositions in the Section 2 litigation are no longer privileged, if

they once were, because all such privileges have been waived.[7]

To the extent that Mr. Mattox attempted to limit a waiver to "this matter," his

effort was unsuccessful.  Where a person voluntarily waives the attorney-client privilege for part

of a communication, the privilege as to rest of that communication and for any communication

related to the same subject matter also is waived.  *See* Fed. R. Evid. 502; *Williams & Connolly*,

2011 WL 6118584 at *2.  When the privileged information was made public, the privilege was

waived for all purposes.  *See Navajo Nation*, 209 F. Supp. 2d at 284-84.

---

[7] *See* Davis Br., Ex. 5 [Dkt. #119-5] (identifying deposition testimony by Senators Seliger, Corana, Hoffman and Mr. Davis concerning conversations on redistricting with Senators Paul, Olson, Farenthold, Shapiro, Deuell, Harris, Nelson, Estes, Wendy Davis, Fraser, Patrick, Jackson, Duncan, Eltife, Williams and Zaffarini, as well as staffer Jonathan Simpson and Mr. Staples from the staff of the Senate Redistricting Committee, chaired by Senator Selinger).  Mr. Mattox informed the Court in the Western District of Texas that these Senators and other legislators mentioned in deposition testimony were informed and made no objections; therefore, any privilege covering conversations, emails and other documents between or among one or more of them, between or among one or more of them and the map-drawers, and between or among one or more of them and the Texas Legislative Council, has been waived.  *See also* U.S. Br. [Dkt. #122] at 10 n.6 (noting that Mr. Downton at trial in *Perez v. Perry* "purposefully disclosed his conversations with" Reps. Veasey, Villareal, Castro, Kuempel, Pickett, and Solomons; Dallas County House delegation; Tarrant County House delegation; Harris County House delegation; and legal discussions with Texas Legislative Council).  Texas does not dispute Mr. Mattox's broad statement, and the Court finds that these Representatives also waived any applicable privilege.

Texas argues that "[t]he map-drawers' testimony in the Section 2 proceedings . . . would not have effected a permanent waiver, particularly where the privilege belonged to other legislators." Texas Resp. [Dkt. # 126] at 5. The Court draws no conclusion here as to the privilege that unnamed legislators may continue to possess, but Mr. Maddox's broad waiver of privilege for all legislators named in depositions in the Section 2 proceeding was without limit. It was not limited to the Section 2 case, much less general VRA litigation involving the Texas Plans, even if such a limited waiver were possible.

The Court therefore agrees that Texas must respond fully to the narrow request of the Davis Intervenors for any email correspondence and other forms of communication, oral or written, between Mr. Davis and any one or grouping of these five State senators, or among any one or more of the five State senators themselves, about the redistricting process broadly construed, and especially why Senate District 10 boundary lines were drawn as they were. These subjects and persona are open to normal discovery because any privilege has been waived.

The Court also finds that the legislators mentioned in depositions and later court testimony in the Section 2 proceeding were notified and had no objection to waiver of any privilege they might have held, whether attorney-client, legislative or statutory. These persons and subjects are also open to discovery here.

As suggested by the Davis Intervenors, the Court orders counsel for the State of Texas to review its records to identify any other arguably-privileged communications and canvas the remaining State Senators to ascertain whether any additional Senator wishes to invoke or waive any privileges that may exist and, thereafter, produce such documents as to which no privilege has been raised.

-13-

## B.  Texas Latino Redistricting Task Force's Motion

The Texas Latino Redistricting Task Force complains that Texas has not responded to its discovery except by vague reference to its Internet postings.  Texas has not responded and the points are deemed conceded.  Texas shall respond to the discovery requests of the Task Force, as elucidated in its court filings, forthwith.

## C.  United States' Motion

The United States served interrogatories that sought "[a]ll documents concerning, addressing, or mentioning redistricting or the census between" three varied groupings of persons, identified in the interrogatory by name but not position.  Texas objected, broadly claiming that all such communications between State legislators and Messrs. Davis, Downton, and Interiano (the map-drawers) are protected by the attorney-client privilege, the work-product doctrine, and the legislative privilege.[8]  Mr. Downton "had the primary responsibility (together with Gerardo Interiano) during the most recent legislative session and subsequent special session for inputting and processing proposed amendments to redistricting plans for the Texas House of Representatives, State Board of Education and U.S. Congress."  U.S. Br., Ex. 27 ("Downton Decl.") at 1.  Mr. Interiano's "primary responsibility was the drafting and analyzing of proposed maps for the Texas House of Representatives.  I also assisted Ryan Downtown with the U.S. Congressional map . . . ."  *Id.*, Ex. 28 ("Interiano Decl.") at 1.   Mr. Davis "had the primary responsibility . . . for inputting and processing proposed amendments to redistricting plans for the

---

[8] *See* Texas Resp. at 3 n.2.  To aid in trial preparation, the Court issued a Minute Order on December 30, 2011, ordering such production under seal forthwith.  Since the parties are limited in their use of such documents, the dispute is not mooted by this production.

Texas House of Representatives, Senate, State Board of Education and U.S. Congress." *Id.*, Ex. 29 ("Doug Davis Decl.") at 1.[9]

Texas similarly claimed attorney-client and legislative privileges, the attorney work-product doctrine, and a statutory privilege based on Texas Government Code § 232.017, for all communications with the Texas Legislative Council.  After deposition testimony mentioned the fact of summaries of racially polarized voting analyses prepared in the Office of the Attorney General, the United States asked for copies of those documents as well, which Texas refused to produce pursuant to the attorney-client privilege and attorney work-product doctrine.

### 1.  Communications by Messrs. Downton, Interiano, and Davis

Texas well recognizes that the three map-drawers do not share an attorney-client relationship with every member of the Texas Legislature and claims it only for the individual legislator for whom they act as counsel.  That is, Texas asserts an attorney-client relationship between Speaker Straus and Mr. Iteriano; Senator Seliger and Mr. Davis; and Chair Solomons and Mr. Downton.  The Court agrees that such a professional relationship may exist but it cannot be determined on this record whether the combination of political/legislative and legal duties of one or the other of these men rendered their positions less lawyerly and therefore without a privilege.  *See In re Lindsey*, 148 F.3d at 1106 (rejecting attorney-client privilege for an advisor to the President who also served as a policy advisor).   Because the privilege belongs to the

---

[9] All three map-drawers declare that no one suggested any redistricting changes for the purpose of harming voters "on account of race, ethnicity or national origin."  Downton Decl. at 1; Interiano Decl. at 1; Doug Davis Decl. at 1.   The Declarations do not address language minorities, which is the specific grouping that protects Hispanics under the VRA.  *See* 42 U.S.C. § 1973b(f)(2).

client, not the lawyer, the Court is loath to disregard the possibility of an attorney-client privilege even though Texas has not met its burden of demonstrating one for these relationships.  *See In re Sealed Case*, 737 F.2d at 98-99.  It remains an open and undecided question; if Texas wishes to preserve any privilege, it must submit further evidence in support beyond mere job titles.

Whether a privilege between the map-drawers and their bosses exists may not matter because, as to 2011 redistricting, it has been waived.  Messrs. Downton, Iteriano and Davis have testified extensively about their conversations with various legislators, including Speaker Straus, Senator Seliger, and Chair Solomons,[10] and Mr. Maddox has informed the federal court that no legislators mentioned in deposition in the Section 2 case, including these, have asserted any privilege.  Unless circumstances exist that are not shown in this record,[11] the testimony and documents on communications regarding redistricting between these staffers and legislators — and between staffers and other legislators or other persons on the same subject matter — are not barred from discovery by an attorney-client relationship.[12]  In the same vein, Messrs. Downton, Iteriano, and Davis cannot interpose a privilege claim to avoid answering

---

[10] While some of this deposition testimony was fairly general, it nonetheless spoke to instructions and other conversations between the named legislators and these staff people.  Many further conversations with other legislators were also referenced.  The Court has not combed all the depositions submitted by the parties to discover which legislators had substantive conversations with any of these map-drawers (and to which Mr. Mattox made reference) and leaves it to the parties to identify them.

[11] As noted above, voluntary waiver of the attorney-client privilege often extends to an entire subject matter.  *See* Fed. R. Evid. 502.  However, there is no blanket privilege and it must be claimed with respect to each specific communication at issue.  *See In re Lindsey*, 148 F.3d at 1106.

[12] Only a legislative privilege might shield communications between the map-drawers and other State Legislators but Texas has indicated its willingness to produce relevant documents under seal.

questions or producing documents concerning redistricting that reflect their communications with other staff persons on their own staffs.

The work-product doctrine is a limited one that shields a lawyer's internal work for a client from an opponent's eyes.  It protects materials prepared in anticipation of litigation or trial and can extend to persons working with a lawyer, not just the attorney herself.  Texas cites *Teuber v. State of Texas*, Civ. A. No. 4:11-cv-00059 (E.D. Tex.  Feb. 10, 2011), as a pending redistricting lawsuit that made these lawyers work on redistricting and map-drawing in the Spring of 2011 protected by the work-product doctrine.  The Court declines to stretch the doctrine that far; *Teuber* had only a very attenuated connection to the Texas redistricting process in 2011 and did not touch on the later actions of the Texas Legislature when considering redistricting plans.  In addition, on this record, Texas has failed to show that Messrs. Downton, Davis, and Interiano were acting in a primarily *legal* role as map-drawers instead of in political or policy roles, as to which no work-product doctrine would apply in any event.  *See In re Lindsey*, 148 F.3d 1106.  The Court concludes that the work-product doctrine does not shield the relevant documents sought by the United States.

Texas asserts a broad legislative privilege that would, if adopted, shield almost everything that any Texas State Legislator or his staff ever does.  Texas cites no State law — statute or caselaw — that recognizes the privilege it claims here in federal court, which is at least passing strange if such a privilege actually exists and is recognized within the State.  Texas cannot claim a privilege here that its own courts do not recognize.

At this juncture, the Court need not determine whether the State legislative privilege applies.  Texas will produce under seal all documents as to which it claims a legislative

privilege.  Should any party wish to rely on a sealed document at trial, it will be required to raise

the issue beforehand with specificity as to the document(s) at issue.  The Panel will decide

whether to admit such documents on the public record or under seal.

### 2.  Texas Legislative Council

The Texas Legislative Council is a creature of statute and can exist no further than

the Texas Legislature has decreed.  Communications between the Texas Legislative Council and

members of the Legislature are "confidential."  They are not "privileged."  *See* Tx. Gov't Code

§ 323.017 ("Communications . . . between a member of the legislature or the lieutenant governor

or an assistant or employee of the council . . . are confidential.").  The Texas Legislature knew

the difference.  *See id.* § 323.020(d) (providing that giving information to the Council "does not

waive any exception from required disclosure or *any privilege* not to disclose" (emphasis

added)).  In fact, while § 323.017 makes Legislative/Council communications "confidential,"

§ 323.020 appears to lift even that level of protection for "a statistical or demographic analysis of

information related to the redistricting process," including internal and interagency

correspondence, data, data files, data programs, and the like.

Texas declares that the Texas Legislative Council "has an attorney-client

relationship with all members of the Legislature."  Texas Resp. at 8.  It seeks to protect three

memoranda prepared by Attorney David Hanna which "contain[ed] legal analysis of the proposed

redistricting plans which clearly reflect material, mental impressions, opinion, conclusions,

strategy, and analyses developed in anticipation of possible legal disputes."  *Id.* at 7.  The

argument reflects what appears to be customary and habitual thinking that assumes a legal

privilege between the Legislature and the legal division of the Council.  The Court can find none.

The Texas Government Code expresses no such relationship or expectation.[13]  Texas does not explain why it agrees that the three map-drawers could not have an attorney-client relationship with the entire Legislature but the lawyers at the Texas Legislative Council do have an attorney-client relationship with every one of the individual members of the State House and Senate. Without the threshold evidence of an attorney-client relationship, *In re Sealed Case*, 737 F.2d at 98-99, there can be no privilege.   Texas offers no evidence to satisfy the elements of an attorney-client relationship between the Council and the Legislature.

Further, Texas has not demonstrated that the work-product doctrine is applicable in the absence of an attorney-client relationship.  There is a paucity of information in the record from which to find that Mr. Hanna's early memos (dated April 6, 12, and 20, 2011) were prepared in anticipation of litigation, that is, whether "the prospect of litigation [was] identifiable because of claims that ha[d] already arisen."  *See Nat'l Tank Co.*, 851 S.W.2d at 205.  The Court concludes that the Hanna memoranda from April 2011 are not protected by a privilege or the work-product doctrine and must be produced.

### 3.  OAG Summaries

Texas refuses to produce what it calls "racially polarized voting reports that were generated during the legislative session by the Office of the Attorney General at the request of counsel for every plan that may have been considered by the Legislature."  Texas Resp. at 10. "[T]hese reports were generated at the request of counsel and reflect the mental impressions,

---

[13] While Texas argues that the "statute provides strong evidence that the legislators believed their communications with [the Texas Legislative Council] to be protected by the attorney-client and legislative privileges," Texas Resp. at 8-9, the statute says no such thing and the habits of the years do not transform "confidentiality" to avoid public inquiry into "attorney-client privilege" when demanded as part of litigation.

strategy, and opinions of counsel developed in anticipation of possible legal disputes related to the proposed redistricting plans."  *Id.*  Texas also claims an attorney-client privilege for "any communications transmitting racially polarized voting reports or summaries of such reports . . . ." *Id.*

These descriptions are far too vague to make any determination of privilege.  Does Texas mean that legislative staffers ("counsel") asked for the preparation of racially polarized voting reports and that (non-lawyer) Todd Giberson in the OAG prepared the reports but the reports themselves somehow reflect "opinions of counsel" (presumably in the OAG, not legislative staffers) that were prepared at an unknown time but in anticipation of litigation?  And that "any communications" to forward such reports or summaries were sent by unnamed persons in the OAG to unnamed persons in the Legislative Branch of State government who were within an attorney-client relationship with the OAG?  Attorney-client relationships in a government environment are complicated.  Government lawyers usually represent government institutions, not persons.  Texas may have a different set of relationships within its State Government but none of these complexities is explained by the description Texas provides.

The information that Texas has presented to the Court cannot support any conclusion as to whether the racially polarized reports and/or summaries are protected by the attorney-client privilege or work-product doctrine.  The question is too important for a hasty conclusion.  Thus, the Court invites Texas to support its argument, if it chooses to do so, with more specificity — explaining the relationship of the OAG to the State Legislature generally and

to individual legislators, the identities of authors and recipients,[14] and the specific nature of the communications that might make them privileged.

### III

The motions of the Davis Intervenors and the Texas Latino Redistricting Task Force will be granted. The motion of the United States will be granted in part and denied in part without prejudice, subject to further evidentiary support from Texas on a schedule to be proposed by the parties should Texas wish to proceed. A memorializing Order accompanies this Memorandum Opinion.


Date: January 2, 2012                              _____/s/_____

                                                   ROSEMARY M. COLLYER
                                                   United States District Judge

---

[14] Again, the Court notes that the attorney-client privilege does not usually protect a client's identity. *See BDO Seidman*, 337 F.3d at 811.