**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STATE OF TEXAS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 11-1303** |
| ) | **(TBG-RMC-BAH)** |
| **UNITED STATES OF AMERICA,** ) | |
| **and ERIC H. HOLDER, in his** ) | |
| **official capacity as Attorney General** ) | |
| **of the United States** ) | |
| ) | |
| **Defendants, and** ) | |
| ) | |
| **Wendy Davis, *et. al.*,** ) | |
| ) | |
| **Intervenor-Defendants.** ) | |
| ) | |

**MEMORANDUM OPINION**

Before: GRIFFITH, *Circuit Judge*, COLLYER and HOWELL, *District Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH, in which *District Judge* HOWELL

joins and *District Judge* COLLYER joins all except section III.A.3. Separate opinion for the Court

with respect to retrogression in Congressional District 25 filed by *District Judge* HOWELL, in

which *District Judge* COLLYER joins.

Dissenting opinion with respect to retrogression in Congressional District 25 filed by

*Circuit Judge* GRIFFITH.

Appendix filed by *District Judges* COLLYER and HOWELL, in which *Circuit Judge*

GRIFFITH joins.

Opinion for the Court by GRIFFITH, *Circuit Judge*:

**Table of Contents**

I.   Background ............................................................................................................. 3

II.  Principles of Section 5 Analysis ......................................................................... 5

   A.   Retrogression ................................................................................................ 5

      1.   Texas's Burden of Proof ........................................................................ 7

      2.   Election Analysis Methodologies ......................................................... 8

         a.   Types of Elections ........................................................................ 8

         b.   Election Analysis Sample Sets .................................................. 11

      3.   Statewide Retrogression Analysis ...................................................... 13

      4.   Coalition and Crossover Districts ...................................................... 18

         a.   Section 5 Analysis ...................................................................... 18

         b.   Standard of Proof ...................................................................... 22

   B.   Discriminatory Intent ................................................................................ 25

III. Congressional Plan .............................................................................................. 27

   A.   Retrogression in the Congressional Plan ................................................. 27

      1.   Congressional District 27 .................................................................... 29

      2.   Congressional District 23 .................................................................... 29

      3.   Retrogression with New Congressional Seats .................................... 34

   B.   Discriminatory Intent in the Congressional Plan ................................... 38

IV.  State Senate Plan .................................................................................................. 43

   A.   Retrogression in the Senate Plan .............................................................. 43

   B.   Discriminatory Intent in the Senate Plan ................................................ 45

V.   State House Plan ................................................................................................... 51

   A.   Retrogression in the State House Plan ...................................................... 51

      1.   Alleged Retrogressive Districts .......................................................... 51

         a.   State House District 33 .............................................................. 51

         b.   State House District 35 .............................................................. 53

         c.   State House District 41 .............................................................. 55

         d.   State House District 117 ............................................................ 58

         e.   State House District 149 ............................................................ 60

         f.   State House Districts 26, 106, and 144 ..................................... 66

      2.   Alleged New Ability Districts .............................................................. 67

   B.   Discriminatory Intent in the State House Plan ....................................... 70

VI.  Conclusion ............................................................................................................ 72

The latest Census reports that since 2000 the population of Texas grew by over four million. This dramatic increase required the Texas legislature to create new voting districts for the four seats added to the State's congressional delegation, U.S. CONST. art. I, § 2, cl. 3; *id.* amend. XIV, § 2, and draw new boundaries for the state and congressional voting districts to comply with the mandate of one-person, one-vote, *see Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003).

Because Texas is a covered jurisdiction under section 5 of the Voting Rights Act of 1965 (VRA), 42 U.S.C. § 1973, the Attorney General of the United States or a three-judge panel of this Court must approve, or "preclear," any redistricting plan before it can take effect. *Id.* § 1973c(a). Texas chose not to seek administrative preclearance and instead seeks from this Court a declaratory judgment that its redistricting plans will neither have "the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [language minority group]." *Id.* The United States opposes preclearance of the redistricting plans for Texas's congressional delegation and the State House of Representatives, but has no quarrel with the plan for the Texas Senate. Seven Intervenors raise a variety of challenges that collectively encompass all three plans. We conclude that Texas has failed to show that any of the redistricting plans merits preclearance.[1]

## I.   Background

On July 19, 2011, Texas filed a complaint in this Court seeking a declaratory judgment that its newly enacted redistricting plans for the U.S. House of Representatives (Plan C185 or

---

[1] Texas sought declaratory judgment that the three plans comply with section 5 in counts two, three, and four of the complaint. In its first count, Texas also sought from this Court preclearance of its redistricting plan for the State Board of Education. No party objected to the plan, either in their written answers or during a conference call the Court held with the parties on September 21, 2011. With no opposition and satisfied that the State Board of Education plan complies with section 5, we granted preclearance for that plan on September 22, 2011. *See* Minute Entry Order, Sept. 22, 2011.

Congressional Plan), the Texas House of Representatives (Plan H283 or House Plan), and the Texas Senate (Plan S148 or Senate Plan) comply with section 5 of the VRA. This Court has been properly convened as a three-judge court, 28 U.S.C. § 2284; 42 U.S.C. § 1973c(a), and we took jurisdiction under 42 U.S.C. § 1973c and 28 U.S.C. §§ 1346(a)(2), 2201. After the United States and several Intervenors[2] filed answers, Texas moved for summary judgment for all three plans on September 14, 2011. We heard argument on the motion on November 2, 2011, and issued an order denying summary judgment on November 8, 2011. Our memorandum opinion followed on December 22, 2011.

   The same three redistricting plans have been challenged under section 2 of the VRA before a three-judge district court in the Western District of Texas. The State's population growth and the addition of four seats to its congressional delegation make it impossible for Texas to conduct elections using the district boundaries last approved under section 5. Our denial of Texas's motion for summary judgment required the district court in the section 2 litigation to draw interim maps for the State's fast-approaching primaries and the ensuing general election. After the Supreme Court invalidated those maps, *see Perry v. Perez*, 132 S. Ct. 934 (2012), the court issued a second set, which have not been challenged. *See* Feb. 28, 2012 Order, *Perez v. Perry*, No. 11-cv-360 (W.D. Tex. filed May 9, 2011), ECF No. 681 (Congressional Plan interim map); Feb. 28, 2012 Order, *Perez*, No. 11-cv-360, ECF No. 682 (House Plan interim map); Feb.

---

[2] This Court has granted Defendant-Intervenor status to seven parties, each of whom challenges various aspects of some or all of Texas's proposed plans in their capacities as individual voters, elected state representatives, or civil rights advocacy groups. The Davis Intervenors are Texas State senators and representatives from districts in the Fort Worth area. The Mexican American Legislative Caucus is a caucus in the Texas House of Representatives. The Gonzales Intervenors are a group of Hispanic and Black Texas voters. The Texas Legislative Black Caucus is composed of seventeen members of the Texas House of Representatives. The Texas Latino Redistricting Task Force is a group of Hispanic organizations focusing on redistricting and voter registration. The Texas State Conference of NAACP Branches and the League of United Latin American Citizens are civil rights and advocacy groups concerned with minority voting rights in Texas.

28, 2012 Order, *Davis v. Perry*, No. 5:11-cv-00788 (W.D. Tex. filed May 9, 2011), ECF No. 141 (Senate Plan interim map).

Meanwhile, after expedited discovery, this Court sat for trial January 17-26, 2012, with closing arguments on January 31, 2012.[3] The voluminous trial record includes evidence taken in open court, party exhibits, expert reports, post-trial briefing, and designated portions of the transcript from the section 2 trial in Texas.[4] After reviewing this record and carefully considering the arguments of all parties, we now deny Texas preclearance and enter judgment for the defendants.

In the discussion that follows, we do not recount the extensive background of the Voting Rights Act or of this case. Much of that is contained in our opinion at summary judgment. In addition, we do not repeat many of the factual findings set out in the appendix to this opinion. Using the framework for applying section 5 described in our summary judgment opinion, we first address a series of legal issues that remain outstanding after trial about what section 5 requires for preclearance. Then, we examine the Congressional, Senate, and House Plans in turn.

## II.  Principles of Section 5 Analysis

### A. Retrogression

Texas must show that its redistricting plans have neither the effect nor the purpose of abridging minority voting rights. 42 U.S.C. § 1973c(a). We will take up the "purpose" prong below in section B. The goal of the "effect" prong is "to insure that no voting-procedure changes

---

[3] Given the parties' unanimous desire to proceed quickly to trial but faced with scheduling constraints from the panel members' previously scheduled proceedings, the Court adopted a trial schedule in which all three judges heard evidence during the first four days of trial and two judges heard evidence the last four days, with the third judge reviewing the evidentiary record and transcript from those days. All three judges were present for closing arguments. The Court divided trial time so that Texas and the United States and the Intervenors would have equal time for argument when all three judges were physically present. No party raised an objection to these arrangements.

[4] The full record in this case runs many thousands of pages, including over a thousand exhibits introduced by the parties.

would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise," *Beer v. United States*, 425 U.S. 130, 141 (1976), regardless of whether the change was intended to do so. "Effective exercise," in turn, has long been understood to include not only the "ability of minority groups to participate in the political process," but also the ability "to elect their choices to office." *Id.* (quoting H.R. REP. NO. 94-196, at 60 (1975)). In the most recent reauthorization of the VRA, Congress further reinforced the meaning of the effect prong by stating that minority voters' "ability to elect" their candidates of choice is the appropriate measure of whether a proposed change will be retrogressive. *See* 42 U.S.C. § 1973c(b) (stating that section 5 blocks voting changes that diminish minority citizens' "ability . . . to elect their preferred candidates of choice"), *id.* § 1973c(d) (explaining that the "purpose of subsection (b) . . . is to protect the ability of [minority] citizens to elect their preferred candidates of choice").

As we explained in our summary judgment opinion, ensuring that a proposed plan will not undo the gains minority voters have achieved in electoral power requires a multi-factored, functional analysis. *Texas v. United States*, 831 F. Supp. 2d 244, 262-64 (D.D.C. 2011). A single-factor inquiry, such as the test Texas proposed relying on racial and ethnic population statistics alone, is inconsistent with precedent and too limited to provide an accurate picture of the on-the-ground realities of voting power.[5] *Id.*; *see also, e.g.*, *Ashcroft*, 539 U.S. at 480 ("The

---

[5] Indeed, analysis of the full record developed at trial has made it more clear that the test Texas initially proposed is insufficient to measure whether minority voters have an ability to elect. Several districts in the proposed plans show that population statistics alone rarely gauge the strength of minority voting power with accuracy. For example, the discussion that follows shows that Congressional District 23 and House District 117 were selectively drawn to include areas with high minority populations but low voter turnout, while excluding high minority, high turnout areas. Such districts might pass a retrogression analysis under Texas's population demographics test (40% Black Voting Age Population or 50% Hispanic Citizen Voting Age Population as sufficient to establish ability status), even though they were engineered to decrease minority voting power. The 65% presumption of ability status we employ, discussed further below, is less susceptible to such problems. Our threshold is significantly higher than Texas's proposed 50% test, and where it is met a district is only presumptively an ability district, not conclusively

ability of minority voters to elect a candidate of their choice is important but often complex in practice to determine."). We do not repeat here the rationale for our conclusion, but instead address the additional arguments raised at trial about the appropriate standard to determine retrogression.

### 1. Texas's Burden of Proof

Texas bears the burden of proving by a preponderance of the evidence that its redistricting plans are not retrogressive.[6] *City of Pleasant Grove v. United States*, 479 U.S. 462, 469 (1987). Texas does not deny that it bears this burden. Instead, relying on the Supreme Court's observation that a state is entitled to select its "own method of complying with the Voting Rights Act," *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) (plurality opinion), Texas claims that "the flexibility to choose one theory of effective representation over the other," *Ashcroft*, 539 U.S. at 482, gives it significant latitude in how to prove its case. Tex. Post-Trial Br. 3.

We agree that section 5 does not interfere with many of the policy judgments a state must make during redistricting, such as whether to retain an ability district — a district in which minority citizens have the ability to elect their preferred candidates — or create a new one elsewhere. Yet Texas takes this point too far, claiming that the prerogative to choose among methods of redistricting extends to the type of evidence we should use to measure retrogression.

---

so. The 65% presumption may be rebutted by other factors, such as voter turnout, that indicate the district is not effective for minority voters.

[6] Significantly, the State's expert, Dr. John Alford, declined to offer an opinion on whether the enacted plans are retrogressive, even when this Court directly questioned him on the point. He testified that his analysis provided only the first steps in the more complicated inquiry this Court must undertake, refused to offer an opinion on the number of districts protected by section 5 in the existing and enacted plans, and stated he was not offering an answer to the question whether the enacted plans preserve the current degree of ability to elect. *See* Trial Tr. 63:21-67:10, 94:21-96:25, Jan. 24, 2012 PM. The State's failure to produce testimony showing the enacted plans are not retrogressive may well be sufficient for us to find that Texas has not met its burden of proof under section 5. Nevertheless, because we find that the trial record is sufficient to show that the enacted plans cannot be precleared, this failing is not the only ground for our conclusions.

For example, Texas argues that we must defer to its decision to use the results of statewide elections to measure compliance with section 5. *Id.* at 5. We disagree. *Ashcroft* holds that states may choose between "theor[ies] of *effective* representation," 539 U.S. at 482 (emphasis added), but gauging effectiveness is a legal judgment that we must make. Texas is entitled to advocate its preferred methods of measuring minority voting strength, and we address those arguments below, but we need not defer to a state's legal theory on how best to measure minority voters' ability to elect. That is a measure at the heart of the preclearance analysis that section 5 has left to the Attorney General or the judiciary.

### 2. Election Analysis Methodologies

The parties have submitted reports and testimony from fourteen experts in fields such as redistricting, election analysis, voting rights law, and the history of voting discrimination in Texas. Although we do not find the analysis of any one expert sufficient to guide our retrogression inquiry, we rely most heavily on the reports and testimony of Dr. Lisa Handley, expert for the United States; Dr. Richard Engstrom, expert for the Texas Latino Redistricting Task Force (TLRTF); and Dr. Stephen Ansolabehere, expert for the Gonzales Intervenors. We find their methodologies sound and their conclusions helpful to our analysis of the State's redistricting. To explain our use of these experts we address two areas of disagreement between the parties about the merits of the various approaches the experts use: which type of elections to examine and the appropriate sample sets to use.

### a.   Types of Elections

Endogenous analysis examines the results of elections held within a district to determine how often minority-preferred candidates succeed.[7] *See, e.g.*, Defs.' Ex. 326, Dr. Lisa Handley, A

---

[7] All parties have agreed throughout this litigation that minority voters in Texas vote overwhelmingly Democratic, and thus there is generally no dispute about the identity of minority-preferred candidates in a given

Section 5 Voting Rights Analysis of the Proposed Texas State House Plan 3 [hereinafter Handley House Rep.]. Because endogenous analysis is based on actual election results within a single district, it is necessarily retrospective. It can only be used to determine whether a district in the existing, or benchmark, plan has an ability to elect. It cannot be used to assess whether a proposed district does as well, because a proposed district has not yet conducted any district-wide elections.

Exogenous election analysis examines how minority-preferred candidates fared in a particular district in statewide or national elections. *See, e.g.*, Pl.'s Ex. 175, Direct Written Test. of Dr. John Alford 5-6 [hereinafter Alford Rep.]. Take the 2008 presidential election as an example. In a state where minority voters almost always prefer Democratic candidates, exogenous election analysis suggests that minority voters lack an ability to elect in a benchmark district carried by John McCain over Barack Obama. Because exogenous analysis considers results from elections that occur across all districts in a state, such analysis allows comparison between benchmark and proposed districts. Precinct-level data from statewide or national elections can show if the minority-preferred candidate won the benchmark district, and by assembling, or "reconstituting," the precinct-level returns into a district's proposed new shape, exogenous election analysis can indicate whether the minority-preferred candidate would have won in the proposed district as well.

Texas urges us to consider exogenous election analysis alone, *see* Tex. Post-Trial Br. 4-5, but we conclude that endogenous results are often more probative of ability to elect. As Dr.

---

district. *See, e.g.*, Trial Tr. 12:8-14, Jan. 17, 2012 AM (State's opening statement, noting that "in virtually all of the elections in fact, all of the elections you're going to hear about during this trial" the Hispanic-preferred candidate was the Democrat). In light of the parties' agreement on this point, as a general matter we do not address the racially polarized voting data that makes this point. In the few districts in which there is a dispute over who is the candidate of choice of minority voters, discussed further below, we credit Dr. Handley's assessment, which is based on her analysis of racial bloc voting in the districts.

Engstrom explained, exogenous elections are "not a good basis for predicting the specific number of elections in many new districts that will result in Hispanic preferred candidates winning," partly because there are significant contextual differences between exogenous and endogenous elections. Defs.' Ex. 747, Rebuttal Report of Dr. Richard Engstrom 6 [hereinafter Engstrom Reb. Rep.]. Likewise, Dr. Handley concluded that "the most essential piece of information" when determining benchmark ability districts "is whether minority voters have been successful at electing their preferred candidates to the legislative office at issue in the district." Defs.' Ex. 794, Rebuttal Report of Dr. Lisa Handley to Supplement Expert Report of Dr. John Alford 3 [hereinafter Handley Reb. Rep.]. Candidates in endogenous elections live in a particular district and focus their campaigns on local voters. Candidates in statewide elections are likely to make an appeal with a less direct connection to voters in that district. Nationwide contests are even more attenuated. Local connections and direct campaigning, then, may allow a minority-preferred candidate to win an endogenous election in a district the minority-preferred candidate for statewide office could not carry. We agree with Dr. Engstrom and Dr. Handley. Given the numerous and difficult-to-quantify factors that go into determining ability to elect, the best evidence is whether and how often minority voters have actually elected their candidate of choice to the position at issue, not the indirect proxy offered by exogenous analysis.

Texas argues that endogenous analysis is an "impracticable" tool because it is available only for benchmark plans and does not provide the "common unit of measurement" available with exogenous results. Tex. Post-Trial Br. 4. As we have stated, we agree that endogenous elections are not well suited to prospective analysis, but when predicting the impact of redistricting changes on minority voters' ability to elect, more information is better than less. We should not discount the powerful evidence of minority voting power that endogenous elections

provide in favor of a single tool that may be a less accurate gauge. When endogenous and exogenous analyses yield different results, we will give special attention to other relevant characteristics of the voting district.

Texas argues that endogenous analysis may overvalue minority voting power and undervalue the advantage of incumbency in districts where the minority-preferred candidate has been repeatedly reelected. *See id.* at 5. We disagree with the premise that an incumbent's advantage does "not bear on the ability-to-elect inquiry." *Id.* The advantage incumbents enjoy during reelection campaigns is a factor that minority voters, like any other voters, often use to help elect their preferred candidate. Ability to elect is not less real simply because subsequent elections are easier to win than the first. Texas raises the more specific objection that endogenous results may be misleading in a district in which ability status is closely contested if a long-term incumbent plans to retire. *Id.* Yet as our analysis below bears out, our finding that endogenous elections are particularly probative evidence does not mean that a high endogenous score automatically implies ability status. Careful consideration of all factors matters, especially in close cases.

We thus see no reason to exclude all endogenous election data from our analysis, nor to weigh exogenous data more heavily. Both types of data provide information about whether minority voters are or will be able to participate in the political process.

### b.  Election Analysis Sample Sets

The experts also vary widely in which elections they used for their sample sets. All use a similar methodology for their exogenous analysis. Starting with the boundaries in the benchmark plan, they count the number of times the minority-preferred candidate carried the district. Reconfiguring the districts by regrouping precincts as called for in the enacted plan, their

analyses then look to see how many times the minority-preferred candidate would have carried that district. Outcomes are determined by inputs, of course, and whether the analysis shows an ability to elect turns on variations in the sample set such as the number of elections chosen, the length of time they span, whether the sample is weighted toward more recent contests, and the offices at stake. For example, Texas's expert, Dr. Alford, relies on reconstituted election results from a set of ten statewide elections weighted toward more recent years provided by the Texas Office of the Attorney General (the OAG 10). *See* Alford Rep. 9 tbl.2.[8] Texas argues that we should give greatest weight to these exogenous results because they used a larger data set and relied more heavily on recent elections than did any other expert in the case.[9] Tex. Post-Trial Br. 5.

Although we agree that a larger data set generally improves accuracy, we are not persuaded that the OAG 10 is the best indicator of minority voting strength. A preference for recent elections may in fact distort the results. Dr. Handley, the expert for the United States, cautions against giving more weight to some years than others. To do so, she warns, would allow atypical election years to skew the picture of long-term minority voting power. *See* Handley Reb. Rep. 4 n.6. This caution is especially appropriate here because three of the OAG 10 elections are from the 2010 election cycle. As the evidence in this case shows, 2010 was an unusual year with

---

[8] The OAG 10 includes one 2002 contest; two contests each from 2004, 2006, and 2008; and three contests from 2010. Dr. Alford's analysis includes results using all ten of these contests, and also using only the five most recent elections on this list. *See* Alford Rep. 8-9.

[9] Texas's reliance on the OAG 10 exogenous analysis is a litigation position; the record is clear that this functional election analysis played little to no role in the map-drawing process itself. The OAG did not identify which districts were protected in the benchmark plans or even how many benchmark ability districts existed. In fact, the only evidence that analysis was performed regarding these critical facts was testimony from the primary House mapdrawer, Gerardo Interiano, that he made an effort to identify Hispanic ability districts in the benchmark. Trial Tr. 25:5-26:10, Jan. 17, 2012 PM. Both Interiano and the other main mapdrawer, Ryan Downton, testified that they did not look at the OAG 10 analysis of the benchmark and enacted districts until their work was essentially complete. *See id.* at 57:17-25, Jan. 18, 2012 AM; Trial Tr. 14:51-52, *Perez*, No. 11-cv-360, Sept. 12, 2011. And there is no evidence that the legislators and mapdrawers made any modifications to the proposed district lines when they did consult the OAG 10 analysis late in the process.

low Democratic turnout in which Republicans won several seats that had long been held by Democrats. *See, e.g.*, Defs.' Ex. 776, Seliger Dep. 15:1-7, Sept. 1, 2011, *Perez*, No. 11-cv-360 [hereinafter Seliger San Antonio Dep.] It is too soon to tell if 2010 was an aberration or marked the start of a lasting change in Texas politics.

Our concerns with the OAG 10 extend to the other sample sets used by the parties' experts. Dr. Engstrom's exogenous election sample also places greater weight on recent years, considering elections from only 2006-2010. *See* Defs.' Ex. 726, Supplemental Expert Report of Dr. Richard Engstrom 2 [hereinafter Engstrom Suppl. Rep.]; Defs.' Ex. 799, Dr. Richard Engstrom Analysis: Retrogression in State's Adopted House Plan [hereinafter Engstrom Chart]. And all the experts in this case use relatively small sample sets. Dr. Handley, for example, uses only five elections from 2002-2010, and Dr. Engstrom uses just seven general elections. Handley House Rep. 3-4; Engstrom Suppl. Rep. 2; Engstrom Chart. Where there are so many elections from which to choose — the record contains analysis using races ranging from governor to railroad commissioner — it is hard to assess the merits of any one expert's data when the sample sets are small and often do not overlap. In short, we are uncomfortable relying exclusively on the exogenous analysis of any single expert. Our solution is to consider the exogenous results from all three of these sources — the OAG 10, Dr. Handley, and Dr. Engstrom  — as well as the analysis for the Congressional Plan conducted by Dr. Stephen Ansolabehere, the expert for the Gonzales Intervenors, finding all to be probative but none dispositive.

### 3. Statewide Retrogression Analysis

As the Supreme Court has made clear, our analysis of minority voting power "must encompass the entire statewide plan as a whole." *Ashcroft*, 539 U.S. at 479. Section 5 is not concerned with the location of particular ability districts, but rather with whether the enacted

plan, in its entirety, preserves minority voters' ability to elect. In other words, section 5 allows a state to dismantle an ability district as long as it offsets that loss by drawing a new ability district elsewhere.

But Texas asks us to expand this principle to a point that is inconsistent with section 5. Texas's expert submitted two reports to the Court, one at summary judgment and another at trial. His first report counted any district in which the number of registered Hispanic voters exceeded 50% or the Black Voting Age Population (BVAP) exceeded 40% as an ability district, without giving attention to actual election performance. *See Texas*, 831 F. Supp. 2d at 263 n.23. After we rejected this single-factor test, Dr. Alford changed tack in his trial report, which uses what he calls a "statewide functional analysis." *See* Alford Rep. 7. Rather than determine if particular districts are ability districts, Dr. Alford's latest approach examines changes in the *degree* of minority voting power across the entire plan. Using the benchmark ability districts the United States listed, Dr. Alford counted every instance in which a minority-preferred candidate carried the district in an exogenous election. He then counted how many times the minority-preferred candidate would have carried the district in the enacted plan. If the total number of "wins" in the enacted plan meets or exceeds the number in the benchmark, Dr. Alford concludes that the plan is not retrogressive. *See id.* at 7-12. Dr. Alford contrasts his statewide approach to what he calls the "binary" approach of every other expert in the case. Those experts examine each district individually, using exogenous results as one factor when determining if a district is an ability district. *See id.* at 12-13. They then compare the number of ability *districts* in the benchmark map with the number in the proposed plan. Dr. Alford's method counts election *victories* across all districts and does not label a district as "ability" or not. Texas argues this approach is superior

to the "blunt technique" of the binary method because it "captures the *degree* of minority voting strength across all relevant districts." Tex. Post-Trial Br. 6.

Perhaps, but this approach is a variation on the type of retrogression analysis that Congress rejected when it amended the VRA in 2006. In *Georgia v. Ashcroft*, 539 U.S. 461 (2003), the Supreme Court concluded that courts "should not focus solely on the comparative ability of a minority group to elect a candidate of its choice," but instead should consider the "totality of the circumstances" regarding minority participation in the electoral process. *Id.* at 479-80. Specifically, the Court concluded that states could draw maps containing a combination of two different types of districts to satisfy section 5: traditional majority-minority districts, and "influence districts," which are not ability districts, but rather those in which minority voters play a "substantial, if not decisive, role in the electoral process." *Id.* at 480-83.

Congress rejected this holding in 2006 when it reauthorized section 5, making it clear that retrogression is not concerned with the degree of influence minority voters exert, but with their ability to elect their preferred candidates. *See* 42 U.S.C. § 1973c(b) (stating that voting changes must not diminish minority citizens' "ability . . . to elect their preferred candidates of choice"), *id.* § 1973c(d) (defining subsection (b)'s purpose as protecting "the ability of [minority] citizens to elect their preferred candidates of choice"). The House Report explained that the 2006 amendments were a response to *Georgia v. Ashcroft*, which allowed "the minority community's own choice of preferred candidates to be trumped by political deals struck by State legislators purporting to give 'influence' to the minority community while removing that community's ability to elect candidates." H.R. REP. NO. 109-478, at 69 (2006). Congress decided that "[p]ermitting these trade-offs is inconsistent with the original and current purpose of Section 5." *Id.*; *see also id.* at 68-72; S. REP. NO. 109-295, at 18-20 (2006) (stating that the amendments

"clarify that [section 5] protects the ability of minority voters 'to elect their preferred candidates of choice,'" *id.* at 19). Congress does not view "ability to elect" in degrees; states may not add up districts in which minority voters have "partial" ability to elect to satisfy section 5. Instead, Congress views ability status as an on-off switch: minority voters either have an ability to elect in a district or they do not.

Endorsing Dr. Alford's analysis would be a return to the approach Congress rejected in 2006. Consider, for example, a benchmark map with three districts. In two of the districts, minority voters elect their preferred candidates in six out of ten elections in a sample set, but in the third, they fail to win a single election. In all three districts in the enacted plan, minority-preferred candidates win in four out of the ten elections. A traditional binary approach would likely conclude that the benchmark map has two ability districts (where minority voters can elect their candidate of choice more often than not), and the enacted plan has no ability districts, just three influence districts. Such a plan would be clearly retrogressive under the current version of section 5. Yet Dr. Alford's approach would show no retrogression because the total number of minority electoral victories remains the same (6 + 6 + 0 = 12 in the benchmark; 4 + 4 + 4 = 12 in the enacted).

Texas argues that Dr. Alford's approach yields better policy results, but such determinations belong to Congress, not the courts. In any event, the "benefits" Texas touts are illusory. Texas argues that the binary approach "ignores gradations in minority abilities to elect and gives States no credit for improving electoral performance in districts that stay above or below the ability-to-elect cutoff." Tex. Post-Trial Br. 6.[10] In other words, Texas seeks credit for

---

[10] This observation is accurate, but we also note that the binary approach runs both ways: under a retrogression analysis, a State may not claim credit for strengthening an ability district, but neither is it penalized for reducing minority voting power in districts that are trending toward minority ability status but have not yet achieved it, as we discuss below with respect to HDs 26, 106, and 144.

strengthening an already-performing district from, say, six out of ten victories to ten out of ten. Yet giving credit in a scenario like this would allow Texas to use those four "additional" victories to offset a four-election decrease elsewhere. Such an approach would create a legal tool to dismantle ability districts as long as the state increases the effectiveness of others. In short, it would give states credit for packing minority voters into districts. A starker example would be a plan in which six benchmark districts perform for minority voters nine out of ten times, but perform ten out of ten times in the enacted plan. Statewide functional analysis would allow a state to use this six-election "increase" in minority effectiveness to weaken or even destroy ability districts in other parts of the state.

We also find it significant that Dr. Alford can point to no other advocates of his approach within the well-populated field of voting rights and redistricting. Statewide functional analysis is not only foreclosed by the 2006 amendments, but it lies outside accepted academic norms among redistricting experts. *See, e.g.*, Engstrom Reb. Rep. 2-6 (critiquing Dr. Alford's approach and noting he was "not aware of any analysis, prior to this one by Dr. Alford, by any expert that completely ignores the results of endogenous elections in a benchmark plan in a retrogression analysis," *id.* at 2); Handley Reb. Rep. 2-6 (critiquing Dr. Alford's approach).

Moreover, statewide functional analysis would be much more difficult to administer than the already fact-intensive binary approach because courts would need to make even more precise findings than whether a district is or is not an ability district. Courts would need to determine, for example, the difference between districts with effectiveness levels of 60% and 70%. Dr. Alford claims he can make these fine distinctions based on a district's electoral performance in the limited set of elections that he chose. Yet as the multitude of experts in this case demonstrates, there is no agreed-upon method to choose how many elections are necessary to demonstrate

voting strength, much less which elections and over how long a period of time. We lack confidence that we, or any court, would be able to make findings at the level of precision Dr. Alford's approach requires.

Finally, we reject Texas's argument that refusing to accept statewide functional analysis would increase the "substantial federalism costs" of preclearance by further limiting state flexibility, at the risk of rendering section 5 unconstitutional.[11] *See* Tex. Post-Trial Br. 7 (quoting *Reno v. Bossier Parish Sch. Bd.* (*Bossier II*), 528 U.S. 320 (2000)) (internal quotation marks omitted). The constitutional avoidance canon is no aid to Texas because we are not faced with two competing yet permissible interpretations of section 5. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (describing the interpretative presumption "that a statute is to be construed *where fairly possible* so as to avoid substantial constitutional questions" (emphasis added)). As we have just discussed, retrogression analysis under section 5 as amended limits our analysis to ability to elect and does not permit us to weigh degrees of effectiveness. We cannot adopt an interpretation at odds with the statutory text to avoid possible constitutional concerns.

### 4. Coalition and Crossover Districts

#### a. Section 5 Analysis

In a crossover district, a minority group "is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13. In a coalition district, two or more minority groups work together to elect their preferred candidate. *Id.* We held at summary

---

[11] Because Texas has not raised the argument, we have no opportunity in this case to consider whether the federalism costs of preclearance, when weighed against current conditions, call into question the constitutionality of section 5's remedial scheme. *Cf. Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202-05 (2009) (noting the Court's serious concerns that "current needs" may no longer justify the burdens preclearance imposes on covered jurisdictions). The constitutionality of section 5 was neither briefed nor argued to us, and we express no opinion on this significant point. In fact, our Circuit has recently held that section 5 is constitutional. *See Shelby Cnty. v. Holder*, 679 F.3d 848 (D.C. Cir. 2012).

judgment that because existing "coalition and crossover districts provide minority groups the ability to elect a preferred candidate, they must be recognized as ability districts in a Section 5 analysis of a benchmark plan." *Texas*, 831 F. Supp. 2d at 267-68. Texas asks us to reconsider our ruling in light of *Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality opinion), and the Supreme Court's recent decision in *Perry v. Perez*, 132 S. Ct. 934 (2012). Having considered the parties' arguments, we reaffirm our conclusion that coalition and crossover districts are protected under section 5.

The Supreme Court has never directly addressed whether section 5 protects coalition or crossover districts. A close reading of *Georgia v. Ashcroft*, however, suggests that it does. The Court described districts with "coalitions of voters who together will help to achieve the electoral aspirations of the minority group," 539 U.S. at 481, concluding that such districts count as "effective representation" for purposes of section 5, just like "safe majority-minority districts." *Id.* at 480-82 ("Section 5 gives States the flexibility to choose one theory of effective representation over the other." *Id.* at 482.).[12] The Court's statements in *Georgia v. Ashcroft* are reinforced by the House Report accompanying the 2006 amendments, which spoke of coalition districts as a type of ability district: "Voting changes that leave a minority group less able to elect a preferred candidate of choice, either directly *or when coalesced with other voters*, cannot be precleared under Section 5." H.R. REP. NO. 109-478, at 71 (emphasis added).[13]

---

[12] Although the 2006 amendments rejected the portion of *Georgia v. Ashcroft* that directed courts to consider factors other than ability to elect in their retrogression analyses, this passage is from the opinion's earlier section describing ability to elect.

[13] As we noted at summary judgment, Senator Kyl wrote separately a week after the passage of the amendments "to explain why [he] believe[d] that Congress *cannot* require that state or local governments create or retain influence or coalition districts," S. REP. NO. 109-295, at 22 (additional views of Senator Kyl), but those individual views were filed a week after the VRA had passed both houses of Congress, were not considered by Congress prior to the vote, and were neither adopted nor affirmed by Congress in its findings accompanying the 2006 amendments. *See Texas*, 831 F. Supp. 2d at 267 n.30.

In addition, the Court's jurisprudence under section 2, a distinct yet related provision of the VRA mandating equal opportunity for minority voters to participate in the electoral process, supports protecting coalition and crossover districts under section 5. The Court has long acknowledged the existence of coalition and crossover districts, recognizing at times that they can provide the means for minority voters to elect their candidates of choice. *See Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994) (describing "communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district *in order to elect candidates of their choice*" (emphasis added)); *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993) (describing a district in which a minority group was not large enough to elect its preferred candidate operating alone but could do so if it "attract[ed] sufficient cross-over votes from white voters").[14] In fact, the Court has suggested that such districts will become more common over time, replacing majority-minority districts as waning racial polarization makes it easier for minority voters to elect their preferred candidates even when they do not make up the majority of a district's voters. *See De Grandy*, 512 U.S. at 1019-20. In other words, "ability" may look different now than it did when the VRA was first enacted. Our responsibility to protect the rights secured by section 5 calls that we be sensitive to these new, but real, forms of minority voting power.

Texas argues that the Court's decision in *Bartlett* precludes recognizing coalition and crossover districts under section 5. *See* Tex. Post-Trial Br. 8. But the *Bartlett* Court only concluded that section 2 does not compel states to draw *new* crossover districts under section 2, not that states can disregard the existence of established crossover and coalition districts in a

---

[14] In lower court section 2 cases, courts have also frequently referred to coalition and crossover districts using the same adjectives used to describe traditional majority-minority districts, such as "performing," "effective," and "ability." *See, e.g., Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 904 (D. Ariz. 2005) (describing this trend).

section 5 inquiry.[15] *See Texas*, 831 F. Supp. 2d at 267-68. Significantly, *Bartlett* noted that it did not reach the question of whether states could choose to draw crossover districts "as a matter of legislative choice or discretion," and cited *Georgia v. Ashcroft* to show that drawing such districts may be the most effective way to strengthen minority voting power. *Bartlett*, 556 U.S. at 23. Far from revealing skepticism or hostility toward coalition districts, this language suggests that such districts can increase minority voters' electoral ability, even while holding that states are not required to draw districts maximizing this potential.

Nor do the *Bartlett* Court's concerns under section 2 speak to our task under section 5. Part of the Court's analysis rested on the difficulties of predicting whether a potential coalition would provide minorities with an opportunity to elect. *Id.* at 17. Section 5, by contrast, asks whether an existing coalition has achieved an ability to elect. Section 5 does not call on us to guess the future, but to determine whether there is past evidence of a demonstrated ability to elect. And while section 2 does not demand granting "special protection to a minority group's right to form political coalitions" or "impose on those who draw election districts a duty to give minority voters the most potential, or the best potential, to elect a candidate by attracting crossover voters," *id.* at 15, section 5 mandates that we ensure that "the gains thus far achieved in minority political participation [are] not destroyed," *Beer*, 425 U.S. at 141 (quoting S. REP. NO. 94-295, at 19 (1975)). To be sure, forcing a state to create crossover districts would reach beyond section 2's equality mandate, but nothing in *Bartlett* suggests that courts can turn a blind eye towards a district in which minority voters have already turned electoral opportunity into ability to elect.

---

[15] *Bartlett*'s holding was limited to crossover districts. It did not analyze coalition districts. *See Bartlett*, 556 U.S. at 13-14.

And nothing in *Perez* extends the reasoning in *Bartlett* to section 5. *Perez* held only that the district court had no basis to draw a *new* coalition district under section 2, without addressing the separate question before us: whether preexisting coalition or crossover districts merit protection under section 5. *See Perez*, 132 S. Ct. at 944. Thus, although section 2 does not require states to draw new crossover districts, we read section 5's ban on retrogression to extend protection to districts in which minority voters have demonstrated an ability to elect their preferred candidates via either assembling a coalition or attracting sufficient crossover votes, or both.

### b. Standard of Proof

As we stated in our summary judgment opinion, proving the existence of coalition and crossover districts "require[s] more exacting evidence than would be needed to prove the existence of a majority-minority district." *Texas*, 831 F. Supp. 2d at 268. The discussion that follows explains the test we have applied.

At the outset, the minority group or groups must vote cohesively in coalition and crossover districts, just as they must in protected majority-minority districts. *See Growe v. Emison*, 507 U.S. 25, 41 (1993) (noting that proving political cohesion across an "agglomerated political bloc" — *i.e*, a coalition — "is all the more essential" than the need to prove cohesion within a single minority group).[16] If minority groups split their vote between opposing candidates in the general election, there is by definition no candidate of choice, and the district is not protected under section 5.

---

[16] Texas suggests that the test for proving cohesion across a coalition requires proof that the coalition votes together in primaries, not just general elections. The TLRTF joins Texas's position in its post-trial submissions. *See* TLRTF Response to the Ct.'s Order of Mar. 6, 2012, at 9, ECF No. 219 (relying on Democratic primary results in Congressional District 25 as support for a conclusion that the district is not protected under section 5). As explained in our discussions of Congressional District 25 and House District 149 below, we reject this argument.

While the first inquiry considers whether minority voters have a candidate of choice, the next inquiry is grounded in a different part of section 5: do minority voters have the "ability to elect" their preferred candidate? *See* 42 U.S.C. § 1973c. In other words, are the groups large enough, motivated enough, or influential enough to elect their candidate of choice — and have they in fact done so? This question is in many respects similar to that for majority-minority ability districts. There is no single, clearly defined metric to determine when a minority group has an ability to elect, so we use a multi-factored approach to determine when a coalition or crossover district achieves that ability. *See Growe*, 507 U.S. at 41 (pointing to anecdotal evidence, statistical evidence of minority political cohesion, and racial bloc voting as some of the factors relevant to prove the existence of a coalition district under section 2); *Texas*, 831 F. Supp. 2d at 268 ("[T]here must be discrete data, by way of election returns, to confirm the existence of a voting coalition's electoral power.").

A coalition district is protected under section 5 if there is sufficient evidence to find that minorities vote cohesively and have the ability to elect their preferred candidates. The same two inquiries apply to a crossover district, but the ability-to-elect analysis is more complicated. Although election returns are necessary to show that minority voters in a crossover district have a track record of success — results are the coin of the realm — it is not enough that they simply go along with the electoral decisions of some of the district's Anglo voters.[17] We must also be satisfied that it is the minority voters themselves who have the ability to elect their preferred candidate.

---

[17] The same concern exists in majority-minority ability districts. A minority group that has low election day turnout despite comprising a little over half of the district's voting age population may find itself consistently on the winning side in the district while providing relatively few votes and little influence. Nevertheless, courts have generally presumed that success electing the minority-preferred candidate in a majority-minority district is sufficient to find ability status. That such a presumption is rebuttable illustrates that we are not requiring a different kind of proof for coalition and crossover districts, only more exacting evidence.

The test to establish this ability must be rigorous enough to avoid the scenario Texas describes: that section 5 will be interpreted to protect any district that elects a Democrat, no matter how small its minority population. In other words, that minority voters are needed to win an election does not in itself prove that they have an ability to elect. As an extreme example of this concern, consider a district with a 90% Anglo and 10% minority population. If the Anglo vote splits evenly between Democrats and Republicans and minorities vote overwhelmingly Democratic, then the Democratic candidate will win with approximately 55% of the vote, and the minority vote will properly be viewed as essential to victory every time. Yet this would not be a district in which the minority group has an ability to elect; the Anglos do. Such a district would merely be a Democratic district that happens to contain a minority group. If we were to hold otherwise, then every district that consistently elects a Democrat with the minority vote providing the margin of victory, no matter how small, would qualify for protection under section 5. This would stretch the scope of section 5 too far. A protected crossover district is not created each time Anglos and minorities vote together to elect a candidate.

With respect to both coalition and crossover districts, we require "more exacting evidence" to prove that minority voters have an ability to elect than we do for majority-minority ability districts. *Texas*, 831 F. Supp. 2d at 268. Doing so ensures that we stay within the boundaries of section 5 and protect only those districts in which minority voters have demonstrated their effectiveness. Yet where that standard is met — where minority voters themselves "pull, haul, and trade" to elect their preferred candidates, *De Grandy*, 512 U.S. at 1020 — then the district is one in which minority voters have an ability to elect, and section 5's

safeguards apply.[18]

## B. Discriminatory Intent

In *Reno v. Bossier Parish School Board* (*Bossier II*), 528 U.S. 320 (2000), the Supreme Court considered whether section 5 barred a plan that "would have no retrogressive effect" but "nonetheless . . . was enacted for a discriminatory 'purpose.'" *Id.* at 325. The Court held that it did not, concluding that the purpose prong extended only to intent to retrogress, not to all intentional discrimination. Thus, section 5, the Court wrote, would catch only an "incompetent retrogressor," but offered no recourse against a mapdrawer who intended to discriminate against minority voters using methods that did not create retrogression. *Id.* at 332. In direct response, the 2006 amendments to section 5 clarified that the term "purpose" must be read more broadly and includes "any discriminatory purpose." 42 U.S.C. § 1973c(c); *see also* H.R. REP. NO. 109-478, at 93 (stating that Congress "rejects the Supreme Court's holding in *Reno v. Bossier Parish*"). As a result, we may not preclear any redistricting plan enacted with discriminatory intent.

Texas argues that it should not be required to prove that it lacked any discriminatory purpose. Saddling a state with that burden, so the argument goes, adds too much to the serious federalism costs already imposed by preclearance and could "exceed Congress' enforcement authority under the Fifteenth Amendment and violate the Tenth Amendment." Tex. Post-Trial Br. 17-18. The only way to avoid this problem, Texas claims, is to shift the burden of proof for discriminatory intent from Texas onto the United States and the Intervenors. *Id.* at 18. We acknowledge the substantial federalism costs of section 5, *see Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203-04 (2009) (stating that the preclearance remedy implicates

---

[18] As described further in our discussions of Congressional District 25 below, although the Court agrees on the general standard outlined above, we disagree on the appropriate test to determine when minority voters possess sufficient voting power to have established their ability to elect.

serious federalism concerns), and recognize the difficulty of proving a negative. Yet it is settled law that Texas bears the burden of proving lack of discriminatory intent. *See, e.g.*, *Pleasant Grove*, 479 U.S. at 469 ("The burden of proving absence of discriminatory purpose and effect is on [the covered jurisdiction]."); *City of Rome v. United States*, 446 U.S. 156, 183 n.18 (1980) ("Under § 5, the city bears the burden of proving lack of discriminatory purpose and effect."); *Beer*, 425 U.S. at 140-41; *Georgia v. United States*, 411 U.S. 526, 538 (1973); *South Carolina v. Katzenbach*, 383 U.S. 301, 335 (1966). Texas has pointed to no evidence that Congress intended to modify this established understanding.

Moreover, Texas's burden is not insurmountable.[19] There is no question, as the Supreme Court has previously stated, that "assessing a jurisdiction's motivation in enacting voting changes is a complex task requiring a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Reno v. Bossier Parish Sch. Bd.* (*Bossier I*), 520 U.S. 471, 488 (1997) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). And as Texas rightly argues, this task is all the more difficult because disparate impact alone is insufficient to establish discriminatory purpose, *see Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality opinion) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify . . . ."). But we have clear direction how to conduct this "complex task" from *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). *See Bossier I*, 520 U.S. at 488 ("In conducting [a section 5 purpose] inquiry, courts should look

---

[19] While Texas ultimately bears the burden of proving nondiscrimination, it may shift that burden to the defendants by making out a prima facie case for nondiscrimination. *See Bossier Parish Sch. Bd. v. Reno*, 907 F. Supp. 434, 446 (D.D.C. 1995), *vacated on other grounds*, 520 U.S. 471 (1997) (noting that in section 5 cases "something like a burden shifting must occur in this, as in every other, civil case," and that once "[a jurisdiction] makes out its *prima facie* case, it is entitled to preclearance unless its *prima facie* case is rebutted"). After the defendants respond to the *prima facie* case, the issue becomes whether Texas's "evidence is more persuasive than the evidence proffered against it." *Id.*

to . . . *Arlington Heights* for guidance.”); *see also* H.R. REP. NO. 109-478, at 68 (“[T]he factors

set out in [*Arlington Heights*] provide an adequate framework for determining whether voting

changes submitted for preclearance were motivated by a discriminatory purpose . . . .”). There,

the Court set forth a framework for analyzing “whether invidious discriminatory purpose was a

motivating factor” in a government body’s decisionmaking. *Arlington Heights*, 429 U.S. at 266;

*see also Bossier I*, 520 U.S. at 488-89 (collecting cases in which courts have applied *Arlington*

*Heights* in the section 5 context). We follow this well-worn path and base our inquiry upon the

five *Arlington Heights* factors: (1) discriminatory impact, (2) historical background, (3) sequence

of events leading up to the decision, (4) procedural or substantive deviations from the normal

decisionmaking process, and (5) contemporaneous viewpoints expressed by the decisionmakers.

*Arlington Heights*, 429 U.S. at 266-68. Texas can carry its burden by showing that these

factors — the longstanding yardstick for determining discriminatory intent — do not, taken

together, show discriminatory purpose.

### III.  Congressional Plan

We now turn to the merits of the three plans before us, considering in turn whether

Texas has carried its burden to prove the absence of discriminatory purpose and effect in the

Congressional, Senate, and House Plans.

### A.  Retrogression in the Congressional Plan

There are thirty-six districts in the enacted Congressional Plan. Certain Intervenors argue

that the enacted plan has one fewer ability district than the benchmark because three ability

districts  — Congressional Districts (CDs) 23, 25, and 27 — are lost and only two ability

districts — CDs 34 and 35 — are added. There is no dispute that these two new districts are

Hispanic ability districts. Texas agrees that CD 27 is a lost ability district, but disputes that

benchmark CDs 23 and 25 are ability districts. Under Texas's theory, the Congressional Plan results in a net increase of one Hispanic ability district.

The United States and certain Intervenors argue that the enacted Congressional Plan retrogresses by failing to draw an additional Hispanic ability district. They assert that CDs 23 and 27, but not CD 25, were Hispanic ability districts in the benchmark whose loss in the enacted plan is offset by the gain of CDs 34 and 35. Nevertheless, in light of the growth in the State's Hispanic population, they argue that failing to draw one of the four new congressional districts as a Hispanic ability district increases the degree of Hispanic disenfranchisement from the benchmark level and thus violates section 5.

In addition to these arguments about Hispanic ability districts, some of the Intervenors argue that the Congressional Plan is retrogressive with respect to Black voters as well. All parties agree that CDs 9, 18, and 30 are ability districts for Black voters in both the benchmark and enacted congressional maps. Some of the Intervenors allege that the enacted plan "packed" these districts with Black voters from neighboring jurisdictions that were not performing for minority voters. But because section 5's effect prong does not prohibit reductions in minority voting power in nonability districts, we find no retrogression in Black ability districts in the Congressional Plan.

We do, however, conclude that the enacted Congressional Plan is retrogressive and thus cannot be precleared under section 5. Although we differ among ourselves whether benchmark CD 25 was an ability district, this disagreement does not affect our overall conclusion. At the outset, we discuss the two disputed ability districts upon which we agree, then explain the majority's conclusion that Texas was required to draw a new ability district under section 5. We set out our separate views on CD 25 at the end of the opinion.

### 1. Congressional District 27

Benchmark CD 27 includes the cities of Corpus Christi and Brownsville in southeastern Texas. With a Hispanic Citizen Voting Age Population (HCVAP) of 63.8%, Pl.'s Ex. 11, at 9, and, until 2010, a twenty-seven year history of representation by a Hispanic Democrat, benchmark CD 27 is a clear Hispanic ability district. Although an Anglo Republican won the seat with a 775 vote margin in 2010, Pl.'s Ex. 32, at 13, no party argues that this anomalous result is reason to doubt the district's status as an ability district. Indeed, Texas's own expert conceded that the district had "performed" from the time of its creation for close to thirty years until the 2010 election, Defs.' Ex. 581, Trial Tr. 1870:16-1871:4, Sept. 14, 2011, *Perez*, No. 11-cv-360, and Kel Seliger, chairman of the Texas Senate Select Committee on Redistricting, testified that benchmark CD 27 is clearly protected by the VRA and that he felt the legislature needed to draw another district to compensate for its loss, Seliger San Antonio Dep. 25:22-26:13; *see also* Trial Tr. 17:19-18:11, Jan. 24, 2012 AM.

The enacted plan pivots CD 27 roughly 180 degrees such that the old northern boundary of the district is now the new southern boundary, with new CD 34 filling in much of CD 27's old geography. The result is that enacted CD 27 is a majority-Anglo district: HCVAP drops to only 41.1%. Pl.'s Ex.12, at 9. All parties agree that these significant geographic and demographic shifts mean that CD 27 will no longer perform for minority voters. We agree.

### 2. Congressional District 23

West Texas's CD 23 has a complicated history under the VRA. In 2006, the Supreme Court held that CD 23, as then constituted, violated section 2. *See LULAC v. Perry*, 548 U.S. 399, 425-42 (2006). In response, the U.S. District Court for the Eastern District of Texas redrew its boundaries in 2006 to be an "opportunity district," or one in which Hispanic voters would

have an opportunity to elect their preferred candidates, as required by section 2. *See* Defs.' Ex. 575, Trial Tr. 300:13-18, Sept. 7, 2011, *Perez*, No. 11-cv-360. We now find that the Hispanic voters in CD 23 turned that opportunity into a demonstrated ability to elect, but that the 2010 redistricting took that ability away.

Benchmark CD 23 has an HCVAP of 58.4%. Pl.'s Ex. 11, at 9. During the most recent redistricting, the mapdrawers in the Texas legislature acknowledged that CD 23 was a protected district under the VRA. *See, e.g.*, Seliger San Antonio Dep. 13:19-15:11, 30:6-15, 31:6-16 (testimony of Chairman Seliger describing his belief during the redistricting process that CD 23 was a protected Hispanic district); Defs.' Ex. 978 (email from congressional mapdrawer Doug Davis to National Republican Congressional Committee staffer noting VRA concerns when drawing CD 23). CD 23 elected the minority-preferred candidate in two out of the three endogenous elections since its boundaries were redrawn in 2006. Defs.' Ex. 327, Dr. Lisa Handley, A Section 5 Voting Rights Analysis of the Proposed Texas Congressional Plan 5 [hereinafter Handley Cong. Rep.]. The one narrow loss was in 2010, a year that Chairman Seliger described as "a bit of an aberration because of things like the Tea Party influence," further noting that he "didn't know if [that election] was reliable." Seliger San Antonio Dep. 15:5-7; *see also* Trial Tr. 11:15-21, Jan. 24, 2012 AM.[20]

Texas counters that none of the experts found that benchmark CD 23 clearly performs as an ability district and points to the weak showing of minority voters in exogenous elections: only three out of ten victories in the OAG 10 and two out of five victories in Dr. Handley's election

---

[20] Texas argues that one of the two endogenous victories, the 2006 election, should be discounted because it did not occur on general election day. *See* Tex. Post-Trial Br. 16. VRA litigation left no time for a primary that year, and instead all eight candidates competed in a special election held the same day as Texas's general election. *See* Trial Tr. 66:21-68:9, Jan. 26, 2012 AM. Texas is correct that the Republican candidate won the plurality of votes in the special election, but we find this result unremarkable because six of the eight special election candidates were Democrats. When the runoff election was held five weeks later, Hispanic-preferred candidate Ciro Rodriguez won a decisive victory. Pl.'s Ex. 17, at 368. We see no reason to discount Rep. Rodriguez's victory.

set. Alford Rep. 23 tbl.4b; Handley Cong. Rep. 5. But these numbers do not tell the full story. Every expert save Dr. Alford concluded that benchmark CD 23 is an ability district despite marginal exogenous performance. Dr. Handley concluded that endogenous results are more probative than exogenous for this district, *see* Handley Cong. Rep. 5-6, and, as we have already discussed, we agree that this assessment is generally accurate. Dr. Ansolabehere's analysis shows that minority-preferred candidates won the district "more often than not." Defs.' Ex. 724, Expert Witness Report of Dr. Stephen Ansolabehere 36-37 [hereinafter Ansolabehere Rep.]. And the TLRTF argues that a larger election sample set is necessary to make an informed judgment. When four additional racially contested contests are added to the OAG 10, the district's exogenous success rises to seven out of fourteen. *See* Trial Tr. 111:14-113:4, Jan. 18, 2012 AM; Defs.' Exs. 390, 647. These election results, combined with the endogenous elections discussed above, the fact that CD 23 was drawn to be an opportunity district, and the contemporary views of redistricting officials, are enough for us to find that benchmark CD 23 lived up to its potential as drawn in 2006 and became an ability district.

But enacted CD 23 is not. Even though the district's demographics remain relatively unchanged — HCVAP actually increased 0.1% from the benchmark to the enacted plan, Pl.'s Ex. 12, at 9 — this fact is inconclusive. Instead, we must look to other factors, including exogenous elections, testimony, and other evidence about changes made in the district.

Enacted CD 23's exogenous election results are significantly worse than those in benchmark CD 23. In the OAG 10, the number of victories decreases from three of ten to one. In Dr. Handley's sample the number decreases from two of five to none. Alford Rep. 23 tbl.4b; Handley Cong. Rep. 7; *see also* Ansolabehere Rep. 37 (concluding that the enacted plan "lowers the electoral performance of minority-preferred candidates in the District to the point that it is

likely no longer a minority opportunity seat"). Minority voter turnout in enacted CD 23 declines. While Hispanic voters accounted for an average of 39% of total votes cast in benchmark CD 23 over the past decade, they made up only 36.5% in enacted CD 23.[21] Defs.' Ex. 365, at 5-12; *see also, e.g.*, Defs.' Ex. 575, Trial Tr. 450:19-454:11, Sept. 7, 2011, *Perez*, No. 11-cv-360 (testimony of Dr. Henry Flores, noting that Hispanic voter turnout was higher in areas moved out of the district than in areas that were moved in; turnout in some excluded areas was consistently over 30%, while turnout in areas that replaced them was only 25-30%). The changes were enough to "nudge" a district that was an ability district, but barely so, to a nonperforming district. *See* Ansolabehere Rep. 37 (noting that "in a competitive district such as this one," seemingly small changes "made a huge difference"). Even Texas's expert testified that CD 23 "is probably less likely to perform than it was, and so I certainly wouldn't count and don't [and] haven't counted the 23rd as an effective minority district in the newly adopted plan." Defs.' Ex. 581, Trial Tr. 1839:2-7, Sept. 14, 2011, *Perez*, No. 11-cv-360. Thus, CD 23 is an ability district in the benchmark, but would be no longer in the enacted plan.

Texas claims that the enacted district has remained functionally identical to the benchmark, but these claims are undermined by the mapdrawers' own admissions that they tried to make the district more Republican — and consequently, less dependable for minority-preferred candidates — without changing the district's Hispanic population levels. The mapdrawers consciously replaced many of the district's active Hispanic voters with low-turnout Hispanic voters in an effort to strengthen the voting power of CD 23's Anglo citizens. In other words, they sought to reduce Hispanic voters' ability to elect without making it look like anything in CD 23 had changed. *See, e.g.*, Defs.' Ex. 304 (email from Eric Opiela, counsel to

---

[21] Judges Collyer and Howell do not depend on voter turnout data to conclude that CD 23 is a lost ability district.

Texas House Speaker Joe Strauss, to mapdrawer Gerardo Interiano in November 2010 urging Interiano to find a metric to "help pull the district's Total Hispanic Pop[ulation] and Hispanic CVAPs up to majority status, but leave the Spanish Surname [Registered Voter] and [turnout numbers] the lowest," which would be "especially valuable in shoring up [CD 23 incumbent] Canseco"); *id.* (email from Interiano responding that he would "gladly help with this"); Defs.' Ex. 739, at 40 (email indicating that Opiela provided sample maps to Interiano as late as June 11, 2011, that would "improve CD 23's [H]ispanic performance while maintaining it as a Republican district"). We also received an abundance of evidence that Texas, in fact, followed this course by using various techniques to maintain the semblance of Hispanic voting power in the district while decreasing its effectiveness. *See, e.g.*, Defs.' Ex. 436 (evidence showing that over 600,000 persons were moved into and out of the district to redress overpopulation of only 149,000); Defs.' Ex. 903, at 1 (email noting that a draft map of CD 23 was "over 59% HCVAP, but still at 1/10 [exogenous election performance]," and commenting that there must be an HCVAP level high enough that low election results would not raise trouble under section 5); Defs.' Ex. 978 (email commenting that a draft map of CD 23 "looks nice politically," but still raises "concern[s] about the Voting Rights Act"); Trial Tr. 106:18-108:3, Jan. 18, 2012 AM (testimony of Ryan Downton that he drew the district's lines precinct-by-precinct based on election results to keep Hispanic population numbers high while maximizing Republican performance); *Id.* at 12:2-16, Jan. 24, 2012 AM (testimony of Kel Seliger that CD 23 was drawn by considering "voting patterns and ethnicity" to see what could be done "to change the district"). Texas's protestations that the district has remained functionally identical are weakened first by the mapdrawers' admissions that they tried to reduce the effectiveness of the Hispanic

vote and then, more powerfully, by evidence that they did. We conclude that CD 23 is a lost ability district.

### 3. Retrogression with New Congressional Seats[22]

Texas's population grew by approximately 4.3 million in the past decade, an increase of 20.6%. Approximately 89% of this growth was from non-Anglo minorities: Hispanics comprise 65% of the increase, Blacks 13.4%, and Asian-Americans 10.1%. *See* U.S. Req. for Judicial Notice ¶¶ 8, 20, 22, 24 (citing 2000 and 2010 Census data).[23] As a result of this increase, the Texas delegation in the U.S. House of Representatives grew from 32 to 36 members, the largest growth ever in a jurisdiction fully covered by section 5. *See Texas*, 831 F. Supp. 2d at 257. The United States and various Intervenors argue that Texas was required to draw at least one of these new districts as an ability district. *See, e.g.*, U.S. Post-Trial Br. 14-15. We agree.

As already discussed, section 5's prohibition on retrogression means that "the entire [enacted] statewide plan as a whole," *Ashcroft*, 539 U.S. at 470, cannot "increase the degree of discrimination against [minority voters],"[24] *City of Lockhart v. United States*, 460 U.S. 125, 134 (1983). *Abrams v. Johnson*, 521 U.S. 74 (1997), tells us how to measure the degree of discrimination when the number of districts remains the same or increases by one: there is no retrogression as long as the number of ability districts remains the same. *Id.* at 97-98. At summary judgment we concluded that our case was similar to *Abrams* because "Texas'

---

[22] Having found retrogression in the Congressional Plan because CD 25 was an ability district that was eliminated and not replaced, Judge Collyer does not reach the further question of retrogression based on proportional representation arising from multiple new congressional seats and a sizeable growth in minority population.

[23] Likewise, minorities comprise 80.4% of the increase in Texas's voting age population between 2000 and 2010. U.S. Req. for Judicial Notice ¶ 19 (citing 2000 and 2010 Census data). We agree with the United States that U.S. Census data is an appropriate subject of judicial notice. *See id.* at 2 (citing *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 572-73 (5th Cir. 2011); *City of Port Arthur v. United States*, 517 F. Supp. 987, 993 n.5 (D.D.C. 1981)).

[24] The Supreme Court has also described our task as determining that the enacted plan "is no more dilutive than what it replaces." *Bossier II*, 528 U.S. at 335.

percentage gain in congressional seats (12.5%) is similar to Georgia's percentage gain in *Abrams* (10%)." *Texas*, 831 F. Supp. 2d at 269. Yet we also noted that "*Abrams* does not control. Although *Abrams* is clear that the VRA does not require there to be a new minority ability district for every new congressional seat, it does not hold that a state's failure to draw new minority districts can never be retrogressive." *Id.* Upon further examination and after weighing the arguments presented at trial, we have concluded that Texas's failure to draw a new minority district does in fact make the enacted plan retrogressive under the specific facts of this case. *Abrams* spoke only to the case of a state that gained a single seat, 521 U.S. at 97-98, not to the case of a state that gains multiple seats.[25]

Neither section 5's text nor existing case law tells us how to measure the "degree of discrimination" in these circumstances. But guidance is available in the Supreme Court's section 2 cases. Even though section 5 is not ameliorative and has different purposes than section 2, some tools used in section 2 analysis reveal insights into the underlying principles of the VRA, *see, e.g.*, *Texas*, 831 F. Supp. 2d at 261-62 & 262 n.21, which are especially helpful as we find ourselves in a setting no section 5 cases have yet considered.

In the section 2 context, the Court has looked to the relationship between a minority group's share of the CVAP statewide and the number of opportunity districts to help determine whether new opportunity districts must be created. *See LULAC*, 548 U.S. at 438 ("Looking statewide, there are 32 congressional districts. The five reasonably compact Latino opportunity districts amount to roughly 16% of the total [number of districts], while Latinos make up 22% of

---

[25] We agree with the United States that the holding of *Abrams* cannot be read to govern all cases in which a state gains seats in a district map. At the extreme, consider a state with a 100-member legislature and 30 ability districts in the benchmark map. If the state redrew its legislature to double the number of districts to 200, but created no new ability districts, it would be difficult to conclude that the new plan was not dilutive and had not increased the degree of discrimination against minority voters merely because it contained the same number of ability districts.

Texas' citizen voting-age population. . . . Latinos are, therefore, two districts shy of proportional representation."); *De Grandy*, 512 U.S. at 1014 n.11 (examining "the number of majority-minority voting districts [compared] to minority members' share of the relevant population"). We agree with the United States that this "representation gap" between the number of districts proportional representation would yield and the number of districts the legislature has actually created is a strong indicator of the "degree of discrimination." U.S. Post-Trial Br. 15. When the representation gap grows, the degree of discrimination increases.

This analysis squares with the outcomes of previous section 5 cases. Where the number of districts remains the same, the representation gap does not increase. Likewise, the representation gap in *Abrams* was unchanged between plans. There, Blacks constituted 27% of Georgia's voting age population and had the ability to elect in only one of ten districts in the benchmark plan. *See* 521 U.S. at 103 (Breyer, J., dissenting). That put the representation gap at two districts (27% of 10 is 2.7, which, when rounded up, is two more than one).[26] In the enacted plan the representation gap remained the same (27% of 11 is 3.0, which is also two more than one). There was no increase in the degree of discrimination, and the plan did not retrogress.

By contrast, the representation gap in Texas has increased. The Black and Hispanic communities currently make up 39.3% of Texas's CVAP. Joint Stipulations of Fact ¶ 38. Thus, if districts were allocated proportionally, there would be 13 minority districts out of the 32 in the benchmark (39.3% of 32 is 12.6). Yet minorities have only 10 seats in the benchmark, so the representation gap is three districts. In the enacted plan, proportional representation would yield

---

[26] We note that we are rounding 2.7 up to 3. We do so following the Court's example in *LULAC*, in which it noted that "'rough proportionality' must allow for some deviations." 548 U.S. at 438 (quoting *De Grandy*, 512 U.S. at 1023).

14 ability districts (39.3% of 36 is 14.1), but there are still only 10 ability districts.[27] Thus, the representation gap in the enacted plan is four districts. Because this gap increases by one district, we cannot preclear the enacted plan.[28]

We emphasize what our analysis does *not* do. It does not entitle minorities to proportional representation. It does not require a state to create new ability districts in proportion to increases in a minority group's population.[29] We require only that a state not "undo[] or defeat[] the rights recently won" by minorities, *Beer*, 425 U.S. at 140 (quoting H.R. Rep. No. 91-397, at 8 (1969)) (internal quotation marks omitted), by increasing the "degree of discrimination," *Lockhart*, 460 U.S. at 134, which requires assessing the "number of majority-minority voting districts to minority members' share of the relevant population," *De Grandy*, 512 U.S. at 1014 n.11.

---

[27] Our calculations use the combined Black and Hispanic share of the CVAP (39.3%), the metric advanced by the United States and various Intervenors. *See also De Grandy*, 512 U.S. at 1014 n.11 ("'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population."). Nevertheless, we note that our method also yields one additional congressional seat if the Black and Hispanic representation gaps are calculated separately. Hispanics comprise 26.4% of Texas's CVAP, Joint Stipulations of Fact ¶ 38, and the "Hispanic" representation gap increases by one in the enacted plan (Hispanics have seven ability districts in both plans, but 26.4% of 32 is 8.4 and 26.4% of 36 is 9.5). By contrast, Blacks comprise 12.9% of Texas's CVAP, *id.*, and the "Black" representation gap does not change between plans. Blacks have three ability districts in both plans; 12.9% of 32 is 4.1, and 12.9% of 36 is 4.6. Following the "rough proportionality" principle, this increase of 0.5 in the representation gap does not require the State to draw a new district, just as we require the State to draw only one additional ability district above, even though there is a 1.5 increase in the representation gap.

Similarly, this representation gap would exist even if CD 25 were counted as an ability district in the benchmark. In that case, the benchmark representation gap would be two districts (the difference between 13 and 11 districts) and the enacted representation gap would be three districts (the difference between 14 and 11 districts).

[28] We note that this requirement would likely be subject to the caveat that a state is only required to draw a new district if possible, *i.e.*, if it can draw a new ability district without violating other principles such as one-person, one-vote or the demands of section 2. Yet the facts that minority population growth was largely concentrated in three areas in Texas and that the parties submitted several alternate plans drawing a new Hispanic ability district suggest that this will not be an issue here. In any event, the infeasibility of drawing a new district was not argued or briefed in any depth during this litigation.

[29] Under our logic, if Texas had experienced the same population growth but had not gained additional congressional seats (because, for example, other states experienced equivalent or greater growth), it would have been required to draw only 10 ability districts. It is the growth in the number of districts that triggers our analysis, not growth in the population.

Because the Texas legislature purposes to increase this representation gap, we cannot preclear its Congressional Plan.

**B.  Discriminatory Intent in the Congressional Plan**

Although we need not reach the issue of discriminatory intent because we conclude that the Congressional Plan will have a retrogressive effect, we do so here because, as we have just discussed, we do not all agree on the appropriate rationale for finding retrogression. But because we agree that the plan was enacted with discriminatory purpose, we reach this issue as an alternative, unanimous basis to deny preclearance for the Congressional Plan. If true, the allegations of the United States and the Intervenors that Texas drew the Congressional Plan with discriminatory purpose provide grounds to deny preclearance. Texas argues that intent to discriminate against minority voters played no role in the plan and that its decisions were motivated solely by partisan politics. *See, e.g.*, Tex. Post-Trial Br. 26 ("Texas adopted the Congressional Plan with the lawful aim of protecting incumbents.").

There is no direct evidence that the enacted plan was motivated by discriminatory purpose; no emails, letters, or testimony about conversations between those members involved in congressional redistricting disclose such an intent. *Cf. Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) ("Direct evidence is something close to an explicit admission . . . that a particular decision was motivated by discrimination; this type of evidence is rare, but it 'uniquely reveals' the . . . intent to discriminate." (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005))). Thus, we must assess the circumstances surrounding the drawing of the new maps. Our analysis follows the Supreme Court's decision in *Arlington Heights*, which, as discussed in more detail above, identifies five "subjects of proper inquiry in determining whether racially discriminatory intent existed": (1) discriminatory impact, (2) historical

background, (3) sequence of events leading up to the decision, (4) procedural or substantive

deviations from the normal decisionmaking process, and (5) contemporaneous viewpoints

expressed by the decisionmakers. *Arlington Heights*, 429 U.S. at 266-68.

As we have already noted, CDs 9, 18, and 30 are the only Black ability districts in the

benchmark and enacted plans. CD 9 is located south of Houston and incorporates parts of Harris

and Fort Bend Counties, CD 18 is located within Houston, and CD 30 is within Dallas. The

Texas legislature proposed substantial changes to these districts even though the 2010 Census

data shows the population in each was already close to the ideal size.[30] We have already

determined that these changes are not retrogressive, but they raise serious concerns about what

motivated the Congressional Plan.

Congressman Al Green, who represents CD 9, testified that "substantial surgery" was

done to his district that could not have happened by accident. The Medical Center, Astrodome,

rail line, and Houston Baptist University — the "economic engines" of the district — were all

removed in the enacted plan. Trial Tr. 124:6-20, Jan. 20, 2012 AM; *see also* Defs.' Ex. 721, Pre-

Filed Test. of Congressman Alexander Green 3-4. The enacted plan also removed from CD 9 the

area where Representative Green had established his district office. Trial Tr. 124:16, Jan. 20,

2012 AM. Likewise, Congresswoman Sheila Jackson Lee, who represents CD 18, testified that

the plan removed from her district key economic generators as well as her district office. *Id.* at

13:13-14:5, Jan. 23, 2012 PM. Congresswoman Eddie Bernice Johnson of CD 30 also testified

that the plan removed the American Center (home of the Dallas Mavericks), the arts district, her

district office, and her home from CD 30. *Id.* at 79:20-81:16, Jan. 18, 2012 PM. The mapdrawers

---

[30] According to the 2010 Census, Texas's population was 25,145,561. If this population were divided equally between the State's thirty-six congressional districts, each district would have 698,488 individuals. Pl.'s Ex. 12, at 2. Benchmark CD 9 has a surplus of 35,508 people, or 5.05% of the district's population. CD 18's surplus is 22,503 (3.22%), and CD 30's is 7,891 (1.14%). Defs.' Ex. 347, at 28-29.

also removed the district office, the Alamo, and the Convention Center (named after the incumbent's father), from CD 20, a Hispanic ability district. Mem. Opp. Summ. J. Ex. 16, Decl. of Charles A. Gonzalez ¶¶ 3-9, 11, ECF No. 77.

No such surgery was performed on the districts of Anglo incumbents. In fact, *every* Anglo member of Congress retained his or her district office. Trial Tr. 14:12-15, Jan. 23, 2012 PM. Anglo district boundaries were redrawn to include particular country clubs and, in one case, the school belonging to the incumbent's grandchildren. *See* Mem. Opp. Summ. J. Exs. 11, 18-19, ECF No. 77. And Texas never challenged evidence that only minority districts lost their economic centers by showing, for example, that the same types of changes had been made in Anglo districts.

The United States and the Intervenors convincingly argue — and Texas does not dispute — that removing district offices from minority ability districts but not from Anglo districts has a disparate impact on the minority districts. *See* U.S. Post-Trial Br. 26. District offices help "provide[] a meaningful connection between a member and the people represented." Defs.' Ex. 721, Pre-Filed Test. of Congressman Alexander Green 4. Their locations are often well known to constituents, often placed to be easily accessible by freeway and public transportation, and serve as a way for members of Congress to communicate with and provide services to their constituents. *See id.* We are likewise troubled by the unchallenged evidence that the legislature removed the economic guts from the Black ability districts. Texas does not dispute that part of a member of Congress's job is to "bring economic generators that will benefit that community," *id.* Removing those economic generators harms the district. *Id.* at 3-4; U.S. Post-Trial Br. 26.

The only explanation Texas offers for this pattern is "coincidence."[31] Trial Tr. 95:5-19, Jan. 25, 2012 PM. But if this was coincidence, it was a striking one indeed. It is difficult to believe that pure chance would lead to such results. The State also argues that it "attempted to accommodate unsolicited requests from a bipartisan group of lawmakers," and that "[w]ithout hearing from the members, the mapdrawers did not know where district offices were located." Tex. Post-Trial Br. 29. But we find this hard to believe as well. We are confident that the mapdrawers can not only draw maps but read them, and the locations of these district offices were not secret. The improbability of these events alone could well qualify as a "clear pattern, unexplainable on grounds other than race," *Arlington Heights*, 429 U.S. at 266, and lead us to infer a discriminatory purpose behind the Congressional Plan.

When taken with the remaining *Arlington Heights* factors, Texas's explanation becomes weaker still. First, the historical background gives us grounds for concern. In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost. *See*, *e.g.*, *LULAC*, 548 U.S. 399; *Vera*, 517 U.S. 952; *Upham v. Seamon*, 456 U.S. 37 (1982); *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973); *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1992), *aff'd sub nom.*, *Richards v. Terrazas*, 505 U.S. 1214 (mem.). While a losing streak alone does not control our decision, Texas's history of failures to comply with the VRA is one of the circumstantial factors that *Arlington Heights* instructs us to consider.

Next, the sequence of events leading to the passage of the Congressional Plan also supports an inference of discriminatory purpose. Black and Hispanic members of Congress testified at trial that they were excluded completely from the process of drafting new maps, while the preferences of Anglo members were frequently solicited and honored. *See, e.g.*, Mem. Opp.

---

[31] Unlike in its arguments about retrogression, Texas never argued that the removal of district offices and economic generators was the product of political animus.

Summ. J. Exs. 18-19; Defs.' Ex. 370, at 1, ECF No. 77. The Texas House and Senate redistricting committees released a joint congressional redistricting proposal for the public to view only after the start of a special legislative session, and each provided only seventy-two hours' notice before the sole public hearing on the proposed plan in each committee. *See, e.g.*, Defs.' Ex. 320, Decl. of Theodore S. Arrington 57-59; Defs.' Ex. 366. Minority members of the Texas legislature also raised concerns regarding their exclusion from the drafting process and their inability to influence the plan via amendments. *See, e.g.*, Defs.' Ex. 370, at 1.

Lastly, procedural and substantive departures from the normal decisionmaking process raise flags. Citing failure to release a redistricting proposal during the regular session, the limited time for review, and the failure to provide counsel with the necessary election data to evaluate VRA compliance, the Senate redistricting committee's outside counsel described the proceedings as "quite different from what we've seen in the past." *Id.* at 2.

Texas argues that, "[a]t worst, the evidence shows that [it] was guilty of blithe indifference to the wants to certain [minority] Congressmen." Tex. Post-Trial Br. 29. But we do not find this explanation credible. Although we have already concluded that the Congressional Plan cannot be precleared under section 5's effect prong, we are also persuaded by the totality of the evidence that the plan was enacted with discriminatory intent. Texas did not adequately engage with the evidence raised by the other parties on this point, and under *Arlington Heights* we find sufficient evidence to conclude that the Congressional Plan was motivated, at least in part, by discriminatory intent.[32] Therefore, we deny Texas declaratory judgment with respect to the Congressional Plan on this ground as well.

---

[32] The parties have provided more evidence of discriminatory intent than we have space, or need, to address here. Our silence on other arguments the parties raised, such as potential discriminatory intent in the selective drawing of CD 23 and failure to include a Hispanic ability district in the Dallas-Fort Worth metroplex, reflects only this, and not our views on the merits of these additional claims.

## IV.  State Senate Plan

Next we consider Texas's request to preclear its State Senate Plan. The United States has not objected to this plan, but the Davis Intervenors, the Texas State Conference of NAACP Branches, the League of United Latin America Citizens, and the Texas Legislative Black Caucus argue that the Senate Plan retrogresses and was enacted with discriminatory intent. Their arguments concern a single district, Senate District (SD) 10, which they contend is a coalition district in the benchmark plan, and which all parties agree is not an ability district in the enacted plan. These Intervenors also argue that discriminatory purpose motivated the legislature's decision to break up SD 10. We conclude that benchmark SD 10 is not a coalition district, and thus that the Senate Plan is not retrogressive. Nevertheless, we deny preclearance because Texas failed to carry its burden to show that it acted without discriminatory purpose in the face of largely unrebutted defense evidence and clear on-the-ground evidence of "cracking" minority communities of interest in SD 10. Thus, we conclude that the Texas legislature redrew the boundaries for SD 10 with discriminatory intent.

### A.  Retrogression in the Senate Plan

Benchmark SD 10 is located entirely within Tarrant County, which includes Fort Worth. When the Texas legislature last drew the district in 2001, the population was 56.6% Anglo, 16.7% Black, and 22.9% Hispanic. Defs.' Ex. 126, 2001 State of Texas Submission for State Senate Preclearance app. I (Aug. 15, 2001). Urging the Department of Justice to preclear the 2001 State Senate Plan, Texas justified SD 10's configuration by arguing that "[t]he voting strength of these minority communities in the future will depend on the cohesion within and between Black and Hispanic voters and the ability of such voters to form coalitions with other

racial or ethnic groups in support of their preferred candidates." *Id.* at 18. In other words, Texas argued that SD 10 had the potential to become a coalition district.

The Department of Justice precleared the 2001 map, and, over the past decade, the minority population in SD 10 has continued to grow. According to the 2010 Census, 47.6% of the population in SD 10 was Anglo, 19.2% Black, and 28.9% Hispanic. Defs.' Ex. 151, at 5. Minorities made up a smaller portion of the 2010 CVAP, however: 62.7% were Anglo, 18.3% Black, and 15.1% Hispanic. Pl.'s Ex. 15, at 8. Republicans have won almost every election in SD 10 in the past ten years, including the district's endogenous State Senate elections from 2000-2008. No Democratic candidate running in a statewide or other exogenous election has ever won a majority of the vote in SD 10. *See* Alford Rep. 30.

The only Democrat to win an election in SD 10 is the district's current senator, Wendy Davis, who was elected to a four-year term in 2008. Davis's path to the State Senate began when Democratic candidate Terri Moore lost the 2006 election for Tarrant County District Attorney, yet received nearly half of the vote in SD 10. *See* Trial Tr. 30:10-25, 31:1-17, Jan. 18, 2012 PM. In light of these results, Democratic elected officials and community leaders in Tarrant County were of the view that if the Black and Hispanic communities "came together as a coalition to vote . . . they could win Senate District 10." *Id.* at 30:15-16. These and other leaders within the district's minority communities recruited Fort Worth City Council member Wendy Davis to run for State Senate. *Id.* at 32:3-25, 33:1-17; *see also id.* at 16:1-5, Jan. 20, 2012 AM (Senator Davis, testifying, "I was approached by leaders in our minority community in large part because of the work I'd done as a City Council person and asked if I would consider running for the Texas State Senate."). Senator Davis ran unopposed in the 2008 Democratic primary, *see* Pl.'s Ex. 135, at 3,

then won the general election with 49.9% of the vote, beating the incumbent by 2.4% —

approximately 7,100 out of 288,000 votes cast.[33] Pl.'s Ex. 31, at 14.

According to Texas's expert, Davis received 99.6% of the Black vote, 85.3% of the

Hispanic vote, and 25.8% of the Anglo vote. Trial Tr. 32:24-25, 33:1-16, Jan. 25, 2012 AM.

Although this is strong evidence that the minority communities in SD 10 voted cohesively in the

2008 election, the argument that SD 10 is a coalition district runs into trouble when looking at

evidence that the district's minority communities have been effective in electing their preferred

candidates.

At summary judgment, we noted that "evidence that a coalition had historical success in

electing its candidates of choice would demonstrate that the minority voters in that district had,

and would continue to have, an ability to elect their preferred candidates." *Texas*, 831 F. Supp.

2d at 268. The case that SD 10 is an ability district turns on a single, razor-thin election victory,

which is not "historical success." Indeed, SD 10's decade-long history of electing Republicans

shows just the opposite. There is no doubt that the minority community came together to elect a

preferred candidate in 2008, but a single victory is not the more exacting evidence needed for a

coalition district. If it were, any single victory built upon the support of minority voters would

create a claim for ability status.

**B.  Discriminatory Intent in the Senate Plan**

There is no direct evidence that the Texas legislature acted with a racially discriminatory

purpose in its reconfiguration of SD 10, and so we must look to circumstantial evidence. Once

again, we look to the *Arlington Heights* factors to determine whether Texas has met its burden of

disproving discriminatory intent.

---

[33] Richard Cross, a libertarian candidate, received 2.6% of the vote (7,591 votes). Pl.'s Ex. 31, at 14.

Considering first the impact of the redistricting — "whether it 'bears more heavily on one race than another,'" *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)), there is little question that dismantling SD 10 had a disparate impact on racial minority groups in the district. Even Dr. Alford agreed that the enacted plan "diminishes the voting strengths of Blacks and Latinos in [SD 10]," Trial Tr. 39:14, Jan. 25, 2012 AM. In a letter he sent to the Department of Justice objecting to the enacted Senate Plan, Texas State Senator Rodney Ellis explained in detail how the new boundaries eliminate the ability of minority citizens to elect their preferred candidates by submerging their votes within neighboring and predominantly Anglo districts:

> The demolition of District 10 was achieved by cracking the African American and Hispanic voters into three other districts that share few, if any, common interests with the existing District's minority coalition. The African American community in Fort Worth is "exported" into rural District 22 — an Anglo-controlled District that stretches over 120 miles south to Falls [County]. The Hispanic Ft. Worth North Side community is placed in Anglo suburban District 12, based in Denton County, while the growing South side Hispanic population remains in the reconfigured majority Anglo District 10.

Defs.' Ex. 375, at 3. We find that Senator Ellis's testimony is well supported by the record. *See also* Defs.' Ex. 134, Expert Witness Report of Dr. Allan J. Lichtman ¶ 12 [hereinafter Lichtman Rep.] ("The state legislature, in dismantling benchmark SD 10 cracked the politically cohesive and geographically concentrated Latino and African American communities and placed members of those communities in districts in which they have no opportunity to elect candidates of their choice or participate effectively in the political process.").

Texas does not deny this disparate impact, but responds that its decision to "crack" SD 10 is best explained by partisan, not racial, goals. Tex. Post-Trial Br. 25. While this is a potentially plausible rationale, *Arlington Heights* instructs that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such

circumstantial and direct evidence of intent as may be available," and so we must "look to the other evidence." 429 U.S. at 266.

These other factors do not support Texas's case. The second factor is Texas's history of discrimination, and as we discussed in our analysis of the Congressional Plan above, history is not on Texas's side. The third considers the "specific sequence of events leading up to the challenged decision." *Id.* at 267. The Senate's principal mapdrawer and staff director of the Senate Redistricting Committee, Doug Davis (no relation to Senator Davis), began discussing draft maps of new Senate districts prior to the February 2011 release of official Census data by using projected population increases. Defs.' Ex. 127, at 38-39. Once the 2011 general legislative session started in January, these maps were kept in an anteroom off the Senate floor, where many Republican members were taken individually by Chairman Seliger and Doug Davis to review the draft plans and provide input. *See, e.g.*, Trial Tr. 39:15-25, Jan. 20, 2012 AM; Defs.' Ex. 809, Dep. of Senator Judith Zaffirini 29:22-25, 30:1-19, Jan. 6, 2012. Senator Davis was consistently rebuffed when she asked to see the plans for SD 10, even as another senator told her that the proposed plan was "shredding" her district. Trial Tr. 38:2-8, 40:11-14, Jan. 20, 2012 AM. Senator Judith Zaffirini's uncontroverted testimony shows that this scenario was not unique to Senator Davis, but reflected a larger pattern: every senator who represented an ability district was excluded from this informal map-drawing process and was not allowed into the anteroom to preview the maps. *See* Defs.' Ex. 809, Dep. of Senator Judith Zaffirini 30:1-3. Indeed, none of the senators representing ability districts were shown their districts until forty-eight hours before the map was introduced in the Senate. *See* Defs.' Ex. 129.

Texas offered conflicting testimony in response. Doug Davis testified that "we were not printing maps and giving them to members," Trial Tr. 172:10-11, Jan. 17, 2012 PM, suggesting

that at least part of this informal process that gave Republican senators opportunities to provide input into the plans did not occur. But Chairman Seliger, Davis's boss, testified that he provided paper maps to at least three senators during this period, all of them Anglo. Trial Tr. 68:1-3, Jan. 24, 2012 AM. In any case, it is clear that senators who represented minority districts were left out of the process.[34]

Our skepticism about the legislative process that created enacted SD 10 is further fueled by an email sent between staff members on the eve of the Senate Redistricting Committee's markup of the proposed map. The ostensible purpose of the markup was to consider amendments to the proposed plan, but the email suggests a very different dynamic at work. David Hanna, a lawyer for the Texas Legislative Council, a nonpartisan agency that provides bill drafting and legislative research to the Texas legislature, sent an email to Doug Davis and Senate Parliamentarian Katrina Davis (Doug Davis's wife). Hanna's email responded to an earlier message Texas did not produce, but which concerned "precook[ing]" the committee report, *i.e.*, writing the report before the hearing had been held. Trial Tr. 71:23-25, 72:1-7, Jan. 24, 2012 AM. With a subject line titled, "pre-doing committee report," Hanna's email read:

> No bueno. RedAppl [the redistricting software Texas used] time stamps everything when it assigns a plan. Doing [the Committee Report on] Thursday [May 12] would create [a] paper trail that some amendments were not going to be considered at all. Don't think this is a good idea for preclearance. Best approach is to do it afterwards and we'll go as fast as possible.

Defs.' Ex. 359. Although the chairman of the redistricting committee, Kel Seliger, denied knowing of any advance decision to refuse to consider amendments, he acknowledged what is apparent from the email: the boundaries of the new Senate districts would be a *fait accompli* by

---

[34] We also note that Texas did not refute testimony indicating that the field hearings held prior to the start of the 2011 legislative session were "perfunctory," Trial Tr. 94:20-21, Jan. 20, 2012 AM, and "a sham," with low attendance, low participation, and little invited testimony or prepared materials. Defs.' Ex. 809, Dep. of Senator Judith Zaffirini 7:11-21.

the time of the markup and the committee did not intend to consider any amendments to the plan. Trial Tr. 71:3-25, 72:1-16, Jan. 24, 2012 AM. We agree with Chairman Seliger that, at a minimum, this email shows that a plan was in place, at least at the staff level, such that no new proposals or amendments to the district map would be entertained at the markup.

*Arlington Heights* instructs that "departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." 429 U.S. at 267. This factor focuses on comparing past redistricting cycles to the present one for anomalous behavior. The State held no field hearings after Census data was released and proposed plans were drawn, unlike the hearings that were held after such data was available in the past. Defs.' Ex. 134, at 13. Additionally, Senator Zaffirini testified that she, a senator of a minority district, "had never had less input into the drawing of any [redistricting] map" in over thirty years of redistricting experience," Defs.' Ex. 370, at 1, and that the 2010 redistricting process was the "least collaborative and most exclusive" she had ever experienced. Lichtman Rep. app. 7, Decl. of Senator Judith Zaffirini ¶ 3. We find this unchallenged testimony sufficient to conclude that the 2010 redistricting process was markedly different from previous years.

Finally, *Arlington Heights* states that "the legislative or administrative history may be highly relevant especially where there are contemporary statements by members of the decisionmaking body." 429 U.S. at 268. Aside from the "No Bueno" email described above, we have no evidence of contemporary statements by the majority members or their staff "concerning the purpose of the official action," *id.* But that email indicates, at a minimum, that redistricting committee staff feared their actions might create the appearance of impropriety under section 5. We do, however, have a statement published in the Senate journal from the eleven senators representing majority-minority districts and Senator Davis. They alleged that the fact they were

shut out from the map-drawing process until just forty-eight hours before the map was introduced in the Senate showed that the Senate Plan had a "racially discriminatory purpose." Defs.' Ex. 129, at 3. Other senators also wrote directly to Chairman Seliger to express their "disappointment in the process used to develop the Senate redistricting plan" and the "exclu[sion] [of] elected representatives of minority citizens" from that process. Defs.' Ex. 132, at 1. Although statements from the senators aggrieved by the process do not necessarily show that it was racially discriminatory, instead of merely partisan, they do indicate that the majority was aware during redistricting that several members were upset by the irregular process, yet chose not to address their concerns.

We conclude that Texas has not shown that the Senate Plan was enacted without discriminatory intent. Senator Davis and other Intervenors provided credible circumstantial evidence of the type called for by the Supreme Court in *Arlington Heights*, which, as a whole, indicates that an improper motive may have played a role in the map-drawing process. Rather than directly rebut this evidence, Texas asserts only that the legislature's motivations were wholly partisan, untainted by considerations of race. We agree that a plan that impacts minority citizens more harshly than majority citizens is not necessarily at odds with section 5. But under the VRA and *Arlington Heights*, it is not enough for Texas to offer a plausible, nonracial explanation that is not grounded in the record. It must, at a minimum, respond to evidence that shows racial and ethnic motivation, which it has failed to do. *See Arlington Heights*, 429 U.S. at 266 ("Absent a [clear pattern of discrimination] . . . the Court must look to other [circumstantial] evidence."). Here, Texas has made no real attempt to engage with the *Arlington Heights* factors, even though it concedes that the Senate Plan has a disparate impact on minority voters in SD 10. We find it telling that the legislature deviated from typical redistricting procedures and excluded

minority voices from the process even as minority senators protested that section 5 was being run roughshod. One would expect a state that is as experienced with VRA litigation as Texas to have ensured that its redistricting process was beyond reproach. That Texas did not, and now fails to respond sufficiently to the parties' evidence of discriminatory intent, compels us to conclude that the Senate Plan was enacted with discriminatory purpose as to SD 10.

## V.  State House Plan

### A.  Retrogression in the State House Plan

The United States and the Intervenors argue that the enacted House Plan retrogresses minority voting power by eliminating eight ability districts (House Districts (HDs) 26, 33, 35, 41, 106, 117, 144, and 149) without creating any others. Texas acknowledges retrogression in HD 33, but argues the House Plan works no abridgement of minority voting rights in any of the other districts. Texas maintains that the loss of HD 33 is offset by the plan's provision for at least one and as many as three new ability districts. We conclude that the enacted plan will have the effect of abridging minority voting rights in four ability districts — HDs 33, 35, 117, and 149 — and that Texas did not create any new ability districts to offset those losses. Consequently, we conclude that the enacted plan cannot be precleared. We first analyze each of the eight alleged ability districts before turning to the three alleged offset districts.

#### 1.  Alleged Retrogressive Districts

##### a.  State House District 33

Nueces County in southeastern Texas includes three State House districts in the benchmark plan. HDs 33 and 34 are entirely within the county; HD 32 partially so. Benchmark HD 33 comprises the core of Corpus Christi. HD 34 includes the western part of the county, and HD 32 covers much of the eastern portion and extends into other counties immediately north of

Nueces County. The population of Nueces County grew at a slower rate than that of the rest of the State, so it was only entitled to 2.03 districts in the new map. Because the Texas Constitution mandates that any reapportionment of State House districts observe county lines where possible,[35] the House mapdrawers drew only two districts in Nueces County, choosing to eliminate Hispanic-majority HD 33. *See* Trial Tr. 146:21-147:10, Jan. 17, 2012 AM.

With an HCVAP of 60.4%, Pl.'s Ex. 13, at 13, and success electing the Hispanic candidate of choice in four out of the past five endogenous elections (with only a narrow victory by a Hispanic Republican in 2010 breaking this streak), Engstrom Suppl. Rep. 6 & n.5, there is no question that benchmark HD 33 was a Hispanic ability district. Even Texas concedes that if we accept, as we have, the binary analysis instead of Dr. Alford's statewide functional approach, benchmark HD 33 would be an ability district. Tex. Post-Trial Br. 13.

There is similarly little question that HD 33 is not an ability district in the enacted plan. The benchmark district's population was redistributed to neighboring districts, and the new HD 33 was transplanted to two predominantly Anglo counties near Dallas. The new HCVAP is only 8.5%, Pl.'s Ex. 14, at 13, and no expert's reconstituted election analysis shows any electoral victories for minority-preferred candidates. *See, e.g.*, Alford Rep. 11 tbl.3b. At trial, Dr. Alford conceded that enacted HD 33 is not an ability district. Trial Tr. 99:16-18, Jan. 24, 2012 PM. The State also concedes that the binary approach supports this conclusion. Tex. Post-Trial Br. 13. We thus conclude that HD 33 is a lost ability district.

---

[35] Under the County Line Rule, TEX. CONST. art. III, § 26, a district must be drawn to mirror a county's boundary lines if that county has sufficient population for a voting district. When the population of more than one county is needed to make up a single voting district, the Rule requires that contiguous counties be joined to form that district. Likewise, when the population of a county requires more than one voting district, the districts must be contained within the county lines and any excess population must be joined wholly with population from a neighboring county to form a district.

### b. State House District 35

The parties who address this district agree that enacted HD 35 in south Texas is not an ability district. They disagree whether it is an ability district in the benchmark plan. The United States argues that benchmark HD 35 is an ability district because, just as in HD 33, the minority-preferred candidate won four out of the last five endogenous elections, and the fifth was a close election where a Hispanic Republican won the seat from the incumbent Hispanic Democrat.[36] U.S. Post-Trial Br. 5; *see also* Handley House Rep. 5. This track record of success is evidence that benchmark HD 35 is an ability district. Texas counters that the exogenous analysis tells a different story. The OAG 10 indicates that the district performs for minority voters only half the time. *See* Alford Rep. 11 tbl.3b. The other experts' analyses place its success rate even lower: the district performed for minority voters in just two of Dr. Handley's five elections, and two of Dr. Engstrom's seven. *See* Handley Rep. 5; Engstrom Chart.

Texas also argues that enacted HD 35 will perform much the same as benchmark HD 35. The district's HCVAP drops only slightly, from 54.6% in the benchmark to 52.5% in the enacted plan, Pl.'s Exs. 13, at 13; 14, at 13, and the exogenous analyses show only minor changes between the plans. The analyses of Dr. Handley and the OAG 10 show a one election drop in effectiveness. Handley House Rep. 9; Alford Rep. 11 tbl.3b. Dr. Engstrom's analysis, which weights recent elections more heavily, shows a one election *increase*. *See* Engstrom Chart. To Texas, all this suggests that there is no meaningful change in the district's performance, and because all agree that enacted HD 35 is not an ability district, benchmark HD 35 must not be an ability district either.

---

[36] We agree with Dr. Handley that Representative Jose Aliseda, who won in 2010 with only 22.3% of the Hispanic vote, is not the Hispanic candidate of choice. *See* Handley House Rep. app. D, at 34.

While true that only minor changes were made between benchmark and enacted HD 35, we think the best reading of the record is that the benchmark district is one in which minorities usually, although not always, elect their preferred candidate. Hispanic voters constitute the majority of the district, albeit barely, and they have been successful in electing their preferred candidate in endogenous elections held between 2002 and 2008. We find this to be persuasive evidence that Hispanic voters have attained an ability to elect their preferred candidates in HD 35. Texas does not argue that endogenous results are misleading in this district, but instead repeats its general position that we should consider only exogenous election results. Tex. Post-Trial Br. 12. We have already rejected this argument. Exogenous analysis uses statewide and national elections to help determine political trends within a district. But by considering district-wide election results, endogenous analysis provides a more direct answer to the question posed by section 5: have minority voters shown an ability to elect their preferred candidates in that district? Because the exogenous results do not cut entirely against ability status — here, Texas's own exogenous analysis shows a 50% benchmark success rate — and there is nothing in the record that calls into question the probative value of this district's endogenous track record, we are confident that endogenous results accurately describe minority voting ability in the benchmark.

As to enacted HD 35, Texas has not presented any evidence that HD 35 remains an ability district or that it tried to preserve the district's ability status, and its argument based on the small changes in exogenous election performance is insufficient to counter the evidence we do have supporting the conclusion of the United States's expert that the district loses ability status. When a district is close to the ability-to-elect line, even minor changes can be significant. The low exogenous election results for the enacted district combined with HCVAP changes that push

the district even closer to the majority line (52.5%) are not enough to show that the district will continue to perform for minority voters. We must conclude that the evidence Texas offers is not persuasive to meet its burden to show that the changes made to HD 35 will not have a retrogressive effect on minority voters.[37]

### c. State House District 41

All parties agree that benchmark HD 41 in south Texas's Hidalgo County is a minority ability district. Texas argues that the district remains so in the enacted plan, and we agree.

The HCVAP in enacted HD 41 is 72.1%. Pl.'s Ex. 14, at 14. Although a decrease from 77.5% in the benchmark, Pl.'s Ex. 13, at 14, that percentage remains well above the 65% threshold we laid down in our summary judgment opinion as a presumption of ability status.[38] *See Texas*, 831 F. Supp. 2d at 263 & n22. We agree that such a high Hispanic population density creates a strong presumption that HD 41 remains an ability district. Significantly, none of the experts thought that HD 41 lost ability status, a conclusion that both the OAG 10 and Dr. Engstrom's analysis confirm. Alford Rep. 11 tbl.3b; Engstrom Chart.

The United States takes issue with the value of a bright-line test, especially in a district like HD 41 where the uncontested record shows that voters have faced serious and pervasive socioeconomic barriers that depress voter turnout. U.S. Post-Trial Br. 8-9. The United States also argues that we know very little about enacted HD 41, and what we do know — its high Hispanic

---

[37] This district presents a close and very difficult case. Presented with more or different evidence, we might conclude that the seemingly minor changes made to the district do not alter its ability status. Nevertheless, Congress has allocated the burden to prove lack of discriminatory effect to the State. On the record before us, we conclude that Texas has not done so.

[38] Texas argues that our summary judgment opinion set out a 60%, not 65%, bright-line test. Tex. Post-Trial Br. 7 & n.5, 11. We find this argument puzzling given that our previous opinion stated that "a minority voting majority of sixty-five percent (or more) essentially guarantees that . . . a cohesive minority group will be able to elect its candidate of choice." *Texas*, 831 F. Supp. 2d at 263. Texas argues that most of the authorities we cited used a 60% voting age population bright line, but we cited these (nonbinding) cases only as examples of the ways other courts have approached this issue.

population — is not enough for Texas to meet its burden to show no retrogression. The background for Texas's approach to redrawing HD 41 centers on the decision of Representative Aaron Peña, the five-term incumbent in neighboring HD 40, to switch party affiliations from Democrat to Republican following the 2010 election. One of the mapdrawers' goals during redistricting was to protect Rep. Peña's chances of reelection. Trial Tr. 163:4-165:13, Jan. 17, 2012 AM. They decided that the best way to do this was to have Peña, in effect, switch districts with HD 41's incumbent, and then cut out of the district some strong Democratic areas "to increase the Republican performance of [enacted HD 41]." *Id.* at 168:1-3. The result is an oddly shaped district full of sharp corners that has earned the nickname "Transformer," both here and in the section 2 litigation. *See id.* at 42:4-5, Jan. 23, 2012 PM. Enacted HD 41 splits apart seventeen of the forty-two voter tabulation districts (VTDs)[39] in the district, Defs.' Ex. 800, at 35, in an effort to bolster Republican voting strength. Trial Tr. 165:17-168:17, Jan. 17, 2012 AM.

Dr. Handley was unable to draw a conclusion whether enacted HD 41 remains an ability district because of these splits. Handley House Rep. 1 n.1. Election performance data is only available at the VTD level and not at the more precise level of a city block. Reconstituted election analysis uses the political averages for an entire VTD to assess how a portion of a VTD will perform. *See, e.g.*, Trial Tr. 74:25-78:21, Jan. 24, 2012 PM; *id.* at 11:7-13, 50:19-23, 74:10-75:13, Jan. 26, 2012 AM. The higher the number of VTD splits in a new district, the more inconclusive these predictions become. Here, where over 31% of the district's population lives in split-VTD areas and where the mapdrawers' stated goal was to peel off from the district strong Democratic areas — suggesting that the general concerns about skewed exogenous results from political variance within split VTDs may be especially strong in this district — Dr. Handley

---

[39] In Texas, VTDs are roughly equivalent to precincts elsewhere.

concluded that the results of her exogenous analysis were not reliable forecasters of the district's future voting strength. *See* Handley House Rep. 9-10.

We are not deaf to the concerns the United States raises, and we are skeptical of the State's claim that high HCVAP is sufficient to prove continued ability status in light of the uncontested testimony that HD 41 was engineered to transform a reliable Democratic district into one that would elect a Republican instead. Nevertheless, we do not think the record calls into question enacted HD 41's status as an ability district. Dr. Handley's concerns would give us more pause were minority voting power less established, but we agree with the other experts that the shortcomings of reconstituted election analysis for enacted HD 41 are not enough to keep us from concluding the district does not retrogress. This is not a case in which the Hispanic population is close to the majority line, or even close to the supermajority 65% line we set out in our summary judgment opinion. Enacted HD 41 still has an HCVAP of 72.1%. We are hard pressed to find that minority voters lack an ability to elect in a district in which they comprise such a high percentage of the voting public. We need not decide whether the United States is correct that, in a rare case, 65% HCVAP may not be enough to ensure ability to elect, because in this case, 72.1% is.

Lastly, if Texas succeeded in its goal to create a Republican district, Rep. Peña's success would require support from a sizable portion of the district's Hispanic community. This suggests either that Rep. Peña would be the Hispanic candidate of choice, or that Hispanic voting cohesion would have broken, perhaps to the point where there would no longer be one Hispanic-preferred candidate. If the former, Rep. Peña's victory would not be a mark against Hispanic ability to elect. If the latter, finding retrogression would cause us to discount the preferences of

the district's Hispanic Republican voters, which would put us at odds with section 5's mandate. We conclude that HD 41 remains an ability district in the enacted plan.

### d. State House District 117

As it does with regards to HD 41, Texas argues that the 63.8% HCVAP of southwestern San Antonio's enacted HD 117, Pl.'s Ex. 14, at 16, satisfies our bright-line test for ability to elect. Yet as we have said, Texas misreads our summary judgment opinion. A minority voting population of 65% or higher, not 60%, is necessary to "essentially guarantee" ability to elect. *Texas*, 831 F. Supp. 2d at 263. We thus use the multi-factored analysis to assess the status of this district without starting from a presumption of ability status.[40]

Benchmark HD 117's protected status has not been seriously challenged, and we have been presented with no evidence indicating that the district does not perform for minority voters. Dr. Handley's endogenous data shows the minority-preferred candidate won four of the five past elections, and only lost the fifth by a narrow margin. Handley House Rep. 9. The exogenous data shows an ability district, too. *See* Alford Rep. 11 tbl.3b (five out of ten elections); Handley House Rep. 5 (three out of five elections); Engstrom Suppl. Rep. 6 (four out of seven elections).

As for enacted HD 117, Texas points out that the district's boundaries remain essentially unchanged and notes that the district has been trending Republican in recent years. Considering only the five most recent elections in the OAG 10, exogenous results are the same for benchmark and enacted HD 117: minority-preferred candidates won only two out of five. *See* Tex. Post-Trial Br. 11-12; Alford Rep. 11 tbl.3. The United States, by contrast, argues that enacted HD 117 was

---

[40] In its post-trial brief, Texas argues for the first time that enacted HD 117 satisfies the bright-line test as a coalition district because the Hispanic and Black communities comprise 68.4% of the district's voting age population. Tex. Post-Trial Br. 11. We reject this new argument, especially because Texas has presented no evidence, such as election analysis or evidence of voting cohesiveness between the minority communities, to support a conclusion that HD 117 is a coalition district.

purposely engineered to appear unchanged from the benchmark, but that the proposed boundaries actually decrease minority voter power. U.S. Post-Trial Br. 9-10.

We conclude that enacted HD 117 is no longer an ability district. Texas may be correct that minority voting power is beginning to weaken in the benchmark district, but it has not yet dropped below the ability-to-elect threshold. The exogenous data shows that changes made during redistricting, not shifting political trends, are responsible for enacted HD 117's loss of ability status. The exogenous election analyses of all experts, including Texas's, show that minority effectiveness decreases from the benchmark level, and all conclude that minority-preferred candidates carry HD 117 less than half the time. Alford Rep. 11 tbl.3 (two out of ten elections); Handley House Rep. 11 (one out of five elections); Engstrom Suppl. Rep. 8-9 (three out of seven elections).

The high Hispanic population in enacted HD 117 — HCVAP increases five percentage points from the benchmark to 63.8%, Pl.'s Exs. 13, at 16; 14, at 15 — could suggest that enacted HD 117 remains an ability district despite its meager exogenous results. Yet HCVAP numbers do not tell the full story. The district's Spanish Surname Voter Registration (SSVR)[41] level is significantly lower at just 50.1%. Pl.'s Ex. 14, at 27. The record shows that the mapdrawers purposely drew HD 117 to keep the number of *active* Hispanic voters low so that the district would only appear to maintain its Hispanic voting strength, and that they succeeded.

The primary mapdrawer for the House Plan, Gerardo Interiano, testified that a "ground rule[]" for drawing HD 117 was to keep the SSVR level just above 50%. Trial Tr. 106:25-108:1, Jan. 25, 2012 PM. The mapdrawers accomplished this goal by placing in the new district areas with high Hispanic populations but lower voter turnout, while excluding from the district high-

---

[41] SSVR is a metric used to approximate the number of registered Hispanic voters in a given geographic area. The list is compiled by comparing state voter registration records against a Census list of common Spanish surnames.

Hispanic, high-turnout areas. For example, the heavily Hispanic communities of Somerset and Whispering Winds, part of benchmark HD 118, are both very poor and have low voter turnout. *See id.* at 9:7-13:7, Jan. 24, 2012 PM; Defs.' Ex. 363, Garza Dep. 40:8-42:25, Oct. 19, 2011. They were moved to HD 117 despite repeated requests from HD 118's representative, Joe Farias, to keep the communities within his district. Trial Tr. 7:11-14, 14:2-15:3, Jan. 24, 2012 PM. Rep. Farias's offer to "trade" an area in HD 118 with similar Hispanic population numbers in exchange for keeping Somerset and Whispering Winds in his district was rejected, and according to his unchallenged testimony, the only plausible reason for this refusal was that Hispanic voters in the region he offered to trade have much higher turnout rates than the voters in Somerset and Whispering Winds. *Id.* at 14:19-17:23. Similarly, Interiano testified that Somerset was moved to HD 117 as a way to keep the district "above 50 percent [SSVR] and maintain [our] other goals in the district" — strengthening Representative John Garza's chances at reelection. *Id.* at 107:7-11, Jan. 25, 2012 PM.

These incidents illustrate Texas's overall approach in HD 117: Texas tried to draw a district that would look Hispanic, but perform for Anglos. According to the experts, that was the result achieved. We conclude that HD 117 is a lost ability district.[42]

### e. State House District 149

HD 149 in Houston-area Harris County is an alleged coalition district composed of Asian-American, Black, and Hispanic voters. The 2010 Census shows that Harris County was

---

[42] Our conclusion that HD 117 is retrogressive may seem inconsistent with our conclusion regarding HD 41, given that HD 117's HCVAP is only 1.2 percentage points below the 65% bright line. Yet there are significant differences between the two districts. First, HD 41's HCVAP is eight points higher than that of HD 117, and eight points represents a significant difference in electoral power. Second, unlike HD 41, where no expert was willing to conclude that the district lost ability status, both Dr. Handley and Dr. Engstrom conclude HD 117 did. Handley House Rep. 11; Engstrom Suppl. Rep. 8-9. Finally, our concerns that finding HD 41 retrogressive would discount the choice of Hispanic Republicans is not an issue here. The evidence for HD 41 showed that the mapdrawers excluded Republican portions of the map; here it shows they excluded high-turnout portions. Selecting among Hispanic voters based on their political preferences may not raise a red flag under section 5, but selecting based on minority voters' history of turnout, regardless of political preference, does.

entitled to twenty-four districts, not its current twenty-five, so HD 149 was selected for elimination. The legislature chose to draw the home of HD 149's representative, Hubert Vo, into HD 137 so that Rep. Vo would be forced to run against Scott Hochberg, HD 137's representative, in the next election. Defs.' Ex. 352, Test. of Rogene Calvert, Trial Tr. 422:14-22, *Perez*, No 11-cv-360. Representatives Vo and Hochberg are the only Democrats in the county's delegation. Benchmark HD 149's population was redistributed to neighboring districts and enacted HD 149 was transplanted to an entirely different county in a different part of the state. The new district's demographics shift dramatically from minority- to majority-Anglo. Pl.'s Exs. 13, at 17 (benchmark Anglo CVAP of 37.6%); 14, at 17 (enacted Anglo CVAP of 77.4%). There is, unsurprisingly, no dispute that enacted HD 149 is not an ability district. Our only task is to determine whether benchmark HD 149 is a coalition district protected under section 5. As discussed above, we have concluded that section 5 protects coalition districts when there is clear evidence both of cohesion among the coalition's members and demonstrated electoral success. Here, we conclude that this standard has been met.

Rep. Vo is the minority candidate of choice and has won the last four endogenous elections in the district. Handley House Rep. 7 tbl.3. With such strong results, we would likely conclude that HD 149 is an ability district were there a single minority group in the district. But as we have already discussed, we must ask more when analyzing a claim that a coalition has created an ability district. There are four reasons why we conclude this endogenous success is persuasive evidence of the coalition's demonstrated ability to elect.[43]

First, population demographics give HD 149 the potential to perform as a coalition district. The district's combined Asian-American, Black, and Hispanic CVAP is 61.3%. Pl.'s Ex.

---

[43] Our conclusion is consistent with Dr. Handley's assessment of the district. *See* Handley House Rep. 3, 7, 13.

13, at 17. This fact has limited value in assessing minority voting power without information such as voter turnout and cohesion statistics, but it does indicate that if the minority groups in the district came together, they would likely be able to elect their preferred candidate, potentially without any help from Anglo crossover voters.

Second, the record shows that all three minority groups in the district vote cohesively. Texas has not contested that the district's minority communities vote cohesively in general elections. And although the parties did not provide racially polarized voting analysis or a breakdown of election returns for Rep. Vo's races, the Texas OAG's analysis shows that Hispanic and Black voters in HD 149 uniformly prefer the same candidates in general elections and that their preferences consistently diverge from those of the district's Anglo voters. *See* Pl.'s Ex. 26, at 3557-60. We have no statistical evidence of Asian-American voting patterns in the record, but the testimony at trial, discussed in more detail below, reports broad, cohesive support for Rep. Vo among all three minority communities and especially within the Asian-American community.

Third, uncontroverted anecdotal evidence shows that a tripartite coalition of the Asian-American, Black, and Hispanic communities consistently elects its candidate of choice. HD 137's Rep. Hochberg testified to the strength of the coalition, concluding that "[p]olitically all three of [the minority] communities form a coalition, and the Asian community is the glue holding things together." Defs.' Ex. 738, Pre-Filed Direct Test. of Representative Scott Hochberg 13:12-13. Rogene Calvert, an associate of the Texas Asian American Redistricting Initiative, testified that Rep. Vo defeated a twenty-two year incumbent in 2004 on the strength of the district's tri-ethnic coalition. Defs.' Ex. 736, Pre-Filed Direct Test. of Rogene Calvert 11:3-16. The Asian-American community "really rallied behind Mr. Vo when he announced his

candidacy" and "took a lot of pride in Vo's candidacy," to the point that many Asian-Americans came out to support him who had "never participated in elections." *Id.* at 11:8-11. Furthermore, he "wouldn't have had a chance of success if he hadn't received support from the other minority communities in District 149," including endorsements from both Black and Hispanic political groups, and the Asian-American, Hispanic, and Black communities "all worked together to elect Mr. Vo." *Id.* at 11:11-23; *see also* Defs.' Ex. 352, Trial Tr. 420:14-17, Test. of Rogene Calvert, *Perez*, No. 11-cv-360, (Calvert, testifying that she has "seen Asian-Americans elected to office and other candidates of our choice due to the fact that we can coalesce with other groups to elect those people"); Defs.' Ex. 353, Trial Tr. 425:18-24, Test. of Sarah Winkler, *Perez*, No. 11-cv-360 (local school board member testifying that it is necessary to gain the support of all three minority groups to win office within HD 149). We find this testimony credible, and Texas has made no effort to dispute this evidence that the coalition is effective in local and district-wide elections.[44]

Finally, the coalition has a track record of success, electing Rep. Vo in 2004 and in every election since. The tri-ethnic coalition has also had sustained success electing other local officials, such as school board and Houston City Council members. Defs.' Ex. 736, Pre-Filed Direct Test. of Rogene Calvert 12:11-13:7. Although Texas points out that the district only performs in one of Dr. Handley's five exogenous elections, Tex. Post-Trial Br. 13; *see also* Handley House Rep. 7 tbl.3, we do not find this persuasive. Texas's expert did not provide general election exogenous analysis for this district; the only expert to do so is Dr. Handley, and

---

[44] Although the Court agrees that this testimony is sufficient to conclude that the district is protected under section 5, it differs in its views of the strength of the evidence. Judge Griffith concludes that the testimony of Rep. Hochberg and Calvert shows that the Asian-American community leads the coalition and that the Black and Hispanic communities play a consistently supportive and vital role in its success. Judges Collyer and Howell need not reach the issue of leadership because they conclude that a tri-partite arrangement of equals is sufficient for protection under section 5.

she concluded that the endogenous results were more important for understanding voting patterns in the district. *See* Handley House Rep. 13 & n.20. Especially when combined with evidence that the coalition has success electing other local officials, we agree with Dr. Handley that endogenous elections, which speak to the ability of a particular voting community to coalesce around candidates for local office, are the best evidence of this coalition district's success. Unlike the facts of SD 10, here we have evidence of both concerted efforts among a coalition to elect its preferred candidates and a pattern of success extending across multiple election cycles.

Texas's primary objection to this approach is to argue that the minority groups in HD 149 do not vote cohesively in primaries and only come together to agree on a second- or third-best candidate in time for the general election. In Texas's view, this does not prove an effective coalition district. Tex. Post-Trial Br. 9-10, 12-13; *see also* Alford Rep. 19-21 (explaining his analysis showing that Asian-American, Black, and Hispanic voters in HD 149 do not vote cohesively at the primary level). We agree that evidence of shared voting preferences at the primary level would be powerful evidence of a working coalition, but it is not needed to prove cohesion. In the first place, there is little support for Texas's focus on primary elections. Texas cites *LULAC* for this point, but *LULAC*, a section 2 case, only talks about primaries as a method to determine *one* minority group's candidate of choice; it says nothing about the need for two groups in a putative coalition to vote cohesively in a primary. *See* 548 U.S. at 444. More importantly, it does not hold that evidence of cohesion in a primary is *necessary* to identify a candidate of choice. *Id.* (stating that without a contested primary there was "no obvious benchmark" to determine the minority-preferred candidate, and that the district court could draw multiple reasonable inferences from this lack of primary-level evidence). The same is true here, where there has been no contested endogenous Democratic primary since 2004, when Rep. Vo

first won his seat. Texas also cites two district court cases that rely on primary cohesion, *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004); and *Session v. Perry*, 298 F. Supp. 2d 451, 478 (E.D. Tex. 2004), but these cases represent the minority view. Most courts to address this issue have expressed no preference about the election level at which voting cohesion must be shown. *See, e.g.*, *Lewis v. Alamance Cnty.*, 99 F.3d 600, 615 (4th Cir. 1996); *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 886 (5th Cir. 1993) (en banc); *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 276 (2d Cir. 1994), *vacated and remanded on other grounds*, 512 U.S. 1283.

We agree with the majority view. Courts regularly consider general election data to demonstrate voter cohesion in traditional majority-minority districts, without any indication that such a showing is insufficient without evidence of voter cohesion in the primary as well. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 58-59 (1986); *Old Person v. Cooney*, 230 F.3d 1113, 1121 (9th Cir. 2000). Additionally, requiring cohesion in the primary election distorts the role of the primary. Although minority groups sometimes coalesce around a candidate at that point in time, minority voters, like any other voters, use the primary to help develop their preferences. We refuse to penalize minority voters for acting like other groups in a political party who do not coalesce around a candidate until the race is on for the general election. *See Alamance Cnty.*, 99 F.3d at 614-16 ("We reject the proposition that success of a minority-preferred candidate in a general election is entitled to less weight when a candidate with far greater minority support was defeated in the primary. . . . [S]uch a view is grounded in the belief that minority voters essentially take their marbles and go home whenever the candidate whom they prefer most in the primary does not prevail, a belief about minority voters that we do not share." (citation and internal quotation marks omitted)). "Pull, haul, and trade" describes the task of minority and

majority voters alike, and candidates may be minority "candidates of choice" even if they do not "represent perfection to every minority voter." *De Grandy*, 512 U.S. at 1020.

We are persuaded the record establishes that benchmark HD 149 is a coalition district protected under section 5. The Asian-American, Black, and Hispanic voters in the district work together to support their preferred candidates, and they have a multi-year record of success. Benchmark HD 149 is a protected ability district, and Texas's decision to dismantle it without offsetting the loss elsewhere is retrogressive.

### f. State House Districts 26, 106, and 144

Various Intervenors have argued that HDs 26, 106, and 144 are also lost ability districts. We disagree. For two of the districts, HDs 26 and 106, the only evidence presented shows that neither is a majority-minority district and both are currently represented by Anglo Republicans. *See* Pl.'s Ex. 13, at 13, 16. Other than scant assertions about one endogenous election in which the Anglo Republican candidate won by a narrow margin and reputed exogenous success since 2008, *see* Texas Legislative Black Caucus Post-Trial Br. 3-7, the parties have offered no election performance data or reconstituted election analysis. We cannot make findings of minority voting ability based on this thin record. At best, the evidence may show that the districts are beginning to favor minority-preferred candidates, but section 5's effect prong protects only existing, not emerging, ability districts. *See Texas*, 831 F. Supp. 2d at 264-65.

Similarly, HD 144 is not a majority-minority district and is represented by an Anglo Republican. Pl.'s Ex. 13, at 17. Both Dr. Handley's and Dr. Engstrom's exogenous election analyses show no victories for minority-preferred candidates in this district. *See* Handley House Rep. 5; Engstrom Chart. We find that benchmark HD 144 is not an ability district.

## 2.   Alleged New Ability Districts

Texas argues that the legislature created as many as three new ability districts, which offset the loss of any that might have been eliminated in the enacted plan. But the enacted plan does not draw any new ability districts. It only strengthens minority voting power in some districts that have already achieved the ability to elect. As we have already discussed, strengthening ability districts cannot salvage a retrogressive plan. A state may not offset the elimination of an ability district by "packing" additional minority voters into a district that already performs. What the State calls offsets are actually existing ability districts, and they do not compensate for the loss of others.

During the course of this litigation, Texas has offered three different explanations for how the enacted plan creates new Hispanic ability districts. At summary judgment, Texas identified HD 148 in the Houston area as a new ability district. Mot. Summ. J. ¶ 11. At trial, Texas's chief witness for the House Plan testified that he believed strengthening the SSVR percentages in HD 148 and Tarrant County's HD 90 compensated for the loss of HD 33. Trial Tr. 11:24-12:6, Jan. 17, 2012 PM. And at closing arguments and in post-trial briefing, Texas appears to abandon these claims, shifting instead to the altogether new argument that enacted HD 74 in western Texas is a new ability district. Tex. Post-Trial Br. 13-14.

Texas's decision no longer to rely on HDs 90 and 148 was sound. Although an initial examination of the demographic data shows that both districts are more strongly Hispanic in the enacted plan,[45] all the experts' election analyses show that both are already ability districts. Both achieved a perfect score under Dr. Handley's endogenous election analysis, Handley House Rep.

---

[45] The HCVAP in proposed HD 90 increases from 47.9% to 49.7%, and SSVR from 47.2% to 50.1%. Pl.'s Exs. 13, at 20; 14, at 20. HCVAP in proposed HD 148 increases from 42.1% to 51.4%, and SSVR from 40.0% to 50.0%. Pl.'s Exs. 13, at 21; 14, at 21.

5 tbl.1, and no expert's exogenous analysis shows any change between the performance of the benchmark and enacted districts. *See* Alford Rep. app. B; Handley House Rep. 5 tbl.1, 11 tbl.3; Engstrom Chart. Increasing the size of their minority populations had no impact on these districts for purposes of section 5's effect prong.

Whether enacted HD 74 is a new ability district is a closer call, but we conclude it is not.[46] With an HCVAP of 69.4%, Pl.'s Ex. 14, at 15, all parties agree that enacted HD 74 is an ability district; the question is whether benchmark HD 74 is as well. Yet the rest of the evidence shows that, as with HDs 90 and 148, the district's demographic changes only strengthen an already-performing minority district.

Benchmark HD 74 is majority-Hispanic, with an HCVAP of 59.7%. Pl.'s Ex. 13, at 14. Representative Pete Gallego, the Hispanic candidate of choice, has represented the district since 1990. Although Texas now argues that benchmark HD 74 is not an ability district, key players during redistricting believed it was. *See* Trial Tr. 25:5-22, Jan. 17, 2012 PM (Interiano, testifying that he identified HD 74 as a protected district at the outset of the redistricting process); Defs.' Exs. 214, 215, 820 (memoranda from Texas Legislative Council attorney David Hanna identifying benchmark HD 74 as a protected district). With a majority-Hispanic population, twenty-two years of success electing the minority-preferred candidate, and apparently little doubt by anyone that the district was protected until late in the litigation process, it seems clear that HD 74 does not need the new boundaries of the enacted plan to perform for minority voters.

In response, Texas points to the exogenous election analyses that paint a weaker picture of minority success. *See* Alford Rep. 11 tbl.3b (reporting minority victories in four of the OAG 10 elections); Handley House Rep. 5 tbl.1 (one out of five victories). *But see* Engstrom Chart

---

[46] We note that even if we agreed with Texas that enacted HD 74 is a new ability district, the enacted plan would still be retrogressive because the creation of one new ability district cannot offset the loss of several others.

(four out of seven victories). Texas argues that the endogenous results reflect only the fact that Rep. Gallego has held office in HD 74 for over two decades. According to Texas, that is insufficient evidence that HD 74 is an ability district. Tex. Post-Trial Br. 13-14.

We are not persuaded. As discussed above, endogenous elections are the best indication of ability to elect. What a minority community actually does in a specific district on election day is more powerful evidence than reconstituted statewide results of its ability — or lack thereof — to elect a preferred candidate. To be sure, Rep. Gallego's success is almost certainly attributable, in part, to the considerable advantages of incumbency. But Texas asks us to discount a long history of endogenous success without providing evidence that incumbency is the predominant reason the minority community is able to elect Rep. Gallego. We decline to speculate with Texas that this rationale, instead of, for example, a large Hispanic community of interest with a mobilized voter base, accounts for the district's long history of electing the Hispanic-preferred candidate. Texas has failed to show that the minority community has reelected Rep. Gallego multiple times despite lacking an ability to elect.

Moreover, we reject the premise that incumbency advantage is a mark against ability to elect. The minority community need not elect a different candidate in successive terms to prove continuing ability to elect. As we emphasized in our summary judgment opinion, analyzing ability to elect includes considering all relevant factors. *Texas*, 831 F. Supp. 2d at 260. Incumbency can be a tool that a minority community, like any other group of voters, uses to enhance its electoral power. We are sensitive to Texas's concern that incumbency advantage could, at times, give a "false positive" for ability status, but we conclude that the best solution is to consider the record as a whole, not to exclude probative evidence. We are persuaded that what has happened on the ground in HD 74 for over two decades — the consistent reelection of Rep.

Gallego — reflects the reality of established minority voting power. We thus conclude that HD 74 is an ability district in the benchmark plan, and that Texas's attempt to add Hispanic voters to the district cannot be used to offset the loss of ability districts elsewhere.[47]

### B. Discriminatory Intent in the State House Plan

Because of the retrogressive effect of the State House Plan on minority voters, we do not reach whether the Plan was drawn with discriminatory purpose. But we note record evidence that causes concern. First, the process for drawing the House Plan showed little attention to, training on, or concern for the VRA. *See, e.g.*, Trial Tr. 61:1-66:23, Jan. 20, 2012 PM. And despite the dramatic population growth in the State's Hispanic population that was concentrated primarily in three geographic areas, Texas failed to create any new minority ability districts among 150 relatively small House districts.

These concerns are exacerbated by the evidence we received about the process that led to enacted HD 117. As detailed above, the mapdrawers modified HD 117 so that it would elect the Anglo-preferred candidate yet would look like a Hispanic ability district on paper. They accomplished this by switching high-turnout for low-turnout Hispanic voters, hoping to keep the SSVR level just high enough to pass muster under the VRA while changing the district into one that performed for Anglo voters. This testimony is concerning because it shows a deliberate,

---

[47] In a footnote in its post-trial briefing, Texas advances — for the first time — HD 101 as another potential offset district. Tex. Post-Trial Br. 14 n.7. It argues that if this Court finds coalition districts are protected under section 5, as we have, then enacted HD 101 is a new coalition district because the combined Black, Hispanic, and Asian-American CVAP is 55.5% and the district is located in Democratic-leaning Tarrant County (and so, presumably, the minority community will have help from crossover Anglo voters). We stated at summary judgment that the lack of election returns to show that two or more distinct minority communities will coalesce around a preferred candidate makes it "extremely difficult to confirm that minority voters would indeed have the ability to elect" in a prospective coalition district. *Texas*, 831 F. Supp. 2d at 268. Accordingly, we will not conclude, without evidence, that the minority groups in this new district will coalesce around the same candidates and turn out in sufficient numbers to elect them.

race-conscious method to manipulate not simply the Democratic vote but, more specifically, the *Hispanic* vote.

Finally, the incredible testimony of the lead House mapdrawer reinforces evidence suggesting mapdrawers cracked VTDs along racial lines to dilute minority voting power. Texas made Interiano's testimony the cornerstone of its case on purpose in the House Plan. Trial Tr. 45:22-25, Jan. 17, 2012 AM ("[O]ur [discriminatory purpose] case rests largely on the credibility of one person. His name is Gerardo Interiano."). Interiano spent close to a thousand hours — the equivalent of six months of full-time work — training on the computer program Texas used for redistricting, *id.* at 131:3-5, yet testified that he did not know about the program's help function, *id.* at 85:18-25, Jan. 25, 2012 PM, or of its capability to display racial data at the census block level, *id.* at 93:13-19, Jan. 17, 2012 PM. As unequivocally demonstrated at trial, this information was readily apparent to even a casual user, let alone one as experienced as Interiano. *See id.* at 93:1-15; *id.* at 88:5-89:17, Jan. 25, 2012 PM. The implausibility of Interiano's professed ignorance of these functions suggests that Texas had something to hide in the way it used racial data to draw district lines. The data about which Interiano claimed ignorance could have allowed him to split voting precincts along racial (but not political) lines in precisely the manner the United States and the Intervenors allege occurred.

This and other record evidence may support a finding of discriminatory purpose in enacting the State House Plan. Although we need not reach this issue, at minimum, the full record strongly suggests that the retrogressive effect we have found may not have been accidental.

## VI.  Conclusion

We conclude that Texas has not met its burden to show that the U.S. Congressional and State House Plans will not have a retrogressive effect, and that the U.S. Congressional and State Senate Plans were not enacted with discriminatory purpose. Accordingly, we *deny* Texas declaratory relief. Texas has failed to carry its burden that Plans C185, S148, and H283 do not have the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group under section 5 of the Voting Rights Act.

Date: August 28, 2012

_____/s/_____
THOMAS B. GRIFFITH
United States Circuit Judge

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

_____/s/_____
BERYL A. HOWELL
United States District Judge

Separate opinion for the Court with respect to retrogression in Congressional District 25 by
HOWELL, *District Judge*:

The enacted Congressional Plan abridges the ability of minorities to elect their candidates

of choice, and thus cannot be precleared under Section 5 of the VRA.  As explained below, CD

25 was among the districts that provided minorities the ability to elect their candidates of choice

in the Benchmark Plan, and is therefore protected under the VRA.  The elimination of this

district, without a corresponding offset, was retrogressive.

All parties agree that CD 25 in the enacted plan is not an ability district.  They disagree,

however, whether Benchmark CD 25 is a protected crossover district.  Texas, the United States,[1]

and one defendant-intervenor claim that it is not; the remaining intervenors argue that it is.  As

discussed above, we reaffirm the conclusion reached in our summary judgment opinion that

crossover districts are protected under Section 5, and that proving their existence requires "more

exacting evidence than would be needed to prove the existence of a majority-minority district,"

with "discrete data, by way of election returns, to confirm the existence of a voting coalition's

electoral power."  *Texas v. United States*, 831 F. Supp. 2d 244, 268 (D.D.C. 2011).  We conclude

that the record before the Court demonstrates that minority voters are politically cohesive, have a

demonstrated history of electoral success, and effectively exert their political power within the

coalition that elects minority preferred candidates in CD 25.  The district is therefore a protected

ability district in the Benchmark that was lost in the enacted plan.

In the Benchmark Plan, CD 25 draws a majority of its population from South Austin in

Travis County, but also includes seven counties southeast of Austin.  The total population in the

---

[1] The United States does not dispute that minority voters have the ability to elect their preferred candidate in CD 25, but explained that, in its view, Section 5 does not apply because racially polarized voting is not present due to the number of Anglo crossover votes.  While, in dissent, our colleague correctly notes the government does "not argue that benchmark CD 25 is a protected district," CD 25 Dissent, at 1 n.1, the government's underlying rationale for this position is based upon a restricted view of the protection provided by Section 5, which, as discussed *infra*, we reject.

district is 49.8% Anglo, 38.8% Hispanic, and 8.7% Black.  Pl.'s Ex. 11.  Anglos constitute

63.1% of the CVAP in CD 25 while Hispanics make up 25.3% and Blacks 9.1%.  *Id.*  If Anglos

voted cohesively in CD 25, they could elect their preferred candidate in every election, and the

district would be beyond the ambit of Section 5.  The Anglo vote in CD 25 is split, however; as

many as half of Anglo voters cross over to vote with Hispanics and Blacks to elect Democratic

candidates (a much greater crossover percentage than the statewide average of approximately

25%).  *See* Defs.' Ex. 578 (Trial Tr. 1120-21, *Perez v. Perry*, Sept. 10, 2011).  In contrast, the

Hispanic and Black voters of CD 25 overwhelmingly vote cohesively for the Democratic

candidates.  Defs.' Ex. 724 (Ansolabehere Rebuttal Report to the Supplemental Report of Dr.

John Alford, Attach. 3) ("Ansolabehere Reb. Rep.").  For instance, in the 2008 and 2010

congressional elections, 100% of Black voters cast ballots for Congressman Lloyd Doggett, as

did over 80% of Hispanic voters.  *Id.*  Anglo support for Congressman Doggett, however, has

varied considerably.  In 2008, he received 53% of the Anglo vote, but Anglo support dropped to

37% in the 2010 election.  *Id.*  The dominant political force in CD 25 is thus described by some

as a "tri-ethnic coalition" composed of almost all the district's Black and Hispanic voters, and up

to half, but as little as 37%, of Anglo crossover voters.  *See, e.g.*, Trial Tr. 84-86, Jan. 19, 2012

PM (Dukes); Ansolabehere Reb. Rep., Attach. 3.

   To determine if a crossover district is protected under Section 5, the Court must assess

whether minority voters (1) vote cohesively and (2) successfully elect their preferred candidate

by effectively exerting their political power within the voting coalition.[2]

---

[2] Although our dissenting colleague characterizes this test as "novel" and "divorced from Supreme Court precedent," CD 25 Dissent, at 1, the test we outline above is no more novel than the application of any precedent to a unique set of facts, and fully comports with this panel's conclusion at summary judgment that crossover and coalition districts are protected by Section 5 of the VRA, *Texas*, 831 F. Supp. 2d at 266-68, as well as our reading of the Supreme Court precedent regarding protected districts outlined in the Majority Opinion. Majority Op., at 18-25. Nevertheless, the dissent argues that the test we delineate "sweeps too wide because it provides no way to distinguish between unprotected influence districts, where minority voters play a substantial role, and protected

The parties do not dispute that minorities in CD 25 combine with some Anglo voters to form a "tri-ethnic coalition," that this coalition votes cohesively in general elections, and that the coalition has had considerable success in electing minorities' candidates of choice.[3]  For example, despite the fact that Anglos comprise 63.1% of the citizen voting age population, "the candidate preferred by Blacks and Hispanics [in CD 25] has won every Congressional election this decade."  Ansolabehere Reb. Rep., at 5; Pl.'s Ex. 11.  Indeed, Texas's own expert agreed that Benchmark CD 25 is a district in which minorities have the ability to elect the candidates of their choice in general elections.[4]  Trial Tr. 21-22, Jan. 25, 2012 AM (Alford); *see also* Alford Dep. 181-82, Jan. 22, 2012.

---

crossover districts, in which they have an ability to elect."  CD 25 Dissent, at 2.  The "unprotected influence districts" referenced by the dissent, however, are districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process."  *Georgia v. Ashcroft*, 539 U.S. 461, 482 (2003).  In other words, minority voters in influence districts fall short of exercising sufficient power to be a protected district.  By contrast, our inquiry under the test we apply focuses on whether minority voters are able to "*successfully elect their preferred candidate* by exerting their political power."  As we make clear, it is not enough that minorities exert political power.  They must also be successful in electing the candidates of their choice.  *See LaRoque v. Holder*, 650 F.3d 777, 793-94 (D.C. Cir. 2011) ("Essentially overruling *Georgia v. Ashcroft*, Congress added subsections (b) and (d) to section 5, which make clear that the section 5 inquiry should focus on whether the proposed change 'has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice.' 42 U.S.C. § 1973c(b)").  As discussed below, and our dissenting colleague concedes,  CD 25 Dissent, at 3-4 (stating that ". . . there is evidence that a coalition of Black, Hispanic, and some Anglo voters consistently elects minority-preferred candidates in CD25 . . . ."), it is undisputed that the tri-ethnic coalition elected Congressman Doggett, the minority candidate of choice, in each of the past three elections.

[3] Given that Hispanic and Black voters in Benchmark CD 25 prefer the same candidate of choice in the general election, the Court considers these voters together for purposes of assessing minority voting power.  *See* Majority Op., at 5-6 (stating that "[t]he goal of the 'effect' prong [of section 5] is 'to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of *racial minorities* with respect to their effective exercise of the electoral franchise," *Beer v. United States*, 425 U.S. 130, 141 (1976) . . . .") (emphasis added).  While the dissent queries whether such aggregation is permissible under Section 5, CD 25 Dissent, at 2 n.2, this Court has already answered this question by confirming that coalitions formed by minority voters, who have united to elect their preferred candidate in a district, are protected under Section 5.  Majority Op., at 18-22.

[4] Although our dissenting colleague faults us for citing Dr. Alford's expert opinion regarding CD 25 because we reject his methodology, Texas bears the burden of proof and its only expert credibly opined, in disagreement with his own client, the State of Texas, that Benchmark CD 25 is a district in which minority voters are able to elect the candidates of their choice.  The dissent states that because "Dr. Alford uses a metric . . . we have emphatically rejected[,] [t]here is no reason that his assessment should be legally conclusive for this district, yet no other."  CD 25 Dissent, at 5 n.5.  There are two inaccuracies in this statement.  First, Dr. Alford's conclusion regarding Benchmark CD 25 was not based on his rejected metric, but upon the undisputed fact that the minority candidate of choice has won all endogenous elections in the district.  Trial Tr. 21, Jan. 25, 2012 AM (Dr. Alford responding "yes" to the

Given that there is no dispute that CD 25's tri-ethnic coalition votes cohesively and has had considerable and proven success in general elections, the only remaining question before the Court is whether minorities in CD 25 exert their political power effectively in the tri-ethnic coalition, or are rather just "hangers-on" to the choices of Anglo voters.

### A. Minority Groups Effectively Exert Political Power Within the Tri-Ethnic Coalition that Elects Minority Preferred Candidates in CD 25

Texas argues that minorities succeed in CD 25 because Anglos do not vote as a racial bloc and some Anglos happen to vote for Democratic candidates, who are preferred by minorities. *See* Texas Post-Trial Brief, ECF No. 201, at 16 (stating that "[t]he demographics for the district show why" CD 25 is not a protected district and arguing that it performs for minorities because it is a "reliable Democratic district"). Texas's expert, while agreeing that minorities in Benchmark CD 25 have the ability to elect the candidates of their choice, similarly asserts that the sole cause of the minority groups' undisputed success is the partisan makeup of the Anglo population in the district. *See* Pl.'s Ex. 175, at 26-27 (Alford Pre-Filed Direct Testimony) (stating that "the key factor at work is partisanship"); Defs.' Ex. 319, Alford Report, at 2 ("Because these 'tri-ethnic' coalitions are driven by partisanship, they cannot be easily disentangled from partisanship . . . ."). According to this argument, minority voters in CD 25 are subject to the whims of Anglo Democrats and have no effective voice in the electoral process.

This argument is untenable for two reasons. First, the fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether

---

question: "You would agree . . . that on the benchmark plan Congressional District 25 was a district in which Blacks and Hispanics were able to elect the candidates of their choice in general elections, correct?"). In fact, Dr. Alford testified that he did not even include CD 25 in his statewide functional analysis. *Id.* 21-22. Second, we do not deem Dr. Alford's statement on CD 25 to be "legally conclusive," which is why we discuss the law and evidence pertaining to CD 25 at length.

minorities are able to elect the candidate of their choice, no matter the political party that may benefit.  Second, as detailed below, the record does not support Texas's argument concerning the political dynamics in CD 25.  Both factual and expert testimony establish that Anglos do not control the election outcomes in CD 25 and that power is shared equally among Hispanics, Blacks, and Anglos in this district, giving minority voters the ability to elect their preferred candidates.[5]

The record demonstrates that no single group in CD 25's tri-ethnic coalition is sufficiently numerous to elect its candidate alone, but together the coalition consistently wins general elections in the district.  Contrary to the assertion that Anglo Democrats control the district, evidence shows that candidates supported by the minority groups within the tri-ethnic coalition are the ones who win.  Trial Tr. 104, Jan. 19, 2012 PM (Dukes).  For example, Texas State House Representative Dawnna Dukes testified that candidates are not able to bypass minority voters, and candidates who only obtain endorsements from Anglo groups in the tri-ethnic coalition do not win elections.  *Id.* at 106 (Rep. Dukes testifying that " . . . in general elections in Travis County [] if you do not win the Hispanic and African-American boxes that are largely located in the central portion of Travis County, then you are not going to win an election

---

[5] Writing in dissent, our colleague argues that to draw "the line between protected crossover districts and non-protected districts that simply vote Democratic," a minority group "must lead" a crossover coalition and that "an equal voice" in a district's electoral decisions is not enough.  CD 25 Dissent, at 1, 3.  For this reason, the dissent is critical of the testimony that "could support a conclusion that Anglos do not control CD 25, but [] doesn't tell us anything more." *Id.* at 5.  This new "leadership" test sets down a hurdle for which we find no basis in the law or precedent and, consequently, to which we do not subscribe.  Section 5 of the VRA protects "the ability of [minority voters] to elect their preferred candidates of choice."  42 U.S.C. § 1973c(d).  This text charges the Court, quite simply, with assessing whether minority voters are able effectively to elect their preferred candidates.  The Supreme Court has never stated that minorities must "lead" a voting coalition, but rather that when minorities "pull, haul, and trade" to elect their preferred candidate, the district is one in which minority voters have an ability to elect and section 5's safeguards apply. *See Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994); *see also Georgia v. Ashcroft*, 539 U.S. 461, 481 (2003).  The Supreme Court's oft-used description belies an interpretation of Section 5 that would require minority voters to "lead," with the implication that they must eschew any "trade" or compromise in power sharing, even though such trading and compromise are a necessary part of the process in a political coalition.  We decline to adopt a new "leadership test," as outlined in the dissent, when the text of the statute and Supreme Court construction of the law provide no basis for the assertion that minorities are only able to elect their candidate of choice if they are "leaders," as opposed to equal participants in the process of political coalition building.

in Travis County without the progressive Anglo Black and Hispanic communities.  I may not have an Excel spreadsheet, but I can tell you I know my county.").

Representative Dukes provided specific examples of elections to support her analysis of minority groups' voting power in CD 25.  She recalled the 2008 election for Travis County Tax Assessor, in which the African-American supported by the coalition successfully defeated, with 74% of the vote, an Anglo male "progressive Democrat."  *Id.* at 112.  Before the Court is similar testimony from David Escamilla, the Travis County Attorney, regarding the power of minority voters in the tri-ethnic coalition.  *See* Defs.' Ex. 735 (Pre-Filed Direct Testimony of David Escamilla).  Mr. Escamilla not only echoed Representative Dukes' testimony that Anglos do not control the election outcomes in the tri-ethnic coalition, but also provided the example of a race in 2008 in which an Anglo Assistant County Attorney lost a race for a county judgeship despite having "the lion's share of endorsements from the local Democratic clubs" because he was "unable to gain significant support from the Hispanic or African American community."  *Id.* at 9-10.

The evidence presented to the Court regarding the power of minority voters in the tri-ethnic coalition is persuasive, particularly because it is corroborated by the expert analysis performed by Dr. Stephen Ansolabehere.[6]  To assess the relative power of the groups comprising the tri-ethnic coalition, Dr. Ansolabehere examined each groups' success in Democratic primary elections in Travis County.  In the 43 Travis County primaries he analyzed, the Anglo preferred

---

[6] As discussed *infra*, Dr. Ansolabehere's analysis could be more comprehensive.  His findings are nonetheless probative of the voting dynamics within CD 25.  Our dissenting colleague believes that some of Dr. Ansolabehere's statistics result in "discrepancies," CD 25 Dissent, at 7 n.8,  but our colleague's deconstruction of Dr. Ansolabehere's data has not been corroborated by any statistical expert.  Regardless, even taking into account any alleged "discrepancies," it is undisputed that Dr. Ansolabehere's data indicates that Congressman Doggett enjoys virtually unanimous support from Black voters and overwhelming support from Hispanic voters.

candidate won only once without support from the Hispanic and Black communities.[7]
Ansolabehere Reb. Rep., Attach. 6.  On the other hand, minority preferred candidates won twelve elections without the support of Anglo voters.  *Id.*  While Texas – as well as the TLRTF – argues that Anglo Democrats control the tri-ethnic coalition and drown out minority voters, these election results belie that conclusion.  To the contrary, Dr. Ansolabehere concludes that "[l]ooking across the different patterns of group coalitions reveals that no one group dominates the primary process.  Power is shared very equally and in such a way that the racial groups succeed in nominating their preferred candidates 75 percent of the time."  *Id.* at 23.  By way of example, in the 43 primaries Dr. Ansolabehere analyzed, Anglo voters backed the winner in 31 primaries; Hispanic voters backed the winner in 32 primaries; and Black voters backed the winner in 31 primaries.  *Id.*, Attach. 6.[8]

These statistics support the testimony presented to the Court that the tri-ethnic coalition consistently elects candidates in the Democratic primary that appeal to the minority voters in the tri-ethnic coalition.  Mr. Escamilla effectively described the political cohesion and cooperation within the tri-ethnic coalition, which "consistently produces broad agreement to support individual candidates and slates of candidates.  The high frequency of agreement on candidates among the organizations within the Coalition also stems from the fact that many individuals are members of more than one of the organizations.  This overlap in membership promotes

---

[7] These primary election results are cited only to assess the relative power among groups comprising a voting coalition, not to assess whether a voting coalition exists.  *See* Majority Op., at 64-66 (noting that groups comprising a voting coalition need not vote cohesively at the primary level).

[8] A second expert also noted that voter turnout in primary elections is generally low in Travis County and CD 25, which effectively amplifies the preference of minority voters in Democratic primaries.  He explained: "[I]n the low-turnout Travis County and CD 25 primaries, minority voters vote almost exclusively in the Democratic election, while the Anglo majority in Travis County, and elsewhere in CD 25, splits its vote in the March partisan balloting.  That means minority voters, especially in Travis County, combining with the minority of Anglos who remain in the Democratic primary, are very effective in determining the nominee of their party."  Murray Suppl. Rep., ECF No. 218, Ex. 1, at 1; *see also id.* at 5 ("Fewer and fewer Anglos vote in Democratic primaries in the 25th District.").

agreement on common slates of political candidates." Defs.' Ex. 735, at 7. Indeed, the evidence demonstrates that Anglos do not dominate the tri-ethnic coalition that successfully elects candidates in CD 25. Rather, the record shows that the views and preferences of minority voters in the tri-ethnic coalition are not only necessary but, more importantly for Section 5 analysis, regularly prevail in the coalition's selection of candidates. In our view, as noted, the tri-ethnic crossover coalition at work in Benchmark CD 25 reflects equal power-sharing among the members of the coalition rather than domination by Anglo voters.

In addition to the anecdotal and expert evidence of the dynamics within the tri-ethnic coalition, there is no greater evidence of the power of minority voters in CD 25 than the reelection of Congressman Doggett in 2010. In 2008, 53% of Anglo voters supported Congressman Doggett's successful reelection campaign. In 2010, however, Congressman Doggett won reelection despite receiving only 37% of the Anglo vote because 100% of Blacks and 86% of Hispanics voted for him. Ansolabehere Reb. Rep., Attach. 3.[9] Thus, notwithstanding the fact that a large majority of Anglos voted against the minority preferred candidate, minority voters effectively exerted their political power (with the aid of a number of crossover Anglo voters) to elect the candidate of their choice.

Texas argues that minority success is solely due to the partisan makeup of the district, but the 2010 election alone refutes this conclusion. Indeed, despite Texas's burden of proof, Texas supplies no evidence aside from demographic statistics to support its argument that minority

---

[9] Most of the experts agree that such endogenous election results are the most probative evidence of whether a minority group or minority coalition has the ability to elect the candidate of choice. *See, e.g.*, Defs.' Ex. 794, at 3 (Handley Rebuttal Report) ("[T]he most essential piece of information in determining if a Benchmark district is a district that provides minority voters with the ability to elect their candidates of choice is whether minority voters have been successful at electing their preferred candidates to the legislative office at issue in the district."); Defs.' Ex. 327, at 4 (Handley Congressional Report); Defs.' Ex. 724 (Ansolabehere Oct. 21, 2011 Report, at 31). While the retrogression expert proffered by Texas disagrees with reliance on endogenous election analysis, as noted previously, even he agreed that Benchmark CD 25 is a district in which minorities have the ability to elect the candidates of their choice. Trial Tr. 21-22, Jan. 25, 2012 AM (Alford).

voters do not have power in the tri-ethnic coalition nor does it supply evidence to undercut the intervenors' argument that they do.  The intervenors argue that minority voters' repeated electoral success as well as the unrebutted factual and expert testimony regarding equal power-sharing among the groups comprising the tri-ethnic coalition is sufficient to establish that Benchmark CD 25 is a minority ability district.  We agree.

## B.  Evidence Discrediting Minority Voting Power is Unpersuasive

Despite the success of minority voters in electing the candidates of their choice in CD 25, unrebutted testimony of elected officials from within this district, and expert evidence corroborating the political power of minority voters within the tri-ethnic coalition, two arguments are asserted for support of the position that minority voters do not exert political power in Benchmark CD 25 and that this district is therefore not eligible for protection as an ability district.  The United States also takes the position that Benchmark CD 25 is not a protected district, but does so on the belief that Section 5 does not apply to CD 25 because Anglo voting in the district is not characterized by racial polarization.  Each of these arguments merits consideration.

First, the TLRTF discounts the expert evidence presented by Dr. Ansolabehere demonstrating the electoral success of minority voters and their power within the tri-ethnic coalition because this evidence relies on information from Travis County, as opposed to all of the counties that comprise CD 25 in the Benchmark plan.  TLRTF's Resp. to the Ct.'s Order of Mar. 6, 2012, ECF No. 219, at 7.[10]  We acknowledge that, as with other experts in this case, the analysis by Dr. Ansolabehere does not cover all possible useful data.  Nonetheless, the Court finds evidence of the tri-ethnic coalition's performance in Travis County probative of its analysis

---

[10] Our dissenting colleague also cites this focus on Travis County as a weakness in the expert analysis and testimony.  CD 25 Dissent, at 5-6.

of whether minorities in CD 25 have the ability to elect the candidates of their choice.  As an initial matter, there is only one endogenous election within CD 25 as a whole:  the election for a representative to the U.S. Congress, which Congressman Doggett has won since the district's initial formation.  Thus, in order to measure the effectiveness and power of minorities in the tri-ethnic coalition that elects Congressman Doggett, one must necessarily look to the performance of the coalition in other political subdivisions, such as in Travis County.  The portion of CD 25 that encompasses Travis County not only comprises a significant majority of the population of CD 25 (59.7%), but also contains a large majority of the district's minority population (66%).  *See* Pl.'s Ex. 11.  The voting dynamics in the district's most populous county have a significant impact on the voting dynamics in the rest of the district.  The minority population's other successes in Travis County are therefore significant in assessing its power and influence within the crossover coalition. [11]

Second, like Texas, the TLRTF contends that Benchmark CD 25 is not an ability district because Anglo voters dominate the electoral outcomes in CD 25.  As the prior discussion reveals, this argument is factually wrong.  It is also based upon faux data.  In support of its view of the relative voting power of minority versus Anglo voters, the TLRTF cites two different sets of data supplied by the OAG: racially polarized voter turnout estimates and exogenous election results in statewide Democratic primaries.   Prior to discussing the reliability of these datasets,

---

[11] No party, including Texas, presented any evidence regarding the tri-ethnic coalition's performance in the six smaller counties wholly contained in Benchmark CD 25.  Our colleague states that we are "mistaken" on this point, and writes that "[w]e received evidence indicating that the tri-ethnic coalition was ineffective in these counties in 2010."  CD 25 Dissent, at 6 n.6.  The exhibit to which he cites, however, is a 206-page table of election results, which indicates that the Democratic candidate lost in the elections he references.  *See id.*; Pl.'s Ex. 34.  This table and the election results our colleague discovered on the Internet, *see* CD 25 Dissent, at 6 n.6, indicate that the other six counties wholly contained in Benchmark CD 25 vote overwhelmingly Republican.  *Id.* (concluding, based on an analysis of aggregate data, that "the tri-ethnic coalition prevailed in only three of one hundred and twenty elections held in these counties in 2010").  This confirms that at least the majority of voters in these counties are not part of the tri-ethnic coalition, and thus do not affect the voting dynamics *within* the tri-ethnic coalition, which is the focus of our inquiry.  It further indicates that the tri-ethnic coalition is able to prevail in endogenous elections in Benchmark CD 25 despite the fact that most of the voters in these six smaller counties do not vote for the minority preferred candidate.

the Court briefly reviews the peculiar manner in which the TLRTF first raised its arguments to the Court.

Over three weeks after trial and following submission of the parties' proposed findings of fact and post-trial briefs, the TLRTF argued for the first time in an "advisory" that the Court should not count Benchmark CD 25 as a protected district because Anglo voters "dominate the Democratic primary."[12]  Advisory of Def. Intervenor TLRTF, ECF No. 210, at 3; *see also* TLRTF Resp. to Gonzales Intervenors' Brief Regarding CD 25, ECF No. 223, at 2 n.3 (TLRTF concedes that prior to filing its advisory, this intervenor had "never previously 'suggest[ed] to the Court that CD 25 was not a minority ability district[.]'").  As support for its blanket statement that Anglos "dominate" Democratic primaries in CD 25, the TLRTF cited tables of exogenous election results from statewide primary and general elections in four years (2002, 2006, 2008 and 2010).  Advisory of Def. Intervenor TLRTF, ECF No. 210, at 3 n.10 (citing Defs.' Exs. 437, 439-41).  Since the tables of election results did not identify the minority candidates of choice, the exhibits did not corroborate TLRTF's statement, prompting the Court to issue a Minute Order directing the TLRTF to provide a "fuller explication of its reasoning for and the evidence behind its conclusion."  Minute Order dated Mar. 6, 2012.

In response to the Court's Order, the TLRTF argued for the first time that Anglos often cast a majority of votes in primary elections. [13]  TLRTF's Resp. to the Ct.'s Order of Mar. 6,

---

[12] According to the other intervenors, when the U.S. District Court in the Western District of Texas initially adopted a congressional map that preserved CD 25, the TLRTF "defended that map in Texas's appeal to the Supreme Court, never suggesting to the Court that CD 25 was not a minority-ability district . . . ."  Resp. of Certain Def. Intervenors to TLRTF's Briefing Relating to CD 25, ECF No. 221, at 3.

[13] The TLRTF also urges the Court to look to a second OAG dataset of exogenous election results in CD 25 for statewide Democratic primaries, which the TLRTF interprets as showing that Hispanic candidates of choice only prevail in three out of nine primary elections.  TLRTF's Resp. to the Ct.'s Order of Mar. 6, 2012, ECF No. 219 at 12-13; TLRTF's Resp. to Gonzales Intervenors' Brief Regarding CD 25, ECF No. 223 at 13 ("Latino candidates won only *three out of the nine* Democratic Primary elections") (emphasis in original).   Other intervenors dispute the TLRTF's interpretation of this data and argue that the data shows that minority preferred candidates prevailed in

11

2012, ECF No. 219, at 13.  The Court agrees with the remaining intervenors, however, that the

data presented by the TLRTF to support this argument is not persuasive.[14]

According to the TLRTF and our dissenting colleague, the OAG turnout estimates for

certain selected elections in four elections cycles between 2002 and 2010 indicate that Anglo

voters cast the majority of votes in both the Democratic primary and general elections in CD

25.[15]  *Id.*; *see also* TLRTF Resp. to Gonzales Intervenors' Brief Regarding CD 25, ECF No. 223,

at 1-2 (arguing that "Anglo voter preferences drive the outcome of both the Primary and General

Election").  These turnout estimates, however, were appropriately criticized by Dr. Alford

because they are unreliable on their face.  Dr. Alford explained:

> . . . if you'll take a quick look at the last two columns [of the data] I think you'll
> agree with me there's very little reason to put any faith in this particular analysis.
> I don't put any faith in the analysis.  I've not relied on the analysis.  Precisely
> what you're about to talk about here, because of a variety of technical things, we
> don't need to discuss.  I mean, look at the general election in 2004. This model
> estimated that the turnout was 26 percent.  The actual turnout in the election was
> 40.8 percent. The error in this model is enormous, and it's increased when we try
> to estimate the increase in categories.  I don't rely on this.

---

"six of eight primaries."  Resp. of Certain Def. Intervenors to TLRTF's Briefing Relating to CD 25, ECF No. 221, at
5.  Resolving this dispute, which the TLRTF raised for the first time in a post-trial brief, is unnecessary since the
Court finds that exogenous primary evidence is not probative to assess whether a voting coalition exists or to
measure the effectiveness of minority voters in CD 25.  In any event, exogenous primary election results would not
rebut the testimonial and expert evidence demonstrating that minority voters in CD 25 have fulfilled their
"obligation to pull, haul, and trade to find common political ground" and achieve electoral success.  *Georgia v.
Ashcroft*, 539 U.S. at 481 (quoting *De Grandy*, 512 U.S. at 1020).

[14] The timing and weak evidentiary basis for TLRTF's belated "advisory" suggest that tactical considerations were
at play.  *See generally* Resp. of Certain Intervenors to TLRTF's Briefing Relating to CD 25, ECF No. 221, at 3
(implying that the "Task Force has now created that argument in an attempt to justify the deal it cut with Texas" in
the interim map-drawing process in the U.S. District Court for the Western District of Texas).  Indeed, the TLRTF
uses this Court as a forum to contend that a new Latino-majority district in CD 35 in Central Texas may properly
encompass portions of Travis County, a matter that is not at issue before this Court.  Advisory of Def. Intervenor
TLRTF, ECF No. 210, at 3; TLRTF's Resp. to the Ct.'s Order of Mar. 6, 2012, ECF No. 219, at 2.  Whether CD 25
is a protected district only has a bearing on the key issue of the retrogressive impact of the enacted plan, and not the
location or boundaries of any offsetting new ability district.

[15] The TLRTF specifically referenced turnout in the 2002 Democratic primary race for Governor; the 2006
Democratic primary for Lt. Governor; the 2008 Democratic primary race for U.S. Senator; and the 2010 Democratic
primary race for Lt. Governor.  TLRTF's Resp. to the Ct.'s Order of Mar. 6, 2012, ECF No. 219, at 13.

Trial Tr. 86-87, Jan. 24, 2012 PM (Alford).  In other words, the predictions of voter turnout produced using the methodology employed by the OAG relied on assumptions that differed drastically from what occurred in real life.  Dr. Alford's comments pertained to the OAG turnout data for elections for the State House, but there is no indication that the OAG's methodology differed when compiling data for congressional elections or that Texas's expert's views of the unreliability of this data would be any different for congressional elections.  Indeed, examination of the turnout predictions for congressional elections reveals that the error rate Dr. Alford referenced is equally as large, if not greater, than in the State House portion of this dataset.[16]

For example, the statistical model used to produce the OAG turnout data projected that turnout in CD 25 in the 2010 general election was 74.6%, when the actual turnout was 31%.  Pl.'s Ex. 24, at 577.  In the 2008 general election, the OAG projected turnout was 100%, but the actual turnout was 48.6%.  *Id.*  In 2006, the OAG projected turnout was 65.7% when the actual turnout was 28.1%.  *Id.*  In short, the projected congressional turnout data contains enormous error rates, similar to that found in the turnout estimates for the State House, and is subject to the same criticism of unreliability.[17]  Our dissenting colleague states that he relies on "different data"

---

[16] The dissent states that Dr. Alford rejected the turnout data because he found significant discrepancies in the "'last two columns [of the data],'" CD 25 Dissent, at 9 n.11, while we find discrepancies in other parts, or columns, of this data, an observation that leads our colleague to conclude that "Dr. Alford's concern is not the same as" ours.  This is simply wrong.  Dr. Alford pointed out blatant error rates in certain columns of the dataset merely as examples of the significant issues with relying on this data, and made clear that there were a "variety" of issues with this data.  Trial Tr. 86-87, Jan. 24, 2012 PM (Alford) ("I've not relied on the analysis . . . *because of a variety of technical things*, we don't need to discuss.") (emphasis supplied).  Thus, when our dissenting colleague "use[s] that same metric [namely, the difference between the real and projected voter turnout] —the only ground Dr. Alford gave as support for his critique — to test the data," CD 25 Dissent, at 9 n.11, he may be missing the remaining "variety of technical things" referenced by Dr. Alford that were not fully developed in the record by the experts and that make this data insufficiently reliable for even Texas' own expert to rely upon.

[17] Notably, at no point did Texas cite to the OAG turnout data in response to the intervenors' argument that CD 25 was a protected ability district in the Benchmark Plan.  The only time any party cited to this data in regards to CD 25 was in the post-trial submission filed by the TLRTF in response to a show cause order issued by the Court.  *See* Minute Order dated Mar. 6, 2012; TLRTF's Resp. to the Ct.'s Order of Mar. 6, 2012, ECF No. 219.  Even then, the TLRTF cited to turnout data for primary elections.  If the OAG's turnout data were reliable and minority voter turnout was 10% in CD 25, CD 25 Dissent, at 9, the Court's inquiry into whether CD 25 is a protected district in the Benchmark plan would meet a swift end.  *See* Majority Op., at 24 (noting that minority voters who make up 10% of

from the OAG than the one we discuss, but it appears that all of the OAG turnout projections were produced using the same methodology.[18]  Dr. Alford stated that error rate in the "model" used by the OAG led him to completely disregard that data.  Trial Tr. 86-87, Jan. 24, 2012 PM (Alford).  Indeed, none of the experts in this case appeared to rely on OAG turnout projections, in any of its forms.[19]  The dissent expends much energy attempting to demonstrate that the OAG turnout data *could* be accurate, and even "extrapolat[es] [] missing turnout data" from Dr. Ansolabehere's analysis as an alternative, but, quite frankly, our colleague's own calculations of turnout data are defective.[20]  While reliable and accurate data regarding voter turnout by racial group in Benchmark CD 25 would be highly probative, the Court is not presented with such evidence and will not endeavor to create its own.[21]  Consequently, we do not rely on such data

---

a population and provide a margin of victory to Anglo Democratic voters could not be protected under Section 5).  If the OAG turnout data had sufficient reliability to have any probative value, Texas's failure to rely on this data would be inexplicable.  Rather, the explanation lies in the fact that this data is simply so unreliable as to be irrelevant.

[18] Our colleague states in dissent that unlike the OAG dataset criticized by Dr. Alford, the OAG dataset upon which the dissent relies appears to "accurately predict[] the overall turnout in a given election."  CD 25 Dissent, at 9 n.11.  This may be so, but the projections relevant to the Court's analysis are those pertaining to the number of votes cast by minority groups.  There is no testimony, expert or otherwise, in the record that the data on which the dissent relies is not as flawed as the turnout numbers rejected by Dr. Alford.  Texas's failure to cite to this data again indicates to the Court that it has little probative value.

[19]  Our dissenting colleague fails to acknowledge that none of the experts in this case appears to rely on OAG turnout projections.  He also dismisses, without explanation, the fact that Texas – the party that compiled and calculated the turnout projections – never relied upon this data.

[20] For example, our colleague acknowledges that his calculation that minorities cast only 19% of the vote for Congressman Doggett is "imperfect" because "relative turnout among minority groups . . . could have changed between elections."  CD 25 Dissent, at 8 n.10.  Overall turnout changed dramatically between the 2008 and 2010 elections.  In 2008, 291,296 voters voted in the election for the U.S. Congress in Benchmark CD 25.  Pl.'s Ex. 31, at 10.  In 2010, voter turnout dropped over 33%, by more than 100,000 votes, to 189,247.  Pl.'s Ex. 32, at 13.  The dissent's assumption that turnout among racial groups remained constant as a percentage of the overall voter turnout is unsupported speculation.  Given the number of variables affecting voter turnout generally and the complexity of predicting turnout on a demographic basis, none of the experts in this case – including the one who compiled the data used by our colleague to compute his 19% figure –apparently viewed such predictions as sufficiently reliable to offer an opinion.

[21]  We disagree with our dissenting colleague's assertion that turnout data is the only way to provide a "context" for the expert testimony before the Court.  CD 25 Dissent, at 9 n.11.  In the absence of reliable turnout projections, unrebutted witness testimony and endogenous election results are sufficient to corroborate expert analysis and to provide a "context" for such evidence.  *See Texas*, 831 F. Supp. 2d at 268 (recognizing crossover and coalition districts may be ability districts based upon "discrete data, by way of election returns, to confirm the existence of a

and give neither the OAG turnout projections nor our colleague's extrapolated calculations weight or further consideration.  In its place, we rely on the most probative evidence presented to the Court: testimony from elected officials, endogenous election results, and expert analysis.

### C.  The United States' Position that CD 25 is Not Protected because of the Absence of Racially Polarized Voting Among Anglo Voters is Incorrect

The United States does not argue that CD 25 is a protected district in the Benchmark Plan and has remained generally silent as Texas and the intervenors argue over the district's status under Section 5.  At closing argument, in response to a direct question posed by the Court, the United States clarified its position that while minority voters have an ability to elect the candidate of their choice in CD 25, it believes that CD 25 is not protected by Section 5 because Anglo voting in the district is not racially polarized.  Trial Tr. 82-85, Jan. 31, 2012 AM.[22]

The Court is presented with four distinct positions regarding racial polarization in CD 25: The United States and certain intervenors posit that Anglo voters in CD 25 are not racially polarized, but that finding compels the government to conclude that no Section 5 protection applies,[23] while the intervenors reach the opposite conclusion.  According to these intervenors, the lack of racially polarized voting among Anglos is irrelevant to the Court's Section 5 analysis. *See, e.g.,* Trial Tr. 34-35, Jan. 31, 2012 PM (Gonzales intervenors' counsel acknowledging that

---

voting coalition's electoral power," citing as example  "evidence that a coalition had historical success in electing its candidates of choice").

[22] Counsel for the Department of Justice explained as follows: "Congressional District 25 does perform . . . the issues there . . . has to do with polarized voting . . . we aren't finding the polarized voting in that area . . . . [T]here is polarized voting in most of Texas . . . . The question is regarding this area around Travis County area, and the success where it's not crossover anymore if 52 percent of the . . . Anglo voters are voting the same as the [B]lack voters and the same as the Hispanic voters or whatever the percent may be depending upon which election contest you're looking at.  So at a certain level again, is the protections that flow do deal with the realities of polarized voting and whether or not there exists polarized voting."  Trial Tr. 84-85, Jan. 31, 2012 AM.

[23] The Department does not indicate the threshold number of Anglo cross-over votes that would remove from the protection of Section 5 an otherwise minority ability district. In any event, rather than focus on the single demographic statistic of the number of Anglo cross-over votes, a functional test must be applied to assess whether minority voters effectively exercise power to elect their candidate of choice in a cross-over coalition.

voters in Travis County are "colorblind," but stating that "[t]he only way the Voting Rights Act could not protect that district . . . is if somehow, there had been a bailout. . . . In fact, Section 5 covers all of Texas as a matter of law, and so Travis County, CD 25, is covered, just like every other jurisdiction in Texas.").  By contrast to those two positions, the TLRTF argues that voting is polarized in all elections.  TLRTF Resp. to Gonzales Intervenors' Brief Regarding CD 25, ECF No. 223, at 10.  Finally, Texas appears to take the position that Anglo voting is not racially polarized in general elections, but asserts that CD 25 should not be protected because racial polarization is present among *minority* voters in Democratic primary elections.  Trial Tr. 131-35, Jan. 19, 2012 PM.  The Court need not determine which of these views is ultimately correct because, regardless, CD 25 is a protected district under Section 5.

The Court agrees with the Gonzales intervenors that Section 5 covers all of Texas as a matter of law and Travis County, including CD 25, is covered, just like every other jurisdiction in Texas.  The position of the United States would have the anomalous consequence that once minorities successfully elect their candidates of choice in a cross-over district, Section 5 would no longer apply. [24]  That is not the law.  Such an ability district remains protected by the VRA and, if it is eliminated as an ability district, it must be offset, which CD 25 is not.  This loss of Benchmark CD 25 as an ability district, without the creation of any new ability district, renders the enacted Congressional plan retrogressive.

---

[24] The United States' position is that the protections of Section 5 need not apply to CD 25 because of the presence of crossover Anglo voters.  The presence of these crossover Anglo voters does not sufficiently protect minority voters in CD 25, but, in fact, may create a ripe target for actors in other parts of the state to retrogress minority voting power in CD 25 by fracturing the district and submerging its pieces in areas where race-based voting remains prevalent.  Indeed, the enacted plan divides Travis County into five different districts and as a result, "[t]his is the only county in which the population exceeds the number required to constitute a [congressional] district, but the county is not the seat of any single district."  Ansolabehere Report on Minority and White Representation and Voting Patterns in the Texas Congressional District Plan C185 at 47, *Perez v. Perry*, Aug. 8, 2011, ECF No. 123-1.

GRIFFITH, *Circuit Judge*, dissenting with respect to retrogression in Congressional District 25:

I, too, reaffirm our decision at summary judgment that crossover districts are protected under section 5, and I agree that enacted CD 25 is not an ability district. But I cannot join in my colleagues' proposed test for the existence of a crossover district, which is divorced from Supreme Court precedent and dangerously broad. I first explain why the test to find a protected crossover district is more demanding than that my colleagues employ. Then I show that even under their standard, the record does not contain the "more exacting evidence" needed to show that benchmark CD 25 is a crossover district.[1] *Texas v. United States*, 831 F. Supp. 2d 244, 268 (D.D.C. 2011).

As my colleagues' analysis shows, Blacks and Hispanics vote cohesively in CD 25, and their support is necessary to victory. But as we have already agreed, these factors alone are not enough to show that minority voters can effectively exercise their electoral power to elect their preferred candidates. My colleagues and I agree that section 5 does not protect every district in which "Anglos and minorities vote together to elect a candidate," or "that elects a Democratic candidate no matter how small its minority population." Majority Op. at 25, 24. We disagree over where section 5 draws the line between protected crossover districts and nonprotected districts that simply vote Democratic.

My colleagues hold that a district is protected when minority voters "effectively exert[] their political power within the voting coalition." Under this novel rephrasing of "ability to elect," they establish a false dichotomy, testing "whether minorities in CD 25 exert their political

---

[1] As my colleagues note, Texas and the Texas Latino Redistricting Task Force argue that benchmark CD 25 is not an ability district under section 5. In addition, the United States and its expert, Dr. Handley, do not argue that benchmark CD 25 is a protected district. Indeed, the United States explicitly noted in its post-trial briefing that, in its view, retrogression in the Congressional Plan is based on the failure to add an additional ability district, "not on a . . . determination that benchmark [CD] 25 provides minority voters with the ability to elect preferred candidates of choice." U.S. Post-Trial Br. 16 n.9.

power effectively in the tri-ethnic coalition, or are rather just 'hangers-on' to the choices of Anglo voters." CD 25 Majority Op. at 4. Although my colleagues do not provide a full definition of what it means for minority voters to "effectively exert[] their political power," it appears that they view *anything more* than "hanging on" as sufficient to prove that the district is protected. But this overbroad result runs headlong into the 2006 amendments to the VRA. As we noted at summary judgment, *Texas*, 831 F. Supp. 2d at 251, Congress amended the VRA to make clear that section 5's retrogression prong did not include "influence districts" — ones in which minorities play a "substantial, if not decisive, role in the electoral process," *Georgia v. Ashcroft*, 539 U.S. 461, 482 (2003); *see also LaRoque v. Holder*, 650 F.3d 777, 793-94 (D.C. Cir. 2011). The majority's "effectively exert" test sweeps too wide because it provides no way to distinguish between unprotected influence districts, where minority voters play a substantial role, and protected crossover districts, in which they have an ability to elect.

The line between influence and protected crossover districts[2] is admittedly difficult to draw. But Supreme Court precedent — which my colleagues do not cite as support for their "effectively exert" test[3] — helps us at least to sketch its location, and CD 25 falls on the unprotected side. Whenever the Court has examined crossover districts, it has spoken of Anglo voters providing *supplemental* support to minority voters. *See Bartlett v. Strickland*, 556 U.S. 1,

---

[2] CD 25 is, in fact, a combination of a potential coalition district (because Blacks and Hispanics band together) and a potential crossover district (because that joint minority group combines with Anglos to elect its candidate of choice). Even if there were only one minority group in the district, however, my analysis would yield the same result. If CD 25 were 35% Hispanic, for example, I would still conclude based on this record that it was not an ability district. For that reason, I do not assess the possible impact that a multi-ethnic coalition within a crossover district might have on the ability-to-elect inquiry. My colleagues, who hold the district is protected, do not address this issue either. Rather, they treat the Black and Hispanic communities as a single minority group for purposes of their crossover district analysis, with no explanation why such aggregation is permissible under section 5.

[3] My colleagues note that the VRA "charges the Court, quite simply, with assessing whether minority voters are able effectively to elect their preferred candidates." CD 25 Majority Op. at 5 n.5. But the majority's "effectively exert" test, just like the statute's "ability to elect" language, is not self-defining. As we noted above, the Supreme Court has never directly addressed the test to determine ability to elect in the context of crossover districts. Majority Op. at 19-20. Nevertheless, to the extent the Court has spoken to the issue in previous cases, we must look to those precedents for guidance.

13 (2009) (plurality opinion) (defining a crossover district as one in which the minority group can "elect the candidate of its choice *with help from voters* who are members of the majority and who cross over to support the minority's preferred candidate" (emphasis added)); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (describing a crossover district as one in which minority voters can elect "their candidate of choice *with the assistance of crossover votes* from the white majority" (emphasis added)). The Court's language reflects its assumption that minority voters take the leadership role in a crossover district, with Anglo voters providing necessary — but ultimately secondary — support. Likewise, the Court's use of vivid, active phrases to describe the part minority voters play in a crossover district suggests a leading role. The Court has stated that minority voters must "*attract*[] sufficient cross-over votes from white voters," *Voinovich*, 507 U.S. at 154 (emphasis added), and "*pull*, *haul*, and trade" to elect their preferred candidates, *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994) (emphases added). This is the line we must draw: the minority group must lead in order to have the ability to elect. The leadership needed to prove ability can be demonstrated in a variety of ways, such as by consistently casting the majority of votes for the winning candidate in most elections, coordinating get-out-the-vote drives, or recruiting the lion's share of candidates. It makes little difference how that leadership is asserted. What is crucial is that minority voters do more than provide the margin of victory or have simply an equal voice in a district's electoral decisions.[4]

Such a showing is especially important in a district like CD 25, where minority voters comprise only 35% of the Citizen Voting Age Population (CVAP). Although there is evidence

---

[4] My colleagues argue that leadership requires that minority voters "eschew any 'trade' or compromise in power sharing," CD 25 Majority Op. at 5 n.3, but leaders can (and good leaders often do) trade at times without relinquishing their position at the head of a coalition. Trading alone, however, is not enough; minority voters must also "pull" and "haul." The Supreme Court case my colleagues and I both cite for this point reads "pull, haul, *and* trade," *De Grandy*, 512 U.S. at 1020 (emphasis added) — and both "pull" and "haul" imply taking the lead. My colleagues' critique isolates "trade" both from its immediate context and from the balance of Supreme Court precedent, which supports a test that requires minority voters to take a more active role in a coalition than simply being "effective."

that a coalition of Black, Hispanic, and some Anglo voters consistently elects minority-preferred candidates in CD 25, there is none showing that minority voters lead the effort. For example, no testimony was presented that they play a critical role in recruiting the candidates who run in CD 25 (in contrast to Senator Davis's uncontroverted testimony about SD 10), are instrumental in the coalition's efforts to get out the vote (in contrast to the Asian-American community in HD 149), or that minorities consistently make up the majority of a winning candidate's votes. The record shows only that the minority-preferred candidate wins consistently in CD 25, but that fact alone tells us little (and perhaps nothing) about who is responsible for engineering these wins.

Because there is no evidence that minorities lead in CD 25, I would stop my analysis here and find that it is not protected. But even assuming my colleagues' test is correct, and that a district in which power is shared equally would satisfy such a test, there is insufficient evidence in the record to support a finding of equal electoral power. First, I address the anecdotal evidence regarding CD 25; then I turn to the expert and statistical evidence about the district's voter turnout and electoral results.

My colleagues place much weight on the anecdotal testimony of one of Travis County's State House representatives, Dawnna Dukes, and Travis County Attorney David Escamilla regarding the tri-ethnic coalition in Travis County. I am not confident their testimony can bear this weight. First, evidence about Travis County voting patterns does not adequately describe minority voting power within CD 25 because, as discussed in more detail below, less than half of Travis County is in CD 25, and approximately 40% of CD 25 lies outside Travis County. More importantly, this testimony — at best — only indicates that minority votes are needed to win, not that minority voters have an equal role in the coalition. The testimony boils down to this: to win local elections in Travis County, a candidate must have the support of Black and Hispanic voters.

For instance, Rep. Dukes testified that candidates running in Travis County cannot win without support from "the progressive Anglo, Black, and Hispanic communities." Trial Tr. 106:10-18, Jan. 19, 2012 PM. Escamilla testified about a candidate who lost the primary because he was "unable to gain significant support from the Hispanic or African American community." Defs.' Ex. 735, Pre-Filed Direct Test. of David Escamilla 9-10. My colleagues are surely right that this testimony *could* support a conclusion that Anglos do not control CD 25, but it doesn't tell us anything more. The testimony of Dukes and Escamilla simply doesn't address the critical issue: do minority voters in Travis County play some role beyond providing votes necessary to win? Minority voters may have veto power in Travis County, but the same is true whenever a minority group, however small, consistently provides the margin of victory.

Neither do the expert analysis nor statistical data show that CD 25 is a protected district.[5] My colleagues place much weight on the Travis County primary election results analyzed by Dr. Ansolabehere. But as noted above, Travis County is not CD 25. Travis County contains only 59.7% of CD 25's population, even though it has a larger portion (66%) of the district's minority population. *See* Pl.'s Ex. 11, at 7. The remaining 40.3% of CD 25 — which votes Republican —

---

[5] As a preliminary matter, my colleagues place much faith in Dr. Alford's statement that benchmark CD 25 is a district in which minorities have an ability to elect. But as we have already explained at length, Majority Op. at 14-19, Dr. Alford uses a metric that determines ability to elect by degree — a metric we have emphatically rejected. There is no reason that his assessment should be legally conclusive for this district, yet no other. My colleagues respond that the burden of proof is on Texas, and "its only expert credibly opined . . . that Benchmark CD 25 is an ability district." CD 25 Majority Op. at 3 n.4. But Texas did not concede benchmark CD 25's ability status. *See, e.g.*, Pl.'s Mem. Concerning Congressional District 25, at 1 ("[U]nless all Democratic districts are *ipso facto* ability districts, no minority group in benchmark CD 25 had the ability to elect candidates of their choice."). That Texas's expert uses the word "ability" in his assessment of benchmark CD 25 does not mean that he was offering a legal opinion on its protected status, properly defined, contrary to the State's position. As we agreed in the opinion, Dr. Alford has a different view of an "ability district" than that called for in section 5. In fact, he stated that if "the 25[th] District is a protected district, then it is hard to see how any other majority Democratic district, assuming it had at least one eligible minority resident, would not also be a protected district." Pl.'s Ex. 175, Pre-Filed Direct Test. of Dr. John Alford 28-29. And we did not rely on Dr. Alford's similar concession that SD 10, under his metric, was an ability district. Trial Tr. 39:5-21, Jan. 25, 2012 AM.

does not figure into Dr. Ansolabehere's calculations at all.[6] Even more troubling, over half of Travis County lies outside CD 25, but is nonetheless included in the analysis. *Id*. Dr. Ansolabehere's data set is thus both over- and under-inclusive in the extreme. This is particularly problematic because we have been provided with no explanation why it is appropriate to draw conclusions about CD 25 from voting data drawn from only a subset of the relevant population together with voters from a different district entirely.[7] This is not the type of "more exacting evidence" necessary to prove a crossover district. We must consider the *district*'s ability status, not Travis County's.

Even assuming Travis County can stand in for CD 25, this primary data still does not show that minority voters themselves have an ability to elect in the district. Dr. Ansolabehere's report shows that the Anglo-preferred candidate won only one primary without support from the Hispanic and Black communities in the contests he analyzed, but that the Hispanic- and Black-preferred candidates won twelve elections without Anglo support. And the *vast* majority of the time — in 31 out of 43 primaries — the prevailing candidate had support from the Black,

---

[6] In contrast, the smaller counties of Caldwell, Colorado, Fayette, Gonzales, Hays, and Lavaca are all wholly contained within CD 25 and are not addressed in either the anecdotal testimony or Dr. Ansolabehere's analysis. My colleagues state that "[n]o party, including Texas, presented any evidence regarding the tri-ethnic coalition's performance in the six smaller counties wholly contained in Benchmark CD 25." CD 25 Majority Op. at 10 n.11. They are mistaken. We received evidence indicating that the tri-ethnic coalition was ineffective in these counties. In 2010, Republican candidates won (and the tri-ethnic coalition lost) all eighteen elections held within Gonzales and Lavaca Counties. Pl.'s Ex. 34, at 49-52, 189-92. The tri-ethnic coalition fared little better in Hays County, where Democrats won only one of twenty-two elections, and Caldwell County, where Democrats won only two of eighteen. *Id.* at 165-68. According to the Texas Secretary of State, the tri-ethnic coalition lost all twenty-three elections in Colorado County in 2010 and all nineteen elections in Fayette. *See Historical Election Results*, Tex. Sec'y of State, http://www.sos.state.tx.us/elections/ historical/index.shtml (last visited Aug. 16, 2012) (official website of the Texas Secretary of State listing past election results). Thus, the tri-ethnic coalition prevailed in only three of one hundred and twenty elections held in these counties in 2010. My colleagues would have us disregard this data because "the majority of voters in these counties are not part of the tri-ethnic coalition," CD 25 Majority Op. at 10 n.11. But nowhere else do we examine only a subset of a district to determine the district's ability status. To determine voting dynamics in CD 25, we must examine CD 25.

[7] My colleagues concede that Dr. Ansolabehere does not "cover all possible useful data," but they argue that Travis County data is useful nonetheless because "one must necessarily look to the performance of the coalition in other subdivisions, such as in Travis County." CD 25 Majority Op. at 9-10. But it is a far jump from useful to conclusive. My colleagues give no indication, for example, why such an analysis would not include even a passing glance at the six "other subdivisions" that are wholly contained within CD 25.

Hispanic, *and* Anglo communities. More importantly, the conclusion he drew from this evidence is only that "[p]ower is shared very equally" in Travis County, Defs.' Ex. 724, Expert Witness Report of Dr. Stephen Ansolabehere 105-06 [hereinafter Ansolabehere Rep.], not that minorities lead the way. At best, this shows that all members of the coalition play a vital role at the primary level in Travis County. Even taking this conclusion as true, evidence that power is shared equally does not show that minority voters are at the helm, and thus that they themselves have an ability to elect in CD 25.

The final piece of evidence my colleagues marshal — and the only one that concerns CD 25 as a whole — is also from Dr. Ansolabehere. His report considers the breakdown of votes by racial and ethnic group for Representative Lloyd Doggett, the minority candidate of choice in CD 25. Even taking Dr. Ansolabehere's calculations as accurate,[8] this evidence is still insufficient to conclude that CD 25 is a crossover district. Dr. Ansolabehere calculates that Doggett won in 2008 with 53% of the Anglo vote, 83% of the Hispanic vote, and 100% of the Black vote in CD 25. Ansolabehere Rep. attach. 3. In 2010, he calculates that Doggett won with 37% of the Anglo vote, 86% of the Hispanic vote, and the entire Black vote. *Id.* At first blush, this seems persuasive. With the support of a little more than one-third to one-half of the Anglo vote, Rep. Doggett's victories seem attributable to a minority community doing the heavy lifting. But Dr. Ansolabehere's analysis begs the question, because it tells us nothing about voter turnout. Without that crucial element, there is no way to put his analysis into context. *See Texas*,

---

[8] The regression analysis Dr. Ansolabahere provides is also not without its flaws. Dr. Ansolabehere uses VAP, not CVAP, in his calculations. Ansolabehere Rep. attach. 3. The HCVAP of CD 25 is 25.3%; its HVAP 34%. We are left to guess if this significant difference between citizen and noncitizen minority population, a highly relevant factor in light of citizen voting requirements, would change his conclusions. Moreover, there are unexplained discrepancies in Dr. Ansolabehere's data. He states that Hispanics comprised 83% of Doggett's coalition in 2008, *id.*, but his retrogression calculation appears to indicate that figure was 93%, *id.* attach. 4. And he calculates Black support for Doggett in 2008 at 111%. *Id.* attach. 3, an overestimation by (at least) 11%. These problems are additional reasons why I am hesitant to find that this evidence supports finding that CD 25 is an ability district. At a minimum, it is not "more exacting evidence."

831 F. Supp. 2d at 263 ("However, when there is no supermajority in a district, a Section 5 analysis must go beyond mere population data to include factors such as minority voter registration, *minority voter turnout*, election history, and minority/majority voting behaviors." (emphasis added)). In other words, Dr. Ansolabehere does not answer the question, "83% and 86% *of how many Hispanic voters*, and 100% of *how many Black voters*?" That minorities voted overwhelmingly for Rep. Doggett tells us very little about their role in the coalition. This data could support a story in which minorities lead the way to victory, but it could also tell a story in which minority voters have an equal voice to Anglos, or even one where Anglo voters take the lead in CD 25. Incomplete data from which we *might* infer ability status is not the type of "more exacting evidence" necessary to find a protected district.

Even taking Dr. Ansolabehere's data at face value — a limb on which I am extremely loathe to perch for the reasons stated above — and using it to try to extrapolate the missing turnout data[9] would indicate that Anglos cast an average of 81% of all votes in CD 25 in 2008 and 2010, and thus that minorities cast only 19%.[10] Absent any indication that minorities play a

---

[9] To be clear, I do not think that we should engage in this type of endeavor. In my view, the fact that the experts in this case did not provide sufficient information to show ability to elect should be the end of the inquiry. I set out this analysis only because my colleagues do not share my view that Dr. Ansolabehere's data, as presented, is insufficient.

[10] Assuming that Dr. Ansolabehere is correct, I calculate turnout in the following manner. In 2008, Rep. Doggett received 65.82% of the vote. Pl.'s Ex. 31, at 10. In 2010, he garnered 52.82%. Pl.'s Ex. 32, at 13. This change, according to Dr. Ansolabehere's data, was due almost exclusively to the decrease in Anglo support for Rep. Doggett from 53% to 37% (the only other change was an increase in Rep. Doggett's Hispanic vote share from 83% to 86%, which is negligible and within the standard margin of error). Thus, a 16% change in Anglo preferences (53% - 37%) triggered a 13% change in votes for Rep. Doggett's vote share (65.82% - 52.82%). This implies that Anglos comprised 81% of the total number of votes cast in 2008 and 2010 (13% / 16% = 81.25%). While this analysis is imperfect — relative turnout among minority groups (as opposed to overall turnout, which my colleagues cite, CD 25 Majority Op. at 13 n.19) could have changed between elections — it is the best we can accomplish with the limited data provided by Dr. Ansolabehere. As discussed above, I conclude that Dr. Ansolabehere failed to provide any evidence regarding turnout data, and so would prefer to stop my analysis there. I engage in this calculation only because my colleagues find Dr. Ansolabehere's analysis to be persuasive.

leadership role in the coalition, I cannot conclude that a district where (according to the most favorable reading of expert testimony) minorities cast only 19% of the votes can be protected.

This reading of Dr. Ansolabehere's data is also largely consistent with the OAG voter turnout statistics my colleagues discard.[11] In the 2008 election, the OAG analysis indicates that minorities comprised approximately 18% of voters, almost exactly the 19% composition Dr. Ansolabehere appears to predict. Pl.'s Ex. 24, at 579. In 2010, the OAG data indicates voter turnout of 10%, which is lower than Dr. Ansolabehere's apparent, average prediction of 19%, but

---

[11] My colleagues reject this data based on a single comment by Dr. Alford, Texas's expert, during oral argument. CD 25 Majority Op. at 12. But Dr. Alford addressed the OAG's racially polarized voting analysis concerning the House, not the Congress. Trial Tr. 86:12-87:7, Jan. 24, 2012 PM. And he compared a different subset of that data than my colleagues do. *Compare id.* at 86:19-20 ("[I]f you'll take a quick look at the *last two* columns [of the data] . . . ." (emphasis added)), *with* CD 25 Majority Op. at 13 (discussing the difference between "estimated turnout % in district" and "actual turnout % in district," Pl.'s Ex. 24, at 576, which are the *third to last* and the last columns.). In other words, Dr. Alford's concern is not the same as my colleagues'. Moreover, Alford and my colleagues raise concerns about different data than I examine here. He critiqued the total estimated turnout calculated "as a percent of VAP," Trial Tr. 85:23-87:7, Jan. 24, 2012 PM (discussing Defs.' Ex. 6, at 358), *i.e.*, what percentage of eligible voters in a minority group voted in an election.

Neither Alford nor my colleagues assess the OAG's calculations concerning "distribution of votes in [a] contest," Pl.'s Ex. 24, at 579, *i.e.*, what percentage of votes *in any given election* was cast by each minority group. Unlike the data my colleagues examine (and on which I do not rely in any way), this analysis accurately predicts the actual overall turnout in a given election, including every election my colleagues identify as problematic. *Compare* Pl.'s Ex. 24, at 587-88 (predicting 190,223 votes in the 2010 general election when 173,309 were actually cast, resulting in an error rate of 9.8%), *with* CD 25 Majority Op. at 13 (calculating an error rate in 2010 of 43.6%); Pl.'s Ex. 24, at 587 (predicting that 300,273 votes were cast in the 2008 general election when 282,161 votes were actually cast, resulting in an error rate in 2008 of 6.4%), *with* CD 25 Majority Op. at 13 (calculating an error rate of 51.4%); Pl.'s Ex. 24, at 587 (predicting that 172,695 votes were cast in the 2006 general election when 159,507 were actually cast, resulting in an error rate of 8.2%), *with* CD 25 Majority Op. at 13 (calculating an error rate of 28.1%). Additionally, this data predicts the "number of votes cast by [each] minority group," *see* Pl.'s Ex. 35, at 585-89, despite my colleagues' apparent statements to the contrary. CD 25 Majority Op. at 13 n.18.

My colleagues state that "there is no testimony, expert or otherwise, in the record that the data on which the dissent relies is not as flawed as the turnout numbers rejected by Dr. Alford." *Id.* But my colleagues would discard the State House OAG data (and, by extension the Congressional OAG data) based on the metric Dr. Alford described in his testimony: the gap between the predicted turnout and "real life." *Id.* at 12. I use that same metric — the only ground Dr. Alford gave as support for his critique — to test the data. My colleagues also note that "Texas's failure to cite to this data again indicates to the Court that it has little probative value." *Id.* at 13. While I am skeptical that our assessment of evidence contained in the record should be influenced by whether a particular party chose to cite it, I note that the United States cited the OAG turnout data favorably. *See* U.S. Proposed Findings of Fact ¶¶ 24, 54, 58, 163, 197.

Finally, it bears reemphasizing that even if my colleagues' concerns were serious enough to warrant discarding this data entirely, the proper consequence should be to conclude that Dr. Ansolabehere's analysis is not the "more demanding evidence" necessary to prove a coalition district. As I have explained above, turnout data is the only way to provide context for the data on which my colleagues rely so heavily. My attempt to provide that missing data should not detract from the more important fact: Dr. Ansolabehere's report does not include this essential information at all.

not absurdly so. *Id.* The rest of the OAG data indicates that minorities cast closer to 10% of the vote in CD 25, Pl.'s Ex. 24, at 579-80. This data indicates that CD 25 looks much like the hypothetical district we described before in which the Anglo voters that made up 90% of the district split their vote evenly and minority voters comprise just 10% of the votes, providing the margin of victory. We agreed that such a district would not be protected. Majority Op. at 24-25. Even assuming that minorities cast 19% of the vote, as Dr. Ansolabehere's data appears to indicate, this would be enough only to show *influence*, not that benchmark CD 25 is a district in which minority voters themselves have an ability to elect.[12]

In sum, we heard testimony and received expert reports that minorities are essential to victory in Travis County, but that is not enough to find that CD 25 is a protected crossover district. To protect CD 25, we must find that minorities *themselves* have an ability to elect *in CD 25* — that they lead the coalition there. It is not enough that they provide the margin of victory in a competitive Democratic district. Most of the evidence concerns Travis County alone. No evidence includes turnout data, in Travis County or in the district as a whole. At best, the evidence shows that minorities cast no more than 20% of the votes in CD 25, and possibly significantly less. If this is the "more exacting" evidence we require to prove the existence of a coalition district, it is hard to see what Democratic district in Texas would not be so protected. Respectfully, I dissent from my colleagues' assessment that benchmark CD 25 is an ability district.

---

[12] Even assuming that the 2010 election alone did rise to that high level of proof (which I do not believe it does), we have previously stated in the context of SD 10 that a single election does not indicate a proven history of ability to elect.

## APPENDIX TO THE MEMORANDUM OPINION

## FINDINGS OF FACT & CONCLUSIONS OF LAW REGARDING DISPUTED ABILITY DISTRICTS

COLLYER & HOWELL, *District Judges*:

## I.   THE CONGRESSIONAL PLAN

### A.  Congressional Redistricting Plan, C185

1. In 2006, a three-judge district court adopted a redistricting plan for the Texas congressional delegation.  *See LULAC v. Perry*, 457 F. Supp. 2d 716, 716–18 (E.D. Tex. 2006) (per curiam).   That plan, known as C100, is the Benchmark Plan for the purposes of this case.

2. The 2010 Census showed that the population of Texas increased by 4,293,741, from 20,851,820 in 2000 to 25,145,561 in 2010.  Pl.'s Ex. 75.  This growth represented a 20.6% increase in the State's overall population, with 89.2% of the increase attributable to growth in the minority populations.  Mot. for Judicial Notice, ECF No. 180, ¶¶ 8, 18.  Hispanics comprise 65% of the increase and Blacks comprise 13.4%.  *Id*. at ¶¶ 20, 22.

3. As a result of this population growth, Texas was entitled to four new seats in the U.S. House of Representatives, increasing the State's number of representatives from 32 to 36 members.  This increase required the State to reallocate congressional districts, and necessitated the drawing of new district maps to govern congressional elections in 2012.

### B.  The Legislative Process

#### a.  2010 Field Hearings

4. Anticipating that the State's population growth would result in additional congressional districts, in 2010, prior to the start of the 2011 legislative session, the Texas House Committee on Redistricting, the Texas House Judiciary Committee, and the Texas Senate Select Committee on Redistricting jointly or separately held approximately 19 field hearings around the State regarding the redistricting process for the State Legislature and congressional plans.  Defs.' Ex. 320, at 58-60 (Rep. of Dr. Arrington); Trial Tr. 86, Jan. 17, 2012 AM (Rep. Todd Hunter); Pl.'s Ex. 39; Pl.'s Ex. 42.  The purpose of the hearings was to receive input before the formal redistricting process began in 2011.  Trial Tr. 54, Jan. 17, 2012 AM (Rep. Hunter); Trial Tr. 145, Jan. 17, 2012 PM (Doug Davis).

5. At the time of these hearings, the official 2010 Census data had not yet been released, nor had any of the State legislative committees participating in the hearings furnished for public comment any proposed Congressional redistricting plans.  Trial Tr. 115-16, Jan. 17, 2012 AM (Rep. Hunter).  Testimony was presented at the hearings regarding the need to retain minority communities of interest, recognize minority population growth in the

Dallas-Fort Worth metroplex with a new minority ability district, and maintain those congressional districts where minority voters had been able to elect their candidates of choice. *See, e.g.*, Trial Tr. 10-11, Jan. 23, 2012 PM (Congresswoman Jackson Lee). Nevertheless, these hearings were of limited utility since no plans were available for the witnesses to review or to offer specific comment on. Furthermore, the sponsoring legislative committees prepared no written reports summarizing the information presented at the hearings to facilitate communication of any concerns or recommendations raised to members of the legislature who were not present. Trial Tr. 115, Jan. 17, 2012 AM (Rep. Hunter).[1]

6. Testimony at trial made clear that minority elected representatives from Texas viewed the 2010 field hearings as a "sham" or "just for show." Trial Tr. 91, Jan. 19, 2012 AM (Rep. Dawnna Dukes) (testifying that the 2010 field hearings were "just a circus to show that a hearing had been held around the state, but it was not of substance because there was absolutely nothing before the committee for individuals to testify on, for or against."); Defs.' Ex. 809, at 4 (Senator Judith Zaffirini, Hispanic representative for SD 21, describing the 2010 field hearings as "a sham" with "low attendance, [] low participation, [] lack of invited testimony, [and] the lack of prepared materials for [members of the Senate Redistricting Committee]."); *see also* Trial Tr. 94, Jan. 20, 2012 AM (Sen. Rodney Ellis testifying that the 2010 field hearings were "perfunctory").

7. In addition, the only Black member of the House Redistricting Committee, Representative Marc Veasey, testified that some field hearings, specifically in the Dallas-Fort Worth metroplex, were held in locations inconvenient for minority voters that did not have public transport, which limited their participation. Trial Tr. 8-12, Jan. 18, 2012 PM (Rep. Veasey). Representative Veasey offered to help find locations convenient for minority voters, but ultimately locations were picked without regard to the concerns of minority members of the redistricting committee. *Id.* at 12 ("But when it came to, you know, trying to make sure that you know, southeast Ft. Worth and the city of Ft. Worth, which, like I said, is the third largest concentration of African-Americans in the state -- trying to find a place to do hearings there, that no one came to consult with me or any other minority members of the committee. They just decided they were going to have this field hearing in Arlington, which just, you know, still to this day makes no sense at all.").

8. No evidence was presented that the 2010 field hearings addressed the topics of the number of districts that provided minority citizens the ability to elect the candidates of their choice or the minimal number of minority ability districts required for compliance with the Voting Rights Act ("VRA") under any new congressional plan. *See generally* Pl.'s Ex. 50 (Texas Legislative Council Redistricting Guidance, dated August 2011, stating that courts generally compared the number of minority districts in the benchmark plan and in the enacted plan).

---

[1] The only way for legislators to review the information presented during these hearings was to obtain from the Committee Clerks any material submitted during the field hearings, or by viewing the hearings by webcast. Trial Tr. 114-15, Jan. 17, 2012 AM (Rep. Hunter).

### b.   2011 Regular Texas Legislative Session

9. After convening in January 2011, the Texas Legislature faced the task of enacting redistricting maps for the State House of Representatives ("State House"), State Senate, and U.S. House of Representatives in response to the population growth in the state.  Trial Tr. 59-60, Jan. 18, 2012 AM (Downton).  The regular session of the Texas Legislature ran from January 11 through May 30, 2011.  Joint Stipulation, ECF No. 177, ¶¶ 3-4.  No congressional redistricting plan was publicly released by the Redistricting Committees of either the State House or State Senate, nor were any hearings held concerning a congressional plan during the regular session.[2]  Defs.' Ex. 509, at 29-32; Joint Stipulation, ¶¶ 4-5.

10. During the Legislature's regular session, only informal discussions were held concerning the congressional redistricting plan.  Interested advocacy groups, including the Mexican American Legal Defense and Educational Fund ("MALDEF") and Mexican American Legislative Caucus ("MALC"), proposed congressional maps to the House Redistricting Committee.  Trial Tr. 60-61, Jan. 18, 2012 AM (Ryan Downton).  Members of Texas's congressional delegation also submitted proposals and attempted to meet with State legislators to discuss proposed plans.

### c.   2011 Special Legislative Session

11. The Legislature's failure to enact a new congressional plan during the regular session prompted Governor Rick Perry, on May 31, 2011, to order the State Legislature to sit in Special Session to address, among other things, legislation relating to congressional redistricting.  Joint Stipulation, ¶ 5.  On the first day of this special session, on May 31, 2011, Chairman Kel Seliger, chairman of the Senate Redistricting Committee, and Chairman Burt Solomons, chairman of House Redistricting Committee, publicly released C125, which was the first congressional redistricting plan proposed publicly by the leadership of the State Legislature.  Defs.' Ex. 366.

12. Hispanic and Black members of the State House were not included in the map-drawing process for C125.  State Representative Marc Veasey, a Black member of the House Redistricting Committee, testified that no minority state representative had any input into the proposed congressional redistricting map before it was made public.  Defs.' Ex. 335 (Veasey Dep. at 25-27, Aug. 19, 2011); *see also* Trial Tr. 91-93, Jan. 19, 2012 PM (Rep. Dukes) (testifying that she first saw the proposed congressional map on Friday, June 9, 2011 well after its release).[3]

13. In the late afternoon of May 31, 2011, the State House and Senate noticed public hearings on C125.  Less than 48 hours later, at 9:00 a.m. on June 2, 2011, the House Redistricting

---

[2]  The focus of the legislative redistricting efforts during this session was on the State House and Senate plans, which, if not enacted during the regular session, would have been determined by the Texas Legislative Redistricting Board.  Trial Tr. 59-60, Jan. 18, 2012 AM (Downton).

[3] Representative Dukes did not explain why she first saw the map on June 9 when the map was publicly released on May 31, 2011.

3

Committee held its only public hearing on the proposed plan at the State Capitol in Austin.  The following day, on Friday, June 3, 2011, the Senate Redistricting Committee held its only hearing on C125, also in the State Capitol in Austin.  Defs.' Ex. 320, at 59 (Rep. of Dr. Arrington); Defs.' Ex. 366 (Congressional Redistricting Timeline); Defs.' Ex. 509, at 39.

14.   At the June 3, 2011 Senate Redistricting Committee hearing, minority members of the Committee complained of being excluded from the congressional redistricting process.  Defs.' Ex. 370 at 1.  Specifically, Senator Judith Zaffirini, a Hispanic Senator representing SD 21, and Senator Royce West, a Black Senator representing SD 23, complained that the process was too rushed and stated that neither they nor the public had adequate time to study the proposed map or meaningfully participate.  *Id*.  Senator West stated:  "For the purposes of the record, I did not have any input into the map 125.  I never saw map 125 before you published it."  *Id*.  Similarly, Senator Zaffirini told Chairman Seliger: "I've been on every redistricting committee since my election in 1986 and I must say that I have never had less input into the drawing of any map until this session."  *Id*.

15.   Experts retained by the Senate Redistricting Committee from Baylor University's School of Law and the University of Texas Law School, Professors David Guinn, Mike Morrison, and Robert Heath ("Senate Redistricting Committee Outside Experts"), echoed concerns about the lack of opportunity for public scrutiny of C125 in comparison to redistricting processes in previous years.  Trial Tr. 73, 81, Jan. 24, 2012 AM, (Chairman Seliger); Defs.' Ex. 370, at 2.  These outside experts indicated that they did not have an opportunity to review the proposed congressional redistricting plan before it was presented in the Committee hearing.  Defs.' Ex. 370, at 2; Defs.' Ex. 568, at 1.  Professor Morrison testified that "this process has been quite different from what we've seen in the past. . . [n]obody has had the opportunity to study it the way it has been done in the past."  *Id*.  He explained further that this procedure differed from the one followed in 2003 when the committee's staff "went all over the state . . . spent sixteen hours in one place, twenty in another.  We sat down . . . we visited.  We hired experts to do retrogression analysis."  *Id*.  In fact, evidence presented at trial shows, for example, that prior to passage of the congressional redistricting plan in 2003, the Redistricting Committees held seven public hearings, and the committee substitute bill was the focus of six of those hearings.  Defs.' Ex. 300.

16.   At the June 3, 2011 hearing, the Senate Redistricting Committee Outside Experts cautioned Members about the care required for compliance with the VRA, testifying that they "furnished the committee an advisement to take [the DOJ 2011 Guidelines] and read them all very carefully."  Defs.' Ex. 370.  Indeed, Chairman Seliger testified that the sole responsibility of these outside counsel was "to vet the maps as we drew them and to inform me or anyone else on the committee whether they were legal or not."  Trial Tr. 81, Jan. 24, 2012 AM (Chairman Seliger).  In his pre-filed written direct testimony, Chairman Seliger claimed that he relied on these experts to "inform me if the demographics, performance, or any other attribute of a proposed district would raise concerns under the Voting Rights Act."  Pl.'s Ex. 162, ¶ 4 (Seliger Pre-filed Direct

Testimony). To the contrary, these experts testified before the Senate Redistricting Committee that they did not "provide[] verbal or written guidance or []opinion to the committee regarding whether [the proposed Congressional plans were] in compliance with Section 5" because they were not asked to do so. Defs.' Ex. 370, at 3.

17. On June 6, 2011, the Monday immediately following the Friday hearing, the full Senate considered the proposed congressional redistricting plan, C185 (the "Congressional Plan"). On the floor of the Senate, Senator Zaffirini asked Chairman Seliger if "any minority Members [were] involved in developing" the redistricting maps under consideration. Chairman Seliger bluntly responded, "[n]ot that I recall." Devaney Decl., ECF No. 77, Ex. 9 (Texas State Senate Journal, June 6, 2011, at A-12). Chairman Seliger also admitted during the floor debate that the Senate Redistricting Committee Outside Experts he hired had not seen the Congressional Plan until it was released in committee and that these outside experts had not evaluated the plan for compliance with the VRA. Defs.' Ex. 568 at 1. Nevertheless, the Senate passed the proposed Congressional Plan in Senate Bill 4 ("SB4") on June 6, 2011 by a party-line vote of 18-12. Joint Stipulation, ¶¶ 16-17, 19.

18. Following passage of SB4, the State House leadership gave notice that the House Redistricting Committee would meet to consider the Senate Bill at 9:00 a.m. on June 9, 2011. On June 9, 2011, the House Redistricting Committee met to consider the proposed Congressional Plan, and passed it out of Committee without taking any public comments. Defs.' Ex. 320, at 59 (Rep. of Dr. Arrington); Defs.' Ex. 366. Representative Dukes, who is not on the House Redistricting Committee, testified that she first saw the proposed Congressional Plan on June 9, 2011. Trial Tr. 91-93, Jan. 19, 2012 PM (Rep. Dukes). That same day, the State House passed a Calendar Rule requiring any amendments to the proposed map to be filed "prior to Monday." *Id*. This effectively gave any representative two days to prepare and submit proposed alterations to the congressional map. Representative Dukes testified that she worked through the weekend on an amendment and proposed a new map, but Chairman Solomons tabled her amendment and it was never considered. Trial Tr. 93-94, Jan. 19, 2012 AM (Rep. Dukes). State Representative Dukes further testified that every Democratic proposal to amend C185 was tabled. *Id*.

19. On June 15, 2011, the State House passed the proposed Congressional Plan by a vote of 93-47-3,[4] after incorporating minor amendments. Joint Stipulation, ¶¶ 16-17. All Democratic members of the State House voted against passage of SB4. Texas State House Journal, June 15, 2011, at 421. The State Senate concurred with the State House amendments to the proposed Congressional Plan on June 20, 2011, and SB4 was reported as enrolled on June 20, 2011. SB4 was then signed by the State Senate on June 22, 2011, and the State House on June 24, 2011. Joint Stipulation, ¶ 16. On June 24, 2011, SB4 containing the proposed congressional map, C185, was transmitted to Governor Rick Perry, who signed it into law three weeks later, on July 18, 2011. *Id.*

20. The legislative process under which the Congressional Plan was made public, considered

---

[4] Three Representatives voted "present."

and enacted was rapid.  The timing of the two public hearings in the House and Senate Redistricting Committees within the short span of 48 and 72 hours, respectively, after first public release of the Congressional Plan severely circumscribed the opportunity for meaningful public scrutiny and comment, including by minority citizens and their elected officials.  Defs.' Ex. 320, at 58-60 (Rep. of Dr. Arrington); Trial Tr. 16, Jan. 18, 2012 PM (Rep. Veasey).  Outreach by Representative Todd Hunter, Chair of the House Judiciary Committee, to the congressional delegation during a 2010 visit to Washington, D.C., and by Congresswoman Sheila Jackson Lee and Congressman Gene Green to Chairman Solomons in 2011, appear to have been "meet and greet" sessions with minimal to no substantive discussion about the changes planned by the Texas legislators to the districts represented by minority Members of Congress.  Pl.'s Ex. 162, ¶ 12 (Chairman Seliger Pre-Filed Direct Testimony); Pl.'s Ex. 148, ¶ 8 (Chairman Solomons Pre-Filed Direct Testimony) (stating that the meetings with Congressman Green and Congresswoman Jackson Lee were "more of a 'meet and greet,' neither of the congresspersons provided me with any details requesting specific changes to their districts").

## C.  Mapdrawers' View of the Redistricting Process

21. Ryan Downton, the general counsel to the House Committee on Redistricting under Chairman Burt Solomons, was the principal drafter of the Congressional Plan.  Trial Tr. 44-45, Jan. 18, 2012 AM (Downton); Trial Tr. 47, Jan. 17, 2012 PM (Interiano).  Mr. Downton was primarily responsible for "zeroing-out"[5] districts to make them conform to the required population size and for allocating Texas's four new congressional districts.  Gerardo Interiano, counsel to Speaker of the State House Joe Straus, also testified that he periodically helped Mr. Downton with the congressional map to zero-out population deviations.  Trial Tr. 105, Jan. 17, 2012 PM (Interiano);  Trial Tr. 44-45, Jan. 18, 2012 AM (Downton); Trial Tr. 47, Jan. 17, 2012 PM (Interiano).

22. Upon release of the 2010 Census data on February 17, 2011, Mr. Downton testified that he learned that "there were three areas where the population growth per region significantly outpaced growth in the rest of the state.  Those three regions, the first being north central Texas around the Dallas-Fort Worth metroplex.  The second being the suburban areas around Harris County in kind of Southeast Texas, and the third being the I-35 corridor running from San Antonio north through Austin."  Trial Tr. 61-62, Jan. 18, 2012 AM (Downton).[6]  Mr. Downton believed that of the four new congressional seats allotted to Texas, "one had to go in each of those regions and in the fourth one [Texas] had some flexibility."  Id. at 62.

---

[5] Congressional districts must be drawn within one person of the ideal district size.  Congressional districts therefore must be "zeroed out" by the mapdrawer, meaning that the district must deviate from the required population by at most one person.  Trial Tr. 91-92, Jan. 18, 2012 AM (Downton); Trial Tr. 71-72, Jan. 25, 2012 PM (Interiano).  Based on the 2010 Census, the ideal population for each of the 36 congressional districts in Texas is 698,488.  Joint Stipulations, ¶ 15.

[6] Mr. Downton later clarified that although "Dallas County itself lost population relative to the rest of the State[,] Tarrant County on the west and Colin and Denton counties on the north gained population."  Trial Tr. 62, Jan. 18, 2012 AM (Downton).

23. Prior to assignment of map-drawing responsibilities, Mr. Downton was aware of the VRA and actively sought to educate himself on its requirements. Trial Tr. 45, Jan. 18, 2012 AM (Downton). To this end, Mr. Downton consulted with the Texas Legislative Council[7] ("TLC"), including a lawyer named David Hanna. *See id.* at 50. Mr. Downton testified that he viewed compliance with the VRA on par in importance with getting enough votes to get the map passed, but this testimony is not credible. Defs.' Ex. 778A (Downton Dep. 62, Aug. 12, 2011).

24. Mr. Downton testified that during the map-drawing process he identified districts protected by the VRA in the Benchmark Plan "based on Census level. If they were above 50%, then they were Hispanic majority districts." Trial Tr. 63, Jan. 18, 2012 AM (Downton). The specific demographic statistics that Mr. Downton relied upon were Hispanic Citizen Voting Age Population ("HCVAP") and Spanish Surname Voter Registration ("SSVR"). Defs.' Ex. 778A (Downton Dep. 22, Aug. 12, 2011); Trial Tr. 67, Jan. 18, 2012 AM (Downton). If these statistics were above the 50% mark, he believed the district was protected under the VRA. Defs.' Ex. 577 (Trial Tr. 966, *Perez v. Perry*, civil action no. SA:11-360 (W.D. Tex. Sept. 9, 2011)). Based on Census data alone, Mr. Downton identified seven districts (CDs 15, 16, 20, 23, 27, 28 and 29) as protected districts in the Benchmark Plan that provided Hispanic citizens the ability to elect their candidates of choice.[8] Trial Tr. 63-65, Jan. 18, 2012 AM (Downton)

25. The Office of the Attorney General (the "OAG") performed a racially polarized voting analysis of the Benchmark and enacted districts. Pl.'s Ex. 26, 27.

26. The OAG also performed reconstituted election analyses that estimated what percentage of a specific racial or language-minority group voted for certain candidates in chosen primary and general elections. Pl.'s Ex. 27. These analyses were based on ten general elections (the "OAG 10") selected by Todd Giberson, an employee in the OAG's Legal Technical Support Division, because they were "racially contested elections," i.e., ones that involved minority candidates running against each other or a minority candidate running against a non-minority candidate. Giberson Dep. 16, 20-21, Oct. 18, 2011.

27. Mr. Interiano, who assisted in drawing the Congressional Plan, confirmed that any initial understanding of protected districts in the Benchmark Plan was made solely by looking at the demographic population statistics of the district. Trial Tr. 26-27, 47-48, Jan. 17, 2012 PM (Interiano). He testified that the mapdrawers did not look at election result analyses for the Benchmark Plan to help identify protected districts until they had already submitted draft redistricting plans to the OAG. *Id.* Mr. Downton was also clear that he did not factor the State's reconstituted election analysis into his determination of

---

[7] The TLC is an agency within the legislative branch of the Texas State government that provides nonpartisan, technical support and services to each member of the Legislature. Archer Dep. 8-9, Oct. 12, 2011.

[8] By contrast, Texas argued at summary judgment that any district with a Black voting age population of 40% or more is an ability district. Pl.'s Mem. in Supp. of Mot. for Summ. J., ECF. No. 41, at 30.

whether a district was a Hispanic majority district and therefore a protected district in the Benchmark Plan. Defs.' Ex. 778A (Downton Dep. 22-23, Aug. 12, 2011). In his view, political performance was not particularly relevant. *Id.* at 24. If a district met the mapdrawers' own standard of over 50% in HCVAP and SSVR, he classified the district as an ability district regardless of whether it elected the minority candidate of choice 3 out of 10 times, or 1 out of 10 times. *Id.* at 24-25; Defs.' Ex. 577 (Trial Tr. 966, *Perez v. Perry*, Sept. 9, 2011 (Downton)). Mr. Interiano also testified that demographic information, including Hispanic Voting Age Population ("HVAP"), HCVAP and SSVR, must be considered to determine if a district is a Hispanic "opportunity" district. Defs.' Ex. 579 (Trial Tr. 1451, *Perez v. Perry*, Sept. 12, 2011 (Interiano)). Mr. Hanna advised the mapdrawers, however, that even if a district were over a 51% threshold based upon demographic data, it might not perform for the minority population. *See* Defs.' Ex. 305; Defs.' Ex. 312, at 5 (when editing Texas's informal preclearance submission to the DOJ, Mr. Hanna commented that demographic benchmarks were "phony").

28. Mr. Downton ignored Mr. Hanna's advice about identifying minority ability districts. Relying solely on demographic statistics to identify a minority population's ability to elect, Mr. Downton testified that when drawing the Congressional Plan, he tried to keep the demographic numbers of protected districts "at their benchmark levels." Trial Tr. 65-66, Jan. 18, 2012 AM (Downton). The Congressional Plan was legally compliant with the VRA, in his opinion, because seven districts in South and Central Texas have over 50% HCVAP. Defs.' Ex. 577 (Trial Tr. 950, *Perez v. Perry*, Sept. 9, 2011 (Downton)). Mr. Downton asserted, however, that based on the reconstituted election analysis conducted after the Congressional Plan was submitted to the OAG, in his view, the Congressional Plan actually increases the number of districts that provide Hispanics the ability to elect their candidate of choice. Trial Tr. 67-68, Jan. 18, 2012 AM (Downton).

29. Messrs. Downton and Interiano both testified that they did not look at reconstituted election analyses or performance prior to completing the Congressional Plan, even though they both received legal advice that, for VRA compliance, reliance solely on demographic data is insufficient to measure the number of protected districts in the benchmark or the enacted plan. Trial Tr. 1451-52, *Perez v. Perry*, Sept. 12, 2011 (Interiano); Trial Tr. 57, Jan. 18, 2012 AM (Downton).

30. While the mapdrawers' reliance solely on demographic data to assess VRA compliance was erroneous, their superiors were negligent of their responsibilities under the VRA. The Chairmen of the Redistricting Committees testified that they relied on the mapdrawers to ensure that the map was "legal," but made little independent effort to ensure that minority districts were protected. Chairman Solomons did not utilize the Senate Redistricting Committee Outside Experts hired to evaluate whether the Congressional Plan complied with the VRA. Neither he nor Chairman Seliger ever asked for the specific number of minority ability districts required, at a minimum, to ensure that the congressional map complied with the VRA. Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger); Trial Tr. 65-67, Jan. 20, 2012 PM (Chairman Solomons testifying that he did not know or identify the number of protected districts in the Benchmark Plan

because that determination was made by his staff).

## D. Congressional Districts at Issue

### a. Congressional District 23

31. In the Benchmark Plan, CD 23 is based in West Texas and incorporates Brewster, Crockett, Culberson, Dimmit, Edwards, Hudspeth, Jeff Davis, Kinney, Maverick, Medina, Pecos, Presido, Reeves, Terrel, Uvalde, Val Verde, and Zavala counties, as well as portions of Bexar, El Paso, and Sutton counties.  Pl.'s Ex. 11, at 5-6.  In terms of metropolitan areas, CD 23 in the Benchmark Plan includes the cities of Del Rio and Eagle Pass, as well as areas of Bexar County that fall outside San Antonio's city limits.  This district was drawn in 2006, following the Supreme Court's ruling in *LULAC v. Perry*, by the U.S. District Court for the Eastern District of Texas in order to remedy the State's violation of Section 2 of the VRA and provide Hispanics the opportunity to elect candidates of their choice.  Defs.' Ex.  826, at 5 (Rep. of Dr. Flores); Defs.' Ex. 575 (Trial Tr. 300, *Perez v. Perry*, Sept. 7, 2011 (Flores)).

32. Based on demographic statistics, Hispanics are a clear majority of the population in the Benchmark CD 23 and endogenous election results indicate that the district often elected a Hispanic candidate of choice, even if not every time. *See infra* ¶ 35.

33. The only expert proffered by Texas on the issue of retrogression disagrees with Texas and concludes that CD 23 is no longer an ability district.  Defs.' Ex. 581 (Trial Tr. 1839, *Perez v. Perry*, Sept. 14, 2011) (Dr. Alford testifying: "I don't think that the 23rd is any more likely to perform that it was. I think it is *probably less likely to perform* than it was, and so I certainly wouldn't count and don't – in all of this discussion, I haven't counted the 23rd as an *effective* minority district in the newly adopted plan, but it does remain a majority district.")  (emphases added).

34.    CD 23 in the Congressional Plan is no longer an ability district.

### i. Demographic and Election Result Data for Benchmark Congressional District 23

35. Texas has identified CD 23 as a Hispanic ability district in the Benchmark.  *See* Pl.'s Mem. Supp. Mot. Summ. J., ECF No. 41, at 6.  In the Benchmark Plan, CD 23 has an overall Hispanic population of 66.4%, an HCVAP of 58.4%, and an SSVR of 52.6%. Pl.'s Ex. 11, at 10.  According to the OAG's election analysis, Hispanic citizens in Benchmark CD 23 elected their candidate of choice in three out of ten elections.  Defs.' Ex. 390.  The Texas Latino Redistricting Task Force ("TLRTF") argues that the OAG 10 does not accurately reflect the ability of Hispanics to perform in the district.  If four additional racially contested elections are examined, the Hispanic candidate of choice wins in 7 out of 14 elections.  Trial Tr. 111-13, Jan. 18, 2012 AM (Downton); Defs.' Ex. 647.  Moreover, Dr. Richard Engstrom, an expert offered by TLRTF, emphasizes that from 2006 to 2010, the candidate of choice of Hispanics won two of three endogenous elections in Benchmark CD 23.  Defs.' Ex. 575 (Trial Tr. 513-14, *Perez v. Perry*, Sept. 7,

2011) (Engstrom).

36. Mr. Interiano testified that prior to redrawing CD 23, he never made a determination as to whether CD 23 was a protected district in the Benchmark Plan.  Trial Tr. 49, Jan. 17, 2012 PM (Interiano).  Chairman Seliger, however, testified that in the Benchmark Plan CD 23 is a Hispanic "opportunity" district and was drawn to be a Hispanic "opportunity" district by the court.  Defs.' Ex. 776 (Seliger Dep. 13, Sept. 1, 2011).  The State's expert witness, Dr. Alford, similarly testified that since the creation of CD 23 in 2006, it elected the Hispanic-preferred candidate in 2006 and 2008.  Defs.' Ex. 964 (Alford Dep. 121, Sept. 2, 2011).

37. CD 23 is currently represented by Congressman Francisco Canseco, a Hispanic Republican.  Defs.' Ex. 406, at 7.  Congressman Canseco was first elected to office in the 2010 election, in which he defeated incumbent Ciro D. Rodriguez, a Hispanic Democrat, by a vote of 74,853 to 67,348, or 49.39% to 44.44%.  Pl.'s Ex. 32, at 13.  Voting in the 2010 election was racially polarized, with 84.7% of Hispanics voting for Mr. Rodriguez.  Defs.' Ex. 728, at 25 (Rep. of Dr. Engstrom).  While Hispanics overwhelmingly supported Mr. Rodriguez, he received only 18.1% of votes cast by non-Hispanics.  *Id.*

38. The evidence presented demonstrates that Congressman Canseco won a close election for CD 23 in 2010.  With regards to this election, and others during 2010, Chairman Seliger testified that "the 2010 election was a bit of an aberration because of things like the Tea Party influence and I didn't know if it was reliable."  Defs.' Ex. 776 (Seliger Dep. 15, Sept. 1, 2011); Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger).

39. Although Chairman Seliger acknowledged that the 2010 election may not be "reliable," he expressed his belief that Congressman Canseco was the preferred candidate of Hispanics in CD 23.  Defs.' Ex. 776 (Seliger Dep. 15, Sept. 1, 2011); Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger).  He conceded that his belief is not based upon any analysis to determine whether Congressman Canseco was in fact the Hispanic candidate of choice.  Defs.' Ex. 776 (Seliger Dep. 31, Sept. 1, 2011).  Furthermore, despite his stated belief that Congressman Canseco was the Hispanic candidate of choice in a Hispanic district, Chairman Seliger testified that he wanted to change CD 23 to make it safer for Congressman Canseco.  *Id.* at 14; Trial Tr. 11, Jan. 24, 2012 AM (Chairman Seliger).  Indeed, he testified that it was possible that Congressman Canseco would lose in 2012 if CD 23 were not reconfigured in some way.  Defs.' Ex. 776 (Seliger Dep. 15, Sept. 1, 2011); Trial Tr. 11-12, Jan. 24, 2012 AM (Chairman Seliger).  Notwithstanding his desire to improve Congressman Canseco's electoral performance, Chairman Seliger testified that he stressed to staff that CD 23 needed to remain a Hispanic district.  Defs.' Ex. 776 (Seliger Dep. 13, 15, 30, 37, Sept. 1, 2011).  He believed that the Legislature was legally required to build a district to elect the Hispanic candidate of choice in CD 23.  *Id.* at 31; Trial Tr. 14-16, Jan. 24, 2012 AM (Chairman Seliger).  Chairman Seliger further testified that if he had understood that Congressman Canseco was not the Hispanic preferred candidate, and he was taking steps to make CD 23 safer for Congressman Canseco, that would have created a concern in his mind regarding compliance with the VRA.  Trial Tr. 11-16, Jan. 24, 2012 AM (Chairman Seliger).

ii.     **Plan to Protect Congressman Canseco**

40. The Senate Redistricting Committee staff attempted to draw a district safe for Congressman Canseco's reelection but found this to be a difficult challenge. Chairman Seliger stated: "in order to keep it as an opportunity district we just couldn't piece it together where it served Congressman Canseco; and we wanted to if we could. And then [the House] came up with their design and we thought it was good." Defs.' Ex. 776 (Seliger Dep. 14, Sept. 1, 2011).

41. The mapdrawers in the State House, Messrs. Downton and Interiano, testified that there were "two goals" with regard to CD 23 when drawing the enacted map: "to maintain or strengthen the Hispanic nature of 23 and also strengthen the [R]epublican nature of 23." Trial Tr. 80, Jan. 18, 2012 AM (Mr. Downton); Trial Tr. 47, Jan. 17, 2012 PM (Interiano); Defs.' Ex. 579 (Trial Tr. 1454-55, *Perez v. Perry*, Sept. 12, 2011 (Interiano)); Defs.' Ex. 779A (Interiano Dep. 102, Aug. 2, 2011). Mr. Interiano acknowledged, however, that he never conducted any analysis to determine if Congressman Canseco is the Hispanic preferred candidate in Benchmark CD 23. Defs.' Ex. 579 (Trial Tr. 1456, *Perez v. Perry*, Sept. 12, 2011 (Interiano)); Defs.' Ex. 779A (Interiano Dep. 86-87, Aug. 2, 2011); Trial Tr. 49, Jan. 17, 2012 PM (Interiano). Mr. Downton conceded that he knew when he was drawing CD 23 that Congressman Canseco was not the Hispanic candidate of choice. Defs.' Ex. 577 (Trial Tr. 966, *Perez v. Perry*, Sept. 9, 2011 (Downton)); Defs.' Ex. 778A (Downton Dep. 90, Aug. 12, 2011). He nonetheless drew CD 23 to "giv[e] Mr. C[a]nseco his best chance to be re-elected while maintaining and increasing the . . . total . . . Hispanic voting age, Hispanic citizen voting age, and Spanish surname voter registration." Trial Tr. 105-107, Jan. 18, 2012 AM (Downton).

42. The mapdrawers were aware that because Congressman Canseco was not the minority candidate of choice, increasing CD 23's performance for Congressman Canseco would be problematic. For example, on April 13, 2011, a staffer at the National Republican Congressional Committee, Lee Padilla, requested in an email that Doug Davis, Director for the Senate Select Committee on Redistricting, "check on the latest Canseco version." Defs.' Ex. 978. Mr. Davis responded that "[i]t looks nice politically. We're still concerned about the Voting Rights Act." Mr. Davis continued that "[w]e're going to have to put our best legal minds on the 23rd." *Id.*

43. During the map-drawing process, legislative staffers understood that drawing a map to protect Congressman Canseco while maintaining the benchmark demographic statistics would require careful uses of demographic statistics. As early in the redistricting process as November 2010, Eric Opiela[9] sent an email to Mr. Interiano, explaining that "certain data would be useful in identifying a nudge factor by which one can analyze which census blocks, when added to a particular district, especially 50-plus-1 majority-minority districts, help pull the districts total Hispanic pop[ulation]

---

[9] Mr. Interiano testified that at the time of this email, Eric Opiela was his colleague doing political work for Speaker Straus. Trial Tr. 54, Jan. 17, 2012 PM (Interiano).

and the Hispanic CVAP up to majority status, but leave the Spanish surnamed registered voters and turnout the lowest. This is especially valuable in shoring up Canseco and Farenthold." Defs.' Ex. 304; Trial Tr. 52-53, Jan. 17, 2012 PM (Interiano). According to Mr. Interiano, the import of this November 2010 email was to use demographic data, such as HVAP, HCVAP and SSVR, to draw a district that featured lower turnout of Spanish surname voters, while leaving the HCVAP at the benchmark level. Trial Tr. 53, Jan. 17, 2012 PM (Interiano).

44. Mr. Opiela was not an outsider to the redistricting process and played a role in the manner in which districts were drawn. Mr. Downton testified that he communicated with Mr. Opiela during the drawing of the Congressional Plan and understood that the latter was "speaking on behalf of the Republican Congressmen from Texas with the exception of Representative Barton." Trial Tr. 104, Jan. 18, 2012 AM (Downton); Trial Tr. 56, Jan. 17, 2012 PM (Interiano). Indeed, Mr. Downton acknowledged that he incorporated some of Mr. Opiela's ideas into the Congressional Plan. Trial Tr. 104, Jan. 18, 2012 AM (Downton). Mr. Opiela also gave pointers to Mr. Interiano during the redistricting process. In particular, after Mr. Opiela informed Mr. Interiano in the November 2010 email that data available at the block level could be used to lower a district's turnout of voters with Spanish surnames while raising its total Hispanic population, Messrs. Interiano and Opiela requested SSVR data at the block level from the TLC. Defs.' Ex. 820; Defs.' Ex. 980.

### iii.    Alterations to Congressional District 23 in the Congressional Plan

45. The 2010 Census indicated that CD 23 was overpopulated by about 149,000 people. Defs.' Ex. 575 (Trial Tr. 450, *Perez v. Perry*, Sept. 7, 2011 (Flores)); Defs.' Ex. 436. Mr. Downton testified that CD 23 was "a very sensitive district" throughout the redistricting process because "[i]t was previously a court drawn district. We wanted to make sure we maintained the SSVR and HCVAP level of District 23." Trial Tr. 78, Jan. 18, 2012 AM (Downton). As noted above, Mr. Downton also wanted to improve the district's performance for Congressman Canseco. *Id.* at 105.

46. Mr. Downton testified that while drawing CD 23 in the Congressional Plan he shaded precincts by election results and moved precincts in and out of CD 23 based on their election performance. Trial Tr. 107-08, Jan. 18, 2012 AM (Downton). In choosing between two precincts with similar SSVR, Mr. Downton testified that he would select the precinct with the greater percentage of Republican votes. *Id.* at 109. He did not, however, have any data showing which voters in a precinct were both Hispanic and Republican. *Id.* at 108. Mr. Downton sought to protect Congressman Canseco's reelection prospects by including in CD 23 those precincts that voted for Senator John McCain in the 2008 Presidential election, even though he recognized the possibility that these precincts voted for Senator McCain because Anglo voters preferred Senator McCain and turned out at higher rates than Hispanic voters. *Id.* at 109-10; Defs.' Ex. 577 (Trial Tr. 956, *Perez v. Perry*, Sept. 9, 2011 (Downton)); Defs.' Ex. 778A (Downton Dep. 76-77, Aug. 12, 2011). Mr. Downton testified, however, that he "never looked at turnout data for any map." Trial Tr. 89, Jan. 18, 2012 AM (Downton).

47. To address the overpopulation in CD 23 of approximately 149,000 people, mapdrawers moved over 600,000 residents in and out of the district. Defs.' Ex. 575 (Trial Tr. 450, *Perez v. Perry*, Sept. 7, 2011 (Flores)); Defs.' Ex. 436. The Congressional Plan adds approximately 33,000 people from traditionally Anglo counties along Benchmark CD 23's northern border. *Id.* at 448; Defs.' Ex. 430, at 1. Chairman Seliger testified that he did not know why some of these counties were added to CD 23 because it was done by his counterparts in the State House, but stated that no study was done in these counties to determine if the Republican primary voters would support a Hispanic candidate. Defs.' Ex. 776 (Seliger Dep. 31, 36, Sept. 1, 2011); Trial Tr. 15, Jan. 24, 2012 AM (Seliger).

48. Instead of adding population from Anglo counties in the northern part of CD 23 – north of the Pecos river – Chairman Seliger testified that the excess population in CD 23 could have been addressed by simply moving CD 23 down toward the border with Mexico, without extending the district northward. Defs.' Ex. 776 (Seliger Dep. 38, Sept. 1, 2011); Trial Tr. 20-21, Jan. 24, 2012 AM (Seliger). Chairman Seliger acknowledged that if CD 23 were pulled down closer to the border, Hispanic voters would "determine[] the outcome" of the election in CD 23. Defs.' Ex. 776 (Seliger Dep. 38, Sept. 1, 2011); Trial Tr. 20-21, Jan. 24, 2012 AM (Seliger). Mr. Downton similarly testified that because CD 23 lies adjacent to the border with Mexico and New Mexico, it is mathematically possible to achieve the ideal population in CD 23 by removing precincts from the northern and western part of the district. Defs.' Ex. 778A (Downton Dep. 85, Aug. 12, 2011).

49. In addition to adding population from Anglo counties to the north of CD 23, over 300,000 people in Bexar County were moved *out of*, and about 60,000 individuals in Bexar County were moved *into* CD 23. Defs.' Ex. 575 (Trial Tr. 485, *Perez v. Perry*, Sept. 7, 2011 (Flores)); Defs.' Ex. 436.

50. At the same time that he attributed population shifts in CD 23 as furthering the goal of making the district safer for Congressman Canseco, Mr. Downton also testified that changes were made to CD 23 in Bexar County to accommodate requests by State Representative Jose Menendez and Congressman Charles Gonzales for CD 20 and CD 35, a new congressional district in the Bexar County area. Trial Tr. 78-79, Jan. 18, 2012 AM (Downton). These requests with respect to CD 23 in the San Antonio area, according to Mr. Downton, "dropped the HCVAP of [CD] 23 below the Court [drawn] level" and required "other changes to [CD] 23 in other parts of the map to try to bring it back up. So it was kind of a constant ripple between 20, 23, 35 and to a lesser extent 21, and it might be 15, and other districts coming into Bexar County to try to get all of that to work." *Id.* In order to increase the HCVAP and SSVR of CD 23 to benchmark levels, Mr. Downton testified that he altered the boundary between CD 16 and CD 23 near El Paso County, and made changes to the "southern region" of CD 23. *Id.* at 81-83. Specifically, Mr. Downton testified that he split Maverick County at the southern end of enacted CD 23 and moved half of that County into enacted CD 28 in order to raise enacted CD 23's HCVAP level. He did this, in part, because he did not want to split Webb County, given previous litigation regarding a split of Webb County in *LULAC v. Perry. Id.* at 83-84.

13

### iv.    The Splitting of Maverick County

51.   In the Benchmark Plan, Maverick County, and its most populous city, Eagle Pass, are entirely contained in CD 23. Defs.' Ex. 428, at 4. The Congressional Plan, however, moves half of Maverick County from CD 23, splitting the city of Eagle Pass between CD 23 and CD 28. *Id.*; Defs.' Ex. 340, at 1; Defs.' Ex. 575 (Trial Tr. 447, *Perez v. Perry*, Sept. 7, 2011 (Flores)); Defs.' Ex. 430, at 1.

52.   Maverick County is located along the Mexican border and is among the "poorest counties in the United States."   Trial Tr. 113, Jan. 18, 2012 PM (Saucedo).  The County Judge for Maverick County, David Saucedo, testified that despite their relative poverty, "the citizens of Maverick County have been educated on the electoral process.  They're aware of the fact of the investments that are made in that district.  They're aware of the fact [of] the money that's invested by candidates to run in that district.  And Maverick – the people in Maverick County understand that you can actually have a larger margin come [from] one community like Maverick County than you would in all of the San Antonio portion that is represented by that congressman.  So that is what has given a community, a mid-sized community like ours, more influence." *Id.* at 118.  Judge Saucedo further testified that the Maverick County community is united and "[w]hen we go out, . . . we vote for one candidate and we've finally seen some of that change come about.  We're fighting for four-year universities, we're fighting for veterans clinics, things that don't exist in Maverick County that actually exist in smaller communities outside Maverick County." *Id.* at 115.

53.   The Congressional Plan splits Maverick County in half between enacted CD 23 and CD 28. Defs.' Ex. 428, at 4; Defs.' Ex. 340, at 1.  During his testimony at trial, Mr. Downton could not remember how he split Maverick County, but believed "a large part of it follows the road . . . it was essentially just cutting the county in half."  Trial Tr. 85, Jan. 18, 2012 AM (Downton).  Mr. Downton later conceded, however, that the split of Maverick County in the enacted plan does not follow just one road and also resulted in at least three precinct cuts. *Id.* at 114; Defs.' Ex.  575 (Trial Tr. 449, *Perez v. Perry*, Sept. 7, 2011 (Flores)).

54.   Mr. Downton indicated that he was not aware that he cut the city of Eagle Pass in half when he split Maverick County.  Trial Tr. 86, Jan. 18, 2012 AM (Downton).  In any event, he appeared to discount the impact of this decision, stating his belief that "there's roughly a thousand people that live there.  So it didn't change the nature of either district." *Id.*  The City of Eagle Pass actually has a population of 26,248 and is 95.5 % Hispanic. Defs.' Ex. 391, at 1012.

55.   Mr. Downton testified that he removed portions of Maverick County from CD 23 because Maverick County does not have a good record of voting Republican. Defs.' Ex.  577 (Trial Tr. 963, *Perez v. Perry*, Sept. 9, 2011 (Downton)); Defs.' Ex. 778A (Downton Dep. 87-90, Aug. 12, 2011).  In the 2010 general election, Ciro Rodriguez, the candidate of choice of Hispanics, won 80.29 % of the vote in Maverick County and Congressman

Canseco won only 15.64 % of the vote.  Defs.' Ex. 393, at 3.  In the 2010 Republican
Primary Election, Congressman Canseco received only 23.07 % of the vote in Maverick
County.  *Id.* at 4.  Judge Saucedo testified that for the past ten years Maverick County has
turned out about 12,000 to 14,000 voters for presidential elections, and 8,000 to 9,000
voters in other elections, and they vote heavily for the Hispanic-preferred candidate.
Defs.' Ex. 576 (Trial Tr. 771, *Perez v. Perry*, Sept. 8, 2011 (Saucedo)); Defs.' Ex. 576
(Trial Tr. 681, *Perez v. Perry*, Sept. 8, 2011 (Korbel)). Splitting Maverick County,
according to Judge Saucedo, could make the difference in an election.  Defs.' Ex. 576
(Trial Tr. 771, *Perez v. Perry*, Sept. 8, 2011 (Saucedo)).

    **v.**    **Hispanic Citizens' Ability to Elect in Congressional District 23 in the
Enacted Plan**

56. In the Congressional Plan, CD 23 is 67.8% Hispanic, with an HCVAP of 58.5% and an
SSVR of 54.8%.  Pl.'s Ex. 12, at 6, 11.  The Congressional Plan slightly increases CD
23's HCVAP by 0.01% and its SSVR by 2.2% over the Benchmark.  *See* Defs.' Ex.
575 (Trial Tr. 454-55, *Perez v. Perry*, Sept. 7, 2011 (Dr. Flores stating that "even
though the number SSVR is higher I don't consider it a Hispanic opportunity district at
all.  I think that a Hispanic candidate would find it very difficult to get elected in the
new configuration.")); Pl.'s Ex. 11; Pl.'s Ex. 12.

57. The evidence demonstrates that mapdrawers sought to ensure that the overall
performance of Hispanic candidates of choice would decrease.  On May 28, 2011,
Messrs. Downton, Davis, and Interiano had an email exchange regarding the Attorney
OAG's election analysis results for the Congressional Plan, in which Mr. Interiano
asked, "Any guidance on your 23.  Have you been able to make any of the changes that
we all discussed?"  Mr. Downton responded, "Have it over 59 % HCVAP, but still at
1/10. There has to be some level of HCVAP where it doesn't make a difference what the
election results are. It is more Hispanic than the other two San Antonio based districts . .
. ."  Defs.' Ex. 903, at 1.  In this email, mapdrawers referenced the OAG's
reconstituted election analysis, which indicated that candidates supported by Hispanics
dropped from winning three out of ten elections in the Benchmark Plan, to one out of
ten in enacted CD 23.  Pl.'s Ex. 65; Defs.' Ex. 390.

58. Mr. Interiano conceded that enacted CD 23 does not perform as a minority ability
district.  Defs.' Ex. 779A (Interiano Dep. 96-97, Aug. 2, 2011).  David Hanna and
Jeffrey Archer from the TLC expressed concern that CD 23 was not "really effective in
the proposed map."  Defs.' Ex. 288.  The goal of changes to CD 23 was, in fact, to make
the district safer for Congressman Canseco, who is not the Hispanic candidate of choice.

59. Mr. Downton, however, expressed little concern about the performance of CD 23.  In
proceedings before the U.S. District Court for the Western District of Texas, Mr.
Downton testified that he did not consider political performance as particularly relevant.
Defs.' Ex. 577 (Trial Tr. 966, *Perez v. Perry*, Sept. 9, 2011 (Downton)).  He would
classify a district as a majority-minority district if it elected the minority candidate of
choice three out of ten times or one out of ten times because he believes "that any

district where the Hispanic citizen voting age population exceeds 50 percent, it is, by definition, a Hispanic opportunity district." *Id.*; Defs.' Ex. 778A (Downton Dep. 24-25, Aug. 12, 2011). Notwithstanding Texas's position before this Court that CD 23 is an ability district both in the Benchmark and in the enacted plan, Mr. Downton does not view it as such. He testified that he believed CD 23 "was not an ability to elect district . . . before or afterward. It was performing in three out of ten elections before, and one of ten afterward, so in neither case was it performing." Trial Tr. 87, Jan. 18, 2012 AM (Downton). The Chairmen of the Redistricting Committees, however, testified otherwise. Chairman Seliger testified that no one had told him that CD 23 in the Congressional Plan was predicted to elect the Hispanic preferred candidate in only one out of ten elections. Defs.' Ex. 776 (Seliger Dep. 24, Sept. 1, 2011); Trial Tr. 13-14, Jan. 24, 2012 AM (Seliger). Chairman Solomons similarly testified that he would consider it problematic if a new congressional plan were to reduce the number of wins by the minority candidate of choice by three or more in a VRA protected district. He stated that it would also be a problem if the number of wins went from three in the base plan down to one and would necessitate a change to the plan. Defs.' Ex. 580 (Trial Tr. 1605-07, *Perez v. Perry*, Sept. 13, 2011 (Solomons)). He further testified that if an election analysis reduces the number of wins for minority preferred candidates by one out of ten, it would get his attention and that it was his understanding that legislative council was using that as a basis of their analysis. Trial Tr. 89, Jan. 20, 2012 PM (Solomons).

60. The ability of Hispanic voters to elect their candidate of choice is lost in enacted CD 23.

### b. Congressional District 25

61. In the Benchmark Plan, CD 25 draws 59.7% of its population from south Austin in Travis County, and also incorporates counties southeast of Austin, including Caldwell, Colorado, Fayette, Gonzales, Hays, and Lavaca counties, as well as portions of Bastrop County. Pl.'s Ex. 11. The District as configured in the Benchmark Plan is 38.8% Hispanic, 8.7% Black, and 49.8% Anglo. The citizen voting age population ("CVAP") is 25.3% Hispanic, 9.1% Black, and 63.1% Anglo. *Id.* at 7, 9. The SSVR in the District is 20.4%. *Id.* at 10. As reflected by the above statistics, the combined minority citizen voting age population totals 34.4% and Anglos constitute a majority of voters in the district.

62. CD 25 is currently represented by Congressman Lloyd Doggett. Defs.' Ex. 802; Trial Tr. 115, Jan. 19, 2012 PM (Dukes). Congressman Doggett won the special election for CD 25 in December 2006, and was reelected in 2008 and 2010.

63. Congressman Doggett is the candidate of choice of minority voters in CD 25. Trial Tr. 101, Jan. 19, 2012 PM (Dukes). A tri-ethnic coalition of Black, Hispanic, and cross-over Anglo voters work together to elect Democratic candidates in the area that CD 25

encompasses.[10]  *Id.* at 85.

64.   The success of this tri-ethnic coalition depends on support of some Anglos for Democratic candidates.  Trial Tr. 86, Jan. 19, 2012 PM (Dukes).

### i. Minority Election Performance

65.   Despite the fact that Anglos comprise 63.1% of the CVAP, "the candidate preferred by Blacks and Hispanics [in CD 25 in the Benchmark] has won every congressional election this decade."  Defs.' Ex.  724, at 5 (Ansolabehere Reb. Rep Jan 16, 2012); Pl.'s Ex. 11.

66.   Elected officials from areas encompassed by CD 25 testified at trial about the effectiveness of the tri-ethnic coalition and the role of minority voters within that coalition.  State Representative Dukes testified that candidates supported by the tri-ethnic coalition are the ones who win in Travis County.  Trial Tr. 104, Jan. 19, 2012 PM (Dukes).  Candidates are not able to bypass minority voters, and those who only obtain endorsements from Anglo groups in the tri-ethnic coalition do not win elections in Travis County.  *Id.* at 106 ("[I]n general elections in Travis County [] if you do not win the Hispanic and African-American boxes that are largely located in the central portion of Travis County, then you are not going to win an election in Travis County without the progressive Anglo[,] black and Hispanic communities. I may not have an Excel spreadsheet, but I can tell you I know my county.").  As an example, Representative Dukes testified that Nelda Wells Spears, an African-American supported by the coalition, successfully defeated an Anglo male "progressive Democrat" with 74% of the vote.  *Id.* at 112.

67.   In addition to Representative Dukes, David Escamilla, the Travis County Attorney, provided unrebutted written testimony that political cohesion and cooperation in the tri-ethnic coalition "consistently produces broad agreement to support individual candidates and slates of candidates.  The high frequency of agreement on candidates among the organizations within the Coalition also stems from the fact that many individuals are members of more than one of the organizations.  This overlap in membership promotes agreement on common slates of political candidates."  Defs.' Ex. 735, at 7.  He provided the example of the 2008 election, in which an Anglo Assistant County Attorney lost a race for a county judgeship despite having "the lion's share of endorsements from the local Democratic clubs" because he was "unable to

---

[10] Representative Dukes testified that this coalition includes "multiple democratic organizations. There is the Black Austin Democrats, the Tejano Democrats, the Mexican-American Democrats, the lesbian-gay, or Stonewall Democrats, there's the Central Austin Progressives, there's the University Democrats, the Northwest Democrats that help northeast, and the list goes on and on and on and on, coupled with labeled [sic] organizations, especially the Central Labor Counsel [sic] made up of 15 labor unions, the police association, fire fighters, all working together, and the candidates work very hard to get the endorsements because they will go out and work the community, through literature and create a slate. It is very rare, if you have that coalition's support that you are not successful in winning." Trial Tr. 85, Jan. 19, 2012 PM (Dukes).

gain significant support from the Hispanic or African American community." *Id.* at 9-10.[11]

### ii.     Congressional District 25 in the Congressional Plan

68.   In the enacted plan, CD 25 is significantly altered.  While CD 25 in the Benchmark extended southeast of Travis County, CD 25 in the enacted plan takes a smaller population from Travis County and extends north to Tarrant County.  Compared to its Benchmark configuration, CD 25 in the enacted plan loses population from south Austin and five counties and gains eleven counties.  CD 25 in the enacted plan no longer incorporates Bastrop, Caldwell, Colorado, Fayette, Gonzales, and Lavaca counties, and now includes Bosque, Burnet, Coryell, Hamilton, Hill, Johnson, Lampasas, and Somervell counties, as well as portions of Bell, Erath, and Tarrant counties.  *Compare* Pl.'s Ex. 11 *with* Pl.'s Ex. 12.

69.   State House Representative Dawnna Dukes testified that the Congressional Plan "takes the historical African-American community that was forced by segregation into central Austin and moved it into a majority Republican district that runs west . . . ." Trial Tr. 129, Jan. 19, 2012 PM (Dukes).

70.   CD 25 in the Benchmark Plan was overpopulated by 115,893 voters, or by 16.59%, and needed to shed this excess population.  Pl.'s Ex. 11.  Compared to the Benchmark, enacted CD 25 retained only 126,507 of the District's original voters, lost 489,434, and added 392,869 voting age persons.  Defs.' Ex. 724, tbl. C.2 (Ansolabehere Rep. Oct. 21, 2011).  In sum, only 28% of the voters in enacted CD 25 are from the Benchmark district.  *Id.* at 39.

71.   In the Congressional Plan, CD 25 is 70.3% Anglo, 17.3% Hispanic, and 8.3% Black. Pl.'s Ex. 12.  The CVAP is 78.2% Anglo, 10.3% Hispanic, and 8.1% Black.  *Id.*  In short, the citizen voting age population of Hispanics was cut by more than half and of Blacks was reduced by half a percentage point, while the population of Anglos was increased by over fifteen percentage points.  In addition, the Anglo population in the new areas added to CD 25 "shows high levels of racial cohesion and polarization" and "85 % of Whites in this new district vote for the same candidate."  Defs.' Ex. 724, at 35-36 (Ansolabehere Rep. Oct. 21, 2011).  In contrast to the new areas added to CD 25, the small area that remains from the old district votes 60% for the minority-preferred candidates.  *Id.* at 39.  According to Dr. Ansolabehere, CD 25 in the enacted plan no longer provides minorities living in the district the ability to elect their candidates of choice.  *Id.*

### c.  Congressional District 27

---

[11]  Mr. Escamilla stated that since 2002 minority candidates have prevailed in 34 county-wide elections in Travis County, 18 of whom were Black and 16 were Hispanic.  Defs.' Ex. 735, at 8.  He did not provide the total number of countywide elections from which this information is draw, which undermines the usefulness of this evidence in evaluating the ability of minority voters in the district.

i.       **Congressional District 27 in the Benchmark Plan**

72.   In the Benchmark Plan, CD 27 is located in southeastern Texas, and includes the cities of Corpus Christi and Brownsville, the counties of Kenedy, Kleberg, Willacy, and Nueces, as well as portions of Cameron and San Patricio counties.  Pl.'s Ex. 11; Defs.' Ex. 575 (Trial Tr. 458, *Perez v. Perry*, Sept. 7, 2011 (Flores)); Defs.' Ex. 818.  Based on 2010 demographic data, CD 27 in the Benchmark had a total Hispanic population of 73.2%, an HVAP of 69.2%, an HCVAP of 63.8%, and an SSVR of 61.1%.  Pl.'s Ex. 11.

73.   CD 27 is currently represented by Congressman Blake Farenthold, an Anglo Republican.  Congressman Farenthold has been representing CD 27 since 2010, when he defeated twenty-seven year incumbent Solomon Ortiz, a Hispanic Democrat.  Pl.'s Ex. 32, at 13; Trial Tr. 16, Jan. 24, 2012 AM (Chairman Seliger).  In the 2010 election, Congressman Farenthold defeated Mr. Ortiz by only 775 votes and received 51,001 votes, or 47.84 %, compared to Mr. Ortiz, who received 50,226 votes, or 47.11 %.  Pl.'s Ex. 32, at 13.

74.   Chairman Seliger recognized that Congressman Farenthold was not the Hispanic candidate of choice in CD 27.  Defs.' Ex. 776 (Seliger Dep. 20, Sept. 1, 2011); Trial Tr. 16-17, Jan. 24, 2012 AM (Seliger).  Despite their inability to reelect Mr. Ortiz in 2010, Hispanic citizens in Benchmark CD 27 elected their candidate of choice to the United States House of Representatives in 2004, 2006 and 2008.  Defs.' Ex. 327, at 5 (Handley Congress Rep.).

75.   According to Texas's expert, CD 27 had "performed" from the time of its creation for close to thirty years until the 2010 election.  Defs.' Ex. 581 (Trial Tr. 1870-71, *Perez v. Perry*, Sept. 14, 2011 (Alford)).  Indeed, Chairman Seliger testified that CD 27 in the Benchmark Plan is "clearly an opportunity district."  Defs.' Ex. 776 (Seliger Dep. 25-26, Sept. 1, 2011); Trial Tr. 17-18, Jan. 24, 2012 AM (Seliger).  Chairman Solomons similarly understood that CD 27 was protected under the VRA.  Defs.' Ex. 777 (Solomons Dep. 153, Aug. 31, 2011).

ii.       **Congressional District 27 in the Congressional Plan**

76.   According to 2010 Census data, CD 27 in the Benchmark Plan was overpopulated by about 43,000 people.  Trial Tr. 99, Jan. 18, 2012 AM (Downton); Pl.'s Ex. 11.  In the Congressional Plan, CD 27 is reconfigured and moved north, keeping the city of Corpus Christi and adding the cities of Victoria, Wharton, and Bay City, but eliminating Brownsville from the district.  Mr. Downton acknowledged that CD 27 in the Benchmark Plan and CD 27 in the Congressional Plan are very different districts. Defs.' Ex. 577 (Trial Tr. 971, *Perez v. Perry*, Sept. 9, 2011 (Downton)); Defs.' Ex. 778B (Downton Dep. 48, Aug. 31, 2011).  The Congressional Plan removes the southern counties of Kenedy, Kleberg, Willacy, and Cameron from the district, and adds Aransas, Calhoun, Jackson, Lavaca, Matagorda, Refugio, Victoria, and Wharton counties, as well as parts of Bastrop, Caldwell, and Gonzales counties.  Pl.'s Ex. 12.

77. Mr. Downton testified that he believed that CD 27 was a district protected by the VRA in the Benchmark but was no longer a majority Hispanic district in the Congressional Plan. Defs.' Ex. 778A (Downton Dep. 32-33, Aug. 12, 2011); Defs.' Ex. 778B (Downton Dep. 54, Aug. 31, 2011). Similarly, Texas's expert, Dr. Alford, testified that CD 27 in the Congressional Plan "has flipped, in almost exactly the same way 23 was flipped previously, so it is CD 27 this time that is flipped into being a majority . . . Anglo district." Defs.' Ex. 581 (Trial Tr. 1829-30, *Perez v. Perry*, Sept. 14, 2011 (Alford)).

78. In the Congressional Plan, CD 27 has a total Hispanic population of 49.5%, an HVAP of 45.1%, an HCVAP of 41.1%, and an SSVR of 36.8%. Defs.' Ex. 859, at 2; Defs.' Ex. 881, at 1. When compared to the Benchmark Plan, the HVAP decreases by 24.4%, SSVR decreases by 22.6%, and the HCVAP decreases by 22.7% in enacted CD 27.

79. While enacted CD 27 no longer includes counties in South Texas, Nueces County remains in the district. Nueces County is thus no longer included in the South and West Texas configuration of Hispanic ability districts. Trial Tr. 103, Jan. 18, 2012 AM (Downton). Mr. Downton testified that, Nueces County effectively is in a different district in the Congressional Plan than in the Benchmark Plan. Defs.' Ex. 778B (Downton Dep. 49, Aug. 31, 2011).

80. Nueces County has a population of 340,223 and an HCVAP of 54.6%. Pl.'s Ex. 11; Defs.' Exs. 883, 746B, 391. In the Benchmark Plan, Nueces County voters constitute over 50% of the total registered voters of CD 27, while in the Congressional Plan, they do not. Trial Tr. 119-20, Jan. 18, 2012 AM (Downton); Defs.' Ex. 778B (Downton Dep. 54-55, Aug. 31, 2011).

81. According to Mr. Interiano, a goal of the Congressional Plan was to allow Nueces County to anchor a congressional district. That said, Mr. Interiano testified that he did not know what portion of CD 27 voters were in Nueces County under the Benchmark Plan. Defs.' Ex. 579 (Trial Tr. 1461-62, *Perez v. Perry*, Sept. 12, 2011 (Interiano)); Defs.' Ex. 779A (Interiano Dep. 112, Aug. 2, 2011).

82. Mr. Downton conceded that because Benchmark CD 27 was overpopulated by only about 43,000 individuals, if it had simply been the State's goal to maintain CD 27, he would have had to remove only a few precincts. Trial Tr. 119, Jan. 18, 2012 AM (Downton). Mr. Downton further testified that CD 27 was redrawn to give Congressman Farenthold a better chance of reelection. This could have been accomplished in the Congressional Plan by carving out a small portion of Nueces County containing the incumbent's home and moving that portion into a northern district, leaving the bulk of Nueces County in a South Texas district. Defs.' Ex. 778B (Downton Dep. 53-54, Aug. 31, 2011).

83.  Chairman Seliger similarly testified that it is conceptually possible to take
Congressman Farenthold's neighborhood, which is located along Gulf Shore Drive in
Corpus Christi, and pair it with counties to the north to make him a safer district,
leaving the remainder of Nueces County in the district that runs south to Cameron
County.  Defs.' Ex. 776 (Seliger Dep. 27-28, Sept. 1, 2011); Trial Tr. 19, Jan. 24,
2012 AM (Chairman Seliger).

84.  Mr. Downton testified that the mapdrawers considered and rejected proposals to
include Nueces County's Hispanic population in the South Texas configuration of
congressional districts.  Trial Tr. 103-04, Jan. 18, 2012 AM (Downton).  This decision
was in large part a political choice.  *Id.* at 104.  According to Mr. Downton, he moved
Nueces County north into CD 27 in part because "the Cameron County delegation in
the House and the Senate had expressed a preference that they have a District
anchored in Cameron County without Nueces so that their county would be the sole
anchor point and could control the election."  The Cameron County delegation
included State Senator Eddie Lucio, Jr., State Representative Eddie Lucio, III, and
State Representative Renee Oliveira, who are all Democrats.  Mr. Downton fulfilled
these representatives' requests by creating enacted CD 34, a new district that was
intended to be an offset for the loss of CD 27.[12]  Trial Tr. 71, Jan. 18, 2012 AM
(Downton); Trial Tr. 118, Jan. 18, 2012 AM (Downton); Defs.' Ex. 575 (Trial Tr.
485-86, *Perez v. Perry*, Sept. 7, 2011 (Flores)); Defs.' Ex. 577 (Trial Tr. 971, *Perez v.
Perry*, Sept. 9, 2011 (Downton)); Defs.' Ex. 778A (Downton Dep. 31-32, 66, Aug. 12,
2011).

85.  As configured in the Congressional Plan, CD 27 does not provide Hispanic citizens the
ability to elect their candidates of choice.

## E.      Discriminatory Purpose in the Congressional Plan

### a.   Disparate Impact on Minority Congresspersons

#### i. Congressional District 9

86.  In the Benchmark Plan, CD 9 is located south of Houston and incorporates parts of
Harris and Fort Bend counties.  Pl.'s Ex. 11.  This district provides Black and
Hispanic citizens the ability to elect the candidate of their choice.

---

[12] CD 34, one of four new districts created in the Congressional Plan, is located in southeast Texas, and includes
De Witt, Goliad, Bee, Jim Wells, Kleberg, Kenedy, Willacy and Cameron counties, as well as portions of Hidalgo
County, San Patricio County, and Gonzales County. Pl.'s Ex. 12, at 1. All parties agree that proposed CD 34
provides Hispanic citizens living in the district the ability to elect candidates of their choice. Defs.' Ex. 726, at 4.
Specifically, CD 34 has an HVAP of 79%, an HCVAP of 71.7%, and an SSVR of 71.9%. Defs.' Ex. 885; Pl.'s
Ex. 12, at 9. Chairman Seliger testified that he created CD 34 because he felt he was required to create a Hispanic
district in South Texas, particularly after the loss of CD 27. Defs.' Ex. 776 (Seliger Dep. 25-26, Sept. 1, 2011);
Trial Tr. 18, Jan. 24, 2012 AM (Chairman Seliger).

87. Based on 2010 demographic data, CD 9 is 36.7% Black and 42.4% Hispanic. The district has a BVAP of 36.3%, an HCVAP of 19.1%, and an SSVR of 16.2%. Pl.'s Ex. 11, at 4, 10-11. Congressman Al Green has represented CD 9 since 2005.

88. In the Benchmark Plan, CD 9 has a surplus of 35,508 people, or 5.05 %. Defs.' Ex. 347, at 28. While this district was required to shed a small percentage of population, Congressman Green testified that his district had "substantial surgery" done to it. Trial Tr. 124-25, Jan. 20, 2012 AM (Congressman Green). Primarily Black communities, such as Hiram Clarke, were removed from his district, along with "economic engines," such as the rail line, Houston Baptist University, the Medical Center, and the Astrodome. The removal of these areas substantially decreased the political power of the citizens in his district. Defs.' Ex. 721, at 4; Trial Tr. 124-25, Jan. 20, 2012 AM (Congressman Green).

89. In addition to removing key landmarks from his district, the Congressional Plan removes Congressman Green's district office. Congressman Green testified that the "district office provides a meaningful connection between a member and the people represented. Our district office is in a location that is well-known to my constituents and has been in its present location since 2006; it has easy access to major freeways, mass transit, and many of the important centers of business activity within the Ninth Congressional District such as the Texas Medical Center, the VA hospital, and the Astrodome complex. Other similar properties in the area have been surgically removed; this couldn't have been done by accident." Defs.' Ex. 721, at 4 (Congressman Green Pre-filed Direct Testimony).

**ii.    Congressional District 18**

90. In the Benchmark Plan, CD 18 is located in Houston and within Harris County. Pl.'s Ex. 11. Based on 2010 demographic data, CD 18 in the Benchmark Plan is 43.5% Hispanic, 37.6% Black, and 15.8% Anglo. The district has a BVAP of 46.4%, an HCVAP of 22.3%, and an SSVR of 18.4%. *Id.* at 6, 9-10. Congresswoman Sheila Jackson Lee has represented CD 18 since 1995.

91. Congresswoman Jackson Lee testified that during the 2011 redistricting process, she traveled to Texas to meet with the Chairmen of the House and Senate Redistricting Committees, and went to a public redistricting hearing to urge state lawmakers to respect communities of interest in CD 18. Trial Tr. 9-11, Jan. 23, 2012 PM (Congresswoman Jackson Lee). These requests, however, were unheeded and she was never contacted to discuss changes to CD 18. *Id.*

92. Based on 2010 demographics, CD 18 in the Benchmark is over-populated by 22,503 people, or 3.22%, which thus required only minor changes to reach the ideal population size. Defs.' Ex. 347, at 29 (Murray Rep.). Nonetheless, in the Congressional Plan, the district's key economic generators, as well as Congresswoman Jackson Lee's district office are removed. Trial Tr. 13-14, Jan. 23, 2012 PM (Congresswoman Jackson Lee). Congresswoman Jackson Lee testified that

her district office has been in the same location for a lengthy period of time, having been used by the previous two representatives of CD 18, including former Congresswoman Barbara Jordan.  Consequently, constituents in the district know where the office is and go there to seek services.  *Id.*  In addition to removing her district office, the Congressional Plan also splits the historic Third Ward-MacGregor area, an important Houston community and home to many of Houston's African-American leaders.  This area has been in CD 18 since the district's creation in 1972.  Defs.' Ex. 577 (Trial Tr. 1051, *Perez v. Perry*, Sept. 9, 2011 (Murray)); Trial Tr. 12-13, Jan. 23, 2012 PM (Congresswoman Jackson Lee).

### iii.    Congressional District 30

93.    In the Benchmark Plan, CD 30 is located in Dallas within Dallas County.  Pl.'s Ex. 11.

94.    Based on 2010 demographic data, CD 30 is currently 42.4% Black, 39.7% Hispanic, and 16.7% Anglo.  The district has a BVAP of 42.5%, an HCVAP of 19.8%, and an SSVR of 14.6%.  Pl.'s Ex. 11, at 7, 9-10.  Since 1992, Congresswoman Eddie Bernice Johnson has represented CD 30.  Trial Tr. 67, 69, Jan. 18, 2012 PM (Congresswoman Johnson).

95.    Benchmark CD 30 has only 7,891 people over the ideal population, or 1.14%, and thus required only minor changes to reach the ideal population size.  Pl.'s Ex. 11.  Despite this fact, significant changes were made to CD 30, including the addition of a large prison, which artificially inflated the Black population in the enacted district.  Trial Tr. 81, Jan. 18, 2012 PM (Congresswoman Johnson); Defs.' Ex. 579 (Trial Tr. 1276, *Perez v. Perry*, Sept. 12, 2011 (Congresswoman Johnson)).

96.    The Congressional Plan removes from the district Congresswoman Johnson's district office and even her own home.  Trial Tr. 79, Jan. 18, 2012 PM (Congresswoman Johnson).  Congresswoman Johnson testified that the removal of her district office would be a significant loss to her community because her constituents are familiar with her office and it is easily accessible.  *Id.* at 79-80.

97.    In addition to her district office and home, the Congressional Plan removes economic generators from the district, including areas that Congresswoman Johnson has worked to improve, such as the American Center, where the Dallas Mavericks play, transportation areas for the downtown park, and the arts district.  Trial Tr. 81, Jan. 18, 2012 PM (Congresswoman Johnson).

### iv.    Congressional District 20

98.    Hispanic Congressman Charlie Gonzalez represents CD 20. In the Congressional Plan, his district office is removed from CD 20.  The enacted plan also removes key economic and cultural landmarks from Congressman Gonzalez's district, including the Alamo and the Convention Center named after Congressman Gonzalez's father.

Devaney Decl., Ex. 16 (Decl. of Congresman Charles Gonzales, ¶¶ 3-9, 11).

    **v.    Comparative Treatment of Anglo Congresspersons**

99.    While all three Black Congresspersons and Hispanic Congressman Gonzalez had their district offices removed from their re-configured districts, and Congresswoman Johnson even had her home removed, no Anglo Congressperson had his or her district office or home removed from his or her district as a result of the re-districting process. Trial Tr. 14, Jan. 18, 2012 PM (Congresswoman Jackson Lee); Trial Tr. 80, Jan. 18, 2012 PM (Congresswoman Johnson).

100.    While minority Congresspersons had key landmarks in their districts removed, the mapdrawers accommodated requests from Anglo Congresspersons to include in their districts country clubs and grandchildren's schools. Devaney Decl., Exs. 19-21. For example, mapdrawers ensured that Anglo Congresswoman Kay Granger, whose office originally had been drawn out of her district, had her office restored before adoption of the final plan. Devaney Decl., Ex. 5 ( Opiela Dep. 63, Aug. 22, 2011); *id.*, Ex. 17. Anglo Congressman Kenny Marchant requested on May 31, 2011, that his district lines be drawn to cross a street to include his grandchildren's school. *Id.*, Ex. 18. Mapdrawers accommodated that request. Anglo Congressman Lamar Smith requested on June 8, 2011, that his district lines be drawn to include a precinct with the San Antonio Country Club. *Id.*, Ex. 19. The Republican leadership also granted that request. Devaney Decl., Ex. 20.

101.    With regard to the removal of district offices, Mr. Interiano testified that the mapdrawers did not have the addresses of any congressional district offices when they were redrawing the congressional map. Mr. Interiano stated that it was just "coincidence" that minority Congresspersons had their district offices removed. Trial Tr. 95, Jan. 25, 2012 PM (Interiano). The Court finds that this testimony is not credible.

    **b.  Configuration of Congressional Districts in North Texas**

102.    In the Benchmark Plan, nine congressional districts converge in the Dallas-Fort Worth metroplex. Defs.' Ex.  818, at 1.  Of these nine districts, CD 30 is the only minority ability district.  Defs.' Ex. 327, at 2 (Handley Congress Rep.).

103.    The Dallas-Fort Worth metroplex is located in north Texas, and is spread across Dallas and Tarrant counties.  Between 2000 and 2010, the non-Anglo population in Dallas County grew by 28%, accounting for 100% of the population growth in the county. During the same period, the Anglo population declined by 20%.  Defs.' Ex. 734, at 5-6 (Supp. Rep. of Rogelio Saenz). The non-Anglo population in Tarrant County grew 12 times faster than the Anglo population, accounting for 89% of the population growth there.  *Id.*  According to 2010 census data, Blacks and Hispanics now account for a combined 55% of the voting age population in Dallas County and 37% of the voting

age population in Tarrant County.  Mot. for Judicial Notice, ECF No. 180, ¶¶ 33, 37.

104. Due to significant population growth in Dallas and Tarrant counties, the Congressional Plan allocates CD 33, one of the State's newly apportioned congressional districts that will be Anglo controlled, to the area.  Pl.'s Ex. 12. The Dallas-Fort Worth metroplex will thus have ten congressional districts converge in the area in the Congressional Plan, but CD 30 remains the only minority ability district among them.  *Id.*

105. Despite significant minority population growth, and the addition of another congressional district, the Congressional Plan does not reflect the minority growth in the Dallas-Fort Worth metroplex.  Trial Tr. 13, Jan. 18, 2012 PM (Rep. Veasey); Defs.' Ex. 320, ¶¶ 148-52 (Arrington Rep.).  The Congressional Plan divides the urban, minority population in the Dallas-Fort Worth metroplex among four Anglo-controlled congressional districts, CD 6, CD 12, CD 26, and new CD 33.  Trial Tr. 16-17, Jan. 18, 2012 PM (Rep. Veasey); Defs.' Ex. 320, ¶¶ 148-152 (Arrington Rep.); Defs.' Exs. 677-80, 683-84; Trial Tr. 75, Jan. 18, 2012 PM (Congresswoman Johnson testifying that the Congressional Plan has been configured to break "solid African-American and Latino growth up in one, two, three, four, five or six different districts").

106. To rebut claims that minorities in the Dallas-Fort Worth metroplex were either fractured into Anglo-dominated districts or packed into CD 30, Mr. Downton testified, that it was difficult to draw a Hispanic district in the Dallas-Fort Worth metroplex because "a significant part" of the population growth was either non-citizen, under 18, or "assimilated."  Trial Tr. 74, Jan. 18, 2012 AM (Downton).

107. The Republican congressional delegation, through Congressman Lamar Smith, MALDEF, MALC and Representative Veasey all presented Mr. Downton with "concepts" for North Texas, but Mr. Downton stated that none of these groups provided him with a proposed map during the regular or special session.  Trial Tr. 73, Jan. 18, 2012 AM (Downton).

108. Mr. Downton's testimony on this issue is not accurate.  In early April 2011, Congressman Lamar Smith, on behalf of a majority of the Texas Republican congressional delegation, distributed a draft congressional map to Republican leaders of the Texas Legislature, as well as the Lieutenant Governor and Governor.  Defs.' Ex. 394.  Congressman Smith's map created "one new Voting Rights Act district in the Dallas-Ft. Worth area," which, *inter alia*, "reflects the population growth in Texas over the last decade."  *Id.*

109. Representative Veasey testified that when he heard through the local paper that the Congressman Lamar Smith and the Republican congressional delegation had proposed a map with another minority congressional district in north Texas, in addition to CD 30, he approached Chairman Solomons and asked to see it.  Chairman Solomons responded that there was no such map.  Representative Veasey testified that he subsequently learned that Chairman Solomons had, in fact, seen Congressman Smith's proposed map.  Trial Tr. 15-16, Jan. 18, 2012 PM (Rep. Veasey).

### i. Congressional Districts 6, 12, and 33

110. CD 6 in the Benchmark Plan is anchored in the heavily Anglo counties of Ellis and Navarro and reaches into both Dallas County and Tarrant County to include heavily Hispanic neighborhoods in Dallas County and areas of Tarrant County with rapidly growing Hispanic and Black population areas.  Trial Tr. 21, Jan. 18, 2012 PM (Rep. Veasey); Defs.' Ex. 819 at 1.  CD 6 in the Benchmark has a combined Black and Hispanic CVAP of 38.6%, with most of the minority population in Dallas County.  Defs.' Ex. 857, at 2.

111. CD 12 in the Benchmark is based in northern Tarrant County, which is comprised of affluent Anglo communities.  The district also incorporates southeast Fort Worth, which is a Black community.  Southeast Fort Worth is situated south of Interstate 30 and east of Interstate 35 and is made up of several inner-city, low-income communities that are predominantly minority.

112. CD 33 is one of the State's newly apportioned congressional districts.  In the Congressional Plan, this district includes all of Parker County and parts of Wise County, both of which are predominantly comprised of Anglo, suburban areas.  Anglos make up 85.3% of the population in Parker County and the portion of Wise County included in CD 33 is 78.7% Anglo.  Pl.'s Ex. 12.  In addition to those Anglo areas, CD 33 cuts into Tarrant County to include Tarrant County's fast-growing minority populations.  Representative Veasey testified that enacted CD 33 "goes around southwest -- underneath southeast Ft. Worth in the unincorporated Tarrant County, and then moves into Arlington, into the heavily Anglo part of Arlington, and then picks up the fast minority growth area in southeast Tarrant County, Arlington -- southeast Arlington-Grand Prairie area."  Trial Tr. 23, Jan. 18, 2012 PM (Rep. Veasey).

### ii. Congressional District 26

113. CD 26 in the Benchmark Plan covers parts of Cooke, Dallas, Denton, and Tarrant counties.  Pl.'s Ex. 11.  Benchmark CD 26 is anchored in Denton County, and then reaches south into the center of Tarrant County in a long peninsula-like strip, incorporating 363,872 individuals.  The population of benchmark CD 26 in Tarrant County is 45.5% Anglo, 24.4% Black, and 26.5% Hispanic.  Pl.s' Ex. 12.

114. In the Congressional Plan, CD 26 covers parts of three counties: Dallas, Denton, and Tarrant, with most of Denton County within the district.  Pl.'s Ex. 12, at 1, 7.  The portion of Denton County in CD 26 is 67.1% Anglo.  Id.; Trial Tr. 18, Jan. 18, 2012 PM (Rep. Veasey).  CD 26 also includes a small portion of Dallas County containing 841 individuals, who are 43.9% Anglo.  Pl.'s Ex. 12, at 7.  In addition to these Denton County and Dallas County areas, CD 26 in the Congressional Plan runs down the center of Tarrant County in an exaggerated "lightning bolt" shape to capture 147,815 individuals, 65.2% of whom are Hispanic.  Id.; Defs.' Ex. 75.



| Benchmark CD 26 | Enacted CD 26 |

115. The "lightning bolt" into Tarrant County divides two significant minority communities of interest in Tarrant County – North Side and South Fort Worth – and moves these areas to CD 12, a district represented by Anglo Republican Congresswoman Kay Granger.  North Side is an urban, low-income, majority Hispanic community in Fort Worth.  South Fort Worth is another urban, low-income, majority Hispanic community in Fort Worth.  Trial Tr. 19, Jan. 18, 2012 PM (Rep. Veasey); Trial Tr. 98-99, Jan. 18, 2012 PM (Jiminez).

116. The boundary between enacted CD 26 and enacted CD 12 in Tarrant County – the eastern boundary of the "lightning bolt" – divides minority communities according to race.  Defs.' Ex. 630; Pl.'s Ex. 133.

117. The "lightning bolt" running through Tarrant County in the Congressional Plan contains 38 splits of voter tabulation districts ("VTD").[13]  Defs.' Ex. 875, at 10-11. The purpose behind the split VTDs was to move Hispanic populations into enacted CD 26 and split the non-Hispanic population out of the district.  Defs.' Ex. 887 at 74-82, 185-88.  Mr. Downton testified that he drew the map to keep the Hispanic population together, even though he also testified that these Hispanic populations may not want to be submerged into Denton County.  Defs.' Ex. 778A (Downton Dep. 130-131, Aug. 12, 2011).

118. In an effort to explain the configuration of the "lightning bolt" in the Congressional Plan, Mr. Downton testified that the "lightning bolt" running from Denton County to Tarrant County went through "multiple iterations and changes based on concerns raised by various people throughout the process."  Trial Tr. 68, Jan. 18, 2012 AM (Downton). According to Mr. Downton, the "lightning bolt" went further down into Fort Worth because "concerns were raised that we had split the Hispanic population of the City of Fort Worth between a group in the . . . northern side of Fort Worth which we had put in

---

[13] While not precisely the same, the parties agree that VTDs are essentially the same as voting precincts.

26 and a group down in the southern part of Fort Worth that we had put in 12.  So to rectify that concern we reached down further . . . and . . . the two Fort Worth Hispanic communities which we were told shared a community of interest, we put them in 26. Initially when we did that, it looked a little cleaner coming down, but in doing that we had taken out downtown Fort Worth and the [Trinity Vision] project out of District 12. Congressman Granger expressed concern that she really needed those areas in her District. . . . Then we made an additional change over Representative Veasey's request that primarily the black community we had put in 26 and he asked us to move that to 12 and so we did that as well." *Id.* at 68-69.

119.  The assertion that that the jagged edges in the "lightning bolt" were due to Congresswoman Granger's request to keep the Trinity Vision Project in CD 12, is disputed by other evidence in the record.  Specifically, Tarrant County Commissioner Roy Brooks stated in a memorandum, dated September 15, 2011, to the DOJ: "Frankly, you are not being told the truth . . . . I have no doubt that the State wants Trinity Vision to remain in CD 12.  However, using the project to explain and excuse their racially discriminatory map is flatly dishonest." Defs.' Ex. 113.  Mr. Brooks further stated that "[t]he contorted lines south of the Trinity Vision site reflect a careful effort to include Hispanic precincts and blocks in CD 26 while placing African American precincts and blocks in CD 12.  Any difficulty in retaining Trinity Vision in CD12 was caused by the State placing a higher priority on separating black and Hispanic voters from each other." *Id.*

### iii.  Packing of Minorities into Congressional District 30

120.  Evidence presented to the Court demonstrates that the Congressional Plan concentrates a large part of Dallas County's minority population into enacted CD 30.  Enacted CD 30 has a BVAP of 45.6% and an HVAP of 40.3 %, which increases the combined minority voting age population from the Benchmark district by 4.8 %.  *Compare* Defs.' Ex. 859, at 2 *with* Defs.' Ex. 858, at 2.

## II.  STATE SENATE PLAN

121.  There are 31 seats in the State Senate.  Senators serve terms of four years.

122.  On July 24, 2001, following the failure of the Texas State Legislature to enact a redistricting plan for the State Senate, the Texas Legislative Redistricting Board adopted a plan to redistrict all 31 Senate seats.  This plan was precleared by the DOJ on October 15, 2001.  This is the Benchmark State Senate Plan (the "Benchmark Plan") for the purposes of this case.

123.  Redistricting maps for the State House and State Senate must be passed during the general legislative session.  Otherwise, the maps are drawn by a Legislative Redistricting Board that is designated by statute and consists of the State's Lieutenant Governor, Speaker of the House, Attorney General, Comptroller, and Land Commissioner.

124. On May 17, 2011, the State Senate passed Senate Bill 31, containing a new redistricting plan for the State Senate based on the 2010 Census, and the Governor signed it into law on June 17, 2011 (the "State Senate Plan").  This is the Plan for which Texas is seeking preclearance.

125. SD 10 is represented by Senator Wendy Davis in the Benchmark Plan and its configuration in the State Senate Plan is the only challenge to the State Senate Plan before the Court.

## A.  State Senate Redistricting Process

126. Doug Davis, the director for the Senate Select Committee on Redistricting, was the principle mapdrawer for the State Senate Plan.  Trial Tr. 140, Jan. 17, 2012 PM (D. Davis).

127. In September 2010, the Senate Redistricting Committee held seven field hearings across the State to "receive input from the public" on redistricting.  Trial Tr. 145, Jan. 17, 2012 PM (D. Davis).

128. Redistricting hearings for the State Senate Plan were held in "population centers" around the State, but none was held in Tarrant County by the Senate Redistricting Committee.  Trial Tr. 17, Jan. 18, 2012 AM (D. Davis).

129. The State House Committee on Redistricting held the only hearing in Tarrant County in Arlington, which has the dubious distinction of being the largest city in the United States that lacks both public bus and rail service, Trial Tr. 8, Jan. 18, 2012 PM (Rep. Veasey), and therefore is not fully accessible without private transportation.  As discussed, Rep. Veasey specifically asked that a public hearing be held in Fort Worth and offered to locate an appropriate site, but his request was ignored.  *Id.* at 8-10.

130. Senator Judith Zaffirini, a Hispanic who served on the Senate Redistricting Committee in 2011 and who had been through several past Senate redistricting cycles, said that the field hearings were "a sham" because of low attendance and participation, lack of invited testimony, and lack of prepared materials for members of the Redistricting Committee.  Defs.' Ex. 189 (Zaffirini Dep. 7-8, Jan. 6, 2012).  Senator Rodney Ellis similarly testified that these hearings had very limited attendance and were "fairly perfunctory."  Trial Tr. 94-95, Jan. 20, 2012 AM.  Both Senators' testimony is credited by this Court.

131. Chairman Seliger and Doug Davis met with Senator Davis in March 2011 and asked her what changes she would like made to SD 10.  Trial Tr. 35, Jan. 20, 2012 AM (Sen. Davis).  She told them that the urban cores of Fort Worth and Arlington were "very important" to the District and that she felt "it was important to keep the district wholly contained within Tarrant County."  *Id.*

29

132. During late April 2011, draft redistricting maps were available for viewing in a room adjacent to the State Senate floor, but only by invitation. Those senators who were invited to look would leave the floor of the State Senate with Chairman Seliger and Mr. Davis to review the draft proposals and provide comments on them. Trial Tr. 39, Jan. 20, 2012 AM (Sen. Davis).

133. Senator Ellis testified that senators who represented "minority districts" were left out of the redistricting process. Trial Tr. 95, Jan. 20, 2012 AM (Sen. Ellis). Senator Zaffirini testified that Anglo senators had access to view the plans for their districts and the overall State Senate Plan but minority senators did not. Defs.' Ex. 809 (Zaffirini Dep. 29-30, Jan. 6, 2012). She characterized the redistricting in 2011 as the "least collaborative and most exclusive" she had ever experienced. Defs.' Ex. 134, Lichtman Rep. app. 7 (Decl. of Judith Zaffirini, ¶ 3).

134. Throughout April and May, Senator Davis constantly asked Mr. Davis and Chairman Seliger to see the map for her district. Trial Tr. 38-39, 42, Jan. 20, 2012 AM (Sen. Davis). Senator Davis was not shown any drafts and it was not until May 10, 2011 that she saw her district for the first time. *Id.* at 42; Defs.' Ex. 128. On that date, Senator Davis sent a letter to Chairman Seliger, expressing concern that minority voting rights were badly undermined by the State Senate Plan and that excluding her from the process, as the representative of several minority communities, contributed to this result. Defs.' Ex. 128.

135. Mr. Davis explained that he did not show Senator Davis how her district was re-drawn because "we were not printing maps and giving them to members." Trial Tr. 172, Jan. 17, 2012 PM (D. Davis); *see also id.* at 173. On the contrary, Chairman Seliger admitted that he provided maps to three other senators who represent majority-Anglo districts. Trial Tr. 67-68, Jan. 24, 2012 AM (Chairman Seliger*); see also* Defs.' Ex. 646 (Dep. of Sen. Jane Nelson 10-11, Jan. 6, 2012).

136. Senator Davis appeared at the May 12, 2011 Senate Select Committee on Redistricting hearing to testify against the State Senate Plan. Trial Tr. 9-10, Jan. 18, 2012 AM (D. Davis). Because Senator Davis was not a member of the Committee, she could not propose amendments in Committee. Senator Zaffirini sponsored amendments on her behalf. Trial. Tr. 43-45, Jan. 20, 2012 AM (Sen. Davis). These amendments were designed to "strengthen[] the African American and Latino makeup of [SD 10]." *Id.* at 45. Neither of these plans passed the committee vote. Senator Davis again offered amendments on the floor of the State Senate, but was defeated in a "party line" vote. Trial. Tr. 12, Jan. 18, 2012 AM (D. Davis).

137. The formal Senate redistricting process began on May 12, 2011 and the bill was passed to the State House on May 18, 2011, six days later. Defs.' Ex. 156. The State Senate passed the redistricting plan by a roll call vote of 29-2. Only Senators Davis and Ellis voted against it.

138. On Wednesday, May 11, 2011, the day before the public hearing on the State Senate
Plan, David Hanna an attorney at the TLC, responded to an email from Karina Davis,
the Senate Parliamentarian (and Doug Davis's wife), with a copy to Mr. Davis. Ms.
Davis had inquired about "pre-doing the committee report," Defs.' Ex. 359, but Mr.
Hanna advised "No bueno [no good]. RedAppl time stamps everything when it assigns
a plan. Doing it Thursday would create paper trail that some amendments were not
going to be considered at all. Don't think this is good idea for preclearance." *Id*.

139. Although Chairman Seliger testified that he never knew about the Davis-Hanna email,
he did agree that he knew on May 11, 2011 that none of Senator Davis's proposed
amendments to the State Senate Plan would pass. Trial Tr. 70-71, Jan. 24, 2012 AM
(Chairman Seliger).

**B. Senate District 10**

140. SD 10 in the Benchmark is a geographically compact district located entirely within
Tarrant County that includes most of Fort Worth, Texas.

141. The 2010 Census reported that SD 10's population is 19.2% Black, 28.9% Hispanic,
4.9% other minorities (*i.e.*, approximately 53% minorities) and 47.6% Anglo. Defs.'
Ex. 151, at 5. However, the 2010 Census showed an 18.3% Black Citizen Voting Age
Population ("BCVAP"), 15.1% HCVAP, 62.7% White Citizen Voting Age Population
("WCVAP"), and a 2.6% Asian-American citizen voting age population in the district.
Pl.'s Ex. 15, at 8.

142. In 2006, an Anglo Democrat, Terri Moore, ran for District Attorney in Tarrant County
but lost with close to 50% of the vote. Trial Tr. 30, Jan. 18, 2012 PM (Rep. Veasey).
This election result caught the attention of State House Representative Marc Veasey,
who studied the 2006 election results to see whether Black and Hispanic voters could
elect a candidate of choice in SD 10. Representative Veasey concluded that "when
African-American and Hispanic communities came together as a coalition to win, . . .
they could win Senate District 10." *Id*.

143. Thereafter, a coalition of Black and Hispanic community leaders in SD 10 visited
Wendy Davis, an Anglo with deep minority support who was then serving on the Fort
Worth City Council, and asked her to run for the State Senate in SD 10 in 2008. Trial
Tr. 16-19, Jan. 20, 2012 AM (Sen. Davis).

144. During her campaign, Senator Davis "spent a great deal of time going into [Black and
Hispanic] neighborhood meetings, knocking [on] doors in those communities and
attending churches and speaking to church congregations in those communities." Trial
Tr. 21, Jan. 20, 2012 AM (Sen. Davis).

145. According to the Chairman of the Texas State Democratic Party, Boyd Richie, "there
was a concerted effort to build support from and mobilize African-American and
Hispanic voters and to have them unite in their electoral support for Wendy Davis."

Defs.' Ex. 732, at 3 (Decl. of Boyd Richie).  Senator Davis corroborated this testimony and is credited by this Court.

146. Senator Davis had no primary opponent and ran against the Anglo Republican incumbent, Senator Kim Brimer, in the general election in 2008.  Senator Davis testified that Senator Brimer was "incredibly well funded" and had "the endorsement of every mayor and the police and fire unions, and had mayors appearing in television commercials with him endorsing him."  Trial Tr. 67-68, Jan. 20, 2012 AM (Sen. Davis).

147. Senator Davis won the election to the State Senate in 2008 by approximately 7,100 of the 288,000 votes cast in SD 10.  Senator Davis received 147,832 votes (49.91%); former Senator Brimer received 140,737 votes (47.52%); and Libertarian Party candidate Richard Cross received 7,591 (2.56 %).  Pl.'s Ex. 110, at 4.

148. Dr. Alford, Texas's expert witness, calculated that Senator Davis was elected with 99.6% of the Black vote, 85.3% of the Hispanic vote, and 25.8% of the Anglo vote.  Trial Tr. 32-33, Jan. 25, 2012 AM (Alford).

149. The Court finds that the election of Senator Davis in 2008 demonstrated a successful three-way coalition of Blacks, Hispanics and some cross-over Anglos in SD 10.  Since, however, there has been no occasion for Senator Davis to win reelection, and no evidence of the coalition's success in other elections, the Court concludes that the ability of minorities to elect candidates of choice in SD 10 has insufficient history to afford it protection as a Benchmark ability district for purposes of redistricting in 2011.

150. Nonetheless, the Court concludes that the record demonstrates purposeful discrimination in the re-drawing of SD 10.

**C.  Dismantling of Senate District 10's Minority Coalition**

151. SD 10 in the Benchmark is comprised of almost all the traditional and growing minority neighborhoods of Tarrant County in and around Fort Worth, including the historic Northside Hispanic area, the growing Southside Hispanic area, Defs.' Exs. 138, 657; Trial Tr. 21-22, Jan. 18, 2012 AM (D. Davis), and the predominantly Black areas of Southeast Fort Worth, Forest Hill, and Everman.  Defs.' Exs. 136, 657; Trial Tr. 21-22, Jan. 18, 2012 AM (D. Davis).

152. These areas were broken apart and placed into Anglo-controlled districts in the State Senate Plan, specifically enacted SDs 12 and 22.  Defs.' Ex. 141; Pl.'s Ex. 16 (showing that enacted SD 12 has a 61% Anglo population and a 75.5% WCVAP and enacted SD 22 has a 61.3% Anglo population and a 72.3% WCVAP).

153. The ideal district size for a senate district in the State Senate Plan is 811,147 individuals.  Trial Tr. 149, Jan. 17, 2012 PM (D. Davis).  The 2010 Census showed Benchmark SD 10 to have a population of 834,265, which is 23,118 more than the

ideal number for a senate district in Texas.  Defs.' Ex. 151, at 5.  The additional population in Benchmark SD 10, however, is well within the populations deviation accepted for redistricting in the State Senate Plan by the State and there is no evidence this "over-population" played any part in redrawing the district.  *See* Pl.'s Ex. 35 at 32.

154.   The maps below show Benchmark SD 10 and enacted SD 10 and the surrounding districts, particularly SDs 12, 9, and 22.



Benchmark SD 10



Enacted SD 10

155.   A closer examination of the area of Fort Worth (below) clarifies the cracking of the minority communities from SD 10 in the State Senate Plan.  An excerpt of the map above is below depicting Fort Worth and its surrounding areas, which are enclosed within the loop shape.  The loop, which represents Interstate 820, is intersected by Texas State Highway 30 running east to west and Interstate 35 running north to south, which create four quadrants within the loop.



Benchmark SD 10



Enacted SD 10

156. In the southeast quadrant lies a large Black community in Southeast Fort Worth, described as "the core urban community of Fort Worth," Trial Tr. 42, Jan. 20, 2012 AM (Sen. Davis). Southeast Fort Worth continues south of Interstate 820 where it remains a predominantly minority community. Defs.' Exs. 657, 136. This area is moved from Benchmark SD 10 into enacted SD 22 in the State Senate Plan. *Id.*

157. Within the northwest quadrant is the community known as the "north side Latino community," Trial Tr. 28-29, Jan. 20, 2012 AM (Sen. Davis); Defs.' Ex. 657, which is moved out of SD 10 into enacted SD 12 in the State Senate Plan. *Id.* at 42.

158. Overall, an examination of enacted SD 10 shows that it is drawn in a bow-tie shape in order to exclude many of the urban minority communities in Tarrant County that are in Benchmark SD 10. Defs.' Ex. 141.

159. Senator Rodney Ellis explained in a letter to the DOJ: "The demolition of [Senate] District 10 was achieved by cracking the African American and Hispanic voters into three other districts that share few, if any, common interests with the existing District's minority coalition. The African American community in Fort Worth is 'exported' into rural District 22 – an Anglo-controlled District that stretches over 120 miles south to Falls [County]. The Hispanic Ft. Worth North Side community is placed in Anglo suburban District 12, based in Denton County, while the growing South side Hispanic population remains in the reconfigured majority Anglo District 10." Defs.' Ex. 375, at 3.

160. Dr. Allan J. Lichtman, an expert witness for the Davis Intervenors, echoed in his report: "[The] [S]tate legislature, in dismantling benchmark SD 10[,] cracked the politically cohesive and geographically concentrated Latino and African American communities and placed members of those communities in districts in which they have no opportunity to elect candidates of their choice or participate effectively in the political process." Defs.' Ex. 134, ¶ 12 ("Lichtman Rep.").

161. Over 53,000 persons are moved from SD 10 into SD 12 in the State Senate Plan, of whom 89.5% are Hispanic or Black, even though Benchmark SD 12 is already over-populated by more than 200,000 people. Defs.' Ex. 151, at 2. Likewise, 104,703 persons are moved from SD 10 to SD 22, of which 78.2% are either Hispanic or Black. *Id.* at 3.

162. Doug Davis admitted that he knew that the areas he cut out of SD 10 were minority neighborhoods. Trial Tr. 22, Jan. 18, 2012 PM (D. Davis). Chairman Seliger also admitted that he knew that many of the neighborhoods being moved out of SD 10, including Everman and Forest Hills, were minority neighborhoods. Trial Tr. 56-57, Jan. 24, 2012 AM (Chairman Seliger).

163. Mapdrawers attribute the changes to SD 10 to partisanship, stating that one of the goals in drawing the State Senate Plan was to increase the Republican voting strength in four districts.  Trial Tr. 144, 161, Jan 17, 2012 PM (D. Davis).  SD 10 was one of those districts.  *Id.* at 160.

164. SD 10 is a majority Anglo district in the State Senate Plan.  The Anglo population is 54.5% of the enacted district's population, 6.9% higher than the Benchmark; the Black population is 14.6%, a 4.6% decrease from the Benchmark; and the Hispanic population is 25.9%, a 3% decrease from the Benchmark.  Pl.'s Ex. 15, at 4; Pl.'s Ex. 16, at 4.  Furthermore, the WCVAP increases to 69.5% of the enacted district's citizen voting age population, 6.8% higher from the Benchmark; the HCVAP in enacted SD 10 is 13.6%, 1.5% lower than in the Benchmark;  the BCVAP is 12.8%, 5.5% lower than in the Benchmark; and the Asian-American citizen voting population CVAP increases from .1% to 2.7%.  Pl.'s Ex. 15, at 8; Pl.'s Ex. 16 at 9.

165. In 2001, the State of Texas predicted that SD 10 could become a district where the minority community would grow to be able to elect a candidate of its choice.  Trial Tr. 36, Jan. 20, 2012 AM (Sen. Davis).  In the State Senate election of 2008, SD 10 exhibited the real-life potential of that prediction.  In 2011, the State Senate cracked SD 10 and removed most of its minority populations, spreading them into predominately Anglo districts and effectively dismantling the coalition that had elected Senator Davis.

166. The dismantling of SD 10 will have a disparate and negative impact on minority groups in the District.

## I.  STATE HOUSE PLAN

167. There are 150 Members (the "Members") of the State House, who run for office every two years.  There are currently 101 Republican Members and 49 Democratic Members.  Trial Tr. 133, Jan. 17, 2012 AM (Interiano).

168. The Texas State Constitution provides that its Legislature will meet every two years.  The Legislature is sworn in on the second Tuesday of every odd-numbered year and meets for 140 days, unless a special session is called by the Governor.  The committees within the Legislature are typically not appointed until February and, therefore, legislation is not usually considered until mid-February, when the general legislative session begins.  Actual legislative consideration of bills and their passage primarily takes place between February and May of a legislative year.  Trial Tr. 61-62, Jan. 17, 2012 AM (Hunter). There are approximately 70 to 80 days that are available within a regular legislative session to pass a bill in the State House.  Trial Tr. 70, Jan 20, 2012 PM (Chairman Solomons).

169. On November 28, 2001, a three-judge district court adopted a redistricting plan for the State House in *Balderas v. Texas*, No. 6:01-cv-158, 2001 WL 34104833 (E.D. Tex. Nov. 28, 2001), based on the 2000 Census.  That plan is the Benchmark Plan for purposes of this case.

170. When the State House failed to pass a redistricting plan for the State House in 2001, the Legislative Redistricting Board drew the map.  Pl.'s Ex. 148, at 2 (Solomons' Pre-filed Testimony). Avoidance of this default process was important to the State House in 2011. *Id.*

171. On February 17, 2011, the U.S. Census Bureau released redistricting data from the 2010 Census to Texas.  During the 82nd Legislature, which met between January and May 2011, the State House took up redistricting based upon population numbers from the 2010 U.S. Census.  The Texas Legislature did not begin the actual map-drawing process until the U.S. Census Bureau released block-level population data.  Pl.'s Ex. 35, at 26.

172. The redistricting plan for the State House contained in House Bill 150 (the "State House Plan") is the redistricting plan for which Texas seeks preclearance.

## A. Map-Drawing Process

173. Speaker of the State House Joe Straus appointed Representative Burt Solomons, who represents HD 65, to chair the State House Redistricting Committee.  Straus Dep. 63-64, Oct. 24, 2011.  Chairman Solomons had never before chaired a redistricting committee, Pl.'s Ex. 148 at 1 (Pre-filed Testimony of Chairman Burt Solomons), and had "no background in redistricting."  Trial Tr. 65, Jan. 20, 2012 PM (Chairman Solomons).

174. Speaker Straus did not give Chairman Solomons any specific instructions other than to prepare a map that would be supported within the State House.  Straus Dep. 63-64, Oct. 24, 2011.

175. Chairman Solomons spent no time learning anything about the VRA or Texas's obligations thereunder, and was entirely reliant on legislative staff members (Ryan Downton, Gerardo Interiano, and the TLC) and the OAG throughout the redistricting process.  Trial Tr. 65-66, Jan. 20, 2012 PM (Chairman Solomons).

176. Mr. Interiano was the principal mapdrawer for the State House Plan.  Trial Tr. 127-32, Jan. 17, 2011 AM (Interiano).

177. Members provided Mr. Interiano with proposed maps for their districts and it was his responsibility to put the pieces together to create the 150-district map.  Trial Tr. 132, Jan. 17, 2012 AM (Interiano).  Mr. Interiano worked with Members on drawing and re-drawing their districts.  Trial Tr. 105, Jan. 25, 2012 PM (Interiano).

178. Mr. Interiano understood from both Speaker Straus and Chairman Solomons that one major goal behind the State House Plan was "to give members the opportunity to be reelected."  Trial Tr. 160, Jan. 17, 2012 AM.  Additionally, he was tasked by Speaker Straus to pass a legal map; ensure that map-drawing was a member driven process; and

pair the least number of Members to run against each other in re-drawn or new districts. *Id*. at 133-34.

179. Mr. Downton's role in the process was to assist Members in drawing maps and to help mediate disagreements. Trial Tr. 46, Jan 18, 2012 AM (Downton).

180. Speaking on the floor of the State House, Chairman Solomons told the Members in early 2011 that he wanted the redistricting process to be a member-driven process, which meant that he wanted the Members to draw their own districts. Pl.'s Ex. 148 at 3.

181. As a result, redistricting was in large measure left to the State House Members without, as far as the record reveals, any instruction on or attention to the State's obligations under the VRA or its history of discrimination in voting. The process promoted Members' self-interest in reelection – with Republicans preferred by the Republican House majority – ahead of all other considerations for redistricting. *See, e.g., infra* ¶¶ 240, 249, 258.

182. Chairman Solomons never addressed, or contemporaneously even knew, the number of minority districts protected by the VRA under the Benchmark Plan. Trial Tr. 61-62, Jan. 20, 2012 PM (Solomons). There is no evidence that any other legislator was any better informed. Speaker Straus relied on Chairman Solomons and staff to assure him that the State House Plan was compliant with the VRA. Straus Dep. 71, Oct. 24, 2011. Likewise, Chairman Seliger in the State Senate relied on assurances from Chairman Solomons that the State House Plan complied with the VRA. Trial Tr. 33-34, Jan. 24, 2012 AM (Chairman Seliger).

183. When issues concerning the VRA arose, Mr. Interiano and/or Mr. Downton would usually make any necessary decision, but they went to the political leadership on critical issues. Trial Tr. 99, Jan. 25, 2012 PM (Interiano) ("[I]n the vast majority of the process of drawing, the decision was made by the staff. . . . [W]hen it was a decision that we were not comfortable making [,] we would take [it] to [Chairman Solomons and Speaker Straus].").

## B. Redistricting Principles

184. It is a requirement of Texas law that a candidate live in the State House district from which s/he is running for election. Trial Tr. 166, Jan. 17, 2012 AM (Interiano). This requirement resulted in strangely-shaped new districts, such as HD 41 (known as the "Transformer" because of its abrupt angles) in which lines were carefully drawn to *include* the home of Representative Aaron Pena and to *exclude* the home of Representative Veronica Gonzales so that the two incumbents would not have to run against each other. *Id.*

185. Based on the State's population of 25,145,561 people in 2010, State House districts with perfectly equalized population would each contain 167,637 residents. Pl.'s Ex. 35

at 15.  A ten percent total population deviation from 167,000 individuals per State House district was acceptable in redistricting.  Trial Tr. 1473-74, *Perez v. Perry*, Sept. 12, 2011 (Interiano); Trial Tr. 149, Jan. 17, 2012 AM (Interiano).

186. The County Line Rule greatly shaped the State House Plan.  It stems from Section 26, Article 3 of the Texas State Constitution, which provides that State House districts must be apportioned within counties "as nearly as may be" according "to the most recent United States Census." TEX. CONST., art. III, § 26.  The mapdrawers first divided the total population of the State into 150 districts and then assigned the appropriate number of districts to each county.  They interpreted the County Line Rule to mean that as many whole districts as possible must be drawn within a county and that any surplus population must be wholly joined with other counties or with whole surpluses from other counties to form a district.  Trial Tr. 143-45, Jan. 17, 2012 AM (Interiano); Pl.'s Ex. 9.  Adherence to the County Line Rule was the explanation offered for the elimination of Hispanic ability districts.  Trial Tr. 147, Jan. 17, 2012 PM (Interiano); *see infra* § E(a).

187. Where all proposed State House districts in a county were projected to be wholly contained within the county lines, the affected State House Members drew their own maps because any changes did not affect the rest of the State House Plan.  Those counties were "dropped-in" to the overall redistricting map.  Trial Tr. 46-47, Jan. 18, 2012 AM (Downton).  El Paso, Dallas, Tarrant, Denton, Bexar, Travis, Nueces, and Harris Counties were treated as drop-in counties.  *Id.* at 48.  The process worked smoothly for some counties, but was more difficult in others.

188. Mr. Interiano testified that he used HCVAP and SSVR data to determine that the State House Plan complied with the VRA.  Trial Tr. 138-39, Jan. 17, 2012 AM (Interiano).

189. Neither Mr. Interiano nor Mr. Downton even looked at the OAG election analyses until the work was basically done.  Trial Tr. 1451-52, *Perez v. Perry*, Sept. 12, 2011 (Interiano);  Trial Tr. 57, Jan. 18, 2012 AM (Downton).  There is no testimony that the OAG analyses prompted any changes in the State House Plan after Messrs. Interiano and Downton actually looked at them.

190. The OAG did not identify or analyze districts in which minority voters had the ability to elect a candidate of choice.  Giberson Dep. 20-21, Oct. 18, 2011.  Using a test of 50.1% or more for an ability district, both Mr. Interiano and Mr. Hanna identified 29 Hispanic ability districts in the Benchmark Plan, and thought this number increased to 30 in the State House Plan because the SSVR of HDs 90 and 148 increased.  *See* Trial Tr. 25-26, 32, Jan. 17, 2012 PM (Interiano); *id.* at 181, Jan. 17, 2012 AM (Interiano); Pl.'s Ex. 6.

191. Based upon the testimony at trial, the Court does not find credible or persuasive representations by counsel that election analysis was an important tool to determine whether proposed State House districts would assure minority voters the ability to elect.  It is clear that Texas adopted the principle that districts with SSVR above 50.1% were Hispanic ability districts under the VRA.  *See, e.g.*, Pl.'s Ex. 6 (email between

Mr. Hanna and Mr. Interiano discussing the number of districts with an SSVR over 50%); Trial Tr. 183, Jan. 17, 2012 AM (Interiano); Trial Tr. 66-68, Jan. 25, 2012 PM (Interiano).

192. Although Mr. Interiano agreed that it would have been possible to draw another Hispanic ability[14] district in the map, he did not do so because "this was a member-driven map [and] we were not going to be asking [members] to make changes unless we believed that it was required by the Voting Rights Act or any other law." Trial Tr. 35, Jan. 17, 2012 PM (Interiano).

## C. Data Available to Draw the Maps

193. Mr. Interiano testified that he spent close to one thousand hours learning the RedAppl software program used for redistricting even before any census results were available. Trial Tr. 131, Jan. 17, 2012 AM (Interiano). He also attended several conferences and read major cases on redistricting. *Id*. at 130. David Hanna and Jeffery Archer of the TLC contributed legal advice when asked, *id*. at 134-35, but, according to the record, were frequently ignored.[15]

194. RedAppl has a function that shades a map to indicate the percentage of ethnic (Hispanic) or racial (Black) voting age population in a certain voter tabulation district ("VTD"). As relevant here, RedAppl further disaggregates this data to allow a user to view the variations of voting age population or total population by race or ethnicity at the census block level through color shading. RedAppl also allows a user to view variances in SSVR[16] between VTDs through color shading, but does not show variances in SSVR between census blocks within a particular VTD. Trial Tr. 70, Jan.

---

[14] Mr. Interiano testified that another Hispanic *opportunity* district could have been drawn. Because he was discussing retrogression the Court finds that he was testifying to the possibility of an additional Hispanic *ability* district. Trial Tr. 35, Jan. 17, 2012 PM (Interiano) ("Q. And you agreed also with me that it was possible to have avoided retrogression in [the] house plan by creating a Latino Opportunity District elsewhere in the state, but you did not so that? A. That's correct. And that was due to the fact that this being a member-driven map – in many circumstances, the delegation bought us a map where they had all agreed to it – we were not going to be asking them to make changes to it unless we believed that it was required by the Voting Rights Act or any other law. But at this point, we felt comfortable that the fact -- with the map, that it was a legal map."). A minority opportunity district is meaningful under Section 2 of the VRA, which is concerned with whether minority "voters have less opportunity than other members of the electorate to . . . elect representatives of their choice." 42 U.S.C. § 1973(b).

[15] Mr. Hanna prepared various memoranda during the redistricting process that noted Section 5 problems with the developing map. *See* Pl.'s Ex. 3 (April 6, 2011); Pl.'s Ex. 4 (April 10, 2011); Pl.'s Ex. 5 (April 20, 2011). Mr. Interiano reviewed all of these memos, Trial Tr. 175-78, Jan. 17, 2012 AM (Interiano), although he identified no significant changes or actions he took as a result.

[16] Mapdrawers for the State House used non-suspense data with respect to SSVR, instead of total voter registration data. Trial. Tr. 181-83, Jan. 17, 2012 AM (Interiano). According to the Texas Secretary of State's website, "[a] suspense voter is a voter known to have an incorrect address or outdated address. The county has sent the voter a form to obtain a new current address, but no response has been received. The voter is however considered to be an active voter for voting purposes." Texas Secretary of State's Voter Registration Public Information Request Form, http://www.sos.state.tx.us/elections/forms/pi.pdf, (last visited Aug. 10, 2012). The Court takes judicial notice of this information and all SSVR numbers referenced are non-suspense numbers for 2010.

25, 2012 PM (Interiano).  Similarly, election information, *i.e.* the percentage of population that voted for a certain candidate in a prior election, is only available at the level of a VTD.  Trial Tr. 69-71, Jan. 19, 2012 AM (Korbel).

195.  Mr. Interiano testified that the State has no specific policy against splitting VTDs when drawing new electoral maps.  Trial Tr. 63-64, Jan. 25, 2012 PM (Interiano).  As a result, VTDs were split readily in districts like HD 41 in Hidalgo County.  Splitting VTDs reduces minority voting, as confusion and lack of language skills causes some minority voters not to vote.  Trial Tr. 61-62, Jan. 19, 2012 AM (Korbel) ("[I]t has a disproportionate impact because minority, a great number of minority voters don't have transportation for example, don't read . . . , aren't able to read these notices in the newspaper about changes in polling place and it results in a great deal of confusion.").

196.  Mr. Interiano testified that he used shading functions on RedAppl to indicate population by racial or ethnic group very early in the process, but he did not use this function to shade for Hispanic voting age population at the census block level; instead, he only examined Hispanic voting age population at the VTD level.  Trial Tr. 86-87, Jan. 25, 2012 PM (Interiano).  He further testified that he did not know that the RedAppl software could even show shading for different racial populations at the census block level.  Trial Tr. 94, Jan. 17, 2012 PM (Interiano)  ("I never did it at the bloc [sic].  I did not know that it was even possible, as I testified in several of my depositions.  I did not know that it was possible to do it, and because it was not possible I certainly never tried and never used bloc [sic] racial shading.").

197.  This testimony is not credible and is not accepted by this Court.  As demonstrated at trial, when racial/ethnic population shading is used in RedAppl, a drop-down menu gives the user the option to show variances in that demographic between census blocks.  Trial Tr. 88-89, Jan. 25, 2012 PM (Interiano).   After one thousand hours of training and experience, the Court is confident Mr. Interiano would be aware of this functionality in the software and saw the drop-down menu.

198.  Furthermore, it is clear Mr. Interiano knew that using census block data to identify the demographics of voters could advance the goal of maximizing Republican electoral strength by suppressing the minority vote.  As previously discussed, in early December 2010, Eric Opiela, counsel to Speaker Straus, suggested to Mr. Interiano that voting and population data might permit distinctions between minorities who turn out heavily to vote and those who do not; with such information, he suggested, districts could be drawn that would retain a large minority population but actually include a much smaller number of minority voters.  Defs.' Ex. 304.  Mr. Interiano tried to obtain demographic information on the level of census blocks but learned that only data on "Spanish Surname VR/Total Hispanic Population" was available.  Defs.' Ex. 197.  Although he obtained the data and sent it to Mr. Opiela, Mr. Interiano insisted that he never opened the files containing SSVR information on a census block level.  Interiano Dep. 69, Jan. 10, 2012.  Given the results in some districts, such as CD 23, where low-voting minorities were substituted for politically-active minorities, the Court does not credit this testimony.

199. In addition, the fact that HD 41, a Benchmark ability district, was crafted with 17 VTD splits in the State House Plan, Defs.' Ex. 886, at 76-77, and the reasons for all of these splits was not explained further leads the Court to discredit this testimony.  Trial Tr. 168, Jan. 17, 2012 AM (Interiano).

## D. Hearings, Procedures, and Passage

200. The first statewide proposal put forth by the Chairman of the State House Redistricting Committee, known as Plan H113, was released on Wednesday, April 13, 2011.  Notice of a public hearing on the plan was provided on that day, and public hearings were held immediately, in Austin, Texas, on Friday, April 15 and Sunday, April 17.  No hearings outside Austin were conducted.

201. The House Rules provide for a three-to-five day rule for posting advance notice of hearings.  The notice for the April 15th hearing on the H113 was posted on April 13, 2011, which resulted in less than two days' notice.  Solomons Dep. 83-85, Aug. 31, 2011.  David Hanna advised that the hearing schedule was too tight, but his caution was ignored.  Defs.' Ex. 971, at 2.

202. On Monday, April 18, 2011, it was announced on the floor of the House that the Redistricting Committee would meet on Tuesday, April 19.  Defs.' Ex. 509 at 18.  When it met, the House Redistricting Committee passed a plan known as H153 out of Committee.

203. State House Members were given until Monday, April 25, 2011 (the Monday after Easter weekend) to file any amendments to the bill.  Trial Tr. 801, *Perez v. Perry*, Sept. 8, 2011 (Turner).

204. The rushed schedule severely hampered the ability of citizens to attend the two hearings on the bill and of legislators to prepare objections or proposed amendments.  *See* Defs.' Ex. 738 at 19 (Rep. Hochberg Pre-filed Direct Testimony).

205. On Thursday, April 28, 2011, the State House passed an engrossed version of the plan, H283, in House Bill 150 by a vote of 92-54-3.

206. No changes were made to the State House Plan in the State Senate.  Pl.'s Ex. 162, ¶ 5 (Seliger Pre-filed Testimony).  Thus, when the Texas Legislature passed House Bill 150 on May 23, 2011, the State House Plan that was adopted was the one drawn by the State House.

207. The Governor signed House Bill 150 into law on June 17, 2011.

## E. Alleged Lost Hispanic Ability Districts

### a.  Nueces County & House District 33

208. The Benchmark contained three House districts in Nueces County: 32, 33, and 34.  HD 32 was the only district not fully contained in the county.  HD 33 was dropped from Nueces County in the State House Plan.  The demographics of the districts containing some part of Nueces County under the Benchmark Plan are as follows:

| Benchmark HD | HCVAP | SSVR |
|---|---|---|
| HD 32 | 35.3% | 33.2% |
| HD 33 | 60.4% | 54.3% |
| HD 34 | 58.2% | 53.8% |

Pl.'s Ex. 13, at 13, 23.

209. Benchmark HD 32 is represented by Representative Todd Hunter, an Anglo Republican.  It is only partially in Nueces County and also includes Aransas, San Patricio and Calhoun counties.  The majority of voters in HD 32 in general elections are Anglo.  Defs.' Ex. 737, at 11 (Abel Herrero Pre-filed Direct Testimony ).

210. Benchmark HD 34 is represented by Representative Connie Scott, an Anglo Republican.  It is made up of both urban and rural areas of Nueces County and is a majority Hispanic district.  The Hispanic candidate of choice won four out of the past five endogenous elections in HD 34.  Defs.' Ex. 326, at 5 (Handley House Report).  It is a district where Hispanic voters have the ability to elect a candidate of their choice in the Benchmark.

211. Benchmark HD 33 is represented by Representative Raul Torres, a Hispanic Republican.  It is made up of the historic core of Corpus Christi.  Defs.' Ex. 737, at 8. Hispanic voters are ordinarily the majority of voters in Benchmark HD 33.  *Id*. at 9-10. It is a district where Hispanic voters have the ability to elect in the Benchmark and it no longer provides Hispanic voters the ability to elect in the State House Plan.

212. The voting demographics of Benchmark and enacted HD 33 are as follows:

| HD 33 | Pop. | VAP[17] | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|---|---|---|---|---|---|---|---|
| Benchmark | 148,929 | 109,257 | 97, 255 | 60.4% | 4.5 % | 33.5% | 55.3% |
| Enacted | 172,135 | 119,518 | 109,865 | 8.5 % | 5.9 % | 81.2% | 6.5% |

Pl.'s Exs. 13, 14.

213. Hispanic voters were successful in electing their candidate of choice in four of the past five endogenous elections in Benchmark HD 33.  Handley House Rep., at 5.  In the 2010 election, Representative Solomon Ortiz, the Hispanic candidate of choice, won

---

[17] VAP represents voting age population.

47.5% of the vote, but lost to Representative Raul Torres, the current representative of HD 33.  Defs.' Ex. 726 at 6, n.5 (Engstrom Supp. Rep.).

214.  Hispanic candidates of choice won at least 50% of the exogenous elections the experts in this case analyzed in Benchmark HD 33.  Handley House Rep. at 5 (five out of five elections); Defs.' Ex. 799 ("Engstrom Chart") (four out of seven elections); Pl.'s Ex. 175, at 11, tbl. 3b ("Alford Rep.") (six out of ten elections).

215.  According to the 2010 American Community Survey 1-year estimates, Nueces County had a citizen voting-age population of 238,102 persons, including 91,467 Anglos (38.4%) and 133,084 Hispanic persons (55.9%).  As a whole, however, Nueces County had an SSVR below 50%.  Trial Tr. 9, Jan. 17, 2012 PM.  It was allotted 2.03 districts based upon the County Line Rule in the State House Plan.  Trial Tr. 147, Jan. 17, 2012 AM (Interiano).  The State calculated this number by dividing Nueces County's population of 340,233 by the ideal district size (167,637).  Pl.'s Ex. 35, at 19.

216.  Messrs. Hanna and Interiano decided that Nueces County "needed to have two districts and only two districts" in the State House Plan.  Trial Tr. 147, Jan. 17, 2012 PM (Interiano).  They informed Chairman Todd Hunter, who represents HD 32, and the rest of the Nueces County delegation of this fact.  *Id.*  HD 33, a Hispanic ability district in the Benchmark, was chosen for elimination.

217.  Legislative staff drew one district that was a "Latino Democratic" district and one that "would likely be Republican and not Latino."  Defs.' Ex. 742 (Hanna Dep. 46, Jan. 12, 2012).  The core of Benchmark HD 33 is moved into enacted HD 34.  Defs.' Ex. 737, at 13-14.  Representative Raul Torres, the current incumbent in Benchmark HD 33, and Representative Connie Scott, the current incumbent in Benchmark HD 34, are the junior Republican members of the Nueces County delegation and are paired under the State House Plan in HD 34, while Representative Todd Hunter is drawn into enacted HD 32 in Nueces County.  Trial Tr. 122, Jan. 17, 2012 AM (Rep. Hunter).

218.  Mr. Hanna recognized that drawing two districts in Nueces County may have to yield to the VRA.  He wrote on April 20, 2011: "While there are two 50% SSVR plus districts within the county currently that may constitute performing Hispanic districts, they are both significantly underpopulated [sic] and the remaining people in Nueces County are predominantly Anglo.  The county line rule likely requires two districts to be wholly contained within Nueces County with no surplus coming out; however this would have to yield to the federal Voting Rights Act if it can be shown retrogression could be avoided by splitting the county."  Pl.'s Ex. 5, at 1.  He further advised that splitting the Hispanic population in half would only result in two districts with SSVRs under 50% which were unlikely to perform as "Hispanic districts of choice."  *Id.*  In keeping with the County Line Rule, it was not possible to draw two districts that had an SSVR of above 50% in Nueces County and therefore only one district was drawn with an SSVR of above 50%.[18]  Trial Tr. 147, Jan. 17, 2012 AM (Interiano).

---

[18]  The County Line Rule was broken in Henderson County to comply with the federal one-person one-vote requirement.  Trial Tr. 85-86, Jan 20, 2012 PM (Chairman Solomons).

219. Mr. Hanna did not know if the loss of a district that "performed" for Hispanic voters in Nueces County was made up somewhere else in the State House Plan. Defs.' Ex. 742 (Hanna Dep. 46, Jan. 12, 2012). Mr. Interiano testified that he felt that the loss of HD 33 would be accounted for through the increase in SSVR in enacted HDs 90 and 148. Under the Benchmark, neither of these districts had an SSVR above 50%, Trial Tr. 10, Jan. 17, 2012 PM (Interiano), although each was in fact an ability district. *See infra* § F.

220. In the State House Plan, only HDs 32 and 34 remain in Nueces County, *see* Pl.'s Ex. 88, with the following demographics:

| Enacted HD | HCVAP | SSVR |
|------------|-------|------|
| HD 32 | 44.2% | 36.6% |
| HD 34 | 64.6% | 60.1% |

Pl.'s Ex. 14, at 13, 23.

221. The area that makes up Benchmark HD 33 is relocated to Dallas County in the State House Plan. Minority preferred candidates have no success in exogenous elections in enacted HD 33. Handley House Rep. at 9; Alford Rep at 11, tbl. 3b; Engstrom Chart.

### b. House District 35

222. Benchmark HD 35 is located in southern Texas and contains Atascosa, Karnes, Goliad, Bee, Live Oak, and McMullen counties. Enacted HD 35 loses the counties of Karnes, Goliad, and Jim Wells. It gains San Patricio and Duvall counties.

223. Benchmark HD 35 is a district where Hispanic voters have the ability to elect. It cannot be determined whether minority voters have the ability to elect in HD 35 in the State House Plan.

224. The voting demographics for the Benchmark and enacted HD 35 are as follows:

| HD 35 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|-------|------|-----|------|-------|-------|-------|------|
| Benchmark | 151,882 | 113,190 | 107,735 | 54.6% | 5.3% | 38.8 % | 55.3% |
| Enacted | 172,482 | 127,314 | 121,925 | 52.5 % | 4.2% | 42.0 % | 53.4 % |

Pl.'s Exs. 13, 14.

225. The minority candidate of choice won the last four of five endogenous elections in Benchmark HD 35. Handley House Rep., at 5. The current representative of Benchmark HD 35 is Jose Aliseda, a Hispanic Republican, who is not running for re-election. Representative Aliseda is a freshman representative who beat former Represenative Yvonne Gonzales, a Democrat, to win the seat in 2010. Trial Tr. 39, Jan

20, 2012 PM (Chairman Solomons).  Representative Aliseda was not the candidate of choice of Hispanic voters.  Handley House Rep., at 34.

226. The exogenous election results for Benchmark HD 35 show that Hispanic candidates of choice may win approximately half or fewer of the elections analyzed by the experts in this case.  *See* Handley House Rep. at 5 (two out of five elections); Alford Rep. at 11, tbl. 3 (five out of ten elections); Engstrom Chart (two out of seven elections).  The exogenous election results of the experts vary with respect to their measurement of minority voting strength in enacted HD 35, making these results inconclusive in evaluating the change in minority voting power in enacted HD 35.  Handley House Report at 5 (one out of five elections); Alford Rep. at 11, tbl. 3 (four out of ten elections); Engstrom Chart (three out of seven elections).

227. Representative Aliseda wanted to draw a proposed HD 35 that was more Republican in the State House Plan.  Trial Tr. 113, Jan. 17, 2012 PM (Aliseda).  He himself proposed a large portion of the map for this district, but he did not receive every area he proposed.  *Id.*  He worked with Mr. Interiano on the map and relied on Mr. Interiano's advice regarding the manner in which the district needed to be drawn.  *Id.* at 111, 113, 118.  He understood that, due to the VRA, he needed to keep the Hispanic population in HD 35 at current percentages.  *Id.* at 122.

   **c.  House District 117**

228. Both the Benchmark and enacted HD 117 are wholly located within Bexar County.  HD 117 shares its eastern border with HD 118 in both the Benchmark and State House Plans.

229. HD 117 is a Hispanic ability district in the Benchmark, but Hispanic voters lose the ability to elect in this district in the State House Plan.

230. The Hispanic candidate of choice won three out of five of the last endogenous elections in Benchmark HD 117.  Defs.' Ex. 326, at 5 (Handley House Rep.).

231. HD 117 is currently represented by John Garza, a Hispanic Republican and a freshman representative in the State House who defeated Representative David Liebowitz, an Anglo Democrat, by a very close margin in 2010.  Representative Garza is not the Hispanic candidate of choice.  Handley House Rep. at 34.  The Hispanic candidate of choice, Representative Liebowitz, won 48.1% of the vote in 2010.  *Id.* at 34; Engstrom Supp. Rep. at 7.

232. HD 118, which lost some area to HD 117 in the State House Plan, is currently represented by Representative Jose Farias, a Hispanic Democrat.

233. The exogenous election results for Benchmark HD 117 show that Hispanic citizens are successful in electing their candidate of choice at least 50% of the time.  *See* Alford Rep., at 11, tbl. 3b (five out of ten elections); Handley House Rep., at 5 (three out of

five elections); Engstrom Supp. Rep., at 6 (four out of seven elections).  In enacted HD 117, the exogenous results show that minority effectiveness in such elections will drop; in particular, Dr. Alford and Dr. Handley's analyses both show decreases of at least 30% in exogenous election results in the enacted district.  Alford Rep., at 11, tbl. 3 (two out of ten elections); Handley House Rep., at 11 (one out of five elections); *see also* Engstrom Supp. Rep., at 8-9 (three out of seven elections).

234.  The voting demographics for Benchmark and enacted HD 117 are as follows:

| HD 117 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|--------|------|-----|------|-------|-------|-------|------|
| Benchmark | 220,360 | 155,490 | 106,595 | 58.8% | 6.1% | 32.3% | 50.8% |
| Enacted | 171,249 | 116,261 | 71,395 | 63.8% | 4.6 % | 29.4% | 50.1% |

Pl.'s Exs. 13, 14.

235.  The Bexar County Delegation, made up of seven Democrats and three Republicans, met as a whole to decide how to redistrict the County.  Trial Tr. 105, Jan. 25, 2012 PM (Interiano).  Representative Mike Villarreal, a Hispanic Democrat, and Representative Ruth McClendon, a Black Democrat, led the process.  Defs.' Ex. 363 (Garza Dep. 25, Oct. 19, 2011).  Mr. Interiano was present at meetings where the delegation discussed how to draw the new map.  *Id*. at 28; Trial Tr. 105, Jan. 25, 2012 PM (Interiano).

236.  Mr. Interiano described the process for drawing the Bexar County map as one where all of the Members proposed their ideal district to Representative Villarreal, who put the districts together in a map that showed where requests overlapped.  The Members then negotiated to determine who would receive specific parts of the map.  Trial Tr. 107, Jan. 25, 2012 PM (Interiano).  Nine out of ten Members from the Bexar County delegation approved the districts for the County.  Trial Tr. 105, Jan. 25, 2012 PM (Interiano).  Representative Farias did not agree.

237.  Mr. Interiano's goal in drawing enacted HD 117 was to keep its SSVR above 50%.  Trial Tr. 159, Jan. 17, 2012 AM (Interiano).  Mr. Interiano told Representative Garza that he needed to keep his district above a 50% SSVR and "maintain [his] other goals in the district."  Trial Tr. 107, Jan. 25, 2012 PM (Interiano).

238.  Representative Garza said that he did not have much control and that the delegation agreed on the map for Bexar County on a consensus basis.  Defs.' Ex. 363 (Garza Dep. 69, Oct. 19, 2011).  He said that he wanted his district to move northward, where the area was more Anglo and more Republican.  *Id*. at 30-31.  And while he testified that he did not identify any specific areas that he wanted in his district, *id*. at 33, he then said that he wanted to keep Port San Antonio, the University of Texas at San Antonio, and Lackland Air Force Base in his district.  *Id*. at 34-35.

239.  Representative Garza was aware that minority representation had to be maintained in HD 117.  Defs.' Ex. 363 (Garza Dep. 26, Oct. 19, 2011).  He was advised by both the OAG and Representative Villarreal that he could not move his district northward and

46

that he had to continue to keep certain indicators of Hispanic voting strength the same as in the Benchmark district. *Id.* In his deposition, Representative Garza could not identify those specific indicators, *id.* at 51, although contemporaneously he told Representative Farias that he had to have an SSVR of 50.1% in his enacted district. Trial Tr. 14-15, Jan. 24, 2012 PM (Rep. Farias).

240. The mapdrawers thus decided to maintain SSVR levels while minimizing the actual Hispanic vote so that Representative Garza, as a Republican, could be reelected. Part of the attention to this issue is revealed by a March 24, 2011 email from Representative Villarreal to Mr. Interiano containing a chart stating that "[o]f the 27 VTD's won by Garza, 4 had a majority of SSRV."[19] Defs.' Ex. 917, at 3.

241. In order to accomplish this goal, the communities of Somerset and Whispering Winds were moved from Representative Farias's district to Representative Garza's district. Somerset is a rural, minority community with low Hispanic voter turnout. Defs.' Ex. 363 (Garza Dep. 39-40, Oct. 19, 2011). Whispering Winds is another largely, Hispanic community with low voter turnout. Trial Tr. 13, Jan. 24, 2012 PM (Farias).

242. Both Somerset and Whispering Winds are very poor communities that have poor water quality and poor housing. Farias Dep. 25, Jan. 5, 2012. As a result, Representative Farias paid special attention to the needs of these communities and was working actively to improve both. Trial. Tr. 9-11, Jan. 24, 2012 PM (Farias). He was very concerned that he continue to represent both communities. Trial Tr. 7-8, Jan. 24, 2012 PM (Rep. Farias).

243. Despite Representative Farias's strong objections, Whispering Winds and Somerset were drawn into HD 117, Representative Garza's district. Trial Tr. 8, 23, Jan. 24, 2012 PM (Rep. Farias).

244. Representative Villarreal proposed taking Somerset and Whispering Winds out of Representative Farias's district, Trial Tr. 24, Jan. 25, 2012 PM (Rep. Farias), at the behest of Speaker Straus to ensure Representative Garza's reelection. Farias Dep. 26, Jan. 5, 2012.

245. Mr. Interiano admitted that the "political numbers" of Representative Garza's benchmark district meant that Representative Garza could not be reelected if Somerset were not included in his district in the State House Plan. In order to maintain "demographic [*i.e.* SSVR] and political numbers" for his reelection, Somerset was a necessary addition. Trial Tr. 160, Jan. 17, 2012 AM (Interiano).

246. Because Representative Farias's goal was to keep the communities of Somerset and Whispering Winds in HD 118, he asked Representative Garza to take South San Antonio Independent School District ("ISD") from HD 118 in exchange for allowing Somerset and Whispering Winds to remain in his district. Trial Tr. 15-16, Jan. 25, 2012 PM (Rep. Farias). Notably, South San Antonio ISD had a very high voter turnout

---

[19] SSVR may also be referred to as SSRV (Spanish Surname Registered Voters).

as compared to Somerset and Whispering Winds.  Trial Tr. 17, Jan. 24, 2012 PM.
Representative Garza refused to make the trade.  *Id.* at 16-18.

247. Representative Farias also visited with Mr. Interiano and Speaker Straus,
unsuccessfully, in his effort to keep Whispering Winds and Somerset in his district.
Trial Tr. 14, Jan 24, 2012 PM (Rep. Farias).

248. Representative Farias ultimately offered an amendment on the floor of the State House
to allow Whispering Winds to stay in his district in exchange for moving the area
around Lackland Air Force Base to Representative Garza's district.  Trial Tr. 17, Jan.
24, 2012 PM (Rep. Farias); Defs.' Ex. 323, at 36.  Representative Garza said he would
leave the Amendment to the will of the House.  Trial Tr. 17, Jan. 24, 2012 PM (Rep.
Farias).

249. During the House discussion of Representative Farias's amendment, Representative
Aliseda expressed concerns regarding what it would do to the "Republican numbers"
of Representative Garza's new district.  Defs.' Ex. 323, at 36.

250. Representative Farias was unsuccessful in passing his amendment and the communities
of Somerset and Whispering Winds are in HD 117 in the State House Plan.

### d.  House District 41

251. Representative Veronica Gonzales, a Hispanic Democrat, currently represents
Benchmark HD 41 in Hidalgo County.  Representative Aaron Pena, a Hispanic
Republican, currently represents Benchmark HD 40, immediately adjacent to HD 41 in
Hidalgo County.  Representative Pena is a five-term incumbent who switched political
affiliation from Democrat to Republican at the end of 2010.  Trial Tr. 163, Jan. 17,
2012 AM (Interiano).

252. Both Benchmark enacted HD 41 are a Hispanic ability districts.

253. In Benchmark HD 41, the Hispanic candidate of choice was elected in five out of five
of the past endogenous elections.  Handley House Rep., at 4.  Furthermore, in
Benchmark HD 41, the minority candidate of choice wins the exogenous elections the
experts analyzed over 50% of the time.  Handley House Rep., at 5 (four out of five
elections); Alford Rep., at 11 tbl. 3 (seven wins out of ten elections); Engstrom Chart
(five out of seven elections).

254. The demographics of Benchmark and enacted HD 41 are as follows:

| HD 41 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|-------|------|-----|------|-------|-------|-------|------|
| **Benchmark** | 185,892 | 125,055 | 86,940 | 77.5% | 0.9% | 20.2% | 69.2% |
| **Enacted** | 160,238 | 111,689 | 79,770 | 72.1% | 0.9% | 25.3% | 64.6% |

Pl.'s Exs. 13, 14.

255. According to the 2010 American Community Survey 1-year estimates, Hidalgo County, Texas had a citizen voting-age population of 363,615 persons, including 48,087 Anglos (13.2%), and 309,690 Hispanics (85.2%).

256. Mr. Interiano drew all of the proposed State House districts in Hidalgo County.  Trial Tr. 1426, *Perez v. Perry*, Sept. 12, 2011 (Interiano).  He first drew HD 41, *id.* at 1476-77, with the objective of boosting Representative Pena's chances for reelection.  Trial Tr. 165, Jan. 17, 2012 AM (Interiano).

257. Mr. Interiano knew when he drew enacted HD 41 that it would have to be a majority-Hispanic district because it was impossible to draw a district that was not majority-minority in Cameron or Hidalgo counties.  Trial Tr. 42-43, Jan. 17, 2012 PM (Interiano).

258. In the process of drawing the map for HD 41, Mr. Interiano split 17 VTDs.  Defs.' Ex. 886, at 76-77.  VTDs were cut in order to avoid pairing incumbents, allow Representative Pena's house to be moved into enacted HD 41, and to cut out heavily Democratic areas "because [mapdrawers] wanted to increase the [sic] Republican performance of that district."  Trial Tr. 168, Jan. 17, 2012 AM (Interiano); Defs.' Ex. 785 (Pena Dep. 160-61, Oct. 19, 2011).  Many splits, however, were not specifically explained.  Over 31% of the population of enacted HD 41 was drawn into the district from split VTDs.  Handley House Report, at 9.

## F. New Hispanic Ability Districts

### a.   Alleged New Hispanic Ability Districts

### i. House Districts 90 & 148

259. Mr. Interiano specifically testified that the loss of HD 33 was made up in part by the increased SSVR in enacted HDs 90 and 148.  Trial Tr. 10, Jan. 17, 2012 PM (Interiano).  Both of these districts are Hispanic ability districts in the Benchmark and remain so in the State House Plan.

260. Representative Jessica Farrar, a Hispanic Democrat, represents Benchmark HD 148, located in Harris County.  Representative Lon Burnam, an Anglo Democrat, represents Benchmark HD 90, located in Tarrant County.

261. The voting demographics for Benchmark and enacted HD 148 are as follows:

| HD 148 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|--------|------|-----|------|-------|-------|-------|------|
| **Benchmark** | 140,946 | 109,647 | 79,785 | 42.1% | 10.0% | 45.4% | 40.0% |
| **Enacted** | 175,324 | 126,854 | 86,715 | 51.4% | 9.4% | 37.0% | 50.0% |

Pl.'s Exs. 13, 14.

262. In Benchmark HD 148, the Hispanic candidate of choice won five out of five of the past endogenous elections.  Handley House Rep. at 5.  The Hispanic candidate of choice also won all of the exogenous elections the experts analyzed in this case.  *Id*. at 5; Engstrom Chart.  These results do not change in the enacted State House Plan. Handley House Rep., at 11; Engstrom Chart.

263. The voting demographics for Benchmark and enacted HD 90 are as follows:

| HD 90 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|-------|------|-----|------|-------|-------|-------|------|
| **Benchmark** | 141,349 | 97,594 | 62,045 | 47.9% | 12.6% | 37.2% | 47.2% |
| **Enacted** | 159,428 | 105,582 | 67,570 | 49.7% | 15.6% | 32.5% | 50.1% |

Pl.'s Exs. 13, 14.

264. In Benchmark HD 90, the Hispanic candidate of choice won five out of five of the past endogenous elections.  Handley House Rep. at 5.  In Benchmark HD 90, the Hispanic candidate of choice also won all of the exogenous elections the experts analyzed.  *Id*.; Engstrom Chart.  These results do not change in the State House Plan.  Handley House Rep., at 11; Engstrom Chart.

265. Other than Mr. Interiano's testimony at trial, there is no evidence that the decision to increase the SSVR in these two districts was intended to offset the loss of HD 33. Instead, it appears that HDs 90 and 148 were drawn with SSVRs at or above 50% in the State House Plan at the request of MALDEF.  Trial. Tr. 10, Jan. 17, 2012 PM (Interiano).  Luis Figueroa of MALDEF testified at a Redistricting Committee Hearing and requested this change.[20]  *Id*.

266. Mr. Interiano never determined whether HDs 90 and 148 are Hispanic ability districts in the Benchmark.  Defs.' Ex. 779A (Interiano Dep. Vol. 1, 151-53, Aug. 2, 2011). However, he decided that both districts are ability districts in the State House Plan because their SSVR increased above 50%.  *Id*. at 153.

267. Mr. Interiano explained that he did not do an election analysis of HD 90 because "[i]t was going to perform ten out of ten, and it performed ten out of ten because it was a Democrat [sic] district, not because it was a district that was always electing the candidate of choice of the Latino community."  Trial. Tr. 14, Jan. 17, 2011 PM (Interiano).  Similarly, Mr. Interiano did no analysis of HD 148 to determine whether it was or would become a Hispanic ability district.  *Id*. at 32.

---

[20]  MALDEF wrote to Chairman Solomons on April 27, 2011, stating that it considered HDs 90 and 148 to be Benchmark ability districts so that raising their SSVR in the State House Plan would not create new ability districts. Defs.' Ex. 649, at 2.

268. Mr. Interiano based some of his assessment of enacted HD 90's effectiveness for minority voters on politics.  Mr. Interiano believed Hispanic voters would be able to elect their preferred candidate in enacted HD 90 because the sitting representative, Lon Burnam, opposed the increase in SSVR in this district, while MALDEF supported it. Trial. Tr. 12-13, Jan. 17, 2012 PM (Interiano).

### ii.   House District 74

269. Benchmark HD 74 encompasses the counties of Uvalde, Edwards, Val Verde, Terrell, Pecos, Brewster, Presidio, Jeff Davis, Ward, Reeves, Loving, Culberson, and Hudspeth.  Enacted HD 74 combines Hudspeth, Culberson, Loving, Jeff Davis, Reeves, Presidio, Brewster, Pecos, Terrell, Val Verde, Kinney and Maverick counties.

270. Benchmark HD 74 is a Hispanic ability district.

271. Benchmark HD 74 is represented by Representative Pete Gallego, a Hispanic Democrat, who has represented this district since 1991.   Representative Gallego is running for Congress in CD 23 in 2012 and he does not plan to run for reelection to the State House.  Pl.'s Ex. 10.  It is uncontested that he has been the candidate of choice of Hispanic voters.

272. Mr. Interiano testified that he believed that HD 74 was a Hispanic opportunity district in the Benchmark.  Trial Tr. 25, Jan. 17, 2012 PM (Interiano).

273. The demographics for Benchmark and enacted HD 74 are as follows:

| HD 74 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|-------|------|-----|------|-------|-------|-------|------|
| **Benchmark** | 143,566 | 104,522 | 85,920 | 59.7% | 1.8% | 36.7% | 58.1% |
| **Enacted** | 162,357 | 115,236 | 86,210 | 69.4% | 1.5% | 27.2% | 69.6% |

Pl.'s Exs. 13, 14.

274. The exogenous election results of the experts in this case for Benchmark HD 74 vary with respect to their measurement of minority voting strength.  Alford Rep. at 11 (reporting minority victories in four of ten elections); Handley House Rep. at 5 (one out of five elections); Engstrom Chart (four out of seven elections).

### iii.   Failure to Draw Additional Hispanic Ability Districts

275. Mr. Interiano thought that that there did not need to be an additional Hispanic ability district in the State House Plan because it was a Member-driven map.  As a result, if the Members did not add such districts, he would not ask them to make changes.  He felt comfortable with this decision because he believes that the State House Plan is legal under the VRA.  Trial Tr. 35, Jan. 17, 2012 PM (Interiano).  However, Mr.

Interiano did admit that it was possible to draw another majority-Hispanic district, which he would classify as an "opportunity" district in Southern Texas in the Rio Grande Valley.

276. In this area of the State, the State House Plan continues to maintain two State House districts in Cameron County and spills its excess population northward into a district shared with Willacy and Kennedy Counties. Pl.'s Ex. 14, at 1. It also maintains four districts in Hidalgo County and spills its excess population towards Starr County to form another district. *Id.*

277. Mr. Interiano testified it was possible to use excess population from Cameron and Hidalgo counties to create a majority Hispanic district in the State House Plan that likely would have performed as a Hispanic "opportunity"[21] district. Trial Tr. 42, Jan. 17, 2012 PM (Interiano).

278. If such a district were drawn, then a ripple effect would have caused a county line split in the northern portion of the map around Nueces County. The TLRTF submitted such a proposal. Trial Tr. 39-40, Jan. 17, 2012 PM (Interiano). Due to the violation of the County Line Rule that would result if the populations from the two districts were spilled towards each other, another majority-Hispanic district was not created in this area in the State House Plan. *Id.* at 40.

279. Chairman Solomons was aware that there was excess population in both Cameron and Hidalgo Counties, but testified that he never realized that a district could have been created using these populations because his staff did not advise him of that fact. Trial. Tr. 76-77, Jan. 20, 2012 PM (Chairman Solomons).

280. Though population is available to draw a potential new Hispanic opportunity district, the State did not choose to do that nor does it argue that any other new potential Hispanic opportunity/ability district was drawn in the State House Plan

281. There are no new Hispanic ability districts in the State House Plan.

## H. Lost Coalition District: House District 149

282. Benchmark HD 149 is in Harris County, but is eliminated from the County in the State House Plan.

283. HD 149 is a district where a coalition of Asian-American, Black, and Hispanic voters have the ability to elect and its elimination from Harris County in the State House Plan leads to the loss of a minority ability district.

---

[21] In this instance, the Court cannot make a finding that Mr. Interiano was discussing a potential ability district, because this portion of his testimony is unclear.

284. Hubert Vo, a Vietnamese-American Democrat, is the representative of Benchmark HD 149.  Mr. Vo was elected in 2004 and is the only Vietnamese-American in the State House.

285. The voting demographics of Benchmark and enacted HD 149 are as follows:

| HD 149 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | Asian CVAP |
|---|---|---|---|---|---|---|---|
| **Benchmark** | 169,836 | 123,771 | 90,245 | 19.0% | 26.1% | 37.6% | 16.2% |
| **Enacted** | 164,376 | 116,361 | 98,445 | 12.9% | 4.4% | 77.4% | 3.8% |

Pl.'s Exs. 13, 14.

286. Benchmark HD 149 contains the community of Alief, a large Asian-American population in the Houston area.  Defs.' Ex. 736, at 5-6, 8 (Rogene Calvert Pre-filed Testimony ).

287. In general, a review of election results from the OAG 10 shows that Hispanic and Black voters uniformly prefer different candidates from Anglo voters in HD 149 in general elections and that voting is racially polarized in this district.  Pl.'s Ex. 26, at 3557-60.

288. Asian-Americans, Hispanics, and Blacks in the area of HD 149 often work together to support candidates in local elections and Asian-American candidates have successfully been elected to school boards in Alief and to the Houston City Council.  Defs.' Ex. 736, at 12.

289. In particular, Hispanic, Black, and Asian-American communities came together to help to elect Representative Vo.  Defs.' Ex. 736, at 11.  Mr. Vo received endorsements from the Tejano Democrats and the African Coalition for his candidacy in 2004.  *Id.* Representative Hochberg, the Democratic representative from HD 137, testified that Hispanics, Blacks, and Asian-Americans form a coalition in HD 149, with the Asian-American community acting as the glue for this coalition.  Defs.' Ex. 738, at 13. Representative Vo has had a very diverse base of volunteers working on his campaigns, including Asian-American, Hispanic, and African-American volunteers. *Id*. at 13; Defs.' Ex. 736, at 11.

290. Mr. Vo would not have been successful in his bid for election if he had not received support from all of the minority communities in HD 149.  Defs.' Ex. 736, at 11.  In particular, the Asian-American community has taken a great deal of pride in Representative Vo's election and many Asian-Americans turned out to vote for him who had not before participated in elections.  *Id.*

291. Because Harris County went from 25 districts in the Benchmark to 24 in the State House Plan, one fewer district was available.  HD 149 is eliminated from Harris County and Representative Scott Hochberg and Representative Vo are paired in

enacted HD 137 in the State House Plan.  Enacted HD 137 contains only one VTD that Representative Vo previously represented.  Defs.' Ex. 738, at 20.  Representative Hochberg understands that enacted HD 137 was drawn to give him a chance to win the district, not Representative Vo.  *Id.* at 21.

292. The decision to decrease the number of districts in Harris County was based upon 2010 census data.  Dividing Harris County's population of 4,092,459 by the ideal district size (167,637) yielded 24.4126 districts for the County.[22]  Pl.'s Ex. 35, at 20; Trial Tr. 148, Jan. 17, 2012 AM (Interiano).

293. Members of the minority community regarded the decision to eliminate this minority ability district as detrimental to minority voting interests and strength.  Leaders of the Texas Asian American Redistricting Initiative, MALDEF, and the NAACP in Houston sent Chairman Solomons a letter protesting the elimination of HD 149.  The letter highlighted that the State House Plan would break up the community of interest in Alief.  Defs.' Ex. 632.

294. Mr. Hanna of the TLC concluded that either 24 or 25 districts would be permissible in Harris County, but he thought the choice to draw 24 districts in Harris County was "absolutely defensible."  Defs.' Ex. 742 (Hanna Dep. 106, Jan. 12, 2012).

295. Initially, Chairman Solomons had stated on the floor of the State House that there would be 25 districts in the enacted Harris County map.  Trial Tr. 43, Jan. 19, 2012 PM (Coleman); Defs.' Ex. 738, at 15.  Mr. Interiano told Representative Wayne Smith, an Anglo Republican, and Representative Senfronia Thompson, a Black Democratic from Harris County, to draw maps for Harris County that had both 24 and 25 districts.  Trial Tr. 148, Jan. 17, 2012 AM (Interiano).  It was generally understood that Representative Smith would lead the redistricting effort in Harris County.  Defs.' Ex. 738, at 15.

296. Between March and April of 2011, Representative Smith and Representative Thompson worked with the whole Harris County delegation on a 25-member map.  Trial Tr. 46-48, Jan. 19, 2012 PM (Coleman).

297. Chairman Solomons later told Representative Smith, however, that the Harris County map would only have 24 districts.  Representative Smith then drew a 24-district version of the Harris County map that merged Representative Vo and Representative Hochberg's districts.  Smith Dep. 22-23, 37, 38, Oct. 13, 2011.  Mr. Interiano provided instruction to the delegation on which districts could be eliminated.  He testified: "If the courts would have found or do find that coalition district[s] are protected by the Voting Rights Act, then we believed that the district that was going to most likely be protected by the Voting Rights Act was Scott Hochberg's district.  As a result, . . . we instructed the Harris County delegation . . . that the demographics of that district, that was the combination of Hochberg and Vo, needed to more closely assemble [sic] Mr.

---

[22] Chairman Solomons testified that he decided that there would be 24 not 25 districts in Harris County in the State House Plan based upon the "advice of counsel."  Trial Tr. 1567, Perez v. Perry, Sept. 13, 2011 (Chairman Solomons).

Hochberg's district rather than Mr. Vo's."  Trial. Tr. 153, Jan. 17, 2012 AM (Interiano).

298.  Representative Smith sent the 24-district version of the map to Speaker pro tem of the State House, Beverly Woolley.  Smith Dep. 34-35, Oct. 13, 2011.  Speaker Woolley separately worked on a map that had 24 districts, which she presented to the State House Redistricting Committee.  Trial Tr. 46-48, Jan. 19, 2012 PM (Coleman).  All of the Republican members of the Harris County delegation signed off on Speaker Woolley's map, which she then showed to Mr. Interiano.  Woolley Dep. 17, Oct. 13, 2011.  Democratic members of the Harris County delegation objected to the decision to decrease the number of districts in Harris County.  Trial Tr. 150, Jan. 17, 2012 AM (Interiano).  Speaker Woolley's map ultimately was the basis for the way that Harris County was drawn in the State House Plan.  Trial Tr. 52, Jan. 19, 2012 PM (Coleman).

299.  Mr. Hanna told Mr. Interiano that he felt that a coalition district composed of three different minority groups would be novel.  Trial Tr. 30-31, Jan. 17, 2012 PM (Interiano).  Nonetheless, he thought that both Representative Hochberg's and Representative Vo's districts fell "into [a] potential coalition district situation."  Defs.' Ex. 742 (Hanna Dep. 39, Jan. 12, 2012).  Indeed, Mr. Hanna advised Mr. Interiano via email on February 17, 2011 that cutting Harris County down to 24 seats would lead to two Republicans being paired because all of the Democratic seats constituted "minority" seats.  Defs.' Ex. 293.

300.  In Mr. Interiano's estimation, neither Representative Vo's district (HD 149) nor Representative Hochberg's district (HD 137) could be classified as a coalition district within his understanding of the term.  Interiano Dep. 46-47, Jan. 10, 2012.  However, he realized there was a chance that Benchmark HD 137 might be protected because the district is majority-minority based upon the population of two minority groups whereas Benchmark HD 149 is majority-minority based upon the combination of three minority groups.  Trial Tr. 30-31, Jan. 17, 2012 PM (Interiano).

## I. Other Disputed Districts

### a.  House District 26

301.  Benchmark HD 26 is located in Fort Bend County and is represented by Charlie Howard, an Anglo Republican.  Enacted HD 26 is also located in Fort Bend County and continues to share a border with Benchmark HD 149.

302.  The voting demographics of enacted and benchmark HD 26 are as follows:

| HD 26 | Pop. | VAP | CVAP | HCVAP | BCVAP | Asian CVAP | WCVAP | SSVR |
|-------|------|-----|------|-------|-------|------------|-------|------|
| Benchmark | 180,729 | 133,838 | 108,535 | 10.5% | 12.6% | 22.2% | 53.5% | 9.7% |
| Enacted | 160,091 | 117,247 | 85,950 | 11.6% | 10.6% | 19.6% | 57.3% | 10.3% |

Pl.'s Exs. 13, 14.

303. No election analysis regarding this district was offered to the Court.

### b.  House District 106

304. Benchmark HD 106 is located in Dallas County and is represented by Representative Rodney Anderson, an Anglo Republican.  Enacted HD 106 is relocated out of Dallas County.

305. The voter demographics of Benchmark and enacted HD 106 are as follows:

| HD 106 | Pop. | VAP | CVAP | HCVAP | BCVAP | WCVAP | SSVR |
|---|---|---|---|---|---|---|---|
| Benchmark | 159,716 | 110,146 | 81,165 | 29.0% | 12.8% | 52.0% | 23.6% |
| Enacted | 161,947 | 110,568 | 74,515 | 8.8% | 6.5% | 80.1% | 7.6% |

Pl.'s Exs. 13, 14.

306. No election analysis was offered to the Court regarding this district.

### c.  House District 144

307. House District 144 is currently represented by an Anglo Republican and is not a minority-majority district in terms of citizen voting age population.  Pl.'s Ex. 13.

308. Minority preferred candidates do not win endogenous elections in this district.  Handley House Report, at 5 (zero out of five elections); Engstrom Chart (zero out of five elections).