IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— )
STATE OF TEXAS,                              )
                                             )
            Plaintiff,                       )
                                             )
       v.                                    )
                                             )   Civil Action No. 1:11-cv-1303
UNITED STATES OF AMERICA;                    )   (RMC-TBG-BAH)
ERIC HOLDER in his official capacity as      )
Attorney General of the United States,       )
                                             )
            Defendants,                      )
                                             )
            and                              )
                                             )
WENDY DAVIS, *ET AL.*,                       )
                                             )
            Defendant-Intervenors.           )
                                             )
———————————————————— )

## DEFENDANT-INTERVENORS' MOTION FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIM

Defendant-Intervenors the Texas State Conference of Branches of the NAACP, *et al.*,

Wendy Davis, *et al.*, LULAC, the Texas Legislative Black Caucus, and Greg Gonzalez, *et al.*,

respectfully move this Court for leave to amend their answers in this action and to assert a

counterclaim against the state of Texas pursuant to Section 3(c) of the Voting Rights Act.

Movants seek an order from this Court subjecting the state of Texas to a preclearance

requirement, under Section 3(c), 42 U.S.C. § 1973a(c), for all voting-related changes enacted by

the state—a remedy that is necessary to protect minority voters in the state from the pattern of

discriminatory actions persistently taken by the State in attempt to disenfranchise and diminish

the voting strength of voters of color.  The undersigned counsel conferred with counsel for the

Plaintiff concerning the relief sought in this Motion on July 3, 2013, and was advised that the Plaintiff opposes this Motion. The Department of Justice indicated that it is not in a position to state a view at this time, but will review and respond to this motion after it is filed.

## I.   INTRODUCTION

The State of Texas is undoubtedly the prime example of why at least some pre-enforcement review under the Voting Rights Act is still necessary to vindicate the voting rights of minority citizens. Texas has engaged in persistent and intentional efforts to diminish the voting strength of voters of color, and to exclude them from the political process. If ever a jurisdiction was deserving of being affirmatively subjected to the preclearance requirement (being "bailed-in") under Section 3(c) of the Act, Texas is that jurisdiction.

Ever since the Supreme Court first ruled that statewide redistricting plans could be the subject of constitutional challenge in federal court in *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964), Texas' statewide redistricting plans have been challenged. *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973); *McDaniel v. Sanchez*, 452 U.S. 130 (1981); *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982); *Upham v. Seamon*, 456 U.S. 37 (1982); *Balderas v. State of Texas*, No. 6:01CV158, 2001 U.S. Dist. LEXIS 25740 (E.D. Tex. 2001); *LULAC v. Perry*, 548 U. S. 399 (2006); *Perez v. Perry*, 132 S. Ct. 934; 181 L. Ed. 2d 900; 2012 U.S. LEXIS 908 (2012); *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012). For six straight decades, one or more of Texas' redistricting plans has been invalidated as unconstitutional and/or in violation of the Voting Rights Act. *Id.*

This litigation is an attempt by the United States Attorney General and aggrieved Intervenors to vindicate the voting rights of Texas' substantial minority population. After the 2010 Census, Texas once again undertook the redrawing of its state legislative and congressional

districts. *Texas v. United States*, 887 F. Supp. 2d 133, 138 (D.D.C. 2012).  And Texas once again did so in way that diminished and minimized the political power of voters of color in the state. *Id.* at 131-32.  Texas, which was then covered under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c(a), declined to seek administrative preclearance for its redistricting plans, instead asking this Court to approve its plans.  887 F. Supp. 2d at 138.  The Attorney General opposed preclearance for the Congressional and State House plans, and Intervenors opposed preclearance for those two plans and the State Senate plan. *Id.*

This three-judge Court unanimously concluded that the State of Texas engaged in intentional discrimination against African-American and Latino citizens in enacting the 2011 State Senate and Congressional redistricting plans. *Id.* at 161, 166.  This Court did not make formal findings of intentional discrimination in the State House redistricting plan because it had already concluded that the plan would have a retrogressive effect on minority voters. *Id.* at 177. It did, however, note that it had been presented with substantial evidence that the State House plan was motivated by such impermissible intent. *Id.* at 177-78.  The Court's findings of fact detailed numerous intentional actions taken by the state of Texas that discriminated against voters on the basis of race. *Id.* at 197-235.  The State of Texas appealed to the United States Supreme Court. *Texas v. United States*, Case No. 1:11-cv-1303, Doc. No. 236 (Oct. 24, 2012).

While that appeal was pending, the Supreme Court issued its decision in *Shelby County, Alabama v. Holder*, 570 U.S. _____, 2013 U.S. LEXIS 4917 (June 25, 2013), a challenge to the constitutionality of Section 5 and the coverage formula established in Section 4 of the Voting Rights Act.  In its decision, the Court made clear that it was only invalidating the coverage formula in Section 4 of the Voting Rights Act.  Its decision did not affect the validity or constitutionality of Section 5 preclearance provisions. *Id.* at *45.  No question was raised before

the Court as to the constitutionality of Section 3(c), and nothing in the *Shelby County* decision affects that section:  Section 3(c) of the Voting Rights Act was not at issue in the *Shelby County* case and remains valid and enforceable.

On June 27, the United States Supreme Court entered an order in an appeal of this case that vacated and remanded the matter for reconsideration in light of the *Shelby County* decision and for consideration of Intervenors' Suggestion of Mootness.  *Texas v. United States*, 570 U.S. _____, 2013 U.S. LEXIS 4927 (U.S., June 27, 2013).  On June 24, 2013, some of the Intervenors had filed with the Supreme Court a Motion to Dismiss the Appeal, arguing that the appeal had become moot because the State of Texas enacted new statewide redistricting plans on June 21st and 23rd, thus repealing the plans that had been the subject of this lawsuit.  By the time the Supreme Court had entered its order in this case, the Governor of Texas had signed the plans into law, effectively rendering the appeal moot.

As movants will demonstrate below, a Section 3(c) equitable remedy requiring the State of Texas to submit all statewide laws relating to voting practices or procedures, including redistricting plans, for preclearance review, for a time period deemed appropriate by this Court but certainly no less than 10 years, is appropriate, justified and required by the Voting Rights Act.  Unlike the Court's concerns with Section 4 and its outdated application, Section 3(c) is not based on any predetermined formula—it is "justified by current needs" and "is sufficiently related to the problem that it targets."  *Nw. Austin v. Holder*, 557 U.S. 193, 203 (2009).  Findings of intentional racial discrimination in voting made by this Court, other courts, and the Department of Justice warrant application of this prophylactic remedy to restrain Texas' mistreatment and political exclusion of its historically marginalized citizens.

## II.      LEAVE TO AMEND IS APPROPRIATE AND EQUITABLE

Rule 15(a) of the Federal Rules of Civil Procedure governs the amendment of pleadings, stating generously that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  Rule 16(b) of the Federal Rules of Civil Procedure governs scheduling orders and the modification of such orders.  Fed. R. Civ. P. 16(b).  A scheduling order may be modified for "good cause" and with the consent of the court.  Fed. R. C. P. 16(b)(4).  The decision to grant or deny leave to amend pleadings rests in the district court's sound discretion.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Firestone v. Firestone*, 76 F.3d 1205, 1208, 316 U.S. App. D.C. 152 (D.C. Cir. 1996). Such discretion is not unlimited, however, for it is an "abuse of discretion" when a district court denies leave to amend without a "justifying" or sufficient reason. *Forman,* 371 U.S. at 181, 182.  This Circuit has held that courts shall "determine the propriety of amendment on a case by case basis." *Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 344, 326 U.S. App. D.C. 362 (D.C. Cir. 1997).  Reasons that justify a denial of leave to amend include undue delay, bad faith, repeated failure to cure a pleading's deficiencies, undue prejudice to the opposing party and futility of amendment. *Foman,* 371 U.S. at 182; *Richardson v. United States*, 193 F.3d 545, 548-49, 338 U.S. App. D.C. 265 (D.C. Cir. 1999).

Although the D.C. Circuit has not ruled on whether the Rule 15 or Rule 16 standard applies to a motion for leave to amend a pleading after a scheduling order deadline has passed, several opinions of this Court have held that in such circumstances the more exacting "good cause" standard of Rule 16(b)(4) applies.  *See Brooks v. Clinton,* 841 F. Supp. 2d 287, 296-97 (D.D.C. 2012); *Litig. v. Samsung Techwin Co. (In re Papst Licensing GmbH & Co.)*, 762 F. Supp. 2d 56, 59 (D.D.C. 2011) (good cause standard of Rule 16 applies to motion for leave to amend a pleading after a scheduling order deadline has passed); *Lurie v. Mid-Atlantic Permanente Med. Group, P.C.,* 589 F. Supp. 2d 21, 23 (D.D.C. 2008)  (same, explaining "[t]o

hold otherwise would allow Rule 16's standards to be short circuited by those of Rule 15 and would allow for parties to disregard scheduling orders, which would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier.")  Under the good cause standard, the Court focuses on the reason for the timing of the motion for leave to amend. *Lurie*, 589 F. Supp. 2d at 23.

Here, the reason for the need to amend the pleading arose with the Supreme Court's holding in *Shelby County v. Holder*, 570 U.S. _____, 2013 U.S. LEXIS 4917 (June 25, 2013), which, for the first time, made the bail-in provisions of Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973(a), applicable in this case.  The amendment is not the result of undue delay, bad faith or the previous failure to cure the deficiency; nor is the amendment unduly prejudicial or futile.  Thus, it is proper under Rule 15(a).  Similarly, this motion for leave is filed at this time for good cause, and the amendment is also proper under the Rule 16(b) standard.

## III.    BAIL-IN UNDER SECTION 3(C) OF THE VOTING RIGHTS ACT

Section 3(c) of the Voting Rights Act provides as follows:

> If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any state or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such a state or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such a period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title: Provided, that such qualification, prerequisite, standard, practice, or procedure may be enforced if

> the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice or procedure.

42 U.S.C. § 1973a(c).

Section 3(c), in short, requires that upon finding that a jurisdiction has committed constitutional violations, a court shall, in addition to any equitable remedy imposed, retain jurisdiction for a time it deems appropriate and require that the jurisdiction obtain preclearance from the court or the Attorney General for any changes to designated voting practices or procedures. This is known as "bail-in" or "pocket trigger". Because bail-in covers only jurisdictions found to have committed constitutional violations, its use is directly related to the problem that it targets.

Section 3(c) is not a novel device. Indeed, this provision was included in the Act as originally enacted in 1965. In at least 17 cases, federal courts have entered orders under Section 3(c), requiring jurisdictions not subject to the coverage formula of Section 4 to obtain preclearance approval of voting changes upon a finding of a constitutional violation by a state or local government: (1) *United States v. Thurston County*, C.A. No. 78-0-380 (D. Neb. May 9, 1979); (2) *McMillan v. Escambia County*, C.A. No.77-0432 (N.D. Fla. Dec. 3, 1979); (3) *Woodring v. Clarke*, C.A. No. 80-4569 (S.D. Ill. Oct. 31, 1983); (4) *Sanchez v. Anaya*, C.A. No. 82-0067M (D. N.M. Dec. 17, 1984); (5) *United States v. McKinley County*, No. 86-0029-C (D. N.M. Jan. 13, 1986); (6) *United States v. Sandoval County*, C.A. No.88-1457-SC (D. N.M. filed Dec. 5, 1988); (7) *Brown v. Board of Commissioners of the City of Chattanooga*, No. CIV-1-87-388 (E.D. Tenn. Jan. 11, 1990); (8) *Cuthair v. Montezuma-Cortez School District Number RE-1*,

No. 89-C-964 (D. Col. Apr. 9, 1990); (9) *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D Ark. 1990),

*appeal dismissed*, 498 U.S. 1129 (1991); (10) *Garza and United States v. Los Angeles County*,

C.A. Nos. CV 88-5143 KN (Ex)  and CV 88-5435 KN (Ex) (C.D. Cal. Apr. 26, 1991); (11)

*United States v. Cibola County*, C.A. No. 93-1134-LH/LFG (D. N.M. filed Oct. 22, 1993); (12)

*United States v. Socorro County*, C.A. No. 93-1244-JP (D.N.M. filed Oct. 22, 1993); (13) *United*

*States v. Alameda County*, C.A. No. C 95-1266 (SAW) (N.D. Cal. filed Apr. 13, 1995); (14)

*United States v. Bernalillo County*, C.A. No. 93-156-BB/LCS (D. N.M. filed Feb. 26, 1998); (15)

*Kirke v. Buffalo County*, C.A. No. 03-CV- 3011 (D. S.D. filed Mar. 20, 2003); (16) *Blackmoon v.*

*Charles Mix County*, C.A. No.05-CV-4017 (D. S.D. filed Jan. 27, 2005); and (17) *United States*

*v. Village of Port Chester*, C.A.No. 06-CV-15173 (S.D. N.Y. filed Dec. 15, 2006).  However,

bail-in in many of these cases was entered via a consent decree, so there is limited judicial

guidance available on the application of Section 3(c).

The most detailed judicial analysis of Section 3(c) related to litigation over Arkansas'

1981 state legislative redistricting plans.  *Jeffers v. Clinton*, 740 F. Supp. 585, 586 (1990), appeal

dismissed, 498 U.S. 1129 (1991).  Arkansas was not subject to preclearance under the coverage

formula set forth in the Voting Rights Act.  *Id.* at 587.  The three-judge *Jeffers* panel held that the

state of Arkansas had committed a number of constitutional violations of the voting rights of its

African-American citizens, and that a preclearance remedy was warranted by the record of

intentional discrimination.  *Id.* at 586.  Recognizing that "authority is scant" when it comes to the

standards for imposing preclearance under Section 3(c), *id.* at 600, the *Jeffers* court embarked on

a thorough analysis of the statute, and concluded that a narrow and "crabbed" reading of the

statutory language would be "inconsistent with its broad remedial purpose."  *Id.* at 592.

Plaintiffs' complaint in *Jeffers* alleged constitutional and Section 2 violations in the 1981 reapportionment plan for state legislature. *Id.* at 586. The *Jeffers* court rejected plaintiffs' Fourteenth and Fifteenth Amendment challenges to the redistricting plan. *Id.* at 591. But plaintiffs pointed to other evidence supporting their 3(c) request. *Id.* at 592. The court noted that at least two previous cases resulted in findings of other constitutional violations in the state. *Id.* at 592. The court also considered other potential constitutional violations identified by plaintiffs: (1) state laws that required a majority (rather than plurality) vote for nomination or election to public office; and (2) local incidents in the state that were motivated by an intent to suppress black political activity. *Id.* at 592.

On the variety of state laws passed to require majority votes, the court concluded that it "cannot ignore the pattern formed by these enactments." *Id.* at 594. It further noted that "[t]his series of laws represents a systematic and deliberate attempt to reduce black political opportunity. Such an attempt is plainly unconstitutional." *Id.* at 595. The court in *Jeffers* rejected the defendants' arguments that other constitutional violations, not directly related to apportionment, were not pleaded in the complaint and were otherwise irrelevant to the 3(c) decision before the court. *Id.* at 591. The court acknowledged that plaintiffs were, from the outset, clearly trying to prove a pattern of statutory and constitutional violations, resulting in a reduced opportunity for black voters to participate in the political process, and defendants had a full and adequate opportunity to offer proof on all these issues. *Id.* The court specifically concluded that "[t]he phrase 'violations of the fourteenth or fifteenth amendment justifying equitable relief,' which the statute uses as the triggering condition for preclearance, is not limited at all." *Id.* at 592.

The *Jeffers* court also concluded that local violations, in addition to state violations, of the voting guarantees of the Fourteenth and Fifteenth Amendments must be taken into account. Section 3(c), the *Jeffers* court observed, does not say that the State or its officials must be guilty of the violations, but only that the violations must 'have occurred within the territory' of the State." *Id.* at 600.  As such, the *Jeffers* court reviewed a number of examples offered by plaintiffs of local jurisdictions engaging in intentional racial discrimination in voting.  *Id.* at 595-600.  It found that there were constitutional violations in at least one of the counties used as illustrative by plaintiffs.  *Id.* at 599.  After considering this wealth of evidence of intentional discrimination, the *Jeffers* court entered a nuanced order under Section 3(c), retaining jurisdiction over the 1991 state legislative redistricting plan for 60 days after enactment so that it could entertain any challenge by plaintiffs in the *Jeffers* case to the new plan.  *Id.* at 602.  It also imposed a preclearance requirement for any state law having to do with a majority-vote requirement in general elections, and left that requirement in place "until further order of this Court."  *Id.*

Arkansas is not the only example of an entire state being brought under the requirements of Section 5 through Section 3(c).  In 1984, a three-judge panel found that the redistricting plan for the New Mexico state legislature violated the Voting Rights Act, and required preclearance of any new redistricting plan for ten years.  *Sanchez v. Anaya*, Civ. No. 8200067M (D.N.M. 1984).  That judgment was entered via consent decree.   *Jeffers*, 740 F. Supp. at 600.

Section 3(c) is applicable in the instant action even though, procedurally, raising a claim for relief under Section 3(c) in this declaratory judgment action is somewhat unique. When Section 3(c) was drafted as part of the original Voting Rights Act in 1965, there was a constitutional coverage formula in place for those jurisdictions meeting the formula.  So

Congress could not and would not have contemplated the application of the statute to then-covered jurisdictions.  But certainly nothing in the Court's decision in *Shelby* indicated that a formerly covered jurisdiction could not be brought under the umbrella of Section 5 coverage by a new coverage formula enacted by Congress or by bail-in under Section 3(c).  Section 3(c) applies in "any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any state or political subdivision." Although Texas is no longer a covered jurisdiction after the *Shelby* decision, this was an action sustained by the efforts of the Attorney General and Intervenors to enforce the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendment.  By opposing preclearance of the State's plans, the Attorney General and the Intervenors sought to enforce and protect the rights of racial and language minorities.  Thus, while the action, a declaratory judgment lawsuit filed by the State of Texas, was not "initiated," per se, by the Attorney General or aggrieved individuals, had the Attorney General and Intervenors not vigorously and affirmatively urged the court to find violations of the Voting Rights Act, this Court would have likely granted preclearance for the plans (as it did with the State Board of Education plan). *Texas v. United States*, 887 F. Supp. 2d at 138, n. 1.  Outside of Section 5 litigation in this Court, the Attorney General and aggrieved individuals would always be the parties "initiating" claims over constitutional violations, and Congress in 1965 would not have foreseen this particular procedural situation arising.  But that does not negate the "broad remedial purpose" that motivated Section 3(c), and it should not be read by this Court to limit the ability of Texas citizens to avail themselves of this remedy in this case.

Section 3(c) is also especially applicable because of the nature of the findings made by this Court.  The Court found that the State of Texas engaged in intentional discrimination when

redrawing the Congressional and State Senate plans, thus violating Section 5 of the Voting

Rights Act.  Section 5 was enacted and repeatedly reauthorized by Congress in order to combat

racial discrimination in voting and to enforce the Fifteenth Amendment.  *South Carolina v.

Katzenbach*, 383 U.S. 301, 308 (1966).  While this Court was not asked to decide a challenge

made directly under the Fourteenth or Fifteenth Amendments, it was asked to rule on claims of

intentional discrimination under a statute designed to enforce the Fifteenth Amendment.

Moreover, the analysis employed by this Court, the *Arlington Heights* analysis, is the same

analysis that would be used in assessing claims of intentional discrimination made directly under

the Fourteenth Amendment.  Put another way, this Court's findings regarding Texas' racially

discriminatory intent would support a finding that Texas engaged in violations of the Fourteenth

and Fifteenth Amendments. Again, the "broad remedial purpose" of the statute warrants an

application in the instant circumstances—where voters of color are desperately in need of

Section 5's pre-enforcement review because of Texas' repeated and stubborn attempts to exclude

them from the political process.  In short, this Court must eventually ask itself the same question

that the *Jeffers* court asked: does the nature of the proof justify the remedy of preclearance.

*Jeffers*, 740 F. Supp. at 599.  The answer in this case is a resounding "yes."  Granting

Intervenors' motion to amend their answer and assert a counterclaim will allow this Court to

answer that vital question.

## IV.      FINDINGS OF INTENTIONAL DISCRIMINATION

The bail-in provision of the Voting Rights Act is triggered by acts of intentional

discrimination by jurisdictions.  This Court made findings of intentional discrimination in this

case[1] that are necessary and sufficient to warrant the imposition of a Section 3(c) preclearance

---

[1] The Supreme Court's vacatur and remand of this case for consideration in light of *Shelby* and Intervenors'
Suggestion of Mootness, *Texas v. United States*, 570 U.S. _____, 2013 U.S. LEXIS 4927 (U.S., June 27, 2013),

requirement on the state of Texas, and the remedy in this situation should be broad, reflecting the variety of ways in which Texas has consciously and purposefully erected barriers to the political participation of its citizens of color in recent years.  This Court unanimously and formally found that intentional discrimination infected both the Congressional and State Senate plans, and while it refrained from reaching the conclusion of whether the State House plan was drawn with a discriminatory purpose, it did "note record evidence that causes concern" about the motivations behind the State House plan.  *Texas v. United States*, 887 F. Supp. 2d at 177.  The findings of intentional discrimination in voting support a conclusion that the remedy of preclearance is justified in the instant case.  At the very least, this Court is certainly justified in granting movants' request to amend their answer and assert a counterclaim, and to offer further arguments on this issue.

Specifically, the level of detail in the evidence in the record in this case, and this Court's resultant unanimous findings, make implausible any argument that a preclearance remedy is not justified in the instant case.  This Court made detailed findings of the intentional discrimination that motivated the drawing of the 2011 Texas redistricting plans, noting with respect to the Congressional plan, that "[t]he parties have provided more evidence of discriminatory intent than we have space, or need, to address" in its opinion.  *Id.* at 162, n. 32.  Even with that caveat, the findings supporting this Court's invalidation of the Congressional plan—findings that the plan was driven by an intent to discriminate on the basis of race—were numerous and compelling.  Similar findings of intent were made by this Court with respect to the Senate plan. Applying the analysis set forth by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing*

---

does not vacate the findings that this Court made.  *Cowgill v. Raymark Industries, Inc.*, 832 F.2d 798, 802 & 802 n. 2 (3d Cir. 1987) (according findings underlying partially reversed or vacated judgments continued vitality in the same proceeding in which they were made); *Molinary v. Powell Mountain Coal Co.*, 173 F.3d 920, 923 (4th Cir. 1999) ("On remand, a lower court may decide matters left open only insofar as they reflect proceedings consistent with the appellate court's mandate.")

*Development Corp.*, 429 U.S. 252 (1977), this Court examined the types of evidence that can support an inference of discriminatory intent, including the impact of the decision, the historical background, the sequence of events leading up to the decision, whether the challenged decision departs substantively or procedurally from the normal practice, and contemporaneous statements and viewpoints held by the decision-makers. *Id.* at 266-68.

With respect to the Congressional plan, this Court noted that the sequence of events preceding the passage of that plan supported a conclusion that the plan was motivated by discriminatory intent. *Id.* at 161. Black and Latino members of Congress were excluded from the map-drawing process, while the most trivial requests of their Anglo counterparts were often honored. *Id.* Minority members of the legislature were also excluded from drafting and unable to influence the process with amendments. *Id.* Additionally, this Court noted that even the Senate's counsel acknowledge that this redistricting process differed procedurally and substantively from prior redistricting processes in that it was rushed and uninformed. *Id.* This Court also viewed the redistricting mischief directed at the districts currently represented by African-American members of Congress as strong evidence of discriminatory intent. District offices, homes, and economic engines were all carefully carved out of the districts, while not a single district represented by an Anglo Congressperson was subject to such surgery. *Id.* at 160-61. Finally, this Court implied that the creatively destructive line-drawing used in Congressional District 23 and the failure to include a Latino opportunity district in Dallas-Fort Worth region might also support a conclusion of intentional discrimination. *Id.* at 162, n. 32.

Again using the *Arlington Heights* analysis, this Court also received a wealth of evidence of discriminatory intent motivating the State Senate plan, and struck down the plan on those grounds. *Id.* at 166. It noted that the dismantling of Senate District 10 had an undeniable and

14

disparate impact on the racial minority groups in the district. *Id.* at 163. The Senate plan, in its early stages, was shown only to a select few, and the representative of Senate District 10 (State Senator Wendy Davis) was consistently rebuffed in her attempts to view the plans for her district. *Id.* at 164. Indeed, every Senator representing a minority-opportunity district was treated that way. *Id.* Emails between legislative staffers revealed an intention to reject any amendments offered in committee, even without knowledge of what those amendments might do. *Id.* at 165. Unlike in previous redistricting cycles, the State held no public field hearings after Census data were released and plans were drawn. All of this evidence, the types of which the Supreme Court has declared relevant to an inquiry into Fourteenth Amendment violations, supported this Court's conclusion that the Senate plan was motived by an impermissible discriminatory intent.

While this Court did not reach the question of whether the State House plan was enacted with an impermissible discriminatory purpose, it did list some of the evidence in the record that might support such a conclusion. *Id.* at 177. It noted that, again, despite the huge minority population growth in the state, Texas failed to create any new minority opportunity districts in the House plan. *Id.* at 177-78. The mapdrawers "showed little attention to, training on, or concern from the VRA." *Id.* at 177. Mapdrawers modified House District 117 so that it would appear to be a Latino opportunity district, but in reality would elect an Anglo preferred candidate. *Id.* at 178. The completely unbelievable testimony of the chief architect of the House plan reinforced evidence that mapdrawers split VTDs on racial lines in order to dilute minority voting strength. *Id.* This Court said that all of this evidence, and more, might support a finding of discriminatory purpose in the State House plan, and that the retrogressive effect that the Court found was not "accidental." *Id.* at 178.

Undoubtedly, this Court is being asked to tread on new ground.  Litigants in a Section 5 case have never before needed to seek bail-in of the offending jurisdiction because the jurisdiction was, obviously, already covered by the Section 5 preclearance requirement. Certainly it is true that in a Section 5 case, the jurisdiction bears the burden of proving that it did not enact the change in voting law with a discriminatory purpose.  *Id.* at 151.  But this Court made clear that the burden on Texas was not insurmountable.  *Id.* at 152.  Indeed, the Court would have held Texas to a lesser burden—allowing them to shift the burden to the Attorney General and Intervenors by making out a *prima facie* case for nondiscrimination.  *Id.* at 152, n. 19.  Texas did not even come close to being able to make that case.  *Id.* at 159-62, 163-66, 177-78.  But more significantly, given the nature of the evidence before this Court, the burden of proof borne by the state and by the Attorney General and Intervenors is not determinative or dispositive in this unique situation.  The nature and volume of unrebutted evidence in front of this Court would have supported this Court's findings even if the burden of proof had been on the Attorney General and Intervenors.

Moreover, this Court engaged in a scrupulous analysis of the facts relating to intentional discrimination following the Supreme Court's guidance on determining whether indirect evidence of satisfies plaintiffs burden of proof in alleging intentional discrimination under the Fourteenth Amendment in *Arlington Heights*. 429 U.S. at 266-68.  That is, this panel applied the exact same analysis it would have applied had this challenge been framed with the Attorney General or Intervenors in the plaintiffs role.  Thus, the conclusion has to be the same.  In 2011, Texas once again intentionally acted to diminish and minimize the political strength of voters of color—actions that are constitutional violations.

While the extensive findings of intentional discrimination made by this Court in the instant action are sufficient to warrant imposition of a preclearance requirement, this Court should also consider the findings of intentional discrimination on the part of Texas by other courts in recent years.  Such evidence can highlight minority voter's dire need for the protections of Section 5.  The *Jeffers* court considered precisely such evidence relevant in its inquiry as to whether a preclearance remedy was justified, and this Court should do so as well.  *See, Jeffers*, 740 F. Supp. at 592-99.

These other recent legal proceedings have cemented Texas' pattern of racial discrimination in voting, and, like the court in *Jeffers*, this Court should consider those findings in its consideration of a Section 3(c) equitable remedy.  For example, the Supreme Court recently had the opportunity to comment on Texas' protracted history of discrimination against voters of color in the state.  *LULAC v. Perry*, 548 U.S. 399 (2006).  In a challenge to Texas' mid-decade redrawing of its congressional districts, the Court recounted the District Court's recitation of Texas' historical persistence in its attempts to exclude minority voters from the political process, stating:

> Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process…[t]he history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act.  Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions.

*Id.* at 439-40 (internal citations omitted).  The majority in *LULAC* found  troubling the evidence that suggested the State intentionally drew Congressional District 23 to appear as if it were a Latino opportunity district—to create a façade—when it knew that the district would not actually

provide Latino voters with an opportunity to elect the candidate of their choice. *Id.* at 441. "In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. **This bears the mark of intentional discrimination that could give rise to an equal protection violation**." *Id.* at 440 (emphasis added). The majority in LULAC was quite aware of the artful and devious ways in which Texas purposefully sought to undermine minority voting strength, and that recognition supports the need for a Section 3(c) remedy now.

Additionally, the Attorney General recently objected to a Texas law that would require that all voters produce government-issued photo identification in order to cast a regular ballot. *See*, Objection Letter from Thomas E. Perez, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Keith Ingram, Director of Elections, Office of the Texas Secretary of State (March 12, 2012). The Attorney General concluded that the change in law would have a retrogressive effect, but did not make any determination as to whether the change was adopted with a discriminatory purpose. *Id.* at 5. However, when Texas then sought preclearance from another three-judge panel in this district, the Attorney General asserted that "the specter of in-person voter fraud is a chimera meant to mask the discriminatory purpose" behind the law. *Texas v. Holder*, 888 F. Supp. 2d 113, 121 (D.D.C. Aug. 30, 2012). That three-judge court was presented with extensive evidence of discriminatory intent, but since it concluded that the law would have a retrogressive effect on minority voters, it also refrained from making a determination as to whether the law also was enacted with an intent to discriminate against minority voters. *Id.* at 118. This is just one more example of how, time and time again, Texas acts with more than just blithe indifference to minority voting rights—it actively and intentionally seeks to restrict those rights.

In addition to these cases, recent objections interposed by the Attorney General under Section 5 highlight other examples of intentionally discriminatory behavior by the state and its political subdivisions.  Another redistricting plan in Texas—the districting plan for the Nueces County Board of County Commissioners—was also denied preclearance based on a finding of discriminatory intent.  *See*, Objection Letter from Thomas E. Perez, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Joseph M. Nixon, Beirne Maynard & Parsons (February 7, 2012).  Nueces County was, as of the 2010 Census, was 56.8% in Latino Voting Age Population.  *Id.* at 2.  A majority of the County Commission had been dominated by Latino-preferred candidates since the 1990s, but a close 2008 election in one of the districts, Precinct 1, resulted in one of the commission's majority-Latino districts electing an Anglo-preferred candidate, switching the majority on the commission to Anglo-preferred representatives.  *Id.*  The 2011 County redistricting plan increased the percentage of Anglo voters in Precinct 1, while also removing Latino voters out of this same district.  *Id.*  This change reduced the ability of Latino voters to elect their candidate of choice, thereby ensuring the re-election of a majority Anglo-preferred commission in 2012.  The Attorney General found that the County offered "no plausible non-discriminatory justification" for this plan, and instead only offered "shifting explanations" for the changes.  *Id.* at 3.  The Attorney General concluded that the County's actions "appear to have been undertaken to have an adverse impact on Hispanic voters."  *Id.*  The Attorney General thus blocked the County's 2011 redistricting plan based on both discriminatory purpose and retrogressive effect.  *Id.* at 4.

In 2010, the Attorney General objected to the Spanish language election procedures for Gonzales County, concluding that discriminatory intent motivated, at least in part, the inadequate implementation of the procedures for translating election materials and assignment of bilingual

poll workers.  *See*, Objection Letter from Thomas E. Perez, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Robert T. Bass, Allison, Bass & Associates (March 12, 2010).  In his objection letter, the Attorney General noted that "[c]ounty officials have openly expressed hostility toward complying with the language provisions of the Voting Rights Act." *Id.* at 5.  The objection letter also noted that the county had simply decided to stop posting election information in Spanish.  *Id.* at 4.

Also in 2010, the Attorney General interposed an objection to the Spanish election procedures for Runnels County, once again concluding that discriminatory intent was a motivator in providing inadequate assistance to bilingual voters. *See*, Objection Letter from Thomas E. Perez, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Elesa Ocker, Runnels County Clerk (June 28, 2010).  The county planned to implement election procedures that it knew were inadequate compared to the levels of Spanish language oral assistance under the benchmark plan, and it completely failed to retain or recruit bilingual pollworkers.  *Id.* at 4.

Federal courts in Texas have ordered relief under Section 3(a) of the Voting Rights Act in five cases since 2006.  Section 3(a) shares with Section 3(c) the requirement of a finding of a constitutional violation.  Courts have ordered relief under Section 3(a) in *United States v. Ector County*, No. M005CV131 (W.D. Tex. 2005); *United States v. Hale County*, No. 5-05CV0043-C (N.D. Tex., April 27, 2006); *United States v. Brazos County*, CIVIL ACTION NO. H-06-2165. (S.D. Tex., June 29, 2006); *United States v. Galveston County*, CIVIL ACTION NO.: 3:07-cv-00377 (S.D. Tex., July 20, 2007); and *United States v. Fort Bend County*, CIVIL ACTION NO. 4:09-cv-1058 (S.D. Tex., April 9, 2009).  The cases in the Hale County, Brazos County  and Fort Bend County  involved denial to minority voters of their right under Section 208 of the

Voting Rights Act to receive necessary assistance in casting a ballot and the right to choose a trustworthy person to provide that assistance.

This list of cases and objections with findings of intentional discrimination is far from exhaustive, but consistency between this Court's findings of intentional discrimination and these other examples make movants' proposition undeniable: minority voters in Texas have a compelling and "current need" for the protections of the preclearance mechanism in the Voting Rights Act.  As such, we respectfully request that this Court allow movants to amend their answer, assert a counterclaim, and conduct a hearing and further briefing and argument on whether a 3(c) remedy is justified and equitable in the instant case.

## V.      CONCLUSION

Movants have acted quickly and in good faith, following the *Shelby* decision, to seek leave from the Court to amend their Answers.  This motion is not being filed to cause delay or for any other improper purpose.  Granting this motion will not prejudice the State of Texas, but denial would leave thousands of voters of color in Texas in an untenable position—being subjected to the unrestrained and intentionally discriminatory actions of the state.

WHEREFORE, movants pray that this Court will grant them leave to amend their answers so as to assert a counterclaim under Section 3(c) of the Voting Rights Act.

Dated: July 3, 2013                                         Respectfully Submitted,

                                                            /s/ Allison J. Riggs_____
                                                            Allison J. Riggs
                                                            N.C. Bar No. 40028
                                                            (Admitted *Pro Hac Vice*)
                                                            Anita S. Earls
                                                            N.C. Bar No. 15597
                                                            Southern Coalition for Social Justice

1415 W. Highway 54, Suite 101
Durham, NC 27707
(919)-323-3380
(919)-323-3942 (fax)
allison@southerncoalition.org

Gary Bledsoe
TX Bar No. 02476500
(Admitted *Pro Hac Vice*)
Law Office of Gary L. Bledsoe and
Associates
316 West 12th Street, Suite 307
Austin, Texas 78701
(512)-322-9992
(512)-322-0840
garybledsoe@sbcglobal.net

Robert S. Notzon
D.C. Bar No. TX0020
Law Office of Robert S. Notzon
1507 Nueces Street
Austin, Texas 78701
(512)-474-7563
(512)-474-9489 (f)
Robert@NotzonLaw.com

Victor Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
Telephone: 410-580-5120
Fax: 410-358-9359
vgoode@naacpnet.org

*Attorneys for NAACP Defendant-
Intervenors*

/s/ J. Gerald Hebert
J. Gerald Hebert
D.C. Bar #447676
Attorney at Law
191 Somerville Street, #405
Alexandria, VA 22304
Telephone: 703-628-4673

Paul M. Smith
Michael DeSanctis
Jessica Ring Amunson
Jenner & Block LLP
1099 New York Ave., N.W.
Washington, D.C. 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
psmith@jenner.com

*Attorneys for Davis Intervenors*

/s/ Luis Roberto Vera, Jr.
Luis Roberto Vera, Jr.
League of United Latin American Citizens
111 Soledad St., Suite 1325
San Antonio, TX 78205

*Attorney for LULAC Intervenor*

/s/ John K. Tanner
John K. Tanner
DC Bar # 318873
3743 Military Road, NW
Washington, DC  20015
202-503-7696
john.k.tanner@gmail.com

*Attorney for the TLBC
Intervenor*

/s/ John M. Devaney
John M. Devaney
Marc Erik Elias
Kevin J. Hamilton
Perkins Coie LLP
700 13th Street, NW, Suite 600
Washington, DC 20005-3960
(202) 654-6200 (phone)
(202) 654-6211 (fax)

*Attorneys for the Gonzalez Intervenors*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this, the 3rd day of July 2013, I filed and served the foregoing Motion For Leave to File an Amended Answer and Counterclaim by filing the same in this Court's ECF system, which caused copies of this document to be sent to counsel of record in this action.

/s/ Allison J. Riggs
Allison J. Riggs
