IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS,<br>　　　Plaintiff, | ) <br> ) <br> ) | |
| 　　　　v. | ) <br> ) | |
| UNITED STATES OF AMERICA and<br>ERIC H. HOLDER, JR., In His<br>Official Capacity As Attorney<br>General Of The United States,<br>　　　Defendants, | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| WENDY DAVIS, *et al.*,<br>Defendant-Intervenors, | ) <br> ) <br> ) | No.1:11-CV-1303<br>(RMC-TBG-BAH)<br>(three-judge court) |
| MEXICAN-AMERICAN LEGISLATIVE<br>CAUCUS,<br>　　　Defendant-Intervenors, | ) <br> ) <br> ) <br> ) | |
| GREG GONZALEZ, *et al.,*<br>　　　Defendant-Intervenors, | ) <br> ) <br> ) | |
| TEXAS LEGISLATIVE BLACK CAUCUS,<br>　　　Defendant-Intervenor, | ) <br> ) <br> ) | |
| TEXAS LATINO REDISTRICTING<br>TASK FORCE,<br>　　　Defendant-Intervenor, | ) <br> ) <br> ) <br> ) | |
| TEXAS STATE CONFERENCE OF<br>NAACP BRANCHES, *et al.*,<br>　　　Defendant-Intervenors, | ) <br> ) <br> ) <br> ) | |
| League of United Latin American<br>CITIZENS (LULAC)<br>————————————————— | ) <br> ) <br> ) | |

## DEFENDANT-INTERVENORS WENDY DAVIS, ET AL.'S MOTION FOR ATTORNEYS' FEES, EXPENSES AND COSTS

Pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1973*l*(e), 42 U.S.C. § 1988, Fed. R. Civ. P.

54(d), and this Court's Local Rule 54.2, Defendant-Intervenors Wendy Davis, *et al.*, (hereafter

"Davis Intervenors") respectfully move this Court for an order granting attorneys' fees, expenses, and costs to them, as the prevailing party in this Voting Rights Act case. Counsel for the Davis Intervenors conferred with counsel for Plaintiff ("Plaintiff" or "Texas") and Plaintiff opposes this motion. Based on this motion, the attached supporting materials, and the record in this case, the Davis Intervenors seek a total sum of $466,680.36 in fees, expenses, and costs.

## BACKGROUND AND PROCEDURAL HISTORY

I.     **Texas Was Denied Preclearance of its State Senate and Congressional Plans By This Court.**

On July 19, 2011, Texas filed a complaint for declaratory judgment that the redistricting plans it adopted to govern elections for the U.S. House of Representatives ("Congressional Plan"), the State House of Representatives ("State House Plan"), the State Senate ("State Senate Plan") (collectively the "Plans"), and the State Board of Education complied with Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.[1]

The Davis Intervenors were the first parties to seek intervention, opposing preclearance of the state senate and congressional redistricting plans.[2]  With respect to both plans, the Davis Intervenors alleged the plans were infected with a racially discriminatory intent and would have a racially discriminatory effect and therefore could not be precleared under Section 5 of the Voting Rights Act.

_____

[1] Without objection from any of the parties, this Court entered declaratory judgment in favor of Texas on the State Board of Education redistricting plan on September 22, 2011. *See* Minute Entry Order (Sept. 22, 2011).

[2] Seven other parties were subsequently granted intervention by this Court and opposed preclearance of the various plans.  The only parties who opposed preclearance of the state senate plan were the Davis Intervenors, LULAC, the NAACP, and the Texas Legislative Black Caucus.

The Plaintiff State of Texas moved for summary judgment on all three plans, which this Court denied on November 8, 2011.  In its Memorandum Opinion explaining the denial of Texas's motion for summary judgment, this Court found that Texas "ha[d] failed to demonstrate that the Plans do not have the purpose of denying or abridging the right to vote on account of race or color, or membership in a language minority group."  Memorandum Opinion of December 22, 2011 at 41 (ECF No. 115) (internal quotation marks omitted).

Trial was held over a two-week period in January 2012, with closing arguments on January 31, 2012.  Thereafter, this Court issued its decision on August 28, 2012, denying preclearance to all three plans.  With respect to the state senate and congressional plans, this Court unanimously found that those plans were the product of a legislature acting with racially discriminatory intent and thus failed to comply with Section 5 of the Voting Rights Act.  The voluminous trial record in this Court includes evidence taken in open court, party exhibits, expert reports, and post-trial briefing.  The record also incorporates evidence from the Section 2 trial before the three-judge court in the consolidated *Perez v. Perry* and *Davis v. Perry* cases in San Antonio.  The Davis Intervenors played an active role throughout these proceedings opposing preclearance of the state senate and congressional plans.  Indeed, counsel for the Davis Intervenors was designated as co-administrator of the Defendant-Intervenor parties.  In sum, the Davis Intervenors were actively involved in discovery proceedings (including discovery disputes), the conduct of the trial, closing arguments, and post-trial briefing.

Because the United States took the position that the state senate plan met the requirements of Section 5, the Davis Intervenors took the lead throughout this case in opposing

preclearance of the state senate plan.[3]   That defense was unquestionably made more difficult by the position taken by the United States, as the State of Texas repeatedly cited the position of the United States in this Court and in the United States Supreme Court as a reason for granting preclearance to its state senate plan.[4]   In addition, the Davis Intervenors also vigorously opposed preclearance of the congressional plan, offering evidence of intentional discrimination that marked the state's creation of that plan.   As explained in detail below, this Court relied on proof offered at trial by the Davis Intervenors in denying preclearance to the state senate and congressional plans, particularly proof of intentional discrimination underlying each plan.

**A.  This Court Relied on Evidence From the Davis Intervenors In Denying Preclearance of the State Senate Plan.**

The case involving the state senate plan focused on the dismantling of Senate District 10, a district held by State Senator Wendy Davis (one of the Davis Intervenors).   This Court unanimously denied preclearance to the state senate plan because it found that it was infected with a racially discriminatory intent and "dismantling SD 10 had a disparate impact on racial minority groups in the district."   Memorandum Opinion of August 28, 2012 at 46 (ECF No. 230).

In reaching its decision denying preclearance to the state senate plan, this Court's Memorandum Opinion relied on and cited both testimonial and documentary evidence produced by the Davis Intervenors.   This included, among other proof: the Davis Intervenors' cross examination of the state's expert witness (Dr. Alford), *id.* at 46;  the Davis Intervenors' cross

---

[3] In this Court, LULAC, the State NAACP, and Texas Legislative Black Caucus also opposed preclearance of the state senate plan, but the Davis Intervenors took the lead role.

[4] *See, e.g.,* Plaintiff's Reply in Support of Summary Judgment as to Defendant-Intervenors' Senate Claims at 2 (ECF No. 90); Texas's Jurisdictional Statement at 33-38, *Texas v. United States*, 133 S. Ct. 2885 (2013) (No. 12-496), 2012 WL 5267659.

examination of Doug Davis and Senate Redistricting Chairman Senator Kel Seliger, *id*. at 47-48; documentary evidence from State Senator Rodney Ellis, *id*. at 46; an expert report from Dr. Allan Lichtman (the Davis Intervenors' expert witness), *id*. at 49; the testimony of State Senator Judith Zaffirini, *id*. at 47-49; and email correspondence of the State's redistricting staff obtained in discovery showing a "pre-cooked" committee report  (the "no bueno" email), *id*. at 48.   In reaching its conclusion that the state senate plan was adopted with a racially discriminatory intent, this Court observed "Senator Davis and other Intervenors provided credible circumstantial evidence of the type called for by the Supreme Court in *Arlington Heights*, which, as a whole, indicates that an improper motive may have played a role in the map-drawing process."  *Id*. at 50.

The Court's Findings of Fact with respect to the Senate plan, appended to the Court's August 28, 2012 Memorandum Opinion, also frequently cited and referenced the testimony of the Davis Intervenors in support of findings that the state senate plan was enacted with discriminatory intent.   For example, Findings of Fact Nos. 129-136 detail the discriminatory process that led to passage of the state senate map, citing testimony of Senator Davis, Rep. Veasey, Senator Zaffirini, Senator Ellis, and the report of Davis Intervenors' expert witness (Dr. Lichtman).   Moreover, the Court, again citing the testimony of Senator Wendy Davis and Rep. Marc Veasey (Findings of Fact Nos. 142-146), found that "the election of Senator Davis in 2008 demonstrated a successful three-way coalition of Blacks, Hispanics and some cross-over Anglos in SD 10."  Findings of Fact No. 149.

This Court's Findings of Fact (Nos. 151-166) detail very specifically how the State of Texas dismantled SD 10's minority voter coalition and fragmented the politically cohesive minority population concentrations that were within the district under the benchmark plan.   In

doing so, this Court cited and found credible the testimony of Senator Davis, Rep. Veasey, Senator Ellis, and relied upon the expert witness report of Dr. Allan Lichtman, as well as exhibits offered by the Davis Intervenors.  *Id*.  This evidence led the Court to find that "[i]n 2011, the State Senate cracked SD 10 and removed most of its minority populations, spreading them into predominately Anglo districts and effectively dismantling the coalition that had elected Senator Davis."  Findings of Fact No. 165.  The Court observed that "the dismantling of SD 10 will have a disparate and negative impact on minority groups in the District."  Findings of Fact No. 166. These were the same contentions made by the Davis Intervenors when they filed their motion to intervene in this case.  *See* Mot. to Intervene of Davis Intervenors at 4-8, ¶¶ 9-16 (ECF No. 5).

Although this Court found that SD 10 "has insufficient history to afford it protection as a benchmark ability district for purposes of redistricting in 2011," (Finding of Fact No. 149), the Court found as a factual matter "that the record demonstrates purposeful discrimination in the re-drawing of SD 10."  Findings of Fact No. 150.

The denial of preclearance by this Court with respect to the state senate plan provided a substantial benefit to the Davis Intervenors.  Having failed to obtain preclearance, the State of Texas was forced to use an interim plan for conducting its 2012 state senate elections.  The interim plan was imposed by the three-judge court in the Section 2 proceedings in the Western District of Texas, *Davis v. Perry*, No. 11-788 (W.D. Tex.), and restored Senate District 10 to its precise pre-2011 configuration.  *See id.* (ECF No. 147), March 19, 2012 Order at 2-3 (attached hereto as Exhibit N).  The interim plan imposed by the San Antonio court is the exact remedy the Davis Intervenors were seeking in that litigation.  Because the State of Texas did not obtain preclearance of its racially discriminatory state senate plan in this Court and because it was forced to hold elections under an interim plan restoring Senate District 10 to its prior

6

configuration, in the 2012 elections, the minority voter coalition that had elected Senator Davis to office in 2008 once again elected her as their candidate of choice. *See Davis v. Perry*, No. 11-788 (W.D. Tex.), Davis-Veasey and LULAC Plaintiffs' Joint Advisory to the Court at 4 (ECF No. 162).

Thus, as a result of this Court's decision denying preclearance to the state senate map, the Davis Intervenors were once again afforded an opportunity to be within a senate district that enabled them to elect their candidate of choice.  Senator Davis was also afforded the benefit of being able to run again from a district where the minority voter coalition would once again be given an opportunity to elect her to office.

Moreover, as members of racial or language minority groups, four of the five Davis Intervenors had been the victims of the State's intentionally discriminatory conduct aimed at black and Latino voters. [5]   As a direct result of this Court's denial of preclearance to the state senate map, these Intervenors were restored to a district in which they would not be purposely divided among several Anglo-controlled districts, as Texas had proposed.

### B.  This Court Relied on Evidence From the Davis Intervenors In Denying Preclearance for the Congressional Plan.

With respect to the state's proposed congressional plan, the record again shows that the Davis Intervenors played an active role in opposing preclearance.  Once again, this Court's decision denying preclearance to the congressional plan relied upon and cited evidence offered by the Davis Intervenors, particularly evidence that the congressional plan was adopted with a racially discriminatory purpose.  For example, this Court's findings of fact cited the testimony of

---

[5] Of the five Davis Intervenors, all were members of racial or language minority groups, except for Senator Davis.  *See* Davis Intervenors' Mot. to Intervene at ¶¶ 4-8 (ECF No. 5).

Senator Zaffirini and Senator Ellis that the field hearings held by the State were perfunctory and a sham. *See* Findings of Fact No. 6.[6]  Both Senator Zaffirini's and Senator Ellis's testimony was presented by the Davis Intervenors.   Similarly, the testimony of Representative Marc Veasey (one of the Davis Intervenors) was cited by this Court in finding "that some field hearings, specifically in the Dallas-Fort Worth metroplex, were held in locations inconvenient for minority voters that did not have public transport, which limited their participation."  Findings of Fact No. 7.

The Court also found credible and cited Rep. Veasey's testimony in finding that "no minority state representative had any input into the proposed congressional redistricting map before it was made public."  Findings of Fact No. 12.   Furthermore, Finding of Fact 20 cited Rep. Veasey's testimony that the "timing of the two public hearings in the House and Senate Redistricting Committees within the short span of 48 and 72 hours, respectively, . . . severely circumscribed the opportunity for meaningful public scrutiny and comment, including by minority citizens and their elected officials."   Similarly, this Court cited Rep. Veasey's testimony that Texas's proposed congressional map not only failed to create any new minority "ability to elect" districts in the North Texas region despite "the significant minority population growth" in the Dallas-Fort Worth metroplex (Findings of Fact No. 105), but that the state's congressional map "divides the urban, minority population in the Dallas-Fort Worth metroplex among four Anglo-controlled congressional districts."  *Id.*   Rep. Veasey's testimony was also cited to support a finding that alternative redistricting plans in the North Texas region had been submitted to the State's map drawer, despite the map drawer's testimony that no such plans had

[6] This Court's Findings of Fact and Conclusions of Law were appended to the August 28, 2012 Memorandum Opinion.  *See* ECF No. 230 at 99-154.

been presented to him—testimony this Court described as "not accurate."  Findings of Fact No.
108.  This Court cited Rep. Veasey's testimony numerous times in its findings of fact regarding
the congressional plan.  *See*, *e.g*., Finds of Fact Nos. 109, 110, 112, & 115.

These findings of fact were, in part, the genesis of the Court's holding that based on "the
totality of the evidence"  "the [congressional] plan was enacted with discriminatory intent."
Memorandum Opinion at 42 ("we find sufficient evidence to conclude that the Congressional
Plan was motivated, at least in part, by discriminatory intent.").

The denial of preclearance by this Court with respect to the congressional plan also
provided a substantial benefit to the Davis Intervenors.  Having failed to obtain preclearance, the
State of Texas was forced to use an interim plan for conducting its 2012 congressional elections.
The interim plan that was imposed by the three-judge court in the Section 2 proceedings in the
Western District of Texas, *Shannon Perez, et al. v. Rick Perry, et al.*, No. 11-788 (W.D. Tex.),
reduced the severe fracturing of the minority population in that area, and created a new minority
opportunity district in the Dallas-Fort Worth region—a district that provided minority voters an
effective opportunity to elect their preferred candidate to office.   The Davis Intervenors had
specifically alleged in this Court that Texas had engaged in the purposeful fracturing of minority
population in the DFW Metroplex. *See* Defendant-Intervenors Wendy Davis' and LULAC's
Post-Trial Brief at 7, 10-12 (ECF No. 205).  One of the Davis Intervenors (Marc Veasey) was
elected to Congress from the new district in that region in the 2012 elections.  *See Perez v.
Texas*, No. SA-11-CA-360-OLG-JES-XR (W.D. Tex.), Quesada Plaintiffs' Third Amended
Complaint ¶ 67 (ECF No. 899).

**II.    Texas Adopted As Its Permanent Plan The Exact State Senate Plan Sought By The Davis Intervenors And A Congressional Plan That Incorporated Much Of The Relief Sought By The Davis Intervenors.**

On October 19, 2012, Texas sought review of this Court's decision in the United States Supreme Court, asking the Court to "note probable jurisdiction and set this case for oral argument . . . so that Texas can implement its legislatively enacted plans for the next electoral cycle." Texas Jurisdictional Statement at 5, *Texas v. United States*, U.S. Supreme Court Case No. 12-496.  While Texas's appeal was still pending with the United States Supreme Court, Texas Governor Rick Perry called a special session of the Texas Legislature specifically for the purpose of considering legislatively adopting the interim plans imposed by the three-judge court in the Western District of Texas.  *See* Press Release, Office of the Governor, Rick Perry, Gov. Perry Announces Special Session for May 27 (May 27, 2013) *available at* http://governor.state.tx.us/news/press-release/18575/.   The Legislature subsequently held hearings on this proposal. Between June 21 and 23, 2013, the Texas Legislature enacted three new statewide redistricting plans for Congress, the Texas Senate, and the Texas House, adopting by statute the same, or in the case of the Texas House, a slightly amended version of, the redistricting plans that had been ordered into effect by the three-judge court. S.B. 2,

83d Leg., 1st Sess. § 1 (Tex. as passed by House, June 21, 2013) (Texas Senate Plan); S.B. 3, 83d Leg., 1st Sess. art. I, § 1 (Tex. as passed by Senate, June 23, 2013) (Texas House Plan); S.B. 4, 83d Leg., 1st Sess. § 1 (Tex. as passed by House, June 21, 2013) (Congressional Plan). In addition to enacting these three new statewide redistricting plans, the statutes containing these plans expressly repealed the three statewide redistricting plans that were the subject of Texas's appeal to the United States Supreme Court.  S.B. 2, 83d Leg., 1st Sess. § 2 (Tex. as passed by House, June 21, 2013); S.B. 3, 83d Leg., 1st Sess. art. III, § 3 (Tex. as passed by Senate,

June 23, 2013); S.B. 4, 83d Leg., 1st Sess. § 3 (Tex. as passed by House, June 21, 2013).  Texas

Governor Rick Perry signed these plans into law on June 26, 2013.

Because both the enactment of the interim plans as law and the repeal of the challenged

plans mooted the appeal of this Court's decision before the United States Supreme Court, the

Davis Intervenors and others moved the Supreme Court to dismiss Texas's appeal.  While that

motion was pending, on June 25, 2013, the United States Supreme Court issued its decision in

*Shelby County v. Holder*, 133 S. Ct. 2612 (2013).  In *Shelby County*, the Court held the coverage

formula of the Voting Rights Act—Section 4(b)—unconstitutional and instructed that "[t]he

formula in that section can no longer be used as a basis for subjecting jurisdictions to

preclearance."  *Id*. at 2631.  The Court stressed that it "issue[d] no holding on § 5 itself, only on

the coverage formula."  *Id*.  Thus, the Court left Section 5 intact and held only that the coverage

formula of Section 4(b) could "no longer be used" on a going forward basis as a means to subject

jurisdictions to the preclearance requirements of Section 5.

On June 27, 2013, the Supreme Court vacated this Court's opinion and remanded the case

to this Court "for further consideration in light of *Shelby County v. Holder* . . . and the suggestion

of mootness of [Defendant-Intervenors]."  *Texas v. United States*, 133 S. Ct. 2885, 2885 (2013).

The State of Texas subsequently moved this Court to dismiss all claims as moot.  On

December 3, 2013, this Court granted the motion, holding that any claims before the Court "were

mooted by *Shelby County* and the adoption of superseding redistricting plans."  Memorandum

and Order at 3 (ECF 255).  The Court noted that the Defendant-Intervenors would "remain free

to seek attorneys' fees after dismissal" citing this Court's decision in *Commissioners Court of*

*Medina County v. United States*, 683 F.2d 435, 438 (D.C. Cir. 1982), for the proposition that

defendant-intervenors in Voting Rights Act preclearance suits could still recover attorneys' fees even after the district court dismissed the suit as moot.

The Davis Intervenors now move this Court for such an award.  The Davis Intervenors were prevailing parties in this case.   Accordingly, they now seek attorneys' fees, expenses, and costs for their success in this action.

## ARGUMENT

The Davis Intervenors are prevailing parties entitled to attorneys' fees.  As Congress has provided:  "In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs."  42 U.S.C. § 1973*l*(e).  Moreover, the United States Supreme Court has found that the enforcement of federal civil rights laws depends upon "private litigation as a means of securing compliance with the law."  *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401-02 (1968).  The availability of fee awards for prevailing parties is critical if private parties are to undertake litigation to vindicate the civil rights laws.  *See id.* The purpose of providing for an award of such fees and expenses to prevailing parties is to encourage "'private litigants to act as 'private attorneys general' in seeking to vindicate the civil rights laws. . . . 'Congress depends heavily upon private citizens to enforce the fundamental rights involved.  The awards are a necessary means of enabling private citizens to vindicate these Federal rights.'" *Donnell v. United States*, 682 F.2d 240, 245 (D.C. Cir. 1982) (quoting S. Rep. No. 94-295 at 40 (1975), 1975 U.S.C.C.A.N. at 774, 807).   Although the party awarded fees is often the plaintiff, defendant-intervenors in Voting Rights Act declaratory judgment actions also may be awarded

fees.  *See Comm'rs Court of Medina Cnty.*, 683 F.2d at 439-40; *see also Donnell*, 682 F.2d at 246.

As explained in more detail below, the Davis Intervenors were the prevailing party both with respect to the Court's order denying the declaratory judgment sought by the State and also with respect to the Court's later order dismissing the case as moot.  The Davis Intervenors also prevailed because this case was necessary for the Davis Intervenors to obtain a court order in the San Antonio litigation imposing the interim map sought by the Davis Intervenors.  Nothing about the Supreme Court's decision in *Shelby County* changes the prevailing party status of the Davis Intervenors.

## I.    The Davis Intervenors Are Entitled to the Requested Attorneys' Fees and Costs.

### A.    The Davis Intervenors Are Prevailing Parties.

The Davis Intervenors are prevailing parties.  On August 28, 2012, this Court issued a final order denying declaratory judgment to the state of Texas, concluding that "Texas has failed to carry its burden that [the enacted plans] do not have the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group under section 5 of the Voting Rights Act."  Aug. 28 Order (ECF No. 230) at 72.  This was the only order entered in this case by any court addressing the merits of Texas's claim, and Texas lost.

The Supreme Court has determined that civil rights parties are prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought." *Texas State Teachers Ass'n. v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 789 (1989) (quotation marks omitted); *Hanrahan v. Hampton*, 446 U.S. 754, 756-58 (1980).  The D.C. Circuit has interpreted the Supreme Court's decision in *Buckhannon Board & Care Home, Inc. v.*

*West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), to require a three-part test for determining whether one is a "prevailing party." First, "there must be a court-ordered change in the legal relationship of the parties," second, "the judgment must be in favor of the party seeking the fees," and third "the judicial pronouncement must be accompanied by judicial relief." *Green Aviation Mgmt. Co., LLC v. FAA*, 676 F.3d 200, 203 (D.C. Cir. 2012) (quotation marks omitted). "Where a *defendant* is seeking fees, as here, the court has applied only the latter two prongs." *Id.* at 204. "[A] party need receive *only some form* of judicial relief, not necessarily a court-ordered consent decree or a judgment on the merits." *Turner v. Nat'l Transp. Safety Bd.*, 608 F.3d 12, 15 (D.C. Cir. 2010) (emphasis added).

A prevailing party is one who obtains "an actual benefit or relief from a burden." *Grano v. Barry*, 783 F.2d 1104, 1108-09 (D.C. Cir. 1986) (quotation marks omitted). The party seeking fees need not have "prevailed on every claim or achieved all of the benefits he might have hoped for in the litigation . . . the critical question in evaluating the availability of fees is whether fee claimants have received any benefit at all." *Id.* at 1109 (internal quotation marks omitted); *see also Hanrahan*, 446 U.S. at 758 ("[W]hen a party has prevailed on the merits of at least some of his claims," there has "been a determination of the 'substantial rights of the parties,' which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney." (quoting H.R. Rep. No. 94-1558, at 8 (1976))); *Rhodes v. Stewart*, 488 U.S. 1, 3-4 (1988) (*per curiam*) ("At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces—the payment of damages, or some specific performance, *or the termination of some conduct.*" (quotation marks omitted)); *Medina Cnty.*, 683 F.2d at 441 (noting the critical question is whether the party has received any benefit at all).

14

The Davis Intervenors' obtained <u>all</u> the relief they sought in intervening in this case. The Court issued a judgment on the merits denying the declaratory relief that Texas sought, Texas's enacted maps were never precleared, and the maps were never used in any election. This Court's denial of preclearance as to the senate plan enabled the Davis Intervenors to advocate successfully for restoration of Senate District 10 in the San Antonio litigation (where they were plaintiffs). Indeed, after this Court denied preclearance on summary judgment, the San Antonio district court ordered in place interim maps that did not discriminate against the Davis Intervenors (plaintiffs in that court) and restored Senate District 10 to its pre-2011 configuration. Furthermore, in 2013, Texas enacted the interim map imposed by the San Antonio district court as its own permanent map, thereby causing its own claims in this case to become moot on appeal. The Davis-Intervenors thus prevailed on the merits in every way possible.

### 1. The Supreme Court's Order Vacating This Court's Judgment Does Not Affect the Davis Intervenors' Entitlement to Attorneys' Fees.

The Davis Intervenors are entitled to attorneys' fees regardless of the fact that the Court's order denying declaratory judgment was ultimately vacated and dismissed as moot. As noted above, the Supreme Court's remand order to this Court instructed that the Court should provide "further consideration in light of *Shelby County v. Holder* . . . and the suggestion of mootness of [Defendant-Intervenors]." *Texas*, 133 S. Ct. at 2885 (emphasis added). This is not the result Texas sought. In a letter filed with the Supreme Court, Texas took the position that "the Intervenors' motion [to dismiss the appeal as moot] should be denied, and that the district court's judgment should be vacated in light of *Shelby County*." *See* Ex. O (June 26, 2013 Clement Letter to the Court). The Supreme Court thus rejected Texas's invitation to vacate this Court's judgment solely in light of *Shelby County*, and instead instructed this Court to likewise consider

15

the mootness occasioned by Texas's voluntary adoption of the plan supported by the Davis Intervenors.

On remand, this Court likewise credited the Davis Intervenors' mootness argument in dismissing the case.  "[T]he Court instructed us to consider *both* the effect of *Shelby County* and the mootness argument Defendant-Intervenors themselves had raised before the Court.  *Having followed that instruction, we conclude that Texas's claims are moot*."   December 3, 2013 Order (ECF No. 255) at 3-4 (emphasis added).  Under these circumstances, the August 28, 2012 final judgment denying declaratory relief was not reversed on the merits—even if *Shelby County* had not been decided, the action of the Texas legislature would have mooted Texas's appeal.

In any event, "the subsequent mootness of a case does not necessarily alter [a party's] status as [the] prevailing part[y]."  *Nat'l Black Police Ass'n v. D.C. Bd. of Elections & Ethics*, 168 F.3d 525, 528 (D.C. Cir. 1999); *see also Thomas v. Bryant*, 614 F.3d 1288, 1294 (11th Cir. 2010) ("When plaintiffs clearly succeeded in obtaining the relief sought before the district court and an intervening event rendered the case moot on appeal, plaintiffs are still 'prevailing parties' for the purposes of attorney's fees for the district court litigation." (quotation marks omitted)); *Diffenderfer v. Gomez-Colon*, 587 F.3d 445, 453 (1st Cir. 2009) ("a 'prevailing party' is a party who managed to obtain a favorable, material alteration in the legal relationship between the parties *prior* to the intervening act of mootness."); *UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d 1189, 1197 & n.8 (9th Cir. 2007) (noting that when a party successfully obtains an injunction before a district court prior to an intervening act of mootness, that party remains the "prevailing party"); *Dahlem v. Bd. of Educ.*, 901 F.2d 1508, 1512-13 (10th Cir. 1990) (listing cases and holding that "[w]e are in accord with the courts which have held that a party which achieves the objective of its suit by means of an injunction issued by the district court is a prevailing party in

that court, notwithstanding the fact that the case becomes moot . . . while the order is on appeal" (footnote omitted)); *Palmer v. City of Chicago*, 806 F.2d 1316, 1321 (7th Cir. 1986) (assuming though not holding that a party is still a prevailing party "if after some relief has been obtained the case becomes moot").

Furthermore, even if the Supreme Court had vacated this Court's judgment purely on the basis of *Shelby County*, as Texas requested, the Davis Intervenors would *still* be prevailing parties. The Davis Intervenors obtained a judgment in their favor that benefited them at least through the 2012 elections (and indeed, indefinitely, given the State's enactment of the court-imposed interim maps as permanent). Because Texas was not granted preclearance by this Court, it could not use its enacted maps for the 2012 elections, and instead was required to use the interim maps imposed by order of the San Antonio district court. The Supreme Court's vacatur of the August 28, 2012 order in June of 2013 cannot (and did not) undo those benefits. The D.C. Circuit has held that such temporary benefits suffice to entitle a prevailing party to attorneys' fees. In *National Black Police Ass'n*, 168 F.3d at 528, a preliminary injunction was in effect for fifty-two days before being vacated as moot because of subsequent legislation. "The order was not moot when issued, and did not become so for 52 days. Accordingly, the plaintiffs secured a real-world vindication of their First Amendment rights, even if, as it proved, extraneous events would have given them the substantial equivalent 52 days later." *Id.* Likewise, the Davis Intervenors secured real-world vindication of their rights by succeeding in preventing Texas from obtaining preclearance in this case. If Texas had obtained preclearance, it could have used its enacted maps for the 2012 elections—that this did not happen also suffices to entitle the Davis Intervenors to attorneys' fees.

**2.      The San Antonio Court's Order Imposing Interim Maps Satisfies**
***Buckhannon*'s Requirements Independent From This Court's**
**Vacated Order.**

This Court's August 28, 2012 final order denying preclearance suffices to establish the

"judicial imprimatur," *Buckhannon*, 532 U.S. at 599, necessary to entitle the Davis Intervenors to

attorneys' fees.  But even if the Court finds that the Supreme Court's vacatur of that order does

not entitle the Davis Intervenors to rely on it to establish  prevailing party status, the Davis

Intervenors are still entitled to attorneys' fees.  Because of the unique jurisdictional requirements

of Section 5 of the Voting Rights Act, the Davis Intervenors were required to litigate Section 5

issues in *this* Court, and the proceedings in *this* Court dictated the outcome of interim relief

sought in the San Antonio litigation regarding the Davis Plaintiffs' Section 2 and constitutional

claims.

In *Perry v. Perez*, 132 S. Ct. 934 (2012), the Supreme Court addressed the unique

interplay between district courts when a Section 5 preclearance case is pending in the D.C. court

while a Section 2 case is proceeding in another district.

> Where a State has sought preclearance in the District Court for the District of Columbia,
> § 5 allows only that court to determine whether the state plan complies with § 5.
> Consistent with that design, we have made clear that other district courts may not address
> the merits of § 5 challenges.

*Id.* at 942.  In *Perez*, the Court held that, although "Section 5 prevents a state plan from being

implemented if it has not been precleared," *id.* at 941, the state plan should "serve[] as a starting

point for the district court" tasked with imposing an interim map pending the preclearance

outcome in the D.C. court, *id.*  In doing so, however, the local district court must "take care not

to incorporate into the interim map any legal defects in the state plan."  *Id.* at 941-42.  The local

district court accomplishes this by "taking guidance from the State's policy judgments unless

18

they reflect aspects of the state plan that stand a reasonable probability of failing to gain § 5 preclearance" in the District of Columbia court—that is, where "the § 5 challenge is not insubstantial." *Id.* at 942. This means that the Section 5 preclearance proceedings in the D.C. court are instrumental in determining the outcome of interim relief sought in a local district court.[7]

Such is the case here. The San Antonio District Court had before it challenges to Texas's enacted redistricting plans under Section 2 of the Voting Rights Act, under the Constitution, and claims that the State's plans would fail preclearance under Section 5 of the Voting Rights Act. After a trial, the San Antonio Court initially "withheld judgment pending resolution of the preclearance process in the D.C. court." *Perez*, 132 S. Ct. at 940. However,

> [a]s Texas' 2012 primaries approached, it became increasingly likely that the State's newly enacted plans would not receive preclearance in time for the 2012 elections. And the State's old district lines could not be used, because population growth had rendered them inconsistent with the Constitution's one-person, one-vote requirement. It thus fell to the District Court in Texas to devise interim plans for the State's 2012 primaries and elections.

*Id.* The San Antonio District Court did so, and its interim plans were ultimately vacated and remanded by the Supreme Court in *Perez*. On remand, the San Antonio court applied the standard set forth in *Perez*, and ordered in place interim maps, relying on proceedings in *this* Court:

> Pursuant to the Supreme Court's decision in *Perry v. Perez*, 565 U.S. __, 132 S. Ct. 934 (2012) (*per curiam*), this Court has received and partially reviewed the trial transcripts and documentary evidence that are a part of the record in the preclearance action, *State of Texas v. United States, et al.*, No. 11-1303 (D.D.C. 2011). While 'avoid[ing] prejudging the merits of preclearance,' *Perry*, 132 S. Ct. at 942, since that issue can only be decided by the United States District Court for the District of Columbia, this Court has concluded

---

[7] Because the Supreme Court left Section 5 undisturbed in *Shelby County*, 133 S. Ct. at 2631, *Perez* is still relevant and controlling law.

that certain aspects of the State's enacted senate plan 'stand a reasonable probability of failing to gain §5 preclearance' and that the Section 5 challenge to those aspects of the plan 'is not insubstantial.'  *Id.  Imposition of an interim plan is therefore appropriate.*

Ex. 20, *Davis. v. Perry*, No. 11-788 (W.D. Tex., Mar. 19, 2012) Memorandum Opinion and

Order (ECF No. 147) at 1-2 (emphasis added).

The Davis Intervenors' arguments in *this* Court were thus *necessary* for them to obtain

the interim relief they sought—and received—in the San Antonio Court.  This is particularly so

with respect to the state senate map.  Because the United States did not contest preclearance for

the state senate plan in this Court, if the Davis Intervenors had not intervened in this case to

litigate that issue, Texas's enacted state senate map would have been precleared in 2011, along

with the State Board of Education redistricting plan (which defendants did not contest).  *See*

Sept. 22, 2011 Minute Order.  This would have eliminated the legal basis upon which the San

Antonio district court ordered in place the interim map returning Senate District 10 to its prior

configuration based on a lack of preclearance.  It was only because of Defendant-Intervenors'

intervention and litigation efforts in *this case* that the San Antonio court's order was possible.

The San Antonio Court's March 19, 2012 Order is the basis for that court's conclusion that the

Davis Plaintiffs are prevailing parties in the San Antonio case.  *See Davis v. Perry,* No. 11-788

(W.D. Tex., Sept. 4, 2013) Final Judgment (ECF No. 190).

In that order, the San Antonio court found that the State's enacted plan could not be

implemented in the 2012 elections because it likely would not receive Section 5 preclearance

approval.  "[T]his Court has concluded that certain aspects of the State's enacted senate plan

'stand a reasonable probability of failing to gain §5 preclearance' and that the Section 5

challenge to those aspects of the plan "is not insubstantial."  *See* Order of March 19, 2012, at 2

(ECF No. 147).  The State was thus ordered to implement a new senate plan in 2012, and that

plan completely restored Senate District 10 to its pre-2011 configuration (the exact relief sought by the Davis Intervenors).   As the San Antonio court explained in its March 19, 2012 order, (ECF No. 141), "Plaintiffs have argued that this Court should impose an interim remedial map that differs from the plan enacted by the Texas legislature last year. This Court agrees."

The San Antonio Court's March 19, 2012 Order is therefore a *direct result* of the arguments put forth by the Davis Intervenors in *this case*.   The San Antonio court's March 19, 2012 order thus satisfies *Buckhannon*'s requirement that the Davis Intervenors obtain "*some form* of judicial relief, not necessarily a court-ordered consent decree or a judgment on the merits." *Turner*, 608 F.3d at 15 (emphasis added).    The San Antonio court imposed an interim map based upon a "preliminary determinations *regarding the merits* of the Section 2 and constitutional claims presented in th[at] case." *See Davis v. Perry*, No. 11-788 (W.D. Tex., Feb. 28, 2012) Order (ECF No. 141) (emphasis added) (attached hereto as Exhibit P); Ex. N (Mar. 19, 2012 Order (ECF No. 147)).   Such preliminary relief on the merits suffices establish prevailing party status and entitlement to attorneys' fees.   *See Nat'l Black Police Ass'n*, 168 F.3d at 530; *Dearmore v. City of Garland*, 519 F.3d 517, 520-21, 526 (5th Cir. 2008).

Given the unique interplay between the D.C. district court and the San Antonio district court as a result of Section 5's jurisdictional provision, *see Perez*, 132 S. Ct. at 942,  it is of no moment that fees be awarded for litigation in *this* case that was *directly necessary* for judicial relief ordered in the San Antonio litigation.   Nothing in *Buckhannon* requires that the judicial relief relied upon for prevailing party status be received in the same case in which fees are sought—indeed the D.C. Circuit has made clear that *Buckhannon*'s requirement is not to be applied narrowly, requiring simply "*some form* of judicial relief."   *Turner*, 608 F.3d at 15 (emphasis added).   Where federal law restricts jurisdiction over an issue to one court, and that

litigation is necessary to establish judicial relief in a related case, a litigant's success in obtaining that judicial relief should satisfy *Buckhannon*'s "judicial imprimatur" requirement for prevailing party status in the first case.

The corollary is true in an analogous context—the D.C. Circuit has held that the district court may award attorneys' fees in a Title VII judicial action for both the court litigation *and* the related pre-litigation administrative proceedings.  *See Parker v. Califano*, 561 F.2d 320, 327-29 (D.C. Cir. 1977).  Title VII contains an exhaustion requirement, obligating the plaintiff to institute administrative proceedings for 180 days prior to filing a complaint in federal court.  *Id.* at 321-22 & n.6.  The D.C. Circuit held that the district court may award fees for both the judicial proceedings and the "related administrative proceedings."  *Id.* at 321.  Like the exhaustion requirement at issue in *Parker*, the jurisdiction requirements of Section 5 required that the Davis Intervenors litigate in two related district court proceedings in order to obtain interim relief in the San Antonio case.  The same principle that permitted the district court to award fees for legal services incurred in two related proceedings in *Parker* counsels in favor of allowing the Davis Intervenors to obtain fees in this case based upon judicial relief obtained in the San Antonio case—relief that could not have happened without their litigation effort here. "[T]he congressional policy of encouraging private enforcement of civil rights legislation require[s] a construction favoring wide availability of attorneys' fees . . . ."  *Id.* at 330.

Because the Davis Intervenors have obtained "actual relief on the merits of [their] claim" that "materially alters the relationship between the parties by modifying the defendant's behavior in a way that directly benefits the [Davis Intervenors]," *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992), they are a "prevailing party," based on both this Court's order denying preclearance and

the San Antonio court's order imposing an interim map based on the Davis Intervenors' successful litigation in *this* case.

> ### 3.   To Hold That The Davis Intervenors Are Not Entitled To Attorneys' Fees Would Defeat The Purpose Of The Fee-Shifting Provisions.

As noted above, the entire purpose of providing an award of fees and expenses to prevailing parties is to encourage "'private litigants to act as 'private attorneys general' in seeking to vindicate the civil rights laws." *Donnell*, 682 F.2d at 245.   This purpose would be defeated if litigants were denied fee and expense awards simply because the law changed due to circumstances beyond their control while they were litigating their cases.   As this Court has found in a similar context, "[t]o hold that mootness of a case pending appeal inherently deprives plaintiffs of their status as 'prevailing parties' would detract from § 1988's purposes. Such a rule could result in disincentives for attorneys to bring civil rights actions when an event outside the parties' control might moot the case after the district court rendered a favorable judgment but before the judgment could be affirmed on appeal." *Diffenderfer*, 587 F.3d at 455.   That is the situation presented here.

The entirety of this case was litigated while Section 5's preclearance provisions were still in effect.   Indeed, Section 5 itself is *still* in effect as the Supreme Court expressly declined to offer any pronouncement on the constitutionality of Section 5 in *Shelby County*.   To deny a fee award to litigants who undertook the role of "private attorneys general" to enforce Section 5's requirements (particularly where the attorney general himself abdicated that responsibility with respect to the state senate plan) simply because the Supreme Court has now held Section 4(b) unconstitutional would be to defeat the purpose of the fee-shifting provisions.   Moreover, it would discourage citizens from undertaking the responsibility to "vindicate the civil rights laws"

for fear that a decision of Congress or the Supreme Court could render all of their hard work for naught.

The Davis Intervenors litigated this case pursuant to the law as it existed at the time and prevailed under the law as it existed at the time.  That the Supreme Court has now changed the law by stating that Section 4(b) "can no longer be used as a basis for subjecting jurisdictions to preclearance," *Shelby County,* 133 S. Ct. at 2631, does not require that those who litigated a case and prevailed under the then-existing law that Section 4(b) was a proper basis for subjecting jurisdictions to preclearance be denied their fees and expenses.

      **B.**      **The Davis Intervenors' Fees are Reasonable.**

Having prevailed on their claims, the only remaining question is whether the fees sought are reasonable.  As explained below, the fees, expenses, and costs that the Davis Intervenors seek are reasonable for litigation of this type and scope.

An award of attorneys' fees is calculated using the lodestar method, which is determined by multiplying "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The lodestar "is presumed to be the reasonable fee," *Blum*, 465 U.S. at 897; *accord People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996), and "includes most, if not all, of the relevant factors constituting a reasonable attorneys' fee." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566 (1986), *supplemented by* 487 U.S. 711 (1987).

Two issues are addressed below demonstrating the reasonableness of the Davis Intervenors' requested fees: 1) the reasonable number of hours expended by the Davis Intervenors' attorneys to litigate this case; and 2) the hourly rates sought by the Davis

Intervenors' counsel.  As explained further below, both the hours incurred and the rates charged were reasonable for a case of this nature.

> **1.      The Davis Intervenors Seek Compensation For A Reasonable Number of Hours.**

This case involved important and difficult constitutional and federal statutory claims. Texas's proposed state senate and congressional plans threatened the rights of Latino and African-American voters to elect candidates of their choice, and intentionally cracked minority voters into several different districts to minimize and dilute their voting power.  Voting rights and redistricting cases like this one are among the most complex federal cases, ranking fifth most difficult out of 42 categories of cases (more difficult than antitrust and SEC/securities cases) according to the case weights issued by the Federal Judicial Center.  *See* Exhibit L.

The Davis Intervenors thus appropriately hired experienced attorneys who have substantial redistricting and Voting Rights Act experience, including extensive experience with Texas redistricting cases.   Declaration of J. Gerald Hebert ("Hebert Decl.") ¶¶ 3-11  (attached hereto as Exhibit A).  For example, the Davis Intervenors' attorneys in this case (Mr. Hebert and Mr. Paul Smith of Jenner & Block) have represented clients in prior Texas redistricting lawsuits going back several decades, including several landmark cases that have reached the United States Supreme Court (*e.g.*, *Balderas v. Texas,* and *LULAC v. Perry*).  Mr. Smith has extensive voting rights litigation experience, having argued three different voting rights or redistricting cases in the United States Supreme Court within the last decade, including *LULAC v. Perry*, 548 U.S. 399

(2006).[8]   *See* Declaration of Paul M. Smith ("Smith Decl.") ¶¶ 3-4 (attached hereto as Exhibit D).  Mr. Hebert has served as lead counsel in many redistricting and voting rights cases over the years throughout the United States and at all levels of the federal system.  Indeed, Mr. Hebert is one of our nation's foremost voting rights litigators, having served as lead counsel for a party or *amicus curiae* in over 100 such cases.  *See* Ex. C (Listing of Voting/Election Cases Handled by Mr. Hebert).

The extensive experience of the Davis Intervenors' counsel, particularly in redistricting and voting rights cases, made them well-suited to these responsibilities.  Given the importance of the issues presented in this case, and the fact that the Davis Intervenors' lawyers had handled similar cases in the past (and thus could perform their duties more efficiently than counsel with less experience in this area of law), the Davis Intervenors were quite reasonable in retaining attorneys Hebert and the Jenner & Block attorneys to advance their interests throughout the course of this litigation.

The Davis Intervenors' lawyers also leanly staffed this case, totally avoiding any duplication of tasks and using attorneys with appropriate levels of experience to handle the various litigation tasks.  *See id.* ¶¶ 13-14.  That this case was staffed leanly and without duplication of tasks was true not only among the Davis Intervenors' counsel, but also between counsel for the Davis Intervenors and counsel for the other intervenors.  *See id.*[9]

---

[8] The other two cases argued by Mr. Smith in the Supreme Court were *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) (the Indiana voter ID case) and *Vieth v. Jubelirer*, 541 U.S. 267 (2004) (a partisan gerrymandering case).

[9] The overall fees and disbursements sought in this case are reasonable and well within the range of what would be expected for this type of complex litigation.  That is especially true

That the Davis Intervenors' lawyers leanly staffed this case is also demonstrated by the fact that just one attorney (Mr. Hebert) performed the vast majority of the tasks at the trial court level, and that the Defendant Intervenors only utilized other attorneys with appropriate levels of experience to handle other various litigation tasks.  In order to avoid unnecessary or duplicative work or the inefficient use of resources, responsibilities in this case were allocated among several different attorneys only when necessary, and according to the experience and expertise of each attorney.  *See id.*  For example, Mr. Hebert assumed primary responsibility in this Court for developing the legal strategy in the case, drafting pleadings and other filings, handling the trial, and managing certain logistical matters, such as client communications.  *See id.*[10]  The Jenner & Block attorneys were involved in drafting the summary judgment briefing and took primary responsibility for the appellate work in the United States Supreme Court when this case was appealed (legal research, and preparation of briefs).  *See* Ex. D (Smith Decl.) ¶ 5; Ex. A (Hebert Decl.) ¶¶ 13-14.  Mr. Chad Dunn, a Texas attorney with vast trial experience, performed specific and important tasks on matters that arose in the trial court, such as defense of Senator Ellis' deposition.  This allocation and division of labor was done throughout the litigation to avoid duplication of work and maximize efficiency, and best utilized the expertise of the attorneys involved. [11]

---

where, as here, the case implicated the important fundamental right to vote and the right to be free of discrimination in the redistricting process.

[10] Because Mr. Hebert is a sole practitioner without any legal support staff, he employed legal support staff whose services he has utilized in prior cases, and they worked directly under his supervision and control.  *See* Ex. A (Hebert Decl.) ¶¶ 16-17.

[11] That Mr. Hebert, a sole practitioner, handled the vast majority of litigation tasks at the trial court level stands in sharp contrast to the State Defendants who, from 2011 to the present,

The Davis Intervenors' attorneys are seeking compensation for the hours and legal work listed in the time sheets and invoices attached to the Declaration of J. Gerald Hebert (Exhibit A) and Declaration of Paul Smith (Exhibit D).   As noted above, these fees pertain to work performed by the Davis Intervenors' attorneys throughout the course of this intensive litigation, which included, among other things:   coordinating the litigation for all of the Defendant-Intervenors as co-administrator; preparing and filing a motion for intervention; responding to Texas's motion for summary judgment; briefing an appeal to the United States Supreme Court; conducting factual and expert discovery, including numerous depositions; responding to the factual and expert discovery propounded by the State; presenting trial testimony and oral argument; and ultimately obtaining a favorable final judgment.   *See* Ex. A (Hebert Decl.) ¶ 13-15.

Following entry of judgment against Texas, the Davis Intervenors' counsel continued to leanly staff the case, as Mark Gaber of Jenner & Block prepared this fee motion, with minimal assistance from other attorneys, so as to minimize the amount of attorney time and fees.   *See* Ex. D (Smith Decl.) ¶ 5.

Based on contemporaneous time records, the Davis Intervenors' attorneys and paralegal and legal support staff spent the following hours working on this case (as verified and substantiated in detail in the attached Declarations of Hebert, Smith, and Dunn):

---

have filed notices of appearance or have listed the names of the following 13 attorneys on their pleadings in this Court:   David Mattax, Angela Colmenero, Matt Frederick, David Schenck, Bruce Cohen, Adam Mortara, John Hughes, Ashley Keller, Reed Clay, Daniel Hodge, Bill Cobb, Jonathan Mitchell and Greg Abbott.

| ATTORNEY | HOURS |
|---|---|
| J. Gerald Hebert | 366.10 |
| Paul M. Smith | 8.00 |
| Jessica Ring Amunson | 34.25 |
| Caroline Lopez | 100.00 |
| Neil Ubriani | 69.25 |
| Mark Gaber | 33.50 |
| Chad Dunn | |

| NON-ATTORNEY STAFF | HOURS |
|---|---|
| Cheryl L. Olson | 26.00 |
| AngleStrategies | 135.00 |

The Davis Intervenors' attorneys have reviewed the time records summarized above and reprinted in the Attachments to their Declarations. These records show sound and reasonable billing judgment. For example, the Davis Intervenors' counsel excluded substantial time for which their firms did not feel it was appropriate to bill during the course of the litigation, and also excluded additional hours to ensure that compensation is not sought for work that might be deemed as properly excluded from a court-ordered fee award. *See* Ex. A (Hebert Decl.) ¶ 13. For example, the Davis Intervenors do not request compensation for activity that, although necessary for client relations, did not directly contribute to the litigation itself. *Id*. The Davis Intervenors' counsel also do not seek any fee enhancement above the lodestar method despite their considerable expertise and experience in this area. The hours that remain after the attorneys' review of the time records were reasonably expended to accomplish the tasks necessary for the successful prosecution of this litigation. *See* Ex. A (Hebert Decl.) ¶¶ 13.

**2.      The Davis Intervenors' Seek Reasonable Hourly Rates For Their Attorneys.**

The hourly rates sought by the Davis Intervenors' attorneys (Mr. Gerald Hebert, Mr. Chad Dunn, and the Jenner & Block attorneys), as well as their paralegal/legal support staff,

reflect their years of practice, litigation experience, expertise. We explain below for each attorney the exceptionally high level of experience and expertise justifying their hourly rates. In addition, we have also attached to this motion Declarations of highly qualified attorneys attesting to the reasonableness of the hours and the hourly rates being sought here.

### J. Gerald Hebert's Hourly Rate.

Mr. Hebert, who seeks an hourly rate of $650 in this case, is now in his fortieth year of practicing law, having spent all but 6 years in the field of voting rights and redistricting. He is widely recognized as one of the leading voting rights and redistricting litigators in the United States. *See* Ex. H (Spiva Decl.) ¶ 10; Ex. I (Wright Decl.) ¶ 12; and Ex. J (Pershing Decl.) ¶ 13. Mr. Hebert works out of his office in the Washington, DC area, and thus his hourly rate reflects the appropriate market rate for the DC area. *See* Ex. H (Spiva Decl.) ¶ 15; Ex. J (Pershing Decl.) ¶ 16.

As detailed in his Declaration, Mr. Hebert has handled over 100 voting rights cases in his forty-year career, with a number of cases ultimately decided in the United States Supreme Court, including *Johnson v. DeGrandy, Pressley v. Etowah County, Shaw v. Reno*, and *LULAC v. Perry*. In the vast majority of the voting rights or redistricting cases he has handled, Mr. Hebert has served as the lead trial attorney. *See* Ex. A (Hebert Decl.) ¶¶ 4-5.

In addition to his vast litigation experience and expertise, Mr. Hebert also has published or co-authored articles on voting rights and redistricting in scholarly journals (*e.g.*, *Yale Journal of Law & Policy*, *George Mason University Law Review*, and *LaRaza Law Journal* at the University of California at Berkeley). He has given lectures or participated in conferences on voting rights issues at Harvard Law School, Yale Law School, William and Mary Law School, among other law schools across the country. Mr. Hebert has taught voting rights classes at

Georgetown University Law Center (from 1994-2006, and 2013), American University's Washington College of Law, and co-taught a voting rights course in 1996 with legal scholar Pamela Karlan at the University of Virginia Law School.

Mr. Hebert also has been quoted or cited in numerous articles or broadcasts as an authority on voting rights, and has appeared frequently as a panelist at conferences of the National Conference of State Legislature, where he has instructed state legislators from across the country on voting rights and redistricting law.

These hourly rates are similar to prevailing market rates charged by attorneys of comparable experience and expertise. As indicated in the Laffey Matrix,[12] for attorneys with twenty years or more experience, the hourly rate is currently $753 per hour. In 2011-2012, when much of this case was litigated, the Laffey Matrix showed that the hourly rate for attorneys with 20 or more years of experience was $734 per hour. So Mr. Hebert's hourly rate is actually *lower* than the Laffey Matrix rate for an attorney with his years of experience, and that does not include his knowledge, forty years of experience, expertise and specialization in handling voting rights and redistricting cases.

**Hourly Rates for Jenner & Block Attorneys**

Because the rates sought here are the actual rates that Jenner & Block attorneys charge their private paying clients, including the Davis Intervenors, the rates are presumptively correct. *See, e.g., Fogle v. William Chevrolet/Geo, Inc.* 275 F.3d 613, 615 (7th Cir. 2001) ("The best evidence of the lawyer's quality is the fee he commands in the market."); *Spegon v. Catholic*

---

[12] The methodology of calculation and benchmarking for the Laffey Matrix has been approved in a number of cases. *See, e.g., McDowell v. D.C.*, Civ. A. No. 00-594 (RCL), 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); *Salazar v. D.C.*, 123 F. Supp. 2d 8 (D.D.C. 2000).

*Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999) ("The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate.") (quoting *People Who Care*, 90 F.3d at 1315).

**Paul M. Smith**

Jenner & Block attorney Paul M. Smith graduated from Yale Law School in 1979, where he served as Editor in Chief of the Yale Law Journal.  Upon graduation from law school, he clerked for the Honorable James L. Oakes, U.S. Court of Appeals, Second Circuit, and Supreme Court Justice Lewis F. Powell, Jr.   Mr. Smith is Chair of the firm's Appellate and Supreme Court Practice and Co-Chair of the Media and First Amendment, and Election Law and Redistricting Practices.  He has had an active Supreme Court practice for nearly three decades, including oral arguments in fourteen Supreme Court cases involving matters ranging from free speech and civil rights to civil procedure.  Among his important victories has been *Lawrence v. Texas*, the landmark gay rights case, and *Brown v. Entertainment Merchants Ass'n*, establishing the First Amendment rights of those who produce and sell video games.

Mr. Smith has argued three voting rights or redistricting cases in the United States Supreme Court in the last ten years:  *Vieth v. Jubilerer*, a partisan gerrymander challenge to the Pennsylvania congressional redistricting plan, *LULAC v. Perry*, the Texas congressional redistricting case, and *Crawford v. Marion County,* the Indiana voter ID case.

Chambers USA has repeatedly named Mr. Smith one of the country's leading lawyers in appellate litigation, media and entertainment law, and First Amendment litigation for multiple years.  In 2010, Washingtonian magazine recognized him as one of "Washington's Top Lawyers," Washington DC Super Lawyer named him one of the "Top 10 Lawyers in D.C.," and *The National Law Journal* named him one of the "Decade's Most Influential Lawyers."  *Best*

*Lawyers* named him the Washington DC First Amendment Lawyer of the Year for 2012.  Mr. Smith was awarded the Thurgood Marshall Award from the American Bar Association Section of Individual Rights and Responsibilities for his work promoting civil rights and civil liberties. He is AV Peer Review Rated, Martindale-Hubbell's highest peer recognition for ethical standards and legal ability.

**Jessica Ring Amunson**

Ms. Amunson graduated *magna cum laude* from Harvard Law School in 2004, where she served as Articles Editor for the Harvard Law Review.  Upon graduation from law school, she clerked for the Honorable Merrick B. Garland, U.S. Court of Appeals, District of Columbia Circuit.  Ms. Amunson, a partner at Jenner & Block, concentrates her practice in appellate and Supreme Court matters.  She has significant experience briefing and arguing matters before both federal and state appellate courts and has filed numerous merits and amicus briefs with the United States Supreme Court.  Ms. Amunson has worked on appeals and petitions for certiorari spanning a range of topics, including First Amendment issues, contract disputes, and administrative law matters. Ms. Amunson's practice also focuses on election law and redistricting.  She has litigated election law and redistricting matters in a number of states, including litigation involving disputed elections.  Ms. Amunson is frequently recognized for her extensive knowledge of election law and often speaks at conferences regarding issues in redistricting and voting rights.  She was recently featured in a video lecture series for state court judges on "Redistricting Litigation: What Every Judge Needs to Know."

**Mr. Chad Dunn**

Mr. Dunn has handled scores of litigation matters under federal and state law.  He has represented private parties in federal or state voting rights litigation in Texas and Washington,

D.C since 2002.  He has handled or is currently handling redistricting cases throughout Texas relative to commissioner's court, school boards, justices of the peace, and constables.  He has handled federal cases relative to candidate qualifications.  He is currently handling a federal case challenging voter registration restrictions adopted by the State of Texas as well as federal challenges to the state's photo voter I.D. law (SB 14).  He has argued numerous cases at the Fifth Circuit, including numerous cases that have resulted in reported opinions.  He has been counsel of record for parties to several U.S. Supreme Court cases as well as most Texas courts of appeal, including the Texas Supreme Court.  He has tried countless matters before a court of a single judge or three judges.  He has tried approximately twenty jury trials as first chair; his trial experience includes federal and state criminal matters.

### a. The Davis Intervenors' Hourly Rates

| ATTORNEY | RATE |
|---|---|
| Paul M. Smith (2011) | $875.00 |
| Paul M. Smith (2012) | $950.00 |
| Paul M. Smith (2103) | $985.00 |
| J. Gerald Hebert | $650.00 |
| Jessica Ring Amunson (2011) | $555.00 |
| Jessica Ring Amunson (2012) | $575.00 |
| Jessica Ring Amunson (2013) | $625.00 |
| Caroline Lopez (2011) | $435.00 |
| Caroline Lopez (2012) | $490.00 |
| Neal Ubriani (2012) | $340.00 |
| Neal Ubriani (2013) | $355.00 |
| Mark Gaber (2013) | $470.00 |
| Chad Dunn | $365.00 |

| NON-ATTORNEY STAFF | RATE |
|---|---|
| Cheryl L. Olson (2011) | $280.00 |
| Cheryl L. Olson (2012) | $295.00 |
| Cheryl L. Olson (2013) | $310.00 |
| Sam Harper | $150.00 |
| Matt Angle | $150.00 |

Lisa Turner                                     $150.00

**b.      The Davis Intervenors' Fee Award Should Equal $432,062.72**

Multiplying the time worked by each attorney by the hourly rates for each year yields the

following calculation:

| ATTORNEYS | HRS | RATE | TOTAL |
|---|---|---|---|
| J. Gerald Hebert | 366.10 | $650.00 | $237,965.00 |
| Paul M. Smith (2011) | 0.50 | $875.00 | $437.50 |
| Paul M. Smith (2012) | 3.75 | $950.00 | $3,562.50 |
| Paul M. Smith (2013) | 3.75 | $985.00 | $3,693.75 |
| Jessica Amunson (2011) | 5.75 | $555.00 | $3,191.25 |
| Jessica Amunson (2012) | 19.25 | $575.00 | $11,068.75 |
| Jessica Amunson (2013) | 9.25 | $625.00 | $5,781.25 |
| Caroline Lopez (2011) | 36.75 | $435.00 | $15,986.25 |
| Caroline Lopez (2012) | 63.25 | $490.00 | $30,992.50 |
| Neal Ubriani (2012) | 55.25 | $340.00 | $18,785.00 |
| Neal Ubriani (2013) | 14.00 | $355.00 | $4,970.00 |
| Mark Gaber (2013) | 33.50 | $470.00 | $15,745.00 |
| Chad Dunn | 142.10 | $365.00 | $51,866.50 |

| NON-ATTORNEY STAFF | HRS | RATE | TOTAL |
|---|---|---|---|
| Cheryl L. Olson (2011) | 1.75 | $280.00 | $490.00 |
| Cheryl L. Olson (2012) | 16.00 | $295.00 | $4,720.00 |
| Cheryl L. Olson (2013) | 8.25 | $310.00 | $2,557.50 |
| Sam Harper/Matt Angle/Lisa Turner[13] | 135.00 | $150.00 | $20,250.00 |

ALL FEES SUBTOTAL:          $432,062.75

---

[13] Because the rate is the same for each of these three AngleStrategies staff, their hours are combined for purposes of the calculation in this Motion.  The individual entries in the attached time sheet, however, indicate which staff member worked on the specific time entry. *See* Ex. M (Angle Decl.) at attached Time Sheet.

### C.    The Davis Intervenors are Entitled to the Requested Expenses and Costs

With regard to expenses and costs, the invoices attached to the Hebert and Smith Declarations detail the out-of-pocket expenses incurred.   These expenses were necessarily incurred and are the type of out-of-pocket expenses normally billed to fee-paying clients.   As such, they are recoverable as part of the Davis Intervenors' attorneys' fees.   *See West Virginia Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 87 n.3 (1991).   Additional documentation of these expenses and costs is attached to the Hebert and Dunn Declarations.   These "costs" are recoverable as defined by 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d), as well as other disbursements that were billed to and paid by the Davis Intervenors as a component of attorneys' fees.   *See* Ex. A (Hebert Declaration) ¶ 14; Ex. E (Dunn Declaration) ¶ 14.

It is also appropriate to require Texas to reimburse the Davis Intervenors' attorneys for reasonable costs.   An award of reasonable attorneys' fees pursuant to 42 U.S.C. §1988, for example, includes an award of "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client."   *Neufeld v. Searle Labs.*, 884 F.2d 335, 342 (8th Cir. 1989) (citing *Laffey v. Nw. Airlines, Inc*., 746 F.2d 4,30 (D.C. Cir. 1984), *overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc)); *see also Rendon v. AT&T Techs.*, 883 F.2d 388, 399 (5th Cir. 1989) (timely request for fees and expenses is appropriate).   Here, the Davis Intervenors' counsel have included in the supporting affidavits a detailed accounting requesting compensation for such out of pocket expenses as travel, exhibit preparation, copies, postage, deposition costs, printing costs, and the like.   These are the sorts of expenses generally charged to a fee paying client and should be reimbursed fully.

The Davis Intervenors seek reimbursement for the following costs (detailed in the attached Declarations:  Chad Dunn: $7,818.47, *see* Ex. G (Dunn Time Sheets) at 11-12; Gerry Hebert: $9,331.79, *see* Ex. B (Hebert Time & Expense Report); AngleStrategies: $5,467.35, *see* Ex. M (Angle Time Sheet).  The total out-of-pocket expenses requested is $22,617.61.

### D. Expert Fees

The fee shifting provision authorizing an award of attorneys' fees in this case specifically authorizes the award of fees for expert costs. 42 U.S.C. § 1973*l*(e) ("In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs.").

Here, the Davis Intervenors hired only one expert witness (Dr. Allan Lichtman), who prepared a report, which was received into evidence at trial.  Dr. Lichtman's report at trial addressed specifically the issue of racially discriminatory purpose and effect of the state's enacted 2011 senate plan.  That report and testimony was important in establishing that the State's senate plan should not receive preclearance.  Texas cannot be heard to argue that an expert witness was not needed; after all, Texas also employed an expert witness (Dr. John Alford) who prepared a report in this case and testified at trial.

The Davis Intervenors seek reimbursement in the amount of $12,000 for expert fees.  *See* Ex. M (Angle Decl.) at attached Time Sheet.

Adding the attorneys' fees, costs, and expert fees, the Davis Intervenors request a total compensation of $466,680.36.  The fees and expenses are substantiated by the Declarations of counsel and other documentary exhibits attached to this motion.

37

## CONCLUSION

The Davis Intervenors are the prevailing parties in this litigation and as such are entitled to their attorneys' fees and costs.  The attorneys' fees sought here are reasonable and not excessive.  They are consistent with those rates normally charged by the Davis Intervenors' attorneys to their fee-paying clients for the type of work in question, and they are within the prevailing market rate charged by attorneys of comparable experience and expertise.  Likewise, the expenses and costs sought here are due to be recovered as they were necessarily incurred during the course of the lawsuit as out-of-pocket expenses, and are of the same type as those ordinarily charged to clients by counsel.

Accordingly, for the reasons set forth above, this Court should award the Davis Intervenors the attorneys' fees, litigation expenses, and costs as requested.

Respectfully submitted,

/s/ J. Gerald Hebert
J. GERALD HEBERT
191 Somervelle Street, #405
Alexandria, VA 22304
Tel. (703) 628-4673

PAUL M. SMITH
JESSICA RING AMUNSON
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001-4412
Tel (202) 639-6023
Fax (202) 661-4993

CHAD DUNN
BRAZIL AND DUNN
D.C. Bar No. 987454
Texas Bar No. 24036507
BRAZIL & DUNN LLP
4201 Cypress Creek Pkwy., Suite 530

Houston, Texas 77068
Telephone: (281) 580-6310
Facsimile: (281) 580-6362
chad@brazilanddunn.com

*Attorneys for Davis Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of December, 2013, I served a copy of the foregoing Davis Intervenors' Motion for Attorneys' Fees, Expenses and Costs, attached Exhibits A through P on counsel who are registered to receive NEFs through the CM/ECF system. All attorneys who have not yet registered to receive NEFs have been served via first-class mail, postage prepaid.

/s/ J. Gerald Hebert
J. GERALD HEBERT

## <u>EXHIBITS TO DAVIS INTERVENORS' MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES</u>

EXHIBIT A—Declaration of J. GERALD HEBERT

EXHIBIT B—HEBERT Time and Expense Records

EXHIBIT C—Listing of Voting/Election Cases Handled by HEBERT

EXHIBIT D—Declaration of PAUL M. SMITH

EXHIBIT E—Declaration of CHAD DUNN

EXHIBIT F—Curriculum Vitae of CHAD DUNN

EXHIBIT G—BRAZIL and DUNN Time and Expense Records

EXHIBIT H—Declaration of BRUCE V. SPIVA

EXHIBIT I—Declaration of BRENDA WRIGHT

EXHIBIT J—Declaration of STEPHEN B. PERSHING

EXHIBIT K—Updated Laffey Matrix on Attorneys' Fees

EXHIBIT L—Federal Judicial Center, Case Weighting Study

EXHIBIT M—Declaration of MATT ANGLE

EXHIBIT N—W.D. Texas March 19, 2012 Order

EXHIBIT O—June 26, 2013 Paul Clement Letter to Supreme Court

EXHIBIT P—W.D. Texas Feb. 28, 2012 Order