IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS,<br>　　　*Plaintiff*,<br><br>v.<br><br>UNITED STATES OF AMERICA, and<br>ERIC H. HOLDER, in his official<br>capacity as Attorney General of the<br>United States,<br>　　　*Defendants*, and<br><br>WENDY DAVIS, et al.,<br>　　　*Defendant-Intervenors*. | Civil Action No. 11-1303 (RMC) |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S EMERGENCY MOTION FOR STAY PENDING APPEAL**

On June 18, 2014, this Court did something that — as far as the parties' collective research reveals — is unprecedented in any court in the country. It ordered the State to pay more than $1 million in attorneys' fees, even though the Supreme Court held that the entire statutory scheme for forcing the State to participate in this lawsuit is unconstitutional. The one-judge district court reached that remarkable result by dismissing the Supreme Court's constitutional holding as merely a "subsequent decision in a different lawsuit." Opinion (Ex. A) at 1.

Then, compounding its error, the district court ordered the State to make "all disbursements" related to the attorney-fee award by July 2, 2014. Order (Ex. B) at 2. Forcing the State to spend its resources — even if only to post a supersedeas bond for the time it takes to reverse the district court's order — would impose irreparable injuries on Texas and would further aggravate the severe federalism

costs that necessitated striking down the preclearance regime in the first place. The State is likely to succeed on the merits because Texas cannot be forced to pay attorneys' fees after successfully vindicating its sovereign right to pass laws without the federal government's permission. And both the public interest and the balance of harms warrant a stay of the district court's disbursement order pending appeal. The State respectfully requests that this Court intervene by the close of business on Friday, June 27, 2014.*

## BACKGROUND

When Texas enacted districting plans for Congress and the Texas Legislature following the 2010 census, the State was subject to the preclearance provisions of Section 5 of the Voting Rights Act. On July 19, 2011, Texas filed suit in the U.S. District Court for the District of Columbia seeking preclearance of the plans adopted by the Legislature in 2011. A three-judge district court conducted a two-week trial and denied preclearance of the plans. *Texas v. United States*, 887 F. Supp. 2d 113 (D.D.C. 2012). Texas appealed to the Supreme Court. While the appeal was pending, the Supreme Court issued its decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), holding unconstitutional the application of the preclearance provisions to States, like Texas, that had been covered jurisdictions under Section 4(b) of the Voting Rights Act. Also while Texas's appeal was pending,

---

* In the absence of a stay of the district court's fee order, the State must pick a surety and serve the appellees with the name and address of the surety by June 30, 2014. *See* D.D.C. LCvR 65.1.1. Given the shortness of that timeframe, and in light of the magnitude and irreparability of the harms associated with forcing the State of Texas to post a bond to fight yet another round against an unconstitutional statute, the State today will file materially identical emergency-stay applications in the district court, the D.C. Circuit, and the chambers of the Chief Justice of the United States.

2

the Texas Legislature considered new districting plans. The day after *Shelby County* declared that requiring preclearance violated the equal-sovereignty rights of the covered jurisdictions, Texas Governor Rick Perry signed the legislation implementing the 2013 districting plans. The following day, the Supreme Court vacated the district court's judgment denying preclearance to the 2011 plans and remanded the case to the district court. *Texas v. United States*, 133 S. Ct. 2885 (2013) (mem.).

Texas moved to dismiss its claims as moot in light of *Shelby County*, and the three-judge district court dismissed the case. The district court found that "*Shelby County* dismantled the legal framework that called for preclearance of Texas's redistricting plans in the first place. That alone rendered Texas's claim for declaratory relief moot." Memorandum and Order (Ex. C) at 4.

Presumably recognizing that they had no basis for claiming prevailing-party status after losing their claims under an unconstitutional statute, some of the intervenors did not seek attorneys' fees. But others did, and the district court awarded them — notwithstanding *Shelby County*'s holding that Texas should not have been forced to participate in this lawsuit in the first place.

**ARGUMENT**

**I.    THE STATE WILL BE IRREPARABLY HARMED WITHOUT A STAY**

This Court's attorney-fee order will impose irreparable harm on the State of Texas. In the absence of a stay, the State will have to choose between either (a) paying $1.1 million in attorneys' fees for a suit that the State never should have

3

been forced to participate in, or (b) posting a supersedeas bond under Federal Rule of Civil Procedure 62(d). That choice exacerbates the unconstitutional burdens that the Supreme Court identified and invalidated in *Shelby County*.

  **A.** In *Shelby County*, the Court held that the preclearance burdens of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, are unconstitutional. The Court reached that result because Section 5 constitutes a "sharp[]" and "drastic departure from basic principles of federalism" — including "the principle that all States enjoy equal sovereignty." 133 S. Ct. at 2618, 2623; *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193, 202, 203 (2009) (Section 5 "imposes substantial federalism costs" and "differentiates between the States, despite our historic tradition that all the States enjoy equal sovereignty."). "[O]ur Nation 'was and is a union of States, equal in power, dignity and authority,'" and "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized.'" *Shelby Cty.*, 133 S. Ct. at 2623 (quoting *Coyle v. Smith*, 221 U.S. 559, 567 (1911)). Under Section 5, however, the nine covered States (including Texas) were anything but equal. The statute forced covered jurisdictions to come to Washington, D.C. and — at great expense to the state fisc — "beseech the Federal Government for permission to implement laws that they would otherwise have the right to enact and execute on their own." *Id.* at 2624. Worse, the Voting Rights Act discriminated between covered and uncovered States "based on decades-old data and eradicated practices." *Shelby Cty.*, 133 S. Ct. at 2627. The discrimination effectuated by Section 5 and against covered

jurisdictions like Texas was so pernicious and unwarranted that the Supreme Court had "no choice" but to exercise its "'gravest and most delicate duty'" and to strike down the statutory scheme as unconstitutional.  *Id*. at 2631 (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring)).

As the three-judge district court previously recognized, Texas was a plaintiff in this preclearance action for one reason and one reason alone:  an unconstitutional statute forced the State to come here, hat in hand, and beg for federal permission to exercise Texas's sovereign lawmaking powers.  *See* Ex. C at 4.  And when *Shelby County* struck down the basis for forcing Texas to come here, the three-judge district court dismissed the suit and allowed Texas to return home and effectuate its own voting laws just like every other State in the Nation is entitled to do.  *See id*. ("The decision in *Shelby County* dismantled the legal framework that called for preclearance of Texas's redistricting plans in the first place.  That alone rendered Texas's claim for declaratory relief moot.").

**B.**   Absent a stay, this Court's one-judge attorney-fee order would redo the unconstitutional discrimination that *Shelby County* condemned.  In every court where Texas is constitutionally amenable to suit, the State is entitled to appeal without posting a supersedeas bond.  *See* TEX. CIV. PRAC. & REM. CODE § 6.001(a), (b)(1) (State can appeal without bond in Texas state court); *In re Long*, 984 S.W.2d 623, 626 (Tex. 1999) (per curiam) (same); TEX. ATTY. GEN. OP. DM-459, 1997 WL 770719 (same); FED. R. CIV. P. 62(f) (State can appeal without bond in federal courts in Texas); *cf. Umbrella Bank, FSB v. Jamison*, 341 B.R. 835, 842-43 (W.D. Tex.

5

2006) (even non-State entities may appeal without bond under Rule 62(f) in federal courts in Texas). Moreover, the Fifth Circuit shows special solicitude for States within its territorial jurisdiction. *See, e.g., Castillo v. Montelepre*, 999 F.2d 931, 941–42 (5th Cir. 1993) (even where judgment is not a lien under Rule 62(f), State entities need not post bond). This Court should give Texas the same benefit in this forum because to do otherwise would impose on the State a burden that it shoulders in no constitutionally convened court. *Cf. Federal Prescription Serv., Inc. v. American Pharm. Ass'n*, 636 F.2d 755 (D.C. Cir. 1980) (holding district court had authority to approve an unsecured stay and did not abuse its discretion in doing so).

Forcing the State to post a supersedeas bond would be particularly pernicious because the law of this Circuit allows the District of Columbia to appeal without bond. *See Hoban v. Washington Metro. Area Transit Auth.*, 841 F.2d 1157 (D.C. Cir. 1988) (per curiam). That means that if the District of Columbia had been forced to preclear its laws like Texas was, the former would enjoy greater benefits of sovereignty than would the latter. *See id.* That is precisely the sort of "sharp[]" and "drastic departure from basic principles of federalism" — including "the principle that all States enjoy equal sovereignty" — that prompted the Supreme Court to strike down the Voting Rights Act's preclearance regime in the first place. *Shelby Cty.*, 133 S. Ct. at 2618, 2623. This Court should not redo it under the auspices of a one-judge attorney-fee order.

## II. THE STATE IS LIKELY TO PREVAIL ON THE MERITS

A stay is warranted because Texas is likely to prevail on its appeal from the attorney-fee order. First, *Shelby County* bars any fee award. And second, the one-judge attorney-fee award operates, impermissibly, to alter the final judgment of the three-judge panel.

**A.** *Shelby County* means what it repeatedly says: Section 5's federalism costs are too great to permit the imposition of preclearance burdens on the previously covered jurisdictions. And the Supreme Court's decision precludes *any* continued use of the preclearance regime to infringe upon Texas's sovereignty.

**1.** The Supreme Court's decision in *Shelby County* held unconstitutional the coverage formula by which States, including Texas, had been subjected to the preclearance requirements of Section 5 of the Voting Rights Act. The constitutional determination was based upon the Court's recognition that the extraordinary federalism costs imposed by the "unprecedented nature of [the preclearance] measures," *id.* at 2618, were no longer justified, *id.* at 2627–31.

The rationale behind the decision is unmistakable. The Supreme Court explained at length, as it had several times before, that Section 5 "'imposes substantial federalism costs' and 'differentiates between the States, despite our historic tradition that all the states enjoy equal sovereignty.'" *Id.* at 2621 (quoting *Northwest Austin*, 557 U.S. at 202, 203); *see also Miller v. Johnson*, 515 U.S. 900, 926 (1995) (recognizing that the federal intrusion countenanced by preclearance posed substantial federalism costs). Our constitutional system commands both that

"States retain sovereignty" and that "there is also a 'fundamental principle of *equal* sovereignty' among the States." *Shelby Cty.* 133 S. Ct. at 2623 (quoting *Northwest Austin*, 557 U.S. at 203). The preclearance regime of "[t]he Voting Rights Act sharply departs from these basic principles," *id.* at 2624, in two ways: (1) by "'authoriz[ing] federal intrusion into sensitive areas of state and local policymaking,'" *id.* (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)), and (2) by marking "an 'extraordinary departure from the traditional course of relations between the States and the Federal Government,'" *id.* (quoting *Presley v. Etowah County Comm'n*, 502 U.S. 491, 500–01 (1992)).

The Supreme Court then concluded that continuing to impose the significant burdens of preclearance on the States based upon a coverage formula devised four decades ago was unconstitutional. *Id.* at 2627–31.

**2.** Unconstitutional federal statutes may not continue to operate to the disadvantage of the States or the People. Rather, unconstitutional acts are treated as if they were *never* passed. "[A]n unconstitutional act is not a law; it confers no rights; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby Cty.*, 118 U.S. 425, 442 (1886). As the Supreme Court explained two centuries ago, "the theory of every [constitution-based] government must be [] that an act of the legislature, repugnant to the constitution, is void." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And "if an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it

8

effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory." *Id.* To permit otherwise "would declare[] that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual." *Id.* at 178.

The federal statute purporting to require Texas to file a federal lawsuit and to obtain preclearance was a nullity, and the entire exercise of subjecting the State to preclearance litigation was an unconstitutional imposition. *See Shelby Cty.*, 133 S. Ct. at 2631. To continue to use the unconstitutional preclearance regime to impose additional burdens (such as attorneys' fees) would further violate Texas's right to equal sovereignty.

    **B.**    The three-judge district court dismissed this case after finding that *Shelby County* "alone" rendered all claims moot. Ex. C at 4. The one-judge attorney-fee order, however, is founded upon the belief that Texas's repeal and replacement of the 2011 districting plans also served to moot the case. *See* Ex. A at 6, 13, 16–17, 20. That view does not survive the three-judge district court's dismissal order, and it cannot provide the basis for a fee award.

    **1.**    Following *Shelby County*, the Supreme Court vacated the three-judge district court's judgment denying preclearance. *Texas v. United States*, 133 S. Ct. 2885 (2013) (mem.). On remand, Texas moved to dismiss its claims as moot on one ground: because "Texas is no longer subject to preclearance." Plaintiff's Motion to Dismiss, at 1; *see also* Ex. A at 6 ("Texas moved to dismiss this lawsuit as moot in

9

light of *Shelby County*."); United States' Response to Texas's Motion to Dismiss, at 3 ("The State has moved to voluntarily dismiss all claims asserted in its Original Complaint on the basis that *Shelby County* has rendered those claims moot.") (citation omitted).

The three-judge district court dismissed the claims on that basis, recognizing that "[t]he decision in *Shelby County* dismantled the legal framework that called for preclearance of Texas's redistricting plans in the first place. *That alone rendered Texas's claim for declaratory relief moot*." Ex. C at 4 (emphasis added). The intervenors neither appealed that judgment nor sought reconsideration of the three-judge district court's decision holding that *Shelby County* alone rendered those claims moot.

Perhaps recognizing that *Shelby County* and this Court's dismissal order precluded further imposition upon the State, a number of intervenors sought no attorneys' fees. Three intervenor groups, however, subsequently sought fees for their work in the since-nullified preclearance proceeding. Given (1) *Shelby County*'s confirmation that the imposition of the preclearance regime on Texas posed an unconstitutional burden and (2) this Court's recognition that *Shelby County* alone rendered these proceedings moot, the State submitted its advisory. The advisory stated that "[t]hese proceedings have already imposed significant unconstitutional burdens" and urged that the intervenors should not be permitted to exacerbate those burdens "by seeking payment from the State of Texas for their voluntary participation in a proceeding that never should have been held in the first place,"

Advisory, at 2.  Responding to lengthy, detailed fee requests would require the use of significant state resources that could never be recovered, and it would do so contrary to the Supreme Court's admonition that any imposition of the then-existing preclearance regime created an unconstitutional burden on the States.

The State thus reasonably sought to minimize any additional unconstitutional burdens that this litigation might pose on the State's resources. And it did so relying on the Court's order recognizing the impact that *Shelby County* had on "the legal framework" that previously provided the only support for this Court's jurisdiction in this case.  But the State also made clear that it would provide a response to the intervenors' fee claims if "requested to do so by the Court." Advisory at 3.

**2.** Section 5 of the Voting Rights Act provides that litigation "under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28.  42 U.S.C. § 1973c(a).  A single judge may not conduct "the trial" or "enter judgment on the merits," and "any action of a single judge may be reviewed by the full court at any time before final judgment."  28 U.S.C. § 2284(b)(3).  The statute thus does not permit a single judge to issue a final order resolving all claims.  Here, the three-judge panel issued its final order dismissing as moot Texas's claims on the ground that *Shelby County* "dismantled the legal framework" for preclearance and "[t]hat alone rendered Texas's claim for declaratory relief moot." Ex. C at 4.  Upon the expiration of the time for parties to appeal that judgment, it became final and unreviewable.  Nor, at any time, did a

11

single judge have the authority to alter the panel's final judgment. *See, e.g.*, *Kenny v. United States*, 118 F. Supp. 907, 910 (D.N.J. 1954) (explaining that where a three-judge district court had determined that plaintiffs had a right to maintain an action, the single judge reviewing the request for attorney's fees had no power to reconsider that determination); *cf. Chapman v. Meier*, 420 U.S. 1, 13–14 (1975) (finding jurisdiction over an appeal under 28 U.S.C. § 1253 as a result of the requirement that only a three-judge district court convened under 28 U.S.C. § 2281 could amend the judgment of a similarly convened three-judge district court: "It would be highly anomalous if jurisdiction were not here, for then it would follow that a single judge could invalidate a reapportionment plan that had been evolved or approved, and was required so to be, by a three-judge court some time before.").

The attorney-fee order, however, is founded upon an impermissible modification of the three-judge district court's final judgment. The opinion notes that the issue of attorneys' fees "is an ancillary matter" left to the single judge, Ex. A at 7, but before proceeding to the issue of fees, the opinion erroneously states that "*both Shelby County* and Texas's enactment of new districting plans" mooted Texas's claims, *id.* at 6 (emphasis added). According to the fee award, the Texas statutes (which were signed by the Governor *after* the *Shelby County* decision) mooted Texas's claims. Perhaps the clearest demonstration of the error is in the opinion's suggestion that because the Governor signed the legislation enacting new maps before the Supreme Court vacated this court's preclearance decision, *Shelby County* cannot preclude a fee award. *Id.* at 20. This assertion is based upon a

12

misunderstanding of mootness (which occurred, for all pending preclearance matters, upon the announcement of the *Shelby County* decision) and a misunderstanding of the nullification effect of *Shelby County* (which made clear that continued imposition of any of the burdens of the preclearance regime on Texas violates the Constitution).

And it is only after modifying the mootness determination that the fee award could purport to award fees based upon, for example: (1) an argument that Texas's 2013 districting plans "enshrined into law" this Court's denial of preclearance to the 2011 plans, *id.* at 13; *id.* at 14 (Intervenors argue that they "achieved the relief they sought because Texas discarded the challenged Plans and adopted different redistricting plans."), (2) the suggestion that even after *Shelby County* was decided, the intervenors retained prevailing-party status at the time the 2013 plans went into effect, *id.* at 16, and (3) the belief that *Shelby County* could not erase "the real-world vindication that Fee Applicants had achieved," *id.* at 17. The fee award impermissibly continues to give effect to a preclearance regime that was wiped out for the very reason that its existence violated Texas's constitutional guarantee of equal sovereignty.

Texas was also prejudiced by the untimely nature of the change in the basis for the mootness ruling. First, had the three-judge district court held that both grounds mooted the litigation, the State would have been afforded the opportunity to seek reconsideration of that erroneous ruling, and the State would have urged the Court to dismiss, as it had in its motion, solely on the basis of *Shelby County*.

13

*See* Ex. A at 6 ("Texas moved to dismiss this lawsuit as moot in light of *Shelby County*."). Because this dual-ground mootness ruling arose in the first instance in the fee award, the State was deprived of the opportunity to seek reconsideration from the three-judge panel. And even if the reconsideration motion had been denied, Texas would have been on notice that the Court had left open the possibility of awarding attorney's fees on an alternative theory of mootness. Second, by relying (correctly) on *Shelby County* "alone," the Court's dismissal invited the State to respond to the fee requests based on *Shelby County* alone. Yet after the State did exactly that, a single judge determined that mootness was based on a different ground and relied on the new ground to provide the basis for a fee award. That about-face imposes extreme prejudice on the State and furthers the unconstitutional, and irreparable, burdens that this preclearance litigation has imposed.

**C.** The one-judge district court's only responses to the foregoing were (1) to dismiss *Shelby County* as a "subsequent decision in a different lawsuit," Ex. A at 1, and (2) to claim that Texas somehow "waived" its response to the intervenors' fee applications, *id.* at 2. Whatever else might be said about the district court's treatment of Texas's arguments, the State certainly did not waive the argument that the intervenors cannot receive prevailing-party fees for brining and losing claims under a statutory scheme that *Shelby County* invalidated. Indeed, for all of its discussion of "waiver," even the one-judge district court's opinion acknowledges that "Texas rests entirely on *Shelby County*." *Id.* at 14; *see also, e.g., id.* (accusing

14

Texas of "fixating on *Shelby County*"); *id.* at 6 (noting "Texas moved to dismiss this lawsuit as moot in light of *Shelby County*"); *id.* ("Texas filed a three-page 'Advisory' that begins and ends with *Shelby County*."). It is precisely because the district court's attorney-fee order ignores *Shelby County* that the State will prevail on appeal and that a stay is warranted.

### III. THE PUBLIC INTEREST NECESSITATES A STAY

A stay also would serve the public interest. It is a foundational tenet of Article III that lower courts must faithfully follow the Supreme Court's decisions and instructions. As the Supreme Court put it thirty years ago, "unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam); *accord Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) (per curiam) ("Needless to say, only this Court may overrule one of its precedents. Until that occurs, [Supreme Court precedent] is the law, and the decision below cannot be reconciled with it.").

Regardless of what this Court thinks about Texas's district maps, the constitutionality of the Voting Rights Act, or the wisdom of *Shelby County*, it cannot be gainsaid that *Shelby County* is the law and preclearance under Section 5 is not. The State of Texas should not have been forced to spend thousands of dollars, waste thousands of attorney hours, and travel thousands of miles to come to Washington, D.C. and "beseech the Federal Government for permission to implement laws that

15

[Texas] would otherwise have the right to enact and execute on [its] own." *Shelby Cty.*, 133 S. Ct. at 2624. And after *the State successfully vindicated* its coequal, sovereign right not to submit to this Court's jurisdiction, it should go without saying that this Court cannot afford prevailing-party fees to the attorneys that infringed the State's sovereignty and lost this suit in the process. Any other result would disregard the Supreme Court's authoritative decision, *see* Ex. A at 1 (dismissing *Shelby County* as merely a "subsequent decision in a different lawsuit"), and would expose the federal judicial system to the kind of "anarchy" that the Supreme Court previously has met with summary reversals, *Davis*, 454 U.S. at 375.

## IV. THE BALANCE OF HARMS NECESSITATES A STAY

The harm to Texas that the denial of a stay would cause is significant. *See supra* Part I. The harm that the intervenors would face by the grant of a stay is non-existent. In the unlikely event that the intervenors successfully defend the attorney-fee order on appeal, they will be fully compensated by post-judgment interest. *See* 28 U.S.C. § 1961 ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."). Because the intervenors' interests will be protected during Texas's appeal of the attorney-fee order, the balance of harms clearly favors a stay of the judgment pending that appeal.

## CONCLUSION

The district court's attorney-fee order should be stayed pending appeal without requiring the State to post a supersedeas bond.

Respectfully submitted.

/s/ Jonathan F. Mitchell

| | |
|---|---|
| GREG ABBOTT<br>Attorney General of Texas | JONATHAN F. MITCHELL<br>Solicitor General |
| DANIEL T. HODGE<br>First Assistant Attorney General | MATTHEW H. FREDERICK<br>Assistant Solicitor General |
| DAVID C. MATTAX<br>Deputy Attorney General<br>  for Defense Litigation | OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1700 |
| JAMES D. BLACKLOCK<br>Deputy Attorney General<br>  for Legal Counsel | Fax: (512) 474-2697<br>*Jonathan.Mitchell@*<br>  *texasattorneygeneral.gov* |
| J. REED CLAY, JR.<br>Special Assistant and Senior Counsel<br>  to the Attorney General | |

COUNSEL FOR THE STATE OF TEXAS