# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA, and JEFFERSON SESSIONS, in his official capacity as Attorney General of the United States, | ) ) ) ) ) ) | Civil Action No. 11-1303 (RMC) |
| Defendants, and | ) ) ) | |
| WENDY DAVIS, *et al.*, | ) ) | |
| Defendant-Intervenors. | ) ) | |

## MEMORANDUM OPINION

This motion for appellate attorney's fees comes at the end of long and complex litigation under the Voting Rights Act. As Texas appealed the decision of a three-judge court in the United States District Court for the District of Columbia that certain of its 2011 redistricting plans could not be approved, the Supreme Court decided that the provision of the Voting Rights Act requiring Texas to obtain such approval was unconstitutional. Nonetheless, to the State's consternation, this Court granted attorney's fees as "prevailing parties" to Intervenor-Defendants who had challenged the new Texas district maps. Defendant-Intervenors now seek attorney's fees for their successful defense of the first fee award on appeal. The Court will grant in part and deny in part their motion.

## I.  BACKGROUND

After the 2010 Census, the State of Texas enacted redistricting plans for the Texas House of Representatives, the Texas Senate, and the United States House of Representatives to reflect its growing population and new congressional seats.  At that time, Texas was covered by Section 5 of the Voting Rights Act of 1965, 52 U.S.C. § 10304(a), which required covered jurisdictions seeking to change any voting procedure to obtain either administrative preclearance from the Attorney General or judicial preclearance from a three-judge court in the United States District Court for the District of Columbia.  52 U.S.C. § 10304(a).  The purpose of preclearance was to ensure that a proposed change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color," 52 U.S.C. § 10304(a), or language minority, *id*. § 10303.

The State of Texas sought a declaratory judgment that its proposed redistricting plans had neither the purpose nor the effect of denying or abridging the right to vote on account of race, color or language minority.  The Federal Government opposed preclearance of the redistricting maps for the U.S. House of Representatives and for the Texas State House of Representatives but not the redistricting map for the Texas State Senate.  Seven parties were granted Defendant-Intervenor status, each of whom challenged aspects of all three maps as individual voters, elected State senators or representatives, or civil rights advocacy groups.

After a two-week bench trial, the three-judge court determined that Texas had acted with discriminatory purpose or effect and denied preclearance to all three redistricting plans, in whole or in part.  *See Texas v. United States*, 887 F. Supp. 2d 133, 138-39 (D.D.C. 2012).  Texas immediately filed a petition for *certiorari* to the Supreme Court, which was opposed by the Federal Government and Defendant-Intervenors.  Before the Supreme Court

addressed the three-judge court opinion in *Texas v. United States*, the Court invalidated Section 4 of the Voting Rights Act, which required Texas, among other political bodies, to submit to preclearance. *See Shelby County v. Holder*, 133 S. Ct 2612 (2013). The Supreme Court then vacated and remanded the decision in *Texas v. United States* to the three-judge district court panel to decide whether the case was moot. Texas moved to dismiss all claims as moot in light of *Shelby County*. The three-judge court agreed that the case was mooted both by *Shelby County* and by the State's adoption of superseding redistricting plans, and so it was dismissed. *See* Mem. and Order [Dkt. 255].

The three-judge court then dissolved. *See* Order [Dkt. 263]. The case was returned to the undersigned, who had served on the three-judge court and to whom the case was originally assigned by random draw.

Three of the Defendant-Intervenors (hereinafter "Intervenors") thereupon sought reimbursement for costs and legal fees incurred in the litigation before the District Court. *See* Davis Mot. [Dkt. 256], Gonzales Mot. [Dkt. 257], NAACP Mot. [Dkt. 258]. The Davis Intervenors are Texas State senators and representatives from voting districts in the Fort Worth area. The Gonzales Intervenors are a group of Hispanic and Black Texas voters. The Texas State Conference of NAACP Branches is a civil rights advocacy group concerned with minority voting rights in Texas.

Texas opposed in an Advisory, arguing that Intervenors were not prevailing parties for purposes of attorney's fees. *See* Advisory [Dkt. 259]. On June 18, 2014, this Court granted Intervenors' motion for attorney's fees, after finding that they were prevailing parties and that the Texas Advisory had waived most of the state's rights to argue otherwise about fee entitlement or amount. The D.C. Circuit affirmed. *See Texas v. United States*, 49 F. Supp. 3d 27

(D.D.C. 2014), *aff'd*, 798 F.3d 1108 (D.C. Cir. 2015). When Texas appealed the D.C. Circuit decision on fees, the Supreme Court denied *certiorari*. *Texas v. Davis*, 136 S. Ct. 981 (2016). Intervenors subsequently filed the instant motion for attorney's fees in the Circuit to recover fees and costs incurred in defending the fee award before both the Circuit and the Supreme Court. The D.C. Circuit remanded the motion because "[t]he motions and accompanying responses raise fact questions about the appropriate rates and hours for appellate work done by intervenors' counsel" that are best determined by the district court. D.C. Cir. Order 3/17/2015 [Dkt. 273]. The matter returned to the undersigned Judge.

## II. LEGAL STANDARDS

Once a party has established that it is entitled to attorney's fees, a court must determine whether the fees sought are reasonable. In doing so, courts traditionally apply a three-part analysis: "(1) determination of the number of hours reasonably exp[e]nded in litigation; (2) determination of a reasonable hourly rate or 'lodestar';[1] and (3) the use of multipliers as merited." *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1517 (D.C. Cir. 1988) (citing *Blum v. Stenson*, 465 U.S. 886 (1984)). To determine a reasonable hourly rate, courts consider three elements: "(1) the attorney's billing practices, (2) the attorney's skill, experience, and reputation and (3) the prevailing market rates in the relevant community." *Reed v. District of Columbia*, 843 F.3d 517, 521 (D.C. Cir. 2016) (internal quotation marks and citation omitted).

---

[1] The "lodestar" method, established by the Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983), is determined by multiplying "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984). It is the approach followed by most federal courts in fee award disputes. *See Gisbrecht v. Barnhart,* 535 U.S. 789, 802 (2002).

4

Parties seeking fee awards must offer evidence, in addition to the attorney's own affidavit, to demonstrate that the fees requested "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Covington v. District of Columbia*, 57 F.3d 1101, 1108 (D.C. Cir. 1995) (quoting *Blum*, 465 U.S. at 896 n. 11). Fee applications must "produce data concerning the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation." *Id*.

In determining the reasonable number of hours expended by attorneys, there must be a "good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

### III. ANALYSIS

Intervenors rely on the explicit provision in the Voting Rights Act awarding attorney's fees to prevailing parties who challenge a voting plan or procedure. *See* 42 U.S.C. § 1988(b). There is no longer any question but that Intervenors are prevailing parties and are entitled to an award of reasonable attorney's fees for their work before the D.C. Circuit and the Supreme Court; that question was definitively settled by the D.C. Circuit in *Texas v. United States*, 798 F.3d 1108 (D.C. Cir. 2015) (affirming the district court's grant of attorney's fees), and the Supreme Court's refusal to hear the Texas petition for *certiorari*. *Texas v. Davis*, 136 S. Ct. 981 (2016).[2] Texas challenges the hourly rates billed for certain counsel for the Davis

---

[2] To clarify for the reader, the Court mentions Intervenors' status as prevailing parties only because the parties' briefs on fees were submitted to the D.C. Circuit prior to the petition for *certiorari* filed by Texas and its denial by the Supreme Court, which resolved the issue. At the time its brief was filed, Texas still hoped for success and argued that Intervenors were not entitled to fees, despite the D.C. Circuit decision to the contrary. Opp'n to Mot. For Attorney Fees [Dkt. 281] at 2-3. On remand, the Court invited further briefing but no party thought it necessary. *See* Court's Minute Order 3/22/2016.

Intervenors on both the appeal to the D.C. Circuit and their opposition to *certiorari*; and the hourly rates for certain counsel for the Gonzales Intervenors for work on the appeal to the D.C. Circuit. Texas "does not object to the requested hourly rates of the individuals representing the NAACP Appellees." Opp'n to Mot. for Attorney Fees [Dkt. 281] at 12; *see also* Opp'n to Supp. Mot. for Attorney's Fees [Dkt. 284] at 1.

In summary, Texas argues that the hourly rates for all counsel and support staff for the Davis and Gonzales Intervenors should be limited to the *Laffey* Matrix[3] for fees used by the District of Columbia Office of the U.S. Attorney (USAO). In addition, Texas challenges the number of hours billed for certain work by the Gonzales Intervenors.

All Intervenors contend that Texas waived any argument that the USAO *Laffey* Matrix should be used by failing to raise the objection during the litigation over trial fees. In general, under the law-of-the-case-doctrine, "a court involved in later phases of a lawsuit should not re-open questions decided . . . by that court or a higher one in earlier phases." *Crocker v. Peidmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995). This principle does not apply in the current circumstances, in which the fee dispute involves appellate litigation, for which no previous award has been made. *See Murchison v. Inter-City Mortg. Corp. Profit Sharing & Pension Plans*, 503 F. Supp. 2d 184, 191 (D.D.C. 2007) (order regarding trial fees not law-of-the-case for post-trial litigation); *see also Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 63-64 (D.C. Cir. 2015) (fees in settlement order not law-of-the-case for fees for later stage of litigation).

### A. Hourly Rates for the Davis and Gonzales Intervenors

---

[3] The *Laffey* Matrix is an attorney's fee matrix developed in *Laffey v. Nw. Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983). It is discussed in greater detail below.

In determining the prevailing market rate, fee applicants may submit their own survey of prevailing market rates or attorney's fee matrices, which "provide a useful starting point" in calculating the prevailing market rate. *Covington*, 57 F.3d at 1109. The *Laffey* Matrix is the most commonly used fee matrix in determining fees for complex federal litigation in the D.C. Circuit. It was developed to reflect prevailing rates for work done in 1981-1982 in *Laffey v. Nw. Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds,* 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds*, *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (1988). The *Laffey* Matrix has since been updated several times, leading to competing matrices, two of which are relevant to this case.

The first *Laffey* Matrix, known as the USAO *Laffey* Matrix, is maintained and updated by the United States Attorney's Office for the District of Columbia. *See* USAO *Laffey* Matrix 2015-2017, *available at* https://www.justice.gov/usao-dc/file/889176/download. The USAO *Laffey* Matrix adjusts the original 1980s rates to account for inflation by using the Consumer Price Index for All Urban Consumers (CPI-U) of the United States Bureau of Labor Statistics. The CPI-U measures prices across several commodities in a specific geographic area, in this case, the Washington D.C. Metropolitan Area. The second *Laffey* Matrix, known as the LSI *Laffey* Matrix, relies on the Legal Services Index of the Bureau of Labor Statistics, which provides national legal rates adjusted for inflation, rather than local and generalized cost data. *See* LSI *Laffey* Matrix, *available at* http://www.laffeymatrix.com/see.html.

Intervenors ask for fees that reflect their billing rates to private clients while Texas argues that the USAO Matrix should govern. In response, Intervenors insist that if a *Laffey* Matrix is to be applied, the more generous LSI Matrix — based on legal rates on a

7

national basis, not general commodities in the local area (including much more than legal rates) — is more appropriate.

Both Matrices have been approved in this District and the selection of one over the other depends on whether fee applicants have shown that their preferred Matrix reflects prevailing rates for comparable work. In *Eley v. District of Columbia*, 793 F.3d 97 (D.C. Cir. 2015), the D.C. Circuit vacated and remanded an award of attorney's fees under the LSI Matrix for litigation under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*, because the fee applicants had failed to produce evidence that the LSI Matrix rates were in line with prevailing rates for other IDEA litigation. *Id*. at 104-05. On remand, the District Court found that "'there is a submarket in which attorneys' hourly fees are generally lower than the rates in either of the *Laffey* Matrices.'" *Eley v. District of Columbia*, No. 11-cv-309 (BAH), 2016 WL 4435187, at *8 (D.D.C. Aug. 22, 2016) (quoting *Salazar*, 809 F.3d at 64). Nonetheless that court awarded fees under the USAO Matrix because it found that IDEA litigation is complex federal litigation.[4] *Id*. Using reasoning similar to that in *Eley*, *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 47-48 (D.D.C. 2011), relied on the USAO Matrix for a fee award to small law firms conducting complex federal litigation because, it concluded, the LSI Matrix is based on rates for the District of Columbia's largest law firms and should not be used for smaller firms that generally charge at lower rates.

In *Salazar*, the D.C. Circuit affirmed an award of attorney fees under the LSI Matrix following litigation of a class action on behalf of Medicaid claimants under 42 U.S.C. §

---

[4] Courts in this District have different opinions on whether IDEA litigation is sufficiently complex to warrant the use of a *Laffey* matrix. *Compare McAllister v. District of Columbia*, 21 F. Supp. 3d 94, 108-10 (D.D.C. 2014) (no) and *Merrick v. District of Columbia*, 134 F. Supp. 3d 328, 339 (D.D.C. 2015) (yes).

1983.  *Salazar*, 809 F.3d 58.  The *Salazar* court noted that there was no evidence that the fee applicants were part of a submarket in which attorneys' rates were generally lower, and therefore analyzed prevailing rates for complex federal litigation in Washington, D.C. generally.  *Id*. at 64.  *Salazar* reviewed copious evidence "regarding prevailing market rates for complex federal litigation" including an affidavit of the economist who developed the LSI *Laffey* Matrix explaining why it "is a better measure of the change in prices for legal services in Washington, D.C. than the USAO update to the *Laffey* Matrix."  *Id*.  In addition, *Salazar* cited evidence of "billing rates tables demonstrating the difference between average national law firm rates and the LSI update to the *Laffey* Matrix, as well as the difference between average national law firm rates and the USAO update to the *Laffey* Matrix."  *Id*. at 65.  Based on this evidence, *Salazar* concluded that "[f]or the same experience level in the same time frame, the LSI updated rate was closer to the average national law firm rate."  *Id*.

    Intervenors request hourly rates based on the actual rates they charge private full-paying clients.  While "an attorney's usual billing rate is presumptively the reasonable rate" this is only so when the "rate is in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum*, 465 U.S. at 895 n. 11).  Intervenors have presented affidavits and biographies of their attorneys, time records, and the National Law Journal Billing Survey of 2014.  *See* Exhibits to Mot. for Attorney Fees [Dkt. 280].  This evidence does not satisfactorily establish that the billing rates for all of Intervenors' counsel are the prevailing market rates for similar services in Voting Rights Act litigation for attorneys with comparable skills and reputation.

There is no doubt that the litigation involved in this case was complex federal litigation. Indeed, Texas does not dispute that fact. Before the Supreme Court, Plaintiffs relied on experienced Supreme Court advocates and succeeded in persuading the Court to decline to review Intervenors' fee awards for trial-level work, as to which Texas had conceded much in its Advisory. *See Texas v. Davis*, 136 S. Ct. 981 (denying *certiorari*); *see also Texas v. United States*, 798 F.3d 1108 (affirming denial of fees).

Balancing all of these factors and case precedents, especially the skills and reputations of the attorneys involved, the Court finds that the appropriate prevailing market rate is provided by the LSI *Laffey* Matrix. In fact, Intervenors' proposed rates are generally in line with the LSI Matrix, and therefore the Court finds them to be reasonable, with three exceptions. First, the Davis Intervenors seek a rate of $1,100 (2014) and $1,150 (2015) per hour for the work of Paul Smith, a partner at Jenner & Block who has over 30 years of experience; the LSI Matrix suggests top rates of $789 (2014) and $796 (2015) per hour for attorneys with more than 20 years of experience.[5] Second, the Davis Intervenors seek an hourly rate of $650 in both 2014 and 2015 for J. Gerard Hebert, a nationally renowned subject-matter expert on the Voting Rights Act with over 40 years of experience and who contributed substantially to the litigation, a rate that is less than the LSI Matrix for an attorney with his years of experience. Third, the Davis Intervenors seek $325 (2014) and $355 (2015) per hour for the work of Cheryl L. Olson, a non-attorney at Jenner & Block, while the LSI Matrix rates for a non-attorney are $195 (2014) and $196 (2015) per hour. Accordingly, the Court will award fees to the Davis Intervenors for the

---

[5] The LSI *Laffey* Matrix provides rates for each year running from June 1 to May 31 of the following year, rather than from January to December of the same year. The Court will use the period from June 1, 2014 to May 31, 2015 for the 2014 rates and the period from June 1, 2015 to May 31, 2016 for the 2015 rates.

work of Mr. Paul and Mr. Hebert at the rates under the LSI Matrix for attorneys with over 20 years of experience in each year $789 (2014) and $796 (2015) and for the work of Ms. Olson at the rates under the LSI Matrix for non-attorneys in each year $179 (2014) and $180 (2015).

### B. Hours Billed to the Gonzales Intervenors

In order to satisfy the burden of justifying the number of hours billed, fee applicants must provide supporting documentation "of sufficient detail and probative value to enable a court to determine with a high degree of certainty that such hours were actually and reasonably expended." *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 970 (D.C. Cir. 2004) (citations omitted).  Such documentation can consist of "contemporaneous time records of hours worked and rates claimed, plus a detailed description of the subject matter of the work with supporting documents, if any." *In re Donovan*, 877 F.2d 982, 994 (D.C. Cir. 1989).  The fact that Defendant-Intervenors were prevailing parties for the purposes of this fee application "may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved." *Hensley*, 461 U.S. at 436.  As *Hensley* noted, "[c]ases may be overstaffed, and the skill and experience of lawyers vary widely" and therefore "counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id*. at 434.

The Gonzales Intervenors request attorneys' fees for 96.6 total hours.  Mot. for Attorney Fees at 7.  Texas objects to certain hours billed to the Gonzales Intervenors for three filings.  Opp'n to Mot. for Attorney Fees at 13-14.  First, Texas objects to 7.6 hours in attorney fees for preparing a motion for extension of time that was never filed to respond to the State's motion for summary reversal.  *Id*. at 14-15.  Second, Texas objects to 48.2 attorney hours and 2.1

11

staff hours for work on the Gonzales Intervenors' response to the State's motion for summary reversal. Texas argues that these Intervenors largely adopted the Davis Intervenors' brief and that their attorneys' work was duplicative and unnecessary. *Id*. at 15-16. Third, Texas challenges 30.5 hours billed for work on the Intervenors' joint brief before the D.C. Circuit on the merits. Texas argues that the Davis Intervenors billed 100 hours for the same brief and the attorney hours billed to the Gonzales Intervenors are duplicative and unnecessary. *Id*. at 16-17.

Conscious of the Supreme Court's words that "trial courts need not, and indeed should not, become green-eyeshade accountants," *Fox v. Vice*, 563 U.S. 826, 383 (2011), and bearing in mind that the "essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection," *id.*, the Court finds that the hours billed on behalf of the Gonzales Intervenors in opposing the Texas motion for summary reversal before the D.C. Circuit and attorney work on the joint brief on the merits are reasonable. The question of whether a single judge court had the authority to issue a fee award was not trivial and the hours expended were not unreasonable. Similarly, the Gonzales Intervenors' attorneys' role in drafting portions of the merits brief in the D.C. Circuit is legitimate time spent in this litigation. On the other hand, the Court finds that the 7.6 hours billed for preparing a motion for extension of time that was never filed were unnecessary, did not reasonably add to the litigants' success, and would not have been billed to a private client who carefully checks its fee statements. The attorney fees sought for these hours by the Gonzales Intervenors hours will not be awarded.

## IV. CONCLUSION

For the foregoing reasons, the Court will award fees to the Davis Intervenors for the work of attorneys Paul Smith and J. Gerard Hebert at the rates consistent with the LSI *Laffey* Matrix of $789 (2014) and $796 (2015) per hour. The Court will award fees to the Davis

Intervenors for the work of non-attorney Cheryl L. Olson at a rate consistent for non-attorneys under the LSI *Laffey* Matrix of $179 (2014) and $180 (2015) per hour.  The Court will reduce the fee award to the Gonzales Intervenors by 7.6 hours for work done on a motion for extension of time that was never filed.  The remaining hours and rates requested by Intervenors are reasonable and shall be granted.  A memorializing order accompanies this opinion.


Date: March 30, 2017

                                              /s/
                                   ROSEMARY M. COLLYER
                                   United States District Judge